# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal Case: 3:18-CR-00293-8** |
| vs. | ) | |
| | ) | **JUDGE RICHARDSON** |
| **LUIS COLINDRES** | ) | |
| | ) | |

## DEFENDANT'S MOTION TO EXCLUDE MR. COLINDRES' STATEMENTS

Comes now, Mr. Colindres, by and through counsel, and moves this Honorable Court pursuant to the Right Against Self-Incrimination and Right to Counsel under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution to exclude Mr. Colindres' statements to law enforcement made on February 28, 2018 and May 5, 2018. In support of this motion, Mr. Colindres would show the following:

### I. Factual Background

Luis Colindres was born March 25, 1997 in Honduras. Mr. Colindres briefly served in the Honduran military as a young adult, and then came to the United States. His highest level of education is a high school diploma which he received at Manuel Bonilla High School in Honduras. He grew up only speaking Spanish, which remains his only fluent language. While his English skills have developed somewhat over the course of his pretrial incarceration in this case, back in 2018 they were weak.

On September 29, 2017, Metro Nashville Police Department ("MNPD") Detective Derry Baltimore swore out warrants in the Davidson County, Tennessee General Sessions Court charging

Mr. Colindres with Criminal Homicide for an alleged "double murder" that had allegedly taken place on September 24, 2017. (Ex. A, GS Warrants).

On October 9, 2017 Mr. Colindres was arrested in Christian County, Kentucky and charged with nine offenses: speeding, improper lane usage, failure to produce insurance card, no registration plates, possession of controlled substance (cocaine) 1st degree, tampering with physical evidence, possession of drug paraphernalia, fugitive warrant, and failure to wear seat belts. Mr. Colindres was then incarcerated in Christian County, Kentucky until August 8, 2018, when he was transferred to U.S. Marshals custody in connection with the five-count indictment initiating this federal prosecution against him. (U.S. Middle District Case No. 3:18-cr-200, ECF 1). Mr. Colindres was appointed a Kentucky Department of Public Advocacy lawyer to represent him.

On February 28, 2018, while still in Kentucky state custody, HSI Agent Michael Perez, ATF Special Agents Warren Smith and Reginald Johnson, and MNPD Detective Donald Barr conducted an interrogation lasting over five hours regarding Mr. Colindres's background, his alleged involvement with MS-13, the alleged double homicide that had already been charged in Davidson County, Tennessee, and another alleged homicide. Agent Perez started the interview by beginning to recite the Miranda rights, but then qualified his warning with ". . . before you make your decision about whether or not you're going to talk to us, I have a story that I want to explain to you, so that you understand very well . . . ." Agent Perez then recited the Miranda warnings, and then finished with "I . . . I'm going to tell you this story about why we are here."

The interrogation lasted five and a half hours. At the outset of the interrogation with Mr. Colindres, the three federal agents and MNPD officer communicated the danger that Mr. Colindres was in given his alleged associations with some members of MS-13.[1] Throughout the

---

[1] In the second superseding indictment, as the original case, the government references the existence of an organization, known as La Mara Salvatrucha, also known as "MS-13" (hereinafter "MS-13"), and that this

interrogation the officer made suggestions saying that they could "help" Mr. Colindres if he is willing to supply information regarding MS-13 criminal activities, making references to the danger of MS-13 and how they could "assist" Mr. Colindres and "keep him and his family safe" if he decides to cooperate with their federal investigation. For over five hours, Mr. Colindres did not have any water, food or assistance of counsel while being interrogated. Throughout this interrogation Mr. Colindres denied having participated in any homicides, but he did make statements connecting himself to the participants and location of one of them. Likewise, while Mr. Colindres denied actual membership in MS-13, he did make admission to having been involved in drug and firearm transactions with members of that organization.

