1                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
2                     NASHVILLE DIVISION

3

4  UNITED STATES OF AMERICA      )
                                 )
5  VS                            )   No. 3:18-cr-00293
                                 )
6  JORGE FLORES [3]              )
   JOSE PINEDA-CACERES [4]       )
7  LUIS COLINDRES [8]            )
   KEVIN TIDWELL [9]             )
8  _____

9

10

11   BEFORE THE HONORABLE ELI RICHARDSON, DISTRICT JUDGE

12              TRANSCRIPT OF PROCEEDINGS

13                   April 12, 2023

14                     Volume 6

15  _____

16

17

18

19

20

21  _____

22  **Roxann Harkins, RPR, CRR**
    Official Court Reporter
23  719 Church Street, Ste 2300
    Nashville, TN 37203
24  615.403.8314
    roxann_harkins@tnmd.uscourts.gov
25

**APPEARANCES:**

For the Government:
                    MATTHEW KEVIN HOFF
                    Department of Justice
                    Organized Crime and Racketeering Sect
                    1301 New York Avenue
                    7th Floor
                    Washington, DC 20005

                    AHMED A SAFEEULLAH
                    BROOKE C. FARZAD
                    US Attorney's Office
                    719 Church Street, Suite 3300
                    Nashville, TN 37203


For Defendant Flores:
                    LEONARD E. LUCAS , III
                    The Law Firm of Leonard Earl Lucas
                    315 Deaderick St
                    Suite 1550
                    Nashville, TN 37238

                    VAKESSHA HOOD-SCHNEIDER
                    236 Public Square
                    Suite 103
                    Franklin, TN 37064


For Defendant Pineda-Caceres:

                    THOMAS F. BLOOM
                    911 Marengo Lane
                    Nashville, TN 37204

                    GEORGE TRAVIS HAWKINS
                    Hawkins Law Firm, PLLC
                    735 Broad Street
                    Suite 305
                    Chattanooga, TN 37402

1    For Defendant Colindres:

2                        KYLE F. MOTHERSHEAD
                         Relentless Advocacy, PLLC
3                        2901 Dobbs Ave
                         Nashville, TN 37211
4

5                        JAY C. CLIFTON , III
                         Clifton Law Office
6                        707 Main Street
                         Suite 123
7                        Nashville, TN 37206

8

9    For Defendant Tidwell:

10                       JUNI S. GANGULI
                         Ganguli Law Firm
11                       202 Adams Avenue
                         Memphis, TN 38103
12

13                       MATTHEW C. GULOTTA
                         The Gulotta Firm, PLLC
14                       202 Adams Avenue
                         Memphis, TN 38103
15

16   For the Witness Avila:

17                       WILLIAM I. SHOCKLEY
                         4505 Harding Road
18                       Suite 126
                         Nashville, TN 37205
19

20

21

22

23

24

25

1

2                              **I N D E X**

3      Government witness

4      **FRANCISCO AVILA**

5      Direct Examination By Mr. Hoff ......................25
       Cross-Examination By Mr. Ganguli ...................71
6      Cross-Examination By Mr. Lucas .....................88
       Cross-Examination By Mr. Clifton...................118
7      Cross-Examination By Mr. Bloom ....................127

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          The above-styled cause came to be heard on

3  April 12, 2023, before the Hon. Eli Richardson, District

4  Judge, when the following proceedings were had at 8:39

5  a.m. to-wit:

6

7          THE COURT:  All right.  We are here this

8  morning on, by my count, Day 6 of trial in *United States*

9  *versus Flores*.

10          I wanted to talk a bit about jury

11  instructions, but first wanted to see if counsel had

12  anything to bring to my attention.

13          Mr. Safeeullah?

14          MR. SAFEEULLAH:  No, Your Honor.

15          THE COURT:  No?

16          Anything from the defendants?  No?  Doesn't

17  look like it.  Okay.

18          So the Court appreciates the parties'

19  efforts in putting together the proposed jury

20  instructions, and we're going to talk some about that and

21  see if counsel agree that they may want to propose some

22  revisions.

23          Now, if they don't, I suppose it's possible

24  to say, okay, well, then I'll make the revisions myself

25  and you may have to live with them, even though you can

1  make your objections if you disagree.

2              All right.  Let's walk through some things.

3  Presumably counsel brought their copy of the draft

4  instructions.  I'm going to refer to the page numbers

5  provided not by the parties but by the clerk's office.

6  The pagination differs by two pages.  So I'm going to use

7  the clerk's office pagination.

8              So, for example, the first one is page 12,

9  which has pagination page 10 by the parties, but you'll

10  note that the clerk's office says page 12 of 162.  On

11  this one, Evidence Defined, the one thing to note is

12  this:  There's a reference there to facts that I have

13  judicially noticed.

14              Do we expect necessarily, even though we

15  don't know for sure, do we expect necessarily there will

16  be any facts judicially noticed?  If you think -- if you

17  have judicially noticeable facts in mind right now, raise

18  your hand.

19              Okay.  No one necessarily expects that.  So

20  probably a good idea to have that kind of thing put in

21  brackets so that it doesn't slip in.  If we don't,

22  judicially noticed facts slip into the instructions and

23  the parties are -- the jurors are wondering what I'm

24  talking about.  All right.  Let's see what we have next.

25              Stand by.  Wanted to look at page 23,

separate consideration; multiple defendants charged with a single crime. The first sentence, I think, needs revisions. Here's why. It says: In several counts, the defendants have been charged with one crime.

Now, first thing is -- now, I think the reference to one crime isn't an ideal way to put it. The other thing is that this sentence doesn't account for the fact that in some cases it's not all defendants. Even if there are multiple defendants, it's not all defendants.

So I'm going to suggest this to be more precise. And I think extreme precision is going to be helpful in charging the jury in this case. "In each of several different counts, multiple defendants have been charged with the crime alleged in that count." So, again, in each of several different counts, multiple defendants have been charged with the crime alleged in that count.

Does that kind of thing make sense to be a little more particular about what we're talking about there? If you disagree, raise your hand. Okay.

So, again, that's the kind of thing, you know, the parties say, well, Judge, you just tweak it or whatever, then we can talk about that, but that's a request that -- a suggestion that I have.

Okay. Now, it seems like a small thing,

but on page 24, reading on or about, there is, I think,
the following.  I think we need to change the paragraph
break.  Instead of breaking after -- excuse me.  Instead
of breaking the paragraph before the sentence that begins
"the remaining counts," we should break the paragraph
after.

Why is that?  Because the -- if you do the
page break that way, what I'm about to read is clearly
shown to apply to everything that comes before and not
just everything that comes before in the second sentence.
The government does not have to prove that these crimes
happened on the exact date, but the government must prove
that the crimes happened reasonably close to the
respective dates.

Under the current paragraph break, it makes
it sound like what I just read only applies to, quote,
the remaining counts in the indictment, and that's not
true.  Anyone disagree with that proposed change?  Okay.
Don't see any hands.

All right.  Continuing.  All right.
Regarding some of the indictment, I proceeded and read,
you know, consistent with what the parties had here, a
summary of the indictment during voir dire.  Do the
parties anticipate this to be read during the final jury
charge or that they just be -- sort of refer to the

1 indictment, they'll have a copy of the indictment.

2                    What do you think, Mr. Safeeullah?

3                    MR. SAFEEULLAH:  Refer to the indictment,

4 Your Honor.

5                    THE COURT:  I think that that's right for a

6 variety of reasons.  Anyone disagree with that?  Okay.

7 So, I mean, it can be -- from my perspective, this could

8 be deleted in its entirety or replaced with something

9 saying just that the jurors will be provided with a copy

10 of the indictment and leave it at that.  I think

11 that's -- that was the two options there.

12                    Now, one of the things is, you know, the

13 way -- RICO has its own set of complications, and when

14 you lay a conspiracy charge on top of that, there are a

15 lot of complications.  And the parties have endeavored to

16 work through an appropriate explanation for what is a

17 complex charge.  I'm going to have some suggestions for

18 adding additional clarity, and we'll see what folks

19 think.

20                    Page 38, which, again, would be page 36 as

21 marked by the parties, but page 38, if you look at this,

22 the first full paragraph reads:  However, the

23 conspiracies charged in violation of Tennessee state law.

24 My concern there is that reads as if the conspiracy in

25 Count One is -- or let me put it this way.  It sounds

1  like there are -- there is a charge of conspiracy in
2  violation of Tennessee state law that the jury needs to
3  render a verdict on.  And instead, there are sort of
4  these conspiracies are alleged as part of Count One, but
5  are not charged in this indictment.  There is no
6  conspiracy charged in this count in violation of
7  Tennessee state law.
8           So what if we change that word just to
9  alleged?  Anyone disagree with that?  Okay.  I think that
10 could help eliminate some possible confusion.
11          MR. SAFEEULLAH:  Your Honor, how would the
12 first sentence read then?
13          THE COURT:  It would read:  The
14 conspiracies alleged in violation of Tennessee state law
15 that are alleged to form part of -- or we could even just
16 remove the word, actually.  What if we do this:  The
17 conspiracies in violation of Tennessee state law that are
18 alleged to form part of the pattern of racketeering
19 activity, and then it goes from there.  If we just take
20 out the word charge, that might be the easiest.  Anyone
21 disagree with that?  Okay.
22          All right.  I know we have, like, some --
23 some things about which there aren't disagreements, and
24 we'll address those in a timely fashion.  But for now,
25 the first thing I want to note is -- stand by one moment.

1              One of the things is -- that I sort of have

2    in mind here is this:  And this is a -- this is a big

3    point for me and want to see what counsel think about

4    this.  I think these instructions are appropriately

5    geared to the fact that, you know, the RICO conspiracy

6    charge, it's an inchoate crime.  It doesn't require

7    commission of the objectives of the conspiracy,

8    including, you know, even the consummation of and the

9    existence of an enterprise or various other things don't

10   actually have to have happened if -- as long as they are

11   within the scope of the agreement.

12             And I think a key point is you don't

13   actually have to have a RICO enterprise.  You just need

14   to conspire to have one and then conduct the affairs of

15   it through a pattern of racketeering activity.  And a lot

16   of the instructions are written that way, and, you know,

17   it's good for counsel to have been focused on that.

18             I do wonder whether given the government's

19   theory in this case -- on this, I think it's the

20   government's choice.  If they want to leave in the

21   language that reflects that there doesn't actually have

22   to be an enterprise, there just has to be an enterprise

23   contemplated, if the government wants that language, I'd

24   be inclined to leave it in.  Fair enough.  But, boy, it

25   seems to me that just may add a level of complexity that

1    the government's theory, to say the least, is not just

2    that an enterprise was contemplated, but that it existed.

3              With that being the case, I wonder if the

4    government, for the sake of everybody -- and especially

5    to sort of minimize juror confusion -- wants to rewrite

6    this in a way where they don't sort of feel constrained

7    to give the jury the choice between two options.  Hey,

8    the enterprise was contemplated to be formed -- that's

9    sufficient for a conviction -- versus, well, yeah, there

10   was an enterprise.

11             I think the government's theory is that --

12   very much that there was an enterprise.  And all this

13   language is -- all this language to the effect of, well,

14   there didn't actually have to be an enterprise.  They

15   just had to have contemplated it.

16             Or, you know, if you find that an

17   enterprise existed or would have existed -- you know, the

18   second part of that phrasing, I just wonder whether the

19   government wants to take it out.  On the one hand, you

20   know, sometimes it takes away an option for the

21   government and is negative for the government in that

22   sense; it takes away an option.  But here I don't think

23   the government loses anything.  And if you take out that

24   option, I'm telling you, these jury instructions will be

25   a lot more comprehensible.  So something to think about.

1              Do you see the issue I'm raising,

2      Mr. Safeeullah?

3              MR. SAFEEULLAH:  Yes, Your Honor.  But if

4      you could point to the specific page number.

5              THE COURT:  So, for example, let's look at

6      this.  Page 46 under Other Instructions, Count One, RICO

7      Conspiracy.  And, again, you know, this is -- this is

8      sort of accurate, but I think under the government's

9      theory, I think it's kind of surplusage.  And it's also

10     language in a way that I can discuss would need to be

11     clarified beyond what it is now.

12             Look at element No. 2, the enterprise --

13     okay.  In fact, let's start with No. 1.  The charged

14     enterprise, MS-13, was or would be established.  Fair

15     enough.  Those are the elements, and there are two

16     different ways of sort of establishing that element.

17     But, you know, on the one hand, that takes away an option

18     for the government.  It's negative for the government,

19     but I think it clarifies things for the jury.

20             I could imagine a jury saying, well, what

21     do they mean, would be established.  Were these -- were

22     these guys contemplating establishing MS-13 but it didn't

23     exist?  You know, you could see the kind of confusion.

24     The other thing about the phrasing that we see throughout

25     the jury instructions, there is the notion -- and it's a

short-hand expression.  I understand why the parties
would use it, but I'm trying to see this from the
perspective of the jurors.  Was or would be.  Would be,
right, is a -- it's a subjunctive tense.  And it means
basically if X, Y -- "would be" means if X, Y or Z
happened, then the enterprise would be established.
That's really what it means.  "Would be" under certain
circumstances, this would have happened.  That's what
that phrase means.

          If you're the jury you, you need to know a
little bit more about what is meant by would be.  And it
seems to me that what that phrasing there is, under --
would be established means it would have been established
if the objectives of the conspirators were carried out.
Or -- or if what the conspirators contemplated had
occurred, then the enterprise would have been
established.  Under what was contemplated by the
conspirators, the enterprise would be established,
something to add some context for the phrase "would be
established."  And they would need to know, what do you
mean by would be.

          Well, I think it would be if -- you know,
if the vision of the conspirators came to fruition.
That's really the idea there.  So you can -- you know,
I -- I think it's an accurate statement of the elements,

1  and so I'd leave it in, but if I left in this would-be

2  formulation, which I think would be not the right choice

3  under the government's theory here, but if we left it in,

4  I would add some language to clarify what is left (sic)

5  by would be.

6            Government -- government, defendants don't

7  have to say anything now, but I do want to ask:  Do you

8  see the issue I'm raising there?

9            MR. SAFEEULLAH:  We see the issue,

10  Your Honor.

11            THE COURT:  All right.  Thank you.

12            Defense counsel with me so far on that?

13            MR. GANGULI:  Yes, Your Honor.

14            THE COURT:  All right.  All right.  This is

15  the kind of thing that comes up, I think, repeatedly in

16  these instructions where, at times, a perfectly accurate

17  statement of the law, but I do wonder if, for the benefit

18  of both parties, we take something out as really not

19  needing to be instructed here.

20            I'll -- it's the kind of language, the kind

21  of instructions I would apply if the parties want, but I

22  suggest they think about it.  For example, page 49 at the

23  bottom -- once again, I'll just point out the parties'

24  pagination is two pages lower, 47.  The bottom of the

25  page, there's a discussion that the enterprise need not

1  have various things.  Then at the end of the sentence, it

2  says "or an enterprise name."  Under the government's

3  theory, I don't -- you know, I don't think the

4  government's going to need to rely on that, point to

5  that.  It could foster confusion, I think, amongst the

6  jury.  Like, if ever there was a case where it's clear

7  that the alleged enterprise had a name, so it doesn't

8  matter that there doesn't need to be a name.  Well, and

9  this is that case.

10              All right.  Everyone see my point there?

11  If you don't get my point, raise your hand.  Okay.  I'm

12  not asking anyone to take a particular position, just to

13  say -- you know, just tell me if you don't see what I'm

14  concerned about.

15              Here is kind of a small thing, but page 50

16  at the top:  Indeed, RICO is not limited to groups whose

17  crimes are sophisticated, diverse, complex, or unique.  I

18  would -- I would be more specific and say, indeed, comma,

19  the definition of, quote, enterprise, end quote.  Little

20  more specific.  Because the question here, what they're

21  being instructed about is not what RICO covers, but

22  rather what the definition of enterprise is.  So that's

23  something I'd recommend the parties consider.

24              Little bit lower on that page is another

25  example of my concerns about throwing out the notion of

what would happen and how it could confuse the jury.  It
says:  Although whether an enterprise existed or would
exist.  You know, again, the notion of would exist is,
well, would exist under the -- under -- you know, if the
agreement that the conspirators had amongst themselves
had been carried out, but just hanging in a vacuum,
"would exist" is not real clear there.

Now, it's 9 o'clock.  Let me see if we have
any word about where -- how we're doing on jurors.  If
it's like most mornings, there's some issue with traffic
or parking or some such thing.  We're missing one?

COURTROOM DEPUTY:  Let me just check and
see if she's here yet.

THE COURT:  All right.  So we'll keep going
and when we can confirm they're all there, we can table
the discussion for further discussion later.

All right.  So let's go a little bit
further.  This is a small thing, but page 66, under the
fourth element of RICO.  I mean, if anyone wants me to
elaborate on why I think this is a change worth making,
I'm happy to.  The word when, where it says "when the
evidence establishes that the defendant knowingly agreed
to facilitate a plan" -- that's at the back part of the
first paragraph there on page 56 -- I'd recommend
replacing "when" with "comma if."  I think that's clear

1  for the jurors.  Comma if, instead of when.  Something to
2  consider.
3            Looks like our folks are here, and when
4  they are lined up in the hallway, we can bring them in.
5            Just a little bit more -- I'm sorry.  Did
6  you have something, Mr. Bloom?
7            MR. BLOOM:  I just wondered, is there a
8  fourth mic here?  I don't see it.
9            THE COURT:  You need a lapel mic?
10            MR. BLOOM:  Unless it's sitting here
11  somewhere.  I don't see it.
12            THE COURT:  Let's take a look at this.
13            COURTROOM DEPUTY:  I'll just get another
14  one.
15            THE COURT:  Did you just need that,
16  Mr. Bloom, or did you want to take your new-found
17  communication abilities and communicate something else at
18  this time?
19            MR. BLOOM:  Do you want me to do a testing
20  one, two, three?
21            THE COURT:  All right.  Beautiful.
22            MR. BLOOM:  Okay.  We're good.
23            THE COURT:  Thank you.
24            All right.  Are we all right out there?  Do
25  you know?

1          COURT SECURITY OFFICER:  They're bringing

2     them up.

3          THE COURT:  And I guess I didn't know this,

4     but they're still assembling every morning, okay.

5          COURTROOM DEPUTY:  They have to turn their

6     phones in.

7          THE COURT:  Makes sense.

8          Now, here's yet another thing that is, you

9     know, I suppose accurate as far as it goes, but it may be

10    the kind of thing, if we look for hyper clarity for

11    complex jury instructions, page 59, there is a further

12    description of the three elements regarding a pattern of

13    racketeering activity.  The end of that paragraph, it

14    says the following:  Your verdict must be unanimous as to

15    which type or types of racketeering activity you find

16    that the defendant agreed was or would be -- there's that

17    notion of would be again, but here's my concern -- new

18    concern here.

19         Was or would be committed, caused or aided

20    and abetted.  I don't know, maybe an agreement that

21    racketeering activity would be aided and abetted could

22    have been something the defendants agreed to, but I

23    wonder if that really isn't surplusage.  If you think

24    about what -- if this alleged conspiracy is like most

25    conspiracy, the conspirators weren't thinking about what

1  was going to be done, not what was going to be aided and

2  abetted to be done.  So I just throw it out there.

3  Whether that may not be sort of stricken is really not

4  helpful to anyone, including the government for whose

5  benefit it would be included, because it gives the

6  government an additional option.  But I don't think it's

7  helpful to the government, but something to think about.

8           All right.  In other words, the next

9  sentence, it says:  At the end of this instruction, I

10  will instruct you on the elements regarding each of the

11  charged types of racketeering activity.  I'm going to

12  suggest striking the word charged and be a little more

13  specific.  If I was to leave that word in there, I'd

14  actually change it to alleged, but I want to describe

15  what's alleged in more detail.

16           So I'm going to suggest the end of that

17  sentence read as follows:  Each of the types of

18  racketeering activity alleged to be an object of the

19  conspiracy.  A little, I think, clearer as to the role of

20  racketeering activity in this analysis.

21           All right.  Then page 60.  In the middle of

22  the page, there's the following sentence:  For example,

23  for both nexus and relatedness purposes, the requisite

24  relationship between the enterprise and a racketeering

25  act may or would be established.

1          I think that's a little bit indeterminate

2   for jurors as to what is meant by may or would be.  Like,

3   under what circumstances are we talking about?  I think

4   they would be confused by that.  And I might suggest

5   additional clarity there.

6          The "would" formulation is used in a lot of

7   places, and I'm not saying in every situation it needs to

8   -- I'm not saying that in every situation I'm suggesting

9   that "would" should come out, but I think in some context

10  we should be very intentional about when it's left in.

11  And as I indicated earlier, sort of be clear as to what

12  we mean by would.

13         But we do see a situation at the bottom of

14  that same page where we see 3 colon.  That sentence says:

15  The racketeering activity must have extended over a

16  substantial period of time or posed a threat of continued

17  criminal activity.  Here I would think that if we were

18  using the "would" alternative construction elsewhere, it

19  would need to be here as well.  Must have extended or

20  would have extended.

21         If we're using a "would" formulation for

22  these instructions, I would think it would go here.  But

23  I think the way this is currently written is kind of

24  consistent with what I'm saying, that maybe you want to

25  consider just taking out the "would" construction.

1          So something to think about.

2          All right.  I'm going to finish -- oh,

3  finish with this comment on the next page, 61.  You are

4  not limited to consideration of the specific type or

5  types of racketeering activity charged against the

6  defendants.  I wonder -- I wonder if type or types should

7  just be changed to types because in this case there are

8  multiple types alleged.  And so consider whether the

9  reference to the singular there isn't very helpful and

10  you might as well just include the plural.

11          But charged against the defendant.  If this

12  had been a substantive RICO count or -- you know, maybe

13  I'd feel differently about it.  I think the better

14  construction is to say:  You are not limited to

15  consideration of the specific type or types -- and,

16  again, I maybe recommend types, but -- of racketeering

17  activity that allegedly were objects of the conspiracy,

18  or something like that.

19          Just to keep them focused, again, on the

20  role.  What is the role of the concept of racketeering

21  activity in Count Two?  Well, these are -- the

22  racketeering activity is what the defendant supposedly

23  agreed to engage in.  And that's its role here, rather

24  than the racketeering activity itself being the charged

25  crime.  So think about that.

1          Now, in this regard, here's -- here's the

2    other thing.  It's another example of whether the parties

3    want to consider just doing what they can under the facts

4    of this case.  And I think -- again, I think it's sort of

5    the government's choice as to how they pitch it, but, you

6    know, with the government's theory being that these types

7    of racketeering activity were within the scope of the

8    conspiracy, they're objects of the conspiracy, but under

9    the government's theory they weren't merely just

10   contemplated, they actually occurred.

11          And since that's the government's theory,

12   there may be places where sort of language reflecting the

13   fact that the government is alleging, not just that these

14   were agreed to, but they occurred might be appropriate.

15   But I'm not insisting on that kind of language.  I just

16   throw that out there as an issue, yet another issue in

17   terms of thinking about clarifying this language.

18          All right.  So I've said sort of a bunch of

19   things to consider so far, and we can talk later about

20   some additional things, but that's a good chunk of it.

21   And it would only be natural for a judge to have, for

22   instructions this long, a variety of different thoughts.

23   And none of the Court's comments here are intended to

24   reflect that counsel shouldn't be commended for trying to

25   work up a jointly agreed set of instructions that, in

their view, you know, adequately explain the elements.
But I'm kind of hyper focused on sort of maximum clarity
for these jurors.

