1          UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF TENNESSEE
2                NASHVILLE DIVISION

3

4   UNITED STATES OF AMERICA        )
                                    )
5   VS                             )   No. 3:18-cr-00293
                                    )
6   JORGE FLORES [3]                )
    JOSE PINEDA-CACERES [4]         )
7   LUIS COLINDRES [8]              )
    KEVIN TIDWELL [9]               )
8   _____

9

10

11   BEFORE THE HONORABLE ELI RICHARDSON, DISTRICT JUDGE

12            TRANSCRIPT OF PROCEEDINGS

13               April 13, 2023

14                  Volume 7

15   _____

16

17

18

19

20

21   _____

22   **Roxann Harkins, RPR, CRR**
     Official Court Reporter
23   719 Church Street, Ste 2300
     Nashville, TN 37203
24   615.403.8314
     roxann_harkins@tnmd.uscourts.gov
25

**APPEARANCES:**

For the Government:

MATTHEW KEVIN HOFF
Department of Justice
Organized Crime and Racketeering Sect
1301 New York Avenue
7th Floor
Washington, DC 20005

AHMED A SAFEEULLAH
BROOKE C. FARZAD
US Attorney's Office
719 Church Street, Suite 3300
Nashville, TN 37203

For Defendant Flores:

LEONARD E. LUCAS , III
The Law Firm of Leonard Earl Lucas
315 Deaderick St
Suite 1550
Nashville, TN 37238

VAKESSHA HOOD-SCHNEIDER
236 Public Square
Suite 103
Franklin, TN 37064

For Defendant Pineda-Caceres:

THOMAS F. BLOOM
911 Marengo Lane
Nashville, TN 37204

GEORGE TRAVIS HAWKINS
Hawkins Law Firm, PLLC
735 Broad Street
Suite 305
Chattanooga, TN 37402

1    For Defendant Colindres:

2                        KYLE F. MOTHERSHEAD
                         Relentless Advocacy, PLLC
3                        2901 Dobbs Ave
                         Nashville, TN 37211
4

5                        JAY C. CLIFTON , III
                         Clifton Law Office
6                        707 Main Street
                         Suite 123
7                        Nashville, TN 37206

8

9    For Defendant Tidwell:

10                       JUNI S. GANGULI
                         Ganguli Law Firm
11                       202 Adams Avenue
                         Memphis, TN 38103
12

13                       MATTHEW C. GULOTTA
                         The Gulotta Firm, PLLC
14                       202 Adams Avenue
                         Memphis, TN 38103
15

16   For the Witness Avila:

17                       WILLIAM I. SHOCKLEY
                         4505 Harding Road
18                       Suite 126
                         Nashville, TN 37205
19

20

21

22

23

24

25

I N D E X

Government witnesses

**FRANCISCO AVILA**

Continued Cross-Examination By Mr. Bloom ...........37
Redirect Examination By Mr. Hoff ...................61
Recross-Examination By Mr. Ganguli ................74
Recross-Examination By Mr. Lucas ..................79
Recross-Examination By Mr. Bloom ..................82

**WARREN FLEAK**

Direct Examination By Ms. Farzad ..................89

**WILLIAM DAVIS**

Direct Examination By Mr. Hoff ...................114

**MATTHEW FRACKER**

Direct Examination By Mr. Hoff ...................118

**CONNOR LAMBERSON**

Direct Examination By Mr. Hoff ...................131
Cross-Examination By Mr. Gulotta .................159
Cross-Examination By Ms. Hood-Schneider ..........164
Redirect Examination By Mr. Hoff .................167

**KENNETH WOLFE**

Direct Examination By Ms. Farzad .................168

**DANIELLE CONNOR**

Direct Examination By Mr. Safeeullah .............194

1

2                    **E X H I B I T S**

3   Government No. 23....Clear plastic bag with red    102
              strip at top containing 4 small brown paper
4             bags with objects inside them and yellow
              evidence tape across top of bags. Piece of
5             paper also enclosed with various writings on
              it and a white sticker adhered to it. White
6             sticker – Nashville Crime Laboratory, Metro
              Nashville P.D., Case # 191022723, Exhibit
7             #001, Rcvd: McGowen, Rudie 10/31/19, Bar Code
              AK7965M50TKFFV.
8   Government No. 24....Clear plastic bag with red  .102
              strip at top containing 5 small brown paper
9             bags with objects inside them and yellow
              evidence tape across top of bags. One larger
10            brown paper bag also enclosed with white
              sticker adhered to it. White sticker –
11            PR25440265, Category: Property, #229 (red
              ink), Description: Shooting, projectile
12            fragment, blazer .45 auto cartridge casing,
              unknown head stamp .45 auto cartridge casing,
13            Win .45 auto cartridge casing, FED .40 S&amp;
              amp:w cartridge casing, Win .40 S&amp; amp: W
14            cartridge casing.
    Government No. 25....Clear plastic bag with red  .102
15            strip containing small brown paper bag,
              undamaged copper bullet with white substance
16            on tip, white description document
    Government No. 26....Clear plastic bag with red  .102
17            strip on top containing damaged
              pewter-colored vehicle side view mirror,
18            brown paper bag and white description
              document
19  Government No. 27....Clear plastic bag with red  .201
              strip across top. One fired cartridge casing.
20            Multiple brown paper bags in clear bag. White
              sticker on brown paper bag – PR25450702,
21            Incident: 20170158052, Category: Property,
              Suspect: Unknown, Description-10-83 (18)
22            7.62x39 Tullamo FCC EM #19-23, 25, 2, 7-32,
              36-38, 42-44. Bar Code ZCH304UT0TZF1H, #227
23            handwritten in red ink.

24

25

```
 1   Government No. 28....Clear plastic bag with red   .201
             strip across top. Multiple brown paper bags
 2           and white piece of paper (folded) in clear
             plastic bag. Handwritten on brown paper bag –
 3           #40 2017-0158052, 2/18/17 @ 0538, DKC, 1316
             Antioch Pike, Winchester 223 REM FCC
 4   Government No. 29....Clear plastic bag with red   .201
             strip across top. One projectile fragment.
 5           White piece of paper (folded). Handwritten on
             brown pieces of paper (similar to that of a
 6           brown paper bag), #18, 2017-0158052, 1316
             Antioch Pike, Copper Fragment. Also
 7           handwritten on brown paper – DKC, @0519, #10,
             17- 0158052, 1316 Antioch Pike, (1) proj.
 8           fragment copper.
     Government No. 32....Physical clear plastic bag   178
 9           with red strip across top. One projectile
             fragment. Brown paper bag folded inside clear
10           bag. White sticker on brown paper bag –
             PR25452806, Incident: 20170180702,
11           Description: Agg Assault, 1 projectile
             fragment, #227 in red ink, and submitted by
12           Wolfe, Kenneth A.
     Government No. 33....Clear plastic bag with red   .230
13           strip across top of it. Contains one silver
             cartridge casing and multiple brown paper
14           bags. Sticker on larger brown paper bag –
             PR25480979, Incident: 20170447305, #219
15           handwritten in red ink, Category: Property,
             Suspect: Unknown, Description: 10 52/64
16           Shooting/Death, (6) Winchester 40 S&amp: amp:
             W FCC EM #3-7, 13, bar code – ZCH304X90RYR47.
17           (1 page)
     Government No. 34....Clear plastic bag with red   .230
18           strip across it, containing fired cartridge
             casing and multiple brown paper bags and
19           white folded piece of paper. Handwritten on a
             brown paper bag – 2017-0447305, 1088
20           Murfreesboro Pike, (3) Tulammo 7- 62 #39,
             FCC.
21   Government No. 35....Clear plastic bag with red   .230
             strip across it, containing projectile
22           fragment, white folded piece of paper and
             brown paper bag. White sticker in clear
23           plastic bag – PR25480976, Incident:
             20170447305, Description-10-52/64
24           Shooting/Death, (1) projectile EM #8.

25
```

```
1    Government No. 40....Clear plastic bag with red  .230
             strip across it, containing projectile
2            fragment, brown paper bag, folded white piece
             of paper enclosed in plastic. White sticker
3            in clear plastic bag – PR25480977, Incident:
             20170447305, Description: 10- 52/64
4            Shooting/Death, (3) Copper fragments EM
             #10-12.
5    Government No. 41....Clear plastic bag with red  .230
             strip across it, containing projectile
6            fragment (very damaged), brown paper bag,
             small yellow envelope, folded white piece of
7            paper enclosed in plastic bag. White sticker
             on brown paper bag – PR25481658, Incident:
8            20170447305, Description: 10-52/64, (2)
             projectile fragments off dark grey t-shirt.
9    Government No. 61....Physical clear plastic bag    249
             with red strip across top of it. Contains 1
10           silver bullet fragment, brown paper bag with
             white folded piece of paper. White sticker on
11           brown paper bag – PR25483540, Description:
             10-52/64/ Shooting Investigation, 1
12           projectile, bar code – ZCW1X4YC0UPDY9.
     Government No. 65....Physical clear plastic bag    249
13           with red strip across top of it. Contains 1
             copper bullet fragment, folded brown paper
14           bag and white folded piece of paper. Brown
             paper bag – handwritten in black ink –
15           2017-0469010, #19, @0245, Copper fragments,
             handwritten in red ink - #217, bar code
16           ZCW1X4YC0VMHT4 (2) copper fragments.
     Government No. 66....Physical clear plastic bag    249
17           with red strip across top of it. Contains 1
             brass fired cartridge casing, folded brown
18           paper bags and white folded piece of paper.
             Handwritten on brown paper bag –
19           2017-0469010, Antioch Pike & McCall St PIC,
             10-52/64, (6) Win NT 45 auto FCC.
20   Government No. 68....Physical clear plastic bag    249
             with red strip across top of it. Contains
21           dull silver-like fired cartridge casing,
             bulky brown paper bags. Visible on brown
22           paper bag, handwritten, 5/28/17 @0235, DKC,
             10-52/64, (25) Tulammo 7.62x39, (5) 6-52x39
23           FCC and (2) Hotshot 7.62x39.
     Government No. 71....Physical clear plastic bag    249
24           with red strip across top of it. Contains
             Mexican Passport of Jesus Alberto Flores
25           Figueroa, brown paper bag, white folded piece
             of paper.
```

```
1    Government No. 94....Clear plastic bag with red  .201
             strip across top. One copper fired cartridge
2            casing, one white piece of folded paper,
             brown paper bag. Sticker on paper bag –
3            PR25450706, Incident 20170158052, Category:
             Property, Suspect: Unknown, Bar Code on brown
4            paper bag – ZCH304UT0UIKOX, (3) 9mm Luger FCC
             EM 4, 6=win EM #3, 9=F.C.
5    Government No. 95....Physical clear plastic bag   192
             with red strip across top. One visible
6            projectile fragment visible. Red Evidence
             tape across bottom portion of plastic bag.
7            Brown paper bag inside plastic bag. Contents
             unknown. On brown paper bag – handwritten in
8            black ink – 17-0847244, 10-52164, 311 Natchez
             Ct. 4 – 9mm luger (illegible).
9    Government No. 359....Physical DVD in white    ..116
             sleeve other than clear plastic middle.
10           Printed on DVD "U.S. v. Ochoa-Martinez, et
             al." "3:18-cr-00293" "Government's Trial
11           Exhibit 359" "Surveillance video clip".
             Hand-written initials "WD".
12   Government No. 360....Physical DVD in white    ..116
             sleeve other than clear plastic middle.
13           Printed on DVD "U.S. v. Ochoa-Martinez, et
             al." "3:18-cr-00293" "Government's Trial
14           Exhibit 360" "Surveillance video clip".
             Hand-written initials "WD".
15   Government No. 361....Color image of I.D. Photo  .92
             Work Order, Date: 1-19-17, Time: 0055 hrs.,
16           Complaint #: 17-0055926, Type Call: 52,
             Victim: Roberto Viera, Address: Bishopgate
17           Rd.@Aldersgate Rd., Photos Take Of: Scene,
             Section Req. S Patrol, Taken By: WL. (1 page)
18   Government No. 362....Color image of brick  .......92
             background with numbers "1025" on metal or
19           plastic plates attached to brick background,
             black square opening above numbers. (1 page)
20   Government No. 363....Color image of view of brick 92
             and siding house with green shutters. Shrubs
21           in front of house. Gray Nissan SUV in
             driveway. Partial view of mailbox on left
22           bottom corner of image. (1 page)
23   Government No. 364....Color image of brick framed .92
             vinyl with porch light and "1025" above
             doorframe, to right of porch light. (1 page)
24   Government No. 365....Color image of off-white   .92
             wall with bullet defect. (1 page)
25
```

Government No. 366....Color image of hardwood ...92
          floor, area rug to right of hardwood, and 3
          stairs, carpeted, with wooden stair rail,
          downward to another living area. (1 page)
Government No. 367....Color image of two green .92
          with white writing cross-street signs,
          Bishopsgate Rd and Aldersgate Rd, partial
          view of red stop sign below the street signs.
          (1 page)
Government No. 368....Color image of street with ..92
          multiple yellow evidence markers on it.
          Yellow evidence markers have black print
          numbers on them. Only 1, 2 and 3 are visible.
          Yellow police tape across road behind the
          markers. U-Haul van in driveway on right of
          road, tree, vehicles, and brick mailbox to
          left of street. (1 page)
Government No. 369....Color image of close-up view 92
          of yellow evidence markers on road. Black
          numbering on markers visible are 1, 2, 3, 4,
          5, 6, 7, and 8. (1 page)
Government No. 370....Color image of close-up of ..92
          yellow evidence marker on road with black "1"
          on both sides of marker, and L scale attached
          to marker. Fired cartridge casing in corner
          of L scale. (1 page)
Government No. 371....Color image of yellow .....92
          evidence markers with black numbering -2 and
          3, on road. Partial piece of mirror frame. (1
          page)
Government No. 372....Color image of yellow .....92
          evidence markers with black numbering – 4, 5,
          6, 7 and 8, on road, partial view of vehicles
          on left of image. (1 page)
Government No. 373....Color image of yellow .....92
          evidence markers on street and driveway with
          black numbering – 5, 6, 7 and 8. Partial view
          of vehicles to left of image. (1 page)
Government No. 374....Color image of yellow .....92
          evidence markers on street with black
          numbering – 5, 7 and 8. (1 page)
Government No. 375....Color image of close-up of ..92
          yellow evidence marker on road with black "6"
          on both sides of marker, and L scale attached
          to marker. Fired cartridge casing in corner
          of L scale. (1 page)
Government No. 376....Color image of yellow .....92
          evidence markers on street with black
          numbering – 7 and 8. (1 page)

Government No. 377....Color image of close-up of ..92
          yellow evidence marker on road with black "7"
          on both sides of marker, and L scale attached
          to marker. Fired cartridge casing in corner
          of L scale. (1 page)
Government No. 378....Color image of close-up of ..92
          yellow evidence marker on road with black "8"
          on both sides of marker, and L scale attached
          to marker. Fired cartridge casing in corner
          of L scale. (1 page)
Government No. 379....Color image of yellow  .....92
          evidence markers on street with black
          numbering – 9, 10 and 11. (1 page)
Government No. 380....Color image of close-up of ..92
          yellow evidence marker on road with black
          "11" on both sides of marker, and L scale
          attached to marker. Fired cartridge casing in
          corner of L scale. (1 page)
Government No. 381....Color image of I.D. Photo  .92
          Work Order, Date: 1-18-17, Time: 2355 hrs.,
          Complaint #: 17-0055926, Type Call: 52,
          Victim: Roberto Viera, Address: 1108 Woburn
          Way, Photos Taken Of: Victim's vehicle,
          Section Req. S Patrol, Officer Req. 887609,
          Taken By: WL. (1 page)
Government No. 382....Color image of driveway, ....92
          partial view of vinyl/brick structure on left
          of driveway, SUV in driveway, trees, and yard
          on right of driveway. (1 page)
Government No. 383....Color image of tan-colored ..92
          2-door SUV, flat front passenger's side tire,
          bullet defects front quarter panel,
          passenger's side. Driver's side door ajar. (1
          page)
Government No. 384....Color image of partial view  92
          of grill of Scion vehicle with paper L scale
          and damage to grill in corner of L scale. (1
          page)
Government No. 385....Color image of hood of  ....92
          vehicle hood and windshield with 4 L scales
          and bullet defects within the L scales.
          Passenger side mirror broken. Measuring rod
          to right of photo. (1 page)
Government No. 386....Color image of close-up view 92
          of vehicle hood and windshield with 4 L
          scales and bullet defects within the L
          scales. (1 page)

```
 1   Government No. 387....Color image of quarter panel 92
              of passenger's side of vehicle, partial view
 2            of tire. 3 L scales with bullet defects in
              corners of each L scale. (1 page)
 3   Government No. 388....Color image of vehicle tire .92
              with partial view of vehicle. L scale and
 4            bullet defect located on vehicle to right of
              wheel well. L scale and bullet defect on
 5            hubcap of tire. (1 page)
     Government No. 389....Color image of 3 L scales    .92
 6            with bullet defects in corners of the L
              scales. Measuring rod to right of two of the
 7            L scales. (1 page)
     Government No. 390....Color image of close-up view 92
 8            of broken passenger-side mirror. Two L scales
              and bullet defects in corners of L scales.
 9            Measuring rod to left of mirror. (1 page)
     Government No. 391....Color image of interior of ..92
10            vehicle. Black cloth seats, fast-food cups in
              center console area with red substance on
11            tops of lids, tilted clear plastic bottle in
              center console area with red substance on
12            bottom of it. Pink air freshener (shape of
              tree) hung on string around gear shift. Brown
13            paper bag on passenger-side seat. (1 page)
     Government No. 392....Color image of interior of ..92
14            vehicle. Black cloth seats, driver's side
              seat has pooling of red substance towards
15            rear of seat. Fast-food cups in center
              console area with red substance on tops of
16            lids, tilted clear plastic bottle in center
              console area with red substance on bottom of
17            it. Red substance on top and side of center
              console. Pink air freshener (shape of tree)
18            hung on string around gear shift. Brown paper
              bag on passenger-side seat. Blue bottle
19            without lid on driver's side floorboard. (1
              page)
20   Government No. 393....Color image of Tennessee  ..149
              Bureau of Investigation, Official Firearms
21            Report, to: Andrew Chouanard, Agency Case No.
              20170055926, Date Issued: 11/20/19, Lab Case
22            No. 191022723, County: Davidson, and color
              image of Tennessee Bureau of Investigation,
23            Official Firearms Report, to: Matt Fracker,
              Agency Case No. 17007005, Date Issued:
24            11/20/19, Lab Case No. 171004990, County:
              Davidson. (4 pages)
25
```

```
 1   Government No. 394....Color image of I.D. Photo   201
                Work Order, Date: 2/18/2017, Time: 0357,
 2              Complaint #: 2017-0158052, Type Call: 10-83,
                Victim: Several, Address: 1316 Antioch Pike,
 3              Photos Taken Of: Scene, Vehicle, Evidence,
                Section Req. South, Officer Req. 151122,
 4              Taken By: D. Connor. (1 page)
     Government No. 395....Color image of structure, ..201
 5              Island Vibes, 1316 Antioch Pike Nashville TN
                37211, flags along eave of porch, colorful
 6              mural, tree to left of structure. (1 page)
     Government No. 396....Color image of road with  ..201
 7              double yellow lines in middle of it, yellow
                evidence markers (1) and (2) on far side of
 8              yellow lines. Police vehicle to right of
                image. (1 page)
 9   Government No. 397....Color image multiple yellow 201
                evidence markers on road (1, 2 and 3), police
10              vehicle to right of image. (1 page)
     Government No. 398....Color image of multiple  ..201
11              yellow evidence markers on road (4-9, etc.).
                Police vehicle on far side of markers towards
12              center of image. (1 page)
     Government No. 399....Color image of multiple  ..201
13              yellow evidence markers on road (5-9, 11-18,
                etc.). Police vehicle on far side of markers
14              towards center of image. (1 page)
     Government No. 400....Color image of yellow  ....201
15              evidence marker/L scale (1) with fired
                cartridge casing to left of marker. (1 page)
16   Government No. 401....Color image of upside-down .201
                yellow evidence marker/L scale (4) with fired
17              cartridge casing to left of marker. (1 page)
     Government No. 402....Color image of yellow  ....201
18              evidence markers/L scales (5 and 6) with
                fired cartridge casing to left of each
19              marker. (1 page)
     Government No. 403....Color image of upside- down 201
20              yellow evidence marker (5) with fired
                cartridge casing to left of marker. (1 page)
21   Government No. 404....Color image of upside-down .201
                yellow evidence marker (6) with fired
22              cartridge casing to left of marker. (1 page)
     Government No. 405....Color image of upside-down .201
23              yellow evidence marker (18) with fired
                cartridge casing to left of marker. (1 page)
24   Government No. 406....Color image of yellow  ....201
                evidence markers (19, 20 & 21) with plastic
25              cups to left of each marker. Police vehicle
                to right of markers. (1 page)
```

Government No. 407....Color image of yellow    ....201
            evidence markers (25, etc.) to right of
            structure with flags across eave, vehicles to
            right of markers. (1 page)
Government No. 408....Color image of yellow    ....201
            evidence markers (32-35, 39-41). Police
            vehicle and red stop sign past the markers.
            (1 page)
Government No. 409....Color image of 2 storage ...201
            buildings and a blue trash dumpster to left
            of road, trees and structures at end of road.
            (1 page)
Government No. 410....Color image of ground,   ....201
            concrete pad covered with leaves and trash
            and a cellular phone. (1 page)
Government No. 411....Color image of concrete pad 201
            covered with leaves and trash and a cellular
            phone (1 page)
Government No. 412....Color image of close-up     201
            view of black ZTE cellular phone. (1 page)
Government No. 413....Color image of screen of    201
            ZTE black phone showing "61782," "Familia
            Papo," "Chilango," "+1 678-851-1000," "Leo,"
            etc. (1 page)
Government No. 414....Color image of back of      .201
            black cellular phone, ZTE, LI-ION Polymer
            Battery, Min 1820mAh (7.0 Wh) Typ 1870mAh
            (7.1Wh), etc. Bar code at bottom of back of
            phone – 10102535631782017, P/D: 2015/06/03.
            (1 page)
Government No. 439....Color image of I.D. photo  169
            Work Order, Date: 2.25.17, Time: 0650,
            Complaint #: 17-0180702, Type Cal 10-52,
            Victim: Sanchez, Hansy, Address: Murfreesboro
            & Una Antioch, Photos Taken Of: Vehicle,
            Section Req. S Patrol, Taken By: Wolfe. (1
            page)
Government No. 440....Color image of paved road, .169
            police vehicle, brown-like minivan or SUV
            with rear-end damage, white truck with topper
            to left of damaged vehicle. White vehicle to
            right of damaged vehicle, with driver's side
            door open. Yellow crime tape, Burger King
            sign past the vehicles, Cash America Pawn to
            left of Burger King sign. (1 page)
Government No. 441....Color image of rear white  .169
            Scion vehicle with multiple bullet defects.
            Driver's side door open, TN license plate
            6D7-8L2, Davidson County. Police vehicle top
            right of white vehicle. (1 page)

Government No. 442....Color image of rear    .....169
            passenger view of white Scion vehicle. Rear
            windshield missing, bullet defects on rear of
            vehicle, bullet defects on passenger-side
            door. Tan-like minivan to left of vehicle
            with bumper hanging off vehicle. (1 page)
Government No. 443....Color image of view of .....169
            passenger-side of white vehicle, multiple
            bullet defects
Government No. 444....Color image of view of    .169
            white Scion 2-door vehicle from
            front-passenger side of vehicle, black hood.
            Bullet defects on passenger-side door. (1
            page)
Government No. 445....Color image of view of    .169
            front of white Scion vehicle with black hood,
            driverside door open, bullet defects on front
            windshield. (1 page)
Government No. 446....Color image of white Scion .169
            vehicle, driver-side view, bullet defect on
            front quarter panel of vehicle, bullet
            defects on windshield and driver-side door.
            (1 page)
Government No. 447....Color image of driver-side  169
            view of white Scion vehicle, driver-side door
            open, bullet defect to right of driver-side
            door. (1 page)
Government No. 448....Color image of interior of .169
            vehicle from outside of driver's door. Red
            substance on steering wheel, bullet defects
            on front windshield, bullet defect on
            driver's side headrest. (1 page)
Government No. 449....Color image of close-up of .169
            bullet defect on driver's side headrest and
            damaged seatbelt. (1 page)
Government No. 450....Color image of red    .....169
            substance and bullet fragment on floorboard
            of white vehicle. (1 page)
Government No. 451....Color image of close-up    169
            view of bullet fragment on black floorboard.
            (1 page)
Government No. 452....Color image of bullet    ..169
            defect on dark-color fabric (vehicle seat).
            (1 page)
Government No. 453....Color image of back of    .169
            white vehicle, missing rear windshield, glass
            on inside of vehicle. (1 page)

1    Government No. 454....Color image of outside rear 169
            view of white Scion vehicle, multiple bullet
2            defects on back of vehicle, missing rear
            windshield, driver-side door open, license
3            plate – Tennessee, 6D7-8L2, Davidson County.
            (1 page)
4    Government No. 455....Color image of bullet    ...169
            defects and L scales on front windshield of
5            white vehicle. (1 page)
    Government No. 456....Color image of bullet    ...169
6            defects and L scales on front windshield of
            white vehicle. (1 page)
7    Government No. 457....Color image of close-up    169
            view of bullet defects and an L scale on
8            white vehicle door. (1 page)
    Government No. 458....Color image of close-up of  169
9            scale ("20") and bullet defect on white
            vehicle. (1 page)
10   Government No. 459....Color image of driver-side  169
            view of interior of vehicle. Red substance on
11           upright portion of driver's seat, lower
            driver seat and steering wheel. Bullet defect
12           on upright portion of driver's seat. (1 page)
    Government No. 460....Color image of view of  ....169
13           interior driver-side door with multiple
            bullet defects. (1 page)
14   Government No. 469....Color image of I.D. Photo   230
            Work Order, Date: 5/21/2017, Time: 0116,
15           Complaint # 2017-0447305, Type Call:
            10-52/64, Address, 1088 Murfreesboro Pike,
16           Photos Taken Of: Scene, Vehicle, Evidence,
            Section Req. Hermitage, Taken By: D. Connor.
17           (1 page)
    Government No. 470....Color image of strip mall, .230
18           including Sheeba Restaurant, Coffee Shop.
            Multiple vehicles parked in front of Sheeba
19           Restaurant. (1 page)
    Government No. 471....Color image of red Honda    230
20           with black trunk and shattered rear
            windshield, parked in parking lot of strip
21           mall. Law enforcement officer to left of
            Honda. (1 page)
22   Government No. 472....Color image of driver's     230
            side view of two-door red Honda with red
23           rims. Driver's door open. (1 page)
    Government No. 473....Color image of driver's     230
24           side rear view of red Honda with driver's
            door open. Shattered rear windshield. (1
25           page)

Government No. 474....Color image of driver's      230
          side rear view of red Honda with driver's
          door open. (1 page)
Government No. 475....Color image of security    ..230
          camera at top right of image. (1 page)
Government No. 476....Color image of security    ..230
          camera towards left of image. Doors with
          "1088" above each door to the right of
          camera. (1 page)
Government No. 477....Color image of security   ...230
          camera, top right of image. (1 page)
Government No. 478....Color image of two security 230
          cameras. (1 page)
Government No. 479....Color image of two security 230
          cameras above windows of establishment. (1
          page)
Government No. 480....Color image of close-up      230
          view of two security cameras. (1 page)
Government No. 481....Color image of close-up      230
          view of driver's side shattered rear window
          of red Honda. Bullet defects in window and
          bottom right of window. (1 page)
Government No. 482....Color image of exterior      230
          side of driver's door of red Honda with
          multiple bullet defects and shattered window.
          (1 page)
Government No. 483....Color image of interior      230
          side of red Honda with bullet defects in door
          panel. (1 page)
Government No. 484....Color image of gray front ..230
          seats, red substance and bullet defects in
          seats and headrest. (1 page)
Government No. 485....Color image of front    ....230
          driver's side of red Honda vehicle. (1 page)
Government No. 486....Color image of passenger's 230
          side view of red 2-door Honda vehicle with
          red rims. (1 page)
Government No. 487....Color image of passenger's  230
          side of vehicle with bullet defects. (1 page)
Government No. 488....Color image of rear  .......230
          passenger's view of red Honda, rear
          windshield shattered, bullet defects along
          passenger's side of vehicle. (1 page)
Government No. 489....Color image of fired  .....230
          cartridge casing on pavement. (1 page)
Government No. 490....Color image of building ....230
          structure, Sheeba Restaurant Coffee Shop. (1
          page)
Government No. 491....Color image of mid-range     230
          view of bullet projectile on ground. (1 page)

```
 1   Government No. 492....Color image of close-up    230
              view of projectile on ground. (1 page)
 2   Government No. 493....Color image of yellow   ....230
              evidence marker (1) on pavement. (1 page)
 3   Government No. 494....Color image of yellow   ....230
              evidence markers (1 and 2) in parking lot. (1
 4            page)
     Government No. 495....Color image of yellow   ....230
 5            evidence markers (1 and 2) in parking lot. (1
              page)
 6   Government No. 496....Color image of back view of 230
              red Honda with black trunk and multiple
 7            yellow evidence markers around the Honda in
              parking lot. yellow evidence markers (1 and
 8            2) on pavement. (1 page)
     Government No. 497....Color image of yellow   ....230
 9            evidence markers (9 & 10) in parking lot.
              yellow evidence markers (1 and 2) on
10            pavement. (1 page)
     Government No. 498....Color image of rear      ....230
11            driver's side angle, rear windshield
              shattered, driver's side back window
12            shattered, yellow evidence markers (3 – 7).
              yellow evidence markers (1 and 2) on
13            pavement. (1 page)
     Government No. 499....Color image of rear      ....230
14            driver's side view of red Honda vehicle with
              black trunk, driver's door open, yellow
15            evidence markers (3 – 7). yellow evidence
              markers (1 and 2) on pavement. (1 page)
16   Government No. 500....Color image of view of ....230
              driver's side of red Honda, driver's door
17            open, yellow evidence markers, red rims, back
              driver's side window shattered. yellow
18            evidence markers (1 and 2) on pavement. (1
              page)
19   Government No. 501....Color image of view of  ....230
              driver's side of red Honda, driver's door
20            open, yellow evidence markers, red rims, back
              driver's side window shattered. yellow
21            evidence markers (1 and 2) on pavement. (1
              page)
22   Government No. 502....Color image of front of ....230
              building structure, Sheeba Restaurant Coffee
23            Shop. (1 page)
     Government No. 503....Color image of front of red 230
24            Honda vehicle with driver's door open and
              yellow evidence markers to each side of the
25            Honda. (1 page)
```

```
 1   Government No. 504....Color image of front of red 230
             Honda vehicle with driver's door open and
 2           yellow evidence markers to each side of the
             Honda. (1 page)
 3   Government No. 505....Color image of yellow   ....230
             evidence marker (8), yellow crime scene tape
 4           and red vehicle on other side of crime scene
             tape. (1 page)
 5   Government No. 506....Color image of rear     ....230
             driver's side view of red Honda vehicle with
 6           black trunk, rear windshield shattered.
             Yellow evidence markers behind and to the
 7           right of the vehicle. (1 page)
     Government No. 507....Color image of two yellow ..230
 8           evidence markers (1 & 2) on pavement. (1
             page)
 9   Government No. 508....Color image of two yellow ..230
             evidence markers (1 & 2) on pavement. (1
10           page)
     Government No. 509....Color image of yellow   ....230
11           evidence marker (1) on pavement. Small yellow
             square outlined in black, bottom right of
12           image, Government Exhibit 509, 3:18-cr- 00293
             (1 page)
13   Government No. 510....Color image of close-up     230
             view of yellow evidence marker (1) on
14           pavement. (1 page)
     Government No. 511....Color image of close-up     230
15           view of yellow evidence marker (1) with fired
             cartridge casing to left of marker. (1 page)
16   Government No. 512....Color image of distant      230
             view of yellow evidence marker (2). (1 page)
17   Government No. 513....Color image of mid-range     230
             view of yellow evidence marker (2). (1 page)
18   Government No. 514....Color image of distant      230
             view of yellow evidence marker (2), right of
19           image. (1 page)
     Government No. 515....Color image of mid-range     230
20           view of yellow evidence marker (2), lower
             center of image. (1 page)
21   Government No. 516....Color image of rear view of 230
             driver's side red Honda vehicle, driver's
22           door open, yellow evidence markers on side
             and at rear of vehicle. (1 page)
23   Government No. 517....Color image of upside-down .230
             yellow evidence marker (4). Bullet projectile
24           to left of marker. (1 page)
     Government No. 518....Color image of upside-down .230
25           yellow evidence marker (8) with bullet
             projectile to left of marker. (1 page)
```

Government No. 519....Color image of yellow   ....230
           evidence marker (10) on pavement. (1 page)
Government No. 520....Color image of close-up    230
           view of yellow evidence marker (10). (1 page)
Government No. 521....Color image of yellow   ....230
           evidence marker/L scale (10) with bullet
           projectile in corner of L scale. (1 page)
Government No. 522....Color image of backseat of  230
           red vehicle. Yellow evidence markers (11 &
           12) on backseat with shattered glass. (1
           page)
Government No. 523....Color image of close-up    230
           view of upside-down yellow evidence marker
           (11) with copper-like projectile to right of
           marker among shattered glass. (1 page)
Government No. 524....Color image of close-up    230
           view of upside-down yellow evidence marker
           (12) among shattered glass. (1 page)
Government No. 552....Color image of I.D. photo   230
           Work Order, Date: 5/22/17, Time: 2236,
           Complaint #2017-0447305, Type Call: 10-52/64,
           Victim: Ammerli Josue Garcia-Munoz, Address:
           400 Myatt Drive, Photos Taken Of: Victim's
           clothing/belongings, Section Req. Hermitage,
           Taken By: D. Connor. (1 page)
Government No. 553....Color image of dark-colored 230
           t-shirt with printed pocket. Shirt is cut and
           torn with dark-colored substance on most of
           it. 11 white L scales (numbered 1 – 11), L
           scale at bottom left corner outside of shirt.
           (1 page)
Government No. 599....Color image of I.D. Photo   249
           Work Order, Date: 5/28/17, Time: 0016,
           Complaint #2017-0469010, Type Call: 10-52,
           Victim: Jesus Alberto Flores, Address:
           Antioch Pike & McCall St., Photos Taken Of:
           Scene, Vehicle, Evidence. Section Req. South,
           Taken By: D. Connor. (1 page)
Government No. 600....Color image of side view of 249
           pewter-color 4-door sedan on road. (1 page)
Government No. 601....Color image of partial view 249
           driver's side of vehicle on road. (1 page)
Government No. 602....Color image of yellow ......249
           crime-scene tape from street intersection
           sign to other side of road. (1 page)

1   Government No. 603....Color image of wet road,  ..249
            yellow crime-scene tape on right side of
2           image. Police vehicle above crime-scene tape.
            (1 page)
3   Government No. 604....Color image of yellow ......249
            crime-scene tape across wet road. (1 page)
4   Government No. 605....Color image of wet road   249
            with yellow evidence marker (1) to left of
5           image. (1 page)
    Government No. 606....Color image of wet road,  .249
6           black mailbox, and fire hydrant to right of
            image, multiple yellow evidence markers on
7           road. (1 page)
    Government No. 607....Color image of multiple  ..249
8           yellow evidence markers (#7 is at front right
            of image) on wet road. (1 page)
9   Government No. 608....Color image of multiple  ..249
            yellow evidence markers (8 – 13) on wet road.
10          (1 page)
    Government No. 609....Color image of yellow  ....249
11          evidence markers (14-18) on wet road.
            Oncoming vehicle on left of image. (1 page)
12  Government No. 610....Color image of yellow  ....249
            evidence markers on far side of wet road.
13          Crime-scene tape attached to yellow street
            sign with red octagon shape and black up
14          arrow on sign. (1 page)
    Government No. 611....Color image of multiple  ..249
15          yellow evidence markers on wet road.
            Crime-scene tape on left of image. Police
16          vehicle parked perpendicular to road. (1
            page)
17  Government No. 612....Color image of yellow  ....249
            evidence markers (#40 in forefront of image),
18          yellow crime-scene tape on right side of
            image, police vehicle parked at angle past
19          the evidence markers. (1 page)
    Government No. 613....Color image of telephone   249
20          pole with yellow placard sign on it
            "11702112." (1 page)
21  Government No. 614....Color image of yellow  ....249
            evidence marker (1) on wet road. (1 page)
22  Government No. 615....Color image of yellow  ....249
            evidence marker with a ruler (1) and a fired
23          cartridge casing to right of evidence marker.
            (1 page)
24