On May 5, 2018, a federal agent and MNPD Detective Baltimore met with Mr. Colindres in the Kentucky jail to question him again regarding his involvement with MS-13 and the alleged homicides, including the alleged double murder Baltimore had charged him with in Davidson County. Prior to the interview, the agents had Colindres sit alone in the interview room for over forty minutes, handcuffed and with no food or water. After the second interview finally began, the federal agent and Detective Baltimore made references to MS-13 trouble and made several statements pressuring Mr. Colindres to confess, declaring that this was his last moment to produce any helpful information. Mr. Colindres felt lost and confused while being interrogated without a lawyer yet again. While he continued denying actual participation in any homicides, he made various prejudicial admissions regarding his involvement with MS-13 and again made statements connecting himself to the participants and location of the alleged double homicide.

---

organization is a "violent international street gang operating in the Middle District of Tennessee and elsewhere…" and that its "membership is composed largely of individuals of Salvadoran and Central American descent." (ECF 150, 2nd Superseding Indictment, p. 3). Furthermore, the Government asserts that "cooperation with law enforcement is strictly prohibited under MS-13's rules. It is well understood within the gang that anyone who assists the authorities will be punished with death, and that the gang honors those who have killed police informants." *Id*. at 4.

On August 8, 2018, the United States Government indicted Mr. Colindres in U.S. Middle District of Tennessee Case No. 3:18-CR-00200, which included murder charges based on the same alleged September 24, 2017 double homicide that the Davidson County warrant had stemmed from. On July 26, 2021, the Government indicted Mr. Colindres in the second superseding indictment of U.S. Middle District of Tennessee Case No. 3:18-CR-00293, Doc. No.: 150, which also includes counts related to that same homicide. The Government then dismissed the original indictment (3:18-CR-200, Doc. No.163).

## II. Argument

### A. The February 28, 2018 and May 5, 2018 interviews violated Defendant's Fifth Amendment right against self incrimination

The February 28, 2018 actions undertaken by HSI Special Agent Michael Perez, ATF Special Agents Warren Smith and Reginal Johnson violated Mr. Colindres's Fifth Amendment right against self-incrimination, as did the May 5, 2018 actions of MNPD Detective Derry Baltimore and his companion federal agent. In both interviews, law enforcement made illusory promises to help Mr. Colindres and his family and made explicit references to the infamous MS-13 as a scare tactic to coerce statements. Indeed, the Fifth Amendment provides, *inter alia*, that "[n]o person shall be compelled in any criminal case to be a witness against himself."[2] Firmly rooted in American jurisprudence, the Fifth Amendment's self-incrimination clause excludes statements or confessions rendered involuntary due to governmental coercion. *Dickerson v. U.S.*, 530 U.S. 428, 433 (2000), quoting *Bram v. United States*, 168 U.S. 532, 542 (1897) (explaining

---

[2] U.S.C.A. Const.Amend. V.

that the voluntariness test is controlled by that portion of the Fifth Amendment … that no person shall be compelled in any criminal case to be a witness against himself.").[3]

The Sixth Circuit has adopted a test for determining whether statements made to any government officials were coerced and therefore inadmissible. When a defendant asserts that the statements elicited were coerced, the government bears the burden of proving by a preponderance of the evidence that the statements were in fact voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992). Accordingly, there are three requirements for a finding that a confession [or admission] was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988). The threshold factor, however, requires "that police extorted [the confession] from the accused by means of coercive activity." *Id*. (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). Ergo, once "it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the 'coercion' in question was sufficient to overbear the will of the accused." *Id.* Furthermore, in determining whether a defendant's statements are involuntary, the court looks to the totality of the circumstances concerning whether the defendant's will was overborne in a particular case. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir.1994). In assessing this, the court looks to

---

[3] Supreme Court caselaw leading up to *Miranda v. Arizona*, 384 U.S. 436 (1966), refined the inquiry regarding involuntary confessions, producing what is known as the voluntariness test. This test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. U.S.*, 530 U.S. 428, 434 (2000), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 225–226 (1973). Although, *Miranda* and *Malloy v. Hogan*, 378 U.S. 1, (1964) altered the focus on the admissibility of confessions, the Supreme Court has never abandoned voluntariness as the predicate for confessions to be admissible as evidence. *Dickerson v. U.S.*, 530 at. 434.