Any questions about what we covered so far,
Mr. Safeeullah?

MR. SAFEEULLAH:  No, Your Honor.

THE COURT:  Thank you.  Anyone from the
defense side?  If so, raise your hand.  Okay.

So those are some thoughts.  We'll talk
more about that.  We'll find a time.

All right.  Everyone ready for the jury to
be brought in?  Maybe we could bring in Mr. Avila first.
Does that work?  And you may take the podium, Mr. Hoff.

MR. HOFF:  Thank you, Your Honor.  And may
the interpreters approach as well?

THE COURT:  They may, yeah.  I tell you
what, we'll have Mr. Avila -- the interpreters can come
forward.  We will not have them take their final place
until Mr. Avila comes in.

(Witness retakes the witness stand.)

THE COURT:  Looks like we are prepared,
then.  Jurors may come in.  Appreciate that.

(Whereupon, at 9:17 a.m. the jury returned
to open court.)

1                    **FRANCISCO AVILA**

2  called as a witness, duly sworn yesterday, returned to

3  the stand today and testified as follows through an

4  interpreter:

5                    THE COURT:  Thank you.  Please be seated.

6                    All right.  Folks, as you'll recall,

7  Mr. Avila was testifying when we broke yesterday.  Thanks

8  again for your continued arrival, presence, and

9  attention.

10                    So we'll continue with that examination.

11 And, Mr. Avila, I need to remind you that you are under

12 oath.  Any questions about that?

13                    THE WITNESS:  No.

14                    THE COURT:  Okay.  You may continue.

15                    MR. HOFF:  Thank you, Your Honor.

16                    **CONTINUED DIRECT EXAMINATION**

17  BY MR. HOFF:

18        Q.    Mr. Avila, I believe when we stopped

19 yesterday, you were discussing the fact that you had

20 killed two individuals outside of La Mansion; is that

21 right?

22        A.    Yes.

23        Q.    And I believe you testified that -- excuse

24 me, that Cabezon and Cuervo, the leaders, were happy that

25 you had achieved that goal?

1          A.    Yes.

2          Q.    Now, at that point, had you already earned

3    your letters and become a homeboy?

4          A.    Yes.

5          Q.    So this murder that you committed, did that

6    earn you respect with MS-13?

7          A.    Yes.

8          Q.    And why is that?

9          A.    Well, because I had just gotten through

10   killing two chavalas.

11         Q.    After these murders, did you learn about

12   another murder that happened outside Bola Ocho by members

13   of MS-13?

14         A.    Yes.

15         Q.    And did you actually go to Bola Ocho that

16   night?

17         A.    Yes.

18         Q.    Who did you go with?

19         A.    With Frijol, with Happy, and two girls.

20         Q.    And why were you going to Bola Ocho that

21   night?

22         A.    I don't remember what I was going to do.

23         Q.    What happened -- what did you see when you

24   got to Bola Ocho?

25         A.    I saw a car and there were people around

1  the car.

2        Q.    What -- did you approach the car?

3        A.    Yes.

4        Q.    What did you see as you approached?

5        A.    There was a guy laying down on the seat.

6        Q.    And could you see if anything had happened

7  to that guy?

8        A.    The car was full of bullet holes.

9        Q.    Did you know the person who was in the car?

10       A.    Yes.

11       Q.    Who was that?

12       A.    I don't remember their name.

13       Q.    Did you know -- how did you know the

14 person?

15       A.    Because I had seen him in the bars before.

16       Q.    Did you know if that person was related to

17 anyone?

18       A.    He was a brother of somebody who was

19 supposedly a chavala.

20       Q.    Did you later learn what happened at

21 Bola Ocho before you arrived?

22       A.    Yes.

23       Q.    Who did you learn that from?

24       A.    From Bomba.

25       Q.    I want to show you Government's

1  Exhibit 1273.  Who is this?

2          A.    Bomba.

3          Q.    And I believe previously you said Bomba was

4  related to someone; is that right?

5          A.    Demente's brother.

6          Q.    Thank you.

7                What was Bomba's rank at this time?

8          A.    Chequeo.

9          Q.    Okay.  And you were a homeboy at the time?

10          A.    Yes.

11          Q.    Was it important for you to know what was

12  going on in the gang as a homeboy?

13          A.    Yes.

14          Q.    Okay.  And did -- so Bomba was a lower rank

15  than you at the time?

16          A.    Yes.

17          Q.    And as a homeboy, was it important for you

18  to know what happened at Bola Ocho that night?

19          A.    Yes.

20          Q.    Why is that?

21          A.    Because a chavala had just died and Bomba

22  had earned the jump.

23          Q.    Okay.  When you say the jump, had earned

24  the right to become a member of MS-13?

25          A.    Yes.

```
 1          Q.    What did Bomba tell you happened at Bola
 2   Ocho that night?
 3               MR. LUCAS:  Your Honor, I'm going to
 4   object.  May we approach?
 5               THE COURT:  You may.
 6               (Whereupon, the following proceedings were
 7   had at the bench outside the hearing of the jury:)
 8               MR. LUCAS:  So I think my objection is
 9   basically to -- it's hearsay.  And I understand the
10   co-conspirator exception to the hearsay rule.  My issue
11   is is that if it's -- if it's a co-conspirator statement
12   or if he's gotten information as a part of the
13   conspiracy, this doesn't seem in furtherance of the
14   conspiracy.  There was a murder that took place.  It
15   hadn't been established that there was a murder that took
16   place as a -- by somebody that was a part of their
17   organization.  And so I don't see how anything Bomba says
18   at this point is hearsay.
19               THE COURT:  All right.  Before I ask for
20   Mr. Hoff's response, I think there are a couple things
21   going on here.  There are two components as to -- it
22   seems to me, that would need to be established to show
23   it's in furtherance of a conspiracy.  One is that it, in
24   fact, was something that was MS-13 business, which has
25   sort of been assumed by from this line of questioning,
```

1  but hasn't really been established.

2              MR. LUCAS:  I think we've, to some extent,

3  in certain instances allowed it to go on, but I think at

4  some point -- this is going to be a long trial, and I

5  think you've got to establish those things.

6              THE COURT:  Well, here's -- so here is --

7  if we sort of peel this back.  The second piece of it is,

8  if it was MS-13, why it was in furtherance of the

9  conspiracy, and that is why Mr. Hoff asked the question,

10 was it important for you, as a member of MS-13, to know

11 this.

12             I'm confident that that was part of laying

13 a foundation for why it was in furtherance of the

14 conspiracy that if there are -- if this whole set of

15 circumstances involves a RICO conspiracy, part of what

16 furthers that conspiracy is the conspirators, including

17 Bomba, Mr. Avila, communicating what's going on.

18             Now, I think probably that piece of it has

19 probably been adequately established.  The other piece of

20 it, though, I mean, I get your point, that there is a

21 missing piece that the killing that they're talking about

22 has anything to do with MS-13.

23             So here is how we're going to proceed:  Of

24 course, Mr. Hoff can, you know, do anything he wants to

25 lay any additional foundation before offering

1    co-conspirator statements.  Your objection is noted.

2    I've done my order about how to -- how to proceed and

3    sort of log objections to co-conspirator statements

4    because we'll cover them on the back end, so counsel

5    should do that.

6            So, Mr. Hoff, are you going to lay a

7    further foundation about -- well, let me say it this way.

8    I suspect that you can't really lay a foundation with

9    this witness that this was actually an MS-13 killing

10   separate and apart from Mr. Avila saying that he heard it

11   pursuant to a co-conspirator statement.  Is that fair to

12   say?

13           MR. HOFF:  That's fair to say.  And he also

14   did say -- he did say that Bomba earned his membership as

15   a result of this.

16           THE COURT:  Yeah.  So -- so -- yeah, he --

17   he did, although his testimony wasn't quite as clear as

18   it might have been that it was this particular killing.

19           MR. HOFF:  Right.

20           THE COURT:  Yeah.  So I see what you're

21   saying.  The bottom line is the objection's noted.  I'm

22   going to admit this co-conspirator statement

23   conditionally, subject to the procedures set forth in my

24   order, because it is true as of this time, not all

25   predicates have been laid for this coming in as a

1 co-conspirator statement.

2          This is an example of what my order and

3 some of the case law is intended to address because, you

4 know, the other two possibilities, besides what I did,

5 were *Enright* hearing and requiring the government to lay

6 the foundation totally before offering any co-conspirator

7 statements.  And those are very sort of cumbersome

8 procedures.

9          So, again, I think my order's the best we

10 can do to be fair to both sides and follow existing case

11 law.  So the ruling is the objection's noted.  Counsel

12 should log this for further discussion.  It's admitted

13 conditionally subject to a later finding that the

14 predicates for the admission of a co-conspirator

15 statement have been satisfied.

16          MR. HOFF:  Your Honor, just to avoid

17 another conference, I believe that I anticipate that

18 Mr. Avila will also testify about the others involved,

19 which would include, I believe, Mr. Flores, as well as

20 Mr. Tidwell.  So I just wanted to bring that up because I

21 imagine that Mr. -- that I imagine that Mr. Tidwell's

22 attorneys would have the same objection.

23          THE COURT:  Yeah.  I suspect that -- I tell

24 you what, here's what we can do.  If you want -- if on

25 behalf of Mr. Tidwell you want to make that objection at

the time it's offered, I might suggest that you say
something like, you know, we object for the reasons
previously discussed, and that will preserve your
objection.

MR. GANGULI:  From counsel table,
Your Honor?

THE COURT:  Yeah, from counsel table.  And
I think that will adequately preserve it.  Again, I'm
going to do my best to sort of log these occasions where
objections are made, but counsel need to do that too.

MR. HAWKINS:  Your Honor, for Mr. Pineda,
we join in this objection.

THE COURT:  Yeah.  So -- and I'll treat
sort of all counsel as making the objection to the
anticipated testimony about what Bomba was going to say
here.  And one thing I noted in my order, I think I said
if one counsel makes the objection, it will be treated as
preserved for all defendants.  So I think that's right,
right?  So you wouldn't have to keep doing that.

So if one counsel makes the objection, it's
preserved for all, and we'll do our best to keep track of
these things.  Anytime a co-conspirator statement is
offered, you can preserve it by saying, we object to this
as being a co-conspirator statement.  If you think you
need a sidebar also, then that's -- then that's fine.  In

1  your discretion, we can take it up.  Otherwise, I

2  envision this going that the co-conspirator statement is

3  offered, an objection is made to preserve it for all

4  defendants, and that it gets logged for later discussion.

5                 MR. HAWKINS:  Yes, sir.

6                 MR. LUCAS:  Thank you.

7                 (End of bench conference.  Whereupon, the

8  following proceedings were had in the hearing and

9  presence of the jury:)

10                THE COURT:  All right.  Mr. Hoff, you may

11 continue.  I tell you what, I, for one, can't recall if

12 we had a pending question.  If we did, I'm going to say

13 that it's withdrawn and you may ask another question.

14 BY MR. HOFF:

15       Q.    Okay.  So, Mr. Avila, you spoke with Bomba

16 about what happened at Bola Ocho, I believe you

17 testified; is that right?

18       A.    Yes.

19       Q.    And I believe you also testified that Bomba

20 was jumped in based -- or was Bomba jumped in based on

21 what happened at Bola Ocho?

22       A.    I don't remember if he was jumped, but the

23 jump, he did earn it.

24       Q.    Okay.  How did he earn it?

25       A.    Killing a chavala.

1      Q.    Was that the chavala at Bola Ocho?

2      A.    Yes.

3      Q.    What did Bomba tell you happened at Bola

4 Ocho that night?

5      A.    He said that he, Peluche, El Guero, and

6 Brian were following the chavala.

7      Q.    Okay.  And who was El Guero?

8      A.    Miklo.

9      MR. GANGULI:  Same objection, Your Honor.

10     THE COURT:  All right.  Thank you.  The

11 objection is made.  The co-conspirator statement is

12 conditionally admitted.  That objection is preserved on

13 behalf of all defendants.

14     All right.  You may continue.

15     MR. HOFF:  Thank you, Your Honor.

16     THE COURT:  Yes, sir.

17 BY MR. HOFF:

18      Q.    Who is Miklo?

19      A.    The gringo.

20      Q.    Do you see Miklo in the courtroom?

21      A.    Yes.

22      Q.    Can you describe what he's wearing and

23 where he's sitting in the courtroom?

24      A.    On your left, on the back side, with the

25 gray shirt.

1     Q.    Okay.  Seated over here?

2     A.    Yes.

3          MR. HOFF:  Your Honor, indicating, for the

4 record, that Mr. Avila has identified Kevin Tidwell as

5 Miklo.

6          THE COURT:  All right.  Absent objection,

7 the record will so reflect.

8 BY MR. HOFF:

9     Q.    I also want to show you Government's

10 Exhibit 1278.  Do you recognize this person?

11    A.    Yes.

12    Q.    Who is that?

13    A.    Miklo.

14    Q.    So what did Bomba tell you as they were

15 following this person?

16    A.    That they followed him into the Bola Ocho

17 parking lot.

18    Q.    Did Bomba say what happened when they

19 followed him to the Bola Ocho parking lot?

20    A.    He said that when the chavala parked, they

21 began to shoot at him.

22    Q.    Did he say who shot at the individual?

23    A.    All I remember is that he said Peluche and

24 El Guero.

25    Q.    Did Bomba say why they shot that person?

1          A.      He said he was a chavala.

2          Q.      Now, Mr. Avila, I want to go back a little

3    bit to yesterday.  I asked you about Demente's Facebook

4    name.  Do you remember that?

5          A.      Yes.

6          Q.      I believe at the time you couldn't remember

7    the name; is that right?

8          A.      Yes.

9          Q.      Is there something I could show you that

10   would help you remember?

11         A.      Yes.

12         Q.      If you could, look up there, there's a

13   binder up there that's marked 1137 through 1328.  Do you

14   see that?  If you could, could you turn to Exhibit

15   No. 1218, which is marked for identification purposes.

16                 If you could, let me know when you're at

17   that exhibit.

18         A.      Yes.

19         Q.      If you could turn to page 30 of that

20   exhibit.  If you could tell me when you're there.

21         A.      Yes.

22         Q.      Okay.  If you could take a moment to look

23   at that or did you do that?

24         A.      I already did that.

25         Q.      And after reviewing that, does that help

1  you remember Demente's Facebook name?

2         A.    Yes.

3         Q.    And what was that?

4         A.    Manuelito.

5         Q.    Now, you previously testified that you

6  joined MS-13 when you came to Nashville, and you were

7  around 17 or 18; is that right?

8         A.    17, 18.

9         Q.    Okay.  And previously you spoke to

10 investigators in this case; is that right?

11        A.    Yes.

12        Q.    And did you previously tell, on another

13 occasion, investigators that you joined MS-13 sooner when

14 you were in Honduras?

15        A.    Yes.

16        Q.    And is it fair to say that the first time

17 you spoke with federal agents and the police, there were

18 some things you weren't completely truthful about?

19        A.    Yes.

20        Q.    And is that one of those things about your

21 joining MS-13 earlier than you already did?

22        A.    Yes.

23        Q.    And was that because you didn't want to

24 discuss your upbringing in Honduras with the

25 investigators?

1          A.     Yes.

2          Q.     Now, Mr. Avila, did you also participate in

3    a kidnapping from a victim in a parking lot at Club

4    Galaxy?

5          A.     Yes.

6          Q.     Okay.  What caused you to go to Club Galaxy

7    that day?

8          A.     There was -- Bomba called me and told me

9    that there was this dude there who claimed to be from a

10   gang.

11         Q.     Okay.  And what gang did Bomba tell you the

12   person claimed to be from?

13         A.     Salvatrucha.  MS-13.

14         Q.     What did you do based on the phone call

15   with Bomba?

16         A.     I decided to go to Galaxy.

17         Q.     Did you go with anyone?

18         A.     I was with Frijol and Happy.

19         Q.     So did the three of you go to Club Galaxy?

20         A.     Yes.

21         Q.     And why?

22         A.     Well, to verify that dude, that loco, was

23   saying the truth.

24         Q.     And would it have been a problem if the

25   person wasn't telling the truth that he was a member of

1   MS-13?

2           A.    Yes.

3           Q.    And so what happened when you got to Club

4   Galaxy?

5           A.    I found Bomba arguing with two guys and

6   with the guy who supposedly belonged to the gang.

7           Q.    Did you have a gun?

8           A.    Yes.

9           Q.    Did anyone else have a gun?

10          A.    Happy and Frijol did.

11          Q.    What kind of gun did Frijol have?

12          A.    He had an AK.

13          Q.    So once you got there and saw Bomba arguing

14  with this person, what happened?

15          A.    I headed to the guy who said he belonged to

16  the gang because I knew him already.

17          Q.    And did you know if he was a member of

18  MS-13?

19          A.    I knew that he was lying.

20          Q.    So what did you do in response to that?

21          A.    I grabbed him and I put him in the car.

22          Q.    And what was the plan?

23          A.    Go to kill him at the lake.

24          Q.    After you put him in the car, what did --

25  what did you do?

1      A.    I turned around and I saw that Frijol was
2  fighting with one of the guys.
3      Q.    Did you see what happened when Frijol was
4  fighting with one of the guys?
5      A.    When I headed towards them, the AK was
6  fired.
7      Q.    Was anyone hit?
8      A.    No.
9            THE INTERPRETER:  Correction.  The AK was
10 fired because they were fighting for it.  No.
11 BY MR. HOFF:
12     Q.    Okay.  Let me just reask the other
13 question.  Was anyone hit when the AK was fired?
14     A.    It was fired to the air.
15     Q.    So no one was hit?
16     A.    No.
17     Q.    Did you go to the lake?
18     A.    Yes.
19     Q.    Who went with you?
20     A.    Happy, Frijol, the chavala, Danielito.
21     Q.    Now, in this instance, the person you
22 referred to as the chavala, is that the person who
23 claimed to be MS-13 who you knew was lying?
24     A.    Yes.
25     Q.    And would lying about being in the gang

1   make someone a chavala?

2           A.      For me it did.

3           Q.      What happened when you got to the lake?

4           A.      Before I got to the lake, I remembered that

5   there were cameras at the Galaxy.

6           Q.      And why was that important to you?

7           A.      Because they had taken the video when we

8   had picked them up.

9           Q.      At that point did your plan change?

10          A.      Yes.

11          Q.      So what happened then?

12          A.      I told the locos, the dudes, we were just

13  going to give him a punishment.

14          Q.      And did you do that?

15          A.      Yes.

16          Q.      How did you do that?

17          A.      We all jumped on him.

18          Q.      And did you beat him up?

19          A.      Yes.

20          Q.      What happened after that?

21          A.      We left.

22          Q.      Shortly after this incident, were you

23  involved in a robbery at an apartment complex after

24  leaving Club Galaxy one night?

25          A.      Yes.

1    Q.    Who were you with?

2    A.    I was with Frijol, Listo, Brian, and Bomba.

3    Q.    Just to be clear, the person you described

4    as Listo is the person sitting over at the end over here

5    that you described yesterday?

6    A.    Yes.

7    Q.    Yes.  How did this plan for the robbery

8    come about?

9    A.    We were at the parking lot of the Galaxy

10   when Listo said that he knew someone there who was -- had

11   money and was going to pay his workers.

12   Q.    And what did Listo say about that?

13   A.    That we go over there and that we rob him.

14   Q.    Did Listo tell you where the person lived?

15   A.    Yes.

16   Q.    So did you decide to do that, to rob this

17   person?

18   A.    Yes.

19   Q.    So what happened after that?

20   A.    Well, we got to the apartments.  I parked a

21   little further up from where the guy we were supposed to

22   rob was at.

23   Q.    And did you drive?

24   A.    Yes.

25   Q.    Who drove with you?

1          A.    I remember that Frijol was with me.

2          Q.    And were there other cars with people in

3    them as well?

4          A.    Bomba was with Bryan.

5          Q.    And what about Listo?

6          A.    I don't recall who he was with.

7          Q.    Did he go with you to the apartment

8    complex?

9          A.    Yes.

10         Q.    What happened when you got to the apartment

11   complex?

12         A.    Frijol got out of my car and went with

13   Listo.

14         Q.    Did you see where they went?

15         A.    They walked on down.

16         Q.    On down to where?

17         A.    Towards where the guy we were going to rob

18   was at.

19         Q.    Okay.  And did you see what happened?

20         A.    No.

21         Q.    Did Frijol and Listo eventually come back

22   to where you were?

23         A.    Yes.

24         Q.    And did Listo say anything when he came

25   back?

1       A.    They said that they had made a hit.

2       Q.    And what did you understand that to mean?

3       A.    That they had already robbed the guy.

4       Q.    And did anyone give you anything?

5       A.    Listo gave me some thousand two hundred, or

6 something, of money.

7       Q.    What was that money supposed to be used

8 for?

9       A.    To buy guns.

10      Q.    And were those guns for the clique?

11      A.    Yes.

12      Q.    Did it get used for that?

13      A.    No.

14      Q.    No?  What was it used for?

15      A.    I used it for myself.

16      Q.    So you didn't use it for the gang?

17      A.    No.

18      Q.    Was that a violation of the rules?

19      A.    Yes, if the palabrero found out, it was.

20      Q.    Did you know if the palabrero ever found

21 out?

22      A.    No.

23      Q.    Now, as part of your plea agreement, did

24 you also admit to participating in multiple carjackings?

25      A.    Yes.

```
1        Q.    And did one of those -- did those
2   carjackings occur in March of 2017?
3        A.    Yes.
4        Q.    During one of these carjackings, was there
5   a child in the car?
6        A.    A child?
7        Q.    A child.
8        A.    Yes.
9        Q.    Who were you with that day?
10       A.    I was with Peluche, Happy, and a chequeo.
11       Q.    And what happened?
12       A.    Chequeo needed a car.
13       Q.    What did the chequeo need a car for?
14       A.    To move about.
15       Q.    So what did you guys decide to do?
16       A.    That we go and rob, steal one.
17       Q.    Who was driving that day?
18       A.    Peluche was.
19       Q.    Did you find a car to steal?
20       A.    Yes.
21       Q.    And what happened when you found that car?
22       A.    Peluche parked behind the car, and then I
23   got out with a chequeo.
24       Q.    What happened when you got out of the car?
25       A.    Chequeo went to the door where the driver
```

1    was at, and I went to the passenger door.

2         Q.    What happened then?

3         A.    I tried to open the door, but it wouldn't

4    open.  And then I heard chequeo arguing with the guy who

5    was driving the car.

6         Q.    So when you saw the person -- the chequeo

7    arguing with the guy, the driver of the car, what did you

8    do?

9         A.    I went to where they were at.

10        Q.    And what did you do?

11        A.    I told the guy to get out.

12        Q.    And did you get him out of the car?

13        A.    Yes.  I pulled him and I got him out of the

14   car.

15        Q.    Did you do anything when you got him out of

16   the car?

17        A.    I told him to leave, and I hit him with the

18   butt of the pistol.

19        Q.    So you had a gun that day?

20             THE INTERPRETER:  Interpreter requests a

21   repetition.

22             THE WITNESS:  I told him to leave.  And I

23   hit him with the butt of the gun on the head.