25

```
 1    Government No. 616....Color image of yellow   ....249
               evidence markers (2 & 3). Fired cartridge
 2             casing to left of evidence marker 2. (1 page)
      Government No. 617....Color image of yellow   ....249
 3             evidence markers (2 & 3). Fired cartridge
               casing to left of evidence marker 2. (1 page)
 4    Government No. 618....Color image of close-up   249
               view of yellow evidence marker (2). Fired
 5             cartridge casing to left of evidence marker.
               (1 page)
 6    Government No. 619....Color image of close-up  ...249
               view of yellow evidence marker (3). Fired
 7             cartridge casing to left of evidence marker.
               (1 page)
 8    Government No. 620....Color image of yellow   ....249
               evidence marker (8). Fired cartridge casing
 9             to left of evidence marker. Small yellow
               square outlined in black, bottom right of
10             image, Government Exhibit 620, 3:18-cr-00293
               (1 page)
11    Government No. 621....Color image of yellow   ....249
               evidence markers (11 - 13) on wet road. (1
12             page)
      Government No. 622....Color image of yellow   ....249
13             evidence marker (13) to left side of image.
               (1 page)
14    Government No. 623....Color image of lateral  ....249
               view of wet road, yellow evidence marker on
15             other side of yellow solid line on road. Yellow
               crime-scene tape on left side of image.
16             (1 page)
      Government No. 624....Color image of lateral  ....249
17             view of wet road with 3 yellow evidence markers
               on road. (1 page)
18    Government No. 625....Color image of yellow   ....249
               evidence markers (8 - 13) on wet road. (1
19             page)
      Government No. 626....Color image of yellow   ....249
20             evidence markers (14 at forefront). Yellow
               crime-scene tape attached to mailbox. Second
21             yellow crime-scene tape attached to yellow
               sign with red octagon and black up arrow on
22             it. (1 page)
      Government No. 627....Color image of yellow   ....249
23             evidence markers on wet road. (1 page)
      Government No. 628....Color image of yellow   ....249
24             evidence markers (14 at forefront). (1 page)

25
```

Government No. 629....Color image of close-up ...249
         view of yellow evidence marker (14) with fired
         cartridge casing to left of evidence marker.
         (1 page)
Government No. 630....Color image of close-up ...249
         view of yellow evidence markers (15 - 18) on
         wet road. (1 page)
Government No. 631....Color image of close-up ...249
         view of yellow evidence markers (15 - 18) on
         wet road. (1 page)
Government No. 632....Color image of close-up ...249
         view of yellow evidence marker (19) with
         projectile fragment to left of evidence marker
         on wet road. (1 page)
Government No. 633....Color image of close-up ...249
         view of yellow evidence marker (20) with
         projectile fragment to right of evidence
         marker. (1 page)
Government No. 634....Color image of close-up ...249
         view of yellow evidence marker (21) with black
         object to left of evidence marker. (1 page)
Government No. 635....Color image of street ......249
         intersection signs - Antioch Pk, Antioch and
         McCall St. (1 page)
Government No. 636....Color image of close-up ...249
         view of yellow evidence marker (24) with fired
         cartridge casing to left of evidence marker.
         (1 page)
Government No. 637....Color image of close-up ...249
         view of yellow evidence marker (25) with fired
         cartridge casing to right of evidence marker.
         (1 page)
Government No. 638....Color image of multiple ..249
         yellow evidence markers on wet road, yellow
         crimescene tape to left of image. Police
         vehicle perpendicular to road. (1 page)
Government No. 639....Color image of yellow ....249
         evidence markers on wet road. Police vehicle
         parked perpendicularly to direction of road.
         (1 page)
Government No. 640....Color image of close-up ...249
         view of yellow evidence marker (29). (1 page)
Government No. 641....Color image of yellow ....249
         evidence markers (30, 31, 33-37) on wet road.
         Police vehicle parked perpendicularly to
         direction of road. Small yellow square
         outlined in black, bottom right of image,
         Government Exhibit 641, 3:18-cr- 00293 (1
         page)

Government No. 642....Color image of yellow    ....249
          evidence markers (30, 31, 34 - 37) on wet
          road (1 page)
Government No. 643....Color image of yellow    ....249
          evidence markers (30 in the forefront of
          image) on wet road. Police vehicle parked
          perpendicularly to the direction of the road.
          (1 page)
Government No. 644....Color image of yellow    ....249
          evidence markers (30 in the forefront of
          image) on wet road. (1 page)
Government No. 645....Color image of close-up of .249
          yellow evidence marker (30) on wet road.
          White painted line on right of image. (1
          page)
Government No. 646....Color image of close-up  ...249
          view of yellow evidence marker (30) with fired
          cartridge casing to left of evidence marker on
          wet road. (1 page)
Government No. 647....Color image of yellow    ....249
          evidence markers (31 on right forefront of
          image) on wet road. (1 page)
Government No. 648....Color image of yellow    ....249
          evidence markers (31 on right forefront of
          image) on wet road. Police vehicle parked at
          angle on road. (1 page)
Government No. 649....Color image of yellow    ....249
          evidence markers (31 on right forefront of
          image) on wet road. Police vehicle parked at
          angle on road. (1 page)
Government No. 650....Color image of yellow    ....249
          evidence markers (32 on right forefront of
          image) on wet road, yellow crime-scene tape
          to right of evidence markers attached to
          traffic sign. (1 page)
Government No. 651....Color image of yellow    ....249
          evidence marker (31) on left side of image on
          road. (1 page)
Government No. 652....Color image of close-up  ...249
          view of yellow evidence marker (31) with a
          fired cartridge casing on each side of evidence
          marker. (1 page)
Government No. 653....Color image of yellow    ....249
          evidence marker (32) on wet road on right
          side of image and yellow crime-scene tape on
          right side of image. (1 page)
Government No. 654....Color image of close-up  ...249
          view of yellow evidence marker (32) on road.
          (1 page)

Government No. 655....Color image of close-up  ...249
          view of yellow evidence marker (32) with fired
          cartridge casing to left of evidence marker.
          (1 page)
Government No. 656....Color image of yellow  ....249
          evidence markers (34 at right forefront of
          image) on wet road. (1 page)
Government No. 657....Color image of yellow  ....249
          evidence markers (34 at right forefront of
          image) on wet road. Police vehicle parked
          perpendicularly to direction of road. (1
          page)
Government No. 658....Color image of yellow  ....249
          evidence markers (33, 35, 36, 37 & 38 with 33
          at left forefront of image) on wet road. (1
          page)
Government No. 659....Color image of close-up  ...249
          view of yellow evidence marker (33) with fired
          cartridge casing to left of evidence marker.
          (1 page)
Government No. 660....Color image of close-up  ...249
          view of yellow evidence marker (34) and yellow
          evidence marker (37) further away on image.
          Evidence marker 34 on side of road. Evidence
          marker 37 on road. (1 page)
Government No. 661....Color image of close-up  ...249
          view of yellow evidence marker (34) with fired
          cartridge casing to left of evidence marker.
          (1 page)
Government No. 662....Color image of yellow  ....249
          evidence markers (35 – 37) on wet road. (1
          page)
Government No. 663....Color image of yellow  ....249
          evidence markers (35 & 36) with a fired
          cartridge casing to left of each of evidence
          markers. (1 page)
Government No. 664....Color image of yellow  ....249
          evidence marker (35) with a fired cartridge
          casing to left of evidence marker. (1 page)
Government No. 665....Color image of yellow  ....249
          evidence marker (36) with a fired cartridge
          casing to left of evidence marker. (1 page)
Government No. 666....Color image of yellow  ....249
          evidence marker (37) with a fired cartridge
          casing to left of evidence marker. (1 page)
Government No. 667....Color image of yellow  ....249
          evidence markers (38 in forefront of image)
          with yellow crime-scene tape behind it on wet
          road. (1 page)

Government No. 668....Color image of yellow   ....249
              evidence marker (38) with a fired cartridge
              casing to left of evidence marker. (1 page)
Government No. 669....Color image of yellow   ....249
              evidence markers (38 in forefront of image)
              on wet road with yellow crime-scene tape to
              top right of image. (1 page)
Government No. 670....Color image of yellow   ....249
              evidence markers (38 in forefront of image)
              on wet road. (1 page)
Government No. 671....Color image of yellow   ....249
              evidence markers (39 in forefront of image)
              on wet road. Intersecting road signs top left
              of image and police vehicle perpendicular to
              direction of road. (1 page)
Government No. 672....Color image mid-range of  .249
              yellow evidence markers (39 in forefront of
              image) on wet road. Intersecting road signs
              top left of image and police vehicle
              perpendicular to direction of road. (1 page)
Government No. 673....Color image mid-range of  ..249
              yellow evidence markers (39 in forefront of
              image) on wet road. Intersecting road signs
              top left of image and police vehicle
              perpendicular to direction of road. (1 page)
Government No. 674....Color image of yellow   ....249
              evidence markers (39 at forefront of image)
              on wet road. (1 page)
Government No. 675....Color image of two yellow ..249
              evidence markers (39 to right of image and 40
              to left of image) on wet road. (1 page)
Government No. 676....Color image of close-up  ...249
              view of yellow evidence marker (39) with fired
              cartridge casing to right of evidence marker.
              Small yellow square outlined in black, bottom
              right of image, Government Exhibit 676,
              3:18-cr-00293 (1 page)
Government No. 677....Color image of yellow   ....249
              evidence markers on wet road. House with
              vehicle in covered carport beyond the
              evidence markers. Small yellow square
              outlined in black, bottom right of image,
              Government Exhibit 677, 3:18-cr-00293 (1
              page)
Government No. 678....Color image of yellow   ....249
              evidence markers (40 & 41) on wet road. House
              with vehicle in covered carport beyond the
              evidence markers. (1 page)

Government No. 679....Color image of yellow    ....249
        evidence markers (41 in forefront of image)
        on wet road, yellow crime-scene tape beyond
        the evidence markers. (1 page)
Government No. 680....Color image of yellow    ....249
        evidence markers (41 in forefront of image)
        on wet road, yellow crime-scene tape to right
        of image. (1 page)
Government No. 681....Color image of yellow    ....249
        evidence markers on wet road, intersecting
        street signs, yellow crime-scene tape
        attached to street signs. (1 page)
Government No. 682....Color image of yellow    ....249
        evidence marker in front of storm drain,
        yellow crime scene tape across image on wet
        road. (1 page)
Government No. 683....Color image of yellow    ....249
        evidence marker and yellow crime scene tape
        across image on wet road. (1 page)
Government No. 684....Color image of rear      ....249
        driver's side angle of pewter-colored Nissan
        4-door vehicle with two white stickers on
        rear windshield. (1 page)
Government No. 685....Color image of rear      ....249
        driver's side view of pewter-colored 4-door
        vehicle. (1 page)
Government No. 686....Color image of front     ....249
        driver's side view of pewter-colored 4-door
        vehicle. Flat driver's side tire. (1 page)
Government No. 687....Color image of front of ....249
        pewter-colored Nissan vehicle. (1 page)
Government No. 688....Color image of front .......249
        passenger's side view of pewter-colored
        4-door Nissan vehicle. Flat passenger's side
        front tire. (1 page)
Government No. 689....Color image of passenger's 249
        side of pewter-colored 4-door vehicle. Flat
        front passenger's side front tire. (1 page)
Government No. 690....Color image of rear  .......249
        passenger's side view of pewter-colored
        4-door Nissan vehicle. (1 page)
Government No. 691....Color image of wet road     249
        with driver's side rear quarter panel on
        bottom left of image. (1 page)
Government No. 692....Color image of wet road     249
        with yellow crime-scene tape on far side of
        road. (1 page)
Government No. 693....Color image of wet road     249
        with driver's side front quarter panel of
        vehicle on bottom right of image. (1 page)

Government No. 694....Color image of wet road      249
              with driver's side front quarter panel of
              vehicle on bottom right of image. (1 page)
Government No. 695....Color image of wet road      249
              with yellow crime-scene tape across image,
              driver's side front quarter panel of vehicle
              on bottom right of image housing structure on
              far side of road. (1 page)
Government No. 696....Color image of wet road,    .249
              small portion of rear of vehicle on bottom
              left of image, yellow crime-scene tape along
              sidewalk to left of road. Telephone pole to
              left of road. (1 page)
Government No. 697....Color image of passenger's  249
              side rear corner of vehicle, yellow
              crime-scene tape along sidewalk and fence. (1
              page)
Government No. 698....Color image of side of  ....249
              driver's side of vehicle with bullet defect
              in vehicle. Measuring road to right of bullet
              defect. (1 page)
Government No. 699....Color image of close-up  ...249
              view of bullet defect with measuring tool to
              right of defect. (1 page)
Government No. 700....Color image of front     ...249
              portion of driver's side of vehicle. Bullet
              defect in door of vehicle. (1 page)
Government No. 701....Color image of front left   249
              view of vehicle, headlight on, measuring rod
              against vehicle. (1 page)
Government No. 702....Color image of close-up  ...249
              view of front left side vehicle, measuring rod
              standing against headlight, small measuring
              tool below bullet defect. (1 page)
Government No. 703....Color image of front of ....249
              pewter-colored vehicle, measuring rod located
              in front of vehicle grill, to the left of the
              car symbol. Small measuring tool on hood of
              car, to the left of the measuring rod. (1
              page)
Government No. 704....Color image of bullet     ..249
              defect with small measuring tool beneath the
              defect. (1 page)
Government No. 705....Color image of hood of   ...249
              vehicle with bullet defect in lower left side
              of windshield. (1 page)
Government No. 706....Color image of vehicle .....249
              windshield, bullet defect towards bottom left
              side of windshield with small measuring tool
              above the defect. (1 page)

Government No. 707....Color image of close-up  ...249
        view of shattered window with bullet defect in
        middle of damage, small measuring tool above
        defect. Measuring tool "WL. Fleak". (1 page)
Government No. 708....Color image (portrait ......249
        orientation) of front passenger's side of
        vehicle. Partial view of tire on bottom right
        of image, measuring rod located beside
        vehicle, in front of sideview mirror. (1
        page)
Government No. 709....Color image of interior of .249
        Nissan Maxima vehicle, black leather
        interior. (1 page)
Government No. 710....Color image of close-up  ...249
        view of driver's side seat. Black cell phone
        located on seat (1 page)
Government No. 711....Color image of close-up  ...249
        view of black cell phone (cracked screen) on
        black seat. (1 page)
Government No. 712....Color image of clear    ...249
        plastic bottle and black object (to left of
        bottle) on grassy area. Residential home in
        background. (1 page)
Government No. 713....Color image of grassy area. 249
        Residential home in background. (1 page)
Government No. 805....Color image of I.D. Photo  169
        Work Order, Date: 9.24.17, Time: 0820,
        Complaint #: 17-0847244, Type Call: 10-52/06,
        Victim: UAT, Address: 311 Natchez Ct, Photos
        Taken Of: Scene & Victims, Section Req. S
        Patrol, Office Req. Baltimore. (1 page)
Government No. 806....Color image of entrance to .169
        Maple Crest Apartments, yellow crime scene
        tape, silver Toyota Camry to left of
        apartment entrance. (1 page)
Government No. 807....Color image of road with  ..169
        two police cars facing each other with yellow
        crime scene tape. Apartment building to right
        of image. Mi Ranchito Market sign to left of
        road. (1 page)
Government No. 808....Color image of pavement    169
        with fired cartridge casing on it, yellow
        crime scene tape and orange pylon at top of
        image. (1 page)
Government No. 809....Color image of close-up  ...169
        view of fired cartridge casing. (1 page)
Government No. 810....Color image of surveillance 169
        camera attached to brick wall. "A" below
        camera, windows and siding to left of camera.
        (1 page)

Government No. 811....Color image of inside .....169
        apartment complex. Dark colored Lincoln
        vehicle parked in road. Both driver and
        passenger doors open. (1 page)
Government No. 812....Color image of close-up   169
        view inside apartment complex. Dark colored
        Lincoln vehicle parked in road. Both driver
        and passenger doors open. (1 page)
Government No. 813....Color image of red fluid  .169
        trail from dark-colored Lincoln vehicle and
        fired cartridge casings. (1 page)
Government No. 814....Color image of view from   169
        back driver's side. Both front driver and
        back driver-side doors open. View of male
        (back of head and partial torso) hanging out
        of driver's side back door. Red fluid trail
        from vehicle. (1 page)
Government No. 815....Color image of rear view of 169
        passenger's side of black Lincoln vehicle,
        front passenger's side door open, back
        passenger's side window shattered. (1 page)
Government No. 816....Color image of view of  ....169
        front of black Lincoln vehicle, driver's side
        front and rear doors open, passenger's side
        front door open. Male body in front passenger's
        seat. (1 page)
Government No. 817....Color image of view of  ....169
        front of black Lincoln vehicle, driver's side
        front and rear doors open, passenger's side
        front door open. Male body in front passenger's
        seat. Law enforcement officer standing near
        rear passenger's side door. (1 page)
Government No. 818....Color image of close-up  ...169
        view of rear of black Lincoln vehicle, two
        yellow evidence markers, 7 and 8. Temporary
        license plate, C610659. Male individual in
        khaki pants and light-colored shirt to right of
        vehicle. (1 page)
Government No. 819....Color image of view from    169
        rear passenger's side of black Lincoln
        vehicle. Front passenger's side door open,
        rear passenger's window shattered, yellow
        evidence markers on ground, to right of
        vehicle (11, 12, 13, 14, 15 & 17). (1 page)

Government No. 820....Color image of close-up  ...169
            view of right side of black vehicle with human
            hand and blue-jean clad legs in front
            passenger's seat, front passenger-side door
            open. Rear passenger's side windows shattered.
            Yellow evidence markers on road (10, 12, 13 &
            14). (1 page)
Government No. 821....Color image vehicle window  169
            with bullet defect. (1 page)
Government No. 822....Color image of close-up  ...169
            view of right side of black vehicle with male
            upper torso in front passenger's seat, front
            passenger-side door open. Rear passenger's side
            windows shattered. Yellow evidence markers on
            road (11 & 14). (1 page)
Government No. 823....Color image of passenger's  169
            side window with bullet defect and partial
            view of
Government No. 824....Color image of front .......169
            passenger's door with bullet defects in door,
            window, and side-view mirror. (1 page)
Government No. 825....Color image of close-up  ...169
            view of bullet defect on passenger's side door.
            (1 page)
Government No. 826....Color image of view of    .169
            black Lincoln vehicle from front passenger's
            side angle, human body in passenger's side
            seat with door open, yellow evidence markers
            (1s, 14, 15 & 16). (1 page)
Government No. 827....Color image of view from ...169
            driver's side of black 4-door Lincoln
            vehicle, human body in passenger's side, both
            driver's side doors open. Red fluid trail
            from vehicle. Yellow evidence marker (8). (1
            page)
Government No. 828....Color image of close-up    169
            view from back driver's side. Both front
            driver and back driver-side doors open. View
            of male (back of head and partial torso)
            hanging out of driver's side back door.
            Yellow evidence marker on ground (8). Red
            fluid trail from vehicle. (1 page)
Government No. 829....Color image of interior of .169
            Lincoln vehicle from front driver's side.
            Both front doors open. Male victim's body in
            passenger's seat. 93 (1 page)
Government No. 830....Color image of front .......169
            passenger's door open, bullet defect in
            window, lower portion of male victim's legs
            and feet, wearing tennis shoes. Red substance

1    on inside of door and window. Yellow evidence
     marker (20) outside of door. (1 page)

2 Government No. 831....Color image of back of male 169
     victim's torso, wearing brown pants, brown

3     belt, gray Hanes underwear and dark-colored
     shirt, two bullet wounds in lower back. (1

4     page)

 Government No. 832....Color image of road with  ..169

5     yellow crime scene tape on left side of it.
     Police car to right of crime scene tape,

6     facing towards the camera. Yellow evidence
     marker in front of police car. (1 page)

7 Government No. 833....Color image of close-up  ...169
     view of yellow crime scene tape on left side of

8     it. Police car to right of crime scene tape,
     facing towards the camera. Yellow evidence

9     marker (1) in front of police car. Small yellow
     square outlined in black, bottom right of

10    image, Government Exhibit 833, 3:18-cr-00293
     (1 page)

11 Government No. 834....Color image of yellow  ....169
     evidence marker (1) (L scale) with fired

12    cartridge casing in corner of L scale portion
     of marker. (1 page)

13 Government No. 835....Color image of rear of    .169
     black Lincoln vehicle with doors open.

14    Multiple yellow evidence markers on each side
     of vehicle. (1 page)

15 Government No. 836....Color image of rear of    .169
     black Lincoln vehicle with doors open.

16    Multiple yellow evidence markers on each side
     of vehicle. (1 page)

17 Government No. 837....Color image of red fluid  .169
     trail on pavement with yellow evidence

18    markers on each side of red fluid trail (2,
     3, 4, 5 & 6). Fired cartridge cases within L

19    scales of evidence markers. (1 page)

 Government No. 838....Color image of close-up  ...169

20    view of yellow evidence marker (2) attached to
     an L scale. Fired cartridge casing within

21    corner of L scale. (1 page)

 Government No. 839....Color image of close-up  ...169

22    view of yellow evidence marker (3) attached to
     an L scale. Fired cartridge casing outside of L

23    scale lying in red fluid trail. (1 page)

 Government No. 840....Color image of yellow   ....169

24    evidence marker (9) attached to L scale on
     pavement. (1 page)

25

Government No. 841....Color image of right-side   169
          view of black Lincoln vehicle, front
          passenger's door open, back two passenger
          side windows shattered. Yellow evidence
          markers to right of vehicle (10, 11, 12, 13,
          14, 15, 17 & 20). (1 page)
Government No. 842....Color image of front .......169
          passenger's side, door open, yellow evidence
          markers alongside of vehicle (12, 14, 15, 16,
          17, 18, 19 & 20). (1 page)
Government No. 843....Color image of yellow  ....169
          evidence markers (24, 2, 3, 4, 5, 6, 7, 8 &
          9) to left of rear driver's side of black
          Lincoln vehicle. (1 page)
Government No. 844....Color image of view from ...169
          driver's side of black Lincoln vehicle, with
          front driver's side door open. Yellow
          evidence marker (24) on pavement in front of
          vehicle. (1 page)
Government No. 845....Color image of front view  .169
          of black Lincoln vehicle, with 3 yellow
          evidence markers on hood and front windshield
          (26, 27 & 28). Human body in front passenger's
          seat. (1 page)
Government No. 846....Color image of close-up  ...169
          view of yellow evidence marker 26 to right of
          fired cartridge casing on windshield. (1 page)
Government No. 847....Color image of close-up  ...169
          view of yellow evidence markers 27 and 28 with
          fired cartridge casings on windshield below
          evidence markers. (1 page)
Government No. 848....Color image of front view  .169
          of black Lincoln vehicle, with multiple yellow
          evidence markers on hood and front windshield,
          and in front of and on each side of the
          vehicle. (1 page)
Government No. 849....Color image of front view  .169
          of black Lincoln vehicle, with multiple yellow
          evidence markers on hood and front windshield,
          and in front of and on each side of the
          vehicle. (1 page)
Government No. 850....Color image of backside of   169
          male victim's body, brown shorts, across
          length of backseat of black Lincoln vehicle.
          Shards of glass in backseat, along with red
          fluid on seat and victim's shorts.
Government No. 851....Color image of ID card for .169
          Hector Jose Pagada, Honduras. ID card held by
          blue-gloved fingers. (1 page)

Government No. 852....Color image of male     ....169
          victim's mid-torso area. Brown shorts, brown
          belt, keys on torso, red star tattoo on
          victim's right hand, black watch on left
          wrist, red fluid stains on shorts. Bullet
          wounds on right arm. (1 page)
Government No. 1220....Physical clear plastic bag 201
          with red strip across top of it. One fired
          cartridge casing. Multiple small brown paper
          bags. White sticker on paper bag - Case
          Number: 776075-17-0064, Action - Retained for
          Evidence, Cust Date 05/26/2020, Exh # 157,
          Description - Other: Other, five (5)
          Winchester .45 Auto FCC, Location Recovered
          From - Rodriguez and Pedroza homicide,
          Nashville, TN
Government No. 1235....Color image of map -     ..103
          Google Maps - 1108 Woburn Way. Small yellow
          square outlined in black, bottom right of
          image, Government Exhibit 1235, 3:18-cr-
          00293 (1 page)
Government No. 1255....Color image of aerial map -103
          Google Maps - 1108 Woburn Way. (1 page)
Government No. 1304....Color image of top of  ....125
          handgun, stamped "40 S&W". (1 page)
Government No. 1305....Color image of barrel of ..125
          handgun being held by black-gloved fingers, 1
          round of ammunition sticking out of chamber.
          4 rounds of ammunition under handgun. (1
          page)
Government No. 1306....Color image of serial   ..125
          number adhered to black handgun (PAM3966). (1
          page)
Government No. 1307....Color image of  .......122
          pewter-color 4-door vehicle, driver's side
          view, driver's door open. (1 page)
Government No. 1308....Color image of interior of 122
          pewter vehicle. View from open driver's door.
          Cloth seats with dark-colored hat on driver's
          seat. (1 page)
Government No. 1310....Color image of ...........110
          diagram-Date/Time: 5-28-17/0045 hrs.,
          Complaint #: 17- 0469010, Location: Antioch
          Pike @ McCall Street, Scene: 10-52/64,
          Victim: Jesus Alberto Flores, Drawn By:
          Warren L. Fleak, Not to Scale. (2 pages)

1

2          The above-styled cause came to be heard on

3   April 13, 2023, before the Hon. Eli Richardson, District

4   Judge, when the following proceedings were had at

5   9:05 a.m. to-wit:

6

7          THE COURT:  Thank you.  Please be seated.

8          All right.  Looks like we are up to Day 7

9   of the trial in *United States versus Flores*.  We were

10  coming up on the next phase of the cross-examination by

11  Mr. Bloom of Mr. Avila.

12          Any preliminary matters that the parties

13  have at this time?

14          MR. SAFEEULLAH:  Not from the

15  United States.

16          THE COURT:  Anything from defendant's side?

17  Doesn't look like it.

18          I'm going to raise something with the

19  government.  I don't think the defense have a dog in this

20  hunt, but just to speed things along, there was a filing

21  in this case that counsel may be familiar with, a motion

22  to return one of the defendants to state custody, if you

23  know what I mean.

24          MR. SAFEEULLAH:  Yes, we do, Your Honor.

25          THE COURT:  Any objection -- any logistical

1  or other reason why the government might have an

2  objection to that?

3              MR. SAFEEULLAH:  Yes, the United States

4  objects to that.  Sorry, Your Honor.

5              THE COURT:  Go ahead.  Yeah, go ahead.

6              MR. SAFEEULLAH:  We intend to file a

7  written response objecting to that.  I think,

8  logistically, the marshals do not need to continue to be

9  transporting people back to state custody, back to

10  federal custody, that have already pled guilty.  And also

11  that individual has continued activity related to the

12  racketeering crimes while in state custody, and we would

13  ask that he remain in the custody of the marshals.  And

14  we can put this in a written filing.

15              THE COURT:  All right.  Thank you,

16  Mr. Safeeullah.  That's helpful, because that is -- I'm

17  confident your experience has been, a lot of times,

18  pretty routine, the government has no objection.  And if

19  that had been the case, and then we'd speed this along.

20  Understood, the government is permitted to object.  The

21  usual rule would be to have 14 days to respond to

22  something like this.  So let's say this:  When do you

23  think you can file a response on that one?

24              MR. SAFEEULLAH:  By the close of business

25  tomorrow.

1          THE COURT:  Tomorrow, okay.  So we'll take

2   a look at that and may give time for a reply by the

3   defendant.  We'll get that one resolved.

4          All right.  Okay.  Then what we can do is

5   bring in Mr. Avila.  And then, Mr. Bloom, if you want to

6   take the stand -- I should say, again, the podium.  Yeah,

7   I need to stop that.

8          MR. BLOOM:  Based on my cross-examination

9   yesterday, maybe I should.

10          THE COURT:  Now, now, Mr. Bloom.  I

11   appreciate your preparing for the podium.  And then what

12   we will do is get our interpreters in place as well, as

13   they are doing, and then we can call in the jurors.

14          Turns out we have a new interpreter that --

15   we're not talking about the ones for the witness, but

16   rather the ones interpreting for defendants that we need

17   to swear.  So if our new interpreter, who we thank for

18   being here, would rise and raise his right hand.

19          (Interpreter Richard Singer sworn.)

20          THE COURT:  All right.  Thank you.  We can

21   call in the jurors.  Thank you.

22          (Whereupon, at 9:10 a.m. the jury returned

23   to open court.)

24          THE COURT:  All right.  Thank you, folks.

25   Please be seated.  We appreciate your continued service

1   and looks like this morning you brought another morning

2   of sunshine with you.

3                    We broke yesterday, as you'll recall, with

4   Mr. Bloom continuing his cross-examination of Mr. Avila.

5   And Mr. Bloom may continue.

6                    MR. BLOOM:  Thank you.

7                    **FRANCISCO AVILA**

8    previously called as a witness, duly sworn April 11,

9   returned to the stand today and testified through

10  interpreters as follows:

11                   **CONTINUED CROSS-EXAMINATION**

12   BY MR. BLOOM:

13       Q.    Good morning.  Mr. Avila, in one of your

14  interviews with the investigators, did you say that

15  Mr. Pineda left La Mansion in a white Infiniti?

16       A.    I don't recall what car it was on that day.

17       Q.    Okay.  If I were to show you a document,

18  would that perhaps refresh your recollection?

19       A.    Yes.

20                   THE COURT:  Are we refreshing as to whether

21  he said something in an interview or refreshing as to

22  what the car was on that day?

23                   MR. BLOOM:  What he said in an interview.

24                   THE COURT:  What he said.  Okay.  So,

25  Mr. Avila, do you recall whether you said to

1 investigators that there was a white Infiniti that

2 Mr. Pineda left in that day?

3          THE WITNESS:  Today I don't recall what car

4 it was.

5          THE COURT:  But do you recall whether you

6 said to investigators that it was a white Infiniti?

7          THE WITNESS:  Yes.

8 BY MR. BLOOM:

9     Q.    You recall that, okay.  Do you -- at a

10 later interview, did you make that same statement, that

11 Mr. Pineda left in a white Infiniti?

12    A.    I don't remember.

13    Q.    You do not remember making that statement,

14 any statement such as that, to the investigators?

15    A.    I remember we met many times, and today I

16 don't recall exactly everything that I've said, but I did

17 say many things.

18    Q.    But you do remember in one interview you

19 stated it was a white Infiniti; correct?

20    A.    Yes.

21    Q.    After the chaos and fights at La Mansion,

22 did the TPLS people that you were with leave and go to

23 Wallace Road?

24    A.    I remember that, yes.  There were several

25 homeboys back there at the house.

1       Q.      Would it be fair to say that the group

2   decided to continue their partying at Wallace Road?

3       A.      When you're talking about partying, are you

4   referring to drinking?

5       Q.      We're talking to drinking, listening to

6   music, just socializing in an elevated manner.

7       A.      I remember that everyone was outside, and

8   the only one who was drinking was Frijol who was already

9   drunk.

10      Q.      Okay.  Whereabouts outside were you?

11      A.      In the part that's in front of the house.

12      Q.      Do you remember, was Happy, Franklin

13  Hernandez, there that evening, that morning?

14      A.      I don't remember.

15      Q.      Do you remember if Sergio Alvarez, Scrappy,

16  was present that morning?

17      A.      I don't remember.

18              THE COURT:  Meaning you don't remember?

19              THE WITNESS:  No.

20   BY MR. BLOOM:

21      Q.      I might have the names confused.  Is Sergio

22  Ochoa-Alvarez, is that Scrappy?

23      A.      I know Ochoa, but he's Cabezon.

24      Q.      That's Carlos Ochoa; correct?

25      A.      I don't know his name, the last name.

1        Q.    Okay. Was Franklin Pineda, Gordo, present
2   that morning?

3        A.    I don't recall anymore.

4        Q.    Do you recall anybody who was there?

5        A.    Cabezon was there.  Frijol.  Danielito was
6   there.  Demente's mother was there.  Joslyn.  I was.  And
7   I don't remember more.

8        Q.    At what time did Mr. Pineda arrive?

9        A.    I don't remember what time it was.

10       Q.    How soon after you arrived at the
11  331 Wallace Road did Mr. Pineda arrive?

12       A.    I also don't remember.

13       Q.    Did you tell -- did you tell the agents
14  that the gun that was used to kill Ms. Rodriguez was your
15  gun?

16       A.    Yes.

17       Q.    At that time, did you tell the agents that
18  you could not remember how Mr. Pineda got the gun?

19       A.    What I recall is that I gave it to him.

20       Q.    Okay.  Can you remember when you gave it to
21  him?

22       A.    I gave it to him before we went to the
23  bars.

24       Q.    Which bars?

25       A.    Bars, like El Uno.

1    Q.    When might this have been, approximately?

2    A.    That night, early.

3    Q.    I believe in your direct testimony you

4 stated that you -- that you had given the gun to

5 Mr. Pineda soon after the kidnapping of Danielito, which

6 was a few months before.  Do you remember that testimony

7 the other day?

8    A.    I remember I told him that I give it to him

9 after Danielito's kidnapping.

10    Q.    So what your testimony is now is that you

11 gave it to him after Danielito's kidnapping and right

12 before you went to the bars that day?

13    A.    Yes.

14    Q.    From your knowledge, did Mr. Pineda usually

15 not carry a firearm?

16    A.    He always carried one.

17    Q.    But that day he did not have one; correct?

18    A.    He had one, but it didn't work.

19    Q.    So you gave him your gun; correct?

20    A.    One of mine.

21    Q.    So you still remained armed after you gave

22 him your gun?

23    A.    I had two.

24    Q.    And where were you when you gave

25 Mr. Pineda -- when you allegedly gave Mr. Pineda this

1  gun?

2          A.     At that same Wallace house.

3          Q.     I'm sorry?

4          A.     At that same Wallace house.

5          Q.     Okay.  Approximately how long before July

6  was Danielito's kidnapping?  What month?

7          A.     I don't remember.

8          Q.     Would it have been a month before?  More

9  than a month?  Less than a month?

10         A.     Reality, I don't remember.

11         Q.     Okay.  But that kidnapping is how you're

12 measuring when you gave Mr. Pineda the gun.  You said

13 after Danielito -- after the kidnapping you gave him the

14 gun?

15         A.     I didn't understand that.

16         Q.     I'll go on.

17                Everyone at 331 Wallace Road learned of the

18 death of Ms. Rodriguez when the news came on; correct?

19         A.     At 3:30 in the morning.  Is that what you

20 asked, if it was at 3:30?

21         Q.     No, I asked -- basically I asked, when did

22 the group at 331 Wallace Road learn that Ms. Rodriguez

23 had been killed rather than a chavala?

24         A.     When Demente arrived, maybe an hour or two

25 afterwards.

1      Q.    An hour or two afterwards -- after what?

2      A.    After Demente arrived at the house.

3      Q.    A minute ago I think that you said you

4 couldn't remember when Demente arrived at the house after

5 you arrived.

6      A.    I remembered that Demente arrived, and then

7 it came on the news that the girl had died.

8      Q.    But now you're saying it was a few hours

9 after this incident occurred?

10           MR. HOFF:  Objection, Your Honor.

11           THE COURT:  Yes.  What's the nature of the

12 objection?

13           MR. HOFF:  That's misquoting what the

14 witness said.

15           THE COURT:  Well, maybe, maybe not.  But if

16 you look at it, he's asking whether that's what the

17 witness is saying.  So if you're right, then the

18 witness -- may be an answer consistent with your view

19 that he was misquoting what the witness is saying, so I'm

20 going to overrule the objection.

21           The question, Mr. Avila, being:  Now you're

22 saying it was a few hours after this incident occurred?

23           THE WITNESS:  I don't know what time the

24 incident happened at.  All I know is that Demente came to

25 the house, and he said he had killed a chavala.  And a

1  while passed, maybe one or two hours, when the news came

2  on the phone.

3  BY MR. BLOOM:

4        Q.    Okay.  I believe that you testified the

5  other day that as soon as the news came on and the

6  mistake was discovered, that Ochoa, Cabreezy, immediately

7  ordered everyone not to talk.

8        A.    True.

9        Q.    Did you ever -- isn't it rather -- strike

10  that.

11              Isn't it true that Cabreezy actually called

12  a meeting, a misa, a few days later?

13              THE COURT:  I'm sorry, is Cabreezy the

14  right name?

15              MR. BLOOM:  I believe so.  Carlos Ochoa.  I

16  think that's Cabreezy.

17              THE COURT:  Cabezon?

18              MR. BLOOM:  Cabezon.  Maybe it's -- I've

19  got my little face -- my --

20              THE COURT:  And I could be -- is there a

21  Cabreezy, from the government's perspective?

22              MR. HOFF:  No, it's not, Your Honor.  I

23  think he means Cabezon.