5

several relevant factors that may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *Id*. *See also United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir.1997) (stating that this Court looks to the totality of the circumstances to determine whether the defendant's will was overborne by police coercion) (citing *United States v. Brown*, 557 F.2d 541, 546 (6th Cir. 1977)). A finding of coercion, moreover, need not depend on actual violence by a government agent. *See, e.g. U.S. v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1994) (stating that "[w]e consider the psychological impact on the accused by the totality of the circumstances of the confession … including his emotional state at the time of the confession, … the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession given.").

**1. The police activity was objectively coercive.**

The jailhouse interrogation setting coupled with illusory promises provided by the police rendered the police activity objectively coercive. This setting created by the agents presented an inherently coercive environment. *See, e.g., U.S. v. Pelton*, 835 F.2d, 1067, 1073 (6th. Cir. 1987) (concluding that the setting of defendant's interview did not render defendant's statements involuntary where officers were unarmed and officers did not create a hostile environment in a public hotel)). On October 9, 2017 Mr. Colindres was arrested in Kentucky, jailed and charged with Kentucky state offenses. Moreover, Mr. Colindres already had Davidson County, Tennessee charges pending for the alleged homicide that was one of the subjects of the interrogation.

On February 28, 2018, three federal agents and one MNPD detective pulled Mr. Colindres out of his cell and interrogated him for over five hours. Officers engaged Mr. Colindres with a level of questioning asserting the danger that Mr. Colindres was alleged to have been involved in,

6

and several times offering what amounts to illusory promises that they could aid or at the very least provide some leniency if Mr. Colindres answered their questions. Promises of leniency may be objectively coercive if they are broken or illusory.[4] *U.S. v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003) (stating that "a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary.")). *See also U.S. Binford*, 818 F.3d 261, 272 (6th Cir. 2016) (explaining that "a promise of leniency in exchange for cooperation was only objectively coercive if it was broken or illusory.")). From the beginning of the interview, the agents initiated the interrogation discussing MS-13, an organization the government describes as a pervasive, infamous, violent organization:

> MS-13 is violent international street gang operating in the Middle District of Tennessee and elsewhere. (ECF 150, 2nd Superseding Indictment, p. 3, ¶ 2).
>
> MS-13 members are required to follow various rules. In most cases, gang members who violate the rules are punished with a beating, a practice commonly referred to as 'corte' or 'calenton'. (ECF 150, 2nd Superseding Indictment, p. 4, ¶10).
>
> Cooperation with law enforcement is strictly prohibited under MS-13's rules. It is well understood within the gang that anyone who assists the authorities will be punished with death, and that the gang honors those who have killed police informants. (ECF 150, 2nd Superseding Indictment, p. 4, ¶ 11).
>
> When preparing to kill disloyal and/or disobedient gang members, MS-13 cliques often assign gang members to follow, or 'watch' the targeted individuals to learn their patterns and movements, enabling the gang to carry out the murders at opporture times, without alerting law enforcement. (ECF 150, 2nd Superseding Indictment, p. 5, ¶ 13).

Even the three federal agents began the interview with statements reflecting their knowledge of MS-13's danger and how that can affect Mr. Colindres:

> …we have been investigating a gang in Nashville for a long time. Uh, it's the Mara Salvatrucha [MS-13]. (Ex. A, Excerpts of Mr. Colindres' Interrogation Transcript, p. 6.

---

[4] An illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action. *U.S. v. Johnson*, 351 F.3d 254 (6th Cir. 2003).

…Maybe they [MS-13 members] know your family in another country and they are threatening you … *Id*. at p. 7.

In addition to beginning the interrogation with mentioning MS-13 and having that serve as a lens by which the conversation should be viewed, the secluded, uncounseled five-hour questioning constantly comprised of statements or questions only designed coerce a confession. Indeed, the federal agents' interrogation ranged from tempting Mr. Colindres with either helping or protecting him and his family to vague promises that they could assist with any federal prosecution with no evidence that any of the agents had prior discussions or authorizations from anyone with the United States District Attorney's office:

…and see if there is a chance to help him in this case, or if he has a story about what happened, if something happened against him, if they threatened him. *Id*. at p. 7.