24   BY MR. HOFF:

25        Q.    So you had a gun that day?

```
 1          A.    Yes.
 2          Q.    After you did that, did you get in the car?
 3          A.    Yes.
 4          Q.    Did you take the car?
 5          A.    I looked in the back of the car, and there
 6   was a girl there.
 7          Q.    And so did you take the car?
 8          A.    No.
 9          Q.    Why not?
10          A.    Because the little girl was there.
11          Q.    Did you also take another person's car who
12   owed you money in March of 2017?
13          A.    Yes.
14          Q.    And what happened in that instance?
15          A.    The dude owed me drug money.
16          Q.    And because he owed you money, what did you
17   do?
18          A.    I decided that I was going to take his car
19   from him until he paid me the money.
20          Q.    And did you do that?
21          A.    Yes.
22          Q.    How did you do that?
23          A.    One day he called me saying that he wanted
24   some drugs, and I told him that we could meet at that
25   store where we always would meet.
```

```
1        Q.    Did you go to the store?

2        A.    Yes.

3        Q.    Did he meet you there?

4        A.    Yes.

5        Q.    And what happened when he met you there?

6        A.    I told Frijol to bring the gun because we

7   were going to go take the car from him.

8        Q.    Did you take his car?

9        A.    Yes.

10        Q.    What did you do with it?

11        A.    I drove it for one night, and then I left

12   it parked at some apartments.

13        Q.    I want to show you Government's

14   Exhibit 1280.  Who is that person?

15        A.    Chamaco.

16        Q.    And at some point, did Chamaco have a

17   falling out with MS-13?

18        A.    Yes.

19        Q.    Why was that?

20        A.    Because supposedly he was out and about

21   working with the police.

22        Q.    And was there a discussion about him --

23   Chamaco working with the police at a misa?

24        A.    Yes.

25        Q.    And what was discussed at that misa?
```

1    A.    That Chamaco was out and about working with
2  the police, and that's why a green light was going to be
3  put on him.
4    Q.    Who said that?
5    A.    Cabezon.
6    Q.    And did Cabezon say anything else that you
7  specifically were supposed to do?
8    A.    He said for me and Frijol to dig a hole
9  where we were going to bury him.
10    Q.    Did you and Frijol do that?
11    A.    No.
12    Q.    Why not?
13    A.    Too much work.
14    Q.    Who was present at this misa that you
15  remember?
16    A.    I think Cabezon was there.  I was there.
17  Peluche was there.  Frijol was there.  Shaggy.  And I
18  can't remember who else.
19    Q.    So once Cabezon issued the green light on
20  Chamaco, who was supposed to carry it out?
21    A.    Whoever had the opportunity to.
22    Q.    And at some point, did you have the
23  opportunity to try and carry out that green light?
24    A.    Yes.
25    Q.    And the day that you tried to carry out

1  that green light, who were you with?

2          A.    With Peluche.

3          Q.    And did you find out where Chamaco was that

4  day?

5          A.    Yes.

6          Q.    From who?

7          A.    Cabezon.

8          Q.    What did Cabezon tell you?

9          A.    That Chamaco was at Bola Ocho.

10         Q.    So did you and Peluche go to Bola Ocho?

11         A.    Also, Peluche was with Cabezon and with

12 Happy.

13         Q.    Was Frijol there too, I believe you said?

14         A.    Yes.

15         Q.    And who did you drive there with?

16         A.    I was driving with Peluche.

17         Q.    When you got to Bola Ocho, did you see

18 Chamaco?

19         A.    He left in a car with a dude referred to as

20 El Gordo, E-l G-o-r-d-o, and with Hansy.

21         Q.    And who was El Gordo?

22         A.    He was a dude that also dedicated himself

23 to selling drugs.

24         Q.    And who was the person that you -- who was

25 Hansy?

1    A.    Hansy worked with El Gordo.

2    Q.    So El Gordo and Hansy were also drug

3 dealers?

4    A.    Yes.

5    Q.    And they were with Chamaco that day?

6    A.    Yes.

7    Q.    I want to show you Government's

8 Exhibit 1259.  Do you see that person?

9    A.    Yes.

10    Q.    Who is that?

11    A.    Gordo.

12    Q.    And I want to show you Government's

13 Exhibit 1275.  Who is that?

14    A.    Hansy.

15    Q.    So after you saw the three of them in a

16 car, what did you and Peluche do?

17    A.    We started to follow them.

18    Q.    Why?

19    A.    To kill Chamaco.

20    Q.    And as you started following them, what

21 happened?

22    A.    Somebody from the car where Chamaco was at

23 shot into the air.

24    Q.    Was your plan -- was your plan that day to

25 shoot Hansy and Gordo?

1      A.    No.

2      Q.    So after they shot out of the car that

3 Chamaco was in, what happened?

4      A.    Peluche stuck out from the moon roof and

5 started to shoot them with a firearm.

6      Q.    What kind of gun did Peluche have?

7      A.    An R.

8      Q.    I'm sorry.  Is that an AR?

9      A.    Yes.

10     Q.    And were you driving?

11     A.    Yes.

12     Q.    And were you chasing the car that Chamaco

13 was in?

14     A.    Yes.

15     Q.    So your plan was not to shoot Hansy or

16 Gordo, but they were obviously in the car with Chamaco;

17 is that right?

18     A.    Before we started following them, Cabezon

19 had said that if you end up hitting them, he was sorry

20 about that for them.

21     Q.    So it didn't matter if they got hit?

22     A.    No.

23     Q.    Did you see if Peluche hit the car that

24 they were in?

25     A.    Yes.

1        Q.    And what happened?  Did you continue
2   following them?
3        A.    We followed them all the way up until they
4   arrived at La Mansion.
5        Q.    So you continued following them from one
6   nightclub to La Mansion?
7              THE COURT:  Let me ask a point of
8   clarification.  The question was:  Did you see if Peluche
9   hit the car that they were in?  Answer was yes.  The
10  question, as posed, gave an answer that he saw whether
11  Peluche hit the car.  But I'm going to ask:  Based on
12  what you saw, did Peluche hit the car when you were
13  following it?
14             THE WITNESS:  Yes.
15             THE COURT:  I figured that might be what
16  you meant, but I wanted to make sure.  Thank you.
17             MR. HOFF:  Thank you, Your Honor.
18   BY MR. HOFF:
19        Q.    As you followed the car to La Mansion, was
20  Peluche shooting at the car while you were driving there?
21             THE INTERPRETER:  I'm sorry.  Repeat.
22   BY MR. HOFF:
23        Q.    As you followed the car to La Mansion, was
24  Peluche shooting the entire time?
25        A.    Yes.

1        Q.    What happened after you got to La Mansion?

2        A.    They went into the parking lot all the way

3    to the deep end and got out of the car.

4        Q.    And what did you and Peluche do?

5        A.    We got out of the car and continued

6    shooting at them.

7        Q.    So at that point, you both were shooting at

8    them?

9        A.    Yes.

10        Q.    What kind of gun did you have?

11        A.    I don't remember.

12        Q.    Was it a handgun or a rifle?

13        A.    Handgun.

14        Q.    Do you know if Gordo, Hansy, or Chamaco

15    were shot that night?

16        A.    We did not hit them.

17        Q.    Did you later learn that on another

18    occasion Hansy had been shot?

19            THE INTERPRETER:  Your Honor, the

20    interpreter needs to change the translation to "we did

21    not land shots at them."

22            MR. LUCAS:  Your Honor, I just want to make

23    the objection about co-conspirator statements.  I think

24    he's about to ask him did he learn at some point, which

25    means obviously that wouldn't have been his own --

1                THE COURT:  Well, let's -- I'm going to

2    take that as an objection to -- I think for starters, one

3    of the -- we don't know if the answer necessarily calls

4    for a hearsay statement in response.  I would say a

5    foundation has not been laid as to how he learned this or

6    how he has knowledge that Hansy had been shot.

7                So let's -- I'm going to -- we had an

8    interruption there.  I'm going to grant the objection to

9    the question as posed.  Mr. Hoff can ask another one, and

10   he may want to start by asking a question that sort of

11   clarifies the two different interpretations we got to see

12   what that testimony was.

13               MR. HOFF:  I'm going to, Your Honor.

14               THE COURT:  Okay.

15    BY MR. HOFF:

16        Q.    So I just want to clarify something.  Do

17   you know if you -- if Chamaco, Hansy, or Gordo were shot

18   the night you were shooting at him -- at them?

19        A.    We did not shot at them -- we did not land

20   shots at them.

21        Q.    Eventually was Chamaco arrested?

22        A.    Yes.

23        Q.    And was the green light ever able to be

24   carried out?

25        A.    No.

1      Q.     Now, at some point did you and Peluche have
2  a falling out?
3      A.     Yes.
4      Q.     Why was that?
5      A.     Because I hit his baby momma.
6      Q.     And so that was a problem between you and
7  him?
8      A.     Yes.
9      Q.     Now, you were arrested in August 2017 I
10 believe you testified; correct?
11     A.     Yes.
12     Q.     Prior to your arrest, were you involved in
13 a shooting on Lutie Street in Nashville?
14     A.     A few months before, yes.
15     Q.     And what happened?
16     A.     Bomba called Demente.  He was being
17 followed by a chavala.
18     Q.     Based on -- was this before Demente had
19 left for Honduras?
20     A.     Yes.
21     Q.     And based on the call between Demente and
22 Bomba, what did you do?
23     A.     Demente told Bachata to take us to where
24 Demente was at -- where Gretchen -- where Bomba was at.
25     Q.     And was Bachata a friend of some of the

1  gang members?

2  A.    Yes.

3  Q.    So did you and Demente and Bachata go meet

4  up with Bomba?

5  A.    Yes.

6  Q.    Where did you meet up with him?

7  A.    We met up at a gasoline station that was on

8  Thompson Lane and Moody Street.

9  MR. BLOOM:  Excuse me, Your Honor.  I might

10  have misheard.  I believe the testimony was that Demente,

11  Mr. Pineda was in Honduras.

12  THE COURT:  I think I heard the answer that

13  he was not yet in Honduras.  I think.  Is that what you

14  heard, Mr. Hoff?

15  MR. HOFF:  Yeah.  The question was, was

16  this before Demente went to Honduras, and I believe the

17  witness's answer was yes.

18  THE COURT:  That's my recollection as well.

19  Yeah.

20  MR. BLOOM:  Thank you.

21  MR. HOFF:  May I continue, Your Honor?

22  THE COURT:  You may, yup.

23  BY MR. HOFF:

24  Q.    So after you got to the gas station, what

25  happened?

1      A.    We went to the car where the chavala was
2  at.
3      Q.    So the chavala had followed Bomba?
4      A.    Yes.
5      Q.    And what happened when you went over to the
6  car?
7      A.    Bachata began to hit the chavala, and then
8  I did.
9      Q.    And what happened then?
10     A.    We tried to get him out of the car.
11     Q.    Were you able to get him out of the car?
12     A.    No, because people from the gas station
13  were already walking towards us.
14     Q.    So what did you do then?
15     A.    Chavala said that his homie was going to
16  come.
17     Q.    I'm sorry.  Did you say big homie?
18     A.    Yes.
19     Q.    And what did you understand that to mean?
20     A.    That it was another chavala.
21     Q.    So what happened then?
22     A.    So someone said that they were going to see
23  one another someplace.
24     Q.    Did you guys go to a location where this
25  individual was?

1     A.    We got to a location, waiting for the
2 individual to arrive.
3     Q.    Why were you waiting?
4     A.    Because Demente was going to fight him,
5 from what he said.
6     Q.    Did the guy show up?
7     A.    Yes.
8     Q.    And did Demente and this chavala fight?
9     A.    No.
10     Q.    Why not?
11     A.    Because when I saw the car and I saw the
12 chavala, I recognized him.
13     Q.    And what did you do?
14     A.    When he saw us, he also ran in the car.
15     Q.    And when -- you mean he drove off in the
16 car?
17     A.    Yes.
18     Q.    What did you do then?
19     A.    I began to shoot at him.
20     Q.    And what happened then?
21     A.    Hit the car and he left.
22     Q.    Did you guys then leave?
23           THE INTERPRETER:  Correction.  The car
24 was -- took off and was lost.
25

1    BY MR. HOFF:

2         Q.    Did you hit the -- when you were firing at

3    the car, did you hit the car?

4         A.    Yes.

5         Q.    And what happened to the car?

6         A.    Its rear windows broke.

7         Q.    What did you and Demente do then?

8         A.    We tried to follow him.

9         Q.    Did you follow him?

10        A.    Yes.

11        Q.    What happened when you followed him?

12        A.    We saw that he went into a Kroger.

13        Q.    And what did you do then?

14        A.    We went home.

15        Q.    Was there also a time that you and other

16   members of your clique shot at a house of Brown Pride

17   members?

18        A.    Yes.

19        Q.    Are Brown Pride members chavalas?

20        A.    Yes.

21        Q.    Who were you with when that happened?

22        A.    I was with Demente, Frijol, and Danielito.

23        Q.    Was this prior to Demente leaving for

24   Honduras?

25        A.    Yes.

1       Q.    Why did you shoot at this house?

2       A.    Because someone said that there was a

3 chavala there.

4       Q.    And what did you guys do?

5       A.    We shot at the house.

6       Q.    Who shot at the house?

7       A.    From what I can remember, all of us did.

8       Q.    Was there another occasion when you and

9 Frijol got into a confrontation with rival drug dealers

10 at a bar?

11      A.    Yes.

12      Q.    And what were you doing at that bar?

13      A.    Well, we got there with the intention of

14 trying to sell drugs.

15      Q.    And did that happen?

16      A.    No.

17      Q.    Why not?

18      A.    Well, we were playing billiards when some

19 guys got there and told us, you can't sell here.

20      Q.    So in response to that, what did you and

21 Frijol do?

22      A.    They didn't give us a chance to do anything

23 because they began to beat us up.

24      Q.    Did you leave the bar?

25      A.    Yes.

1        Q.    And what happened when you left?

2        A.    I called Cabezon and I told him what the

3 situation was like there.

4        Q.    Did Cabezon show up?

5        A.    A while later he did.

6        Q.    And what happened when he showed up?

7        A.    I told him that the dudes had ran us from

8 there and that we had to hit somebody.

9        Q.    So what did you guys then do?

10       A.    We parked at Hooters and waited for them to

11 get out.

12       Q.    Did you see them come out of the bar?

13       A.    No.

14       Q.    Okay.  Did you do anything after that?

15       A.    I met a guy who knew the guys who were in

16 there.

17       Q.    And what did you do when you met him?

18       A.    I saw that he was leaving the bar.

19       Q.    And when you saw him leaving, what did you

20 and Frijol and Cabezon do?

21       A.    I told Cabezon that that dude had been with

22 them and that we followed him and hit him.

23       Q.    Okay.  And did you do that?

24       A.    Yes.

25       Q.    Who drove?

```
1              A.    I did.

2              Q.    And did someone shoot at this person?

3              A.    Cabezon did.

4              Q.    Did you see -- do you know if -- did you

5    see if Cabezon hit the person?

6              A.    I saw that he hit his car.

7              Q.    And what happened -- after he hit the

8    car -- or shot the car, what did you guys do?

9              A.    We went back home.

10             Q.    At some point were you promoted or -- yeah,

11   were you promoted to the Second Word of TPLS?

12             A.    Yes.

13             Q.    Why -- or when was that?

14             A.    Like one or two months before they closed.

15                   THE INTERPRETER:  Correction.  That I got

16   incarcerated.

17    BY MR. HOFF:

18             Q.    So one or two months before you were

19   arrested?

20             A.    Yes.

21             Q.    Why did you get promoted to Second Word?

22             A.    Because Peluche was real hot in the news,

23   and he decided to move to another state.

24             Q.    And so you then became the -- so was

25   Peluche the Second Word before you?
```

1      A.    Yes.

2      Q.    What were your responsibilities as Second

3  Word?

4      A.    I collected the quota, the money, that was

5  collected on Sundays.  I sent money to the homeboys who

6  were locked up, and I sent money to El Salvador.  And I

7  would also buy bullets.

8      Q.    Did you order any green lights as Second

9  Word?

10     A.    Once.

11     Q.    On who?

12     A.    A man who they call El Cholo.  C-h-o-l-o.

13     Q.    Why did you issue that green light?

14     A.    Because I wanted to get into the bar where

15  he was selling.

16     Q.    Did anything happen to this person that you

17  issued the green light on?

18     A.    We had the opportunity like three times,

19  but it didn't go through.

20     Q.    You mentioned a person by the name of

21  Arling that used to sell drugs for you; is that right?

22     A.    Yes.

23     Q.    And did he sell drugs for other members of

24  the clique?

25     A.    When I was arrested, he sold for Peluche.

1        Q.    And I believe you mentioned that Arling was

2   a paro; is that right?

3        A.    Yes.

4        Q.    And at some point did you learn that

5   something happened to Arling?

6        A.    Yes.

7        Q.    When did you learn that?

8        A.    When I was locked up at the Nashville jail,

9   Harding Place.

10       Q.    And as a member of the clique, was it

11  important for you to know what was happening outside of

12  the jail?

13       A.    Yes.

14       Q.    Why?

15       A.    To be up to date.

16       Q.    And if someone were to help out a chavala,

17  would that be a violation of the rules, MS-13 rules?

18       A.    Yes, because he's helping an enemy.

19       Q.    And would it be important for you to know

20  that?

21       A.    Yes.

22       Q.    So you mentioned that you learned about it

23  while you were incarcerated.  And who did you learn that

24  from?

25        A.    From Happy.

```
 1          Q.    And Happy was a homeboy in TPLS?

 2          A.    Yes.

 3          Q.    I want to show you Government's

 4   Exhibit 1268.  Do you recognize this person?

 5          A.    Yes.

 6          Q.    Who is that?

 7          A.    Happy.

 8          Q.    Did Happy tell you what happened to Arling?

 9          A.    Yes.

10          Q.    Did -- what did Happy say happened to

11   Arling?

12                MR. CLIFTON:  I'm going to object.  Same

13   objection as to the Court ruled on earlier.

14                THE COURT:  The objection is made to the

15   offering of a co-conspirator statement, which I will

16   conditionally admit.  The objection is preserved on

17   behalf of all defendants.

18                We'll complete this line of questioning and

19   then take our midmorning break.

20                MR. HOFF:  I'm almost done, Your Honor.

21                THE COURT:  Okay.

22    BY MR. HOFF:

23          Q.    What did Happy say happened to Arling?

24          A.    Because he said Peluche, Bomba, and the fly

25   boy had picked him up and killed him.  Also, Listo.
```

```
1          Q.    Did Happy say why they killed Arling?
2          A.    He said that he had been killed because
3    several nights earlier he had helped a chavala flee.
4          Q.    And when you say he helped a chavala flee,
5    are you referring to Arling?
6          A.    Yes.
7          Q.    And was that a problem?
8          A.    Yes.
9          Q.    What did Happy tell you -- strike that.
10          Did Happy tell you specifically what
11   happened to Arling?
12          A.    Yes.
13          Q.    What did Happy tell you?
14          A.    He said that he was picked up from a bar
15   and that Peluche put him in the trunk of a car.
16          Q.    Who was picked up from the bar?
17          A.    Arling.
18          Q.    Did Happy say what happened when Arling was
19   put in the trunk of the car?
20          A.    That they took him to the outskirts of
21   Nashville.
22          Q.    And did Happy say what happened when they
23   took Arling to the outskirts of Nashville?
24          A.    Yeah.  That when they got outside of
25   Nashville, they opened up the trunk.  Arling tried to get
```

1   out and run away from them.

2        Q.    And did Happy say what happened then?

3        A.    That Peluche began to shoot at him and told

4   him to shoot at him as well.

5        Q.    For who to -- and who shot at him as well?

6        A.    That Peluche shot at Arling and he told

7   Happy for Happy to also shoot at him.

8        Q.    Did Happy tell you what, if anything,

9   happened to the car that Arling was in?

10        A.    That it was -- gasoline was poured all over

11   it, and it was lit on fire.

12        Q.    Did Happy tell you if anything happened to

13   Peluche when the car was lit on fire?

14        A.    He said that Peluche burned his hand.

15        Q.    Mr. Avila, do you still consider yourself a

16   member of MS-13?

17        A.    No.

18        Q.    Why not?

19        A.    Well, because I violated the No. 1 rule

20   that is not supposed to be violated.

21        Q.    And what's the punishment for that?

22        A.    Death.

23        MR. HOFF:  I don't have any further

24   questions, Your Honor.

25             THE COURT:  All right.  Thank you.  This

```
 1    will be a good time to take our midmorning break.  We'll
 2    take about 15 minutes, and I will give my usual
 3    admonition.  No talking about this case, folks, and no
 4    research or investigation.  We'll reconvene in about 15
 5    minutes.
 6                  Jurors may step down, and when they come
 7    back we'll have cross-examination.
 8                  (Whereupon, at 10:39 a.m. the jury retired
 9    from open court.)
10                  THE COURT:  Thanks, folks.  Please be
11    seated.  Anything to take up before we go on break?
12    Mr. Safeeullah?
13                  MR. SAFEEULLAH:  No, Your Honor.
14                  THE COURT:  Anything from any of the
15    defendants?
16                  Don't see anything.  So we'll reconvene in
17    about 15 minutes.  Thank you.
18                  (Whereupon, a break was taken from
19     10:40 a.m. to 11:04 a.m.)
20                  THE COURT:  Thank you, please be seated.
21                  Mr. Ganguli, are you conducting the
22    cross-examination?
23                  MR. GANGULI:  Yes, Your Honor.
24                  THE COURT:  You may take the podium.
25                  All right.  We'll call in the jurors.
```

1    Thank you.

2              (Whereupon, at 11:05 a.m. the jury returned

3    to open court.)

4              THE COURT:  All right.  Thank you,

5    everybody.  Please be seated.

6              All right.  Mr. Ganguli, you may commence

7    cross-examination.

8              MR. GANGULI:  Thank you, Your Honor.

9                        **CROSS-EXAMINATION**

10   BY MR. GANGULI:

11        Q.    So tell me your name, please.

12        A.    Francisco Avila.

13        Q.    Are you sure?

14        A.    Yes.

15        Q.    Who is Edwin Reyes?

16        A.    It is my Facebook name.

17        Q.    That's not true, is it?

18        A.    In Facebook, it is my name.

19        Q.    Well, when you got indicted in this court,

20   your name was listed as Francisco Avila, and you were

21   also known as Edwin Reyes; right?

22             THE COURT:  One moment, Mr. Ganguli.  I

23   think that's a compound question.  If we could break that

24   down.

25             MR. GANGULI:  Yes, sir.

1          THE INTERPRETER:  And the interpreter
2    directs if the defense counsel could stay close to a
3    microphone.
4     BY MR. GANGULI:
5          Q.    When you were indicted in this court, your
6    indictment was listed as Francisco Avila, also known as
7    Edwin Reyes; right?
8          A.    Also as Humilde.
9          Q.    Understand.  When you pled guilty in 2018,
10   your alias in state court was listed as Edwin Reyes;
11   right?
12         A.    I don't remember.
13         Q.    That's fine.  I'm going to pass to you a
14   document, and I'll ask if it refreshes your recollection.
15              MR. GANGULI:  Your Honor, may I approach
16   opposing counsel?
17              THE COURT:  You may.
18              MR. GANGULI:  And may I approach the
19   witness?
20              THE COURT:  You may.
21    BY MR. GANGULI:
22         Q.    Mr. Avila, I'd like to invite your
23   attention to the top of that document.  Do you see the
24   name Francisco Avila?
25         A.    Yes.

1     Q.    Next to it, do you recognize the name Edwin

2   Reyes?

3     A.    Yes.

4     Q.    And the document that you're looking at is

5   a judgment sheet?