24              MR. BLOOM:  Cabezon, sorry.

25              THE COURT:  Thank you.

1    BY MR. BLOOM:

2          Q.    So isn't it true that Cabezon called a

3    meeting, a misa, a few days after July 31, and at that

4    time, he told the meeting, no one is to speak of this?

5          A.    True.

6          Q.    And, in fact, the morning of July 31, he

7    didn't say anything about -- about the murder of

8    Ms. Rodriguez; isn't that true?

9          A.    On several occasions that death was spoken

10   about.

11         Q.    On the morning of July 31, he did not

12   reprimand Mr. Pineda, allegedly, for murdering an

13   innocent victim?

14         A.    I do not remember if he reprimanded him.  I

15   just remember that we were all scared.

16         Q.    At the misa that was called when this was

17   discussed, where was this misa held?

18         A.    I do not remember.

19         Q.    Do you remember who was present?

20         A.    Not all of them.

21         Q.    At these misas, I believe you testified

22   that all homeboys and some chequeos are required to

23   attend; is that true?

24         A.    But the chequeos cannot hear what is

25   discussed in the misas.

1     Q.   But the homeboys were required to be there

2 and hear what's discussed; correct?

3     A.   True.

4     Q.   I believe you -- was Mr. -- a few days

5 after July 31, is it correct that you testified that

6 Mr. Pineda appeared to be scared?

7     A.   Yes.

8     Q.   And did you also testify that another worry

9 was that Smiley had been arrested, and there was a fear

10 he could cooperate?

11          THE INTERPRETER:  I'm sorry.  The

12 interpreter requests a repetition of that last part.

13  BY MR. BLOOM:

14     Q.   And Mr. Pineda was allegedly afraid that

15 Smiley would cooperate with the police?

16     A.   Yes.

17     Q.   Are you aware that Smiley was arrested

18 about three weeks after July 31?

19     A.   I do not remember.

20     Q.   Are you aware that Smiley, in his black

21 Infiniti, was stopped for a traffic violation just within

22 a week of July 31?

23     A.   No.

24     Q.   I believe you testified that you drove with

25 Mr. Pineda to Texas when he was returning to Honduras;

1  correct?

2       A.    Yes.

3       Q.    Who else went with Mr. Pineda driving to

4  Texas?

5       A.    His mother, Happy, Cabezon, I was going, my

6  baby momma, and I can't remember who else was going.

7       Q.    How many cars did you take?

8       A.    Three were going.

9       Q.    Did Mr. Pineda tell you that he was going

10 back to Honduras because his grandmother was ill?

11      A.    No.

12      Q.    Now, you said you and Mr. Pineda had been

13 friends since high school; correct?

14      A.    Yes.

15      Q.    Did he ever tell you that he was

16 essentially raised by his grandmother and grandfather in

17 Honduras?

18      A.    I do not remember.

19      Q.    Did you know that he had a family in

20 Honduras and that his father was in Honduras?

21      A.    I knew that he had family in Honduras.

22      Q.    And did you know when was the last time he

23 had been back to see his family?

24      A.    I just remember that he was little when he

25 arrived here.

1      Q.    Okay.  And you testified that he waited

2 three to five months after July 31 to go back to

3 Honduras.

4      A.    Yes.

5      Q.    Would it be fair to say that he really was

6 not that scared or worried that he would wait three to

7 five months?

8      A.    Not at first, but later on, yes.

9      Q.    I'm sorry.  Could you explain that?  Not at

10 first, but later yes?

11      A.    At the end, he found out that they were

12 knocking at the door of his previous last address with

13 his photograph asking about him.

14      Q.    That didn't happen immediately -- are you

15 saying that that did not happen within weeks, a few weeks

16 of July 31?

17      A.    No.

18      Q.    It did not happen within a few weeks of

19 July 31, is that what you're saying?

20      A.    No.

21      Q.    Do you know when that happened?

22      A.    I do not remember.

23      Q.    Okay.  Turning to the murder of Mr. Potter.

24 Now, it's true that you withheld information about the

25 murder of Mr. Potter for several months after your first

1  interview; is that correct?

2       A.    I do not remember.

3       Q.    Well, on the day that Mr. Potter was

4  murdered, I believe you were at 331 Wallace Road;

5  correct?

6       A.    Yes.

7       Q.    And according to your testimony, you said

8  Mr. Pineda arrived with Jojo?

9       A.    Yes.

10       Q.    And did you tell the agents that he arrived

11  in a big truck?

12       A.    Today I do not remember the car.

13       Q.    You do not remember whether it was a car or

14  a -- you have no idea whether it was a car or a truck?

15       A.    I already forgot that.

16       Q.    Well, after that, you did leave in that

17  vehicle with Mr. Pineda, Jojo, and a chavala; correct?

18       A.    Correct.

19       Q.    Was it a big truck or was it a car?

20       A.    I do not remember anymore.

21       Q.    How far did you drive between Wallace Road

22  and the field where Mr. Potter was murdered?

23       A.    I do not know.

24       Q.    Did you stop anywhere before you reached

25  the field?

1      A.    Not that I remember.

2      Q.    Do you think back in 2018-19 your memory

3 was perhaps better about these events?

4      A.    Perhaps, yes.

5      Q.    I believe you've met with agents -- would

6 it be fair to say that you've met with agents seven or

7 eight times in the last five years?

8      A.    Yes.

9      Q.    And you would talk about the murder of

10 Mr. Potter and of Ms. Liliana Rodriguez; correct?

11      A.    Correct.

12      Q.    And you knew that you'd be coming here to

13 testify at some point about these events; correct?

14      A.    At first I had no thought of testifying.

15      Q.    Well, when did you find out you were going

16 to testify?

17      A.    I would say some one or two months prior to

18 me pleading guilty.

19      Q.    And you pled guilty on what date?

20      A.    I do not remember the date.

21      Q.    Okay.  Did you not think it was important

22 to really search your memory so that you could give

23 information when you testified?

24      A.    I'm very bad with dates.

25      Q.    Well, I'm not talking about dates.  I'm

1  also talking about what car you drove in, whether you
2  stopped anywhere.
3             THE COURT:  Do you want to follow up with a
4  question, put a question back on the floor?
5             MR. BLOOM:  Okay.
6  BY MR. BLOOM:
7        Q.    You said that you're not good with dates,
8  but are you also not good with events that happened?
9        A.    There are details that are forgotten.
10       Q.    Would you agree with me that the details of
11 these two murders we've spoken about are very spotty in
12 your memory?
13       A.    What does spotty mean?
14       Q.    You remember some things very well, but
15 most things not at all.
16       A.    Regarding those situations, I wrote nothing
17 on paper, and I cannot control what I remember and don't
18 remember.
19       Q.    Okay.  I believe you testified that you sat
20 in the back seat of the truck with the chavala; correct?
21       A.    Correct.
22       Q.    And I believe you said the chavala had long
23 hair and was chubby?
24       A.    Yes.
25       Q.    And according to you, Mr. Pineda had a 9mm

1  gun; correct?

2        A.   I no longer remember what was the caliber

3  of the weapon.

4        Q.   Do you remember that Jojo had a .45?

5        THE INTERPRETER:  Interpreter requests a

6  repetition of the question.  Do you remember...

7  BY MR. BLOOM:

8        Q.   Do you remember if Jojo had a .45?

9        A.   I also do not remember.

10        Q.   What type of gun did you have?

11        A.   I had a revolver.

12        Q.   And do you know what type or caliber you

13  had?

14        A.   I did not check it.  I do not remember.

15        Q.   Okay.  I understand there are many things

16  that you do not remember.  That said, would it be fair

17  for me to rely on what you said in interviews as being

18  the truth?

19        MR. HOFF:  Objection.

20        THE COURT:  Let's approach.

21        (Whereupon, the following proceedings were

22  had at the bench outside the hearing of the jury:)

23        MR. BLOOM:  I'm not going to bring up the

24  interviews.  That's not the beginning of bringing up the

25  ROIs.  That is not the beginning of bringing up any ROIs.

 1              MR. HOFF:  I'm sorry?

 2              MR. BLOOM:  I'm not bringing up -- that's

 3     not the beginning of bringing up any ROIs.  I'm not doing

 4     that.

 5              MR. HOFF:  Is it safe for me to rely on

 6     that what you said in those interviews is the truth?

 7              MR. BLOOM:  What's wrong with that?

 8              THE COURT:  Well, Mr. Bloom obviously can

 9     explore, I think, in considerable depth what is reliable

10     from this witness and what is not.  Your theory for

11     what's wrong with the question as stated is what?

12              MR. HOFF:  Whether -- whether he can rely

13     on -- it assumes that he can tell him what he can rely

14     on.  And Mr. Bloom's belief --

15              MR. BLOOM:  That's not true at all,

16     Your Honor.

17              THE COURT:  The witness -- you know, it's

18     like any leading question, right.  The witness can go

19     with it.  A leading question always seems to make it more

20     likely the witness will go with it than a nonleading

21     question.  Or if it's not right, though, the witnesses

22     generally say, you know what, that's not right.

23              MR. HOFF:  Okay.

24              THE COURT:  You know what I mean?  And so I

25     do think -- and here's the other thing.  Of course, you

1  have an opportunity -- you'll have an opportunity on

2  redirect to put any answers in context as you see fit.

3  So what I'm -- I guess what I'm saying is, sort of the

4  line of questioning as to what is reliable, what he said

5  in court versus what was in the interviews, if there's a

6  difference I think is a fair question.

7           Having said that, I do realize the form of

8  particular questions, if Mr. Bloom goes down this path,

9  that there could be issues with the form of the question.

10 And if so, we can take them up.  And the question as

11 posed, though, I'm going to overrule the objection.  I

12 will have the court reporter read it back and then have

13 Mr. Avila answer.

14           MR. BLOOM:  Thank you.

15           (End of bench conference.  Whereupon, the

16 following proceedings were had in the hearing and

17 presence of the jury:)

18           THE COURT:  All right.  If we could impose

19 upon our court reporter to read back that last question,

20 and then Mr. Avila can answer it.

21           (Whereupon, the requested portion of the

22 record was read back by the court reporter.)

23           THE WITNESS:  Yes.

24  BY MR. BLOOM:

25       Q.    After Mr. Potter was shot, I believe you

1    testified yesterday that you were dropped off at

2    331 Wallace Road; is that correct?

3         A.    Yes.

4         Q.    And what -- can you remember what time you

5    were -- about what time you were dropped off at Wallace

6    Road?

7         A.    No.

8         Q.    Was it dark?  Was it getting light?

9         A.    It was dark.

10        Q.    Okay.  Did you -- excuse me.

11              After you left the field where Mr. Potter

12   was shot, did you see the three -- did you see the three

13   firearms?

14        A.    No.

15        Q.    At any time after Mr. Potter was shot until

16   the time you got to Wallace Road, did you see anything

17   distinctive about any of the firearms?

18        A.    Not that I can recall.

19        Q.    Okay.  Now, I believe you testified that

20   you got two additional MS-13 tattoos since you've been in

21   jail; is that correct?

22        A.    Correct.

23        Q.    Did you kill two more people since you've

24   been in jail to earn these letters?

25        A.    Once you earn the letters, you can put them

1    on a hundred times if you want.

2          Q.    Why would you put on an MS-13 tattoo if

3    you'd left the gang?

4          A.    I didn't leave the gang until I pled

5    guilty.

6          Q.    Which was two years ago?

7          A.    Correct.

8          Q.    Okay.  So you put on those two tattoos

9    prior to pleading guilty; that's your testimony?

10         A.    True.

11         Q.    Excuse me, I want to get these names

12   straight.  Does Carlos Ochoa, Cabeza (sic), and Sergio

13   Ochoa, Scrappy, do they have MS-13 tattoos?

14         A.    Yes.

15         Q.    Well, you testified earlier that you did

16   not know if they'd murdered anyone.  Are not those

17   tattoos evidence that they had murdered someone?

18         A.    If they have them, it's because they

19   killed, but I never asked them whether they had or not.

20         Q.    I don't think that was the precise

21   question.  The question, I believe, was asked of you had

22   they murdered anyone, and you said you didn't know; is

23   that correct?

24         A.    I don't know.

25         Q.    Well, if that question had been asked of

1  you and you knew that they had MS-13 tattoos, wouldn't it
2  have been truthful to say, yes, they have murdered
3  chavalas?
4         A.    When I was outside, I heard that Cabezon
5  got a punishment because he put on the MS letters without
6  permission.
7         Q.    I don't think that answered my question.
8         A.    In response to your question, I know that
9  he was punished and that he had put the letters on.
10        Q.    Do you -- do you recall having the
11 opportunity to speak with Franklin Hernandez, Happy,
12 since you've been at the Davidson County jail?
13        A.    Yes.
14        Q.    All right.  And you discussed that you were
15 both cooperators in this case; correct?
16        A.    Yes.
17        Q.    And you shared information about the case?
18        A.    Are you talking about Grayson County or
19 Davidson County?
20        Q.    Either.  Right now I'm talking about, did
21 you also speak to Mr. Hernandez at Daviess (sic) County?
22              THE COURT:  Wait.  Point of clarification,
23 right.  There are three potential counties we're talking
24 about.  There's Grayson, Davidson and a Daviess; is that
25 right?

1              MR. BLOOM:  Correct.

2              THE COURT:  Right.  So let's just be clear.

3    And I know there can be confusion.  You know, all of them

4    have the long A at the beginning of the word.  And

5    Daviess and Davidson are very -- obviously very similar

6    in many ways.  So let's make sure that the -- and this

7    isn't -- I'm not saying he did anything wrong, but let's

8    make very sure that the interpretation is clear as to

9    whether you're saying Davidson or Daviess.

10             MR. BLOOM:  Okay.

11             THE COURT:  You may ask another question.

12   BY MR. BLOOM:

13        Q.    My question was:  Had you had the

14   opportunity to speak with Happy at the Davidson County

15   jail, and I believe you said yes.  And I believe I asked

16   whether the two of you discussed that you were both

17   cooperators, and I believe you said yes.

18        A.    When I spoke with Happy at Davidson, it was

19   in 2018, and I still then had not begun cooperating.

20        Q.    You'd begun cooperating, I think, in May of

21   2018; does that sound correct?

22        A.    Yes.

23        Q.    Okay.  When you -- you mentioned -- you

24   asked me whether it was -- I was talking about Davidson

25   County or Daviess County.  Did you also speak with Happy

1   in Daviess County?

2          A.    No.

3          Q.    Okay.  Have you been incarcerated in any

4   other jails other than Daviess County and Davidson County

5   here in Tennessee?

6          A.    I saw Happy at Grayson about a month, month

7   and a half ago.

8          Q.    So you saw him at Grayson.  How -- how did

9   you see him?

10         A.    I went to the recreation room.

11         Q.    Okay.  And Happy was there?

12         A.    No.  He was in his cell that was nearby.

13         Q.    Okay.  Did you send any kites, any

14  messages, to Happy there when you were at Grayson County?

15         A.    No.

16         Q.    Were there any other persons involved in

17  this case that you have had the opportunity to speak with

18  while you've been incarcerated?

19         A.    This morning I saw the Chamaco who was

20  coming with me.

21         Q.    Okay.  And you have not seen Chamaco since

22  you've been incarcerated?

23         A.    No.

24         Q.    Have you received or sent any messages to

25  Chamaco?

```
 1          A.    No.

 2          Q.    Okay.  Would you say you have a reputation

 3   for truthfulness?

 4          A.    You could say I do.

 5          Q.    And would you agree that you have a very

 6   long history of criminal acts?

 7          A.    Yes.

 8          Q.    And the government went through a whole

 9   litany of those, and I'm not going to do that again.  A

10   few things, I believe, might have been left out.  Did you

11   conspire to kill an 18th Street gang member who was, in

12   fact, killed as he exited a taxi here in Nashville?

13          A.    An accident?

14          Q.    A taxi.  When the 18th Street gang member

15   was exiting a taxi, a taxicab.

16          A.    Yes.

17          Q.    Did you tell the government about that?

18          A.    Yes.

19          Q.    Okay.  Did you murder a Brown Pride gang

20   member near the Nashville Zoo in 2017?

21          A.    What I know is that he didn't die.

22          Q.    Is this something that you -- did you tell

23   the government about this?

24          A.    Yes.

25          Q.    At the Nashville Zoo?
```

1        A.    Near the Nashville Zoo.

2        Q.    Okay.  Did you murder two Hispanics at a

3   traffic light after an altercation with them at

4   La Mansion?

5        A.    Not that I remember.

6        Q.    Okay.  Well, let me ask you this:  If you

7   were speaking with a person that you didn't know and had

8   a criminal history like yours, would you believe what

9   they said?

10        A.    I don't understand.

11        Q.    If someone like -- if someone that you did

12   not know, a stranger, had a criminal history just like

13   yours, would you trust what that person said to be the

14   truth?

15        A.    If he's a stranger, I wouldn't.

16              MR. BLOOM:  No further questions.  Thank

17   you very much.

18              THE COURT:  All right.  Mr. Hoff, redirect

19   examination.

20                   **REDIRECT EXAMINATION**

21    BY MR. HOFF:

22        Q.    Mr. Avila, are you a native Spanish

23   speaker?

24        A.    Yes.

25        Q.    And you can read and understand some

1  English; is that right?

2         A.    Yes.

3         Q.    Has that gotten better over your time while

4  you've been incarcerated?

5         A.    Yes.

6         Q.    Do you feel more comfortable speaking and

7  conversing in Spanish?

8         A.    Yes.

9         Q.    So, originally, who made the call to law

10  enforcement to provide information?

11        A.    Me.

12        Q.    And when you first made that first phone

13  call, the first time you met with law enforcement, had

14  you fully decided that you were going to cooperate?

15        A.    No.

16        Q.    And during that first meeting and that

17  first phone call, had you -- did you tell them everything

18  you knew?

19        A.    No.

20        Q.    And did you leave out some things that

21  would get you in trouble in that first meeting?

22        A.    Yes.

23        Q.    And that included murders that you

24  participated in?

25        A.    Yes.

```
 1        Q.    And after that first meeting, did you then
 2   reach out on your own to law enforcement again and ask to
 3   speak with them?
 4        A.    Yes.
 5        Q.    And you met with -- you met with law
 6   enforcement several times; is that right?
 7        A.    Yes.
 8        Q.    And you admitted to murders that you
 9   participated in?
10        A.    Yes.
11        Q.    Admitted to carjackings; is that right?
12        A.    Yes.
13        Q.    Did you admit to shooting people?
14        A.    Yes.
15        Q.    During -- and you told law enforcement
16   agents about those things that you did; is that right?
17        A.    Yes.
18        Q.    During any of those meetings, did you ever
19   tell law enforcement that anyone other than you, Demente,
20   and Jojo were involved in the murder of Mr. Potter in
21   April of 2016?
22              THE INTERPRETER:  I'm sorry, the
23   interpreter requests a repetition of the question and
24   break it down.
25
```

1    BY MR. HOFF:

2         Q.    During those meetings did you ever say

3    anyone else other than you, Jojo, and Demente were

4    involved in the murder in the field?

5         A.    No.

6         Q.    Did you ever tell law enforcement during

7    any of those meetings that anyone else, other than

8    Demente, told you he killed a chavala on the highway?

9         A.    No.

10        Q.    And you testified about killing two men

11   outside of La Mansion; is that right?

12        A.    Yes.

13        Q.    You pled guilty to those?

14        A.    Yes.

15        Q.    You were shown several documents over the

16   last couple days.  Do you remember that?

17        A.    Yes.

18        Q.    Did you write any of those?

19              THE INTERPRETER:  Read or wrote?

20   BY MR. HOFF:

21        Q.    Did you write any of those?

22        A.    No.

23        Q.    Were they written by other people?

24        A.    Yes.

25        Q.    And I believe the term proffer was used.

1  Do you remember hearing that term?

2          A.     Yes.

3          Q.     And is that a meeting with members of the

4  government or law enforcement?

5          A.     Yes.

6          Q.     And those are -- are those -- those aren't

7  court proceedings; is that right?

8          A.     I do not know.

9          Q.     Were you in -- where were those meetings

10  held?

11         A.     At the courthouse.

12         Q.     Were they in court or were they in the

13  office, the government office?

14         A.     At the office.

15         Q.     And you were asked about when you wrote a

16  letter to the government.  Do you remember that?

17         A.     Yes.

18         Q.     And in that letter, did you admit to more

19  crimes that you committed?

20         A.     Yes.

21         Q.     Who wrote that letter?

22         A.     I did.

23         Q.     Did anyone tell you to write that letter?

24         A.     They were simply things that in the past I

25  had forgotten, and while being in the jail cell I

remembered them and I decided to put them down on paper.

2      Q.      And why did you decide to do that?

3      A.      So that I would not forget them.

4      Q.      And did you want to tell anyone about

5  those?

6      A.      To the government.

7      Q.      So you did that on your own?

8      A.      Yes.

9      Q.      And I want to talk to you about some of the

10  crimes you were asked about from the defense attorneys.

11  You were asked some questions about -- you were asked

12  about an incident where you held someone down -- held a

13  woman down while she was choked.  Do you remember that?

14      A.      Yes.

15      Q.      Did anyone tell you to hold that woman

16  down?

17      A.      Cabezon did.

18      Q.      Why?

19      A.      Because they had her there tousling with

20  her.

21      Q.      I'm sorry.  What does that mean?  How did

22  this incident begin?

23      A.      I was in a room with my baby momma when I

24  heard that they were arguing outside in the living room.

25      Q.      Who was arguing?

1      A.      Cabezon and the wera.

2      Q.      Was he arguing with this woman?

3      A.      Yes.

4      Q.      And what happened then?

5      A.      Some time transpired and Cabezon yelled at

6  me to come to the room.

7      Q.      Did you go to the room?

8      A.      Yes.

9      Q.      And what happened when you went to the

10  room?

11      A.      Frijol was choking the woman, and Cabezon

12  was holding her down on the ground.

13      Q.      And what did Cabezon tell you to do?

14      A.      He told me to grab her legs.

15      Q.      And what happened to that woman?

16      A.      After all of that, Cabezon told her to take

17  a shower, and that they were going to let her go.

18      Q.      And why did -- why was Cabezon angry with

19  her?

20      A.      I do not remember why.

21      Q.      Now, you were also asked about the

22  kidnapping of someone named Shakira.  Do you remember

23  that?

24      A.      Yes.

25      Q.      And do you remember your response was you

1 had nothing to do with that?

2     A.    Yes.

3     Q.    I believe Mr. Ganguli said he was going to

4 come back to that, but we never did. So I want to ask

5 you, what happened to Shakira?

6     A.    Before that or afterwards?

7     Q.    Well, what was the incident that you told

8 the government about involving Shakira?

9     A.    We wanted to get ahold of Shakira's

10 boyfriend.

11     Q.    Why?

12     A.    Because he -- he and another 18th were

13 coming to the house to throw --

14     THE INTERPRETER:  The interpreter asked

15 dirt or gunshots --

16     THE WITNESS:  Gunshots.

17 BY MR. HOFF:

18     Q.    And you said you weren't involved with what

19 happened to Shakira. So what happened with her?

20     A.    One day Cabezon told me that they had

21 picked up chiquita and that they were going to keep her

22 held until her boyfriend came or until they got ahold of

23 him.

24     Q.    And did Cabezon ask you to go to where she

25 was held?

```
 1         A.    Yes.  He told me if I wanted to go watch
 2   over her because they had to keep watching over her 24/7.
 3         Q.    Did you go?
 4         A.    No.
 5         Q.    Why not?
 6         A.    Because when Cabezon asked me, my baby
 7   momma was there, and she told me that I could not go.
 8         Q.    Now, you were -- the night that the person
 9   was murdered outside Bolo Ocho, did you go there that
10   night?
11         A.    Yes.
12         Q.    And did you see the person in the car?
13         A.    Yes.
14         Q.    And you recognized -- did you recognize
15   that person?
16         A.    Not at first.
17         Q.    Okay.  Did you later recognize that person?
18         A.    Yes.
19         Q.    And so you knew what happened to that
20   victim that night?
21         A.    A couple of days later, yes.
22         Q.    Well, did you see that he had -- that he
23   was dead?
24         A.    Yes.
25         Q.    So you saw that for yourself?
```

1       A.    Yes.

2       Q.    Before you were arrested and Peluche was

3 the Second Word, how many homeboys were in your clique?

4       A.    There were at least five.

5       Q.    So about five?

6       A.    Yes.

7       Q.    And to be the Second Word of your clique,

8 did you need to be a homeboy?

9       A.    Yes.

10      Q.    You were also asked some questions about

11 Daniel Caceres.  Do you remember that?

12      A.    Yes.

13      Q.    Who is that?

14      A.    He is Demente's uncle.

15      Q.    So when you broke the rules of TPLS, what

16 happened to you?

17      A.    They gave me a beating.

18      Q.    When the gang believed Chamaco was

19 cooperating with the police, what happened to him for

20 breaking that rule?

21      A.    We tried to kill him.

22      Q.    And were Cuervo and Cabezon in the gang

23 before you?

24      A.    Yes.

25      Q.    Were they already homeboys?

1      A.    Yes.

2      Q.    I believe you testified that you tried to

3  call -- you and Demente and Jojo tried to call Cabezon

4  before you killed the man in the field; is that right?

5      A.    True.

6      Q.    And -- I'm sorry.  You also tried to call

7  Cabezon before you killed the two men outside of

8  La Mansion?

9           MR. BLOOM:  Your Honor, excuse me, I

10  object.  There seems to be a lot of leading going on.

11           THE INTERPRETER:  I'm sorry.  The

12  interpreter could not hear.

13           THE COURT:  I would sustain that objection.

14           MR. HOFF:  I'll rephrase, Your Honor.

15           THE COURT:  Okay.  Thank you.

16  BY MR. HOFF:

17      Q.    Did you try and call Cabezon before you

18  killed the two men outside of La Mansion?

19           THE INTERPRETER:  I'm sorry.  The

20  interpreter needs to know whether the you is a singular

21  or a plural.

22  BY MR. HOFF:

23      Q.    You personally.  Did you personally try and

24  call Cabezon before you killed the two men outside of

25  La Mansion?

1          A.    Yes.

2          Q.    In either of those situations, were you

3    able to get in touch with Cabezon?

4          A.    No.

5          Q.    And in each of those situations, did you

6    kill those victims anyway?

7          A.    Yes.

8          Q.    Why?

9          A.    In the first one because Jojo said that he

10   had received permission.  And on the second one, Cabezon

11   said that whenever we ran into a chavala, just to kill

12   him and not to be calling about it.

13         Q.    Mr. Avila, do you know what your sentence

14   is going to be?

15         A.    No.

16         Q.    Did anyone promise you what your sentence

17   will be?

18         A.    No.

19         Q.    Who decides that?

20         A.    The judge.

21         Q.    Did anyone tell you what to say?

22         A.    Where?

23         Q.    Anytime.  At any time did anyone tell you

24   what to say when you met with the government or in court?

25         A.    That I needed to be sincere and always tell

 1  the truth.

 2             MR. HOFF:  I have nothing further,

 3  Your Honor.

 4             THE COURT:  All right.  Sounds like before

 5  we do recross, which I will permit, it would be a good

 6  time to take a midmorning break, so we'll take about 15

 7  minutes.

 8             Jurors may step down, and I'll give them my

 9  daily admonition to please remember, no talking about the

10  case, no researching the case, no investigation of it.

11             Thank you.

12             (Whereupon, at 10:28 a.m. the jury retired

13  from open court.)

14             THE COURT:  All right.  Thank you.  Please

15  be seated.

16             One of the things about the recross is it

17  does need to be within the scope of redirect, fairly

18  within the scope of redirect.  So I'm going to ask

19  Mr. Ganguli, do you have any recross?

20             MR. GANGULI:  Yes, sir.

21             THE COURT:  Okay, very well.  What we'll

22  do, then, since we have at least one, which doesn't

23  surprise me, we'll just see what other counsel want to

24  do.  Each counsel will be permitted an opportunity to ask

25  questions on recross within the scope of redirect.

1                    From the government, anything before we

2     break?

3                    MR. SAFEEULLAH:  No, Your Honor.

4                    THE COURT:  No?  From the defendants,

5     anything?  No.  All right.

6                    Thank you.  We'll take about 15, and then

7     we'll go from there.  Thank you.

8                    (Whereupon, a break was taken from

9      10:29 a.m. to 10:54 a.m.)

10                    THE COURT:  Thank you.  Please be seated.

11                    All right.  Mr. Ganguli, if you want to

12     take the podium.

13                    MR. GANGULI:  Thank you, Your Honor.

14                    THE COURT:  Looks like we can call the

15     jurors in.  Thank you.

16                    (Whereupon, at 10:54 a.m. the jury returned

17     to open court.)

18                    THE COURT:  All right.  Thanks, folks.

19     Please be seated.

20                    All right.  Mr. Ganguli, you may proceed

21     with recross-examination.

22                    MR. GANGULI:  Thank you, Your Honor.

23                         **RECROSS-EXAMINATION**

24      BY MR. GANGULI:

25            Q.    Mr. Avila, I'm going to ask you some

1   questions.  And just like the same courtesy as yesterday,

2   if there's something that I ask that I'm unclear about,

3   tell me, please.  I'll back up, and I'll try to do

4   better.  Okay?

5          A.   Yes.

6          Q.   The government just asked you on redirect

7   examination as to when you decided to cooperate with law

8   enforcement.  So are you telling us that on May 4, 2018,

9   when you met with law enforcement you were not

10  cooperating with them?

11         A.   A little, yes.

12         Q.   All right.  On August 7, 2018, when you met

13  with the government with your lawyer and gave them

14  information, are you telling us that you weren't

15  cooperating with law enforcement?

16         A.   Yes, I did give it to them.

17         Q.   Were you cooperating with them?

18         A.   Yes.

19         Q.   On October 7, 2020, when you met with law

20  enforcement and gave them information with your lawyers,

21  were you cooperating with law enforcement?

22         A.   Yes.

23         Q.   Would you agree with me that May 4, 2018,

24  August 7, 2018, and October 7, 2020, are all before

25  March 4 -- March 24, 2021?

1      A.    Yes.

2      Q.    So you had been cooperating with law

3 enforcement years before you pled guilty on March 24,

4 2021; right?

5      A.    Yes.

6      Q.    The government asked you some questions

7 about the kidnapping of a woman named Shakira.  So just

8 so I am clear, Cabezon asked you to participate in that

9 kidnapping; right?

10     A.    No.

11     Q.    Someone asked you to participate in her

12 kidnapping and watch over her; right?

13     A.    He asked me to watch over her, but she had

14 already been kidnapped.

15     Q.    Okay.  Who asked you to watch over her?

16     A.    Cabezon did.

17     Q.    All right.  So Cabezon asked you to watch

18 over Shakira after she had been kidnapped; right?

19     A.    He told me that if I wanted to go and watch

20 over her.

21     Q.    But your girlfriend said that you couldn't;

22 right?

23     A.    She said I couldn't.

24     Q.    So let me get this straight.  Cabezon asked

25 you to watch over Shakira if you wanted to, but your

1  girlfriend said you couldn't, so you didn't?

2          A.    My girlfriend told me I couldn't because

3  Cabezon had said that everyone was having sexual

4  relations with her.  And that I couldn't -- and my

5  girlfriend told me there was no way that I could be

6  there.

7          Q.    So, again, if you'll answer my question,

8  please.  Cabezon asked you to watch over Shakira if you

9  wanted, but your girlfriend said for you not to, so you

10  didn't?

11          A.    True.

12          Q.    The government asked you some questions

13  about breaking the rules and so forth -- about breaking

14  the rules regarding MS-13.  You began cooperating with

15  law enforcement in 2018; right?

16          A.    Yes.

17          Q.    That violated one of the cardinal rules of

18  the MS-13; right?

19          A.    Yes.

20          Q.    So when did you get the MS-13 letters?

21          A.    2019.

22          Q.    Okay.  So you began cooperating with law

23  enforcement in 2018; right?

24          A.    Yes.

25          Q.    And that violated one of the cardinal rules

1   of the MS-13; right?

2          A.    True.

3          Q.    But then you got MS-13 letters tattooed on

4   you in 2019?

5          A.    True.

6          Q.    All right.  Finally, these questions are

7   regarding your conditions of cooperation.  As part of

8   your cooperation with law enforcement, you're supposed to

9   tell the truth; right?

10         A.    True.

11         Q.    There's also another condition of

12  cooperation; right?

13         A.    Yes.

14         Q.    That's you can't commit additional crimes?

15         A.    Yes.

16         Q.    Well, you possessed a cell phone while in

17  custody; right?

18         A.    I used it, yes.

19         Q.    So you've, again, possessed a cell phone

20  while in custody; right?

21         A.    True.

22         Q.    So you've been committing additional crimes

23  while in custody; right?

24         A.    I don't know if that's a crime.

25         Q.    Well, are you allowed to possess cell

phones while in custody?

     A.    No.

     MR. GANGULI:  Thank you.  No further questions, Your Honor.

     THE COURT:  All right.  Thank you.

**RECROSS-EXAMINATION**

BY MR. LUCAS:

     Q.    I just have a couple questions for you, Mr. Avila.  On redirect you were asked about whether you were a homeboy when you became the First Word.

     A.    The Second Word.

     Q.    The Second Word, yes.

     A.    Yes.

     Q.    And when I questioned you earlier, you testified you didn't recall telling the government that you weren't a homeboy at the time of your arrest; correct?

     A.    I don't understand the question.  Could you repeat it again?

     Q.    You said earlier you didn't recall telling the government that you were not a homeboy at the time of your arrest.

     A.    When I met with the government, I told them that I was a homeboy.  I did not tell them that I was a Second Word.

1     Q.    At what point did you tell the
2  government -- you've met with the government several
3  times; correct?
4     A.    Yes.
5     Q.    And you were untruthful with the government
6  when you initially met with the government; is that
7  correct?
8     A.    I didn't tell them everything when I met
9  with them at the beginning.
10    Q.    So it's possible that you didn't tell them
11 that you were a homeboy when you first met with the
12 government?
13    A.    At the beginning I don't remember.
14    Q.    If I show you a document, will that help
15 you with your memory?
16    A.    Yes.
17          MR. LUCAS:  Your Honor, may I approach the
18 witness?
19          THE COURT:  You may.
20          THE WITNESS:  (Witness reading document.)
21  BY MR. LUCAS:
22    Q.    Have you had an opportunity to review the
23 document?  The document that you -- that I gave you is a
24 copy of an FBI report of investigation?
25          MR. HOFF:  Objection.

```
1            THE COURT:  What, the reference to
2   refreshing document?
3            MR. HOFF:  Yeah.
4            THE COURT:  All right.  Ladies and
5   gentlemen, let me instruct you.  The way the law works,
6   it's irrelevant for your purpose what he's even
7   reviewing, so don't even give any thought to what he's
8   reviewing.  The issue is whether, by reviewing
9   something -- and it could be a wide variety of things --
10  a document is able to refresh his memory about something
11  he's said he doesn't recall.  And it doesn't matter what
12  it is, and you should not give any thought to what the
13  document is.
14  BY MR. LUCAS:
15       Q.    Have you reviewed the document?
16       A.    Yes.
17       Q.    And does it refresh your recollection?
18       A.    I don't remember having said that.
19       Q.    Now, on redirect and just a few minutes ago
20  under recross from Mr. Ganguli, you talked about your
21  baby's momma telling you that you couldn't go to watch
22  Shakira; is that correct?
23       A.    True.
24       Q.    And in the rules, if someone that's a
25  member of MS-13 needs your help, could your baby's momma
```

1  just tell you you can't go?  Is it in the rules that

2  she's allowed to overrule the other members of MS-13?

3         A.    At that moment, Cabezon gave me the option

4  of whether or not I wanted to go.

5         Q.    Mr. Avila, isn't it true that in one of

6  your interviews that you stated -- in one of your

7  interviews with law enforcement that you stated that

8  Cabezon, Ochoa, did not get respect because Joslyn

9  Caceres would never let Ochoa out of the house?

10         A.    True.

11               MR. LUCAS:  Those are all the questions I

12  have.

13               THE COURT:  Thank you.

14               All right.  Mr. Mothershead?

15               MR. MOTHERSHEAD:  No recross.

16               THE COURT:  Thank you.  Mr. Bloom.

17                      **RECROSS-EXAMINATION**

18   BY MR. BLOOM:

19         Q.    I just have a few questions.  As was

20  mentioned previously, there are certain conditions for

21  your cooperation in order to get any benefit; correct?

22         A.    Yes.

23         Q.    And you mentioned one of them, of course,

24  is to be truthful; correct?