…And this is why I'm looking for you to just be honest, because I'm gonna go back and I'm gonna tell all the district attorneys and everybody, 'Look, this is what Luis ended up telling me.' And I'm gonna tell them, whether or not, that you were being honest, or whether or not, that you were just trying to lie and cover for yourself, and just pin it all off on everybody else. *Id*. at p. 146.

…I know you have, if you have family in Honduras, they [MS-13] can probably get to where they are located. This gang is not a game. *Id*. at p. 171.

…Today is the day where you can talk to us, where we can possibly help you out with this. Later, when you have charges in other areas and everything that happened, everything is going to be much different at that time. *Id*. at p. 172.

…Well, we understand if you worry…you're scared for your family members. And we can protect family members. But that comes with you telling me one hundred percent of the truth… *Id*. at p. 194.

…That's why we're telling you that we want to help you if you weren't involved, and we want to help if your family needs it, too. But, uh, we need to know that you're telling the truth. *Id*. at p. 318.

…He's [Detective 1] saying that if you have that, that fear that something, something is going to happen to your family, we work for the federal government. We have the power to move

people from one city to another city if necessary.  You shouldn't be afraid if you're going to help us, we're going to help you.  Do you understand?  *Id*. at p. 325.

That means that if you're going to uh, of you're going to be in…on our side, then come to our side immediately so that you're…so we can help you.  *Id*. at p. 325.

…So…they [MS-13] could do things right now to your family, if they wanted to?  *Id*. at 326.

[Detective 2]…I'm talking about helping your family.  *Id*. at p. 328.

Under such circumstances, even a mild promise of leniency could suffice as to bar a confession.  *See.*, *e.g.*, Brady v. United States, 397 U.S. 742, 754 (1970) (explaining that *Bram v. United States*, 19 S.Ct. 183 (1897) "dealt with a confession given by a defendant in custody, alone and unrepresented by counsel.  In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess.").  The Sixth Circuit has opined that "leading the defendant to believe that he or she will receive lenient treatment when this is quite unlikely is improper, whereas, making a promise to bring the defendant's cooperation to the attention of the prosecutor or to seek leniency, without more, typically is not."  *United States, v. Long*, 852 F.2d 975, 972 (1988).  Here, there is more.  Three federal agents interrogated Mr. Colindres for over five-hours.  Mr. Colindres lacked any formal legal training, had not learned how to speak or understand English, did not have legal counsel present during this interrogation and was constantly induced into answering the agents' questions who used MS-13, his family safety and prosecutorial-leniency as a tool to unearth a confession.  These comments, coupled with the known danger communicated by the federal agents, presented an objectively coercive environment under that lead to Mr. Colindres' five-hour long interrogation.

On May 5, 2018, MNPD Detective Baltimore and a federal agent employed some of the same tactics used in the February 28, 2018 interrogation to compel more incriminating statements from Mr. Colindres. Throughout the questioning, the federal agent made references to MS-13 and Mr. Colindres' family, asserting that this particular interview was the last opportunity Mr. Colindres had to provide information. These ultimatums were advance without any evidence the federal agent had had actual discussions with the prosecutor or could provide any actual protection to Mr. Colindres or his family, creating a coercive environment under which Mr. Colindres felt his only option was to tell the officers what they wanted to hear.

**2. The coercion in question was sufficient to overbear the defendant's will**

Considering Mr. Colindres' state of mind and personal characteristics in both interrogations, the objectively coercive police activity was sufficient to overbear his will. *See*, *e.g.*, *McCall v. Dutton*, 863 F.2d 454, 459 (6th. Cir. 1988) (stating that "[o]nce it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the 'coercion' in question was sufficient to overbear the will of the accused.")). Mr. Colindres' prior experience, or lack thereof, with police officers strongly weighs in favor of finding that the coercion was sufficient to overbear his will. Mr. Colindres was born in Honduras, is not a United States citizen, has minimal formal education, has no formal legal education or training, and was thus uninformed and vulnerable to coercive police practices or procedures. *Compare*, e.g., *U.S. v. Rohrbach*, 813 F.2d 142, 145 (8th Cir. 1987) (concluding that petitioner was "no stranger to the criminal justice system" where petitioner had a history of reform school, arrests and convictions.). As someone who is completely uninformed about the U.S. legal system, being taken from his cell by four officers for over five hours without any food or water and implicitly threatened with the prospect of MS-13 retaliation if he did not secure law