6             MR. HOFF:  Objection.

7             THE COURT:  Yes.  Why don't we approach?

8             (Whereupon, the following proceedings were

9   had at the bench outside the hearing of the jury:)

10            THE COURT:  All right.  Is the purpose of

11  showing this document to refresh his recollection as to

12  whether, when he pled in 2018, he was listed as having

13  the alias Edwin Reyes?

14            MR. GANGULI:  Yes, sir.

15            THE COURT:  So here's the technique that

16  we'll use.  You can show it to him, ask him to review

17  it -- and I can do it this time.  But he -- we're going

18  to do it this way.  Show him the document and ask him to

19  review it and to let us know when he's done reviewing it,

20  to set it aside, and then ask him whether or not his

21  recollection is refreshed.

22            MR. GANGULI:  Yes.

23            THE COURT:  We'll do it that way.  I'll

24  give a demonstration of what will pass muster with me,

25  and we'll go from there.

1        MR. GANGULI:  Okay.  Thank you.

2             (End of bench conference.  Whereupon, the

3  following proceedings were had in the hearing and

4  presence of the jury:)

5        THE COURT:  All right.  Mr. Avila, here's

6  how we're going to proceed.  You recall some questions

7  about whether you were listed as having the alias Edwin

8  Reyes; correct?

9        THE WITNESS:  Yes.

10       THE COURT:  Here's how I'm going to

11  proceed.  I'm going to ask you not to say anything but to

12  just review the document that's in front of you.  When

13  you feel like you've reviewed it, let me know, and then

14  counsel will follow up with some questions.  Does that

15  make sense?

16       THE WITNESS:  Yes.

17       THE COURT:  All right.  Thank you.  You can

18  take a look at that and let us know when you're done.

19       THE WITNESS:  I have now reviewed it.

20  BY MR. GANGULI:

21       Q.   Has your recollection been refreshed?

22       A.   Yes.

23       Q.   Having your recollection been refreshed,

24  you were listed as Edwin Reyes, as well as Francisco

25  Avila in 2018; right?

1          A.    Yes.

2          Q.    Every time you have used the name Edwin

3    Reyes, that's a lie; correct?

4          A.    Yes.

5          Q.    How many times have you used the name Edwin

6    Reyes?

7          A.    That is the name that I use in Facebook.

8          Q.    Sir, I didn't ask where you used the name.

9                The question was:  How many times have you

10   used the name Edwin Reyes?

11         A.    Oh, I don't have a specific number.

12         Q.    Would you agree with me that it's hundreds

13   of times that you have passed yourself off as Edwin

14   Reyes?

15         A.    I would say under 100.

16         Q.    That's fine.

17               You've got that document in front of you.

18   Yesterday when you testified, you said that you had not

19   received any benefits in exchange for your cooperation.

20   Do you remember saying that?

21         A.    I remember having said that I had not yet

22   received any immigration benefits yet nor protection from

23   the government.

24         Q.    I understand.  You have already received

25   some benefits; right?

1          A.    Yes.

2          Q.    Okay.  Specifically, you started meeting

3    with the government on May 4, 2018; right?

4          A.    Yes.

5          Q.    You met with them again on August 7, 2018;

6    right?

7          A.    Yes.

8          Q.    I want to invite your attention to the

9    document you have in front of you.  If you would look at

10   that document, please.

11              MR. GANGULI:  Your Honor, may I approach

12   the witness just to make sure that he looks at the

13   correct document?  There are several that are stapled

14   together.

15              THE COURT:  Are we offering this as an

16   exhibit?

17              MR. GANGULI:  No, Your Honor.

18              THE COURT:  What's it being offered for?

19              MR. GANGULI:  To refresh his recollection.

20              THE COURT:  I don't recall that he's

21   testified that there's anything pending on the floor as

22   to which he doesn't recall something.  Now, if he needs

23   to -- you know, under the general rule, if he says he

24   doesn't remember, you're free to try to refresh with

25   anything.  But until he testifies and he doesn't call

1  something, that will be premature.

2              MR. GANGULI:  Yes, sir.

3   BY MR. GANGULI:

4        Q.   Now, on that document you've got in front

5   of you --

6              THE COURT:  Well, one moment.  Is there a

7   basis for having that in front of him yet?  Because if

8   it's just refreshing -- because I think the reason to

9   have it in front of him would be part of seeking to offer

10  something into evidence or to refresh his memory.  Is it

11  just potential refreshment?

12             MR. GANGULI:  Potential refreshment.

13             THE COURT:  All right.  Why don't you,

14  Mr. Avila, please turn that over, set it aside for now,

15  that document.  You may or may not need to refer to it

16  later.

17             All right.  Thank you.

18   BY MR. GANGULI:

19       Q.   When you were indicted in state court in

20  2017, you were indicted for the crimes of aggravated

21  robbery; right?

22       A.   Yes.

23       Q.   There were two counts of aggravated

24  robbery; right?

25       A.   Yes.

```
 1          Q.    They were Case Nos. 2017-D-2217 and Case
 2   No. 2017-D-2218; right?
 3          A.    Yes.
 4          Q.    Each of those indictments for aggravated
 5   robbery carried a potential punishment of eight to 12
 6   years at the Department of Corrections; right?
 7          A.    I don't know the penalty guidelines of the
 8   State.
 9          Q.    All right.  Would it surprise you to know
10   that you were facing eight to 12 years at the Department
11   of Corrections per count?
12          A.    Yes, because my State attorney never told
13   me anything.
14          Q.    You pled guilty to the reduced sentence of
15   robbery; right?
16          A.    Yes.
17          Q.    You pled guilty on October 16, 2018; right?
18          A.    Yes.
19          Q.    I noticed that you're yawning.
20          A.    Yes.
21          Q.    Am I boring you?
22          A.    I've been awake since 3:30 in the morning.
23          Q.    You pled guilty to a four-year sentence;
24   right?
25          A.    Yes.
```

1       Q.    And that's for a Class C felony; right?

2       A.    Yes.

3       Q.    So you have received some benefit already;

4 right?

5       A.    If you're referring to those cases, no.

6       Q.    You don't think that getting to plead

7 guilty to a lesser charge and concurrent sentences is a

8 benefit?

9       A.    That was an arrangement made by my attorney

10 and the State attorney for me to be able to plead guilty.

11       Q.    In this federal indictment, you entered a

12 plea on March 24, 2021; right?

13       A.    Yes.

14       Q.    That was roughly two years ago; right?

15       A.    Yes.

16       Q.    Would you agree with me that your

17 sentencing for that indictment has been continued?

18       A.    Yes.

19       Q.    Would you agree with me that your

20 sentencing for that indictment has been continued many

21 times?

22       A.    Yes.

23       Q.    Your sentencing has been continued many

24 times so you could testify in this case; right?

25       A.    Yes.

1     Q.    Because after you testify, you expect to
2   receive a reduction?
3     A.    Yes.
4     Q.    Yesterday when the government was
5   questioning you, they said that you expect to receive
6   some immigration benefit when you are released from
7   custody.
8     A.    I said that I wanted -- I said that I
9   expected to receive something.
10    Q.    When you are released?
11    A.    Yes.
12    Q.    That means that you expect to be released
13  from custody at some point; right?
14    A.    With all due respect, I hope that God does
15  hear you.
16    Q.    When you are sentenced, you understand that
17  it's the government that's going to make a 5K1 motion;
18  right?
19    A.    Yes.
20    Q.    So it's not really up to the Court to grant
21  you a downward departure.  It's up to the government;
22  right?
23    A.    I believe that they're going to ask for a
24  reduction, but in the end, it would be the judge who
25  would decide.

1      Q.    For those offenses to which you pled
2  guilty, each one carries a mandatory life sentence;
3  right?
4      A.    Yes.
5      Q.    So you're facing four life sentences;
6  right?
7      A.    Yes.
8      Q.    But like we talked about a few moments ago,
9  you expect to be released at some point?
10     A.    Yes.
11     Q.    Three of the crimes to which you pled were
12  murders; right?
13     A.    Yes.
14     Q.    And you also pled guilty to a carjacking?
15     A.    I think it was more than one.
16     Q.    Okay.  But having pled guilty to three
17  murders and some carjackings, you expect to be released
18  at some point?
19     A.    Yes.
20     Q.    I ask this in all seriousness.  You pled
21  guilty to three murders.  How many people have you
22  killed?
23     A.    Three that I know about.
24     Q.    Well, you would know if you killed
25  somebody; right?

1          A.    Yes.

2          Q.    So if you would answer my question, please.

3    And the question is:  How many people have you killed?

4          A.    Three.

5          Q.    Okay.  One of the things that you were told

6    to do as part of your proffer was to tell the truth;

7    right?

8          A.    Yes.

9          Q.    You didn't always tell the truth in the

10   proffers, did you?

11         A.    That's true.

12         Q.    You lied several times?

13         A.    Yes.

14         Q.    Okay.  For example, in October of 2022, you

15   met with the government; right?

16         A.    Yes.

17         Q.    And that's the first time that you told

18   them that you were in a leadership position with the

19   TPLS; right?

20         A.    Yes.

21         Q.    Because you'd been meeting with them for

22   about four and a half years before that; right?

23         A.    Yes.

24         Q.    But October 19, 2022, was the first time

25   that you told law enforcement, the government, that you

1  were the Second Word?

2         A.    Yes.

3         Q.    They had asked you several questions about

4  your role in the TPLS before October of 2022; right?

5         A.    Yes.

6         Q.    But just to be clear, you finally told them

7  that you were the Second Word in October of 2022?

8         A.    Yes.

9         Q.    Let's talk about that for just a moment.

10 When did you get elevated to the role of Second Word?

11        A.    Like, about one or two months before I was

12 locked up in 2017.

13        Q.    Okay.  When were you locked up?

14        A.    August 2017.

15        Q.    Okay.  So would you agree with me that you

16 got promoted to be the Second Word in June or July of

17 2017?

18        A.    Yes.

19        Q.    So if you were born in July of 1997, you

20 would have been roughly 20 years old in July of 2017;

21 right?

22        A.    Yes.

23        Q.    Did you tell the officers or law

24 enforcement or the government that you had lied about

25 when you entered the MS-13?

1          A.     That I had been promoted?

2          Q.     I'll back up.  At one point, you had told

3     the government that you joined the MS-13 when you were a

4     child in Honduras; right?

5          A.     Yes.

6          Q.     I'm not asking any questions about your

7     childhood.  In another interview, you said that you only

8     joined the MS-13 after you entered the United States;

9     right?

10         A.     Yes.

11         Q.     So what you're telling us is that you were

12    not a member of the MS-13 when you were a child in

13    Honduras?

14         A.     Right.

15         Q.     But somehow you joined the MS-13 after you

16    immigrated?

17         A.     Yes.

18         Q.     While you told officers that in October of

19    2022, you met with them again in February of 2023; right?

20         A.     Yes.

21         Q.     You met with them on February 15, 2023;

22    right?

23         A.     Yes.

24         Q.     You met with the government because you had

25    mailed them a letter in December of 2022; right?

1          A.    Yes.

2          Q.    In that letter dated December 20, 2022, you

3    detailed additional crimes; right?

4          A.    Yes.

5          Q.    You started talking about crimes, like a

6    robbery that was close to Walmart in 2017?

7          A.    Yes.

8          Q.    You started talking, in February of 2023,

9    about a robbery close to Walmart on Nolensville Road?

10          A.    Yes.

11          Q.    In February of 2023, you finally started

12    talking about the kidnapping of Danielito?

13          A.    Yes.

14          Q.    In February of 2023, you finally started

15    talking about a robbery in Frijol's trailer?

16          A.    Yes.

17          Q.    In December of 2022, in that letter, and

18    also in February of 2023, you started talking about the

19    Lutie Street shooting; right?

20          A.    Yes.

21          Q.    In that December of 2022 letter and in the

22    February 15, 2023, proffer, you also discussed a shooting

23    in the Pagoda Apartments; right?

24          A.    Yes.

25          Q.    Okay.  Then in February of 2023 and also in

1  that December of 2022 letter, you described a kidnapping

2  of a person named Shakira; right?

3        A.    Yes.

4        Q.    To be fair, that wasn't the first

5  kidnapping in which you were involved, was it?

6        A.    I was not involved in Shakira's kidnapping.

7        Q.    We'll talk about that in just a second.

8              In October of 2022, the government asked

9  you if there was any additional crimes that you had not

10 told them during your numerous previous proffers; right?

11       A.    I told them I did not remember another one.

12       Q.    Okay.  Well, did you tell interviewers

13 about the kidnapping of a white girl on October 19, 2022?

14       A.    Yes.

15       Q.    Did you tell them how Mr. Ochoa had held a

16 woman down on the ground?

17       A.    Who's Ochoa?

18       Q.    I'll back up.  Did you tell them that

19 Gerson Serrano-Ramirez had dragged a woman into a spare

20 bedroom?

21       A.    Yes.

22       Q.    Did you tell them that you held the woman's

23 legs down while Gerson Serrano-Ramirez choked the woman?

24       A.    Yes.

25       Q.    Did you tell them that you held the woman's

1  legs down while Mr. Ramirez choked the woman until at one
2  point you no longer felt her struggle?
3       A.    Yes.
4       Q.    Do you know a man Julio Caceres?
5       A.    Yes.
6       Q.    Julio Caceres had sex with that woman that
7  night; right?
8       A.    Yes.
9       Q.    Did you have sex with that woman that
10 night?
11      A.    No.
12      Q.    Are you sure you didn't rape her?
13      A.    My baby momma was with me then.
14      Q.    I didn't ask you who was with you.  I asked
15 you whether you raped that woman who you held down.
16      A.    No.  No, I did not rape her.
17      Q.    The only thing you know about the shooting
18 at -- the only thing you know about the shooting at the
19 Bola Ocho nightclub is what someone told you; right?
20      A.    Right.
21      Q.    You only know what Bomba told you?
22      A.    Yes.
23            MR. GANGULI:  Your Honor, may I have a
24 moment to speak with Mr. Gulotta?
25            THE COURT:  You may.

1          MR. GANGULI:  Thank you, Your Honor.  No

2  further questions.

3          THE COURT:  All right.  Thanks very much.

4          And we will have Mr. Lucas go next.

5                    **CROSS-EXAMINATION**

6  BY MR. LUCAS:

7      Q.    Good afternoon.  Mr. Avila, you've

8  testified that you had spoken to law enforcement several

9  times for close to five years; is that correct?

10     A.    Yes.

11     Q.    Now, let's look at the statement you've

12 previously made -- some of the statements you've

13 previously made to law enforcement.  You stated that you

14 became a member of MS-13 in Honduras at 12 years old;

15 correct?

16     A.    True.

17     Q.    But that -- but that wasn't true?

18     A.    No.

19     Q.    You stated that MS-13 in Honduras told you

20 to move from Georgia to Nashville?

21     A.    Yes.

22     Q.    But that wasn't true?

23     A.    No.

24     Q.    You stated that TPLS here in Nashville

25 checked your credentials with the gang in Honduras?

```
1          A.    I don't remember having said that to them.

2          Q.    Would it help if I showed you something

3   that could help you refresh your recollection?

4          A.    Yes.

5                MR. LUCAS:  Your Honor, may I approach the

6   witness?

7                THE COURT:  You may.

8    BY MR. LUCAS:

9          Q.    Did that refresh your recollection?

10         A.    Yes.

11         Q.    And did you state to law enforcement that

12  you told -- did you state to law enforcement that TPLS

13  checked your credentials with the gang in Honduras?

14         A.    Yes.

15         Q.    Did you tell law enforcement that my

16  client, Jorge Flores, and not you, was the Second Word

17  the entire time?

18         A.    I don't remember that.

19         Q.    Would -- if I -- would a document -- if I

20  presented you with a document, would that -- would a

21  document reflect -- refresh your recollection?

22         A.    Yes.

23                MR. LUCAS:  One minute, Your Honor.

24                THE COURT:  Yes, sir.

25                MR. LUCAS:  I'm going to come back to it.
```

1  BY MR. LUCAS:

2      Q.    Did you state -- you stated to law

3  enforcement that you weren't even a full member of MS-13

4  at the time of your arrest.

5      A.    I -- in 2017?

6      Q.    Yes.

7      A.    I did -- told them that I was a homeboy of

8  the gang.

9      Q.    You also told law enforcement that you

10  never knew Sandoval, Cuervo, or Ochoa, Cabezon, to kill

11  anyone.  Is that what you're saying today?

12             THE INTERPRETER:  The interpreter requests

13  repetition of the question, please.

14             THE COURT:  Let me ask you to rephrase it.

15  I think it assumes -- I think there was a statement there

16  rather than a question at first.

17             MR. LUCAS:  You're right.

18             THE COURT:  So break it down into

19  questions.

20             MR. LUCAS:  You're right.

21  BY MR. LUCAS:

22      Q.    You told -- you stated to law enforcement

23  that you never knew Sandoval, or Cuervo, or Ochoa, who

24  you've called Cabezon, to have killed anyone; is that

25  correct?

```
 1          A.    True.

 2          Q.    Is that what you're saying today?

 3          A.    Yes.

 4          Q.    You've never known them to kill one

 5   chavala?

 6          A.    Yes.

 7          Q.    Are you saying, yes, you've known them to

 8   have killed a chavala, or, no, you have not?

 9          A.    I don't know if they have killed a chavala.

10          Q.    But while you've been in -- while you claim

11   to have been a member of TPLS, you've never known them to

12   have killed a chavala?

13          A.    Could you please repeat the question once

14   again.

15          Q.    While you've been a member of -- while you

16   claim to have been a member of TPLS, you've never known

17   Mr. Sandoval or Mr. Ochoa to have killed a chavala?

18          A.    No, I never knew.

19          Q.    You've been in custody or incarcerated

20   since 2017; correct?

21          A.    Yes.

22          Q.    About six years?

23          A.    Yes.

24          Q.    You testified yesterday that you're 25

25   years old; correct?
```

```
 1          A.    Yes.
 2          Q.    So you would have been about 19 years old
 3    when you were incarcerated?
 4          A.    I had just turned 20.
 5          Q.    And you've also testified that you joined
 6    TPLS in Nashville when you were about 17 or 18?
 7          A.    Yes.
 8          Q.    So according to you, you've been in a TPLS
 9    clique for about six or seven years?
10          A.    Approximately.
11          Q.    But you've only been out of custody during
12    that time for one or two years?
13          A.    Yes.
14          Q.    Now, you testified that when you first
15    joined TPLS your rank was a chequeo; is that correct?
16          A.    Yes.
17          Q.    How long were you a chequeo?
18          A.    I don't remember.
19          Q.    Was it more than a year?
20          A.    Less.
21          Q.    Was it more than six months?
22          A.    Thereabouts.
23          Q.    So you would have been a homeboy after --
24    so you would have been a homeboy in about six months
25    after joining TPLS, according to your testimony?
```

1          A.     Yes.

2          Q.     Now, according to you, you've committed

3    three murders?

4          A.     Yes.

5          Q.     And two were committed without prior

6    authorization, pursuant to the rules; is that correct?

7          A.     Authorization was already there.

8          Q.     Did you not testify that you attempted to

9    contact Cabezon for one of those murders but was unable

10   to get him so that you could get authorization?

11         A.     Which death?

12         Q.     Potter.  Potter's death.

13              THE INTERPRETER:  I'm sorry.  The

14   interpreter does not understand the word.

15              MR. LUCAS:  Potter.

16              THE WITNESS:  I did not contact him.  Jojo

17   was the one that tried to contact him.

18    BY MR. LUCAS:

19         Q.     But Jojo tried to contact him so you would

20   know if you had authority to kill Potter; is that

21   correct?

22              THE INTERPRETER:  And the interpreter is

23   still not hearing the word correctly, that name.

24              MR. LUCAS:  Potter, P-o-t-t-e-r.

25              THE INTERPRETER:  Potter.  P-o-t-t-e-r.

1  And the interpreter requests a repetition of the

2  question.

3   BY MR. LUCAS:

4       Q.    Jojo contacted Cabezon to see if you were

5  authorized to kill Potter?

6       A.    Yes.

7       Q.    But you were unable -- but he was unable to

8  speak with Cabezon?

9       A.    No.  Cabezon did not answer the phone.

10      Q.    Now, you did attempt to kill others prior

11 to getting authorization; is that correct?

12      A.    I already had authorization.

13      Q.    Did you sell drugs you obtained from

14 outside TPLS?

15      A.    Yes.

16      Q.    And you've testified that Dan Caceres sold

17 drugs in TPLS clubs?

18      A.    I don't remember having been asked that.

19      Q.    Did Dan Caceres sell drugs in TPLS clubs?

20      A.    In one, yes.

21      Q.    Is he a member of TPLS?

22      A.    No.

23      Q.    You previously told the government that the

24 Palabrero, at the time Cabezon, told you to bury someone,

25 but you didn't do it because it was too much work; is

1    that correct?

2          A.    Yes.

3          Q.    You're shooting at people in public;

4    correct?  You've shot at people in public?

5          A.    Yes.

6          Q.    High-speed chases?

7          A.    Yes.

8          Q.    Burying guns in the backyard?

9          A.    Yes.

10         Q.    You're telling us that someone made you

11   second in charge of something?

12         A.    Yes.

13         Q.    And the person you claimed to have taken

14   over for wasn't even in the group when you joined?

15         A.    No.

16               THE COURT:  No -- well, let's clarify what

17   he means by no.  Sometimes the way a question is posed

18   you can't tell if no means yes or...

19    BY MR. LUCAS:

20         Q.    I think you testified -- when you -- I

21   think you testified yesterday as to who was in the -- who

22   was in the group when you joined.

23         A.    Yes.

24         Q.    You did not name Mr. Flores.

25         A.    No.

```
 1        Q.    So my -- I will pose my question to you
 2   again.  The person you claimed to have taken over for as
 3   Second Word wasn't even in the group when you joined.
 4        A.    True.
 5        Q.    According to you, though, you became Second
 6   Word for two months after being an actual member for less
 7   than -- for less than two years.
 8        A.    Yes.
 9        Q.    After failing to obey the rules over and
10   over and over again, according to you.
11        A.    Yes.
12        Q.    Losing bullets.
13        A.    Yes.
14        Q.    You've testified that you were using
15   proceeds from a robbery for yourself.
16        A.    Yes.
17        Q.    Stealing cars for personal reasons, driving
18   them for a day or a night and abandoning them.
19        A.    Yes.
20        Q.    And one of your very first acts as the
21   Second Word, from what you've testified to, was to order
22   a green light on someone that was impacting your drug
23   distribution business?
24        A.    Yes.
25        Q.    And you testified that you've been
```

1  cooperating with the police, according to you, for

2  approximately five years?

3          A.    Approximately.

4          Q.    You've also testified that everyone needed

5  to know and follow the rules so there would be order.

6          A.    Yes.

7          Q.    But with you and everyone else, according

8  to you, running around making decisions on their own,

9  there was no order?

10          A.    I was punished several times for that.

11          Q.    No one could rely on what anyone else was

12  doing because there was no order.

13                MR. HOFF:  Objection, Your Honor.

14                THE COURT:  You have an objection?

15                MR. HOFF:  Yes.  Is that a question or a

16  statement?  I wasn't sure.

17                THE COURT:  All right.  So the objection is

18  that that was objection to the form; that it was a

19  statement, not a question?

20                MR. HOFF:  Correct, Your Honor.

21                THE COURT:  All right.  I'll sustain the

22  objection, and you can reframe, making sure it's a

23  question.