25         A.    Yes.

1          Q.    And the government mentioned all the
2    various litany of crimes that you disclosed to them?
3          A.    True.
4          Q.    And that was in addition to the crimes that
5    you pled guilty to.  Now, you didn't -- you withheld any
6    information about those crimes, 15 crimes, until just
7    three months before this trial; isn't that true?
8          A.    I do not remember those crimes.
9          Q.    Do you remember writing a letter just this
10   past December where you listed 15 additional acts that
11   you had not told the government about, including the
12   kidnapping that was just discussed, for example?
13         A.    Yes.  Yes.
14         Q.    So just like your withholding the
15   information about Mr. Potter, you withheld information
16   about these 15 other crimes until the last moment; is
17   that a fair statement?
18              THE INTERPRETER:  Until the last?
19              MR. BLOOM:  Moment.
20              THE WITNESS:  When I remembered that
21   information, I let him know about it.
22    BY MR. BLOOM:
23         Q.    So you did not remember these 15 other acts
24   that you'd committed until December of this past year?
25         A.    Always when I met with the government, we

1  would talk about a lot of criminal acts, and some of them

2  would be forgotten.

3        Q.   Well, I think you said way back in 2018 you

4  were told that you had to tell them everything that you

5  were involved in; isn't that correct?

6        A.   True.

7        Q.   So you had five years to think of

8  everything that you've done, and it was not until

9  December that you finally disclosed this information?

10        A.   True.

11        Q.   So you knew that if you did not disclose

12  this information and on cross-examination I said to you,

13  you did these 15 acts, that would have been bad?

14             MR. HOFF:  Objection, Your Honor.  Can we

15  approach?

16             THE COURT:  You may.

17             (Whereupon, the following proceedings were

18  had at the bench outside the hearing of the jury:)

19             MR. HOFF:  I probably should have done this

20  earlier, but I didn't.  But just saying 15 acts, are you

21  going to ask which acts?

22             MR. BLOOM:  No.

23             MR. HOFF:  You're just generally saying 15.

24  Not even 15 in that letter.

25             MR. BLOOM:  You want to look at it?

1          MR. HOFF:  I just looked at it.  I counted

2     them.

3          MR. BLOOM:  There are 15.  There's 15

4     paragraphs.

5          MR. HOFF:  Okay, there's 15 paragraphs.

6     You said 15 acts.

7          MR. BLOOM:  How many were there?  I can

8     correct.

9          THE COURT:  All right, listen.  Let's not

10    talk at each other.  Let's talk to me.

11         I'm going to allow -- here's what I'm going

12    to do.  I'm going to strike that last question, and you

13    can ask another one.  I'll give you a chance to do

14    re-redirect if you want, but only if you think it's --

15    and --

16         MR. BLOOM:  It's another crime --

17         THE COURT:  Hold on.  And within the scope

18    of recross, and we'll go from there.  He -- you know, he

19    is allowed to ask questions based on his perception of

20    what the information is that he's asking about.  He's

21    allowed to do that, and it's up to the witness to respond

22    accordingly.  If it wasn't 15 acts or if he doesn't agree

23    with that, he can say so.

24         Of course, I don't know whether assumptions

25    made by counsel in a question are true or not.  That's

1  part of the reason why we get it from the witness, and

2  the witness can push back.  That's also why we allow

3  things like the other side to go one more time to clarify

4  something if it's wrong.  Of course --

5                    MR. BLOOM:  And I was wrong.

6                    THE COURT:  Okay.  Yeah.  And any

7  question -- you know, obviously you need to ask a

8  question in good faith and based on reasonable

9  preparation, but obviously I can't police on the front

10 end whether it's a wrong question, so to speak.  So we're

11 going to strike this question, and you can ask another

12 one and we'll go from there.  Like I say, I'm going to

13 allow a re-redirect.  All right.

14                    MR. BLOOM:  Thank you.

15                    (End of bench conference.  Whereupon, the

16 following proceedings were had in the hearing and

17 presence of the jury:)

18                    THE COURT:  All right, ladies and

19 gentlemen, we had a question on the floor that had not

20 been answered.  I'll ask you to disregard that question

21 so that, now that we're back, Mr. Bloom can ask another

22 one.

23  BY MR. BLOOM:

24      Q.    Did you realize that if you did not

25 disclose these eight additional acts to the government

1    and it came out on cross-examination that you had done

2    these additional acts, it may have destroyed your

3    possibility of getting a reduced sentence?

4             A.    Were there eight or 15?

5             Q.    There were eight.  I was incorrect.

6                   THE COURT:  Wait.  One moment.  Let me try

7    and clarify this.  Do you recall Mr. Bloom had asked you

8    about a letter in which he said you had referred to 15

9    criminal acts?  Do you recall his questions?

10                  THE WITNESS:  Yes.

11                  THE COURT:  And now Mr. Bloom has just

12   represented that there were eight in the letter.  Did you

13   hear that?

14                  THE WITNESS:  Yes.

15                  THE COURT:  Okay.  Do you know how many

16   criminal acts you disclosed in this letter?

17                  THE WITNESS:  I do not remember.

18                  THE COURT:  Okay.  There were some that you

19   disclosed; is that right?

20                  THE WITNESS:  Yes.

21                  THE COURT:  Were there more than five, say?

22                  THE WITNESS:  Yes.

23                  THE COURT:  All right.  Mr. Bloom, you may

24   continue.

25

1  BY MR. BLOOM:

2      Q.    That said, would you agree that you would

3  do virtually anything to get a reduced sentence?

4      A.    No.

5      Q.    When you were -- when you began your

6  cooperation, did you -- did you withhold from the

7  government that you were a homeboy?

8      A.    I do not remember.

9      Q.    Do you remember if you ever characterized

10  yourself as almost a homeboy at the time of your arrest?

11          THE INTERPRETER:  I'm sorry.  Interpreter

12  requests a repetition of the question and apologizes for

13  starting to interpret before the ending of the question.

14  BY MR. BLOOM:

15      Q.    Did you characterize yourself as almost a

16  homeboy at the time of your arrest in order to minimize

17  your culpability with the gang?

18      A.    Could be.

19      Q.    Okay.  And just lastly, I believe -- I

20  believe in your testimony you stated that, in all your

21  conversations with the government, you always felt that

22  you were understood in speaking Spanish.  You always felt

23  that you were understood language-wise.

24      A.    Yes.

25          MR. BLOOM:  That's all I have.  Thank you

1  very much.

2              THE COURT:  All right.  And, finally, any

3  re-redirect within the scope of recross?

4              MR. HOFF:  No, Your Honor.

5              THE COURT:  All right.  Thank you.  All

6  right.  Mr. Avila may step down.

7                   *****WITNESS EXCUSED*****

8              THE COURT:  All right.  The government

9  wishes to call its next witness.

10             MS. FARZAD:  Thank you, Your Honor.  The

11 government calls Warren Fleak to the stand.

12             THE COURT:  All right.

13                      **WARREN FLEAK**

14  called as a witness, after having been first duly sworn,

15 testified as follows:

16                   **DIRECT EXAMINATION**

17  BY MS. FARZAD:

18         Q.    Good morning, sir.  Could you please state

19 and spell your name for the record.

20         A.    Yes, ma'am.  It's Warren Fleak.

21 W-a-r-r-e-n, F-l-e-a-k.

22         Q.    Where do you work?

23         A.    I'm employed with the Metro-Nashville

24 Police Department.

25         Q.    What position do you hold there?

         A.     For the last 22 years, I've been assigned
to the Crime Scene Investigative Unit.

         Q.     Have you had any other positions in law
enforcement before that?

         A.     No, I was a patrol officer for three years
prior.

         Q.     Okay.  And what do you do as a crime scene
investigator?

         A.     When we are requested to a scene, it's our
job to respond to that scene, to locate the evidence in
that scene, to document that evidence, to collect that
evidence and preserve it for any future testing.

         Q.     What type of training have you received in
order to hold this position?

         A.     I've done a little over 800 hours of
documented training, everything from fingerprints to
photography, to crime scene reconstructions.

         Q.     I'd like to turn your attention to July 18
of 2017.  Were you working on that day?

         A.     Yes, ma'am, I was.

         Q.     Do you recall being dispatched to 1108
Woburn Way?

         A.     Yes, ma'am, I do.

         Q.     What was that dispatch for?

         A.     I was requested to the scene.  It was an

1  individual who had been driving down the road and had
2  been encountered by two individuals in the roadway who
3  had fired shots into his vehicle.  He had drove to this
4  location to seek medical attention to get some help for
5  where he'd been shot.
6        Q.   And when you arrived on the scene at 1108
7  Woburn Way, were there other law enforcement officers
8  present?
9        A.   Yes, ma'am, there was.
10        Q.   Were you the only crime scene investigator
11  on the scene that day?
12        A.   Yes, ma'am, I was.
13        Q.   So what was your role when you first got
14  there?
15        A.   In this particular incident, all we had was
16  a vehicle at the time, so I just documented the vehicle
17  itself, where it was located, all of the projectile
18  strikes that were in the vehicle.  Did not enter the
19  vehicle.  Did not know what was going to be involved
20  inside of the vehicle, so I was awaiting a search
21  warrant.  So we just pretty much documented the vehicle
22  as it was found at the time of my arrival.
23        Q.   So you mentioned there were two -- two
24  scenes, so to speak?
25        A.   Yes, ma'am.

1     Q.   One where the shooting actually took place?

2     A.   That's correct.

3     Q.   And the other where the -- the victim

4 sought help; is that right?

5     A.   That's correct.

6     Q.   So which scene did you go to first?

7     A.   I went to the car first.  At the time, the

8 actual shooting scene had not been located.  While I was

9 processing the vehicle for photographs, patrol officers

10 were driving through the neighborhood, and they found the

11 cartridge casings and some broken glass indicating that

12 that's where the actual scene had occurred.

13     Q.   Okay.  I'd like to go ahead --

14     MS. FARZAD:  Your Honor, at this point, the

15 government has previously spoken with defense counsel

16 about Government Exhibits 361 through 392.  It's my

17 understanding that they do not have any objections to

18 these exhibits coming in.

19     THE COURT:  All right.  The government is

20 offering at this time Exhibits 361 through 392.  Any

21 objection to their admission at this time?

22     Seeing none, Government Exhibits 361 to 392

23 will be admitted.

24     (Government Exhibits Nos. 361 through 392

25 were admitted.)

1  BY MS. FARZAD:

2       Q.    So while you were at the first scene, the

3  location of the vehicle where this person sought help,

4  did you take photographs there?

5       A.    Yes, ma'am, I did.

6       Q.    If we could take a look, please, at

7  Government Exhibit 361.

8              All right.  So what's this?

9       A.    This is the first photograph that we take

10  when we arrive on scene.  As you can see, it has the

11  date, the time that you arrived.  It has the complaint

12  number, what the type of call is.  In this particular

13  incident, it's a 10-52, which is a shooting.  It has the

14  victim's name, the address where you're at, what the

15  photos are taken of, and who is requesting.

16       Q.    And can we please take a look at Government

17  Exhibit 381.  I'm sorry, 382.

18              So what's this photograph show?

19       A.    This is of the victim's vehicle pulled into

20  the driveway.  This is just a photograph taken from the

21  roadway itself and where the vehicle was located.

22       Q.    Is this that address, 1108 Woburn Way?

23       A.    Yes, ma'am, that's correct.

24       Q.    Which one is the victim's vehicle in this

25  photo?

1          A.     It's the -- kind of that silver-gray SUV
2    you can see there with its back facing you.
3          Q.     If we can take a look at Government
4    Exhibit 383.  And what's this?
5          A.     This is the same vehicle, just taken from
6    the front passenger side of the vehicle itself.
7          Q.     And do you see any defects in this vehicle?
8          A.     Yes, ma'am.  As you can see, the front tire
9    is flat.  Right below the orange amber-colored lights,
10   you can see a projectile strike there.  Right above the
11   tire, you can see two additional strike marks.  It's kind
12   of hard to see in this photograph, but there's also three
13   projectile strikes in the top of the hood.
14         Q.     Do you recall whose house this is?
15         A.     I don't believe I ever spoke to the
16   homeowners themselves.
17         Q.     Okay.  If we could take a look, please, at
18   Government Exhibit 384.  And what's this show?
19         A.     That is another projectile strike.  It is
20   in the front grill of the vehicle, penetrated into the
21   radiator.
22         Q.     Government Exhibit 385.  What's this show?
23         A.     These are the before-mentioned three
24   projectile strikes in the hood of the vehicle itself.
25   You can see there's an additional one just right above

1  the windshield wiper.  Each one of those white L scales

2  is a measurement, and they're placed beside the

3  projectile strike to help to easily identify them.

4       Q.    In the left-hand side there on the

5  passenger side rearview mirror, what's shown there?

6       A.    You can see that, as opposed to the one on

7  the driver's side door, the actual cover is missing.  So

8  what you're seeing is actually internal parts of the

9  mirror itself.  The cover has been detached.

10      Q.    Okay.  If we could take a look, please, at

11  Government Exhibit 386.

12      A.    This is just a closer photograph of the

13  projectile strikes in the hood of the vehicle and the

14  windshield itself.

15      Q.    Okay.  And if we could look, please, at

16  Government Exhibit 387.

17      A.    This is the scaled photographs of the flat

18  tire, the projectile strike below the amber light, and

19  you can see a couple of the ones in the upper fender

20  there in the top left corner.

21      Q.    And the white tape that we see around these

22  defects and in the previous photographs, who put that

23  there?

24      A.    I did myself.

25      Q.    And what's the purpose of it?

1      A.   It's just to show the actual diameter of

2 the projectile strike, and it also makes it easier to

3 identify in a dark environment where you can actually see

4 the projectile strikes.

5      Q.   If we can take a look, please, at

6 Government Exhibit 388.

7      A.   Again, this is the projectile that's

8 actually -- you can see, wherever that marker is on top

9 of the tire, where the projectile actually struck the rim

10 itself and made the tire go flat.

11      Q.   If we could take a look, please, at

12 Government Exhibit 389.

13      A.   Again, this is the front passenger fender.

14 You can see there's two projectile strikes in the middle

15 of the fender plus the one, again, below the amber light.

16      Q.   Government Exhibit 390, please.

17      A.   This is two documented projectile strikes

18 right at the mirror area and one that actually struck the

19 A-frame of the front passenger door, breaking the window

20 out.

21      Q.   And if we could take a look, please, at

22 Government Exhibit 391.

23      A.   This is a photograph of the interior of the

24 vehicle.  The door was open and I took the photograph of

25 the interior.

1     Q.    And what appears to be on the -- the cups

2   that are in the center console there?

3     A.    You can see on the cups, the empty Dasani

4   water bottle and the actual paper bag there in the seat,

5   you can see the red stains appearing to be blood.

6     Q.    And if we could take a look, please, at

7   Government Exhibit 392.

8     A.    This is a photograph of the opposite side

9   of the same photograph.  This is looking into the

10  driver's compartment from the driver's area.  You can see

11  that there is apparent blood on the cups as well, the

12  center console, the driver's seat, and as well as on the

13  floorboard of the driver's compartment.

14    Q.    And if we could pull up Government Exhibit

15  1235, it's a map, if you wouldn't mind.

16          Okay.  Can you tell here what this shows?

17    A.    Yes, ma'am.  This is an overhead view of

18  the neighborhood where the incident occurred, where the

19  vehicle was found.

20    Q.    Okay.  So that's where the vehicle was

21  found.

22    A.    Yes, ma'am, that's correct.

23    Q.    All right.  If we could take a look,

24  please, at Government Exhibit 361.  And what does this

25  show?

1          A.     Again, this is the first photograph that we

2    take when we respond to a scene.  After I was done

3    processing the vehicle, I went to this address.  Again,

4    you have the date, you have the time, you have the same

5    complaint number, 10-52, which is a shooting, the victim,

6    and the change of address of Bishopgate at Aldersgate.

7          Q.     So what -- what happened at Bishopgate and

8    Aldersgate?  Why did you go there?

9          A.     This is where patrol was driving around,

10   and they located the cartridge casing and the broken

11   glass in the middle of the roadway.

12         Q.     And if we could take a look at Government

13   Exhibit 361 -- I'm sorry, 367.  Why did you take this

14   photograph?

15         A.     We take this photograph just to show the

16   actual address and where you are at.

17         Q.     Okay.  Can we please take a look at

18   Government Exhibit 368.  What's this?

19         A.     And this is a photograph looking down the

20   roadway.  What you see in the roadway, you'll see these

21   little yellow markers, and they'll have numerical numbers

22   on them.  Each one of those markers will be placed beside

23   a piece of evidence.  That actual piece of evidence will

24   be collected, and that number will be assigned to that

25   piece of evidence.

1        Q.    And is this what the scene looked like when

2    you arrived?  Were the markers already there or did

3    someone place those down?

4        A.    I placed the markers down once the evidence

5    is located.

6        Q.    Could we take a look, please, at Government

7    Exhibit 369.

8        A.    What you see in between No. 1 and 4, you

9    can see the pieces of glass from the front passenger

10   windshield -- or window.  And you can see right above

11   No. 2, a piece of an item.  That is actually the cover

12   for the side view passenger mirror that was missing from

13   the vehicle itself.

14       Q.    Okay.  And if we could take a look, please,

15   at Government Exhibit 370.

16       A.    This is a closeup photograph of the

17   evidence collected and bagged as No. 1.

18       Q.    I'm going to hand you what's been marked

19   previously as Government Exhibits 23 through 26.

20             And before I ask you about those, if we

21   could take a look at Government Exhibit 371, please.  And

22   what does this show, sir?

23       A.    Again, this is a photograph, just a little

24   closer, of evidence marked No. 2 and No. 3.  You can see

25   that there are broken shards of glass laid throughout

1  that.  Again, you can see the side passenger mirror cover

2  laying there in the top part of the photograph.

3       Q.    Okay.  So I just handed you Government

4  Exhibits 23 through 26.  Can you take a look at those,

5  please?

6       A.    Yes, ma'am.

7       Q.    Do you recognize what you see there?

8       A.    Yes, ma'am, I do.

9       Q.    What is that stuff?

10      A.    These are the cartridge casings that I

11  collected from the scene that you see with the numerical

12  markers wrote on each individual bag itself, a projectile

13  that was recovered from the scene, and the actual side

14  view mirror cover.

15      Q.    Is that the same side view mirror that we

16  see here?

17      A.    Yes, ma'am, it is.

18      Q.    Okay.  And the cartridge casings that you

19  recovered, are they the same that we saw in the previous

20  photographs marked?  And there's 2 and 3 marker --

21  evidence markers in this particular photograph?

22      A.    Yes, ma'am, that's correct.

23      Q.    And do you recall what type of caliber

24  cartridge casings you recovered from the scene that day?

25      A.    I believe there were six .45 caliber

1  cartridge casings and four .40 caliber cartridge casings.

2      Q.    If we could take a look at Government

3  Exhibit 372, please.  What's that show?

4      A.    And, again, this is just showing the other

5  pieces of evidence that were collected at the scene.

6  Again, each one of them has a numerical marker

7  corresponding to what is written on the actual piece of

8  evidence itself.

9      Q.    And do you recall what type of evidence

10 these are marking?

11     A.    They were all cartridge casings, and one of

12 them was a projectile.  I don't recall exactly which

13 number that was, but they were all cartridge casings.

14     Q.    Okay.  And if we could take a look at

15 Government Exhibit 376.

16     A.    Again, this is just a closer photograph of

17 items marked No. 7 and No. 8.

18     Q.    Okay.  Government Exhibit 379, please.

19     A.    Evidence marked number 9, 10, and 11.

20     Q.    And Government Exhibit 380.

21     A.    That is a closeup of evidence collected,

22 Item No. 11.

23     Q.    And if you could hold up, please,

24 Government Exhibits 23 and 24.  What is inside of those

25 bags?

1    A.   It has the individual bags.  As I
2  mentioned, each one of these pieces of evidence will have
3  a marker, numerical marker beside of it, and each one of
4  the bags will have the corresponding number with what you
5  see in the photographs.  These are the cartridge casings
6  that have been marked 1 through however many it was.
7              MS. FARZAD:  Your Honor, I'd like to move
8  to admit Government Exhibits 23 through 26.
9              THE COURT:  All right.  Without objection,
10  Government Exhibits 23 through 26 will be admitted.
11              (Government Exhibits Nos. 23 through 26
12  were admitted.)
13   BY MS. FARZAD:
14        Q.   And could we take a look, please, at
15  Government Exhibit 1255.  It should be a map.
16              MS. FARZAD:  Excuse me, one second,
17  Your Honor.
18              Your Honor, just for the record, the map
19  that I'd like to show has not been previously admitted.
20              THE COURT:  Was 1235 admitted?
21              MS. FARZAD:  No, it wasn't.
22              THE COURT:  Okay.
23              MS. FARZAD:  So the government would move
24  to admit 1235 and ask -- and ask for permission from
25  defense to admit 1255 as well.

```
 1                    THE COURT:  All right.  1235 is one that
 2      was previously published, so we'll take care in the
 3      future to get it admitted before -- I think it was
 4      published, although maybe --
 5                    MS. FARZAD:  It was.
 6                    THE COURT:  I know it was on my screen, and
 7      I guess if it was published on all the screens, it was
 8      published.  So we'll take care and make sure things are
 9      admitted before publishing them.
10                    Any objection to the admission of 1235?
11      All right.  1235 will be admitted without objection.
12                    (Government Exhibit No. 1235 was admitted.)
13                    THE COURT:  And then 1255 has been offered.
14      Any objection?  All right.  1255 will be admitted without
15      objection.
16                    MS. FARZAD:  Thank you.  And may I publish
17      it to the jury as well?
18                    THE COURT:  You may.
19                    MS. FARZAD:  Thank you.
20                    (Government Exhibit No. 1255 was admitted.)
21       BY MS. FARZAD:
22          Q.   Okay.  Sir, if you -- we might zoom in just
23      slightly, if it's possible, just in the -- just to make
24      it a little bit larger.
25                    Okay.  So we previously looked at the
```

1  Government Exhibit 1235 of 1108 Woburn Way.  And then I
2  believe you just testified that the incident -- the crime
3  scene that you went to collect evidence from was at
4  Bishopsgate and Aldersgate?
5        A.    That's correct.
6        Q.    Do you see that intersection on this map
7  here?
8        A.    Yes.  That would be just to the right of
9  the orange teardrop that is kind of toward the lower
10 center of that photograph.
11       Q.    Just to the right.  Where it says --
12       A.    Kismet.
13       Q.    -- Kismet?
14       A.    Yes, ma'am.
15       Q.    Okay.  And about how far away was that from
16 the Aldersgate -- I'm sorry, the Woburn location?
17       A.    Less than a half mile.
18       Q.    All right.  Thank you.  If we could please
19 put up Government Exhibit 362.  What is this a photograph
20 of?
21       A.    This is a photograph of the mailbox at the
22 residence of 1025 -- I forget which street it was.  It's
23 the one that started with the letter A.  It's just a
24 marker of the actual residence itself.
25       Q.    Okay.  If you'd like, I can show you a

1  report to refresh your recollection on the address.

2        A.    I don't remember the actual name of the

3  road itself.

4        Q.    Did you previously testify that the

5  intersection was Aldersgate --

6        A.    Aldersgate.  That -- it was Aldersgate,

7  yes.

8        Q.    Why did you go to this location?

9        A.    When the patrol officers were out at the

10  scene with the -- blocking the roadway for the cartridge

11  cases, the homeowners actually at this residence had came

12  out and stated that a projectile had struck and entered

13  into their residence.

14        Q.    Okay.  And so did you go inside the

15  residence?

16        A.    Yes, ma'am.  They gave me permission to

17  come into their residence.  I photographed the damage to

18  their residence, and I collected the projectile from out

19  of their kitchen.

20        Q.    We'll take a look, please, at Government

21  Exhibit 363.

22        A.    This is a photograph of the residence

23  itself.  What you can see -- it's kind of bleached out

24  because of the flash, but what you see there to the

25  bottom left is a photograph of the before-said photograph

1   of the mailbox itself.

2        Q.    Can we please take a look at Government

3   Exhibit 364.

4        A.    You can see the actual address to the

5   residence itself right above the front door.  Right to

6   the upper left of the light itself, you can see a divot

7   right there in the fold of the vinyl siding.

8        Q.    Thank you.  There we go.

9        A.    Yes, you can see the little hole right

10  there.  The little brown spot is an actual projectile

11  strike to the residence itself.

12       Q.    If we could please take a look at

13  Government Exhibit 365.

14       A.    This is a photograph of the interior of the

15  residence where the projectile struck the actual

16  residence and entered into the residence itself.

17       Q.    If we could take a look, please,

18  at Government -- actually, before you is Government

19  Exhibit 25.  If you could locate that within the bags

20  that are before you.  And at the same time, please, could

21  we look at Government Exhibit 366.  And maybe zoom in a

22  little bit near the table.

23            What is this, sir?

24       A.    That is the projectile that entered into

25  the residence.  It is marked Exhibit No. 25.

1      Q.    Thank you.  So what did you do with the
2   evidence after you collected it on the scene?
3      A.    Once we collect the evidence, we will take
4   and place them into, like I said before, the bags
5   themselves, with the corresponding number as to what the
6   placard was on the crime scene.  The evidence is sealed.
7   It is logged into a property sheet.  Then it is taken to
8   a property room.  It's a secured facility that I don't
9   even have access to, and it is turned in to the property
10  room where it is stored until further request is made for
11  further testings.
12     Q.    And how about the photographs?  What did
13  you do with those?
14     A.    The photographs, we have -- at the time, we
15  had a different program than what we currently use.  The
16  photographs are uploaded into the system.  They are
17  stored in that system, as well as a backup one, at the
18  time a compact disk drive itself.
19     Q.    I'd like to turn your attention to May 27,
20  2017.  Were you working on that night?
21     A.    Yes, ma'am, I was.
22     Q.    Do you recall being dispatched to Antioch
23  Pike and McCall Street?
24     A.    Yes, ma'am, I was.
25     Q.    What was that call for?

1        A.     That was a shooting that had occurred there

2    at the intersection of McCall and Antioch Pike.

3        Q.     And when you arrived on the scene, were

4    there any other crime scene investigators already there?

5        A.     Yes, ma'am.  There was a civilian crime

6    scene investigator and a sergeant supervisor for our

7    unit.

8        Q.     So what was your role that evening or early

9    morning hours?

10        A.     Yeah.  On that night, I was tasked with --

11    the evidence had already been located and marked, and I

12    was tasked with actually doing an overhead diagram, a

13    rough scene sketch, of where the evidence was located and

14    a diagram of the actual roadway itself.

15        Q.     How did you go about collecting your

16    information to make that diagram?

17        A.     I'm kind of gifted in that way.  I've got a

18    blueprint background, so I do a lot of drawing.  So I'm

19    kind of the guy that does all the diagrams, and I just

20    kind of show up and just kind of free-hand it.  Sometimes

21    I'll go back with a map and kind of overlay it just to

22    make sure that it's exactly like it was, representation

23    of what it actually was.  But it's just -- pretty much

24    it's a rough sketch with a piece of paper, and you do

25    some measurements.

1     Q.   So you take measurements to find out the
2  placement of evidence?
3     A.   Yes, ma'am, we do.  We will generally
4  choose a minimum of two reference points.  You will
5  measure between those two reference points, and then from
6  each one of those reference points, you will measure to
7  your piece of evidence.
8            Your reference points are typically
9  something that is semi-permanent, a telephone pole,
10 corner of a house, something that's really hard to
11 relocate.  You'll take those measurements from those two
12 items, measure back to your piece of evidence, and at any
13 time, you can go back with those same measurements and
14 tell exactly where that piece of evidence was.
15           MS. FARZAD:  Your Honor, I have previously
16 asked defense counsel if they have any objections to the
17 admission of Government Exhibit 1310, the crime scene
18 diagram prepared by Mr. Fleak, and they've told me they
19 have no objections.
20           THE COURT:  All right.  Is there -- it's
21 Government Exhibit 1310; is that right?
22           MS. FARZAD:  Yes.
23           THE COURT:  Any objections to Government
24 Exhibit 1310?
25           All right.  Without objection, Government

1   1310 is admitted.

2               (Government Exhibit No. 1310 was admitted.)

3               MS. FARZAD:  May I publish it to the jury?

4               THE COURT:  You may.

5   BY MS. FARZAD:

6       Q.    Can we please pull up 1310.  Thank you.

7               Can you describe the diagram here for the

8   jury?

9       A.    Yes, sir.  I'm sorry, yes, ma'am.

10              What you see is the intersection of McCall

11  Street and Antioch Pike.  You can see that there's a lot

12  of numbers.  There's numbers 1 through 41.  You can see,

13  they're kind of toward the middle, a vehicle in the

14  middle of the roadway.  You can see at the top, and kind

15  of toward the top on the left and right, circles with

16  lines coming down.  You'll see they're noted as RPA, RPB.

17  And then down toward the middle, you have RPC, and then

18  down toward the bottom you have RPD.  Those are what I

19  referred to as your reference points.

20              In this case, the scene was large enough to

21  where we established that we needed more than two

22  reference points.  So we collected measurements from RPA

23  to RPB to X amount of pieces of evidence.  And then we

24  did measurements between RPC and RPD to the lower pieces

25  of evidence themselves.

1          Q.    Okay.  Thank you.  I'd like to draw your

2     attention -- you can go ahead and take that down, thank

3     you -- to MNPD Incident No. 12017-0688839.  Were you

4     requested to conduct latent fingerprints examination of

5     firearms associated with this number?

6          A.    Yes, ma'am, I was.

7          Q.    Okay.  And did you have anything to do with

8     the collection of those firearms?

9          A.    No, ma'am, I did not.

10         Q.    Okay.  So what was your role with respect

11    to these firearms?

12         A.    I'm one of the crime scene investigators

13    that's lab trained, and when certain items of evidence

14    are just required for fingerprints, they will put a

15    request in to have these items fingerprinted.

16              On this given night, that was one of the

17    items that I was given to fingerprint.  I processed the

18    AK-47 and a Glock pistol.

19              MS. FARZAD:  Okay.  May I please retrieve

20    Government Exhibits 1 and 2.  Thank you.

21              May I approach again, Your Honor?

22              THE COURT:  You may.

23     BY MS. FARZAD:

24         Q.    Okay.  So I believe you testified that you

25    examined an AK-47?

1          A.     Yes, ma'am.

2          Q.     Before you you have Government Exhibits 1

3   and 2.  Do you recognize Government Exhibit 1 and 2?

4          A.     Yes, ma'am, I do.

5          Q.     And how do you recognize those?

6          A.     These are the weapons that I photographed

7   and processed for fingerprints on that night.

8          Q.     How do you go about processing a firearm

9   for fingerprints?

10         A.     There's several different ways, depending

11  on the actual texture of the weapon.  In this given

12  instance, what I did was I just fingerprinted the items

13  with fingerprint powder, which is nothing more than

14  essentially just ground-up pencil lead that is very, very

15  fine.  It is placed on the item, and then went over with

16  a feather brush.  And the actual fingerprint powder will

17  stick to the fingerprints if there is a fingerprint on

18  there.

19         Q.     Were you able to retrieve any fingerprints

20  from Government Exhibit 1 or 2?

21         A.     No, ma'am, I was not.

22                MS. FARZAD:  One moment, Your Honor.

23                THE COURT:  Okay.

24                MS. FARZAD:  I have nothing further,

25  Your Honor.

1          THE COURT:  All right.  Thank you.

2          All right.  Mr. Ganguli.

3          MR. GANGULI:  No questions, Your Honor.

4          THE COURT:  All right.  Thank you.

5          Then either Ms. Hood-Schneider or

6  Mr. Lucas?

7          MR. LUCAS:  No questions, Your Honor.

8          THE COURT:  Mr. Mothershead?

9          MR. MOTHERSHEAD:  No questions, Your Honor.

10         THE COURT:  Mr. Bloom?

11         MR. BLOOM:  No questions, Your Honor.

12         THE COURT:  All right.  Thank you, sir.

13 You may step down.

14              *****WITNESS EXCUSED*****

15         THE COURT:  All right.  We'll get at least

16 a start on the government's next witness.  If the

17 government wishes to call the witness.

18         MR. HOFF:  Yes, Your Honor.  The government

19 calls Mr. William Davis.

20         THE COURT:  All right.  He may come

21 forward.

22              **WILLIAM DAVIS**

23  called as a witness, after having been first duly sworn,

24 testified as follows:

25         MR. HOFF:  May I proceed, Your Honor?

1          THE COURT:  You may.

2                    **DIRECT EXAMINATION**

3     BY MR. HOFF:

4          Q.    Sir, can you please state and spell your

5     name for the record.

6          A.    William Davis.  W-i-l-l-i-a-m, D-a-v-i-s.

7          Q.    And, sir, without telling me your address,

8     what street do you live on?

9          A.    Aldersgate Road.

10         Q.    And is that where you lived in 2017?

11         A.    That is correct.

12         Q.    Is that in Nashville, Tennessee?

13         A.    Antioch, Tennessee.

14         Q.    Do you have surveillance cameras at your

15    house?

16         A.    Yes, sir.

17         Q.    And were they working in January of 2017?

18         A.    Yes, sir.

19         Q.    At some point in January of 2017, did the

20    police come to your house looking for video from your

21    surveillance cameras?

22         A.    Yes, sir.

23         Q.    And did you know what they were looking for

24    from your surveillance cameras?

25         A.    Not at the time.  They informed me that

1   there was some type of shooting in the area, and they

2   were giving me a timeframe of the logs of the video that

3   they were requesting.

4           Q.    Okay.  And was that unusual for where you

5   lived?

6           A.    Yes.

7           Q.    Had that ever happened before?

8           A.    Not that I'm aware of.

9           Q.    And has it happened since the shooting?

10          A.    No, sir.

11          Q.    And did you provide them with a video they

12  were looking for?

13          A.    Yes, sir.

14          Q.    And prior to today, have you had an

15  occasion to review those videos?

16          A.    Yes, sir.

17                MR. HOFF:  Your Honor, if I may approach

18  the witness?

19                THE COURT:  You may.

20   BY MR. HOFF:

21          Q.    Sir, if you can just take a moment and look

22  at those.  I've provided you with Government's

23  Exhibits 359 and 360.  Have you seen those before?

24          A.    Yes, sir.

25          Q.    Okay.  And what are those?

1          A.     These are the DVD video -- disks of my

2     videos.

3          Q.     And did you initial those?

4          A.     Yes, sir.

5          Q.     Okay.  And you watched them prior to today?

6          A.     Yes, sir.

7          Q.     Are those the copies of the videos that you

8     provided to law enforcement in January of 2017?

9          A.     Yes, sir.

10              MR. HOFF:  Your Honor, at this time, the

11     government would move to admit Government's Exhibits 359

12     and 360.

13              THE COURT:  Absent objection, 359 and 360

14     will be admitted.

15              (Government Exhibits Nos. 359 and 360 were

16     admitted.)

17              MR. HOFF:  I would ask just for permission

18     to publish those to the jury, Your Honor.

19              THE COURT:  All right.  You may do so.

20      BY MR. HOFF:

21          Q.     If we could pull up Government's

22     Exhibit 359.  If we could just pause it right there at

23     the beginning.

24              Sir, what is this street closest in this

25     video where that black car is parked?

```
1          A.    That is Aldersgate Road.

2          Q.    And behind that, there's an intersection

3  there; is that right?

4          A.    That's correct.

5          Q.    What street is that?

6          A.    That is Billingsgate Road.

7          Q.    I'm sorry?

8          A.    Bishopsgate Road, sorry.

9          Q.    I'm sorry, I just couldn't hear you.

10               If we can play the video.  (Playing video.)

11               Did you also provide law enforcement with

12 another angle from cameras from your home?

13         A.    Yes, sir.

14         Q.    And if we could play Government's 360,

15 please.

16               (Playing video.)

17               MR. HOFF:  Your Honor, I don't have any

18 further questions for Mr. Davis.

19               THE COURT:  All right.  Thank you.

20               Mr. Ganguli?

21               MR. GANGULI:  No questions, Your Honor.

22               THE COURT:  Thank you.  Mr. Lucas?

23               MR. LUCAS:  No questions.

24               THE COURT:  Mr. Mothershead?

25               MR. MOTHERSHEAD:  No questions, Your Honor.
```

1          THE COURT:  And Mr. Bloom?

2          MR. BLOOM:  No questions, Your Honor.

3          THE COURT:  All right.  Thank you.  You may

4   step down, Mr. Davis.

5               *****WITNESS EXCUSED*****

6          THE COURT:  All right.  How long would you

7   expect the government's next witness to take?

8          MR. HOFF:  Maybe 20 minutes, Your Honor.

9          THE COURT:  All right.  If you're in the

10  jury box, raise your hand if you want a break now.

11          All right.  Raise your hand if you would

12  just as soon squeeze in one more witness and then break.

13          All right.  Looks like we have a democracy

14  going here.  We'll have the -- we'll proceed ahead.

15  We'll do one more witness and then break for our noon

16  hour.