enforcement protection through cooperation was sufficient to overwhelm Mr. Colindres' will preventing him from intelligently and knowingly consent to this interrogation. Indeed, the experience only left him confused and nervous, further corroborating that his will was overborne. *Compare*, *e.g.*, *McCall v. Dutton*, 863 F.2d 454, 460 (6th Cir. 1988) (concluding that the alleged police coercion was insufficient to overbear the will of the accused where defendant demonstrated mental acuity by making several coherent telephone calls for assistance, made threats to others and exculpatory statements.); *also U.S. v. Rohrbach*, 813 F.2d 142, 145 (8th Cir. 1987) (rejecting claim of involuntary where federal agents testified that petitioner was 'lucid' and able to communicate)).

**3. The alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement**

After over five-hours in the February 28, 2018 interrogation, and over an hour on May 5, 2018, this coercive police-dominated environment, where the police questioning was saturated with statements regarding the infamous MS-13 and vague promises of protecting his family, Mr. Colindres made statements to the police officers he would not have made under less intimidating circumstances. Although the interaction happened while he was being held in custody on other charges, Mr. Colindres felt compelled by federal agents to continue the interrogation for fear of MS-13, the safety of his family and possible leniency with any future criminal prosecutions. Under the duress produced by this atmosphere, Mr. Colindres' undoubtedly provided statements because of police coercion rather than of his own volition. *See*, *e.g.*, *McCall v. Dutton*, 863 F.2d 454, 461 (6th Cir. 1988) (stating that petitioner did not show a causal nexus because petitioner did not confess because of the coercive conduct of the police, "but was the product of his own incoherent state of mind, rather than a product of police coercion…").

B. **Law enforcement violated Mr. Colindres' Sixth Amendment right to counsel.**

The purpose of the Sixth Amendment right to counsel is "to protec[t] the unaided layman at a critical confrontation with his expert adversary." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (alteration in original; internal quotation marks omitted). Defendants possess this right in the pretrial phase because the time between the arraignment and trial is "perhaps the most critical period of the proceedings." *Massiah v. United States*, 377 U.S. 201, 205 (1964) (internal quotation marks omitted). This right attaches upon initiating adversary judicial criminal proceedings, such as charging or arraignment. *See*, *McNeil v. Wisconsin*, 501 U.S. at 175. There is a wrinkle for Mr. Colindres' argument. The right has been held to be "offense specific," *id.*, meaning it extends to uncharged crimes only if they are the "same offense" as the charged offense. *Texas v. Cobb*, 532 U.S. 162, 173 (2001).

Here, prior to the interviews Mr. Colindres had already been charged in Davidson County, Tennessee with the alleged September 24, 2017 double homicide. (Ex. A, GS Warrant). He was then questioned about his alleged double homicide in both interviews, without his appointed Kentucky public defender present. By interviewing Mr. Colindres without his lawyer regarding the alleged "double homicide" that he had already been charged with in Davidson County, law enforcement violated his Sixth Amendment right to counsel on both occasions.

## CONCLUSION

As detailed herein, Mr. Colindres respectfully requests that the Court exclude the statements he made to law enforcement on February 28, 2018 and May 5, 2018 from trial.

Respectfully submitted,

*s/ Jay Clifton*
Jay Clifton, BPR 033057
707 Main Street, Ste. #123
Nashville, TN 37206
T: (615) 400-1267
E: jaycliftonesq@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on **February 24, 2023** the foregoing **Motion to Suppress** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including **Assistant U.S. Attorney Ahmed Safeeullah, Matthew Hoff, and Brooke Farzad**, **Counsels for the Government**, at Ahmed.Safeeullah@usdoj.gov, Matthew.Hoff2@usdoj.gov, and Brooke.Farzad@usdoj.gov. Parties may access this filing through the Court's electronic filing system.

*s/ Jay Clifton*
Jay Clifton, BPR 033057