24                MR. LUCAS:  Yes, Your Honor.

25

1  BY MR. LUCAS:

2       Q.   No one could rely on what anyone else was
3  going to do because there was no order; correct?

4       A.   I don't understand what you're trying to
5  say.

6       Q.   Did you know -- did you know or could you
7  rely upon everyone obeying the rules at all times?

8       A.   Several of us broke them, and we were
9  reprimanded for that.

10      Q.   You testified today that you've broken the
11 rules by cooperating with law enforcement.

12      A.   Yes.

13      Q.   And you consider yourself not to be in TPLS
14 any longer as a result.

15      A.   Right.

16      Q.   Now, did you -- when you made your
17 agreement to join TPLS, was it your understanding that
18 everyone would follow the rules?

19      A.   Cuervo told me that there were some rules
20 that had to be followed, and if they were not followed,
21 then one would have to be punished.

22      Q.   So if you were being punished, it meant
23 that you were supposed to follow the rules; is that
24 correct?

25      A.   Yes.

1       Q.    So you didn't join believing that people

2 could just do whatever they wanted to do and they'd just

3 get punished for it; correct?

4       A.    Correct.

5       Q.    So I'll ask you again.  Your understanding

6 when you joined was that people would follow the rules?

7       A.    Yes.

8       Q.    Because if they didn't, there would be no

9 order; correct?

10       A.    Yes.

11       Q.    You did not agree to join an organization

12 that was in chaos and unpredictable; is that correct?

13       A.    Yes.

14       Q.    You have alleged that someone selling drugs

15 for you decided to sell drugs for my client, Mr. Flores,

16 because they got a better deal from Mr. Flores; is that

17 correct?

18       A.    Yes.

19       Q.    Because the person wanted to make more

20 money; is that correct?

21       A.    Yes.

22       Q.    So according to you, you competed with

23 Mr. Flores and other drug dealers not in TPLS for drug

24 sellers and drug sales?

25       A.    I didn't understand that.

1          Q.    So if Mr. Flores -- your allegation, not
2     ours, you're suggesting that you had someone that sold
3     drugs for you?
4          A.    Yes.
5          Q.    You did not ask them to go and sell drugs
6     for Mr. Flores, according to you?
7          A.    No.
8          Q.    They just got a better deal from
9     Mr. Flores, according to you?
10         A.    Yes.
11         Q.    So you both, according to you, were
12    competing for what we'll call employees; is that correct?
13         A.    When Listo began selling for Peluche, I was
14    already a chequeo.
15              THE INTERPRETER:  Correction, Listo was.
16     BY MR. LUCAS:
17         Q.    Understood.  But you were competing for him
18    to sell for you; correct?
19         A.    He simply began to sell for Peluche, and I
20    said, that's fine, there's no competition.
21         Q.    If you had offered more money -- if you had
22    offered more money for him to sell for you, would he have
23    sold for you?
24              MR. HOFF:  Objection.  Calls for
25    speculation.

1           THE COURT:  I'll sustain that objection.
2  You can try and get there a different way.
3           MR. LUCAS:  I can address it.  I'll get
4  there another way.
5   BY MR. LUCAS:
6      Q.    Did you try -- did you try to offer him
7  more money to sell for you?
8      A.    No.
9           THE COURT:  Mr. Lucas, do you have a while
10 to go still?
11          MR. LUCAS:  I don't think so, Your Honor.
12          THE COURT:  You think a few more minutes?
13          MR. LUCAS:  Few more minutes.
14          THE COURT:  All right.  We'll finish your
15 cross-examination, and then we'll have our noon break.
16  BY MR. LUCAS:
17     Q.    Mr. Avila, did you keep -- did you keep
18 a -- are you aware that drug dealers often keep records
19 of their sales?
20     A.    I don't know.
21     Q.    Did you keep a record of your sales?
22     A.    On paper I didn't.
23     Q.    You have testified about murders you allege
24 were attributed to Mr. Flores; correct?
25          THE COURT:  I'm going to ask you to

1  rephrase it because were attributed, I can't tell who

2  you're asking it was attributed by.

3              MR. LUCAS:  Right.

4              THE COURT:  Was it him or the government or

5  some third party?

6   BY MR. LUCAS:

7       Q.    You have testified about murders you allege

8  that other members of TPLS, according to you, attribute

9  to Mr. Flores; correct?

10      A.    Yes.

11      Q.    But you weren't present at any of these

12 alleged murders; correct?

13      A.    Correct.

14      Q.    It's just what you've heard?

15      A.    Yes.

16             MR. LUCAS:  Those are all the questions I

17 have, Your Honor.

18             THE COURT:  All right.  Thank you.  That

19 concludes the second of our four cross-examinations.

20             Folks, we'll give you an hour, and we'll

21 seek to reconvene, have you back by 1:15 for us to

22 continue the cross-examinations and go from there.

23 Thanks for your continued attention and obeying of the

24 Court's instructions.  Thank you.

25

1                    (Whereupon, at 12:17 p.m. the jury retired

2     from open court.)

3                    THE COURT:  All right.  Thanks.  Please be

4     seated.

5                    Okay.  Anything that we need to discuss

6     before breaking until 1:15?

7                    MR. HOFF:  Not for the United States.

8                    THE COURT:  Thank you.

9                    Any defense counsel?  If so, raise your

10    hand.  All right.  Not seeing any hands, we'll reconvene

11    at 1:15.  Thank you.

12                   (Whereupon, a break was taken from

13     12:18 p.m. to 1:30 p.m.)

14                   THE COURT:  Thank you.  Please be seated.

15                   The Court has received a note, and we've

16    handed out a copy to the attorneys here.  And the

17    question is sort of what to do about it.  One thing I

18    would note is it's not 100 percent clear what the juror

19    here is asking.  Although, I think one kind of gets the

20    sense of what likely he's really asking.  And I do think

21    it's a he.

22                   Now, the question is what to do about it.

23    There are a variety of different issues related to that

24    answer.  On balance, what the Court is inclined to do is

25    do the following:  Say that -- you know, generally the

Court does not encourage -- well, to announce that -- let
me back up.

First to announce that we have received a
note from a juror with a question about testimony, which
is what this is about.  It's not about a lunch break, and
it's not about, you know, jury service or anything like
that.  It's about the testimony.  And then say, there's
nothing improper about that, even though the Court
doesn't encourage -- this Court does not encourage such
notes.  There's nothing improper about it.

And my thought would be to not read it
aloud.  And then to say that, at the appropriate time,
the Court will give a written response to this, which I'm
inclined to do at the close of the case consistent with
how we might respond if we had a case (sic) from
deliberating jurors.  And the response would be something
neutral, like you need to consider the testimony of the
witness in light of what was presented in Court, and the
Court can't go further than that.  And my thought is to
give that kind of answer, give it at the close of the
case, let everyone know that an answer will be given at
the close of the case and not before then.  And then
counsel are free to, as they see fit -- the two remaining
defense counsels are doing cross-examination and then the
government on redirect -- is free to sort of respond as

they see fit to the concerns or the questions reflected
in this note.

So, again, to summarize, my proposal is to
acknowledge that we received a note about witness's
testimony.  Nothing improper, but we don't encourage it.
We will give a written response at the appropriate time.
And I won't tell them this, but I think the response is
likely to be, as I say, something nonsubstantive, but
nevertheless important, which is, you know, in evaluating
witness testimony, you do it based on what was presented
in court.

So that's my proposal for responding.  What
do you think, Mr. Safeeullah?

MR. SAFEEULLAH:  Your Honor, I guess we're
a little confused as to the note.  And we were wondering
if this has to do with the documents that were shown the
witness.  Because it says testimonies this witness gave
to the courts, plural, written by him or translated to
paper for him.  So I guess we were just a little confused
if it was his specific testimony or the things that were
shown to him.

THE COURT:  Yeah.  You know, I think that's
a fair question.  On balance, it's unclear whether
there's a reference to what was shown to him to refresh
or whether it relates to his actual testimony, like, hey,

1  did, you know, someone give him something to aid his

2  testimony?  Was it written out?  Was it translated onto

3  paper?  Was it his own writing?  What was it?  I guess we

4  don't know exactly.  And I think that's right; I think we

5  don't know exactly what is being asked, which is part of

6  the problem.  And I can't get into a dialogue, right.

7          MR. HOFF:  Yeah, I understand that.

8          THE COURT:  I can't get into a dialogue.

9  So that's what I'm thinking.  When the time comes for a

10  substantive answer, the notion is, you know, whatever it

11  means, here's how you evaluate testimony of a witness.

12          I think -- I would give counsel latitude to

13  kind of -- in light of receiving this note, I think a

14  little bit of latitude for counsel to maybe cover, if

15  they wish -- totally their choice -- the multiple

16  possible interpretations of this note.

17          And just speaking hypothetically, if a

18  counsel wanted to say, you know, for example -- I don't

19  even know if this would be applicable, but it could be.

20  Hey, the documents that you were shown to refresh your

21  recollection, were those written by -- were those your

22  documents, for example.  Could ask that.  Follow-up

23  questions about, you know, whether the testimony given

24  was the witness's own testimony.  Your testimony here in

25  court, something like that, without the government doing

1   much bolstering.  But I think generally sort of asking a

2   couple questions to help clarify each of the possible

3   areas of confusion for this juror, I think, would be

4   appropriate.  There's only so much leeway I can give, but

5   a little bit of leeway.

6               So I don't know.  What do you think,

7   Mr. Hoff.

8               MR. HOFF:  Your Honor, I think that's fine.

9   The only thing I would add is if something is going to

10  be -- based on this, if something's going to be shown to

11  the witness to refresh his recollection, I think perhaps

12  it makes sense to ask if he could read it in English

13  before he's shown -- shown that document.  Obviously,

14  he's looked at a couple of things.  I think two maybe.

15  One was in reference to a name.  But because of that --

16  and he may need the interpreter to read a portion of it

17  to him to fully understand it.

18              THE COURT:  Well, you know, maybe you have

19  a point there.  Maybe what this question is getting at --

20  and if -- and if what I'm about to say is what it was

21  getting at, it's not really reflected by the way the

22  first part of the sentence is written; right.  But, like,

23  yeah, the things that the witness was given to refresh,

24  how could he use it to refresh unless it was either

25  written by him or translated into English for him because

1  it would have to be one or the other for him to be able

2  to understand this document for him to be refreshed.  So

3  it sounds like you think that might be what this is

4  getting at?

5         MR. HOFF:  Yes.  I think -- well --

6  obviously, we're -- with this and not being very clear,

7  we think that's one possibility.

8         THE COURT:  One possibility.  Exactly.

9  Yeah.

10         Mr. Lucas.

11         MR. LUCAS:  Thank you, Your Honor.  I think

12  a couple things.  One is that when he's given the

13  document, he never says -- and which most people do when

14  they can't read English or can't speak English -- he

15  didn't say I can't read.  He sat there and looked at it

16  for a while too.  It looked like he was reading.

17         THE COURT:  Yeah.

18         MR. LUCAS:  And, you know, which brings up

19  other questions in my head.  But beyond that, it sounded

20  like he -- he looked at it.  He didn't say to the Court

21  that he didn't read it, and so I think you got to take

22  him at his word that he read it; it he refreshed his

23  recollection.

24         The second thing I would say is -- and I

25  don't know the answer to this, but it raises another

question.  If, when he actually -- when those documents were actually produced, he was -- he was speaking in Spanish and answering questions that were being asked to him through a translator and then notes were being taken, the question is -- because a report is different than your notes.  A report is what you type up, ultimately, in order to do a report.  It may not include all the notes. It may not include everything.  The question then would be, did we ever get either, A, the recording of his actual proffer, if it was actually taken -- I mean, if a recording was actually made.  And then, two, whether there are notes that we should have received of it that might have -- that might be more than just this report.

And to explain it to you, if he's given a proffer and the agent is asking him questions in English, the presumption -- because he can't speak Spanish or he can't understand -- the presumption is that there's a translator, like there is today, to translate whatever the agent is saying into -- into Spanish so that he can understand.  And then when he gives a response, then the translator is translating it back to English, and the agent is taking notes on that.  He's not actually typing the report contemporaneously, unless he's a transcription expert, I would assume.  And maybe he did.  I don't know. But it would have to then be translated back to English.

So the likelihood of there being actual notes versus just

a report seem to be -- and I didn't really think about

until that question.

THE COURT: Well, I mean, are you saying

that if there are notes, there would be *Jencks* material?

I mean, is that --

MR. LUCAS: Yeah, I would think -- I would

think it would be *Jencks* material. And I would think if

they recorded it in order to go back and translate it

later, there would be *Jencks* material. That would be

*Jencks* material there.

THE WITNESS: I would say an agent -- well,

the first thing -- and I'm going to have to say it this

way. With -- and understanding the question, I'm going

to have to say, with absolute certainty, an agent's rough

notes of what someone else said is not *Jencks* as to that

other person. It's just, you know, the way the statute

definition is written.

And the reality is an agent's report of

what someone else said is also not *Jencks*. But -- and

there's a lot of case law on that. But typically,

probably in an abundance of caution, US Attorney's Office

has treated it as *Jencks* and, you know, behooves them to

-- typically it would behoove them to do it anyway

because it would contain -- you know, could contain

1 *Giglio* material and *Brady* and so forth.  But even the
2 report itself not *Jencks*.
3           So to the extent that there's a request for
4 sort of additional information, that may be, gee, maybe
5 the government should have turned this over.  If the
6 notion is that they should have turned over rough notes,
7 I can't find that obligation in the *Jencks* act.  So
8 that's -- that's sort of one thing I would say.
9           I do agree with you, Mr. Lucas, in this
10 sense, and you raised a good point.  A lot of times when
11 a witness is refreshed, they're testifying under oath,
12 right.  And, you know, the fact finder -- and for that
13 matter the Court -- in its discretion can take them at
14 their word, as you say when they say they're refreshed.
15 Okay.
16           And, you know, someone can be skeptical as
17 to whether this witness really was refreshed for a
18 variety of reasons, including, well, gee, you know, was
19 this refreshing document even in a language that he could
20 understand?  And I don't know if we had any testimony
21 about how much English the witness understands, how much
22 he can read of English and so forth.
23           But -- but this is actually not an uncommon
24 problem.  If you've been doing trials and seen
25 refreshing, you could be skeptical of answers that

1  they're -- that a witness's memory is refreshed.  And

2  it's often an elephant in the room that's ignored.  And

3  what I mean is, anyone who didn't just fall off the

4  turnip truck knows that perhaps what the witness really

5  means is, oh, I see it on the paper.  This must be

6  correct, and so I'm going to say -- I guess I'm supposed

7  to say my memory was refreshed.  Anyone that doesn't

8  think that that's sometimes what happens is naïve.

9            Why do I say that?  The whole point is,

10  just because a witness says they're refreshed -- and I'm

11  sure that they typically do it in good faith; they think

12  that's the right answer -- doesn't mean they were

13  actually refreshed versus they figured out that this must

14  be the right answer, so they better say they're

15  refreshed.  I think that's a phenomenon.  And the other

16  side is always free to cross-examine on something like

17  that.  Were you really -- if they want to.  If anyone

18  wants to make an issue about the actual veracity of the

19  statement, I was refreshed, can make an issue out of

20  that.

21            But Mr. Lucas's point is, on the front end,

22  you start with the notion that they swore under oath that

23  their memory was refreshed and now can testify, and

24  that's what makes the answer admissible.

25            So in this particular case, we have -- we

have admissible answers. We have a juror that, under one interpretation of this note, maybe sort of wanting to sort of go behind the answer from the witness that they were refreshed and remember the fact that the witness testified to.

That's what, under one interpretation, what this witness (sic) wants to do. And, really, the message and in response to that would be, listen, you go with -- you go with the testimony. What we have so far is the witness says the memory was refreshed. Maybe it's right, maybe it's not, but that's the only testimony of record on this point. And it's testimony that makes the answer, based on refreshment, admissible. It doesn't necessarily mean that the witness was actually refreshed, and it doesn't mean that the document was actually even capable of refreshing them.

What it means is the record now is the witness was shown documents. Didn't complain about them being not understandable. Didn't complain that they were inadequate to refresh the memory. Instead, these documents were looked at by the witness who swore under oath that his memory was refreshed. And we probably have to leave it at that, I think.

But, like I say, any -- this issue's still open. We still have two defense counsel to go. We have

1   government redirect.  Anyone wants to explore any of

2   this, they would have an opportunity to do so.  Of

3   course, we also could have recross.

4            So here's what I'm saying.  Let's break

5   down the approach here as follows:  First thing is,

6   anyone object to the notion of me announcing that we had

7   a question about -- and I can even say a witness -- a

8   witness's testimony?  Anyone got a problem with me

9   announcing we got the note?

10           Okay.  Don't see any -- do you,

11  Ms. Hood-Schneider?

12           MS. HOOD-SCHNEIDER:  I guess my concern is,

13  assuming that the other jurors don't know that this note

14  was given to the Court, I worry that if it's announced, I

15  don't want to kind of plant the seed, well, oh, if we

16  have questions, we can just -- you know.

17           THE COURT:  And that's why -- so I

18  appreciate you raising it.  That's why I was thinking the

19  way to do this would be to address that concern while

20  also not making the juror sort of unfairly feel bad or

21  feel -- improperly be made to feel like they're a bad

22  juror because they submitted the note.  What if I say,

23  hey, listen, there's nothing improper about receiving the

24  note; although the Court -- this Court's practice is not

25  to encourage this kind of note.  I think that that would

1    serve all the functions to, A, I think would be helpful
2    for that juror to know that they were acknowledged and
3    that their service as jurors is important as
4    acknowledged, which I think is a good thing.  Makes them,
5    you know, not feel awkward about having submitted the
6    note, even though I am going to follow up and say
7    something along the lines of, listen, we're not looking
8    for a barrage of notes every time someone has a question
9    because that's not part of the practice.  So if I were to
10   say that we've received a note from a juror about witness
11   testimony, and there's nothing improper about the juror
12   doing that, even though it's not the Court's practice to
13   encourage this kind of note, and then go on to say,
14   here's how we're going to handle it.
15                   Anyone object to that approach?  Okay.
16   Don't see any hands.
17                   The second thing for me to say -- because I
18   will -- at some point, my inclination is to respond, but
19   it needs to be at the right time.  And I do think it's
20   the kind of response that can be given -- if everyone
21   said, oh, why don't you say something about it now?  I'd
22   consider it.  But to me it would be -- it would fit
23   naturally; be typically the kind of thing that you say.
24   If you're going to respond to the jury, you know, do it
25   while they're deliberating, at the beginning of their

deliberations, and it's responsive to a juror's question.
And it will serve, I think, a valid function of, yet
again, reiterating the message they need to decide the
fact based on the evidence in the courtroom.

So that would be by way of saying -- the
next thing I would say is the Court will respond in
writing at an appropriate time.  We appreciate everyone's
continued attention.  And do it like that.

Any reason not to do it that way, with the
additional observation that counsel are free to kind of,
you know, explore the areas or seek clarifying
information with the witness about whatever may have been
the concern for this juror?  Any objections to that
approach?  Nope?  Okay.

We'll proceed accordingly.  Thanks.
Anything else of a preliminary nature?  Mr. Hoff?
Mr. Safeeullah?

MR. HOFF:  No, Your Honor.

THE COURT:  All right.  You may take the
podium.  And I guess we're talking about Mr. Mothershead
next; right?

MR. CLIFTON:  I'll be doing it, Your Honor.

THE COURT:  Are you going to do it,
Mr. Clifton?  All right.

You may take the podium.  Let's bring in

1  Mr. Avila so he can be ready.  And then we'll have our

2  interpreters get in place, and then we'll call in the

3  jurors.  And then I will give them the instruction.

4                    (Witness retakes the stand.)

5                    THE COURT:  All right.  We can call in the

6  jurors.  Thank you.

7                    We're going to take back the documents.

8  Any objection to this being circulated amongst counsel so

9  they can know what documents were used to refresh?  Any

10 reason not to?  No.  Okay.

11                   All right.  Here's what I'm going to do.

12 Since we only have one copy, I will ask counsel to take a

13 look, share it amongst themselves, even get it to the

14 government.  And whoever's doing the examination may ask

15 for that and use it up at the podium as they see fit.  I

16 think we have two documents; is that right?

17                   COURTROOM DEPUTY:  Yes, sir.

18                   THE COURT:  Thank you.

19                   (Whereupon, at 1:54 p.m. the jury returned

20 to open court.)

21                   THE COURT:  Thanks, folks.  Please be

22 seated.  I do want to reiterate once again that, even

23 though it seems like you've been out a long time and

24 certainly well past the time we asked you to be back,

25 it's another occasion where counsel and the Court are

1  doing their work to make this an appropriate and
2  efficient trial.  We appreciate your patience.  We were
3  not dallying.
4           The Court has received a note from a juror
5  with a question about certain witness testimony.  And
6  there's nothing wrong with a juror submitting that kind
7  of note even though it's this Court's practice not to
8  encourage that kind of note.  But that submission wasn't
9  improper.  I wanted to note that when the time is right,
10 the Court will submit a written response to that
11 question.  And so I did want to acknowledge that
12 reception a note from a juror and to continue to thank
13 all of our jurors for their continued attention and
14 service on this case.  All right.  Thank you.
15           Mr. Clifton, you may proceed with
16 cross-examination.
17           MR. CLIFTON:  Thank you, Your Honor.
18                    **CROSS-EXAMINATION**
19  BY MR. CLIFTON:
20      Q.    Good afternoon, Mr. Avila.
21      A.    Good afternoon.
22      Q.    My name is Jay Clifton, and I represent
23 Mr. Luis Colindres.  What I will try not to do is to go
24 over anything that my co-counsel might have asked you
25 before.

1              You do have a nickname?

2      A.     Yes.

3      Q.     What is it called?

4      A.     Humilde.

5      Q.     And who gave you that nickname?

6      A.     Demente did.

7      Q.     That was a member of MS-13?

8      A.     Demente, yes.

9      Q.     You testified that you joined MS-13 when

10 you were 15 years old?

11     A.     No.

12     Q.     Well, when did you join MS-13?  How old

13 were you?

14     A.     Close to 17, 18.

15     Q.     Okay.  And how old are you now?

16     A.     25.

17     Q.     And so you were still a teenager when you

18 joined MS-13?

19     A.     Yes.

20     Q.     And being a part of MS-13, there were some

21 benefits that you had as a member?

22     A.     I don't think so.

23     Q.     Well, did you receive some financial

24 benefits?

25     A.     No.

1          Q.     You never received proceeds from drug

2     sales?

3          A.     Yes.

4          Q.     Okay.  Wouldn't you call that a financial

5     benefit?

6          A.     I looked at it more like a job.

7          Q.     You did have a certain level of security as

8     being a member of MS-13?

9          A.     The backing of my homeboys, yes.

10         Q.     About how many homeboys did you have the

11    backing of, would you say?

12         A.     I'd say at least four.  I don't have a

13    specific number.

14         Q.     And you were, as a member of MS-13,

15    mentored by other MS-13 members?

16         A.     A little bit, yes.

17         Q.     When you joined MS-13, you immersed

18    yourself into MS-13 culture?

19         A.     A little bit, yes.

20         Q.     You learned all the rules?

21         A.     I was learning them little by little.

22         Q.     Okay.  You knew what the MS-13 mission or

23    objectives were?