17          MR. HOFF:  Your Honor, the government calls

18  Matthew Fracker.

19          THE COURT:  You may come forward.

20                  **MATTHEW FRACKER**

21   called as a witness, after having been first duly sworn,

22  testified as follows:

23                  **DIRECT EXAMINATION**

24  BY MR. HOFF:

25          Q.   Sir, can you please state and spell your

1    name for the record.

2          A.    Matt Fracker.  M-a-t-t, F-r-a-c-k-e-r.

3          Q.    Sir, where did you work in March of 2017?

4          A.    With the La Vergne Police Department.

5          Q.    And did you retire from that job?

6          A.    Yes.

7          Q.    And you switched careers?

8          A.    Yes.

9          Q.    Okay.  And on March 1 of 2017, were you

10   involved in a carjacking investigation as part of your

11   work?

12          A.    I was.

13          Q.    How did you become involved in this

14   investigation?

15          A.    I was on my way in that morning and heard

16   radio traffic that the -- the call had come out where I

17   was at.  I was able to get in front of the vehicle and

18   stop it.

19          Q.    And what was the call that came out?  What

20   was it for?

21          A.    It was an armed robbery carjacking, three

22   Hispanics males that had stolen a gold Honda Civic.  And

23   there was also a silver SUV involved.

24          Q.    And you mentioned you were on your way in

25   to work?

1      A.    Correct.

2      Q.    And so what happened as you were on your

3 way in to work?

4      A.    I could hear the radio traffic going on,

5 and I knew the location of the officers trying to catch

6 up to the suspect vehicles.  There had been a storm that

7 morning, so traffic was backed up on Murfreesboro Road

8 going into Nashville, and the suspects were caught in

9 traffic.  So I was able to get ahead of them.  And once I

10 spotted the suspect vehicles, I pulled through the median

11 and blocked the car with my car.

12      Q.    Which car did you block?

13      A.    The gold Honda.

14      Q.    And when you blocked it, what did you do?

15      A.    I activated my light, blue lights.  I got

16 out and kind of stood back.  I knew there was a gun

17 involved at that point, so I didn't want to get involved

18 in any kind of crossfire with the other officers that

19 were coming up from behind.  Once the officers made

20 contact with the suspect vehicle, the gold Civic, I went

21 around and went to the driver's side of the Civic.

22      Q.    And did you -- were the -- how many people

23 were in the gold Civic?

24      A.    There were two Hispanic males in the gold

25 Civic.

1       Q.      Were they both arrested?

2       A.      Yes.

3       Q.      Did you ultimately identify the passenger

4  of the vehicle?

5       A.      Yes.

6       Q.      And who was that?

7       A.      Aaron Alvarez.

8       Q.      I want to show you Government's

9  Exhibit 1302.  Do you recognize this person?

10       A.      That's Aaron Alvarez.

11       Q.      And that was the passenger in the vehicle?

12       A.      Correct.

13       Q.      After -- was he removed from the vehicle --

14       A.      Yes.

15       Q.      -- Mr. Alvarez?  Okay.  The driver as well?

16       A.      Both occupants were removed, yes.

17       Q.      After they were removed from the vehicle,

18  were they placed in handcuffs?

19       A.      Yes.

20       Q.      Did you take photographs of the gold Civic

21  as it was on the street?

22       A.      Yes.  I wanted to get photographs as it was

23  before it was moved.

24       Q.      If you could look in a binder there, I

25  think it's the top binder.  Yes.  If you could take a

1  look at Exhibits 1307 and 1308.

2          A.    All right.  I'm on 1307.

3          Q.    If you could look at 1307, and then turn

4  and look at 1308.

5          A.    Yes.

6          Q.    Do you recognize those photographs?

7          A.    Yes.

8          Q.    Are those photographs that you took?

9          A.    Yes, with my city cell phone.

10          Q.    Was it on this date that we're speaking of?

11          A.    Yes.

12          MR. HOFF:  Your Honor, at this time, the

13  government would move to admit Government's Exhibits 1307

14  and 1308.

15          THE COURT:  Seeing no objection, those will

16  be admitted, 1307, 1308.

17          (Government Exhibits Nos. 1307 and 1308

18  were admitted.)

19          MR. HOFF:  Your Honor, if I may publish

20  them for the jury.

21          THE COURT:  You may.

22   BY MR. HOFF:

23          Q.    If we could show Government's Exhibit 1307.

24  What is this a photograph of?

25          A.    That's the gold Honda Civic that was

1  carjacked.

2          Q.    Did you notice anything when you pulled --

3  or when you stopped this car and after you had got

4  everyone out?

5          A.    As I made contact with the driver,

6  obviously we had them with their hands up and told them

7  not to move.  When I opened the door to get the driver

8  out, I observed a handgun between the driver's seat and

9  the driver's side floorboard there next to the door.

10          Q.    If we could show Government's Exhibit 1308.

11  And if we could zoom in around the bottom of the car

12  there.

13                What is this a photograph of, Mr. Fracker?

14          A.    That's the handgun.  It's a Smith & Wesson

15  handgun.

16          Q.    And you mentioned there was a second

17  vehicle involved; is that right?

18          A.    Yes.

19          Q.    And can you describe what that vehicle was?

20          A.    It was directly behind the gold Civic in

21  traffic.

22          Q.    What kind of car was it?

23          A.    It was a silver -- I believe it was a Ford

24  SUV.

25          Q.    And what happened to that car?

         A.    As we were dealing with the gold Civic,
other officers had come up behind -- because they knew
the silver Ford was involved.  And as they were trying to
make contact with him, he turned -- made a sharp left
turn down the median, it was kind of a steep ditch, and
then turned to the opposite lane of travel going
eastbound towards Smyrna on Murfreesboro Road.

         Q.    Did anyone ever stop that car as far as you
know?

         A.    They -- officers gave chase, but the
vehicle got away.

         Q.    After this arrest, was the car, the gold
Honda, taken somewhere to be searched?

         A.    Yes.  It was taken into the police
department sally port and searched.

         Q.    Were you present for that?

         A.    Yes.

         Q.    At the time was the firearm removed from
the vehicle?

         A.    Say again.

         Q.    Was the firearm that was shown in your
photograph, 1308, was that taken out of the car?

         A.    Yes.  During the search, yes.

         Q.    And was that photographed?

         A.    Yes, it was.

1       Q.   Were you present for all of that?

2       A.   Yes.

3       Q.   If you could, in that same binder, look at

4 Government's Exhibits 1304 through 1306.

5       A.   Okay.

6       Q.   And do you recognize those photographs?

7       A.   Yes.

8       Q.   What are those photographs of?

9       A.   That was the handgun that was removed from

10 the gold Civic.

11       Q.   Were you present when those were taken?

12       A.   Yes.  I'm the one holding the gun.

13       MR. HOFF:  At this time, Your Honor, the

14 government to move to admit Government's Exhibits 1304,

15 1305, and 1306.

16       THE COURT:  All right.  Absent objection,

17 1304, 1305, and 1306 are admitted and may be published.

18       (Government Exhibits Nos. 1304, 1305, and

19 1306 were admitted.)

20 BY MR. HOFF:

21       Q.   If we could look at Government's

22 Exhibit 1304.  Do you recognize this?

23       A.   Yes.

24       Q.   What's that?

25       A.   That's the handgun that was removed from

1  the vehicle --

2          Q.    And --

3          A.    -- the gold Civic.

4          Q.    I'm sorry, I didn't mean to interrupt you.

5                Is there a caliber and model on there?

6          A.    Yes.  .40 Smith & Wesson, or S&W.

7          Q.    If we could turn to Government's

8  Exhibit 1305.  What is that -- what is shown in that

9  photograph?

10          A.    That is me holding the gun, ejecting a

11  round from the chamber.

12          Q.    So was the gun loaded when you removed it

13  from the car?

14          A.    It was.

15          Q.    If we could show Government's Exhibit 1306.

16  And I know this is upside down, but can you describe

17  what's shown in that photograph?

18          A.    That's the serial number of the handgun.

19          Q.    And what is that serial number?

20          A.    P as in Paul, A as in alpha, M as in Mary,

21  3966.

22          Q.    After this arrest, was that firearm

23  submitted to the Tennessee Bureau of Investigation

24  Firearms Unit for testing?

25          A.    Yes.

1      Q.    Later was that firearm -- what happened to

2  that firearm?

3      A.    It was, I believe, traded in.  Once -- once

4  the case was adjudicated on the state side, the firearm

5  was awarded to the La Vergne Police Department.  It was

6  then, in turn, traded in for what eventually became our

7  new duty weapons for the police department.

8      Q.    Is that common with the La Vergne Police

9  Department?

10      A.    Yes.

11      Q.    Okay.

12            MR. HOFF:  I have no further questions for

13  this witness, Your Honor.

14            THE COURT:  All right.  Thank you.

15            Any questions, Mr. Ganguli?

16            MR. GANGULI:  No questions, Your Honor.

17            THE COURT:  All right.  Ms. Hood-Schneider?

18            MS. HOOD-SCHNEIDER:  No questions.

19            THE COURT:  Mr. Mothershead?

20            MR. MOTHERSHEAD:  No questions.

21            THE COURT:  And Mr. Bloom?

22            MR. BLOOM:  No questions.

23            THE COURT:  Thank you, sir.  You may step

24  down.

25            *****WITNESS EXCUSED*****

1                 THE COURT:  All right.  Well, I think we

2    probably beat our timing by a little bit.  So it's just

3    about 12:15, and we'll take about an hour for the

4    noontime break and ask everyone to be back by 1:15.

5    Thanks for your continuing attention.

6                 The jurors may step down.

7                 (Whereupon, at 12:14 p.m. the jury retired

8    from open court.)

9                 THE COURT:  All right.  Thank you, please

10   be seated.

11                All in all, Mr. Safeeullah, how do you

12   think we're doing on time?

13                MR. SAFEEULLAH:  Doing pretty well,

14   Your Honor.

15                THE COURT:  Good.  I'm glad to hear that.

16   That's encouraging, if not conclusive, on timing and

17   efficiency.

18                All right.  Anything we need to talk about

19   before the break?

20                MR. SAFEEULLAH:  Not for the United States.

21                THE COURT:  Anything from any defense?

22                MS. HOOD-SCHNEIDER:  On behalf of

23   Mr. Flores, I have a question in regards to -- I guess

24   just to say it frankly, will the Court allow, I guess, a

25   cross-examination of a cross-examination?  Kind of what

1  we were just talking about, if one defense attorney
2  cross-examines a witness after another defense attorney
3  cross-examined that witness, and that subsequent defense
4  attorney opens doors that the prior defense attorney
5  needs to cross -- how would the Court handle that or if
6  that's even possible?

7          THE COURT:  Well, I will tell you what.
8  And I think I understand your question.  It's like, well,
9  if you're going first in the order, you know, you may
10 like to go again, not only after the government
11 necessarily, but also after another defense counsel.

12          My belief is a couple of things.  Unless I
13 can be convinced that there's some sort of due process
14 right to allow that, I'm disinclined to do that.  I do
15 think there's a concern that, well, gee, if I go earlier
16 in the lineup, then I may be more prone -- so if you're
17 second out of four, you're, on average, a little bit more
18 prone to having that happen to you.  That's your
19 situation, Ms. Hood-Schneider.

20          If counsel really think that's a problem, I
21 think they need to probably maybe agree to sort of switch
22 up the order.  But I do think the general notion is that,
23 you know, the idea is to be able to cross-examine the
24 witness with -- when your time comes, cross-examine the
25 witness with whatever you think is relevant, and if

someone after you goes into something that you didn't

cover, I think it's just one of those things.

If I can be persuaded otherwise, then I'll

be happy to take it up, but I do think the idea is for

each counsel who, I think, with -- you know, they should

all have, really, the same discovery or at least very,

very similar discovery.

I suppose there could be an argument under

Rule 16 that some defendants, you know, get some

information that other codefendants don't get, but you're

dealing with the same information that you've received.

You know your client's objectives.  If someone else that

cross-examines after you raises something where it turns

out that they kind of opened something that you wish

you'd gone into, I sort of understand that, but I don't

think it is grounds to have, essentially, another shot at

cross in response to what a codefendant did.  That's my

current position.  If anyone convinces me otherwise, I'm

happy to revisit.

All right.  Anything else that we need to

talk about at this time?  No.

All right.  Thank you, Counsel.  We stand

in recess.

(Whereupon, a break was taken from

12:19 p.m. to 1:21 p.m.)

1          THE COURT:  Thank you.  Please be seated.

2          All right.  If we'd call in our jury,

3  please.  Thank you.

4          (Whereupon, at 1:22 p.m. the jury returned

5  to open court.)

6          THE COURT:  All right.  Thank you for your

7  continued attention and service, folks.

8          The government wishes to call its next

9  witness, please.

10          MR. HOFF:  Your Honor, the government calls

11  Connor Lamberson.

12          THE COURT:  All right.

13                    **CONNOR LAMBERSON**

14  called as a witness, after having been first duly sworn,

15  testified as follows:

16                    **DIRECT EXAMINATION**

17  BY MR. HOFF:

18      Q.    Sir, can you please state and spell your

19  name for the record.

20      A.    My name is Connor Lamberson.  First name is

21  C-o-n-n-o-r.  Last name Lamberson, L-a-m-b-e-r-s-o-n.

22      Q.    Sir, where do you work?

23      A.    I'm employed by the Tennessee Bureau of

24  Investigation here in Nashville, Tennessee.

25      Q.    And is that TBI, for short?

1       A.    Yes, sir.

2       Q.    What do you do for TBI?

3       A.    I am a special agent forensic scientist

4 supervisor in the Firearm and Toolmark Identification

5 Unit.

6       Q.    And as part of that -- as part of your job,

7 what do you do for a living?

8       A.    So one of my main responsibilities right

9 now is supervising the individuals in my unit.  The other

10 major portion of my job is doing microscopic comparisons

11 of cartridge cases, bullets, and other fired components

12 to see if I can determine a common origin between those

13 items.

14      Q.    As a supervisor for your unit, what are

15 your responsibilities in that role?

16      A.    So I look at professional development of

17 the agents underneath me.  I also deal with time entry,

18 leave requests, things of that nature.

19      Q.    Are you also the technical leader for the

20 State for TBI?

21      A.    Yes, sir, I am.

22      Q.    What are your responsibilities for that

23 position?

24      A.    As the technical leader, any policy

25 decisions for the unit will roll through my office.  I

1  also make decisions that come up during case work for

2  other examiners.  So if there is an issue or discrepancy

3  with wording in policy or how a certain piece of evidence

4  should be handled, I would be the person making the

5  decision on how that's done.

6        Q.    How many firearms examiners are in your

7  unit?

8        A.    We currently have nine examiners with two

9  more on the way.

10        Q.    Are you responsible for training those two

11  more that are on the way?

12        A.    Yes.  So I also overlook the training

13  program, and we will have individual training officers

14  made up of other agents in the unit assigned to those

15  individuals.

16        Q.    Are you responsible for the accreditation

17  requirements for your unit?

18        A.    Yes, I am.

19        Q.    Is your -- is the lab where you work in the

20  firearms unit, is that accredited?

21        A.    Yes, we are.  We are accredited by ANAB.

22        Q.    What is ANAB?

23        A.    It stands for the ANSI National

24  Accreditation Board, and ANSI is the American National

25  Standards Institute.

1        Q.    How long have you worked for TBI?

2        A.    I've worked at TBI since September of 2016.

3        Q.    Have you always been in the firearms unit?

4        A.    Yes.  Ever since I was employed, I was

5 employed directly into that unit.

6        Q.    When did you become the supervisor of that

7 unit?

8        A.    I became the supervisor in February of '21

9 and overlapped briefly with the outgoing supervisor at

10 the time.

11        Q.    Prior to becoming the supervisor of the

12 firearms unit at TBI, what did you do?

13        A.    I was a special agent forensic scientist,

14 and I did primarily bench work on cases that were

15 submitted to the TBI.  And I also was a member of the

16 Violent Crime Response Team.

17        Q.    What is the Violent Crime Response Team?

18        A.    It's a crime scene team made up of

19 individuals from every unit at TBI in the Forensic

20 Services Division.  We will go out to scenes of

21 particularly heinous crimes or crimes that rise above the

22 level that the local agency can handle based on the

23 resources that they have available to them.  So at the

24 request of the district attorney in that particular

25 region or some other high-ranking law enforcement agent,

1  we would respond to a crime scene and work the evidence

2  there.

3          Q.      Prior to working at TBI, what did you do?

4          A.      I was at Vanderbilt University here in

5  Nashville, Tennessee, working on my doctorate in organic

6  chemistry.

7          Q.      And what did you get your degree in?

8          A.      It was in organic chemistry with

9  certification in chemical biology.

10         Q.      Was that your doctorate degree?

11         A.      Yes, sir, it was a doctorate degree.

12         Q.      What was your undergraduate degree in?

13         A.      It was in chemistry with an ACS

14  certification.

15         Q.      What is an ACS certification?

16         A.      ACS is the American Chemical Society and

17  for -- to receive that certification, you have to take a

18  set number of chemistry courses above and beyond what is

19  standard for the typical chemistry degree.

20         Q.      And how long did you work on your doctorate

21  degree?

22         A.      I was there for almost five years.  I

23  defended -- in May of 2017 I defended my thesis.  So I'd

24  already begun my employment at TBI, at which time I

25  wrapped up the thesis part of the work.

1     Q.   So you made the switch from chemistry to

2 firearms?

3     A.   Yes, that's correct.

4     Q.   And why did you decide to do that?

5     A.   It sounded a lot more exciting than

6 chemistry.  I had some other job options available, but I

7 didn't want to leave the state.  I liked it here and

8 decided to look for other opportunities.  At that time, I

9 applied with TBI and was granted that opportunity.

10     Q.   Can you briefly describe the subject matter

11 of your specialty in the firearms unit?

12     A.   Sure.  So in the firearms unit, our bread

13 and butter is looking at firearms and fired ammunition

14 components.  And the main thing we do is microscopically

15 examine those fired components together, with each other

16 and with test-fired examples from other firearms that are

17 submitted to us, again, trying to determine if we can

18 find a common origin for all of those items.

19       We also do serial number restorations on

20 firearms and other items.  We do distance determination

21 on clothing, and we also enter cartridge cases into the

22 NIBIN database.

23     Q.   What is the NIBIN database?

24     A.   NIBIN stands for the National Integrated

25 Ballistics Information Network.  It's a network set up by

1   the ATF, and you enter fired cartridge cases onto that

2   system.  Those images that the system takes are sent off

3   to a central database where they crunch the numbers

4   behind the photographs.  There's an algorithm involved

5   that I'm not privy to.

6            But at that time, once the data has been

7   looked at, they send back correlations to a viewing

8   station in our unit.  At that time, we can look at images

9   that came back as potential hits for the cartridge cases

10  that we put on.  And if we see agreement, we can call

11  that extra evidence in for a comparison.

12       Q.   So it's like a -- in those initial -- those

13  initial looking at the images, that's not a confirmation.

14  It's like an initial review?

15       A.   Yes, that's correct.  We call that

16  correlation review.

17       Q.   And you mentioned firearms components.

18  What exactly does that -- do you mean by that?

19       A.   So for a firearm -- firearms components,

20  I'm sorry?

21       Q.   Like, what -- you mentioned the term fired

22  cartridge casing.  What exactly is that?

23       A.   Okay.  So a fired cartridge case would be a

24  component of ammunition.  A typical center-fired

25  cartridge case is going to be made up of four components.

1  You've got the cartridge case, the primer, the gun

2  powder, and the bullet.  So the cartridge case sits right

3  in the middle of everything.  It holds the gun powder

4  inside of it.  It holds the bullet in the mouth of that

5  cartridge case, and then it holds the primer on the rear

6  of that cartridge case.

7        Q.    And what is the -- what is a toolmark?

8        A.    A toolmark is essentially the transfer of

9  marks that are on a tool, from a hard surface tool to the

10  softer surface of the workpiece.

11        Q.    And in your line of work, what does that --

12  what does that mean?

13        A.    So for us, we do two types of examinations.

14  We do firearms examinations.  Firearms are a tool.  So

15  that is a subset of toolmark identification.  We also do

16  a toolmark analysis on what typically pops into your mind

17  when you think of a tool.  So a pair of bolt cutters or

18  pliers, things of that nature.

19        Q.    So a firearm, in your line of work, is a

20  tool?

21        A.    Yes, sir, that's correct.

22        Q.    And can you briefly describe -- I'm sorry.

23  Can you tell us about what type of specialized training

24  you've had in the field of firearms and toolmark

25  identification?

         A.    Yes.  So I went through a two-year training
program at TBI with an in-house training officer.  During
that time, I also completed an approximately year-long
academy.  It was the National Firearms Examiner Academy
and that was put on by the ATF in the DC area.  It
consisted largely of the same types of exercises and
training components, but it was additional training that
I was able to receive there.

              Since that time, I've also been trained to
do NIBIN entries, so trained to use the equipment to
enter cartridge cases into that database.  And I've also
been to training and recognized as an authorized trainer
to get other individuals access to that system.

         Q.    Have you also trained others in the area of
firearms and toolmark identification?

         A.    Yes.  I have trained one examiner at this
point.

         Q.    You've mentioned the phrase microscopic
comparison.  What does that mean?

         A.    Microscopic comparison, in my line of work,
is looking at two items at the same time under
magnification and moving them next to each other, further
away from each other, at the same time.

         Q.    And why do you do that?

         A.    We do that so that we can see down further

than the naked eye can see.  So we can bump magnification
up to 10X, 20X, or further if we need to, to look at the
microscopic marks that are left behind on different
pieces of evidence.

       Q.    And what type of microscope do you use?

       A.    We use a comparison microscope specifically
made by Leica Microsystems.  These microscopes are
basically two compound microscopes similar to what you
would see in an undergraduate biology lab or maybe on TV.
These two microscopes are linked by an optical bridge,
and they come together at the top through an eyepiece.
It looks like a pair of binoculars at the top.  So
whenever you look through that set of binoculars, you can
see both pieces of evidence on either stage of that
microscope.

       Q.    How many microscopic comparisons of
evidence have you done?

       A.    I've done hundreds through training and
casework.

       Q.    And how many of those have involved entry
into the NIBIN network?

       A.    Probably almost all of them.  So the
majority of cases that we touch do also go onto the NIBIN
network.

       Q.    And do you also test fire guns as part of

1    your job responsibilities?

2           A.    Yes, I do.

3           Q.    And what does that exactly entail?

4           A.    So whenever a firearm is submitted to my

5    unit at TBI, we will -- the first thing we do is we look

6    at the firearm and do a bench analysis of it.  So we're

7    checking safety features, looking for damage, and

8    essentially determining whether or not that firearm is

9    safe to fire.

10           Once we've reached that conclusion, that,

11    hey, we can safely fire this in our range, we take the

12    gun with live ammunition into our firing range inside of

13    the unit, and we do a couple different things.  We'll

14    test fire each firearm into a water tank.  It's just a --

15    it's literally a massive metal tank of water.  And we do

16    that to collect bullets in a more or less pristine

17    condition so that we can save those and retain them on

18    file for future analysis, if need be.

19           And we also test fire each firearm down

20    range at least twice, the whole goal being to see whether

21    or not that firearm functions as it should.  So whenever

22    you load two cartridges in the magazine and you pull the

23    trigger, does it only fire one of them, does it fire

24    multiple, does it cycle the next cartridge into the

25    chamber, things like that.

1      Q.    So to make sure it works?

2      A.    Yes.

3      Q.    And when you're doing microscopic

4 comparisons of evidence, what are you looking for when

5 you do that?

6      A.    We're looking for two major classes of

7 characteristics.  So the first one is class

8 characteristics, and the more selective set would be the

9 individual characteristics.

10     Q.    And is this when you're looking at

11 cartridge casings?

12     A.    It's cartridge cases and bullets.

13     Q.    So what are class characteristics?

14     A.    Class characteristics are characteristics

15 that are predetermined by the manufacturer.  And what

16 that means is there was an engineer or somebody else in

17 the design department that said the breach face of this

18 firearm will look this way.

19          So, for instance, a Glock pistol will have

20 a rectangular firing pin aperture and the extractor and

21 the ejector will be located in the same spot, and every

22 Glock pistol made is going to have those same class

23 characteristics.

24          Similar thing for the barrels.  Whenever

25 rifling is created, the manufacturer determines how many

1 lands and grooves are cut into that barrel, the

2 dimensions of those lands and grooves, as well as the

3 caliber of the barrel. So those are the class

4 characteristics.

5 Q. I want to talk about some of those terms

6 you used. What's a breach face?

7 A. So a breach face is where whenever a

8 cartridge is loaded into a firearm, the back end of it,

9 where the primer is, sits up against the breach face. So

10 if this is the cartridge, this is the breach face, they

11 come together like that. And there's a hole in the

12 middle of that breach face where the firing pin can come

13 out and strike the primer whenever the trigger is pulled.

14 Q. Is that how a gun is fired, essentially?

15 A. Yes.

16 Q. Now, you also used -- you also mentioned

17 the terms lands and grooves. What are those?

18 A. So the lands and grooves are inside of a

19 barrel, and they are -- they're put there to stabilize a

20 bullet in flight. So the grooves are typically cut out

21 during manufacture. They'll be the low spots, and the

22 lands will be the high spots in those barrels. What they

23 do is they grab onto the soft jacketing material on a

24 bullet, and they impart the spin on it. So they can be

25 oriented to the right or the left. You could have as few

1   as -- we see three lands and grooves pretty commonly, all
2   the way up to eight or nine, just depends on what the
3   manufacturer requires.
4          Q.    So those lands and grooves in the firing
5   pin, those are specific to different firearms
6   manufacturers?
7          A.    That's correct.
8          Q.    And after -- let me rephrase.  So those are
9   class characteristics.  Are there any others that you
10  look for when you're looking for class characteristics?
11         A.    That covers class fairly -- pretty well.
12         Q.    Is that the first part of what you're
13  looking for when you do an examination?
14         A.    Yes, that's the first thing we evaluate
15  for.
16         Q.    And if you're looking at two pieces of
17  evidence and they have similar class characteristics,
18  what do you look for next?
19         A.    We would move on with the examination at
20  that point, and the next thing I would look at is
21  individual characteristics.
22         Q.    What are individual characteristics?
23         A.    Individual characteristics are microscopic
24  imperfections from the tool that are transferred to the
25  workpiece, so to the cartridge case or to the bullet.

1          Q.    And when you say the tool, in this

2   particular instance, what are you referring to?

3          A.    To the firearm.

4          Q.    And are those -- when you say it's

5   individual to that tool, what does that mean exactly?

6          A.    So all of these individual characteristics

7   arise from multiple different places.  The first one is

8   during the manufacturing process so that you're cutting

9   these hard metals to make a firearm.  The tools that you

10  use to make those cuts on the metal change over time.

11  They sustain damage, they wear out, they get blunt, and

12  you start to leave different marks on the firearm at that

13  time.

14              Additionally, once that firearm goes into

15  circulation, the use and abuse of a firearm can also

16  cause further individuality.  So use, just repeated

17  firing over and over, can change marks over time.  And

18  then things like rust or corrosion.  So if a gun is left

19  out in the rain or if you sweat a lot and you carry it,

20  that can also cause corrosion and change those individual

21  characteristics.

22         Q.    So I just want to make sure I'm clear.

23  Class characteristics are for a number of firearms, and

24  individual are to an individual firearm?

25         A.    That's correct.

1    Q.    Approximately how many firearms have you

2  test fired?

3    A.    I've easily test fired over a thousand at

4  this point.

5    Q.    And have you previously testified as an

6  expert on the subject of firearms and toolmark

7  identification?

8    A.    Yes, I have.

9    Q.    Approximately how many times?

10    A.    Eight times.

11    Q.    And which courts?

12    A.    They've all been state courts.  I've

13  testified three times in Montgomery County, and one time

14  in Cheatham County, Bedford County, Hamilton County,

15  Sumner County, and Marion County.

16    Q.    And are those all in Tennessee?

17    A.    Yes, sir, they are.

18         MR. HOFF:  Your Honor, at this time, the

19  government would offer Mr. Lamberson as an expert in

20  firearms and toolmark identification.

21         THE COURT:  All right.  Any objection to

22  that?

23         All right.  Mr. Lamberson will be permitted

24  to testify under Rule 702.

25

BY MR. HOFF:

Q.    Mr. Lamberson, did you conduct some microscopic comparisons in this case?

A.    Yes, I did.

Q.    Did you have the opportunity to examine four .40 caliber cartridge casings from a Metro-Nashville Police Department case?

A.    Yes, I did.

Q.    And did you compare those cartridge casings with test fired cartridge casings?

A.    I also did that, yes.

Q.    Did you author a report based on your comparisons and your determinations?

A.    Yes, sir.

Q.    Are your reports -- well, are your examinations peer reviewed?

A.    Yes, they are.  They go through a three-step process -- or a three-step peer review process.  So whenever I reach a microscopic conclusion, the first step is a verification.  So another Court-qualified examiner within the Firearms Unit would take that evidence and also microscopically examine it and tell me whether or not he agrees with my conclusion.

The next step is a technical review.  So another individual will come in and technically review

1   all of my records to make sure that policies and

2   procedures were followed.

3              And the final step in that process is an

4   administrative review, where a supervisor or other senior

5   examiner will look over the case file, make sure the

6   report is correct, check for grammatical errors, page

7   numbers, and other miscellaneous administrative items.

8        Q.    And did that happen in this case here?

9        A.    Yes, it did.

10       Q.    Does it happen in every case?

11       A.    Yes, sir, it does.

12       Q.    If you could turn, there's some binders

13  there.  And one of them, I believe, is 1 through 435.  Do

14  you see that?

15       A.    Yes.

16       Q.    If you could turn to Exhibit 393.  If you

17  could just let me know when you're there.

18       A.    I am here.

19       Q.    Okay.  If you could take a moment, look at

20  that exhibit.

21       A.    (Complies.)

22       Q.    Should be four pages; is that correct?

23       A.    Yeah, just one moment.  (Complies.)

24             Okay.

25       Q.    What is that that you just reviewed?

1      A.     These are the two official reports that I

2  authored on this case.

3              MR. HOFF:  Your Honor, at this time, the

4  government would move to admit Government's Exhibit 393.

5              THE COURT:  Absent objection, 393 will be

6  admitted.

7              (Government Exhibit No. 393 was admitted.)

8   BY MR. HOFF:

9      Q.     If we could pull up, please, page 1 of

10  Government's Exhibit 393.

11             And, Mr. Lamberson, what are we looking at

12  here?

13     A.     This is the template of an official

14  firearms report that is generated by the Firearms Unit at

15  the TBI.  And within that report are the items that I

16  looked at, basic chain of custody on those items, and

17  then my findings.

18     Q.     Okay.  And there's -- the items that you

19  looked at, are those listed as exhibits?

20     A.     Yes, sir, they are.

21     Q.     And what were those items?

22     A.     Those items were Exhibits 1A through 1D.

23  And they were all .40 Smith & Wesson caliber cartridge

24  cases, one each.

25     Q.     And does it say -- what does it list for

1   each one of those?

2          A.    So Exhibit 1A is one .40 Smith & Wesson

3   caliber cartridge case from Aldersgate Road/Bishopsgate

4   Road.  1B, one .40 Smith & Wesson caliber cartridge case

5   from Aldersgate Road/Bishopsgate Road.  1C was one .40

6   Smith & Wesson caliber cartridge case from Aldersgate

7   Road and Bishopsgate Road.  And 1D was one .40 Smith &

8   Wesson caliber cartridge case from Aldersgate Road and

9   Bishopsgate Road.

10         Q.    We can take it down.

11               May I please have Government's Exhibit 24.

12   It's a physical piece of evidence.  It should be four

13   cartridge casings.

14               If I could have you take a look at

15   Government's Exhibit 24, which is being passed up to you

16   now.  Do you recognize that?

17         A.    Yes, sir, I do.

18         Q.    Okay.  What are -- what is that that you're

19   looking at, Government's Exhibit 24?

20         A.    This is the evidence that contains

21   Exhibits 1A, 1B, 1C, and 1D for this particular report,

22   as well as the outer packaging that was submitted with

23   that.

24         Q.    Are those the items that you conducted a

25   microscopic comparison on?

1       A.    Yes, they are.

2       Q.    And what caused your -- you to conduct the

3  microscopic comparison of those items?

4       A.    So these items were submitted to our agency

5  with a request to confirm a NIBIN hit that was generated

6  by our laboratory system as well.

7       Q.    And when you say a NIBIN hit, what exactly

8  does that mean?

9       A.    So in this particular instance, a

10  test-fired cartridge case was entered into the NIBIN

11  system.  That examiner reviewed the images that came back

12  as correlations and found one image that, in particular,

13  we reported as a possible association.  And whenever we

14  report that out, we request that, if you need this

15  confirmed microscopically, to please send that back -- or

16  send all that evidence to the TBI for microscopic

17  comparison.

18       Q.    So when you first received those items,

19  what did you do?

20       A.    The first thing that I did was open the

21  packaging and started documenting the evidence that was

22  submitted to me.  Once I had documented everything in

23  full, I moved on to microscopic examination of these four

24  cartridge cases and generated notes in my opinion on a

25  conclusion for those four items.

1      Q.    What do you document when you're first

2 documenting these items?

3      A.    So we're documenting the type of metal that

4 the cartridge cases are made of.  So is the primer a

5 nickel or brass?  Is the cartridge case nickel or brass?

6 We're looking at the head stamp to see what caliber the

7 cartridge case is and the manufacturer of that particular

8 cartridge case.

9      And then I'm also taking note of the class

10 characteristics of the cartridge case.  So what shape is

11 the firing pin impression, what shape is the aperture, if

12 I can see one on there, where are the extractor and

13 ejector marks.  And then I'm also making notes of the

14 individual characteristics that I observe on each

15 individual item.

16      Q.    And is that when you're doing that with the

17 microscope?

18      A.    Yes, sir, I do use a microscope at that

19 time.

20      Q.    So when you first -- you have these four

21 items.  Do you compare them to each other?

22      A.    Yes.  So once I've completed my note-taking

23 or documentation of the items, I'll microscopically

24 examine each one in conjunction with each other.

25      Q.    Why do you do that?

1         A.    We do that to, A, make sure you look at all
2    of the evidence, and, B, we're looking for
3    reproducibility of those individual characteristics and
4    the patterns that they're left behind in.  So you have to
5    look at every single piece of evidence to determine if
6    that reproducibility criteria was met.
7         Q.    And when you say reproducibility criteria,
8    what do you mean by that?
9         A.    So we're looking for sufficient agreement
10   of those individual characteristics.
11        Q.    What is -- when you say sufficient
12   agreement, what does that mean?
13        A.    Sufficient agreement means that the
14   individual characteristics -- well, let me back up.
15              Sufficient agreement of individual
16   characteristics is what is needed for an examiner to
17   render a conclusion of common origin.  So were these
18   items generated by this tool?  So sufficient agreement
19   itself is referring to those individual characteristics.
20   We're looking at -- they could be scratches, dents,
21   burrs, 3D anomalies and other types of visual
22   characteristics that are all laid out in a pattern.
23              Sufficient agreement specifically means
24   that that pattern is better than the similarities that
25   I've seen between toolmarks or, in this case, cartridge

cases that were known to have been generated by a
different source.  And it's also consistent with the
agreement that I've seen whenever two cartridge cases
came from the same source.  So, in other words, it raises
above the best agreement I've seen between two marks
created by different tools and is consistent with marks
that were created by the same tool.

      Q.    And when -- again, in this particular
instance when you use the term tool, are you referring to
a firearm?

      A.    Yes, sir, I am.

      Q.    Okay.  So when you -- you compared those
four cartridge casings to each other.  And were you able
to make -- was there sufficient agreement amongst class
characteristics for those four items?

      A.    Yes, there was.

      Q.    And was there sufficient agreement amongst
individual characteristics?

      A.    Yes, there was.

      Q.    And so did you make a determination
regarding those four cartridge casings as to each other?

      A.    Yes, I did.  My determination was that,
based on the comparative microscopic examinations and the
sufficient agreement of class and individual
characteristics, that they were all fired from the same

1  unknown firearm.

2        Q.    Now, after you made that determination for

3  those four cartridge casings, did you compare those with

4  something else?

5        A.    Yes.  The next thing I did was compare them

6  with test-fired cartridge cases from a firearm.

7        Q.    And when you say -- I just want to be

8  clear.  Test-fired cartridge cases are what?

9        A.    Test-fired cartridge cases are, for my

10  purposes, cartridge cases that myself or another examiner

11  has generated within our unit.  So these would come from

12  that test-firing step and the examination of a firearm

13  when it's submitted.  The cartridge cases, whenever the

14  gun is fired, are collected and retained on file.  So in

15  this instance, I pulled test-fired cartridge cases from

16  our file.

17        Q.    If we could turn to page 3 of Government's

18  Exhibit 393.  And do you recognize this?  It should be on

19  your screen there.