24         A.     Yes.

25         Q.     Okay.  You knew the values and principles?

```
1          A.     A little bit, I did, yes.

2          Q.     For the most part, you only hung around

3    with MS-13 members?

4          A.     Yes.

5          Q.     It's safe to say that from the age of 17 to

6    now you are age 25; is that correct?

7          A.     Yes.

8          Q.     MS-13 was pretty much your world?

9          A.     Yes.

10         Q.     In fact, do you remember a conversation

11   with the government basically saying that you were trying

12   to do whatever it is that you could to prove that you

13   were worthy of the membership?

14         A.     Yes.

15         Q.     Also, not only was it your world and you

16   wanted to prove that you were worthy of membership, you

17   had plans on starting up another MS-13 clique in

18   Honduras.

19         A.     No.

20         Q.     You killed for MS-13?

21         A.     Yes.

22         Q.     You sold drugs for MS-13?

23         A.     Yes.

24         Q.     Did you sell drugs for MS-13?

25         A.     Yes.
```

```
 1        Q.    However, today, you testified that you are
 2   not a member of MS-13?
 3        A.    Not anymore.
 4        Q.    I thought you could only leave MS-13 if you
 5   become a Christian?
 6        A.    Also if you become a snitch.
 7        Q.    Okay.  Or death?
 8        A.    Of course.
 9        Q.    Are you still protected by any members of
10   MS-13?
11        A.    No.
12        Q.    So I know you've been over this before, but
13   what exactly does it mean for a person in your position
14   to receive their letters?
15        A.    It means that you've already killed a
16   chavala, and now you can tattoo on yourself the MS-13
17   letters.
18        Q.    How long did it take you to receive your
19   letters?
20        A.    I don't remember.
21        Q.    Was it less than a year?
22        A.    You could say so, yes.
23        Q.    And after you received your letters, would
24   you say that you had more authority within MS-13?
25        A.    And a little bit more of respect, yes.
```

1        Q.     You were treated better?

2        A.     They saw me differently.

3        Q.     How?

4        A.     They saw me as a member, not a chequeo.

5        Q.     And that meant a lot to you?

6        A.     Yes.

7        Q.     You also had people -- because you gained a

8   certain level of authority, you had people beneath you?

9        A.     A few, yes.

10       Q.     I mean, you were higher than a paro?  You

11   were a higher rank than a paro?

12       A.     Yes.

13       Q.     In fact, you had paros doing favors for

14   you?

15       A.     Yes.

16       Q.     And then you became a homeboy?

17       A.     Yes.

18       Q.     Are there any other ranks between homeboy

19   and becoming Second Word?

20       A.     No.

21       Q.     Did you have any aspirations of becoming

22   First Word?

23       A.     No.

24       Q.     When you were going through the ranks, did

25   you ever have a chance to have an opportunity to decide

1    or deny not to go to a higher rank?

2            A.    If I had the opportunity?  Is that what

3    you're asking me?

4            Q.    Yes.

5            A.    No, I did not have the opportunity.

6            Q.    So once presented with the opportunity to

7    become Second Word, you had to become Second Word?

8            A.    Yes.

9            Q.    On March 24, 2021, you entered into a plea

10   of guilt and basically facing four life sentences?

11           A.    Yes.

12           Q.    And you entered into a cooperation

13   agreement with the United States government?

14           A.    Yes.

15           Q.    Why would you agree to cooperate with the

16   government?

17           A.    To receive less time on my sentence.

18           Q.    I mean, sure, you don't want to spend life

19   in prison.

20           A.    True.

21           Q.    And I guess it's safe to say that you

22   testifying today, you see that as a chance for you to

23   escape that life sentence?

24           A.    Yes.

25           Q.    I mean, you do have family?

1     A.    Yes.

2     Q.    Is your father still alive?

3     A.    No.

4     Q.    Your mother?

5     A.    Yes.

6     Q.    You have a close relationship with her?

7     A.    Yes.

8     Q.    Any siblings?

9     A.    Sisters.

10    Q.    Sisters.  You have a close relationship

11 with them?

12    A.    Yes.

13    Q.    I guess so part of what went into your

14 decision in testifying today has a good amount to do with

15 you wanting to spend more time with them outside of

16 prison?

17    A.    Yes.

18    Q.    You think you deserve a lower sentence?

19    A.    No.

20    Q.    So if you -- if someone were to ask you

21 what number of sentence that you want to receive for your

22 testimony today, what number would that be?

23    A.    I think that we are not at my sentencing

24 phase, so I have no reason why I should say that.

25    Q.    Well, if someone was to ask you what number

do you think you should receive as a sentence for your

testimony today, do you have a number?

        A.    No.

        Q.    So if someone was to say you will receive a

time-served sentence, that's not anything that you would

ever consider?

              MR. HOFF:  Objection, Your Honor.  It's

asked and answered.

              THE COURT:  Well, I don't know that this

specific example of a time-served sentence was given, so

I will find -- I'll overrule the objection on the grounds

that the more specific question had not yet been asked.

So I'm going to read back the question.  Well, I say read

back.  I'm going to, instead, state what I think the

question is and then ask Mr. Clifton if he agrees.

              I believe the question is, if someone was

to say you will receive, say, a time-served sentence,

that's not anything -- wait.  Let's strike -- let's not

do it that way.

              We're going to ask Mr. Clifton to reframe

the question the way that you want to do it.  And, again,

you're allowed to ask his thoughts about a sentence of

time served.

              MR. CLIFTON:  Thank you, Your Honor.

1    BY MR. CLIFTON:

2         Q.    Mr. Avila, in consideration of your

3    testimony today, you never thought of any number that you

4    would like to receive in exchange for your testimony?

5         A.    No.

6         Q.    So if someone was to present to you that

7    you would, in exchange for your testimony, have to serve

8    20 years in prison, you wouldn't think that that was

9    enough?

10              THE INTERPRETER:  You would think that or

11   wouldn't?

12   BY MR. CLIFTON:

13        Q.    You would not think that that was enough

14   for your testimony?

15        A.    I think that that would be a lot better

16   than four life sentences.

17              MR. CLIFTON:  Nothing further, Your Honor.

18              THE COURT:  All right.  Thank you,

19   Mr. Clifton.

20              Mr. Bloom or Mr. Hawkins, you may proceed.

21                     **CROSS-EXAMINATION**

22   BY MR. BLOOM:

23        Q.    Good afternoon.  My name is Thomas Bloom.

24   I represent Mr. José Pineda back here.

25              Yes.  Mr. Avila, you and I have never met,

1  have we?

2         A.    No.

3         Q.    And I wish for you to understand that the

4  only thing that I know about you are reports that I have

5  received from your interviews with law enforcement

6  officers.  So that's all that I really know about you.

7  Do you understand that?

8         A.    Yes.

9         Q.    And that all of these interviews that you

10 conducted with law enforcement, there were present either

11 a certified translator or an agent who was fluent in

12 Spanish; is that correct?

13        A.    Sometimes yes.  Sometimes not.

14        Q.    Tell me about what happened when there was

15 not a translator or person speaking fluent Spanish?

16        A.    Well, I, in English, would communicate with

17 them.

18        Q.    Do you remember an agent, Special Agent

19 Perez, P-E-R-E-Z?

20        A.    Yes.

21        Q.    He was a Spanish speaker, wasn't he?

22        A.    Yes.

23        Q.    When -- how many times would you estimate

24 that you were there without either Mr. Perez there or a

25 certified translator?

1          A.     Truly, I don't remember.

2          Q.     Okay.  During those times, did you feel

3    that you were not being understood?  Excuse my voice.

4          A.     I felt that, yes, that they understood me

5    well.

6          Q.     Thank you.  Just very briefly, just a

7    little background.  I think that you told law enforcement

8    people that you joined MS-13 in Honduras when you were

9    about 12 years old; is that correct?

10         A.     Yes.

11         Q.     And I believe you said that actually you

12   were forced into the gang?

13         A.     Yes.

14         Q.     And is it unusual in Honduras for young

15   boys to be forced to join MS-13?

16         A.     It is not unusual.

17         Q.     Okay.  And then I believe you said that you

18   came to the United States when you were about 15 years

19   old?

20         A.     Yes.

21         Q.     And you came to Atlanta first; is that

22   correct?

23         A.     Yes.

24         Q.     And why Atlanta?

25         A.     Because my sister lives over there.

1          Q.     And then when you were 16 years old, I
2    believe you said that you came here to Nashville?
3          A.     Yes.
4          Q.     And why did you come to Nashville at age
5    16?
6          A.     Because in Georgia I had an alcoholism
7    problem, so I came to Nashville to live with my uncle.
8          Q.     I'm sorry.  What kind of problems?
9          A.     Alcoholism.
10         Q.     Okay.  Was it alcoholism of your uncle or
11   alcoholism with you?
12         A.     Mine.
13         Q.     Okay.  And then when you came here, you
14   went to Glencliff High School; correct?
15         A.     Yes.
16         Q.     And that's where you met my client,
17   Mr. Pineda?
18         A.     Yes.
19         Q.     Okay.  Your birthdate is July 26, 1997; is
20   that correct?
21         A.     Yes.
22         Q.     So when Mr. Potter was murdered in April of
23   2016, you were about 18 years old; is that correct?
24         A.     Yes.
25         Q.     And you are a year older than my client,

1 Mr. Pineda; is that correct?

2          A.    I don't know his age.

3          Q.    Thank you.

4                You said just now that you had developed

5 alcoholism by the time you were 16 years old; is that

6 correct?

7          A.    At around 13 years of age, I already had

8 it.

9          Q.    Okay.  Just going over a little bit into

10 the structure of MS-13, the leader is called the First

11 Word; correct?

12          A.    Yes.

13          Q.    And the First Word would call meetings,

14 called misas, to discuss gang business?

15          A.    Yes.

16          Q.    And these would be called most Sundays?

17          A.    Yes.

18          Q.    And then the First Word was responsible for

19 issuing green lights on individuals who had betrayed the

20 gang or who were considered enemies; is that correct?

21          A.    Yes.

22          Q.    And the second in command was called the

23 Second Word; correct?

24          A.    Yes.

25          Q.    And then I think you testified you achieved

1    a level of Second Word about two months before you were

2    arrested?

3              A.    Yes.

4              Q.    And you issued at least -- well, you issued

5    one green light which was not carried out?

6              A.    Yes.

7              Q.    And then could I ask you, at what age did

8    you begin using marijuana?

9              A.    I've smoked it several times, but it's not

10   a habit.

11             Q.    What time -- what age did you start?

12             A.    I smoked once when I was, like, about 12.

13             Q.    That was marijuana?

14             A.    Yes.

15             Q.    And then did you ever -- did you smoke

16   again when you were 13 or 14?

17             A.    When I was in Georgia, I smoked again.

18             Q.    So from age -- did you say at 13 -- at 13

19   is when you first smoked marijuana?

20             A.    Yes, I tried it.

21             Q.    So between age 13 and 15, no marijuana; is

22   that correct?  You did not smoke any marijuana?

23             A.    No.

24             Q.    Okay.  I assume that alcohol was your drug

25   of choice; is that correct?

1      A.     Yes.

2      Q.     What type of alcohol did you prefer?

3      A.     In Honduras, cheap alcohol.

4      Q.     Would that be -- would that be alcohol like

5  beer or it would be alcohol like tequila or hard alcohol?

6      A.     In Honduras, it's called liquor.

7      Q.     And is that liquor, is that produced by the

8  state or is it home-brewed?

9      A.     It's brewed by the state.

10      Q.     By the state.

11             Did you drink every day?

12      A.     Yes.

13      Q.     Would you -- when you drank, would you get

14  to blackout drunk?  Do you understand blackout drunk?

15      A.     Yes.

16      Q.     Would you sometimes find yourselves --

17  excuse me, back up.

18             After drinking, would you sometimes find

19  yourself in a place where you didn't know how you got

20  there?

21      A.     Yes.

22      Q.     And when did you start using cocaine?

23      A.     When I got to Nashville.

24      Q.     And what other drugs have you used in your

25  lifetime, other than cocaine and marijuana and alcohol?

1        A.      Just those.

2        Q.      Just those.  When you came to Nashville,

3    when you smoked marijuana again, how many blunts would

4    you smoke on average each day?

5        A.      In Nashville, I didn't smoke marijuana.

6        Q.      I might have -- may have misunderstood your

7    earlier testimony.  Did you say that you smoked marijuana

8    perhaps once when you were 12 or 13?

9        A.      Yes.

10        Q.      And you didn't smoke it again until you

11   came to Nashville?

12        A.      I didn't smoke it again until I got to

13   Georgia.

14        Q.      Until you got to Georgia, okay.

15               And you were in Georgia for two years, a

16   year and a half?

17        A.      More or less.

18        Q.      Okay.  And then -- now, I believe -- do you

19   remember telling agents during one of your interviews

20   that you were buying an ounce of cocaine or 28 grams for

21   your personal use here in Nashville?

22               THE COURT:  Let me -- let me call a bench

23   conference, if I could.

24

25

1          (Whereupon, the following proceedings were

2    had at the bench outside the hearing of the jury:)

3          THE COURT:  All right.  Here's my concern.

4    If you look at this question, it was:  Do you remember

5    telling agents during one of their interviews that you

6    were buying an ounce of cocaine or 28 grams for your

7    personal use here in Nashville?  The question is framed

8    about what he remembers telling an agent.  And I want us

9    to be clear.  If we're asking him about the facts, let's

10   frame it in terms of facts.  If we're asking about his

11   recollection of prior statements, let's make sure there's

12   a purpose for asking about the prior statement.  For

13   example, you're setting up to impeach him on a prior

14   inconsistent statement.  So here is what you're really

15   interested in is his version of facts and not really what

16   he told agents.

17          MR. BLOOM:  I get it.

18          THE COURT:  Does that make sense?  Can we

19   all agree to do it that way?

20          MR. BLOOM:  Yes.

21          THE COURT:  That will make it clear kind of

22   what the purpose is, if any, for offering evidence of

23   a --

24          MR. BLOOM:  I'll just ask him did you.

25          THE COURT:  Yeah, exactly.  And that had

1   come up a couple times before, but it just occurred to

2   me, hearing that, it might be time for me to kind of lay

3   a -- lay the rule down on that.  All right.  Thank you.

4               MR. BLOOM:  Thank you very much.

5               (End of bench conference.  Whereupon, the

6   following proceedings were had in the hearing and

7   presence of the jury:)

8    BY MR. BLOOM:

9         Q.    Let me ask that question again.  Did you --

10  once you came to Nashville were you purchasing an ounce

11  or 28 grams of cocaine for your own personal use?

12        A.    Before I was arrested in 2017, I would buy

13  an ounce to distribute it, to sell it.

14        Q.    If I were to show you a document, might

15  that refresh your recollection about what you -- about

16  what you may have said earlier?

17              THE COURT:  Well, all right.  Let's

18  approach again.

19              (Whereupon, the following proceedings were

20  had at the bench outside the hearing of the jury:)

21              THE COURT:  All right.  So think about what

22  had happened in this exchange.  He didn't testify to a

23  lack of recollection, which is necessary before

24  refreshing his memory.  Now, if what you want to do is

25  ask him whether he previously said something different to

impeach him with a prior inconsistent statement, you're
able to do that. When you ask him about the prior
inconsistent statement, you know, a couple things can
happen. He can admit it. He can deny it, in which case,
you know, you may have an opportunity later on to offer
extrinsic evidence to impeach on a noncollateral matter
if it's a noncollateral matter. Option 3 is --

                    MR. LUCAS: It's my understanding --

                    COURT REPORTER: I'm sorry. I can't hear
you.

                    MR. LUCAS: It's my understanding that -- I
suspect he can hear what you're saying down there.

                    THE COURT: Yeah, of course, we're caught
between a rock and a hard place in terms of speaking loud
enough for people that need to hear. Here's the thing,
and I don't think -- I don't think these technical things
would probably impact his testimony anyway if he was to
listen.

                    But -- whether he can hear over there, I
don't know. I would say there's option 3, is when you
ask him about the prior inconsistent statement, then he
says, well, I don't remember if I said that or not. Now
at that point, refreshing him as to whether he made the
prior inconsistent statement would be appropriate. But I
think we need to get to the point where his recollection

1  of the prior inconsistent statement -- we need to get the

2  point where he says he doesn't recall whether he made it

3  for you to refresh him as to whether he made it.  So in

4  this case, were you going to impeach him with a prior

5  inconsistent statement?

6                MR. BLOOM:  Yes.

7                THE COURT:  So here is -- just so you know

8  how I look at it, it would be -- you know, you can ask

9  him about it, see what he says, and we'll kind of go from

10 there.  If I need to call us up again, I can do that.

11               MR. BLOOM:  I'd like to avoid that, for

12 your sake and everyone's.  I would like to say, might you

13 have said in the past --

14               MR. HOFF:  I object to might you have said

15 in the past.  Object to the form of that question.

16               THE COURT:  As being called for

17 speculation.  Yeah.  I tell you what.  Why don't you --

18 why don't you -- the statement you're talking about

19 doesn't -- is it really inconsistent with what he just

20 said?  Truly.

21               MR. BLOOM:  Yes.

22               THE COURT:  Okay.  Why don't you ask him

23 whether he said it, and we can go from there.  And if you

24 go somewhere with it that, I think, needs to be

25 procedurally tweaked, I'm sure I won't be shy.

1             MR. BLOOM:  Okay.

2             (End of bench conference.  Whereupon, the

3    following proceedings were had in the hearing and

4    presence of the jury:)

5    BY MR. BLOOM:

6        Q.    Did you ever make a contrary statement

7    telling someone that you purchased an ounce or 28 grams

8    of cocaine for your personal use?

9        A.    Not that I recall.

10        Q.    Okay.  If I were to show you a document

11    that was taken down following one of your interviews,

12    might that help you to recall or not recall that?

13        A.    Perhaps.

14        Q.    Okay.  I'm speaking of paragraph 4.  And

15    let me ask this:  Are you able to read that in English or

16    would it be better for the interpreter to read it to you

17    in Spanish?  I want to make sure that you understand it

18    fully.

19        A.    I can read it in English.

20        Q.    Okay.  What I'm referring to, if you don't

21    want to read the whole paragraph, it's really the last

22    three lines.

23        A.    (Witness reading document.)

24             I read it already.

25        Q.    Does that change your testimony at all?

1          THE COURT:  Let me ask it this way.  Does

2    this refresh your recollection as to whether you ever

3    told someone that you would purchase an ounce for

4    personal use?  Does it refresh your recollection as to

5    whether you ever told someone that?

6          THE WITNESS:  What paragraph are you

7    saying?

8    BY MR. BLOOM:

9          Q.    It's paragraph 4 on page 2.  And it's the

10   last sentence of that paragraph.

11         A.    I do see it, but I don't remember.

12         Q.    Do you not see the sentence?  Is that what

13   you're saying?

14         A.    I do see what you have said to me.

15         Q.    Okay.  I just wanted to make sure I'd given

16   him the proper document.

17               Now, you have been around people who have

18   consumed many more drugs than you're testifying that

19   you've experienced; is that correct?

20         A.    Yes.

21         Q.    And in that I include alcohol.  Do you

22   understand that?

23         A.    Yes.

24         Q.    Would you agree with me that people who

25   abuse drugs like that, there are a number of symptoms

1    that they can experience?

2            A.      Like addiction?

3            Q.      Not addiction.  I'm talking about, like,

4    for instance, distorted perceptions.

5            A.      I don't know.

6            Q.      How about loss of memory?

7            A.      When I was drunk, yes.

8            Q.      Paranoia?  How about paranoia?

9            A.      At the moment when you're drugged up, yes.

10           Q.      Okay.  We can go on to a different topic.

11                   I believe that you testified in July of

12   2017 you were arrested for aggravated robbery.  Does that

13   sound about right?

14           A.      August.

15           Q.      August, okay.  Some then approximately

16   eight months later, is it correct that you initiated

17   contact with the government through a Crime Stopper tip

18   indicating you wanted to talk to the government about

19   drug trafficking?

20           A.      Yes.

21           Q.      Okay.  And at that time, did you tell the

22   agents that you were willing to provide information on

23   MS-13 if you were let out of jail?

24           A.      Yes.

25           Q.      And is it correct that you told them that

1  you'd done this in the past when you -- in the past, you
2  provided federal agents with information about MS-13 and
3  were released after your arrest on immigration charges?
4        A.    You said federal agents?
5        Q.    Law enforcement agents.
6        A.    Yes.
7        Q.    Okay.  Would it be fair to say that on
8  May 4 you were hoping that you might accomplish the same
9  thing this time?
10       A.    Yes.
11       Q.    And is it correct that the agents told you
12  that they couldn't make any promises, but they would talk
13  with their supervisory agents and be in contact with the
14  US Attorney's Office?
15       A.    I don't remember what they said.
16       Q.    Okay.  But at that point with the
17  aggravated robbery charges, you decided to go ahead and
18  cooperate in hopes that you'd get a reduced sentence from
19  the aggravated robbery?
20       A.    Yes.
21       Q.    And do you remember that in the beginning
22  of your interview, you told the agents about narcotic
23  sales in the various clubs around town and the sources
24  for the narcotics?
25       A.    I don't remember.

1      Q.    If you were to look at a document, might
2   that help you to -- might that refresh your recollection?
3   And don't read it now.  You shouldn't be reading it now.
4   Wait until I tell you what to read.
5              And on that same document, if you could
6   read paragraphs 3 through 8.
7      A.    Yes.
8      Q.    Have you read it?  I'm asking you, could
9   you read paragraphs 3 through 8 of that document in your
10  hand to see if that refreshes your recollection?
11             THE COURT:  One moment.  I'm trying to sort
12  out a technical situation.
13             All right, Mr. Bloom, you may continue.
14   BY MR. BLOOM:
15     Q.    You can put the document down.  You don't
16  need to look at it any more right now.
17             Reading those paragraphs, does that refresh
18  your recollection?
19     A.    Somewhat, yes.
20     Q.    Okay.  With your recollection refreshed,
21  would you agree that you did, at that point, tell about
22  narcotic sales in the clubs and perhaps the sources of
23  those narcotics in Nashville?
24     A.    Yes.
25     Q.    Okay.  And do you remember that during

1  that -- did you remember that at some point you were

2  asked to tell about the gravest acts that have been

3  committed by TPLS in Nashville?

4        A.    Yes.

5        Q.    And do you recall that you told them about

6  four different murders committed by TPLS members in

7  Nashville?

8        A.    Yes.

9        Q.    And do you recall that you said that

10 Franklin Hernandez, or Happy, told you about a body being

11 burned in another county; is that correct?

12       A.    Yes.

13       Q.    And --

14             THE COURT:  Can we approach briefly?

15             (Whereupon, the following proceedings were

16 had at the bench outside the hearing of the jury:)

17             MR. BLOOM:  I apologize.

18             THE COURT:  Yeah.  My concern is when you

19 asked him again about prior statements, I didn't know if

20 this was to impeach, was a part of impeachment.

21             MR. BLOOM:  No, (inaudible) he said I

22 didn't do it.  It's not impeachment because I think he's

23 going to admit it.

24             MR. HOFF:  (Inaudible) the questions are do

25 you remember, and I think the question is did you do

this, did you do this, as opposed to do you remember
this, do you remember that.

          THE COURT:  Yeah.

          MR. HOFF:  I didn't object the last time.

          THE COURT:  Yeah, I think that's right.
So, in other words, I think what I'm going to be looking
for it if there's a question, hey, did you tell someone
this, be it telling law enforcement, telling someone
else.  Did you tell them X, Y, or Z?  That's fine as long
for a proper purpose.  Typically, it would be impeachment
of a prior inconsistent statement.  Here, I'm not sure of
the proper purpose for asking what he told them, but, you
know, if the purpose is to sort of get before the jury
the truth of the underlying information, then you can
just ask him what he knows.  If this --

          MR. BLOOM:  It's not that.  The purpose is
that he didn't mention Juan Potter or Liliana at the time
they asked for the gravest acts.