20        A.    Yes.  This is a copy of my official report.

21  It is a supplemental report covering my examination of

22  the test-fired cartridge cases.

23        Q.    And what are the exhibits listed under

24  there?

25        A.    There is one exhibit, it is Exhibit 4A.

It's listed as a Smith & Wesson model SW40C, .40 Smith & Wesson caliber pistol, Serial No. PAM3966 with magazine from vehicle.

Q.    And what did you -- how many test-fired cartridge casings did you look at from that firearm?

A.    I looked at -- I believe it was five test-fired cartridge cases from that firearm.

Q.    And what do you do when you first begin looking at those test-fired cartridge cases?

A.    So the -- we're doing the same basic thing as whenever you look at evidence, but in this instance, it's a known -- they were known from the same source.  So I'm looking at these five items together to see what type of pattern that this firearm leaves behind on cartridge cases, and I'm looking to see if that pattern is reproducible.

Q.    Okay.  And when you looked at the test-fired cartridge casings, were you looking at -- was there sufficient agreement among the class characteristics for those test-fired cartridge casings?

A.    Yes, there would have been.  So I verified through my work that all five of those were from the gun they said they were, and that would be the sufficient agreement portion.

Q.    And what did you do -- how did you

1  compare -- well, let me rephrase.

2           How many cartridge casings from that

3  test -- from those test-fired cartridge casings did you

4  compare with the four from your initial comparison?

5           A.   So I selected one cartridge case that

6  looked best to me.  Typically, that's going to be a

7  cartridge case where all of the marks that I'm seeing are

8  visible and unobstructed by manufacturing marks on that

9  cartridge case.

10          Q.   And when you selected that one, what did

11 you do?

12          A.   So I took that one example and I

13 microscopically examined it in conjunction with the four

14 cartridge cases that were submitted in the other case.

15          Q.   Do you compare each of those four that were

16 submitted in the first case we talked about with the

17 test-fired cartridge case?

18          A.   Yes, I do.

19          Q.   And did you do that in this instance?

20          A.   Yes, I did.

21          Q.   And when you -- was that a microscopic

22 comparison?

23          A.   Yes.  It was on our comparison microscope.

24          Q.   Did you make any determination as to the

25 class characteristics between the four cartridge casings

1  in the first instance and the one test-fired cartridge

2  casing?

3          A.     Yes.  There was sufficient agreement of the

4  class characteristics for the four cartridge cases and

5  the test-fired cartridge case.

6          Q.     And did you also make a determination as to

7  the individual characteristics?

8          A.     Yes.  There was also sufficient agreement

9  of individual characteristics between all of those items.

10         Q.     And were you able to make a determination

11 as to -- or, I'm sorry.  Were you able to make a final

12 determination as to the four test-fired -- or the four

13 cartridge casings and the one test-fired cartridge

14 casing?

15         A.     Yes, sir.  I determined that they were all

16 fired from the same firearm.

17         Q.     Is that the firearm that was listed -- if

18 we could go to page 3 of the Government's Exhibit 393.

19 And is that the firearm that's listed on page 1 -- I'm

20 sorry, it's page 1 of your second report I'm showing here

21 on the screen?

22         A.     Yes, sir, that's correct.

23                MR. HOFF:  I have nothing further,

24 Your Honor.

25                THE COURT:  All right.  Thank you.

1          Mr. Ganguli, any cross-examination?

2          MR. GULOTTA:  Your Honor, I'll be

3  cross-examining this witness.

4          THE COURT:  All right.  Mr. Gulotta, you

5  may come forward.

6          MR. GULOTTA:  Are we ready, Your Honor?

7          THE COURT:  Yep.  You may proceed.  Thank

8  you.

9          MR. GULOTTA:  Thank you.

10                    **CROSS-EXAMINATION**

11  BY MR. GULOTTA:

12          Q.    Good afternoon, Mr. Lamberson.  I just have

13  a few questions for you.

14          A.    Okay.

15          Q.    My name is Matt Gulotta.  I represent Kevin

16  Tidwell.  As a layman here, I'm going to ask that if you

17  don't understand a question that I'm presenting to you,

18  if you would ask me to clarify if you don't understand,

19  rather than trying to guess what I'm asking you.

20          A.    Yes, sir.

21          Q.    Okay, thank you.  So as a firearm and

22  toolmarks examiner, part of your job is essentially to

23  match these cartridge cases to the guns that fired them;

24  right?

25          A.    We are looking for a common origin, so,

yes.

Q.    Okay.  And what part of your job is to be a firearm and toolmarks examiner, what portion, would you say?

A.    As in the amount of time I spend?

Q.    Exactly.

A.    At this time, whenever I wrote these cases, it was 100 percent of the time, other than when I was on crime scenes.

Q.    Okay.  So as a toolmark examiner, firearm and toolmark examiner, what you're essentially doing is you're looking at the bullets and you're looking at the cartridge cases microscopically; correct?

A.    Yes, sir, that's correct.

Q.    And you're looking for these tiny imperfections; right?

A.    Yes.

Q.    You're looking for irregularities caused by dents, burrs, and blemishes; right?

A.    Yes, sir.

Q.    And these different imperfections, they're imparted by objects within the gun; right?

A.    Yes, sir.  So it's a transfer from the harder surface of the gun to the softer metals that it comes in touch with.

1          Q.     Things like the firing pin and the breach

2     face; is that right?

3          A.     Yes, sir, that's correct.

4          Q.     Okay.  So I think you covered this a little

5     bit on direct, but I'm a little confused so I wanted to

6     clarify this.  Did you say you compared -- the particular

7     gun that you tested, it was a Glock; correct?

8          A.     No, sir.  It was a Smith & Wesson.

9          Q.     Oh, okay.  You compared that gun to a

10    different -- different cartridge casings fired by similar

11    guns; right?

12         A.     I compared the test-fired cartridge cases

13    from the firearm that was submitted in that other case to

14    the -- the evidence cartridge cases in the first case.

15         Q.     Okay.  So you essentially -- you had other

16    guns that you compared this to, essentially.  And maybe

17    I'm saying that wrong.

18         A.     Could you --

19         Q.     It's okay to correct me if I --

20         A.     So I compared the four cartridge cases to

21    the one gun in this instance.

22         Q.     But did you look at similar guns that

23    had -- that had fired other cartridge cases to compare?

24         A.     No, sir, I did not.

25         Q.     Well, wouldn't that tell you how much

1   variation there are when a gun of that type makes marks

2   on a cartridge case?

3         A.    It would have the potential to, yes.

4         Q.    So if there were a hundred guns -- and this

5   is a hypothetical.  If there were a hundred guns all of

6   the same type firing on the same cartridge case, you have

7   no idea, right, what the differences might be?

8         A.    That's correct.

9         Q.    Okay.  And that would -- I think you

10  already said this.  But that would ensure a more accurate

11  test, wouldn't it, if you did that?

12        A.    I'm not sure if it would be more accurate,

13  but it would be more data points, yes, sir.

14        Q.    Okay.  Is it fair to say that what you do

15  is more of an art than it is a science?

16        A.    I would classify it as a science, but it is

17  subjective in nature.

18        Q.    And you -- when you said this to the Court,

19  you kind of said it with a very high degree of certainty.

20  You said, I matched this cartridge case to the gun,

21  didn't you?

22        A.    No, sir.  I said that based on the

23  sufficient agreement of class and individual

24  characteristics.

25        Q.    So this is just your opinion; right?

1          A.     Yes, sir, it's my opinion.

2          Q.     Okay.  Now, there is a certain error rate

3     here; correct?  Some of these tests end up not being

4     correct; right?

5          A.     There are different error rates associated

6     with the fire and toolmark analysis field.

7          Q.     And you don't have any idea what your error

8     rate is?

9          A.     Based on the proficiency testing that I've

10    done -- that's the best example of an error rate that we

11    could have -- I've not recorded an incorrect answer.

12         Q.     Now, you mentioned this peer review

13    process.  You're not peer reviewing this to other people

14    that are outside your agency, though, are you?

15         A.     No, sir, we're not.  It's examiners within

16    the unit.

17         Q.     Other TBI agents within the unit; right?

18         A.     Yes, sir, that's correct.

19         Q.     Okay.  And you are a TBI agent; correct?

20         A.     Yes, I am.

21         Q.     So you're a law enforcement officer?

22         A.     Yes, sir.

23         Q.     And you essentially carry a badge and a

24    gun; correct?

25         A.     Yes, sir, I do.

1      Q.   Now, you mentioned your education.  That's

2 in chemistry; correct?

3      A.   That's correct.

4      Q.   And would you agree that essentially having

5 a doctorate in chemistry doesn't qualify you to be a

6 firearms and toolmark examiner; right?

7      A.   That's correct.  That's where the

8 additional training came into effect.

9      MR. GULOTTA:  That's all I have,

10 Your Honor.

11      THE COURT:  All right.  Thank you,

12 Mr. Gulotta.

13      All right.  Ms. Hood-Schneider.

14        **CROSS-EXAMINATION**

15 BY MS. HOOD-SCHNEIDER:

16      Q.   Good afternoon.

17      A.   Hi.

18      Q.   Agent or Mr. Lamberson?

19      A.   Mr. Lamberson is fine.

20      Q.   Okay.  I just have a few questions.  My

21 name is Vakessha Hood-Schneider.  I represent Jorge

22 Flores over here.

23      So you talked about class characteristics

24 and individual characteristics; right?

25      A.   Yes.

1          Q.     And if I understand you correctly, class
2    characteristics are when -- when a particular gun is
3    produced at the manufacturing level, pretty much every
4    gun that's produced by that cutting tool will have the
5    same characteristics; right?
6          A.     So it will be every firearm in that
7    particular make and model, they would have the same
8    characteristics.
9          Q.     Okay.  And then individual characteristics
10   are just, I guess, for all intents and purposes, the wear
11   and tear of the firearm?
12         A.     Yes, that would be a good way to describe
13   it.
14         Q.     Okay.  What are subclass characteristics?
15         A.     So subclass characteristics are a -- it's
16   between class and individual.  And it's a little more
17   selective than class characteristics, but we cannot use
18   them for identification purposes.
19         Q.     And why is that?
20         A.     It's because these particular marks have
21   the capability of extending across an unknown number of
22   firearms or other tools when those tools are created.
23         Q.     So how do you -- how could you determine --
24   and, again, forgive me, because I'm a -- I'm looking at
25   this from a layman's perspective.  So how can you

determine -- so, basically, you just don't analyze subclass characteristics?

         A.    So if -- in the course of my examination, if I see what I believe to be subclass characteristics, I will document those fully, and then I do not use those characteristics for any identification purposes.

         Q.    And are subclass characteristics where the cutting tool has a defect itself at the manufacturing level?

         A.    Yes, that would be the typical place that a subclass characteristic would come from.

         Q.    So, basically, a batch of tools that come from that cutting tool would all have the same subclass characteristics, but they may have a different subclass characteristics from a different batch?

         A.    Yes, that is entirely possible.

         Q.    Okay.  I think I've just got one more question.  Would you say that there was sufficient agreement between the cartridges that were collected at a scene and the cartridges that you test fired, that's not a hundred percent -- that's not at a hundred percent certainty; correct?

         A.    So that opinion is subjective in nature, and it's based off of my training and experience in the field.

```
1          Q.    Because in order for it to be 100 percent
2    certain, you would have to basically look at every single
3    firearm that was produced?
4          A.    Yes, that's correct.
5                MS. HOOD-SCHNEIDER:  Those are my
6    questions.
7                THE COURT:  All right.  Thank you.
8                Mr. Mothershead.
9                MR. MOTHERSHEAD:  No questions, Your Honor.
10               THE COURT:  All right.  Thank you.  And
11   Mr. Bloom.
12               MR. BLOOM:  No questions, Your Honor.
13               THE COURT:  Thank you, Mr. Lamberson.
14               Well, any redirect examination?  I
15   shouldn't get ahead of myself.  Redirect?
16                    REDIRECT EXAMINATION
17   BY MR. HOFF:
18         Q.    In your examinations, have you ever found
19   two firearms that impart the same individual
20   characteristics on cartridge casings?
21         A.    No, I have not.
22         Q.    And have you ever -- so have you ever come
23   across that in your work?
24         A.    No, sir.
25               MR. HOFF:  Nothing further, Your Honor.
```

1          THE COURT:  All right.  Now you may step

2  down.  Thank you, Mr. Lamberson.

3               *****WITNESS EXCUSED*****

4          MS. FARZAD:  The government calls Ken Wolfe

5  to the stand, please.

6          THE COURT:  All right.  You may come

7  forward.

8                    **KENNETH WOLFE**

9   called as a witness, after having been first duly sworn,

10  testified as follows:

11                **DIRECT EXAMINATION**

12   BY MS. FARZAD:

13     Q.    Good afternoon, sir.

14     A.    Hello.

15     Q.    Can you please state and spell your name

16  for the record.

17     A.    Kenneth Wolfe, K-n-e-n -- excuse me.

18  K-n-n-e-t-h (sic) W-o-l-f-e.

19     Q.    Thank you, sir.

20          MS. FARZAD:  And, Your Honor, before we

21  begin with this witness, I previously checked with

22  defense counsel on Government Exhibits 439 through 460,

23  as well as 805 through 852, and received their permission

24  to admit into evidence.

25          THE COURT:  All right.  Sounds like the

1  government's offering Exhibits 439 to 460 and 805 to 862.

2  Any objection to their admission at this time?

3             All right.  Absent objection, Government

4  439 to 460 and 805 to 862 are admitted.

5             MS. FARZAD:  Your Honor, it's actually 852.

6             THE COURT:  852, okay.  I heard that wrong.

7  All right.

8             MS. FARZAD:  Thank you.  And --

9             THE COURT:  So, yeah, for the record, 805

10  to 852, 439 to 460.  Thank you.

11             (Government Exhibits Nos. 439 to 460 and

12  805 to 852 were admitted.)

13             MS. FARZAD:  Do I have permission to

14  publish to the jury at the appropriate time?

15             THE COURT:  You do.

16             MS. FARZAD:  Thank you.

17  BY MS. FARZAD:

18        Q.    All right, sir.  Could you please tell the

19  jury where you work.

20        A.    Metro-Nashville Police Department.

21        Q.    What position do you told there?

22        A.    I am currently a crime scene investigator.

23        Q.    And how long have you been a crime scene

24  investigator with Metro-Nashville police?

25        A.    Since 2009.  So 12, 13 years.

1        Q.    Have you held any other positions in law

2   enforcement?

3        A.    Just -- I mean, just regular police officer

4   or a sheriff's deputy at one point I was also.

5        Q.    Was that also for Metro-Nashville?

6        A.    Yes, ma'am.

7        Q.    All right.  And have you received training

8   in order to become a crime scene investigator?

9        A.    Yes, ma'am.

10       Q.    Can you tell the jury about that?

11       A.    We receive -- as crime scene investigators

12  for Metro, we receive in-house training as far as

13  fingerprints, photography, DNA collection.  We also

14  receive outside training from different places.

15            In my training, I've been through the

16  National Forensic Academy up in Knoxville.  At that

17  training, you're also -- you receive training for blood

18  spatter analysis, shooter reconstruction on top of the

19  regular photography, DNA collection, the basics of crime

20  scene investigation.

21            You also -- I've also been through the

22  FBI's Post Blast Investigation School and an advanced

23  fingerprint photography class through the FBI.  We do

24  ongoing training.  I've had training through -- I forget

25  the name of it now, but for child death investigations.

1  But we do ongoing training as part of our -- as part of

2  our thing.  I'm also certified as a crime scene

3  investigator through the International Association of

4  Identification which, again, also requires ongoing

5  training and recertification every five years.

6             And I'm sure I'm missing something, but,

7  yeah, that's the basics of it.

8        Q.    Thank you very much, sir.

9             I'd like to turn your attention to

10  February 25, 2017.  Do you recall whether you were

11  working on that date?

12       A.    I believe so, yes, ma'am.

13       Q.    And do you recall being dispatched to

14  Murfreesboro Pike?

15       A.    Yes, ma'am.

16       Q.    What was that dispatch for?

17       A.    A vehicle crash where a car had been shot

18  up -- or the car had been shot multiple times before, I

19  think, the crash occurred.

20       Q.    Do you recall whether the victim was still

21  on the scene when you arrived?

22       A.    No, ma'am, I don't believe the victim was.

23       Q.    Did the shooting occur at the scene where

24  the vehicle was located?

25       A.    I think it occurred close by, but not where

1  the vehicle was located when I got there.

2        Q.   Okay.  So when you arrived on the scene,

3  were there other law enforcement officers present?

4        A.   Yes, ma'am.

5        Q.   Were you the only crime scene investigator?

6        A.   Yes, ma'am.

7        Q.   What was your role?

8        A.   To document, to photograph and document the

9  cars, to collect any evidence that possibly could be

10 obtained from the vehicle.

11       Q.   Okay.  And I'm going to -- just for the

12 sake of efficiency here, I'm going to hand up two

13 exhibits to you.

14           MS. FARZAD:  If I could approach,

15 Your Honor?

16           THE COURT:  You may.

17           MS. FARZAD:  Thank you.

18  BY MS. FARZAD:

19       Q.   I'm not going to ask you about them just

20 yet.  We'll go through some photographs first.

21           If we could please take a look at

22 Government Exhibit 439.  And that will be on your screen.

23       A.   Oh.

24       Q.   What's this?

25       A.   That's our photo work order card in the

1  Crime Scene Unit.  That's our -- the card we fill out

2  prior to when we start taking pictures.

3          Q.    All right.  And is this the one that you

4  filled out for this -- the vehicle at Murfreesboro Pike?

5          A.    Yes, ma'am.

6          Q.    If we could take a look, please, at

7  Government Exhibit 440.  What do we see here?

8          A.    That's the actual scene with the vehicles

9  involved.

10          Q.    All right.  So is this what the scene

11  looked like when you arrived on the scene?

12          A.    Yes, ma'am.

13          Q.    The vehicles to the left, that looks like

14  it's a gold minivan and a white SUV of some kind, are

15  they related or involved at all with the vehicle we see

16  in the middle with the door open?

17          A.    I believe they had been involved in the

18  crash with the vehicle, I think.

19          Q.    Okay.  Do you have any knowledge as to

20  whether they're involved with the shooting?

21          A.    I don't believe so.  I don't remember, to

22  be exact.

23          Q.    Okay.  The vehicle in the center here with

24  the door open, is this the vehicle that was -- that you

25  photographed for the shooting?

1      A.    Yes, ma'am.

2      Q.    All right.  Can we please take a look at

3  Government Exhibit 442.

4            All right.  What do we see here?

5      A.    That's the rear -- excuse me.  That's the

6  rear of the vehicle, of the white vehicle.

7      Q.    All right.  And on the back here, do there

8  appear to be any bullet defects?

9      A.    Yes, ma'am.

10     Q.    Where are they?  If you could point them

11 out for the jury, please.  And just so you know, the

12 screen does not have touch capabilities, so you'll have

13 to just describe it.

14     A.    Okay.  First off, the back window is

15 missing, so that was believed to be one of the bullet

16 defects.  There's one under, looks like, the left side of

17 the spoiler.  There's several more going down just to the

18 left of the license plate.  There's a couple more down to

19 the center of the -- just to the center right of the

20 bumper.  And then on the right side of the bumper there

21 appears to be some more.

22           On the passenger side of the vehicle, there

23 appears to be one at the little -- what I call the opera

24 window, the rear window of the back.  And then there's

25 multiple bullet defects on the passenger door area.

1        Q.      Thank you.  If we could look at Government

2    Exhibit 441.  Does that give us a little better view of

3    these defects you have described?

4        A.      Yes, ma'am.

5        Q.      If we could also take a look at

6    Government 443.  And right here, what are these?

7        A.      Again, they're bullet defects on the

8    passenger side of the vehicle.

9        Q.      If we could take a look, please, at 457.

10   And what are -- is this a closeup of what we just looked

11   at?

12       A.      It's the closeup of the bullet defects

13   right around the passenger side door handle.

14       Q.      If we could -- and just to explain to the

15   jury, what's the silver that we see around these holes in

16   the panel?

17       A.      This is the sheet metal when the paint

18   flakes off or is moved off of the vehicle.

19       Q.      What causes that?

20       A.      Usually the bullet striking the vehicle.

21       Q.      Please take a look at Government

22   Exhibit 446.  What do we see here?

23       A.      It's the driver's side of the vehicle.

24       Q.      Are there additional bullet defects in this

25   photo?

1          A.     Yes, ma'am.  There appears to be at least

2     one in the -- well, two in the -- three -- there's

3     multiple in the windshield.  There's one right there in

4     the fender above the wheel, and there appears to be

5     several -- several more around the door handle.  And I

6     think one more -- at least one more in the window.

7          Q.     Could we please take a look at Government

8     Exhibit 447.  What do we see here?

9          A.     It's the driver's side -- it's just a

10    farther back view of the driver's side of the vehicle.

11         Q.     All right.  Is there an additional defect

12    here on the passenger's rear panel?

13         A.     Yes, ma'am.  Behind the driver's door

14    there's one, and then I think there's another one right

15    above it in, again, what I call the opera window.

16         Q.     Okay.  Government Exhibit 448, please.

17    What's this?

18         A.     It's the interior of the vehicle with some

19    blood on the steering wheel.

20         Q.     And you can see the bullet defects on the

21    windshield as well?

22         A.     Yes, ma'am.

23         Q.     Could we take a look, please, at Government

24    Exhibit 440 -- I'm sorry, 459.  And what does this show?

25         A.     It's just a different view of the interior

of the passenger -- of the driver's seat of the vehicle.
Also to show at least one bullet defect in the back of
the driver's seat about -- looks like the middle right of
the seat.

Q.    And near that bullet defect in the middle
right area, does there appear to be something red next to
that?

A.    Yes, ma'am.  It appears to be blood, yes.

Q.    Okay.  Government Exhibit 449, please.
What do we see here on the bottom part of the headrest?

A.    On the bottom part of the headrest is
another bullet defect where a bullet went through the
headrest.

Q.    And Government Exhibit 450, please.  And
this photograph?

A.    It's showing the floorboard of the vehicle,
the driver's seat area.  And I think there's a
projectile.

Q.    And is there blood located also on the
strip there on the door?

A.    Yes, ma'am.  On the left side of the
driver's seat, there's blood going down the side.

Q.    If we could take a look at 451, please.
And what's this show?

A.    It's just a -- excuse me.  It's a closer

1  picture -- it's a closeup picture of the bullet fragment

2  that was in the driver's floorboard.

3       Q.   If you could take a look -- I handed you

4  earlier what's been marked as Government Exhibit 32.

5  Could you take a look at that, please?

6       A.   Yes, ma'am.

7       Q.   And do you recognize that?

8       A.   Yes, ma'am.

9       Q.   What is that?

10      A.   It would be the bullet projectile that was

11 recovered from the scene.

12      Q.   And how do you know that that's the bullet

13 projectile that you recovered from the scene?

14      A.   Because it's my handwriting on the back of

15 the -- on the back of the envelope here or the back of

16 the paper bag, if I can speak English.

17           MS. FARZAD:  Your Honor, at this time, the

18 government would like to move into evidence Government

19 Exhibit 32 with permission to publish to the jury.

20           THE COURT:  All right.  Absent objection,

21 Government 32 will be admitted and may be published.

22           (Government Exhibit No. 32 was admitted.)

23 BY MS. FARZAD:

24      Q.   Sir, is that the same bullet fragment

25 that's photographed in Government Exhibit 451?

1      A.     It appears to be, yes.

2      Q.     Can we take a look, please, at Government

3 Exhibit 452.  What's this photograph?

4      A.     Again, it's the driver's seat with a closer

5 picture -- closeup picture of the bullet defect in the

6 seat.

7      Q.     Government Exhibit 455, please.  What's

8 that show?

9      A.     The driver's -- the front driver's

10 windshield.  And at this point, I believe I'd placed the

11 defect scales on the different defect marks.

12      Q.     Government Exhibit 458, please.  What's

13 that show?

14      A.     It's a closeup of defect, Defect 20 of the

15 vehicle.  I believe that's the one that was right at the

16 driver's door about midway up.

17      Q.     And finally Government Exhibit 460, please.

18 What's that show?

19      A.     The inside of the driver's door.  It's

20 showing the defects inside of the vehicle.

21      Q.     So would these be areas where the bullet

22 had penetrated the vehicle, gone through from the

23 exterior?

24      A.     Yes, ma'am.

25      Q.     Okay.  What did you do with the evidence

1   that you collected from the scene?

2           A.     It was packaged up and then was -- then I

3   took it to the property room to be turned in for

4   safekeeping.

5           Q.     Did you look for shell casings or cartridge

6   casings nearby the vehicle?

7           A.     I believe we looked around but didn't find

8   any just because, from what I understood talking to the

9   officers, the vehicle was in motion when the shooting

10  took place.

11          Q.     And the photographs that you took, what did

12  you do with those when you got back to the office?

13          A.     They were uploaded to our DIMS system, the

14  Digital Image Management System.

15          Q.     All right.  I'd like to also direct your

16  attention to September 24, 2017.  Were you working on

17  that day?

18          A.     Yes, ma'am.

19          Q.     Okay.  And do you recall being dispatched

20  to a crime scene at Maple Crest Apartments on Natchez

21  Trace?

22          A.     Natchez Court, yes, ma'am.

23          Q.     What was that call for?

24          A.     We had a double homicide there at the

25  Natchez Court.

1      Q.    When you arrived on the scene that day,

2  were there other law enforcement officers already there?

3      A.    Yes, ma'am.

4      Q.    Did you speak with them?

5      A.    Yes, ma'am.

6      Q.    Did you learn about the scene and where to

7  go to look for evidence?

8      A.    Yes, ma'am.  They had already found some

9  evidence already before we even got there.  But the --

10  what was reiterated to me was that there was two victims

11  inside of a vehicle.  Shots had been heard.  When

12  residents came out or looked out from their windows, they

13  saw two victims in the vehicle and another vehicle

14  driving off at a high rate of speed.

15      Q.    So what did you do first to process the

16  crime scene?

17      A.    Just looked for evidence first before

18  anything, just -- well, I talked to the responding

19  officer, the first responding officers, got the

20  information from them, and then we started just looking

21  for evidence was the big thing.

22      Q.    Did you take photographs that day?

23      A.    Oh, yes.

24      Q.    Okay.  I'd like to --

25            Counsel's handed me a wise note to caution

1  y'all before we begin to look at these photographs.  They

2  are graphic.

3          Sir, so you took photographs that day; is

4  that right?

5          A.  Yes, ma'am.

6          Q.  Okay.  I'd like to go ahead and take a look

7  at Government Exhibit 805, please.

8          All right, sir.  What's this?

9          A.  Again, it's our photo work order card

10  before we start any photos.  This is usually the first

11  card you're going to see on the -- as you look at the

12  photos, it's going to be the first card you're going to

13  see.  It gives the information so far as the scene,

14  complaint number, date and time.  The officer -- in this

15  case, Detective Baltimore was the officer who was the

16  responding detective that was there that I talked to on

17  the scene.

18          Q.  Okay.  If we could take a look, please, at

19  806.  What do we see here?

20          A.  It's the front of the Maple Crest

21  Apartments.  It's the entrance area, actually.

22          Q.  Why do you take these types of photographs?

23          A.  I'm sorry?

24          Q.  Why do you take these types of photographs?

25          A.  Just the establishing shot, just showing

1  where you're at.  This just shows -- in this case, it's

2  just showing the name of the apartments.

3           THE COURT:  Let me ask you about that.  You

4  had mentioned Natchez Court.  Is that the name of the

5  street that Maple Crest Apartments are on?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Thank you.

8           THE WITNESS:  I believe, if I can help

9  clarify that, that's actually -- it's actually the little

10  street that runs through the apartment complex, actually.

11           THE COURT:  Through the complex.  Thank

12  you.

13  BY MS. FARZAD:

14      Q.   If we could take a look at Government

15  Exhibit 807, please.

16           All right.  What's this area here?

17      A.   It's just outside of the apartment complex

18  on the little side street there.  I believe it's Natchez

19  Court actually is the side street.

20      Q.   Why are you photographing this?

21      A.   Because officers had located -- when the

22  vehicle was seen leaving, I think it fired several shots,

23  but they were able to locate, I think, at least one fired

24  cartridge casing outside of the fenced-in area for the

25  complex.

1          Q.    Can we take a look at Government 808,

2   please.  It's a little hard to see, but if you could zoom

3   in just slightly.  Thank you.

4               And what's that?

5          A.    That's the fired cartridge casing that was

6   outside of the...

7          Q.    Okay.  And is this from that area that we

8   just saw in Government Exhibit 807?

9          A.    Yes, ma'am.

10         Q.    All right.  And if we could take a look,

11  please, at Government Exhibit 809.  Is that a closeup of

12  that cartridge casing?

13         A.    Yes, ma'am.

14         Q.    Was that collected for evidence?

15         A.    Yes, ma'am.

16         Q.    All right.  Can we take a look, please, at

17  Government Exhibit 810.  What do we see here?

18         A.    It's a surveillance camera, CCTV camera

19  that's outside of the building of the homicide.

20         Q.    Why take this photograph?

21         A.    At the time, in case we had gotten -- in

22  case we had -- in case we had gotten video from the video

23  feed, it would show where the video camera was at --

24  located at the time -- at the time of the homicide.

25         Q.    Thank you.  All right.  If we could then

1   look at Government Exhibit 811.

2          All right, sir.  What do we have here?

3          A.   It's a -- it's a shot just inside of the

4   fenced-in area of the complex.  It's just showing the

5   victim's vehicle in the drive.

6          Q.   Okay.  And when you got on the scene, were

7   the car doors open like that?

8          A.   Yes.

9          Q.   Government Exhibit 812, please.  Is that

10  just a closer up --

11         A.   Again, just a closer-up picture of the

12  same.

13         Q.   Government Exhibit 813.  What's this?

14         A.   It's just a picture showing there were some

15  casings on the ground and the blood trail that had moved

16  downhill from the vehicle.

17         Q.   And the casings that are visible in this

18  photograph, at this point, you-all had not put evidence

19  markers down; is that right?

20         A.   No, ma'am, not at this point.

21         Q.   Government Exhibit 814, please.

22              Okay.  And what's this show?

23         A.   It's showing the driver's side of the

24  vehicle, and, again, there's more casings on the ground.

25  You can --

1          Q.      And is the victim -- one of the victims

2    visible in this photograph?

3          A.      Yes, ma'am.  One of the victims is hanging

4    out of the vehicle from the passenger seat.

5          Q.      In the rear passenger seat?

6          A.      Yes, ma'am.

7          Q.      Just to be clear, did you or anyone in law

8    enforcement open that door to cause the victim to fall

9    out of the car?

10         A.      I did not, but I don't know who else -- who

11   else may have opened the door before I got there.

12         Q.      When you arrived on the scene, this is how

13   the victim was; is that right?

14         A.      Yes, ma'am.

15         Q.      Okay.  And the liquid coming from the area

16   where the victim's seen, does that appear to be blood?

17         A.      Yes, ma'am.

18         Q.      Government Exhibit 815, please.  What does

19   this show?

20         A.      And it's the driver -- sorry, the passenger

21   side of the vehicle, the victim's vehicle, with the

22   windows -- or -- the windows are not in the vehicle.

23   They've been broken out.  I believe there are more

24   casings on the ground also in this picture.  Yeah.

25         Q.      Government Exhibit 817, please.  What does

1  this show?

2         A.    It's showing the front of the vehicle -- or

3  from the front of the vehicle back down the hill or down

4  the little rise at the complex.  You can see the other

5  victim in the front passenger seat and Officer Foster

6  who --

7         Q.    What is -- I'm sorry.

8         A.    -- who appears to be, at this point,

9  putting out markers for the evidence.

10        Q.    That was my next question.  Thank you.

11              Government Exhibit 818, please.  At this

12 point, are we starting to see some of those evidence

13 markers?

14        A.    Yes, ma'am.

15        Q.    Who is the man to the right here in this

16 photograph?

17        A.    That would be Detective Doug Thibodeaux.

18 He was the -- I think he was the ranking sergeant.  He's

19 since made lieutenant.

20        Q.    Do you know what these evidence markers are

21 marking?

22        A.    I believe cartridge casings.

23        Q.    Government Exhibit 819, please.  And what

24 does this show?

25        A.    Again, it's the passenger side of the

1   vehicle with markers laid down on the cartridge casings.

2           Q.    Government Exhibit 820.  What does this

3   show?

4           A.    It's just a closer picture of the vehicle

5   showing where -- showing the victim and showing some of

6   the defects in the window.

7           Q.    Government Exhibit 821.  What does that

8   show?

9           A.    I believe that's the passenger side rear

10  window that had been -- has a bullet defect.

11          Q.    Government Exhibit 822.  What does that

12  show?

13          A.    Again, it's just a different angle of the

14  same vehicle, passenger side.  I believe there's a defect

15  on the outside of the door, but I don't think it came

16  through the door.  I think it was sh- -- from inside or

17  through the vehicle.  And there was also blood on the

18  passenger window.

19          Q.    And the victim in the front seat, is he

20  deceased at this point?

21          A.    Yes, ma'am.

22          Q.    Government Exhibit 823.  What's that show?

23          A.    Again, it's another picture of the front

24  passenger -- front passenger side window showing a bullet

25  defect in the window.

1    Q.    Government Exhibit 824.  What's that show?

2    A.    It's the passenger side of the -- front

3 passenger car door, and it's showing a bullet defect.  A

4 bullet had come from that inside (sic) and stopped just

5 inside the door.  And that's the defect left on the

6 outside of the vehicle.

7    Q.    Government Exhibit 826, please.  Additional

8 evidence markers there?

9    A.    Yes, ma'am.

10    Q.    Government Exhibit 827, please.  What's

11 that show?

12    A.    It's the driver's side of the vehicle

13 showing -- I think there's a defect on the back

14 passenger -- back driver's side door.

15    Q.    Government Exhibit 828, please.  What's

16 that show?

17    A.    Again, it's a little bit closer picture of

18 the same -- same vehicle from the driver's side.

19    Q.    Is the victim deceased in the back seat

20 here?

21    A.    Yes, ma'am.

22    Q.    Government Exhibit 829, please.  And what's

23 that show?

24    A.    The interior of the vehicle and the

25 driver's seat.

1          Q.    Government Exhibit 830.  What's that show?

2          A.    That's the front -- front passenger side

3    window with blood on the window and a bullet defect in

4    the window and at least one more in the door also.

5          Q.    Government Exhibit 831.  Who is this?  Is

6    this the rear victim?

7          A.    That's the passenger in the rear of the

8    vehicle, back passenger seat.

9          Q.    Government Exhibit 833.  What evidence is

10   this marking, if you recall?

11         A.    I believe that was the one from outside of

12   the -- out on the Natchez -- out in the Natchez Court in

13   the street, the first original one that we got.

14         Q.    Thank you.  Government Exhibit 836, please.

15         A.    It's just a picture showing the back of the

16   vehicle.  It's a wider angle showing a lot of the markers

17   where evidence was located.

18         Q.    I see evidence marker 24 here, and it looks

19   like --

20         A.    Yes, ma'am.

21         Q.    -- 21 off to the side there.  Do most of --

22   do all of these represent cartridge casings or bullet

23   fragments?

24         A.    Yes, ma'am, I believe so.

25         Q.    Okay.  If we could take a look, please, at

1    Government Exhibit 845, please.  What's that show?

2         A.    These are just -- they're -- not

3    projectiles.  They're cartridge casings.  They were

4    located on the vehicle in the wipers.

5         Q.    Okay.  Government Exhibit 846, please.  Is

6    that one of those cartridge casings?

7         A.    Yes, ma'am.  It's just a closer picture.

8         Q.    Government Exhibit 848, please.

9         A.    Again, it's just a wider angle shot from

10   the front of the vehicle back down the hill with evidence

11   markers on items.

12        Q.    Government Exhibit 850, please.  What's

13   that show?

14        A.    It's a picture of the rear -- the victim in

15   the rear seat from the passenger side of the vehicle.

16        Q.    Government Exhibit 851, please.  What's

17   that show?

18        A.    I believe that was the -- when the medical

19   examiner arrived, I believe that was one of the IDs that

20   we got off the victim.

21        Q.    And, finally, Government Exhibit 852.

22   What's that show?

23        A.    The victim's hand after the medical

24   examiner removed him from the vehicle.

25        Q.    Okay.  If you could go ahead and remove the

1  photograph, please.

2  Before you there should be a government

3  exhibit previously marked as 95.

4  A.  Yes, ma'am.

5  Q.  Could you take a look at that, please.  And

6  do you recognize that?

7  A.  Yes, ma'am.

8  Q.  What does that appear to be?

9  A.  They are cartridge casings from the Natchez

10  Court call.

11  MS. FARZAD:  Your Honor, at this point, the

12  government moves into evidence Exhibit No. 95 with

13  permission to publish to the jury.