          THE COURT:  All right.  So the notion is
let's talk about what you did tell them, and then let's
talk about what you didn't tell them.  Is that fair
enough?

          MR. BLOOM:  Yeah.

          THE COURT:  If there -- is there a way to
do this by sort of -- well, okay.  Mr. Hoff, what's your

1  view of that.  I mean, the notion of sort of making

2  someone out to be less than candid by omissions is legit.

3  The extent to what you need to walk through everything

4  that he said in the past to make that point is probably

5  debatable.  If he proceeds -- you know, he may do more of

6  this to say, all right, you told them this, this, and

7  this, but you didn't tell them this.  Is that okay with

8  you?  Because there's a slightly different way you can

9  make the same point in the face of a technical objection.

10          MR. HOFF:  I think a legitimate question

11  would be, you didn't tell them about this.

12          THE COURT:  They asked about this, and you

13  didn't tell them about this.  Is that what you mean?

14          MR. HOFF:  I don't think the question is

15  did they.  I think -- well, yes, I think the question

16  would be, as Mr. Bloom related, but I think the follow-up

17  question would be you didn't tell them this.  I don't

18  know about did they ask you, but I think that he said did

19  you ask them about the gravest acts.

20          MR. BLOOM:  Right.

21          THE COURT:  But here's the thing.  Him not

22  disclosing something only, obviously, is an attack on his

23  candor unless the context is such that if he was being

24  candid, he could have disclosed it.  That's why I sort of

25  have in mind this notion, did they ask -- did they ask

1    you about X, but you didn't tell them about this.  And
2    you -- like, in other words, here's what I'm trying to
3    maybe -- if I can establish boundaries.  Okay.  You asked
4    him about this.  You purported to answer the question,
5    right.  Yeah, you can imagine him saying yes, right.  But
6    you didn't tell them.  In your answer, you didn't tell
7    them about this.  I think we can do it that way, rather
8    than having statements about what he did tell them.  If
9    you want to ask about the underlying information that he
10   told them about at that time, you can ask him directly.
11   But I think that the proper way to do it is elicit what
12   they asked him about, that he purported to answer the
13   question, and yet he omitted X, Y, and Z.  I think that's
14   the way to do it.
15                 What do you think of that, Mr. Hoff?
16                 MR. HOFF:  (Inaudible), Your Honor.  The
17   only thing I would say, Judge, from us is we do want to
18   put on the record the same objection of a co-conspirator
19   that we made earlier because I think that's what he's
20   going to -- because I think that's what he's going to
21   elicit is what he said to co-conspirators or what he
22   heard from co-conspirators.  So we -- you know, I think
23   that --
24                 MR. BLOOM:  I can condense this just to
25   say, did you list about four different things from a

1    couple murders, one murder you that eyewitnessed.

2                    MR. HOFF:  I understand Mr. Lucas's

3    concern.  I think Mr. Lucas's concern is he's going to

4    start talking about things that --

5                    MR. LUCAS:  Heard from co-conspirator.

6                    THE COURT:  Yeah, and then if that comes

7    up, you can jump up, make an objection.  I do think the

8    notion of -- this is one of the reasons, like, we want to

9    avoid him sort of blurting out, you know, his hearsay

10   statements about what he told officers in the past, but

11   the notion he was asked about something, he was acting

12   like he was giving an answer, and yet, lo and behold, his

13   answer omitted things.

14                   If we do it that way, I think we should be

15   able to keep away from out-of-court statements that are

16   going to raise -- you know, raise a hearsay problem.

17   And, of course, anything told to law enforcement is

18   rarely, if ever, pursuant to the conspiracy and is not

19   admissible under the co-conspirator exception.

20   Obviously, it tends to be exactly contrary to the

21   objections of the conspiracy.  So let's proceed.

22                   (End of bench conference.  Whereupon, the

23   following proceedings were had in the hearing and

24   presence of the jury:)

25

1           THE INTERPRETER:  Your Honor, this is the

2    interpreter speaking.  During the bench conference, it

3    was brought my attention by the resting interpreter,

4    Dr. Keough, a question as to whether the last question by

5    Mr. Bloom, it was asked about the greatest acts or the

6    gravest acts of the TPLS.  This interpreter thought he

7    heard greatest, g-r-e-a-t-e-s-t, and that I, as the

8    active interpreter at the time, that is what I

9    interpreted.

10           THE COURT:  All right.  Let me comment on

11    this.  I -- thank you for that, sir.  I interpreted your

12    question, understanding the words are pretty similar and

13    both could work in this context; right?  I thought you

14    had asked about gravest with a A-V, rather than an E-A-T;

15    is that accurate?

16           MR. BLOOM:  That's correct, Your Honor.

17           THE COURT:  All right.  Let's do this.

18    Because the translation, understandably enough easy to

19    confuse those words when they come out of the mouth.

20    We're going to strike the answer, and I'm going to

21    instruct the jury to disregard the testimony that

22    occurred after the -- the testimony from the witness

23    after that question because it was understandably enough

24    mistranslated.

25           Instead, we'll have Mr. Bloom sort of

1    continue in this area as he sees fit or in another area.

2                    MR. BLOOM:  Okay.

3    BY MR. BLOOM:

4         Q.    In response to the request that you give

5    agents -- tell agents about the gravest, gravest acts

6    committed by TPLS, did you, in response, tell them about

7    various acts of violence that you had heard about or

8    which you had been an eyewitness to?

9         A.    Yes.

10        Q.    Okay.  And in identifying these gravest

11   acts committed by TPLS on May 4, you didn't mention

12   either the murders of Juan Potter or Liliana Rodriguez

13   during that first interview, did you?

14                    THE INTERPRETER:  I'm sorry.  The

15   interpreter requests a repetition and that these long

16   complex sentences be broken down in a couple of phrases.

17   BY MR. BLOOM:

18        Q.    In identifying the gravest acts committed

19   by TPLS, you didn't mention the murder of Juan Potter,

20   did you?

21        A.    No.

22        Q.    And you did not mention the murder of

23   Liliana Rodriguez during that first interview, did you?

24                    THE INTERPRETER:  I'm sorry.  The

25   interpreter did not understand the first name of the

Rodriguez person.  The interpreter requests a repetition

of the question.

 BY MR. BLOOM:

      Q.   And you did not mention the murder of

Liliana Rodriguez during that May 4 interview either, did

you?

      A.   I don't remember.

      Q.   Okay.  If you were to look at -- if you --

if you were to look at a document pertaining to that

interview, might that refresh your recollection?

      A.   Yes.

      Q.   The document that's in front of you, if you

could look -- if you could read through paragraphs 14

through 16.

      A.   (Witness reading document.)

      Q.   Have you finished reading that?

      A.   Yes.

      Q.   Does that refresh your recollection?

      A.   Yes.

      Q.   So you did not mention the murder of Juan

Potter during that interview; is that correct?

      A.   No.

      Q.   And you did not mention the murder of

Liliana Rodriguez during that May 4 interview?

               THE COURT:  Let me jump in here.  It's

1  another one of these situations where it can be a little
2  unclear what a no answer means, so I'll ask this in a
3  nonleading way.
4          Do you now recall whether you said anything
5  during that interview about the murder of Liliana
6  Rodriguez?
7          THE WITNESS:  No, I did not say anything.
8          THE COURT:  All right.  One thing,
9  Mr. Bloom.  I think you had a question that assumed that
10  the discussion we're talking about was the interview of
11  May 4.  That was worked into your question.  I don't
12  think it came from the witness, and, therefore, I don't
13  know if we have a basis for knowing the date.  Do you
14  want to inquire as to the date of this?
15          MR. BLOOM:  Okay.
16  BY MR. BLOOM:
17      Q.    If you look at the very first page of the
18  document you were looking at, does it state the date on
19  which the interview occurred?
20      A.    It says 05-07-2018.
21      Q.    Do you see at the very top, it says
22  synapsis in bold letters?
23      A.    No.  No.  Oh, yes, yes.  Now I see it.
24      Q.    And if you look at the first line under it,
25  if you could read just that first four or five words.

1          THE COURT:  Let me ask you this, Mr. Avila.

2    Do you remember the date on which the interview we're

3    talking about occurred?

4          THE WITNESS:  No.

5          THE COURT:  If you look at the information

6    Mr. Bloom is asking you to look at, could this refresh

7    your recollection of the date of that interview?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.  Please take a look

10   at his -- the information he directed you to, and when

11   you've done that, let us know.

12         THE WITNESS:  It says Friday --

13         THE COURT:  Well, set it aside for a

14   moment.  Do you happen to recall, having looked at that,

15   what the date of the interview was?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  And what was that date?

18         THE WITNESS:  I don't understand the

19   question.

20         THE COURT:  The question being:  The

21   question here is about when this interview occurred.

22   Just trying to figure out, you know, if you know when

23   this interview we're talking about occurred.  And you had

24   said you didn't recall, but if you looked at this

25   document, you might be able to recall.  Is that correct?

1                    THE WITNESS:  Looking at the document, I

2      can say that that interview did take place.  I just

3      couldn't say what date offhand.

4                    THE COURT:  Yup.  Did looking at that

5      document refresh your memory as to what the date was?

6                    THE WITNESS:  Yes, I do remember that that

7      was the first time I met with the government.

8                    THE COURT:  Okay.  And do you remember the

9      date on which this first-time meeting with the government

10     occurred?

11                   THE WITNESS:  I do remember that it was a

12     Friday, but I don't recall the exact date.

13                   THE COURT:  Okay.  All right.  We'll leave

14     it there.  Mr. Bloom, you may continue.

15                   MR. BLOOM:  Thank you.

16      BY MR. BLOOM:

17          Q.    Do you recall that you were told that you

18     needed to provide all the information, be truthful,

19     including acts that you yourself had committed?

20          A.    Yes.

21          Q.    Would it be fair to assume, then, that at

22     that point, you realized that the government knew a lot

23     more about TPLS than you thought?

24          A.    Not on that day, but on following meetings,

25     I did.

1          Q.    Okay.  Why was it that on -- two days

2     later, on May 6, you telephoned the agents and asked them

3     for another interview?

4          A.    To continue providing them with more

5     information.

6          Q.    Do you remember telling them at that time

7     that you had failed to tell them everything?

8               THE COURT:  One moment.  If counsel could

9     approach, please.

10               (Whereupon, the following proceedings were

11     had at the bench outside the hearing of the jury:)

12               THE COURT:  Mr. Bloom -- and I don't want

13     to keep chopping up your cross, I really don't, but I

14     really am concerned about the questions assuming facts

15     not in evidence.  So if we look at the last one, two days

16     later, May 6, you said.  I think that's a date coming

17     from counsel because the discussion we're talking about,

18     the date's not coming from him.

19               I would also say, you know, if your view is

20     that, well, we can kind of say someone somewhere in the

21     past had mentioned a date and this must be the incident

22     that was associated with the other date of which another

23     witness testified so it's May 6, I mean, I guess I can

24     understand that argument.

25               But I'm just concerned that the facts not

being in evidence for a couple reasons. One, I do think

it's not proper. I think the other thing is -- and this

can happen where counsel, in retrospect, thought that

they had an evidentiary basis and really didn't because

counsel's questions are not evidence. And someone

looking back at this could say, well, you know, listen,

even though the question provides context for the answer,

we're not going to take this answer as agreeing to a

particular date. So that's all I'm trying to --

MR. BLOOM: I'll just say sometime after

that.

THE COURT: Yeah. Yeah. And, you know, I

think there are ways of doing it. I just -- I just

really am concerned about, you know, sort of details

coming from counsel, which I know, you know, there was

one time, for example, with Mr. Safeeullah, right, I

questioned him and said, I think your question assumes

facts not in evidence. Mr. Safeeullah, kind of assured

me that it was in evidence. I'm confident it was not.

And so this can happen to both sides, I understand.

But there's just -- I just want to make

sure the facts get into the record from the right place

and people can sort of rely on it being in the record.

You can ask it any way you want, but, you know, just sort

of be careful about that.

1            What I may do from here on out, though, is
2   part of what I'm doing is -- we're only on day six of a
3   long trial.  It's possible that I just may let it go in
4   the future.  Some of these things go, but there may be
5   times that I feel I need to sort of straighten it out to
6   avoid jury confusion.  But, I think, hopefully, I'm sort
7   of setting expectations.

8            Any questions about that?

9            MR. LUCAS:  I will say, I think myself and
10  Mr. Ganguli have asked the witness in the past about that
11  date, and he's basically said that date.

12           THE COURT:  Yeah, please do.  And I
13  understand your point.  But, like, you know, you've got
14  to sort of piece together, well, when that date was
15  provided, it's this one, because if this same proffer --
16  because my initial thought was that this was some other
17  meeting maybe with local law enforcement who got some
18  Crime Stoppers tips and police go out, I didn't know what
19  it was, which is, you know, part of my concern.

20           The date is in there, but was that date the
21  same date here?  It's just not clear from the record.  So
22  can you -- and, really, I want you to take as long as you
23  want and get your momentum going for the cross if you
24  need to.  But I just want it to be clear about those
25  expectations and that I am concerned that sort of these

1    dates and stuff are not coming from the wrong place.

2                    MR. BLOOM:  Your Honor, the only thing I

3    would say is I think the questions that start with do you

4    remember are going to lead to a lot of I don't remember

5    the date.  I don't remember what day of the week it was.

6    So to the extent he's directed to, you know, some of

7    those things, I just have a feeling there's going to be a

8    lot of dates and times that he's not going to remember

9    specifics.

10                    THE COURT:  You are welcome to ask him,

11   isn't it true that, rather than whether he remembers

12   that.  Then the answer is on him.  You know, if he

13   doesn't remember, then that needs to -- then he's allowed

14   to say I don't remember.  But he's not sort of teed up to

15   think of the question as, well, am I supposed to start

16   with this notion of maybe I don't remember.

17                    So with all those things in mind, I hope it

18   will make these sorts of things go smoothly.  These are

19   consequential cross-examinations, and I want folks to

20   have full opportunity to do them, but, you know, I do

21   want them done in what I'm thinking is the right way.

22                    MR. BLOOM:  Thank you.

23                    (End of bench conference.  Whereupon, the

24   following proceedings were had in the hearing and

25   presence of the jury:)

1  BY MR. BLOOM:

2      Q.    Mr. Avila, isn't it true that sometime

3  after that May 4 interview that you contacted the agents

4  and told them that you'd failed to tell them everything?

5      A.    Yes, I did contact him.  I don't remember

6  what I told them.

7      Q.    Okay.  Do you remember meeting with them in

8  person after that telephone conversation?

9      A.    Yes.

10     Q.    Do you remember the date of that second

11 interview with the agents?

12     A.    No.

13     Q.    Was it shortly after the May 4 interview?

14 Do you remember?

15     A.    Yes.

16     Q.    Okay.  Do you remember at that time that

17 you implicated Mr. Pineda in the death of Liliana

18 Rodriguez?

19     A.    Yes.

20     Q.    Would it be fair to say that by 2018, you

21 knew that Mr. Pineda was a suspect in the murder of

22 Liliana Rodriguez?

23     A.    Yes.

24     Q.    Would it be fair to say that on this date

25 of the second interview that you knew that the government

1   was searching for evidence to prove this suspicion?

2           A.    I don't have knowledge of what they were

3   doing.

4           Q.    Disregarding the day, whatever day this

5   second interview was on, did you realize that the

6   government was really searching for evidence which would

7   confirm their suspicion that Mr. Pineda was involved with

8   the murder of Liliana Rodriguez?

9           A.    They were looking for evidence about a lot

10  of bodies that were out there.

11          Q.    That doesn't really answer my question.  My

12  question is, did you realize that the government was

13  searching specifically for evidence about the murder of

14  Liliana Rodriguez which would support its suspicions?

15          A.    What you're saying is that if they were

16  more focused on the death of Liliana than the other ones?

17          Q.    My question is -- I believe that you

18  testified that you knew that Mr. Pineda was a suspect in

19  the murder of Liliana Rodriguez.  And I'm asking you, did

20  you know that the government was looking for information

21  which would bolster their suspicion that Mr. Pineda was

22  involved?

23          A.    Yes.

24          Q.    And isn't it true that you realized that if

25  you could provide information to the government to

1    support their theory, it would be helpful to you, whether

2    it was true or whether it was false?

3            A.    At that time, they told me I had to be

4    sincere about everything.

5            Q.    Isn't it true, though, that as long as they

6    thought you were being sincere, that would help you?

7            A.    They told me that they were going to ask me

8    questions about which they already knew, but that I

9    always had to be sincere with them whether or not I knew

10   it.

11           Q.    Okay.

12           A.    And of questions of which I did not know.

13                 Strike that.  And of questions of which

14   they did not know.

15           Q.    But at this time, you still withheld any

16   information about the murder of Mr. Potter and your

17   involvement in that murder; correct?

18           A.    I don't remember.

19           Q.    Is it possible -- do you remember when you

20   told the government, law enforcement, about your

21   involvement with the murder of Jorge -- of Mr. Potter?

22           A.    I would say that it was around the second

23   or third time that we got together.

24           Q.    Okay.

25                 THE COURT:  Let's take our midafternoon

break at this time, and after that we'll continue
Mr. Bloom's cross. And we'll take about 15 minutes, and
the jurors may step down at this time. Thank you.

        (Whereupon, at 3:25 p.m. the jury retired
from open court.)

        THE COURT: All right, thanks. Please be
seated. All right. Here's what we're going to do before
break. Let's have counsel approach one more time. This
will be on the record, but we can do it at the bench.

        (Whereupon, the following proceedings were
had at the bench outside the hearing of the jury:)

        THE COURT: Here's one thing I want to
note. I think I may be requiring folks to break some
habit. If we look what happened right after the bench
conference, the question, Mr. Bloom, was -- this is what
I wrote down, and so I think it's accurate, maybe it's
off by a word or two, but isn't it true that sometime
after that May 4 interview. So it's in there; right?

        MR. BLOOM: May 4 interview.

        THE COURT: Yeah. So --

        MR. BLOOM: But it's in there. It's in the
record now.

        THE COURT: Well, I -- you know, that's
just -- I think that's the question. We have evidence
of, A, someone else tying it to May 4. To this day, I

just don't think it's clear that he's acknowledged it's
May 4 or that it's been definitively tied to --

                MR. BLOOM:  He said it was Friday.

                MR. HOFF:  Your Honor, if I can talk to my
co-counsel about that, I might just stipulate it was
May 4.  I don't think it really matters.

                THE COURT:  I think that's -- here's the
other thing.  If it did matter, someone else could call a
witness -- so I don't know that it matters.  This is
about how we're going to ask questions and so forth, but
here's the other thing.  Then there was a couple
questions -- the next question after that, do you
remember meeting with them in person after the telephone
conference?

                As we discussed, it might be better to say,
did you meet with them?  And then if he wants to say he
doesn't remember.  The next question -- the next question
was probably an appropriate use of the -- of the notion
of remembering:  Do you remember the date of the second
interview with the agents?  And he said yes.  And then
you say, was it shortly after the May 4 interview, so
that gets in there again.

                And then so a question -- one question
later, do you remember at that time that you were -- do
you remember at that time that you implicated Mr. Pineda

1   in the death of Liliana Rodriguez?  Another sort of

2   formulation of the question in terms of what he

3   remembers.

4               So that's all by way of saying one final

5   reminder, and I wanted to point this out because I think

6   it is about sort of breaking habits.  But I do think

7   where it's possible just ask him what happened rather

8   than what he remembers.  That would be helpful and, you

9   know, being careful not to assume facts not in evidence

10  with the questions, right.

11              That's probably all I need to say about

12  that and...

13              MR. BLOOM:  I hope so, for everyone's sake.

14  I apologize.

15              THE COURT:  Well, you know, it's just one

16  of those things.  I think it will help make a cleaner

17  record.  Make it easier for the jurors to follow.  And

18  also not leave counsel -- and not leave counsel without a

19  fact in the record that they were sure was in the record.

20              All right.  Take 15.

21              MR. HOFF:  Thank you, Your Honor.

22              (End of bench conference.  Whereupon, the

23  following proceedings were had in the hearing and

24  presence of the jury:)

25              THE COURT:  All right.  Having concluded

1  that, we'll take 15 minutes and go from there upon our

2  return.  Thank you.

3                    (Whereupon, a break was taken from

4   3:27 p.m. to 3:52 p.m.)

5                    THE COURT:  Thank you, please be seated.

6                    All right.  Anything preliminary?  Seeing

7  no indication there is, so we can call in the jurors.

8                    Yeah, Mr. Bloom may come forward.

9                    (Whereupon, at 3:53 p.m. the jury returned

10  to open court.)

11                    THE COURT:  All right.  Thank you.  Please

12  be seated, folks.

13                    All right, Mr. Bloom, you may continue.

14                    MR. BLOOM:  Thank you.

15                    I've got to get this lubricated.  Excuse

16  me.

17                    THE COURT:  Yes, sir.

18   BY MR. BLOOM:

19          Q.    I'd like to talk to you a little bit about

20  the events of July 31, 2016, the murder of Liliana

21  Rodriguez.  You told agents the persons who were present

22  at La Mansion that morning, and you told them that the

23  First Word was there, Carlos Ochoa?

24                    THE INTERPRETER:  I'm sorry.  The

25  interpreter did not understand.

1  BY MR. BLOOM:

2       Q.    Did you tell them that Carlos Ochoa, the

3  First Word, was present; is that correct?

4       A.    Yes.

5       Q.    And --

6             THE INTERPRETER:  I did not hear an answer

7  to the second question; is that correct?

8             THE WITNESS:  Yes.

9  BY MR. BLOOM:

10      Q.    Mr. Pineda was present; correct?

11      A.    Yes.

12            THE INTERPRETER:  Your Honor, the

13  interpreter requests that the attorney allow the

14  interpreter to interpret the answer before proceeding

15  with the next question.

16            THE COURT:  Sounds fair enough, Mr. Bloom.

17  Can we make that happen?

18            MR. BLOOM:  Yes, we can.

19            THE COURT:  All right.

20  BY MR. BLOOM:

21      Q.    And Daniel Martinez was there; is that

22  correct?

23      A.    Yes.

24      Q.    And was Annabelle Saceres there as well?

25            THE INTERPRETER:  The interpreter did not

1  understand the last name.  The interpreter requests the

2  spelling of the last name.

3              MR. BLOOM:  C-a-c-e-r-e-s.

4              THE INTERPRETER:  Caceres, not Saceres.

5  And ask repetition of the question.

6   BY MR. BLOOM:

7        Q.    I'm not going to be able to pronounce that.

8  Is Annabelle Caceres present?

9        A.    Yes.

10       Q.    Was Joslyn Caceres?

11       A.    Also.

12       Q.    Were there other MS-13 members, whether

13  it's chequeos or paros, who was also present at the club

14  that evening?

15             THE INTERPRETER:  Strike that.  Paro, yes,

16  yes.

17   BY MR. BLOOM:

18       Q.    You also that Smiley was there; correct?

19       A.    Yes.

20       Q.    Now, is it fair to say is that any one of

21  the MS-13 affiliated persons would have a motive to kill

22  a chavala in order to gain status in the clique?

23       A.    Yes.

24       Q.    Why didn't you mention that Franklin

25  Hernandez, also known as Happy, was also at the club that

1  evening?