14  THE COURT:  Seeing no objection, Government

15  No. 95 will be admitted and may be published.

16  (Government Exhibit No. 95 was admitted.)

17  BY MS. FARZAD:

18  Q.  And if you could just hold up for the jury,

19  are these cartridge casings, some of which we saw in

20  these photos, that were recovered from the scene?

21  A.  Yes, ma'am.

22  Q.  Once you collected the evidence and took

23  the photographs, what did you do with the evidence in the

24  photographs?

25  A.  The evidence and the photograph was

1    uploaded again to the Digital Image Management System of

2    the police department.

3              MS. FARZAD:  Your Honor, I have no further

4    questions for this witness.

5              THE COURT:  All right.  One moment.

6              Cross-examination?

7              MR. GANGULI:  No questions, Your Honor.

8              THE COURT:  All right.  Thank you.

9              Ms. Hood-Schneider?

10             MS. HOOD-SCHNEIDER:  No questions.

11             MR. MOTHERSHEAD:  No questions.

12             THE COURT:  And Mr. Bloom?

13             MR. BLOOM:  No questions, Your Honor.

14             THE COURT:  Thank you, sir.  You may step

15   down.

16                  *****WITNESS EXCUSED*****

17             THE COURT:  Mr. Safeeullah, you may call

18   your next witness.

19             MR. SAFEEULLAH:  United States calls

20   Danielle Connor.

21                      **DANIELLE CONNOR**

22    called as a witness, after having been first duly sworn,

23   testified as follows:

24

25

1                    **DIRECT EXAMINATION**

2    BY MR. SAFEEULLAH:

3         Q.    Good afternoon, Ms. Connor.

4         A.    Hello.

5         Q.    Can you please state and spell your last

6    name for the record.

7         A.    My last name's Connor, C-o-n-n-o-r.

8         Q.    And can you state your full name.

9         A.    Danielle Connor.

10        Q.    And where do you presently work?

11        A.    I work for the Metro-Nashville Police

12   Department as a civilian crime scene investigator.

13        Q.    How long have you worked for the

14   Metro-Nashville Police Department as a civilian crime

15   scene investigator?

16        A.    Just under seven years.  It will be seven

17   in July of this year.

18        Q.    Where did you work before you worked for

19   the Metro-Nashville Police Department?

20        A.    I started my career as a crime scene

21   investigator with Little Rock Police Department,

22   Arkansas.  And then I worked for the FBI two years before

23   I came to Nashville.

24        Q.    Have you had any training as a crime scene

25   investigator?

1        A.    Yes.

2        Q.    Can you briefly explain some of that

3    training to us.

4        A.    Yes.  So I have a bachelor's of science

5    degree, specifically in forensic science, with my

6    emphasis in crime scene processing, from West Virginia

7    University.  I have had on-the-job training both in

8    Little Rock and here in Nashville.  I also attended the

9    ten-week training at the National Forensic Academy in

10    Knoxville, Tennessee, as well as other 40-hour courses

11    throughout my career.

12        Q.    Now, we've heard another crime scene

13    investigator testify here today, so I'm not going to go

14    through what you do every day on a day-to-day basis.  But

15    I want to ask you, in February of 2017, were you working

16    as a crime scene investigator?

17        A.    Yes.

18        Q.    Was Investigator Wolfe one of your

19    coworkers at that time?

20        A.    No.

21        Q.    He was not?

22        A.    No.

23        Q.    Did you respond to an incident at Island

24    Vibes nightclub on February 18, 2017?

25        A.    Yes, I did.

1      Q.      Why did you go there?

2      A.      I was dispatched to that location in

3 reference to a shooting.

4      Q.      And what time of the day did you go there?

5      A.      I believe it was around 3:45 in the

6 morning.

7      Q.      What did you do when you first arrived on

8 the scene?

9      A.      When I arrived on scene, I spoke with

10 Officer Manning who kind of gave a brief description of

11 the evidence that the officers had located and some of

12 the victim information.

13      Q.      Do you know Officer Manning's first name?

14      A.      I believe it's Autumn.

15      Q.      And what did she explain to you that she

16 learned at that scene?

17      A.      From what I remember, she had advised that

18 some unknown suspects at the time had been shooting on

19 Antioch Pike towards the Island Vibes location; that a

20 vehicle had been struck by gunfire and that was parked

21 behind the location.

22      Q.      And why was it helpful for you to know that

23 information?

24      A.      Generally when the officers first arrive,

25 they do a walk-through of the scene to pinpoint where

location of the majority of the evidence is to secure
that scene for us upon our arrival.  It kind of also
helps us direct our attention to specific locations
within the scene.

Q.    So based on what you learned from
Officer Manning and other officers at the scene, what did
you start to do?

A.    I did an initial walk-through myself of the
scene, and then I took overall photographs of the scene
without evidence markers placed.  And then I walked
through and placed the evidence markers next to items
that I had found to be evidence, and then I took another
series of photos with the evidence markers.

Q.    So let's step back a little bit and tell us
about your process, your methodology, of how you approach
a crime scene.

A.    So generally, like I said, I'll do an
initial walk-through.  The officers already kind of give
me a layout of where they have found evidence, but I like
to verify that and also do a farther search.

So I'll walk through and look at the
evidence, what we have, whether that's cartridge casings
or vehicles with bullet defects or buildings that I have
found to have bullet defects.  And then I'll take overall
photographs of the scene without evidence markers, like I

1 explained, place my evidence markers, take overall

2 photographs again, and then also closeup photographs of

3 each piece of evidence with those evidence markers.

4         Q.    And then do you collect the evidence?

5         A.    Yes.  Once we're done doing all the

6 photographs -- and some of the scenes require us to do a

7 little more additional work.  If it's a homicide, we'll

8 do a diagram and FARO scans.  So once all of our

9 processing is done, all the evidence would be collected,

10 yes.

11         Q.    And do you write a report after that?

12         A.    Yes.

13         Q.    And what happens to the evidence that you

14 collect?

15         A.    Once it's packaged, we'll -- it's all

16 submitted to the property section, which is a separate

17 building that stores all the case evidence.

18         Q.    And did you follow the same process that

19 you just told us on February the 18th, 2017?

20         A.    Yes.

21         Q.    Can you turn to the booklet in front of you

22 that starts with 1 and goes to 435?

23         A.    Okay.

24         Q.    And can you turn to -- look at Exhibits 394

25 through 414.  394 through 414.  And you can move that

1  microphone up there if you need to.

2          A.     394, okay, through 413.

3          Q.     414.

4          A.     414.

5          Q.     Have you looked at those photographs?

6          A.     Yes, sir.

7          Q.     What is depicted in those photographs?

8          A.     Photographs that I took at the scene.

9          Q.     And how do you know that they are

10  photographs that you took at that scene?

11          A.     By the first photo, Exhibit 394, and then

12  just from my memory and reviewing for this case.

13          Q.     Also want to pass up to you now what's

14  previously been marked United States Exhibits No. 27, 28,

15  29, 94, and 1220.  Can you look at these exhibits as

16  well.  These are physical exhibits.

17          A.     (Complies.)  You have two 1220s here.

18          Q.     What number is that you're looking at now?

19          A.     This is 1220, and then this is 1220.  This

20  one's not mine.

21          Q.     Can I see them both back, please.

22          A.     Yeah.

23          Q.     Can you look at this one, 1220, and tell me

24  if you recognize that one along with the other physical

25  exhibits that are in front of you?

1      A.     Yes.

2      Q.     And what are those exhibits?

3      A.     These are evidence that was collected at

4 the scene.

5      Q.     And how do you know that those are evidence

6 that was collected at the scene?

7      A.     The bags -- the evidence bags are marked

8 with this individual complaint number for this case, as

9 well as the address, the date -- this date of this

10 incident, and my initials.

11      Q.     And what's the case number associated with

12 this case?

13      A.     2017-0158052.

14             MR. SAFEEULLAH:  Your Honor, I move to

15 admit into evidence United States Exhibits 394 to 414, in

16 addition to United States Physical Exhibits 27, 28, 29,

17 94, and 1220 and request permission to publish them to

18 the jury.

19             THE COURT:  All right.  One question,

20 Mr. Safeeullah.  Is there a situation with two things

21 inadvertently being marked with the same number?

22             MR. SAFEEULLAH:  I believe so, Your Honor.

23             THE COURT:  All right.  We'll sort out

24 later whether that causes anyone any confusion.

25             Now, any counsel for defendant have any

objection to the admission of any of those exhibits?

Okay.  Seeing no objection, the following exhibits will be admitted:  Government Exhibits 394 to 414 and Government Exhibits 27, 28, 29, 94, and 1220. And they may be published.

(Government Exhibits Nos. 394 to 414 and 27, 28, 29, 94, and 1220 were admitted.)

BY MR. SAFEEULLAH:

Q.    Can we please pull up United States Exhibit No. 394, please.

Ms. Connor, can you tell us what we're looking at in this photograph?

A.    So this is the first photo that I would take on any scene.  So this is what we call the photo work order.  It has the date and the time that I am starting my photographs at the scene, the complaint number, which is individual to every scene or case, the type of call.  This one's a 10-83 which is, like, a shots fired.

And then any victim information we have, the address of the scene, what photos I am taking, the precinct generally or investigative unit that's calling us out there or the officer request, and that's their employee number.  And then at the bottom, it says taken by me.

1     Q.   And does the complaint number match the

2 number that you just told us here in court?

3     A.   Yes, it does.

4     Q.   Can we please look at United States

5 Exhibit 395. Can you please tell us what we're looking

6 at in this photograph.

7     A.   So this is the front of the building at

8 that address, 1316 Antioch Pike, which is the Island

9 Vibes Caribbean Restaurant or lounge.

10    Q.   And why did you take this photograph?

11    A.   Generally I try to get the address of the

12 location or closest location just as a point of

13 reference. So this is the front of that location at that

14 address.

15    Q.   Can we please look at United States

16 Exhibit 396. Can you please tell us what we're looking

17 at in this photograph?

18    A.   So this is some of the evidence markers.

19 You can see evidence markers 1 and 2 with that Island

20 Vibes location building in the background. The street

21 here is Antioch Pike.

22    Q.   So you've taken some steps back away from

23 the picture that we were looking at in 395?

24    A.   That's correct.

25    Q.   And when you talk about the yellow

1  placards, please explain what those are.

2        A.    Yeah.  So those are the evidence markers.

3  So each placard you can see in the photograph is

4  signifying a piece of evidence that we have located.

5        Q.    Now if you hadn't put the placards down

6  there, would we have been able to see the evidence in

7  this photograph or to know that something was there in

8  this photograph?

9        A.    It would have been hard to visually see it

10  in this photograph without the evidence markers.

11        Q.    What is to the left of this photograph?

12        A.    Where the, like, white lights are?

13        Q.    Yes.

14        A.    It's, like, a little strip small with

15  several other businesses.

16        Q.    And what is to the right of the Island

17  Vibes, the front of the Island Vibes establishment?

18        A.    To the right is a driveway to the back of

19  the -- like, a back parking lot behind that business,

20  behind Island Vibes.

21        Q.    Can we look at United States Exhibit 397,

22  please.  What are we looking at in this photograph?

23        A.    So this is -- I took a few steps to the

24  right.  So, again, this is just a different view of that

25  same location with the Island Vibes in the background,

1  and you can also now see additional evidence markers,

2  Evidence Marker 3, and then to the right, kind of before

3  the police cars, are several other evidence markers on

4  the roadway there.

5          Q.    Can we look at United States Exhibit 398,

6  please.  What do we see in this photograph?

7          A.    This is another photograph, just more to

8  the right on Antioch Pike.  You can see a whole bunch of

9  other evidence markers.  Those are all the little yellow

10  triangle-looking things.  And this is more in front of

11  the driveway that we had previously spoken of.

12          Q.    And what's underneath or by those yellow

13  placards?

14          A.    What's -- what are they signifying?

15          Q.    Yes.  What do they signify?

16          A.    In this case, I believe the majority of

17  these are all cartridge casings.

18          Q.    Can we look at United States Exhibit 399.

19  What are we looking at in this photograph?

20          A.    This is another photograph of the evidence

21  markers on Antioch Pike just angled in a different way.

22          Q.    Can we look at United States Exhibit 400.

23  Can you explain to us what we're looking at in this

24  photograph?

25          A.    So this is a closeup photograph of Evidence

Marker 1 that is on Antioch Pike that we had previously

seen in some of the overall photographs.  And this

Evidence Marker 1 is in relation to that cartridge case

that we see here on the roadway.

Q.    And did you put this placard down?

A.    I did.

Q.    Do you know how many placards you put down

this morning?

A.    On this case, I think there were -- I'm

trying to think.  Just over 40, maybe 41, 42, somewhere

around there.

Q.    Somewhere in the 40s?

A.    Yeah.

Q.    With respect to this placard, did you

collect that shell casing that's by this placard in --

depicted in United States Exhibit 400?

A.    Yes, I did.

Q.    And what type of shell casing was that?

A.    I believe -- I can't tell -- remember

offhand because there were multiple calibers out there.

I can't remember if this was a .762 or a .223

specifically.

Q.    Can you look at United States Exhibit

No. 28 in front of you.

A.    So 28 in relation to Evidence Marker 1?

1        Q.    Yes.

2        A.    So evidence -- or Exhibit 28 contains .223

3   caliber cartridge casings.

4        Q.    And how many .223 caliber cartridge casings

5   are in evidence -- United States physical

6   exhibit evidence No. 28?

7        A.    I had collected 16.

8        Q.    Can we look at United States Exhibit 401.

9   And what is depicted in this photograph?

10       A.    This is a closeup photograph of Evidence

11  Marker 4 again on Antioch Pike, and this is another

12  cartridge case at that scene.

13       Q.    Can you look at United States Exhibit

14  No. 94 in front of you?

15       A.    Uh-huh (affirmative).

16       Q.    And based on United States Exhibit No. 4 --

17  94 and 401, do you know how many shell casings were

18  picked up in relation to this one that's depicted in this

19  photograph?

20       A.    Based on Exhibit 94, it's a 9mm, and I

21  believe I collected three 9mm cartridge casings at this

22  scene.

23       Q.    Can you look at United States Exhibit 402.

24  Can we pull up 402?

25             What are we looking at in this photograph?

1        A.     This is a midrange photograph depicting

2   Evidence Markers 5 and 6.  Again, those are representing

3   cartridge casings that were on Antioch Pike.

4               THE COURT:  Let's do this, Mr. Safeeullah.

5   We are at 3 o'clock, so it's probably time to take our

6   midafternoon break.  Jurors may step down, and we'll

7   reconvene in 15 minutes or so.  Thanks, folks, for your

8   continued attention.

9               (Whereupon, at 3:01 p.m. the jury retired

10  from open court.)

11              THE COURT:  All right.  Thank you, folks.

12  Please be seated.

13              Mr. Safeeullah, you know, I would say

14  either -- you know, if you have time on break, a brief

15  discussion tonight or whatever to square away the notion

16  about that second No. 1220 so that no one complains that

17  they didn't know what was marked what.  Understand what

18  I'm saying?

19              MR. SAFEEULLAH:  Yes, Your Honor.  I think

20  we just mislabeled it.  It inadvertently got passed to

21  the witness.  I think she identified 1220 based on her

22  notation on it.

23              THE COURT:  Yeah.  Like that one, if you

24  are going to introduce it, I don't know if you put it on,

25  like, let's say the back end of your witness list or --

1  as far as I'm concerned, you could just mark it 1220A if

2  that's easier or put it on the back end of your witness

3  list, whatever.

4            MR. SAFEEULLAH:  Thank you, Your Honor.

5            THE COURT:  Yeah, thank you.  All right.

6            Mr. Safeeullah, anything we need to talk

7  about before we go to break?

8            MR. SAFEEULLAH:  No, Your Honor.

9            THE COURT:  Anything from any counsel for

10  defendants?

11            MR. HAWKINS:  Your Honor, I believe -- is

12  Hector Venturas coming up today, may I inquire?

13            THE COURT:  I'm sorry.  I'm sorry, I didn't

14  hear that, Mr. Hawkins.

15            MR. HAWKINS:  Sure.  I'm cursed with a soft

16  voice, Your Honor.

17            THE COURT:  No worries.  So I appreciate

18  with the mic, I should be able to hear you.

19            MR. HAWKINS:  So we were wondering if

20  Hector Venturas is going to be called today.

21            MR. SAFEEULLAH:  He's the United States'

22  next witness.  This witness should take approximately 20

23  or 30 more minutes of direct, and after that, the

24  United States plans on calling Hector Venturas.

25            THE COURT:  Do you have an estimate about

1  how long that witness may go?

2           MR. SAFEEULLAH:  He may go three, four

3  hours on direct examination.

4           THE COURT:  So it sounds like we'll begin

5  that direct, we'll finish the direct tomorrow and at

6  least start on cross of that witness -- I say tomorrow,

7  because you know I mean Monday, because we're taking

8  tomorrow off.  But Monday, we'll finish that direct and

9  then go to cross-examination.

10           MR. HAWKINS:  And to that, Your Honor, we

11  would like to have maybe a jury-out hearing about what

12  he's going to testify with respect to statements made by

13  co-conspirators.  We'd like to have a quick motion in

14  limine heard on that to keep the record clean and perhaps

15  even voir dire this witness very quickly.

16           THE COURT:  All right.  Let's do this:

17  While we're on break, maybe talk among yourselves about

18  when you think it might make sense to do this, if it's

19  Monday at 8:00.  Although that's not -- I've got to tell

20  you.  I think we already have something else in another

21  case Monday at 8:00.  I would go at 6:00 a.m., I really

22  would.  But I don't know about other folks in chambers --

23  I'd go at 7:00, I'd -- you know.

24           But maybe amongst yourselves and

25  Ms. Jackson, try and figure out when we can do this.  The

1   problem is tomorrow -- I mean, tomorrow we -- we end up

2   getting a couple motions to continue, by way of

3   explanation.  Obviously, we want to use our days in court

4   that are open; tomorrow is one of them.  We packed it

5   full, a couple of things got continued.  Maybe there's

6   some time tomorrow.  Of course, that would require people

7   that maybe thought they were going to be off all day from

8   this courtroom tomorrow not to be able to do that, and

9   that may -- I know there may be some reasons you may not

10  want to do that.

11             Show of hands.  Anyone that can't be here

12  tomorrow for that purpose?  All right.  I think that's

13  fair enough.  Then we're going to have to try and -- we

14  can't -- can't do it later today because we have

15  something that follows this trial, the trial proceedings

16  today.

17             It would have to be Monday and -- yeah,

18  okay.  Here's what we'll have to do then.  It would have

19  to be, unless someone wants to be here at 7:00 a.m. --

20  and I wouldn't blame the court reporter for not being in

21  favor of that -- it would have to be probably Monday

22  after a plea hearing in another case before the jury

23  comes in.

24             So here's what I'm going to say.  On break,

25  get a sense for how long you think this might take.  You

know, if that entails discussion with the government, I'd
recommend that, and that will help me determine when to
tell the jurors to come in if we can get a reasonable
estimate.  And when I come back in, we can also talk
about what you think the issues are because -- and I --
and I probably said this several times.  I understand
defendants' concerns about co-conspirator statements
coming in, and I don't want anything to come in and
everyone to forget about it and so forth, right.

But do be prepared to sort of articulate,
you know, how this situation it would be prudent, or
otherwise required or whatever, to do something different
than the procedures I've outlined, something more
extensive than the procedures I've outlined.

Does that make sense, Mr. Hawkins?

MR. HAWKINS:  Yes, Your Honor.  I don't
know why we couldn't do a quick voir dire of the witness
today before the jury comes back in -- if there's a
place, there's a pause in the action, we can put the
witness -- I don't know how the government feels about
that.

MR. SAFEEULLAH:  I don't know what the
basis for this is and why it's different and more
extensive than what's -- the Court has already ruled on
in Docket Entry, I believe, 465.  There was not a motion

1  in limine filed on this, and I'm not sure why this is

2  different from the other motion in limine that Your Honor

3  already ruled on.

4          THE COURT:  And so -- and I think that that

5  sort of is the issue.  I'll give you time to think about

6  it, Mr. Hawkins.  Because if I'm Mr. Safeeullah, I'm

7  probably saying the same thing.  And that's initially

8  what I'm thinking, which is understanding the defendant's

9  concerns about it.  Of course, I made my ruling based on

10  the law and practicalities and fairness to the defendants

11  and all that.  So think about how you'd make your pitch

12  as to something different than what we've done.

13          MR. HAWKINS:  I'll speak with the

14  government on the break.

15          THE COURT:  All right.  Then we'll take

16  about 15 minutes, and we will go from there.  Our witness

17  may step down.  Thank you.

18          (Whereupon, a break was taken from

19   3:08 p.m. to 3:33 p.m.)

20          THE COURT:  Anything we need to talk about

21  at this time regarding Mr. Hawkins' issue or anything

22  else?

23          MR. HAWKINS:  Your Honor, I think we've

24  resolved that issue.  You know, we'll just be vigilant

25  during the direct.  We're concerned about hearsay that is

not an exception, the statements made by co-conspirators.
The problem is one of -- these statements not being in
furtherance, as required by the rule. And the Sixth
Circuit has been very clear in *United States versus*
*Darwich*. I'll give you the cite. The Sixth Circuit says
that, you know, mere idle chatter or casual conversation
about past events is not considered a statement in
furtherance of a conspiracy.

And I'm concerned that some of these
statements, perhaps some of them about the murder of
Liliana Rodriguez, are going to come in, statements from
a co-conspirator that are really simply documentary in
telling about something that happened, and they serve no
real purpose. That's 337 F.3d 645.

THE COURT: Okay. So a couple things, and
I'll certainly allow you to continue. You know, one
is -- and you are raising an issue different than what
was the subject of my order which is, like, well, you
know, the problem here is -- but the general nature of
the issue to which my order was responding was to the
notion that the foundation had not been laid. Maybe it
could be laid by the government at a certain point, but
it may not at all be laid by the time the alleged
co-conspirator statement is offered.

You're raising a different issue which is

1    it doesn't matter when it's offered.  There's nothing the

2    government could ever do to make this admissible under

3    the co-conspirator exception because it doesn't meet the

4    definition of a co-conspirator statement that is exempted

5    from the definition of hearsay.  The reason it doesn't do

6    that is it's a statement not in furtherance of the

7    conspiracy.

8              Now, the government, with some witnesses,

9    at least one or maybe -- well, I suppose maybe it was

10   Mr. Avila -- maybe it was just Mr. Avila.  You know, they

11   have a theory that part of what, you know -- and it's

12   obvious that this is their theory, right, and they're

13   eliciting testimony -- that part of what happens, at

14   least if you're Second Word, but maybe if you're a -- if

15   you're a homeboy dealing with someone lower on the totem

16   pole, even in that scenario, it is in furtherance of the

17   conspiracy for you to get the low-down on what's going on

18   right in front of you.  That's the government's theory.

19             What you're describing, I think, makes

20   sense.  Look, idle chatter, just the way we use that

21   term, you wouldn't think idle chatter is in furtherance

22   of much of anything, right.  So I get your point.  In a

23   given context, maybe I'll agree with you.  Maybe there

24   will be a dispute between the parties over that issue,

25   and I guess we can take it up as we come.

1          So when you hear something that you think
2   is hearsay, by all means, feel free to object.  If the
3   objection is along the lines of, well, you know, this
4   statement -- maybe it's the kind of statement that could
5   be in furtherance of the conspiracy but the foundation
6   hadn't been laid, then we'll proceed according to my
7   order.  If there's any other basis for objecting, we can
8   take that up.  And the nature of the objection you're
9   talking about is a different nature, which is, you know,
10  this kind of statement is -- could never be in
11  furtherance of the conspiracy.
12          So when you make an objection, we'll just
13  try and be clear about what the nature of it is, and
14  we'll take it up.
15          All right.  Anything that you have on that,
16  Mr. Safeeullah?
17          MR. SAFEEULLAH:  Not at this time,
18  Your Honor.
19          THE COURT:  All right.  I would say this:
20  I'm going to look at the case that Mr. Hawkins cites.  I
21  think it's -- it sounds like a perfectly reasonable sort
22  of legal proposition.  If the government wants to cite a
23  case maybe setting forth its view about where the line is
24  between sort of idle chatter about historic events versus
25  discussions about prior events that actually do further

1 the conspiracy, if the government wants to present

2 something or if anyone else on the defendant's side wants

3 to present something, I'm happy to look at it.

4                    All right.  Anything further at this time?

5 No?

6                    MR. SAFEEULLAH:  No, Your Honor.

7                    THE COURT:  All right.  Very well.

8                    All right, Mr. Safeeullah.  We can have our

9 witness take the stand again.  Ms. Connor.  And then you

10 can take the lectern and we can call in our jurors as

11 soon as Ms. Connor takes the stand.

12                    (Whereupon, at 3:39 p.m. the jury returned

13 to open court.)

14                    THE COURT:  All right.  Thanks, folks.  I

15 anticipate we'll go until about 4:45 today just as an

16 FYI.  As you'll recall, we are off tomorrow, back Monday.

17 Thanks for your continued attention.

18                    All right.  Mr. Safeeullah, as you'll

19 recall, was doing the direct exam of Ms. Connor, and he

20 may continue.

21                    MR. SAFEEULLAH:  Thank you, Your Honor.

22  BY MR. SAFEEULLAH:

23         Q.    Can we pull back up United States

24 Exhibit 402, please.  I believe when we left off,

25 Ms. Connor, you were explaining to us what was in this

photograph.  Can you tell us what's in United States

Exhibit 402?

         A.    Yes.  So this is a mid-range photograph

showing Evidence Markers 5 and 6 on Antioch Pike.  Each

evidence marker signifies -- I believe both of these are

cartridge cases.

         Q.    And do you know what type of cartridge

casing is next to placard No. 5?

         A.    It appears to be a rifle caliber cartridge

case.

         Q.    Do you know what particular rifle?

         A.    I'd have to see if I can...  I don't think

I can tell on here just looking through the bag.  Let me

see.  I don't think I'm going to be able to tell.  Just

by looking at it -- I'm not a firearms expert, so just by

looking at the picture, I can't tell.  I'd have to check

either my documentation for the exact -- what one I

marked as Evidence 5, whether it's a 7.62 or .223.  I

can't tell just by looking at that.

         Q.    So you can't tell right now?

         A.    Huh-uh (negative).

         Q.    Is there something that would help refresh

your recollection?

         A.    Either looking at the evidence itself or

the 110 evidence submittal form.

1          MR. SAFEEULLAH:  Your Honor, may I pass

2     this witness a form to look at?

3          THE COURT:  You may.

4     BY MR. SAFEEULLAH:

5          Q.    Without reading from that document, can you

6     just look over it, please.

7          A.    (Complies.)

8          Q.    Have you finished reviewing that document?

9          A.    Yeah.  It's my --

10          THE COURT:  One moment.  The way we'll

11     proceed, procedurally, is your memory refreshed after

12     reviewing that document?

13          THE WITNESS:  Of this exact photograph?

14          THE COURT:  Well, so the question being, if

15     I understand your testimony, you did not recall what

16     caliber --

17          THE WITNESS:  Correct.

18          THE COURT:  -- and it sounded like you told

19     Mr. Safeeullah that it might be possible to refresh your

20     memory as to what caliber it was; is that correct?

21          THE WITNESS:  Correct.

22          THE COURT:  Having reviewed that, have you

23     reviewed it and determined whether your memory is

24     refreshed on that point?

25          THE WITNESS:  Yes.

1           THE COURT:  Okay.  All right.  If you would

2    set it aside, please, and then Mr. Safeeullah will ask

3    you a question.  Thank you.

4     BY MR. SAFEEULLAH:

5           Q.   So your memory has been refreshed now?

6           A.   From that, yes.

7           Q.   Okay.  So what cartridge casing is located

8    next to No. 5?

9           A.   A .223 caliber cartridge case.

10          Q.   Was that one of the .223 cartridge casings

11   that you previously testified about in United States

12   Exhibit No. 28?

13          A.   Yes.

14          Q.   What type of cartridge casing is at the

15   placard listed at No. 6?

16          A.   That's going to be a handgun caliber.  So

17   either a .45 or a 9mm.  In this photo, I can't tell

18   because it's not a closeup photograph.  So I'm not able

19   to tell from this photo alone.

20          Q.   Is there something that would help refresh

21   your recollection?

22          A.   Yes.  Again, either this form or the

23   evidence itself.

24          Q.   Without reading from the form, can you look

25   at the form, please, and let me know when you're finished

1  looking at the form.

2          A.      Okay.

3          Q.      Have you finished looking at the form?

4          A.      Yes, sir.

5          Q.      Has your memory been refreshed?

6          A.      Yes, sir.

7          Q.      Now looking at United States Exhibit 402,

8  the placard at -- placard 6, can you tell us what type of

9  cartridge casing that is?

10         A.      That would be a 9mm cartridge case.

11         Q.      Can we turn to United States Exhibit 404,

12 please.  Is this the -- what is this in this photograph?

13         A.      This is a closeup photograph of that

14 cartridge case with Evidence Marker 6.

15         Q.      Can we turn to United States Exhibit 403,

16 please.  Can you tell us what we're looking at in this

17 photograph?

18         A.      This is that previous .223 caliber

19 cartridge case with Evidence Marker 5.

20         Q.      Is there something distinctive about this

21 cartridge casing?

22         A.      The back end of it appears to have been

23 defected in some way.

24         Q.      And based on your training and experience,

25 what would cause it to be defective in this way?

1      A.    It could -- it's possible that the
2  cartridge case was ran over, causing it to have that
3  smashed-look effect on the back end of it.
4      Q.    And where was this photograph taken?
5      A.    That was on Antioch Pike.
6      Q.    Can we turn to United States Exhibit 406,
7  please.  And can you please tell us what we're looking at
8  in this photograph?
9      A.    These are additional evidence markers next
10  to other evidence we had located or I had located.  This
11  is on the driveway.  The lower bottom half would be
12  closest to Antioch Pike, and the background is leading
13  towards the back parking lot behind that building.  That
14  building on the right side is the side of that Island
15  Vibes location.
16      Q.    On the right side or on the left side?
17      A.    The left side, sorry.
18      Q.    So the left side is the Island Vibes
19  location?
20      A.    Correct.
21      Q.    Can we go back to United States
22  Exhibit 498, please.  So when we're looking at this
23  photograph, the driveway is down past the police cars?
24      A.    That's correct.  Uh-huh (affirmative).
25      Q.    So 406 was a view of looking down that

1  driveway?

2          A.    Yeah, closer up.  Uh-huh (affirmative).

3          Q.    Can we go back to United States

4  Exhibit 406, please.  What is on the left-hand side of

5  this photograph we're looking at?  I know you mentioned

6  it's the club, but what's on that -- in that club -- on

7  that club wall?

8          A.    On the farther end of the club wall, we had

9  located some defects to the wall that appeared to have

10  been from projectiles that had struck it.

11          Q.    And when we're looking at these placards

12  here, do you know what's under the placard 21 and 20?

13          A.    21 and 20.  Not offhand.  You mean next to

14  it or under?

15          Q.    Next to placards 21 and 20.

16          A.    As in the plastic cups or the evidence

17  itself?

18          Q.    Well, explain to us what those are.  Are

19  those plastic cups?

20          A.    The little things next to each of those

21  placards, yes, sir.

22          Q.    Did you put those plastic cups down?

23          A.    I did not put those there.

24          Q.    Were they there before you arrived on the

25  scene?

1           A.      That's correct.

2           Q.      Do you know what's under those plastic

3     cups?

4           A.      Evidence.  Whether that's some -- or

5     cartridge cases, and we had found, I think, a few copper

6     fragments out there.

7           Q.      Do you know what evidence is located at

8     placard 20 and 21?

9           A.      A cartridge case, I believe.

10          Q.      Do you know what type of cartridge case?

11          A.      Not off memory.  I can't memorize every

12    cartridge case -- or every evidence marker number.

13          Q.      That's fine.  Is there something that would

14    help refresh your recollection?

15          A.      The form that I had filled out, yes, sir.

16          Q.      Can you look at that form, and let me know

17    when you've finished looking at that form.

18          A.      Okay.

19          Q.      Having looked at that form now, has your

20    memory been refreshed?

21          A.      Yes, sir.

22          Q.      So I'll repeat the question.  Can you tell

23    us what type of evidence is at placard 20 and 21?

24          A.      20 and 21 were 7.62 caliber cartridge

25    casings.

1          Q.     Did you end up recovering the 7.62

2    cartridge casings that were at placard 20 and 21?

3          A.     Yes.  They were collected as evidence.

4          Q.     How many 7.62 cartridge casings did you

5    recover that day?

6          A.     At this scene, 18.

7          Q.     Can you look at United States Exhibit

8    No. 27 in front of you.  What is that exhibit?

9          A.     This is the 18 7.62 caliber cartridge cases

10   that were collected at the scene.

11         Q.     Can we turn to United States Exhibit 407,

12   please.  Can you tell us what we're looking at in this

13   photograph?

14         A.     This is farther down that driveway,

15   approaching that back parking lot, with additional

16   evidence markers.

17         Q.     Can we look at United States Exhibit 408,

18   please.  Can you tell us what we're looking at in this

19   photograph?

20         A.     This is on -- or on the driveway.  I have

21   turned the opposite direction.  So instead of facing the

22   back parking lot, I am now, I believe, facing towards

23   Antioch Pike.  So the Antioch Pike's kind of where you

24   see those cop cars and the stop sign.

25         Q.     And what do all of those yellow placards

1  symbolize?

2          A.    Each of those yellow placards that you see

3  are additional evidence on that driveway that we had

4  located.

5          Q.    Was it raining this morning?

6          A.    It was, sir.

7          Q.    Can we please turn to United States

8  Exhibit 409, please.  What is this a photograph of?

9          A.    This is a photograph in the back parking

10 lot area behind the Island Vibes building.

11         Q.    Can we please turn to United States

12 Exhibit 410, please.  What are we looking at in this

13 photograph?

14         A.    This is at the far backside of the parking

15 lot.  Down on that concrete patio or slab, that little

16 black square is a cell phone.

17         Q.    Why did you take this photograph?

18         A.    Because it was -- when we searched the

19 scene, that cell phone was in proximity to the rest of

20 the evidence, so we had marked it as potential evidence.

21         Q.    Can we look at United States Exhibit 411,

22 please.  Can you tell us what we're looking at in this

23 photograph?

24         A.    This is an additional closer-up photograph

25 of that cell phone and a back of a cell phone on the left

1  side of the photograph.

2          Q.    Can we look at United States Exhibit 412,

3  please.  What are we looking at in this photograph?

4          A.    A closeup photograph of that same cell

5  phone on that concrete slab.

6          Q.    Can we look at United States Exhibit 413,

7  please.  What are we looking at in this photograph?

8          A.    This is -- when I touched the phone, the

9  screen lit up, and this was that front screen.

10         Q.    Was there another CSI detective at the

11 scene taking photographs that morning?

12         A.    Yes, there was.

13         Q.    And who was that?

14         A.    CSI John Terry.

15         Q.    And what did you see him taking photographs

16 of?

17         A.    CSI Terry photographed the defects to the

18 side of the building along the driveway.  And I believe

19 he also photographed a defect to a vehicle that was

20 parked in that back parking lot.

21         Q.    Okay.  I want to change focus and shift to

22 another incident.

23         A.    Okay.

24         Q.    In May of 2017, were you working as a crime

25 scene investigator for the Metro-Nashville Police

1  Department?

2          A.    Yes, I was.

3          Q.    Did you respond to an incident on May 21,

4  2017, at 1088 Murfreesboro Pike?

5          A.    Yes, I did.

6          Q.    Approximately when did you get there?  Do

7  you remember?

8          A.    I believe this was right about 1:00 a.m.

9  timeframe.

10          Q.    And what did you do when you first got to

11  this scene?

12          A.    So, again, I spoke to one of the officers

13  on scene.  If I recall, I think it was Officer

14  Spadaveccia was there on this one.  Again, I garnered any

15  information he had of the scene, victim information,

16  whether the victim was transported to a hospital, and

17  what -- with what injuries.  And then I also, again,

18  searched the scene for any potential evidence.

19          Q.    Did you also take photographs?

20          A.    Yes, I did, sir.

21          Q.    Did you also collect evidence?

22          A.    I did.

23          Q.    Did you also write a report about this

24  incident?

25          A.    I did, yes.

1       Q.    Did you also submit the evidence that you

2  collected to Property?

3       A.    Yes, I did.

4       Q.    Can you look in the booklet in front of

5  you.  I think it might be the next booklet.  You can put

6  that binder back up.

7            The next binder that contains 436 through

8  650, it starts with 436 through 650.  Do you see that

9  binder up there?

10      A.    Yeah.

11      Q.    Before you start going through that

12 binder --

13            MR. SAFEEULLAH:  Your Honor, may I get back

14 the document that refreshed her recollection?