2          A.      Because I don't remember.

3          Q.      He was a good friend of yours; correct?

4          A.      Yes.

5          Q.      But you do not remember that he was there

6  that night?

7          A.      No, I don't remember.

8          Q.      Why didn't you mention that Julio Pineda

9  was there that evening?

10          A.      Because I don't remember.

11          Q.      And why didn't you say that Kimberly

12  Caceres was there that evening?

13          A.      Because I don't remember that either.

14          Q.      Would it be fair to say that your memory of

15  what happened at the club that morning is not crystal

16  clear?

17          A.      A long time has already transpired, and I

18  don't remember everything at 100 percent.

19          Q.      Would you agree that your memory closer to

20  the event would be better than it is now?

21          A.      Could be.

22          Q.      Would you agree with me that the person

23  that I -- excuse me.  Would you agree with me that the

24  names I mentioned, you did not state were at the club

25  that evening?

1      THE COURT:  One moment.  Do we mean the
2  names Happy, Julio Pineda, and Kimberly Caceres?
3      MR. BLOOM:  Correct.
4      THE COURT:  Those three?  Okay.
5      So would you agree with Mr. Bloom that
6  those three names were names that you did not tell law
7  enforcement were at the club that evening?
8      THE WITNESS:  If I did not mention them, I
9  did not mention them because I did not remember them even
10  back at that time.
11  BY MR. BLOOM:
12      Q.   Okay.  That morning at La Mansion, you told
13  the agents that someone came up to you and told you that
14  a chavala was in the club; is that -- do you -- is that
15  correct?
16      A.   I remember that I told him that Smiley had
17  approached me.
18      Q.   So you do not -- you do not remember saying
19  that -- that you told -- you do not remember telling the
20  agents that someone told you that a chavala was present?
21      A.   I do remember.
22      Q.   You do remember.  Okay.
23      Later you told the agents that it was
24  Smiley who told you that a chavala was present; is that
25  correct?

1          A.     And also Demente.

2          Q.     You do not remember saying that Smiley came

3    up to you and told you that a chavala was present?

4                    MR. HOFF:  Objection, Your Honor.

5                    THE COURT:  So, Mr. Bloom, the questions

6    about what he previously said to law enforcement, of

7    course, that can be appropriate under certain

8    circumstances.  Is there a relevant purpose for that

9    here?

10                   MR. BLOOM:  Well, if I could just show him

11   a document, I might refresh his recollection.

12                   THE COURT:  Let me ask you this:  Are you

13   inquiring as to what he recalls today or drawing a

14   contrast between what he said earlier in this trial --

15                   MR. BLOOM:  What he said -- what he said at

16   the time.

17                   THE COURT:  Okay.  What he said at the time

18   is relevant why, in this context?

19                   MR. BLOOM:  Well, for his -- for his

20   credibility, for his implication of Mr. Pineda or his

21   nonimplication of Mr. Pineda at that time.

22                   MR. HOFF:  Can we approach to have this

23   conversation?

24                   THE COURT:  Yeah, let's do that.  Thanks.

25

1          (Whereupon, the following proceedings were
2    had at the bench outside the hearing of the jury:)
3          MR. HOFF:  I'd rather not do that in front
4    of the jury.
5          THE COURT:  Yeah, after a certain level,
6    it's -- if we can't sort it out right away, we'll take it
7    up at the bench.
8          MR. BLOOM:  Can I tell what you I'm getting
9    at?  It might help.
10          THE COURT:  Yes.
11          MR. BLOOM:  In the interview, at first he
12    said somebody came up to him.  Later, he said Smiley came
13    up to him and told him about it.  Later in the same
14    interview, he said that -- he said that -- he told agents
15    that Mr. Pineda did not comment concerning an individual
16    at La Mansion.  So at that time, he said that Mr. Pineda
17    did not say anything about a chavala.
18          THE COURT:  Could we do it sort of like
19    this.  If -- maybe what could be helpful is if before you
20    sort of bring up prior statements of Mr. Avila, maybe
21    give a tip-off to other counsel and the Court, as well,
22    as the jurors over where this is going; for example,
23    saying, now, isn't it true, Mr. Avila, that you have said
24    different things to law enforcement at different times
25    about X topic?  Then it will be sort of clear that you're

1  trying to say, you know, maybe you're not introducing

2  these prior statements to show it's inconsistent with

3  what he's testified to earlier.  You're going to show an

4  inconsistency between various things he said to law

5  enforcement before.  That might give a signal that it's

6  okay for us to see where it's going before we draw an

7  objection.  It's just one idea.

8              What do you -- what do you think, Mr. Hoff?

9              MR. HOFF:  Initial objection is he answered

10 the question.  There was no "I don't remember."  And then

11 it was followed up with, do you not remember that?  And

12 he said, no, I said -- he gave a definitive answer.  He

13 said Smiley and also Demente told me that, and then you

14 followed up with, so you do not remember.  He didn't say

15 he didn't remember.  So, like, the fact that we keep

16 going back to, do you not remember, you're not refreshing

17 his recollection at that point.  He's not saying I don't

18 remember things.  He's saying that he gave a definitive

19 answer.  And what you're impeaching him with are not his

20 -- those are reports written by a federal agent.  So he

21 can say I didn't say that, and I think you're stuck with

22 the answer.  And then if you want to call a witness --

23             MR. BLOOM:  They're not his sworn

24 statements.  I know that.  But this is all I've got.

25             THE COURT:  Listen, here's -- here's kind

of how I view this.  If -- you can ask him about a prior
inconsistent statement.  Let's say that is --
hypothetically, that's what you're trying to do.  You
know, you can ask him about it.  He can either admit the
prior inconsistent statement or you can attempt to prove
it up later if there was a prior inconsistent statement.

　　　　　MR. BLOOM:  I thought it was more of
refreshing his recollection.  Doesn't remember.

　　　　　MR. HOFF:  But he didn't say he doesn't
remember.

　　　　　MR. BLOOM:  I didn't ask him.

　　　　　THE COURT:  And that is -- that is -- we're
not -- it's important not to refresh for a witness that
doesn't say they don't remember.  So if that's where you
were going, I don't know what your objection was.  I
certainly sort of had concerns of my own about the line
of questioning about why we're talking about prior
statements because there are multiple reasons why they
can be appropriate, even including that -- whether it's
been brought up in trial before or not.  I, Tom Bloom,
happen to believe that he said different things to law
enforcement about a particular topic at different times
in the past before trial.  Okay.  But it might be helpful
if we kind of signal that that's where you're going
because, otherwise, I'm going to wonder what the proper

1  purpose is about asking about the prior statements.

2           I think the way we have to leave it is

3  this: I'm trying to see if I can figure out kind of --

4  all right. The objection was to the question, do you not

5  remember saying that Smiley came up to you and told you

6  that a chavala was present. If you -- if it's -- if this

7  is a relevant point, and I'm not denying that -- and you

8  have a good faith base for believing that Smiley came up

9  to him and told him that a chavala was present, then I

10 think it's cleaner. Didn't Smiley come up to you and

11 tell you that a chavala was present? Because then you're

12 not even -- you know, I think you're allowed to ask that

13 question, but, again, without reference to what he

14 remembers or doesn't remember. You're just trying to

15 elicit his -- you're just asking him to form -- what

16 information does he have.

17           I think that's probably the best we can do.

18 So I'll sustain the question as asked, but the notion

19 that -- you know, you can ask him about prior -- you can

20 ask him a question. Let's put it this way. You can ask

21 another question in this area and, you know, see how it

22 goes in light of, you know, the government's view and my

23 view. And we'll -- I guess that's the best we can do is

24 go from there. That's probably the best guidance I can

25 give.

1          MR. BLOOM:  What?

2          THE COURT:  That's probably the best

3    guidance I can give right now, so...

4          MR. BLOOM:  Thank you, Judge.

5          THE COURT:  Thank you.

6          (End of bench conference.  Whereupon, the

7    following proceedings were had in the hearing and

8    presence of the jury:)

9          THE COURT:  All right.  Mr. Bloom, you may

10   ask another question.  The last question did not end up

11   getting an answer, and so it's kind of a nullity, but you

12   can ask another question.

13   BY MR. BLOOM:

14        Q.   Isn't it true that, in your interview, you

15   told the agents that Smiley was the one who came up to

16   you and said that a chavala was in the club?

17        A.   I don't remember.

18        Q.   In that same interview, did you tell the

19   agents that Mr. Pineda did not comment to you concerning

20   the individual at La Mansion?

21        A.   Pineda was at La Mansion.

22        Q.   The question is, did you say that

23   Mr. Pineda never came up to you to say that there was a

24   chavala in the club?

25        A.   I did not remember at that time.

1          Q.     Do you remember now?

2          A.     Yes.

3          Q.     You remember that Mr. Pineda never came up

4    to you to say that a chavala was at the club; is that

5    correct?

6          A.     I remember that Demente came to me, and he

7    said there was a chavala.

8          Q.     Are you saying that at the time -- at the

9    time of your interview, though, you could not remember

10   that?

11         A.     I couldn't remember.

12         Q.     Again, is your memory better now in 2023

13   than it was back in 2018?

14         A.     When you try to remember and you try to

15   remember real hard, then you have to wait for things to

16   come back to you.

17         Q.     Would you admit that you've given -- you

18   would admit that you have given different statements to

19   agents concerning the presence of Mr. Pineda -- excuse

20   me, concerning Mr. Pineda telling you that a chavala was

21   present?

22         A.     I've told them what I remembered at the

23   moment that they've asked me.

24         Q.     So is it possible that you told them at the

25   moment they asked you that Mr. Pineda never came up to

1  you to say that a chavala was present?

2         A.    True.

3         Q.    And then is it possible that, in a later

4  interview, you might have told them that Mr. Pineda did

5  tell you that a chavala was present?

6         A.    Yes.

7         Q.    And during these -- this period of time

8  that your interviews were taking place, is it fair to say

9  that you were learning more about what the government

10  suspected as far as Liliana Rodriguez's murder?

11         A.    I didn't come to realize more about that

12  murder.

13         Q.    I'm sorry?

14         A.    I didn't come to realize more about that

15  murder.

16         Q.    Could you explain that to me?  I don't

17  quite understand your answer.

18         A.    What I said about that death is what I

19  knew -- what I know about it.

20         Q.    So justing to make sure I'm clear.  At the

21  time closer to -- at the time of your first interview,

22  you were not sure -- or at the time of your first

23  interview, you said that Mr. Pineda did not come up and

24  tell you about a chavala.

25                MR. HOFF:  Objection.

1              THE COURT:  Nature of the objection?

2              MR. HOFF:  That it's misquoting the

3  witness, Your Honor.

4              MR. BLOOM:  Misquoting what?  I'm sorry.

5              THE COURT:  Well, I think it's trying to

6  clarify.  So here's what we'll do.  We will sustain

7  the -- I'll sustain the objection because it was -- maybe

8  on other grounds, the question was a bit broken up.  You

9  are allowed to clarify the answer, which I think is fair

10  because the answer was not exactly responsive to the

11  particular question posed.  So you can ask another

12  question to clarify the witness's views on this topic.

13   BY MR. BLOOM:

14         Q.   Is it fair to say that as time passed you

15  remembered more?

16         A.   One or two details.

17         Q.   And one of those details was who exactly

18  told you that a chavala was present at the club?

19         A.   Yes.

20         Q.   And is it possible -- is it possible that

21  Mr. Pineda never came up to you to tell you that a

22  chavala was present at the club?

23         A.   He's the one who told me.

24         Q.   All right.  Now, this is all occurring at

25  5 o'clock in the morning; isn't that correct?  5 o'clock,

1    5:30 in the morning?

2           A.    Yes.

3           Q.    And you told the agents that everyone was

4    partying and selling drugs at La Mansion that morning; is

5    that correct?

6           A.    We were selling drugs.

7           Q.    You were not partying?  You were not

8    partying at the club?

9           A.    We were not permitted to drink when we were

10   out on the street.

11          Q.    So you're telling me no one was drinking

12   that night?

13          A.    As to the members of the gang?

14          Q.    Yes.

15          A.    I don't remember anyone having been

16   drinking.

17          Q.    So you never said that you-all were -- that

18   you-all were partying that night?

19          A.    I don't remember.

20          Q.    If I were to show you a document, might it

21   refresh your recollection of that?

22          A.    Okay.

23          Q.    Yes.  If you could look at page 2,

24   paragraph 4.

25          A.    (Witness reading document.)

1      Q.    Does that refresh your memory at all?

2      A.    Yes.

3      Q.    So would you agree that the members were

4  partying and selling drugs that evening at La Mansion?

5            THE COURT:  Well, let me ask you this.  The

6  refreshing was about whether he previously made that

7  statement to law enforcement.

8            Do you recall whether you ever stated to

9  law enforcement that MS-13 gang members were partying at

10 La Mansion?

11           THE WITNESS:  Yes, I do remember.

12           THE COURT:  You did tell law enforcement

13 that at some point; is that correct?

14           THE WITNESS:  Yes.

15           THE COURT:  Okay.

16  BY MR. BLOOM:

17      Q.    And what had you done -- what had you done

18 on that Saturday, July 30?

19      A.    I imagine sold drugs.  Don't remember.

20      Q.    Would you have smoked some blunts that day?

21      A.    No.

22      Q.    When you're selling drugs to individuals,

23 do you sometimes do the drugs with them?

24      A.    It is not allowed for us to use them when

25 we're out on the street.

1   Q. When you say out on the street, what do you

2 mean by out on the street?

3   A. I'm referring to outside the house.

4   Q. So in your house you could smoke a blunt

5 and do some cocaine?

6   A. It's permitted to smoke marijuana, but not

7 to do cocaine.

8   Q. I know it's not permitted to do cocaine,

9 but do some members of MS-13 do cocaine in the privacy of

10 their home?

11   A. Yes.

12   Q. How about you?

13   A. Yes.

14   Q. Would you have done any cocaine that day in

15 the privacy of your home?

16   A. Before or after that occurred?

17   Q. I'm talking about on Saturday, Saturday day

18 or Saturday night, before going to La Mansion.

19   A. No.

20   Q. Okay.  On that -- on that Saturday -- let

21 me back up.  Routinely, about what time do you wake up in

22 the morning?

23   A. 2:00 or 3:00 in the afternoon.

24   Q. Okay.  And then after that, do you go out

25 and sell drugs?

1       A.    On weekends, I do.

2       Q.    Saturday was a weekend.  So we're talking

3 about a Saturday; correct?

4       A.    Yes.

5       Q.    Mostly do you just -- do you sell the drugs

6 at bars, essentially?

7       A.    Yes.  When they open them, I do.

8       Q.    Okay.  Well, La Mansion does not open until

9 3:00 a.m.; is that correct?

10      A.    Yes.

11      Q.    Do you sell bars before 3:00 a.m. -- do you

12 sell drugs at bars before 3:00 a.m. that are open?

13      A.    Yes.

14      Q.    And at these bars, do you sometimes have a

15 few drinks?

16      A.    No.

17      Q.    I take it that you are a recovered

18 alcoholic?

19      A.    When I arrived at Nashville, I stopped

20 drinking.

21      Q.    Do you go to AA meetings?

22      A.    No.

23      Q.    So you stopped drinking all on your own?

24      A.    Yes.

25      Q.    Okay.  That on -- we're at July 31 now.

1   What time did you arrive at La Mansion?

2           A.      I do not remember.

3           Q.      Did you come with anyone?

4           A.      I also do not remember.

5           Q.      How did you get to La Mansion?

6           A.      I would always drive my car to La Mansion.

7           Q.      And where were you right before going to

8   La Mansion?

9           A.      I was at the bar called El Uno.

10          Q.      And what were you doing at that bar?

11          A.      Selling drugs.

12          Q.      Now, would it be fair to say, by 5 or 6 in

13  the morning, you'd been up all day and into the wee hours

14  of the morning; is that correct?

15          A.      Yes.

16          Q.      And you and the people you were with,

17  everyone was, as you say, partying and selling drugs?

18          A.      Yes.

19          Q.      With that in mind, do you have a whole lot

20  of confidence in the trustworthiness of your perceptions

21  at 6:00 a.m. in the morning?

22          A.      That was my routine.  I needed to be awake.

23  Otherwise, the chavalas were going to kill me.

24          Q.      So did you use any enhancements to help you

25  stay awake until the wee hours of the morning?

1        A.    No.

2        Q.    Would you agree that, with your experience,

3   say, with alcoholism and experience with drugs, no matter

4   how limited you say it has been --

5              THE INTERPRETER:  No matter how limited you

6   say it has been?

7   BY MR. BLOOM:

8        Q.    -- how limited your experience with drugs

9   has been that, you know, memory of events can be impaired

10  by, you know, long-term chronic use of drugs?

11       A.    Up until that time, I hardly ever used

12  cocaine and I hardly ever drank.

13       Q.    Okay.  Concerning the -- concerning the

14  events at La Mansion that night, it was a pretty chaotic

15  night; is that correct?

16       A.    Yes.

17       Q.    There were fights occurring inside the club

18  and outside the club?

19       A.    Yes.

20       Q.    And isn't it true that Mr. Pineda's mother

21  and perhaps her (sic) aunt were involved in one of those

22  fights?

23       A.    Yes.

24       Q.    And security -- is it true that security

25  guards were, like, running around all over the club and

```
 1   that -- I'll just say that.  Was it true that security
 2   guards were running all around the club in this chaotic
 3   situation?
 4            A.    Yes.
 5            Q.    And is it true that Mr. Pineda's mother,
 6   Annabelle, was being evicted or removed from the club?
 7            A.    Yes.
 8            Q.    And Mr. Pineda was actually involved in the
 9   fight that his mother was involved in; is that correct?
10            A.    I do not remember.
11            Q.    Did you -- you did tell agents that
12   Annabelle, Mr. Pineda's mother, had actually been struck
13   with an object on her leg?
14            A.    Yes.
15            Q.    But you don't remember that she was in a
16   fight?
17            A.    No.
18            Q.    Had Ms. Pineda been pepper sprayed when she
19   was evicted and fighting?
20            A.    I don't remember.  I don't remember.
21            Q.    It seems like a lot of things that you --
22   you remember a lot of things that are very helpful to
23   Mr. Pineda's guilt, but you don't remember much else
24   about that evening.  Is that a fair statement?
25            A.    Everything happened very quickly, and I
```

1  hardly remember anymore.

2          Q.    So basically you're telling -- you're

3  telling the jury that what you do remember is that

4  Mr. Pineda came up to you and said there was a chavala in

5  the club?

6          A.    Yes.

7          Q.    But you don't remember when you arrived at

8  the club; correct?

9                You don't remember if you came with

10  anyone --

11                THE INTERPRETER:  I'm sorry.  The

12  interpreter did not hear the witness answer the

13  question --

14                MR. BLOOM:  Oh, I'm sorry.  I'm sorry.

15                THE INTERPRETER:  -- and request again that

16  the attorney allow the interpreter to hear the answer in

17  Spanish and interpret it into English.

18                MR. BLOOM:  My apologies.

19   BY MR. BLOOM:

20          Q.    Now, would it be -- with all the chaotic

21  situation at La Mansion that evening with Mr. Pineda's

22  mother being involved in some sort of altercation, is it

23  fair to say that Mr. Pineda was more focused upon his

24  mother, her safety?

25                THE INTERPRETER:  Is it fair to say that

1  Mr. Pineda was...

2          MR. BLOOM:  That Mr. Pineda was more

3  concerned and focused on his mother's safety rather than

4  the presence of a chavala at the club.

5          THE WITNESS:  I do not remember.

6          THE COURT:  All right.  It appears that we

7  need to break at this time pursuant to a note we

8  received.  And rather than reconvene us, I'm thinking

9  maybe we can break for the day, even though it's a little

10  bit early.  It's 4:35.  How much further do you have to

11  go, Mr. Bloom, do you think?  I don't want to rush you.

12          MR. BLOOM:  I really apologize, but it

13  could be an hour.

14          THE COURT:  All right.  We'll allow the

15  jurors step down.  Please remember our admonition.  No

16  researching, talking, or investigating about this case.

17  Thank you.  We'll see you folks at 9 o'clock tomorrow.

18  Thank you.

19          (Whereupon, at 4:37 p.m. the jury retired

20  from open court.)

21          THE COURT:  All right.  Thank you.  Please

22  be seated.

23          Folks, we received a note.  Anyone wants to

24  see it, check with Ms. Jackson.  But we got one of those

25  notes you sometimes get, restroom emergency, need to stop

1  promptly.

2              So we hadn't been going so long this time

3  and was hoping to make it until 5:00, but that was not in

4  the cards.  So we -- or I should say I thought it was

5  prudent to just break for the day.  So that occasions

6  that, rather than trying to herd the cats again, get us

7  back in here.

8              All right.  What I'm inclined to do is to

9  use our time -- do folks happen to have their jury

10 instructions, draft instructions with them, like they did

11 earlier this morning?

12             MR. HOFF:  I took them back downstairs,

13 Your Honor.  I thought we weren't going to be addressing

14 them for the rest of the day.

15             THE COURT:  Well, that was a good

16 assumption until this happened.  So I understand that.

17 You know, if everyone had them, I think it would be

18 helpful to use our time, but maybe we'll just break for

19 the day.

20             Anything else that we need to address from

21 the government's perspective right now?

22             MR. HOFF:  No, Your Honor.  I mean, if

23 Your Honor wanted to proceed for the rest of the day, we

24 could run downstairs and get them and be back up in five

25 minutes, however the Court wanted to proceed.

1          THE COURT:  I appreciate that.  How do
2   counsel feel?  Prefer to have the extra time you want to
3   use for yourselves, or you want to use the time?
4          MR. MOTHERSHEAD:  Ourselves.
5          MS. HOOD-SCHNEIDER:  Yup.
6          THE COURT:  I understand the -- I
7   understand the temptation, so we'll just break.  I do
8   think -- my thought about continued discussion about the
9   jury instructions, maybe -- maybe Monday morning might be
10  the most appropriate thing.  As you recall, we're not
11  meeting Friday, but we certainly are planning for a
12  pretty full day tomorrow.  Anything from the defense side
13  we need to discuss?  All.
14         Right.  Don't see anything.  So we'll see
15  you folks here -- I think we can probably say 9:00 a.m.
16  because I don't think there's anything preliminary for us
17  to discuss tomorrow.  So we'll pick back up with
18  Mr. Bloom's cross-examination.
19         All right.  Stand in recess.  Thank you.
20         (Whereupon, at 4:40 p.m. these were all of
21  the proceedings had in the above-captioned cause on the
22  above-captioned date.)
23
24
25

1      <u>**REPORTER'S CERTIFICATE PAGE**</u>

2

3           I, Roxann Harkins, Official Court Reporter for

4    the United States District Court for the Middle District

5    of Tennessee, in Nashville, do hereby certify:

6           That I reported on the stenotype shorthand

7    machine the proceedings held in open court on

8     April 12, 2023, in the matter of UNITED STATES OF

9    AMERICA v. JORGE FLORES, JOSE PINEDA-CACERES, LUIS

10   COLINDRES AND KEVIN TIDWELL, Case No. 3:18-cr-293; that

11   said proceedings were reduced to typewritten form by me;

12   and that the foregoing transcript is a true and accurate

13   transcript of said proceedings.

14

15           This is the 14th day of July, 2023.

16

17                      s/ Roxann Harkins
                        ROXANN HARKINS, RPR, CRR
18                      Official Court Reporter

19

20

21

22

23

24

25