15            THE COURT:  You may.

16  BY MR. SAFEEULLAH:

17      Q.    Can you look through the binder that you

18 have in front of you at Exhibits 469 through 524.

19      A.    Okay.

20      Q.    Can you also look at United States

21 Exhibit 552 and 553.

22      A.    Okay.

23      Q.    Have you looked at those exhibits?

24      A.    Yes, sir.

25      Q.    What are those exhibits?

1      A.    These are photographs that I took at that

2  location at 1088 Murfreesboro Pike.

3              MR. SAFEEULLAH:  Your Honor, may I approach

4  this witness again?

5              THE COURT:  You may.

6   BY MR. SAFEEULLAH:

7      Q.    I'm passing up what's been previously

8  marked as United States Exhibits 33, 34, 35, 40, and 41.

9              Can you look at those exhibits, please.

10     A.    Okay.

11     Q.    And do you recognize what those exhibits

12  are?

13     A.    Yes, sir.

14     Q.    And what do you know them to be?

15     A.    Evidence collected at this scene.

16             MR. SAFEEULLAH:  Your Honor, I move to

17  admit into evidence United States Exhibits 469 through

18  524, 552, 553, as well as United States Exhibits Nos. 33,

19  34, 35, 40, 41, and request permission to publish them to

20  the jury.

21             THE COURT:  All right.  Absent objection,

22  the following exhibits are admitted:  Government Exhibits

23  469 to 524, Government Exhibits 552 and 553, Government

24  Exhibits 33, 34, 35, 40, and 41.  And they may be

25  published to the jury.

1          (Government Exhibits Nos. 469-524, 552,

2    553, 33-35, 40 and 41 were admitted.)

3          MR. SAFEEULLAH:  Thank you, Your Honor.

4     BY MR. SAFEEULLAH:

5          Q.    Can we start with United States Exhibit 469

6    and pull that up, please.  Can you please explain to us

7    what we're looking at in this photograph?

8          A.    This is the photo work order for this

9    scene, the date of the incident and time I started these

10   photographs, the individual complaint number for this

11   case, the type of call, which signifies a fatal shooting,

12   the address of this location, 1088 Murfreesboro Pike,

13   again, the photos I'm going to be taking of a scene, any

14   evidence and a vehicle, and then the requesting precinct,

15   which I had put as Hermitage, and then my name.

16         Q.    Can we take a look at United States

17   Exhibit 470, please.  Can you please tell us what we're

18   looking at in this photograph?

19         A.    This is part of the strip mall that this

20   incident was located at.  This is one of the businesses

21   there, the Sheeba Restaurant.

22         Q.    Why did you take this picture?

23         A.    To signify a location, again like I did on

24   the previous case.  Here I have the Sheeba Restaurant,

25   and to the right you can see an address of 1001, which is

1   actually a Thompson Lane address.

2           Q.    Can we pull up United States Exhibit 471,

3   please.  Can you tell us what we're looking at in this

4   photograph?

5           A.    This photograph is a little -- taken a

6   little to the left.  So that Sheeba Restaurant is a

7   little bit out of view on the right side of the

8   photograph.  This is a red Honda Civic that was

9   supposedly, I was informed, the victim had been located

10  in.

11          Q.    So you thought it was relevant to take a

12  photograph of this car?

13          A.    That's correct.

14          Q.    Can we look at United States Exhibit 472,

15  please.  Can you tell us what we're looking at in this

16  photograph?

17          A.    This is the driver's side of that red

18  Honda.  In the background is that Sheeba Restaurant that

19  was first photographed.

20          Q.    When you arrived on the scene, was the door

21  open to that red Honda?

22          A.    Yes, it was, sir.

23          Q.    Can we look at United States Exhibit 473,

24  please.  Can you tell us what we're looking at in this

25  photograph?

1          A.    This is another photograph around that same

2     vehicle, just at a different angle, showing how the

3     driver door is open.

4          Q.    At this point when you're taking

5     photographs around this scene, had you put down any

6     placards yet?

7          A.    No.  These are my initial photographs of

8     the overall scene before I mark evidence.

9          Q.    Can we look at United States Exhibit 474,

10    please.  What are we looking at in this photograph?

11         A.    Another photograph of the driver's side of

12    the vehicle.  And you can see that that triangle window

13    on the rear driver's side is -- has a hole in it.

14         Q.    Can we look at United States Exhibit 475,

15    please.  What are we looking at in this photograph?

16         A.    Several of the security cameras that were

17    located in that strip mall.

18         Q.    And why are you taking this photograph?

19         A.    Generally I try to document any

20    surveillance cameras so that any follow-up investigation

21    by any of the detectives, they can go back to those

22    locations and try to obtain surveillance video.

23         Q.    Can we look at United States Exhibit 476,

24    please.  What are we looking at in this photograph?

25         A.    Additional surveillance cameras at a

different -- or another one of those businesses in the
strip mall.

Q.   Can we blow up the -- the square, yes, to
the left-hand side of the screen.  Is this the security
cameras that you were just talking about?

A.   Yes, sir.

Q.   Can we look at United States Exhibit 477,
please.  Can you tell us what we're looking at in this
photograph?

A.   These are additional surveillance cameras
located on the other end of that same business.

Q.   Can we look at United States Exhibit 478,
please.  What are we looking at in this photograph?

A.   Additional surveillance cameras at another
one of the businesses in that strip mall.

Q.   Can we look at United States Exhibit 479,
please.  What are we looking at in this photograph?

A.   Additional surveillance cameras at another
one of the businesses at that location or that strip
mall.

Q.   Can we look at United States Exhibit 480,
please.  What are we looking at in this photograph?

A.   Additional surveillance cameras at the
strip mall.

Q.   Do you know if any of these cameras were

1 working at the time of the murder?

2          A.    No.  I just photograph all of them, whether

3 they're operating or not.

4          Q.    Can we look at United States Exhibit 481.

5 What are we looking at in this photograph?

6          A.    A closeup photo of the driver side of that

7 red Honda Civic previously mentioned.  This is that rear

8 window.

9          Q.    So now you're getting closer to the car,

10 taking more closer photographs of the car?

11          A.    That's correct, sir.

12          Q.    And why did you find it significant to take

13 this photograph?

14          A.    I was documenting the holes around and to

15 that window, some of the defects.

16          Q.    And where do you see all of the defects?

17          A.    To the lower left of the window, to the

18 interior of the driver door trim below the left corner of

19 the window, and then on the vehicle below the window on

20 the -- towards the right end of that window.

21          Q.    Can we turn to United States Exhibit 482,

22 please.  What are we looking at in this photograph?

23          A.    This is the exterior side of the driver

24 door.  Again, I can visually see several bullet defects

25 to that door.

1       Q.    And how many defects do you see?

2       A.    Appears to be about seven or eight of them.

3       Q.    Can we look at United States Exhibit 483,

4  please.  What are we looking at in this photograph?

5       A.    This is the interior side of the driver

6  door showing defects that had perforated through the

7  door.

8       Q.    Can we look at United States Exhibit 484,

9  please.  What are we looking at in this photograph?

10      A.    These are the front seats in that Honda

11 Civic.  So the driver's seat is the one in the

12 foreground.

13      Q.    Is there anything significant to you in

14 this photograph?

15      A.    There appears to be blood on the driver's

16 seat, as well as several defects to the driver and front

17 passenger, as well as possibly to the front end of the

18 center console.

19      Q.    Where do you see the defects in the driver

20 seat?

21      A.    It appears that there are some possibly to

22 the headrest area.

23      Q.    And what about the passenger seat?

24      A.    To that closer side, to the side closer to

25 the center console, kind of where you see the yellow

1  foam.

2          Q.    Does that appear to be a defect in the

3  center console as well?

4          A.    To the front side of it -- or the front end

5  of it, yes.

6          Q.    Can we pull up United States Exhibit 485,

7  please.  What are we looking at in this photograph?

8          A.    An additional view around the Honda Civic.

9          Q.    Can we pull up United States Exhibit 486,

10  please.  What are we looking at in this photograph?

11         A.    This is the passenger side of that same

12  Honda Civic with other additional defects to it.

13         Q.    And why did you take this photograph?

14         A.    To document the passenger side of the

15  vehicle, as well as those defects.

16         Q.    Can we zoom in to show that back panel and

17  the passenger side door.

18              Approximately how much defects do you see

19  in this photograph?

20         A.    About seven or eight, it looks like.

21         Q.    And based on your training and experience,

22  what do these defects appear to be?

23         A.    From my training and experience, they

24  appear to be exit defects.

25         Q.    Exit defects from what?

1          A.    Projectiles or bullets.

2          Q.    Can we look at United States Exhibit 487,

3    please.  What are we looking at in this photograph?

4          A.    This is a closer photo of those defects we

5    were just talking about on the passenger side of the

6    Honda Civic.

7          Q.    Can we look at United States Exhibit 488,

8    please.  What are we looking at in this photograph?

9          A.    This is the rear passenger view of the

10   Honda Civic.

11         Q.    Can we pull up United States Exhibit 489,

12   please.  What are we looking at in this photograph?

13         A.    This, I believe, is a 7.62 cartridge case

14   that was located at that location.

15         Q.    Can we look at United States Exhibit 490,

16   please.  Why did you take this photograph?

17         A.    There was a projectile located on that

18   sidewalk below the Sheeba Restaurant sign.

19         Q.    Can we look at United States Exhibit 491,

20   please.  What are we looking at in this photograph?

21         A.    This is more of a mid-range photograph of

22   that projectile on the sidewalk.  It's hard to see, but

23   it's kind of centralized, lower center of the photo.

24         Q.    Can we pull up United States Exhibit 493 --

25   92, please.  What are we looking at in this photograph?

1    A.    This is a closeup photograph of that

2 projectile on the sidewalk.

3    Q.    Can we look at United States Exhibit 493,

4 please.  What are we looking at in this photograph?

5    A.    This is a photograph of that location with

6 evidence markers placed with the natural lighting of that

7 location.

8    Q.    So now you're in the process of starting to

9 put down the placards and marking the evidence that you

10 have found at the scene?

11    A.    Yes, sir.

12    Q.    Can we look at United States Exhibit 494,

13 please.  What are we looking at in this photograph?

14    A.    Another photograph of that location using

15 the flash on my camera.  In this photo, the little -- I

16 have placed the little yellow evidence markers next to

17 the items of evidence I had found.

18    Q.    Can we look at United States Exhibit 495,

19 please.  What are we looking at in this photograph?

20    A.    This is another overall photograph of the

21 location with the evidence markers placed by the

22 evidence.

23    Q.    Can we look at United States Exhibit 496,

24 please.  What are we looking at in this photograph?

25    A.    Another photograph of the location with the

evidence markers, just a closer -- I'd moved forward

towards the vehicle in the parking lot.

        Q.    Can we look at United States Exhibit 497,

please.  What are we looking at in this photograph?

        A.    Additional photograph of some of the other

evidence markers, Evidence Markers 9 and 10, in the

parking lot.

        Q.    Now, was this on the passenger side or on

the driver's side?

        A.    This is on the passenger side, the Honda

Civic, the red Honda Civic.

        Q.    Can we look at United States Exhibit 498,

please.  What are we looking at in this photograph?

        A.    Another view of the evidence markers I had

placed around the vehicle.

        Q.    Can we look at United States Exhibit 499,

please.  What are we looking at in this photograph?

        A.    Another photograph almost of the same view,

just taken at a different vantage point to show the

Sheeba Restaurant behind the vehicle.

        Q.    Can we look at United States Exhibit 500,

please.  What are we looking at in this photograph?

        A.    Another photograph at a different angle

around the vehicle.  In the background, the back upper

right in the -- you can see the first evidence markers.

1  Evidence Markers 1 and 2 are back there.

2         Q.    Can we look at United States Exhibit 502,

3  please.  What are we looking at in this photograph?

4         A.    This is Evidence Marker 8, an overall

5  photograph showing below the Sheeba Restaurant, which is

6  the projectile on the sidewalk.

7         Q.    And that's the projectile we talked about a

8  little bit earlier?

9         A.    That's correct.

10        Q.    Can we look at United States Exhibit 503,

11 please.  What are we looking at in this photograph?

12        A.    This is a view of the front of the vehicle

13 with Evidence Markers 6, 7, and 9 in view.

14        Q.    Can we look at United States Exhibit 504,

15 please.  What are we looking at in this photograph?

16        A.    That's a closer-up photograph of the

17 vehicle, of the previous photo.

18        Q.    Can we look at United States Exhibit 505,

19 please.  What are we looking at in this photograph?

20        A.    This is that same Evidence Marker 8 of the

21 projectile on the sidewalk.  I am now standing closer to

22 the building, photographing Evidence Marker 8 back to the

23 location of the vehicle in the parking lot.

24        Q.    Can we look at United States Exhibit 506,

25 please.  What are we looking at in this photograph?

1          A.     The evidence markers in relation to the
2    rear passenger side of the vehicle.

3          Q.     Can we look at United States Exhibit 509,
4    please.  What are we looking at in this photograph?

5          A.     This is a mid-range photograph of Evidence
6    Marker 1.

7          Q.     Would this have been the first placard that
8    you put down?

9          A.     That's correct.

10         Q.     And why did you take this photograph again?

11         A.     To show that evidence marker in relation to
12    the buildings in the background.

13         Q.     How many placards did you put down this
14    morning?

15         A.     I believe I put down -- I think 13.

16         Q.     Now, with respect to this placard at No. 1
17    and this shell casing that's beside it, did you
18    eventually collect it?

19         A.     The evidence marked as Evidence 1, yes.

20         Q.     Do you know what type of shell casing it
21    was?

22         A.     Evidence Marker 1 was a 7.62 cartridge
23    case.

24         Q.     And how many 7.62 cartridge casings did you
25    find on that morning?

1          A.     At this scene, three.

2          Q.     Can you look at United States Exhibit 517,

3     please.  What are we looking at in this photograph?

4          A.     This is a cartridge case that I had marked

5     as Evidence Marker 4.  I believe this was a .40 caliber

6     cartridge case.

7          Q.     Do you know what kind of .40 caliber?

8          A.     I believe it was a Winchester .40.

9          Q.     Do you know how many Winchester .40 caliber

10    cartridge casings you recovered from the scene on this

11    morning?

12         A.     Six.

13         Q.     Can we look at United States Exhibit 518,

14    please.  What are we looking at in this photograph?

15         A.     This is the projectile we had previously --

16    or I had previously talked about as Evidence Marker 8 on

17    the sidewalk below the Sheeba Restaurant or in front of

18    the Sheeba Restaurant.

19         Q.     Are you a ballistic expert?

20         A.     I am not.

21         Q.     So you can't tell us what type of firearm

22    this bullet came from --

23         A.     No, sir.

24         Q.     -- the projectile came from?

25         A.     No, sir, I cannot.

1          Q.     Can we look at United States Exhibit 519,

2     please.  What are we looking at in this photograph?

3          A.     This is Evidence Marker 10 in relation --

4     at that far upper left corner is that red Honda Civic.

5          Q.     Can we look at United States Exhibit 520,

6     please.  What are we looking at in this photograph?

7          A.     This is a closer photograph of Evidence

8     Marker 10, which I believe was a copper fragment that I

9     had located.

10          Q.     And can we look at United States

11     Exhibit 521.  What are we looking at in this photograph?

12          A.     This is a closeup photograph of that copper

13     fragment that I had marked as Evidence Marker 10.

14          Q.     Can we look at United States Exhibit 522,

15     please.  Can you tell us what we're looking at in this

16     photograph?

17          A.     These are Evidence Markers 11 and 12 on the

18     rear driver's seat of the Honda Civic.  Both were copper

19     fragments.

20          Q.     And why did you take this photograph?

21          A.     To show the copper fragments on that seat.

22          Q.     Is there anything else of significance to

23     you in this photograph?

24          A.     Looking at the photo in the foreground on

25     the right side, it appears that there may be some defects

1   to that driver panel.

2          Q.     Is there also glass in the back seat?

3          A.     Yes, sir, there is.

4          Q.     Can we look at United States Exhibit 523,

5   please.  What are we looking at in this photograph?

6          A.     There is a closeup photograph of the copper

7   fragment that was marked as Evidence Marker 11.

8          Q.     Can we look at United States Exhibit 524,

9   please.  What are we looking at in this photograph?

10         A.     A closeup photograph of the copper fragment

11  marked as Evidence Marker 12.  The copper fragment is

12  below the marker.

13         Q.     Did you collect this copper fragment as

14  well?

15         A.     Yes, I did, sir.

16         Q.     In total, how many shell casings did you

17  recover from the scene on this morning?

18         A.     In total, there were nine.

19         Q.     Can we look at United States Exhibit 552.

20  What are we looking at in this photograph?

21         A.     This is another photo work order that I had

22  taken for this incident.  This is signifying that I am

23  now taking the photos on another date at a different time

24  of the victim's clothing/belongings at our office or

25  crime lab at 400 Myatt Drive.

1          Q.    And why do you take photographs of the

2    victim's clothing?

3          A.    To, one, document what was collected before

4    I turn it in to Property.  And also if there's any

5    defects or holes to the clothing, to document those.

6          Q.    Can we look at United States Exhibit 553,

7    please.  Can you tell us what we're looking at in this

8    photograph?

9          A.    This is a gray T-shirt that had been

10   transferred to me, and I was advised that it had belonged

11   to the victim.  This is the front side of that T-shirt.

12   The little white L-shaped scales are marking what I had

13   located as possible defects to that front side of the

14   shirt.

15         Q.    Can we zoom in to the center of this shirt.

16   Can we zoom back out, I'm sorry.

17               It appears that there's a cut -- several

18   large cuts in this shirt.  Do you know how they got

19   there?

20         A.    Generally when either the officers or EMS

21   staff, paramedics, are rendering aid to the victims, they

22   generally cut off their clothing, so those are generally

23   from them.

24         Q.    And was this shirt wet or dry when you took

25   this photograph?

1          A.    I believe it was dry.  It appears to be dry
2     in this photograph.
3          Q.    And, in essence, what are you trying to
4     capture with this photograph?
5          A.    Just the overall condition of the shirt and
6     the defects that I had marked with the scales.
7          Q.    And how many defects did you find in this
8     shirt?
9          A.    I had marked 11 defects to the front side
10    of this shirt.
11         Q.    Okay.  We can take that down, please.
12               All right.  I want to shift focus again and
13    move to another date.
14         A.    Okay.
15         Q.    I want to go to another date in May,
16    May 27, 2017.
17         A.    Okay.
18         Q.    Were you still working as a crime scene
19    investigator with the Metro-Nashville Police Department
20    on that date?
21         A.    Yes, I was.
22         Q.    Did you respond to an incident?
23         A.    Yes, I believe I did.
24         Q.    On May the 27th, 2017?
25         A.    Yes.

1      Q.     And why did you go to the scene on May 27,
2  2017?
3      A.     The scene that I believe you're referring
4  to was a shooting as well that also became a fatality.
5      Q.     And when you arrived on the scene, did you
6  approach it in the same manner that you told us before,
7  like your methodology of how you walk through a scene and
8  document and collect evidence?
9      A.     Yes.  Again, when I arrived, I would have
10  garnered any information from the on-scene officers.  I
11  would have conducted a walk-through of the scene, taking
12  overall photographs before I place evidence markers, then
13  going back through searching for the evidence, and again
14  photographing the scene with the evidence markers.
15      Q.     Can you look at -- in the booklet in front
16  of you, it's going to be binders 2 and 3.  So you're
17  going to have to start with one binder and flip to
18  another one, so you can kind of pack all that stuff up
19  there -- well, we're starting at 599 going through 713.
20      A.     What was the last number?
21      Q.     The last number is 713.
22             Have you reviewed those exhibits?
23      A.     Yes.
24      Q.     And what are in those exhibits?
25      A.     These are photographs I took at the scene

on May 28 of 2017.

                MR. SAFEEULLAH:  Your Honor, may I approach this witness again?

                THE COURT:  Yeah.  I wonder, was it -- did you say May 27?

                MR. SAFEEULLAH:  I'm sorry.  I didn't hear what the witness just said.

                THE COURT:  She said she took them on May 28, and maybe she did.  I just --

                THE WITNESS:  I believe -- I think the incident occurred on the 27th, but I got there, I think, a minute after midnight, so my photos were started on the 28th.

                THE COURT:  That would explain it.  Okay.

                MR. SAFEEULLAH:  May I approach, Your Honor?

                THE COURT:  Yes, you may.

BY MR. SAFEEULLAH:

    Q.    I'm passing up what's previously been marked as United States Exhibits 61, 65, 66, 68, and 71. Can you look over those physical exhibits, please?

    A.    Uh-huh (affirmative).

    Q.    What are those exhibits?

    A.    These are evidence that I collected from this scene.

1          Q.    And how do you know that that's evidence
2     that you collected from the scene on that day?
3          A.    The bags, the paper bags in here have this
4     complaint number and location, as well as my initials and
5     the date of collection.
6               MR. SAFEEULLAH:  Your Honor, I move to
7     admit into evidence United States Exhibits 599 through
8     713 and United States physical exhibits 61, 65, 66, 68,
9     and 71.  And I request permission to publish them to the
10    jury.
11              THE COURT:  All right.  Seeing no
12    objection, these exhibits will be admitted and may be
13    published.  They are Government Exhibits 599 to 713 and
14    Government Exhibits 61, 65, 66, 68, and 71.
15              (Government Exhibits Nos. 599-713, 61, 65,
16    66, 68 and 71 were admitted.)
17    BY MR. SAFEEULLAH:
18         Q.    Can we pull up United States Exhibit 599,
19    please.  What are we looking at in this photograph?
20         A.    This is the photo work order, the first
21    photo that I took at the scene signifying the date and
22    time I started these photos, which was May 28 of 2017,
23    shortly after midnight; the unique complaint number or
24    case number for this incident, the type of call, which
25    was a shooting, the identified victim of the shooting,

the address of this location, which was Antioch Pike and

McCall Street, again, the photographs I was going to take

of the scene, the vehicle, and any evidence located, and

then my name's at the bottom.

Q.    And what's the victim's name?

A.    This incident -- I was advised that the

victim had been identified as Jesus Alberto Flores.

Q.    Do you have Exhibit No. 71 in front of you?

A.    Yes.

MR. SAFEEULLAH:  Your Honor, you previously

said I could publish this to the jury.  Could we pass it

with Juror No. 1 so the jurors can look at this exhibit?

THE COURT:  Yes, sir.

MR. SAFEEULLAH:  Starting with Juror No. 1,

Mr. ██████, in the front, please.

 BY MR. SAFEEULLAH:

Q.    Can we pull up 600, please.  Can you tell

us what we're looking at in this photograph?

A.    This is a photograph of the vehicle the

victim had been riding in at the time of the incident on

Antioch Pike.

Q.    Can we pull up United States Exhibit 601,

please.  And can you tell us what we're looking at in

this photograph?

A.    This is another view.  This is on Antioch

1   Pike.  The left lower corner is that same vehicle.  This
2   is directed towards the intersection where going left
3   would be continuing, I believe, to Antioch Pike and to
4   the right would be McCall Street.
5           Q.   Can we pull up United States Exhibit 602,
6   please.  Can you tell us what we're looking at in that
7   photograph?
8           A.   This is a photograph of that intersection I
9   had just mentioned of Antioch Pike and McCall Street.
10          Q.   Can we pull up United States Exhibit 603,
11  and you tell us what we're looking at in that photograph?
12          A.   This is, I believe, another photograph of
13  that location, the intersection.
14          Q.   So this -- I'm sorry, I cut you off.
15          A.   Sorry.
16          Q.   I cut you off.  You need to continue.
17          A.   I believe this is just on our side of the
18  crime scene tape, so I believe towards that police car is
19  McCall Street, I believe.
20          Q.   So you were walking away from the victim's
21  car back towards the intersection?
22          A.   That's correct.
23          Q.   Can we pull up United States Exhibit 604,
24  please, and you tell us what we're looking at in that
25  exhibit?

1        A.      This is standing on -- or at the

2    intersection, looking at Antioch Pike, with the victim's

3    vehicle up farther in the photograph.

4        Q.      Can we look at United States Exhibit 608,

5    please, and you tell us what we're looking at in that

6    photograph?

7        A.      These are evidence markers that I have

8    placed on Antioch Pike, marking evidence that I had

9    located on -- on the roadway.

10       Q.      Can we look at United States Exhibit 409,

11   please.  What are we looking at in this photograph?

12       A.      This is additional photograph of more

13   evidence markers on Antioch Pike.  The victim's vehicle

14   is the one with the headlights.

15       Q.      Can we look at United States Exhibit 611,

16   and you tell us what we're looking at in that photograph?

17       A.      These are additional evidence markers on --

18   so this is as if we're standing near the intersection on

19   what is McCall Street.  The Antioch Pike with the

20   victim's vehicle would be up to the left of the

21   photograph.

22       Q.      And what are all those yellow placards?

23       A.      Those are additional cartridge casings that

24   had -- I had located at the scene.

25       Q.      Can we turn to United States Exhibit 612,

1  please.  And you tell us what we're looking at in this

2  photograph.

3          A.    This is a photograph of the intersection

4  again in the other direction.  So the cop car is -- would

5  have been to the back of the last photograph.  This is

6  standing on the Antioch Pike side of the intersection

7  looking towards McCall Street, with additional evidence

8  markers.

9          Q.    Can we look at United States Exhibit 614,

10 please, and you tell us what we're looking at in that

11 photograph?

12         A.    This is Evidence Marker 1 on Antioch Pike

13 north of the victim's vehicle.

14         Q.    Can we look at United States Exhibit 615,

15 and you tell us what we're looking at in that photograph?

16         A.    This is a closeup photograph of the

17 cartridge case that I had marked as Evidence Marker 1 on

18 Antioch Pike.

19         Q.    And what type of cartridge casing is this?

20         A.    This was a 7.62 caliber cartridge case.

21         Q.    How many 7.62 cartridge casings did you

22 find at the scene on this day?

23         A.    I believe there were 32 or 33 of them out

24 there.

25         Q.    Can you look at United States Exhibit 616,

1   and tell us what we're looking at in that photograph?

2          A.    These are Evidence Markers 2 and 3 on

3   Antioch Pike signifying additional pieces of evidence.

4          Q.    Can we turn to United States Exhibit 618,

5   and you tell us what we're looking at in that photograph?

6          A.    This is a closeup photograph of Evidence

7   Marker 2 which, again, was a 7.62 caliber cartridge case.

8          Q.    And can we look at United States Exhibit

9   621, and you tell us what we're looking at in that

10  photograph?

11         A.    These are additional evidence markers on

12  Antioch Pike.  Evidence markers in the foreground that

13  are visible are 11, 12 and 13.  The victim's vehicle is

14  up -- with the headlights on.

15         Q.    Can we look at United States Exhibit 625,

16  and you tell us what we're looking at in that photograph?

17         A.    This is another photograph of those

18  evidence markers with additional ones in view in the

19  opposite direction.  So the victim's vehicle would have

20  been behind me in this photograph.

21         Q.    Can we look at United States Exhibit 632,

22  and you tell us what we're looking at in that photograph?

23         A.    This is a closeup photograph of Evidence

24  Marker 19 on Antioch Pike, which I had marked as a copper

25  fragment.

1          Q.    Can we look the United States Exhibit 635,

2     and you tell us what we're looking at in that photograph?

3          A.    This is the street sign at the intersection

4     behind the victim's vehicle showing Antioch Pike as it

5     turns and continues and then McCall Street going the

6     opposite direction at the intersection.

7          Q.    Can we look at United States Exhibit 626,

8     and you tell us what we're looking at in that photograph?

9          A.    This is a photograph on Antioch Pike of

10    additional evidence markers.  The victim's vehicle is on

11    the far left, the headlights.

12         Q.    Can we look at United States Exhibit 642,

13    and you tell us what we're looking at in that photograph?

14         A.    This is additional evidence markers.  This

15    is -- these are located at the intersection.

16         Q.    Can you look at United States Exhibit 658,

17    and you tell us what we're looking at in this photograph?

18         A.    These are additional evidence markers at

19    the intersection of this scene.

20         Q.    Can we look at United States Exhibit 684,

21    and you tell us what we're looking at in this photograph?

22         A.    This is a photograph of the vehicle that I

23    was advised the victim had been located in when they were

24    injured.

25         Q.    Can we look at United States Exhibit 685,

1  and you tell us what we're looking at in that photograph?

2        A.    This is a photograph of the driver's side

3  of that vehicle.

4        Q.    Can we look at United States Exhibit 686,

5  and you tell us what we're looking at in that photograph?

6        A.    This is a photograph of the front driver's

7  side of the vehicle.

8        Q.    Can we look at United States Exhibit 687,

9  and you tell us what we're looking at in that photograph?

10       A.    This is a view of the front of the vehicle

11  the victim had been located in.

12       Q.    Can we look at United States Exhibit 688,

13  and you tell us what we're looking at in that photograph?

14       A.    The front passenger side of the vehicle the

15  victim had been in.

16       Q.    Is that front passenger-side tire flat?

17       A.    Yes, it is.  I believe both front tires

18  were flat on this vehicle.

19       Q.    Can we look at United States Exhibit 689,

20  and you tell us what we're looking at in that vehicle --

21  in that photograph?  I'm sorry.

22       A.    This is the passenger side of that vehicle.

23       Q.    Did you locate any defects on this car as

24  you were taking photographs of it?

25       A.    Yes, I did.

1         Q.    Can we look at United States Exhibit 698,

2    and you tell us what we're looking at in this photograph?

3         A.    This is a photograph marking a defect that

4    I -- we had located on the driver door.  We're using a

5    height rod to get the height of that defect off the

6    roadway.

7         Q.    Can we look at United States Exhibit 699,

8    and you tell us what we're looking at in that photograph?

9         A.    This is a closeup photograph of that defect

10   I was just talking about on the driver door of the

11   vehicle.

12        Q.    Can we look at United States Exhibit 701,

13   and you tell us what we're looking at in that photograph?

14        A.    This is a photograph of a defect that was

15   found on the upper front bumper or hood area of the

16   vehicle on the passenger side.

17        Q.    Can we look at United States Exhibit 702,

18   and you tell us what we're looking at in that photograph?

19        A.    This is a closer photograph of that defect

20   on the passenger front side by the -- that's the

21   passenger-side headlight.

22        Q.    Can we look at United States Exhibit 703,

23   and you tell us what we're looking at in that photograph?

24        A.    This is a photograph that we're marking an

25   additional defect that was located on the hood of the

1  vehicle.

2          Q.    Can we look at United States Exhibit 704,

3  and you tell us what we're looking at in that photograph?

4          A.    This is a closeup photograph of that defect

5  to the hood.

6          Q.    Can we look at United States Exhibit 706,

7  and you tell us what we're looking at in that photograph?

8          A.    This is a photograph of a defect to the

9  window -- or the windshield of the vehicle located in

10  front of the passenger seat.  It's just below the

11  right -- or the white rectangle square.

12          Q.    Can we look at United States Exhibit 707,

13  and you tell us what we're looking at in that photograph?

14          A.    That's a closeup photograph of that defect

15  to the windshield on the passenger side of the vehicle.

16          Q.    Can we look at United States Exhibit 708,

17  and you tell us what we're looking at in that photograph?

18          A.    This is -- we're measuring the height of

19  another defect that was located on the windshield or

20  front framing of the passenger side of the vehicle.

21          Q.    Can we look at United States Exhibit 709,

22  and you tell us what we're looking at in that photograph?

23          A.    This is a photograph of the interior driver

24  compartment of the vehicle.

25          Q.    Can we look at United States Exhibit 710,

1  and you tell us what we're looking at in that photograph?

2       A.    This is a photograph of a cell phone that

3  was located on the driver's seat in the vehicle.

4       Q.    Can we look at United States Exhibit 711,

5  and you tell us what we're looking at in that photograph?

6       A.    This is a closeup photograph of that same

7  cell phone on the driver's seat of the vehicle.

8       Q.    Can you look at United States Exhibit 712,

9  and you tell us what we're looking at in that photograph?

10      A.    This is a photograph of the front yard that

11 was located on the passenger side of the vehicle.  So the

12 vehicle would be at my back when I'm taking this

13 photograph.

14      Q.    And why did you take this photograph?

15      A.    I took this photograph because the on-scene

16 officers had advised that this is where the victim had

17 exited the vehicle and been located by either the

18 officers or the paramedics when they arrived to the

19 scene.

20      Q.    Now, you previously testified that you

21 collected 7.62 shell casings at the scene.  Did you

22 collect any other type of shell casings at the scene?

23      A.    Yes.  I believe there were several .45

24 caliber cartridge casings at the scene.

25      Q.    In total, how many cartridge casings did

1  you recover from this crime scene?

2        A.    I think I collected -- let me do the

3  math -- 39 or 40 of them.

4              MR. SAFEEULLAH:  Can you give me one

5  moment, Your Honor?

6              THE COURT:  I can.

7              MR. SAFEEULLAH:  I don't have any

8  additional questions at this time, Your Honor.

9              THE COURT:  All right.  So wanted to ask --

10  and we'll talk about timing in a minute.  Mr. Ganguli,

11  Mr. Gulotta, will you have cross?

12              MR. GANGULI:  No questions, Your Honor.

13              THE COURT:  Thank you.  Ms. Hood-Schneider,

14  will you have cross, or Mr. Lucas?

15              MR. LUCAS:  No cross, Your Honor.

16              THE COURT:  All right.  Mr. Mothershead?

17              MR. MOTHERSHEAD:  No, Your Honor.

18              THE COURT:  And Mr. Bloom.

19              MR. BLOOM:  No cross, Your Honor.

20              THE COURT:  Then our witness, Ms. Connor,

21  may step down.  Thank you.

22              THE WITNESS:  Do you want me to leave these

23  here?

24              THE COURT:  You may leave those there for

25  now.  Thank you.

1           *****WITNESS EXCUSED*****

2                THE COURT:  It looks like this would be an

3  appropriate time to stop for the day.  Thanks, folks, for

4  your continued attention as we work our way through the

5  evidence.  I will make my, I'm sure, unnecessary but

6  still, from my perspective, necessary admonition not to

7  talk about the case or do any research or any

8  investigation, nothing like that.

9                We are off tomorrow, as I mentioned.  And

10  we anticipate, then, starting Monday at 9:00 a.m., and we

11  will pick back up with the government's next witness.

12               Thanks.  Appreciate your continued

13  attention and have a great weekend.  Thank you.

14               (Whereupon, at 4:44 p.m. the jury retired

15  from open court.)

16               THE COURT:  All right.  Thank you, folks.

17  Please be seated.

18               All right.  Before Monday morning, is there

19  anything else that we need to discuss?  Mr. Safeeullah?

20               MR. SAFEEULLAH:  No, Your Honor.

21               THE COURT:  Thank you.  Anything from any

22  defendant?  Not seeing any hands, then we will reconvene

23  and -- yes?

24               MR. SAFEEULLAH:  You previously said that

25  we would work on jury instructions on Monday morning.

1          THE COURT:  Yeah, I thought about that

2    and -- you know, and I guess I had said 8:30.  Here's

3    kind of what -- and I did say 9 o'clock on purpose

4    because I don't think we can do it before 9:00.  Thanks

5    for clarifying, though.  I previously indicated we'd try

6    and squeeze in that discussion.  I don't think that's

7    going to work now with something else in a different case

8    we have to squeeze in.  So thanks for the reminder,

9    Mr. Safeeullah.

10          What we will do Monday is talk about a good

11   time to continue that and instruction -- that discussion

12   about the proposed jury instructions.  And we'll -- we do

13   have time.  We'll pick a time soon, though, and finish

14   that discussion Monday.  Maybe we can pick a time Tuesday

15   morning or Wednesday morning or whenever it may be.

16   Thank for that.

17          All right.  If nothing further, then, we

18   stand in recess.  Thank you.

19          (Whereupon, at 4:46 p.m. these were all of

20   the proceedings had in the above-captioned cause on the

21   above-captioned date.)

22

23

24

25

1    **REPORTER'S CERTIFICATE PAGE**

2

3          I, Roxann Harkins, Official Court Reporter for

4    the United States District Court for the Middle District

5    of Tennessee, in Nashville, do hereby certify:

6          That I reported on the stenotype shorthand

7    machine the proceedings held in open court on

8    April 13, 2023, in the matter of UNITED STATES OF

9    AMERICA v. JORGE FLORES, JOSE PINEDA-CACERES, LUIS

10   COLINDRES AND KEVIN TIDWELL, Case No. 3:18-cr-293; that

11   said proceedings were reduced to typewritten form by me;

12   and that the foregoing transcript is a true and accurate

13   transcript of said proceedings.

14

15          This is the 14th day of July, 2023.

16

17                    s/ Roxann Harkins
                      ROXANN HARKINS, RPR, CRR
18                    Official Court Reporter

19

20

21

22

23

24

25