```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3
   UNITED STATES OF AMERICA          )
 4                                    )
                                      )
 5      v.                            ) 3:18-cr-00293
                                      ) JUDGE RICHARDSON
 6                                    )
   JORGE FLORES, ET AL.               )
 7                                    )
                                      )
 8   ------------------------------------------------------------

 9

10

11

12

        BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE
13

14

                        TRANSCRIPT OF PROCEEDINGS
15
                        TRIAL VOLUME 9 of 18
16

17

                           April 18, 2023
18

19

20

21

22   ------------------------------------------------------------

23   DEBORAH K. WATSON, RPR, CRR
     Official Court Reporter
24   713 Church Street, Suite 2300
     Nashville, TN 37203
25   debbie_watson@tnmd.uscourts.gov
```

```
1    APPEARANCES:

2

3    For the Government:

4              AHMED A. SAFEEULLAH
                  BROOKE C. FARZAD
5                 U. S. Attorney's Office
                  Middle District of Tennessee
6                 719 Church Street, Suite 3300
                  Nashville, TN 37203
7                 (615) 736-5151
                  Email: ahmed.safeeullah@usdoj.gov
8                 Email: brooke.farzad@usdoj.gov

9                 MATTHEW KEVIN HOFF
                  Department of Justice
10                Organized Crime and Racketeering Sect
                  1301 New York Avenue, 7th Floor
11                Washington, DC 20005
                  (202) 598-8093
12                Email: matthew.hoff2@usdoj.gov

13

14   For the Defendant, Jorge Flores:

15                VAKESSHA HOOD-SCHNEIDER
                  236 Public Square, Suite 103
16                Franklin, TN 37064
                  (615) 791-1819
17                Email: vhslaw1@gmail.com

18                LEONARD E. LUCAS, III
                  The Law Firm of Leonard Earl Lucas
19                315 Deaderick Street, Suite 1550
                  Nashville, TN 37238
20                (301) 204-6498
                  Email: leonard.lucas@lellawfirm.com

21

22

23

24

25
```

```
1    APPEARANCES   (Continued):

2

3    For the Defendant, Jose Pineda-Caceres:

4              THOMAS F. BLOOM
                911 Marengo Lane
5              Nashville, TN 37204
                (615) 260-5952
6              Email: tfbloom1@comcast.net

7              GEORGE TRAVIS HAWKINS
                Hawkins Law Firm, PLLC
8              735 Broad Street, Suite 305
                Chattanooga, TN 37402
9              (615) 599-1010
                Email: travis@travishawkins.com
10

11

12   For the Defendant, Kevin Tidwell:

13             JUNI S. GANGULI
                Ganguli Law Firm
                202 Adams Avenue
14             Memphis, TN 38103
                (901) 544-9339
15             Email: j.ganguli@gmail.com

16             MATTHEW C. GULOTTA
                The Gulotta Firm, PLLC
17             202 Adams Avenue
                Memphis, TN 38103
18             (901) 213-6648
                Email: matt@gulottalaw.net
19

20

21

22

23

24

25
```

1                           I   N   D   E   X

2                                                      Page

3

JURY CHARGE CONFERENCE (Continued)              22

4

5       TESTIMONY OF JAIME TERRY

6       Direct Examination
        By Mr. Safeeullah                            44

7

8       STIPULATION READ RE:  Cocaine (Exhibit 10)   49

9

        TESTIMONY OF AUTUMN MANNING

10

        Direct Examination

11      By Mr. Hoff                                  51

12

        TESTIMONY OF JUSTIN McCORMICK

13

        Direct Examination

14      By Mr. Safeeullah                            63

15

        TESTIMONY OF HANSY SANCHEZ

16

        Direct Examination

17      By Ms. Farzad                                70

18

        TESTIMONY OF STEVEN ROWLETT

19

        Direct Examination

20      By Mr. Safeeullah                           114

21

        TESTIMONY OF JORGE LUIS ANTUNEZ VASQUEZ

22

        Direct Examination

23      By Mr. Hoff                                 119

24

25

```
 1                                                 Page

 2   TESTIMONY OF JAMES KING

 3   Direct Examination
     By Mr. Safeeullah                             133
 4
     STIPULATION READ RE:  Cocaine (Exhibits
 5   150-152)                                      142

 6   Cross-Examination
     By Mr. Ganguli                                144
 7
     Cross-Examination
 8   By Mr. Lucas                                  146

 9
     TESTIMONY OF JOSE SANTOS DEL-CID
10
     Direct Examination
11   By Mr. Safeeullah                             148

12   Cross-Examination
     By Mr. Ganguli                                160
13
     Redirect Examination
14   By Mr. Safeeullah                             165

15
     TESTIMONY OF CINDY HERNANDEZ
16
     Direct Examination
17   By Ms. Farzad                                 166

18   Cross-Examination
     By Mr. Ganguli                                186
19
     Cross-Examination
20   By Ms. Hood-Schneider                         195

21   Redirect Examination
     By Ms. Farzad                                 196
22

23   TESTIMONY OF TIMOTHY BREWER

24   Direct Examination
     By Mr. Safeeullah                             198
25
```

|  |  | Page |
|---|---|---|
| STIPULATION READ RE: Defendant Tidwell | | 204 |
| STIPULATION READ RE: Ruger Revolver (Exhibit 73) | | 205 |

TESTIMONY OF DR. ERIN CARNEY

| Direct Examination By Mr. Safeeullah | | 213 |

TESTIMONY OF KHALID MOZEB

| Direct Examination By Mr. Safeeullah | | 261 |
| Cross-Examination By Mr. Lucas | | 281 |

E  X  H  I  B  I  T  S

|  |  | Page |
|---|---|---|
| Government Exhibit 10 | | 49 |

Physical clear plastic bag with red strip across top and yellow exhibit sticker, containing smaller clear plastic bags.  White sticker adhered to smaller plastic bag – DR25345870, Incident: 20160244745, Category: Drugs, Suspect: Ochoa, Carlos, Description – Possession with intent, cocaine packaged in individual bags.  Bar code on sticker – ZCW1X44L0VXE9A, handwritten in black ink "Box 150 N."

```
 1                                                      Page

 2   Government Exhibit 11                                49
          Physical clear plastic bag with red
 3        strip across top and yellow exhibit
          sticker, containing eyeglasses and
 4        eyeglass case.

 5   Government Exhibit 21                               237
          Clear plastic bag with red strip across
 6        top of it, containing copper-colored
          projectile, clear smaller plastic bag,
 7        small brown envelope, white folded
          paper.  White sticker on outside bag –
 8        PR25388738, Incident: 20160685052,
          Category: Property, Description –
 9        Homicide, bullet in brown envelope,
          recovered from right arm by medical
10        examiner.  Bar code on white sticker –
          ZC0VA4P60KLEB.
11
     Government Exhibit 30                                68
12        Physical clear plastic bag with red
          strip across top and yellow exhibit
13        sticker, containing silver projectile
          and brown paper bags.  White sticker in
14        bag – Case Number: 76075-17-0064,
          Action – Retained for evidence.  Cust
15        Date – 05/26/2020, Exh # 162,
          Description of Property – Other - .40
16        caliber projectile recovered from
          Hansey Sanchez's body, Bar Code
17        information – 2443633.

18   Government Exhibit 42                               253
          Clear plastic bag with red strip across
19        top of it, containing bullet fragments,
          small gauze pad, two yellow envelopes
20        and white folded paper. White stickers
          on small yellow envelope – MEC#17-1353,
21        GARCIA MUNOZ, AMMERLI, 05/21/2017,
          BULLET FRAGMENTS FROM LEFT BACK.
22

23

24

25
```

```
 1                                                    Page

 2   Government Exhibit 43                             253
         Clear plastic bag with red strip across
 3       top of it, containing copper project,
         small clear plastic bag, two yellow
 4       envelopes and white folded paper. White
         stickers on small yellow envelope –
 5       MEC#17-1353, GARCIA MUNOZ, AMMERLI,
         05/21/2017, BULLET FRAGMENTS FROM RIGHT
 6       SIDE OF BACK.

 7   Government Exhibit 44                             253
         Clear plastic bag with red strip across
 8       top of it, one yellow envelopes and
         white folded paper. White stickers on
 9       small yellow envelope – MEC#17-1353,
         GARCIA MUNOZ, AMMERLI, 05/21/2017,
10       BULLET FRAGMENTS FROM LEFT ILIAC VEIN

11   Government Exhibit 45                             253
         Clear plastic bag with red strip across
12       top of it, containing copper-like
         damaged projectile, one yellow
13       envelopes and white folded paper. White
         stickers on small yellow envelope –
14       MEC#17-1353, GARCIA MUNOZ, AMMERLI,
         05/21/2017, BULLET FRAGMENTS FROM
15       MEDIASTINUM.

16   Government Exhibit 46                             253
         Clear plastic bag with red strip across
17       top of it, containing silver damaged
         projectile, one yellow envelope and
18       white folded paper. White stickers on
         small yellow envelope – MEC#17-1353,
19       GARCIA MUNOZ, AMMERLI, 05/21/2017,
         BULLET FRAGMENTS FROM LEFT SIDE OF
20       BACK.

21   Government Exhibit 47                             253
         Clear plastic bag with red strip across
22       top of it, containing copper-like
         damaged projectile, one yellow envelope
23       and white folded paper. White stickers
         on small yellow envelope – MEC#17-1353,
24       GARCIA MUNOZ, AMMERLI, 05/21/2017,
         BULLET FRAGMENTS FROM SPINE.
25
```

```
 1                                                    Page

 2   Government Exhibit 48                            253
         Clear plastic bag with red strip across
 3       top of it, containing copper-like
         damaged projectile, one yellow envelope
 4       and white folded paper. White stickers
         on small yellow envelope - MEC#17-1353,
 5       GARCIA MUNOZ, AMMERLI, 05/21/2017,
         BULLET FRAGMENTS FROM EIGHT
 6       INTERCOSSTAL SPACE.

 7   Government Exhibit 49                            253
         Clear plastic bag with red strip across
 8       top of it, containing copper-like
         damaged projectile, one smaller clear
 9       plastic bag, one yellow envelope and
         white folded paper. White stickers on
10       small yellow envelope - MEC#17-1353,
         GARCIA MUNOZ, AMMERLI, 05/21/2017,
11       JACKET FROM TENTH INTERCOSSTAL SPACE.

12   Government Exhibit 50                            253
         Clear plastic bag with red strip across
13       top of it, containing copper-like
         damaged projectile, one yellow envelope
14       and white folded paper. White stickers
         on small yellow envelope - MEC#17-1353,
15       GARCIA MUNOZ, AMMERLI, 05/21/2017,
         BULLET FRAGMENTS FROM EIGHT
16       INTERCOSSTAL SPACE.

17   Government Exhibit 51                            253
         Clear plastic bag with red strip across
18       top of it, containing metal fragment,
         two yellow envelopes and white folded
19       paper. White stickers on small yellow
         envelope - MEC#17-1353, GARCIA MUNOZ,
20       AMMERLI, 05/21/2017, METAL FRAGMENTS
         FROM LEFT SIDE OF TORSO.
21
     Government Exhibit 52                            253
22       Clear plastic bag with red strip across
         top of it, containing bullet fragment,
23       two yellow envelopes, small gauze pad.
         White stickers on small yellow envelope
24       - MEC#17-1353, GARCIA MUNOZ, AMMERLI,
         05/21/2017, BULLET FRAGMENT FROM NECK.
25
```

```
 1                                                    Page

 2   Government Exhibit 53                               249
          Clear plastic bag with strip across it,
 3        containing silver damaged projectile,
          smaller clear plastic bag, two yellow
 4        envelopes.  On one of the envelopes,
          white stickers adhered to it –
 5        MEC#17-1353 GARCIA MUNOZ-AMMERLI
          05/21/2017 BULLET FROM HEAD, Decedent's
 6        Name Ammerli Garcia Munoz.  Item
          Bullet, Description, bullet from head.
 7
     Government Exhibit 73                               204
 8        Physical – black handgun, with Evidence
          Identification Label attached to gun.
 9        Label – Department of Justice, Bureau
          of Alcohol, Tobacco, Firearms and
10        Explosives, Evidence Identification
          Label, Case Number 776075-17-0064,
11        Action-Seized Judicially, Cust Date
          1/14/2020, Exh # 067, Description of
12        Property, Firearm: Handgun, Mnf: Ruger,
          Type: Revolver, Model: LCR Cal. 38, SN;
13        540-41049, Location Recovered From –
          Tidwell, Arrest Location, Brentwood, TN
14        37027, Person Recovered From: Tidwell,
          Kevin
15
     Government Exhibit 150                              140
16        Clear plastic bag with red strip across
          top – containing smaller plastic bag
17        with unknown substance in it.  White
          label on smaller plastic bag – Case
18        Number: 776075-17-0064, Action:
          Retained for Evidence, Cust Date:
19        5/28/202, Exh # 235, Description of
          Property: Narcotics: Cocaine, Qty:
20        67.1, Mea: grams, plastic bag
          containing cocaine. Sealed by MNPD.
21        Weighed in packaging by ATF. Location
          Recovered From: Location of SANDOVAL,
22        Drug SW, 3055 Lebanon Pk., Nashville,
          TN 3721-4.
23

24

25
```

|  |  | Page |
|---|---|---|
| Government Exhibit 151 |  | 140 |

Government Exhibit 151      140
    Clear plastic bag with red strip across top - containing 3 small plastic bags, each containing white powdery substance.  White sticker in outside plastic bag - DR25606151, Incident: 20180479018, Category: Drugs, Suspect: Unknown, Description: Drugs, Plastic bag containing white powder cocaine. Box 19N, Bar Code: ZCW1X59N0RIDB7.

Government Exhibit 152      140
    Clear plastic bag with red strip across top - containing 3 small plastic bags, each containing white powdery substance. White sticker on outside plastic bag - DR25611635, Incident: 20180531112, Category: Drugs, Suspect: Unknown, Box 30N, Description: Drug (3) individual bags containing a white substance (cocaine).  Bar Code - ZCV4F59N0RJ0F1.

Government Exhibit 200      46
    Color image of undercarriage of vehicle on its side in ravine.  Broken tree limbs in forefront of image. (1 page)

Government Exhibit 201      46
    Color image of vehicle on its side in ravine.  Limbs and vines in forefront of vehicle in image. (1 page)

Government Exhibit 202      46
    Color image of vehicle on its side in ravine.  Limbs and vines in forefront of vehicle in image. (1 page)

Government Exhibit 203      46
    Color image of close-up view of vehicle (smoking) on its side in a ravine. Blue cables located on hill into ravine. (1 page)

|   |   | Page |
|---|---|---|
| 1 |   |   |
| 2 | Government Exhibit 204 | 46 |
| 3 | Color image of vehicle (smoking) on its side in a ravine. Fire department employees on right side of image. (1 page) |   |
| 5 | Government Exhibit 205 | 46 |
|   | Color image of vehicle (smoking) on its side in a ravine, fire department employee to left of vehicle. (1 page) |   |
| 8 | Government Exhibit 350 | 230 |
|   | Color image of report - Office of the Medical Examiner, Center for Forensic Medicine, Nashville, Tennessee, Davidson County Medical Examiner, Feng Li M.D., J.D., Ph.D., Judicial District Number: 20, District Attorney: Honorable Glenn Funk, State Number 16-19-3876, Case Number: MEC16-1824, Name fo Decedent - Liliana Elizabeth Rodriguez, Age: 18 years, Race: White, Sex: Female, Date of Death, 07/31/2016 5:42 AM, Type of Death: Suspected Homicide (1 page) |   |
| 15 | Government Exhibit 351 | 231 |
|   | Color image of black handwriting and yellow ID bracelet, both positioned on top of white material. On handwriting on white material - "Rodriguez" "MEC16-1824". On yellow ID bracelet - "MEC#16-1824" "Rodriguez, Liliana". (1 page) |   |
| 19 | Government Exhibit 353 | 231 |
|   | Color image of a yellow identification band, an orange and white identification band, and a small measuring tool, all resting on human forearm. Yellow ID band - "MEC #16-1824" "Rodriguez, Liliana". On orange and white ID band - "Liliana Rodriguez" "ID Tag", "xxxxxx126176" above bar code. On measuring tool - "MEC# 16-1824". (1 page) |   |

|  |  | Page |
|---|---|---|
| 1 | | |
| 2 | Government Exhibit 355 | 231 |
| 3 | Color image of bruising area around small hole on human skin. Measuring tool to right of wound. (1 page) | |
| 4 | | |
| | Government Exhibit 358 | 231 |
| 5 | Color image of circular wound on human skin. L scale to left and bottom of | |
| 6 | wound. (1 page) | |
| 7 | Government Exhibit 461 | 153 |
| | Physical DVD in white sleeve other than | |
| 8 | clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." | |
| 9 | "3:18-cr-00293" "Government's Trial Exhibit 461" "Surveillance video clip". | |
| 10 | Hand-written letters "JSDA". | |
| 11 | Government Exhibit 462 | 153 |
| | Physical DVD in white sleeve other than | |
| 12 | clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." | |
| 13 | "3:18-cr-00293" "Government's Trial Exhibit 462" "Surveillance video clip". | |
| 14 | Hand-written letters "JSDP". | |
| 15 | Government Exhibit 463 | 153 |
| | Physical DVD in white sleeve other than | |
| 16 | clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." | |
| 17 | "3:18-cr-00293" "Government's Trial Exhibit 463" "Surveillance video clip". | |
| 18 | Hand-written letters "JSDP". | |
| 19 | Government Exhibit 464 | 153 |
| | Physical DVD in white sleeve other than | |
| 20 | clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." | |
| 21 | "3:18-cr-00293" "Government's Trial Exhibit 464" "Surveillance video clip". | |
| 22 | Hand-written letters "JSDP". | |

|  |  | Page |
|---|---|---|
| 1 |  |  |
| 2 | Government Exhibit 465 | 153 |
| 3 | Physical DVD in white sleeve other than clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." |  |
| 4 | "3:18-cr-00293" "Government's Trial Exhibit 465" "Surveillance video clip". |  |
| 5 | Hand-written letters "JSDP". |  |
| 6 | Government Exhibit 466 | 153 |
| 7 | Physical DVD in white sleeve other than clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." |  |
| 8 | "3:18-cr-00293" "Government's Trial Exhibit 466" "Surveillance video clip". |  |
| 9 | Hand-written letters "JSDP". |  |
| 10 | Government Exhibit 467 | 153 |
| 11 | Physical DVD in white sleeve other than clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." |  |
| 12 | "3:18-cr-00293" "Government's Trial Exhibit 467" "Surveillance video clip". |  |
| 13 | Hand-written letters "JSDP". |  |
| 14 | Government Exhibit 468 | 153 |
| 15 | Physical DVD in white sleeve other than clear plastic middle. Printed on DVD "U.S. v. Ochoa-Martinez, et al." |  |
| 16 | "3:18-cr-00293" "Government's Trial Exhibit 468" "Surveillance video clip". |  |
| 17 | Hand-written letters "JSDP". |  |
| 18 | Government Exhibit 554 | 240 |
| 19 | Color image of Report of Investigation by County Medical Examiner, Name of |  |
| 20 | Decedent: Ammerli Josue Garcia Munoz, Age-25 years, Race-White, Sex-Male, |  |
| 21 | Date of Death-05/21/2017 12:45 AM, Type of Death-Suspected Homicide. (13 pages) |  |
| 22 | Government Exhibit 555 | 242 |
| 23 | Color image of handwriting in black ink on a white material, along with a small |  |
| 24 | measuring tool also positioned on the white material. Handwriting – |  |
| 25 | "Ammerli, Garcia" "17-1353". On small measuring tool – "MEC#17-1353". (1 page) |  |

|  |  | Page |
|---|---|---|
| 1 |  |  |
| 2 | Government Exhibit 566 | 244 |
| 3 | Color image of prone x-ray of full body. Multiple white marks on upper body of x-ray. (1 page) |  |
| 4 |  |  |
| 5 | Government Exhibit 568 | 273 |
| 6 | Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD "U.S. v. Ochoa-Martinez, et al." "3:18-cr-00293" "Government's Trial Exhibit 568" "Surveillance video clip". Hand-written letters "KM". |  |
| 7 |  |  |
| 8 | Government Exhibit 569 | 273 |
| 9 | Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD "U.S. v. Ochoa-Martinez, et al." "3:18-cr-00293" "Government's Trial Exhibit 569" "Surveillance video clip". Hand-written letters "KM". |  |
| 10 |  |  |
| 11 |  |  |
| 12 | Government Exhibit 570 | 273 |
| 13 | Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD "U.S. v. Ochoa-Martinez, et al." "3:18-cr-00293" "Government's Trial Exhibit 570" "Surveillance video clip". Hand-written letters "KM". |  |
| 14 | Government Exhibit 571 | 273 |
| 15 | Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD "U.S. v. Ochoa-Martinez, et al." "3:18-cr-00293" "Government's Trial Exhibit 571" "Surveillance video clip". Hand-written letters "KM". |  |

Page

1

2    Government Exhibit 566                            244
3        Color image of prone x-ray of full
         body. Multiple white marks on upper
         body of x-ray. (1 page)
4

5    Government Exhibit 568                            273
         Physical DVD in white sleeve other than
6        clear plastic middle.  Printed on DVD
         "U.S. v. Ochoa-Martinez, et al."
7        "3:18-cr-00293" "Government's Trial
         Exhibit 568" "Surveillance video clip".
8        Hand-written letters "KM".

9    Government Exhibit 569                            273
         Physical DVD in white sleeve other than
10       clear plastic middle.  Printed on DVD
         "U.S. v. Ochoa-Martinez, et al."
11       "3:18-cr-00293" "Government's Trial
         Exhibit 569" "Surveillance video clip".
12       Hand-written letters "KM".

13   Government Exhibit 570                            273
         Physical DVD in white sleeve other than
14       clear plastic middle.  Printed on DVD
         "U.S. v. Ochoa-Martinez, et al."
15       "3:18-cr-00293" "Government's Trial
         Exhibit 570" "Surveillance video clip".
16       Hand-written letters "KM".

17   Government Exhibit 571                            273
         Physical DVD in white sleeve other than
18       clear plastic middle.  Printed on DVD
         "U.S. v. Ochoa-Martinez, et al."
19       "3:18-cr-00293" "Government's Trial
         Exhibit 571" "Surveillance video clip".
20       Hand-written letters "KM".

21

22

23

24

25

| | | Page |
|---|---|---|
| 1 | | |
| 2 | Government Exhibit 572 | 280 |

Government Exhibit 572         280
    Color image of two vehicles (a
    Chevrolet Sedan and a 4-door truck –
    truck has sunroof), parked in parking
    lot with one parking space separating
    them.  Individual in driver's seat of
    truck.  Short yellow poles in front of
    vehicles and yellow curb in front of
    empty parking space.  Individual with
    dark-colored hat, white t-shirt and
    blue pants outside of the passenger
    side of the truck.  (1 page)

Government Exhibit 573         185
    Color image of two vehicles (a
    Chevrolet Sedan and a 4-door truck –
    truck has sunroof), parked in parking
    lot with one parking space separating
    them.  Individual in driver's seat of
    truck.  Short yellow poles in front of
    vehicles and yellow curb in front of
    empty parking space.  Individual with
    dark-colored hat, white t-shirt and
    blue pants in front of yellow poles in
    front of truck. (1 page)

Government Exhibit 574         280
    Color image of male individual just
    inside of store in blue hate, white
    t-shirt, blue pants and white tennis
    shoes.  Two small children to right of
    male individual.  Individual male in
    blue and white striped short-sleeved
    shirt to left of image.  Date stamp at
    top left of image "05-27-2017 St
    22:20:11", Stamp at bottom right of
    image "Front Door". (1 page)

Government Exhibit 575         280
    Color image of male individual on one
    side of counter in grocery store,
    wearing blue hate and white t-shirt
    with tattoos on arms.  Male individual
    on opposite side of counter with black
    short-sleeved t-shirt on. (1 page)

|  |  | Page |
|---|---|---|
| 1 | | |

Government Exhibit 576                  280
        Color image of male individual on one
        side of counter in grocery store,
        wearing blue hate and white t-shirt
        with tattoos on arms.  Male individual
        on opposite side of counter with black
        short-sleeved t-shirt on. (1 page)

Government Exhibit 577                  280
        Color image of male individual on one
        side of counter in grocery store,
        wearing blue hate and white t-shirt
        with tattoos on arms.  Male individual
        on opposite side of counter with black
        short-sleeved t-shirt on. (1 page)

Government Exhibit 578                  280
        Color image of a 4-door sedan vehicle
        and a truck in a parking lot.  Male
        individual standing outside of
        passenger side door of sedan. (1 page)

Government Exhibit 579                  280
        Color image of inside of a store.
        Shopping carts to left of brown and
        blue floor mats.  Male individual with
        white t-shirt and blue ball cap exiting
        store.  Male individual with khaki
        shorts and dark short-sleeved shirt
        entering store. (1 page)

Government Exhibit 580                  280
        Color image of inside of a store.
        Shopping carts to left of brown and
        blue floor mats.  Male individual with
        white t-shirt and blue ball cap exiting
        store.  Male individual with khaki
        shorts and dark short-sleeved shirt
        entering store. (1 page)

Government Exhibit 581                  280
        Color image of inside of a store.
        Shopping carts to left of brown and
        blue floor mats.  Male individual with
        white t-shirt and blue ball cap exiting
        store.  Male individual with khaki
        shorts and dark short-sleeved shirt
        entering store. (1 page)

| | | Page |
|---|---|---|

1

2 Government Exhibit 582     280
     Color image of inside of a store.
3     Shopping carts to left of brown and
     blue floor mats.  Male individual with
4     white t-shirt and blue ball cap exiting
     store turned back towards male
5     individual with khaki shorts and dark
     short-sleeved shirt inside store. (1
6     page)

7 Government Exhibit 583     280
     Color image of inside of a store.
8     Shopping carts to left of brown and
     blue floor mats.  Male individual with
9     white t-shirt and blue ball cap exiting
     store turned back towards male
10     individual with khaki shorts and dark
     short-sleeved shirt inside store. (1
11     page)

12 Government Exhibit 584     280
     Color image of inside of a store.
13     Shopping carts to left of brown and
     blue floor mats.  Male individual with
14     white t-shirt and blue ball cap outside
     of store turned back towards male
15     individual with khaki shorts and dark
     short-sleeved shirt inside store. (1
16     page)

17 Government Exhibit 585     280
     olor image of a 4-door sedan vehicle
18     and a truck in a parking lot.  (1 page)

19 Government Exhibit 586     280
     Color image of a 4-door sedan vehicle
20     parked in parking lot and a 4-door
     truck at an angle in parking lot.  (1
21     page)

22 Government Exhibit 587     280
     Color image of parking lot and truck on
23     road with illuminated taillights (1
     page)

24

25

|  |  | Page |
|---|---|---|
| Government Exhibit 588 | Color image of 4-door sedan vehicle in parking lot.  Individual with khaki shorts and dark short-sleeved shirt standing in parking lot. (1 page) | 280 |
| Government Exhibit 589 | Color image of 4-door sedan vehicle in parking lot.  Individual with khaki shorts and dark short-sleeved shirt standing in parking lot. Individual with gray sweatshirt in front of sedan. (1 page) | 280 |
| Government Exhibit 590 | Color image of 4-door sedan vehicle in parking lot with male individual in dark short-sleeved shirt at passenger side door of vehicle.  (1 page) | 280 |
| Government Exhibit 591 | Color image of parking lot. (1 page) | 280 |
| Government Exhibit 592 | Color image of parking lot with 4-door truck to left of parking lot. (1 page) | 280 |
| Government Exhibit 593 | Color image of parking lot with 4-door truck on road. Male individual wearing dark-colored clothing in parking lot (1 page) | 280 |
| Government Exhibit 744 | Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD "U.S. v. Ochoa-Martinez, et al." "3:18-cr-00293" "Government's Trial Exhibit 744" "Dashcam video clip". Hand-written letters "TAB". | 202 |

|   |   | Page |
|---|---|------|
| 1 |   |   |
| 2 | Government Exhibit 745 | 208 |
| 3 | Color image of male individual, with tattoos on right arm and hand and neck and face, wearing black t-shirt, blue |   |
| 4 | denim jeans and white tennis shoes, lying on medical stretcher in |   |
| 5 | ambulance.  Male individual to right of stretcher wearing a blue glove, and |   |
| 6 | blue short-sleeved shirt with "EMS" "Paramedic" stitched on shirt.  (1 |   |
| 7 | page) |   |
| 8 | Government Exhibit 1239 | 263 |
|   | Color image of aerial map – Google Maps |   |
| 9 | – 931 Richards Road. (1 page) |   |
| 10 | Government Exhibit 1243 | 264 |
|   | Color image of aerial map – Google Maps |   |
| 11 | – 937 Richards Road. (1 page) |   |
| 12 | Government Exhibit 1246 | 150 |
|   | Color image of aerial map – Google Maps |   |
| 13 | – |   |
|   | https://www.google.com/maps/@36.1274729 |   |
| 14 | , -86.7107026.243m/data=!3m1!1e3. |   |
|   | Murfreesboro Pike. Small yellow square |   |
| 15 | outlined in black, bottom right of image, Government Exhibit 1246, |   |
| 16 | 3:18-cr-00293 (1 page) |   |
| 17 | Government Exhibit 1282 | 100 |
|   | Color image of headshot of male |   |
| 18 | individual with dark-colored hair, wearing a gray hoodie.  (1 page) |   |
| 19 |   |   |
|   | Government Exhibit 1288 | 173 |
| 20 | Color image of male individual standing, wearing white and blue |   |
| 21 | striped short-sleeved shir and blue denim jeans, also wearing a watch and |   |
| 22 | holding a phone.  Blurred out visual of individual to bottom left of image.  (1 |   |
| 23 | page) |   |
| 24 |   |   |
| 25 |   |   |

|     |                                                                                                                                                                                                                                      | Page |
| --- | --- | --- |
| 1   |                                                                                                                                                                                                                                      |      |
| 2   | Government Exhibit 1332                                                                                                                                                                                                               | 118  |
| 3   | Physical clear plastic bag with red strip across top, containing smaller                                                                                                                                                             |      |
| 4   | plastic bag and 6 brass-colored fired cartridge casings. Writing on smaller                                                                                                                                                          |      |
| 5   | plastic bag – Agency: MNPD, Case # 2017-0222288, Description of Contents: 9MM casing x5, .45 casing x1.                                                                                                                               |      |
| 6   |                                                                                                                                                                                                                                      |      |
| 7   | Government Exhibit 1336<br>Physical DVD in white sleeve other than clear plastic middle.  Printed on DVD                                                                                                                             | 153  |
| 8   | "Gov. Trial Exhibit 1336" "U.S. v. Ochoa-Martinez, et al."                                                                                                                                                                           |      |
| 9   | "3:18-cr-00293".  Hand-written letters "JSDP".                                                                                                                                                                                       |      |
| 10  |                                                                                                                                                                                                                                      |      |
| 11  | Government Exhibit 1337<br>Stipulation – regarding substance in Exhibit 10 being 49.92 grams of                                                                                                                                     | 50   |
| 12  | cocaine, a Schedule II controlled substance.                                                                                                                                                                                         |      |
| 13  |                                                                                                                                                                                                                                      |      |
| 14  | Government Exhibit 1338<br>STIPULATION: Exhibits 150, 151 and 152                                                                                                                                                                    | 144  |
| 15  | – the exhibits are determined to contain cocaine, a Schedule II controlled substance.  (2 pages)                                                                                                                                     |      |
| 16  |                                                                                                                                                                                                                                      |      |
| 17  | Government Exhibit 1339<br>STIPULATION: Ruger Model LCR Caliber                                                                                                                                                                      | 206  |
| 18  | .38 Special +P revolver, serial number 540-41049 is a firearm as defined under                                                                                                                                                       |      |
| 19  | 18 U.S.C. § 921(a)(3) and was manufactured outside the State of Tennessee and was transported across                                                                                                                                 |      |
| 20  | state lines.                                                                                                                                                                                                                         |      |
| 21  | Government Exhibit 1340<br>STIPULATION: (1) prior to June 1, 2017,                                                                                                                                                                   | 205  |
| 22  | Kevin Tidwell was convicted of a crime punishable by imprisonment for more                                                                                                                                                            |      |
| 23  | than one year, and (2) prior to June 1, 2017, Kevin Tidwell knew he had been                                                                                                                                                         |      |
| 24  | convicted of a crime punishable by imprisonment for more than one year.                                                                                                                                                               |      |
| 25  |                                                                                                                                                                                                                                      |      |

```
1                           *   *   *
2           The above-styled cause came on to be heard at
3  8:37 a.m. on April 18, 2023, before the Honorable Eli J.
4  Richardson, District Judge, when the following proceedings
5  were had, to-wit:
6
7           THE COURT:  All right.  I had noted that we'd be
8  coming in here to further discuss jury instructions as a,
9  you know, preliminary matter and see what the parties wanted
10 to do in terms of suggesting any changes and wanted to
11 continue that discussion.
12          I'm thinking -- and again, I'll go with the page
13 numbers as marked by the clerk's office pursuant to ECF
14 procedures rather than the page numbers assigned by the
15 parties.  Page 63 is a part entitled Count 1 Racketeering
16 Activities Alleged in the Indictment, and we will start
17 there.
18          All right.  For the record, it looks like all
19 counsel for every party that remains at trial is here.
20 The -- one moment.
21          I think count -- I think that there -- you know,
22 this is another example where the word "would" is used, and
23 counsel might want to be intentional about what they mean.
24          The indictment alleges that each defendant agreed
25 that a conspirator, which may include the defendant himself,
```

1  would commit at least two acts of racketeering.  See, that

2  might be an example where the word "would" is appropriate.

3  There are other contexts where the word "would" is used and

4  may be confusing to the jury, so I just suggest counsel

5  think about that when they walk back through this.

6          If we turn to page 64, if we look at the top,

7  here's probably another example of that.  In this case, the

8  indictment alleges acts involving a murder in violation of

9  the laws of the state of Tennessee as part of the pattern of

10  racketeering activity.

11          That's another example.  There, there's no

12  discussion about a pattern of racketeering that would have

13  occurred.  It's stated as a pattern of racketeering that --

14  the way that sentence is written, we're talking about a

15  pattern of racketeering activity that did occur.  And it's

16  just, I think, another example of, you know, the messaging

17  to the jury, to what extent are they asking about what the

18  alleged coconspirators agreed to and to what extent are they

19  asking what actually happened.

20          So a little additional thought on that.  If

21  counsel would take a look at that and see if they can

22  promote additional clarity on that point.

23          Then later on that page, first-degree murder is a

24  premade and intentional killing of another.  To prove

25  first-degree murder under Tennessee law -- now, look at the

next word, "the government."  I'm wondering if that's right because the way it's written, the government, in our case refers to the United States, and I wonder if the message here, the use of that term there is indicating to the jury that the government has the burden in order to convict the defendants on Count 2, the United States Government, the plaintiff in this case, has the burden of showing each of these beyond a reasonable doubt.

I don't think that's the point here.  I think the point of this instruction is to tell the jurors what the nature is of this supposed racketeering activity.  And I think the point is, look, for you to find that the defendants agreed that first-degree murder under Tennessee law was committed, then this is what they must have agreed to, rather than saying that conviction on Count 1 requires the United States Government to prove each of these elements.  So I wonder if the way to fix that is to just change "the government" to "state prosecutors."  Does that make sense?  Do you see what I'm saying there?

**MR. SAFEEULLAH:**  Yeah, I see what you're saying, Your Honor, but could you rephrase that again or say it again?

**THE COURT:**  So if we're in the middle there of page 64 where it says:  First-degree murder is a premeditated and intentional killing of another.  To prove

1  first-degree murder under Tennessee law, comma, something
2  like "state prosecutors" or "the state must prove," because
3  this is a statement about what constitutes first-degree
4  murder under Tennessee law.
5          So if we're going to frame this in terms of what
6  must be proven, I think replacing the government with state
7  prosecutors makes sense.  I think the sentence could be
8  written in another way.  I'm just concerned about the way it
9  currently is written.  It makes it sound like it is not
10 possible to have a conviction on Count 1 unless these
11 elements are met.
12          **MR. HOFF:**  Your Honor?
13          **THE COURT:**  Yeah.
14          **MR. HOFF:**  If I may, I think that maybe including
15 "state prosecutors" might be a little confusing.  What if it
16 just said, "To prove first-degree murder under Tennessee
17 law, each of the following elements must be proven beyond a
18 reasonable doubt"?
19          **THE COURT:**  I was -- I'm actually in favor of
20 that.  I had thought the same thing, and the only reason I
21 said it the way I was, it sort of kept your sentence
22 structure more intact, but I think that your reformulation
23 actually is preferable.  And I think that's the point you're
24 making.  You're describing what the elements are rather than
25 who has to prove it.  And what they need to know are what

1    are the elements and not who has to prove what.  So just a

2    suggestion.

3              And obviously, I'm happy -- anyone wants to raise

4    their hand, we don't have to decide anything now because

5    these are suggestions for a revised version.  But I'm happy

6    to hear whatever anyone has to say.  No one has to make any

7    objections or anything because it would be premature.  This

8    is just a discussion, so -- but anyone wants to discuss

9    anything, let me know.

10             All right.  Page 68.  And I'll just make one more

11   reminder:  I'm talking about the clerk's office pagination.

12             If we see where it says:  "It is no defense to

13   prosecution for criminal attempt that the offense attempted

14   was actually committed."  And I was thinking about adding --

15   that's an accurate statement, but it might confuse the jury

16   because they actually could think, well, gee, did someone

17   leave out the word "not"?  This is an accurate statement,

18   like, in other words -- but you could see the jury saying

19   well, yeah, you can attempt something and then commit

20   something.  This is an obvious statement.  It's a true

21   statement.  But it might strike the jurors as obvious, why

22   are they telling -- why is the Judge telling us this?

23             It's an important point, but they may wonder, why

24   is the Judge telling us this?  Did he really mean to say

25   it's not a defense that the offense attempted was not

1    actually committed?

2            So I propose adding the following statement:
3    "That is, a criminal attempt does not cease to be a criminal
4    attempt if and when the attempt proves successful."

5            See the point I'm making there?  To say -- you
6    figure out whether it's an attempt, and if it's an attempt,
7    it remains an attempt whether successful or not, is kind of
8    my point.  So think about that.  Something like this:  "That
9    is, a criminal attempt does not cease to be a criminal
10   attempt if and when the attempt proves successful,"
11   something like that.

12           Page 69, in the middle of the page.  Acting --
13   here's the thing in subpart A.  There's this phrase:
14   "Acting with the culpability required for the offense, the
15   person causes or aids an innocent or irresponsible person."

16           Now, I think this is a use of the term someone
17   not responsible, not liable for commission of the offense.
18   I think that's what, you know, learned counsel have in mind.

19           The layperson is going to be, what,
20   irresponsible, like if you got like some teenager, you know,
21   that, you know, acts recklessly and doesn't behave
22   themselves, that's an irresponsible person.

23           So think about -- you know, I mean, if that's the
24   word you want to use, I don't think I'd oppose it.  But a
25   layperson, irresponsible person is an immature person that

doesn't, you know, handle their affairs in a mature manner or something like that. You know what I mean? That's what it's going to mean to a layperson.

All right. Bottom of page 70. This is another case where I'm just concerned that the instructions make it sound like the jury is going to be asked to return a verdict as to whether a state crime was committed.

"Before you find a person criminally responsible for said offense committed by the conduct of another, you must find that all the essential elements of said offense have been proven by the government beyond a reasonable doubt."

And again, the notion that the jurors may need to determine whether the conspirators anticipated the commission of these offenses, that may need to be -- go into their verdict on Count 1. But this makes it sound like they're going to be asked to return a verdict on, quote, said offense committed by the conduct of another. And they're not going to be asked to do that.

So think about rephrasing that the same way I suggested the rephrasing earlier as to which Mr. Hoff had ultimately suggested some helpful language.

Page 72. Kidnapping Under Tennessee law. Same issue, right? "For you to find a person guilty of this offense," you're not actually asking the jury -- the

1  government is not actually asking the jury to find anyone

2  guilty of the offense of kidnapping under Tennessee law.  It

3  is asking them to consider whether the conspirators

4  contemplated this, but that's different.  So the same issue

5  there.

6          Page 75.  Robbery.  Same exact concern.  It says,

7  "For you to find a person guilty of this offense," meaning

8  robbery under Tennessee law, they're not going to be asked

9  to determine whether any defendant is guilty of this

10  offense, even though they are being asked to consider

11  whether the conspirators contemplated commission of that

12  offense.

13          All right.  Bottom of page 76.  Yet another

14  concern along the same lines.  And here is where there are

15  definitions given with respect to the elements of offense of

16  robbery under Tennessee law.  Bottom of page 76, there's a

17  reference to "The jury would be justified in returning a

18  verdict of guilty."

19          You know, the verdict that we're talking about

20  here is a verdict on Count 1 and not on robbery under

21  Tennessee law.  And I'm just concerned that they'll read

22  that to make it sound like, you know, the decision about

23  robbery under Tennessee law is dispositive of their verdict

24  on Count 1.  So in other words, there's a confusion there

25  for the jury between this statement, which is about a

1    verdict of guilty in a hypothetical case charging robbery

2    under Tennessee law versus a verdict of guilty on Count 1.

3            All right.  Page 79.  Extortion Under Tennessee

4    Law.  Here is a similar concern to what I started out with

5    this morning.  "In order for you to find a person guilty of

6    extortion under Tennessee law," well, the -- in a

7    hypothetical charge of extortion under Tennessee law, a jury

8    might be asked whether to find a person guilty of extortion

9    under Tennessee law.  This jury is not going to be asked to

10   make that determination.

11           And then it says, "The government must prove each

12   of the following elements beyond a reasonable doubt,"

13   another area where I recommend rephrasing consistent with my

14   earlier comments this morning.

15           Page 81.  Offenses Involving Dealing in a

16   Controlled -- in Controlled Substances.  Really, like the

17   first sentence there where it says, "It is further alleged

18   in Count 1 that acts involving dealing in controlled

19   substances, specifically cocaine and marijuana, is a type of

20   racketeering activity that the defendants agreed would be

21   committed as part of the racketeering enterprise," that's

22   great language.  Might want to use it elsewhere if you're

23   doing revisions, because that is really what we're talking

24   about.

25           We're not talking about whether dealing in

1    controlled substances actually occurred.  The verdict on

2    Count 1 is not a verdict as -- on Count 1 is not a verdict

3    about whether there was dealing in controlled substances.

4    It's a verdict that they're being asked to return based on

5    the types of racketeering that they find or don't find the

6    defendants agreed would be committed as part of the

7    racketeering enterprise.  So that language is great.

8            Now, with respect to Count 1, we have the same

9    issue below.  Possession with intent to distribute.  If you

10   see that part there on page 81:  "To establish the crime of

11   unlawful possession with the intent to distribute controlled

12   substances, the government must prove both of the following

13   elements," same thing.  The government doesn't need to

14   establish that this crime was committed, and the jury is not

15   going to be asked to find, with respect to Count 1, whether

16   the government proved those things.

17           Instead, of course, the jury is being asked to

18   find whether this is a type of racketeering that the

19   defendants agreed would be committed.

20           You know, I made comments the other day about the

21   notion of "would be committed."  To the extent the

22   government's theory is -- you know, really hangs on whether

23   these things were actually committed, as I think I indicated

24   the other day, is it may choose to just cut out all this

25   language about "would be committed" and go with language

1    about what was actually committed.

2            But that's the government's choice.  They're

3    allowed to frame these instructions solely in terms of what

4    the alleged coconspirators contemplated would be done versus

5    what was actually done.  But I think that the government

6    wants to be sort of conscious in its choice about how to put

7    it to the jury so that we can all promote maximum clarity

8    for the jury.

9            The top of page 82 says:  "It is enough that the

10   defendant knew that it was some kind of controlled

11   substance."  Here's a question I have for the government.

12   And I haven't really had this come up in a controlled

13   substance case I've handled for a while, so I'm -- I don't

14   have a ready case law at hand on this.

15           But here's the issue:  The phrasing, "It is

16   enough that the defendant knew that it was some kind of

17   controlled substance," should we clarify for the jury

18   whether this means the defendant must know that it was some

19   kind of substance that, under the law, is controlled,

20   whether the defendant knows that it's a substance that's

21   controlled under the law or not, or does the defendant have

22   to know that it's a substance that is controlled?  Does it

23   have to know that there's controlling of this substance

24   under the law?  Do you see what I'm saying?

25           So, in other words, does the defendant have to

1  know that the substance is one that, as it turns out, is on

2  the list of controlled substance, or does the defendant have

3  to know it's on the list of controlled substances?  And, you

4  know, I think the answer is they just have to know it's a

5  substance that happens -- as it turns out, happens to be on

6  the list of controlled substances.  They don't have to know

7  that it's on the list of controlled substances.

8          Does that sound right to you, Mr. Safeeullah?

9  Well, I'm not sure, though, now that I say that.

10          **MR. SAFEEULLAH:**  Yeah, Your Honor, I'm not sure

11  either, and I would hate to misstate something right now.  I

12  would have to look at that.

13          **THE COURT:**  And it occurs to me that that just

14  hasn't come up in a long time.  It's an interesting

15  question.  I do think -- do you see the ambiguity I'm

16  talking about there --

17          **MR. SAFEEULLAH:**  Yes, Your Honor.

18          **THE COURT:**  -- about what they need to find?

19          So if we could clarify that, I think that would

20  be helpful.  Thank you.

21          Let's look at the language there below about the

22  phrase "intended to distribute."  The sentence here is

23  written:  "The term distribute includes the actual

24  constructive or attempted transfer of a controlled

25  substance."

1        All right.  Then let's look at page 84.  We again

2   define "distribute," but define it slightly differently.  At

3   the bottom of page 84, there is this language:  "I will add

4   here that the term 'distribute' means the defendant

5   delivered or transferred a controlled substance.  The term

6   'distribute' includes the actual constructive or attempted

7   transfer of a controlled substance.  The term 'distribute'

8   also includes the sale of a controlled substance."

9        So here's the thing.  There are three sentences

10  there that define the term "distribute."  Only the middle

11  sentence there is included in the definition on page 82.

12       So what I might suggest is having one definition

13  of "distribute."  Don't sort of redefine it and certainly

14  don't redefine it differently.  So maybe the thing to do is

15  put everything you want up on page 82 about what's included

16  in this definition of distribute, and then when you get to

17  page 84, you know, you could refer back, just refer back to

18  the prior definition.

19       So it's just a suggestion.

20       All right.  This is a point that maybe is more

21  important to judges and criminal practitioners, but I think

22  it's -- might as well make the point just because it's --

23  make the statement of the law more accurate.

24       Page 85, two-thirds of the way down, there is

25  this statement:  "Unlike conspiracy under Tennessee law,

1    conspiracy under federal law does not require proof of a

2    commission of an overt act in furtherance of the

3    conspiracy."

4         I would suggest saying this -- how about this:

5    "A drug conspiracy or a drug trafficking conspiracy under

6    federal law.  A drug conspiracy or a drug trafficking

7    conspiracy under federal law does not require proof,"

8    because the statement as issued is actually inaccurate.  371

9    conspiracies under federal law do require commission of an

10   overt act.  But the kind of conspiracy we're talking about

11   here, drug trafficking conspiracy, it is true, does not

12   require proof of the commission of an overt act.

13        And I realize that, you know, that distinction is

14   not going to be apparent to the jurors in any event, but

15   might as well -- might as well make the qualification to

16   make the statement accurate.

17        Page 87, we have that same language again, that I

18   asked the government to think about clarifying.  And when I

19   say the government, of course, I'm not necessarily

20   suggesting that only the government drives the train.

21   Obviously, defendants can have just as much input, and I

22   realize that.  But for short, I'm saying the government

23   because this would not be the first time the government

24   drives the train on a draft and then shares it with the

25   defendant.  And so that's why I say the government.

1          We have that language:  "It is enough that the

2    defendant knew that it was some kind of controlled

3    substance."  Let's take a look at that again.

4          All right.  We are just a little past 9:00.  I'll

5    make one more remark.  Okay.  The jurors are coming up, so

6    we have just a minute or two.

7          Witness Tampering, top of page 89.  I commend

8    that language there in the first paragraph again.  It's

9    about what is a type of racketeering activity that the

10   defendants agreed would be committed as part of the

11   racketeering conspiracy?  Is witness tampering such a type

12   of racketeering activity?  That is the question.

13          Just a thought.  And I wouldn't insist on this.

14   I think when you're dealing with, you know, a very lengthy

15   complicated set of instructions for laypersons, every time

16   you're able to use one phrase over and over to convey the

17   same concept, it may help the jurors follow along and not

18   wonder whether there aren't two different concepts that

19   they're responsible for.

20          So, for example:  "There are several ways that a

21   defendant may commit this offense."  Then we have a No. 1,

22   right?  And then --

23          (Discussion off the record.)

24          THE COURT:  All right.  We'll come grab them in

25   just a second.  Thank you, sir.

1          Then if you look at what is enumerated as 2, the

2   phrasing is changed.  So in other words, we start out by

3   using the concept of a way in which the defendant may commit

4   this offense.  Then, later on, we switch to the notion of a

5   defendant being convicted of this offense.  Why not just

6   keep speaking in terms of how a defendant commits the

7   offense rather than switch from talking about how a

8   defendant may commit this offense to how the defendant could

9   be convicted of this offense?

10          The other final thought I have, and then we'll

11   bring in the jury on this:  Similar concept to try and keep

12   the concepts consistent and as easy as possible for jurors

13   to follow.  No. 1, we say:  "The first way is if a defendant

14   killed or attempted to kill a witness in order to prevent

15   the witness from providing information to a federal law

16   enforcement officer."

17          Well, the sentence begins talking about a way of

18   doing something.  So why not write the rest of the sentence

19   in terms of a way of doing something?  The first way is by

20   killing or attempting to kill a witness.  That's the way,

21   rather than saying we're going to tell you what the way is

22   and then we're going to use a subjective tense.  The way is

23   by killing or attempting to kill.  That's the first way you

24   do it.

25          So that's a shorter concept, and it keeps out the

1  subjunctive notion where you get into ifs and so forth.  The

2  first way is by killing or attempting to kill.  That way,

3  you keep the language consistent.  You start out talking --

4  saying you're going to tell them what a way is, and then

5  your verbiage is framed in terms of the way of doing it.

6  Just a thought there.

7          Now, I will say this:  We -- we're up to page 90,

8  and, you know, I'll have some more to say.  I think that

9  it's just -- you know, obviously this is a very lengthy set

10  of instructions.  Counsel is, I think, you know, free to

11  suggest whatever they want and not go along with any of the

12  Court's suggestions.  Obviously, whatever I get, I'm going

13  to look at and make my own sort of determinations.

14          I do think accounting for some of these concerns

15  would be in the benefit of all parties.  And I do think some

16  of the concerns are going to be necessary for me -- some of

17  the concerns would have to be addressed for me to be

18  convinced that it's appropriate to instruct the jury because

19  without some of these changes, I'm going to think that it's

20  not going to quite be accurate and therefore shouldn't be

21  given to the jury.

22          There is obviously a long way to go on these, but

23  I think the -- I think the frequency of proposed changes is

24  going to slow down.  And these are complex jury

25  instructions.  The part towards the end is obviously a

little more pro forma in terms of the language, so
hopefully, we can accelerate this discussion.

But that will need to do for now. Anyone have
any questions about sort of the thrust of some of my
remarks?

All right. I don't see any hands.

The other thing is this: Does anyone -- and
you're allowed to be candid with me. We're all trying to do
the right thing, right, by having the jury understand these
instructions in a complex case as best as is possible for
laypersons.

Is anyone of the opinion that most of my remarks,
I'm making a mountain out of a molehill? Anyone feel that
way? Okay. You really -- and I'm not being -- really --
you could tell me and we'd have the discussion, but I really
feel like we want to spoon-feed this as best as possible to
the jurors because, in particular regarding Count 1, having
litigated primarily civil RICO, I'm going to tell you,
lawyers get lost all the time on it. You see it all the
time. And laypersons ask, in a very significant case that's
very important to the government and very important to the
defendants, they're going to -- you know, they're going to
need all the help they can get in keeping it straight. If
we do it right, that's what's going to happen: They're
going to understand the law. But probably need a little

1    work to get there.

2           All right.  Anything of a preliminary matter

3    before we call in the jurors?

4           **MR. SAFEEULLAH:**  Yes, Your Honor.  Prior to the

5    start of trial, the government did an evidence review with

6    the defendants.  We showed them the evidence, specifically

7    cocaine.  We ended up getting stipulations from all four of

8    the defendants that included Luis Colindres.  He is since no

9    longer a part of this trial, so we revised the stipulation

10   to remove his name.  However, we were in discussions with

11   the defense prior to Your Honor coming on the bench on

12   whether they would sign the stipulations now that his name

13   has been removed.

14          I'm not sure whether they're going to sign the

15   stipulations.  I think someone said that they're not going

16   to sign them now.  But we plan -- the government planned on

17   introducing one of the stipulations with this next witness

18   to say that the cocaine that was seized was actually cocaine

19   as opposed to having to bring in a chemist or two for all of

20   the cocaine that we have.  So, I mean, that was the

21   discussion that we were having as Your Honor came onto the

22   bench.

23          **THE COURT:**  All right.  Yes, Mr. Ganguli?

24          **MR. GANGULI:**  Your Honor, if I could have a

25   moment to speak with Mr. Tidwell, I think we have arrived at

1    that stipulation.

2              THE COURT:  All right.  So it sounds like there

3    was an issue there; you think it's been resolved.

4              MR. SAFEEULLAH:  But it's for all three of the

5    defendants.  They all previously signed the stipulation, and

6    I would just hand it back to them and see whether they want

7    to sign it.

8              THE COURT:  Okay.  All right.  That's with just

9    the three names now?

10             MR. SAFEEULLAH:  That's correct, as opposed to

11   the four.

12             THE COURT:  All right.  Very well.  Thank you.

13             (Respite.)

14             THE COURT:  Mr. Safeeullah, when did you

15   anticipate reading this?  In the middle of the testimony,

16   during or before or after?

17             MR. SAFEEULLAH:  After, at the conclusion of the

18   witness's testimony.

19             THE COURT:  All right.  Very well.

20             MR. SAFEEULLAH:  But it's just one stipulation to

21   the cocaine that she submitted into the property and not the

22   other two stipulations that involve other cocaine seizures.

23             THE COURT:  Okay.  Just the one cocaine seizure.

24   All right.  Very well.  Okay.

25             MR. HOFF:  Your Honor, if I may, do you think

```
1    we'll be going over the rest of the jury instructions this
2    week?
3            THE COURT:  Do counsel have a preference?  I
4    could -- you know, we could continue it tomorrow.  I think
5    if we start at -- I don't see why, if we started at --
6    really started at 8:30, we couldn't be done by 9:05.
7            MR. HOFF:  Okay.  I think that makes sense, Your
8    Honor, just because I do think it's going to take some time
9    to make some edits.  Looking at the trial schedule,
10   probably -- it would be better to deal with those sooner
11   rather than later, so . . .
12           THE COURT:  Yeah.  So we have time, but not so
13   much time.
14           MR. HOFF:  Exactly.
15           THE COURT:  Yeah, I agree with that.  I'm happy
16   to have us do it tomorrow at 8:30.  And, you know, I'm
17   committed to getting it done.
18           MR. HOFF:  I think I'll be in charge of some of
19   the edits, so the sooner we can move through them, I think
20   would be best.
21           THE COURT:  All right.  What about tomorrow at
22   8:30?  Does that work for folks?
23           All right.  We'll do tomorrow at 8:30, and we'll
24   push through it and, hopefully, give you what you need and
25   have time to make the revisions.
```

1       Are we about done over there?

2       All right.  So tomorrow at 8:30 a.m., we'll

3   continue with the jury instructions.

4       All right.  If nothing further, we'll call in the

5   jurors.  Thank you.

6       (WHEREUPON, the jury entered the courtroom at

7   9:16 a.m., with matters being heard in open court as

8   follows:)

9       **THE COURT:**  All right.  Thanks, folks.  As

10  always, we appreciate our jurors' continued attendance and

11  attention.  Appreciate them being patient in the hallway

12  while we finished up some business.  We were certainly here

13  on time ourselves taking care of a little business, went a

14  little bit over.  Appreciate your patience.

15      When we left, the government had concluded an

16  examination of its witness, of course, with some

17  cross-examination of Mr. Baca, and now the government may

18  call its next witness.

19      **MR. SAFEEULLAH:**  Thank you, Your Honor.  The

20  United States calls Jaime Terry.

21      **THE COURT:**  All right.  Ms. Terry may come

22  forward.

23      (The witness was sworn.)

24  ///

25  ///

```
1                        *    *    *

2                    JAIME TERRY,

3  was called as a witness, and after having been first duly

4  sworn, testified as follows:

5                    DIRECT EXAMINATION

6  QUESTIONS BY MR. SAFEEULLAH:

7  Q.    Good morning.

8  A.    Good morning.

9  Q.    Will you please state and spell your name for the

10 record.

11 A.    It's Jaime Terry.  J-A-I-M-E, T-E-R-R-Y.

12 Q.    And where are you presently employed?

13 A.    With the FBI in Lexington, Kentucky.

14 Q.    And what's your job title?

15 A.    I'm a special agent.

16 Q.    How long have you been a special agent with the FBI?

17 A.    Six years.

18 Q.    What were you doing before you were a special agent

19 with the FBI?

20 A.    I was a police officer with Metro Nashville PD.

21 Q.    And how long were you a police officer in Nashville?

22 A.    Ten years.

23 Q.    So you would have been a police officer in Nashville

24 on March 15th, 2016?

25 A.    Correct.
```

1  Q.    Were you working that day?

2  A.    I was.

3  Q.    What side of town were you working on that day?

4  A.    On the south side of Nashville.

5  Q.    And what were you doing on that side of town?

6  A.    My -- the unit I was working on was assisting another

7  unit who were conducting search warrants in the area.

8  Q.    And were you tasked with going into the residence to

9  conduct the search warrant?

10  A.    No.  My unit was conducting the perimeter.

11  Q.    And was there communications between people who were

12  going into the search warrant to officers who were working

13  on the perimeter?

14  A.    Yes, sir.

15  Q.    At some point, did you leave the scene where the

16  search warrant was taking place?

17  A.    Yes.

18  Q.    And why did you leave?

19  A.    We'd received information that a vehicle had fled the

20  scene.

21  Q.    And based on that information, where did you go or

22  what did you do?

23  A.    We went to try to find the vehicle in the area.

24  Q.    And what did you see when you got to the place where

25  you parked?

1  A.    There was a vehicle that had flipped over into a

2  ravine or a deep creek.

3  Q.    And did you get out of your car or did you stay in

4  your car?

5  A.    Got out to see if there was any occupants in the

6  vehicle, see if anybody was around the vehicle fleeing,

7  anything like that.

8  Q.    Can you look in one of those binders over there to

9  your right-hand side for Exhibits 200 through 205.  It

10 should be the first one.

11 A.    Okay.

12 Q.    Have you looked at each one of those exhibits?

13 A.    Yes, sir.  Yes.

14 Q.    And what's in those photographs that you looked at?

15 A.    They're pictures of the vehicle that was flipped over

16 that day.

17 Q.    And how do you know that?

18 A.    Because I recognize the vehicle.

19        MR. SAFEEULLAH:  Your Honor, I move to admit into

20 evidence United States Exhibits 200, 201, 202, 203, 204,

21 205.  And I request permission to publish them to the jury.

22        THE COURT:  All right.  Absent objection, the

23 following exhibits will be admitted:  Government 200, 201,

24 202, 203, 204, 205.  They may be published.

25        (Government Exhibits 200 through 205 were marked

1  and admitted into evidence.)

2  **BY MR. SAFEEULLAH:**

3  Q.    Let's start with United States Exhibit 205.  Can we

4  pull that one up on the screen.

5        Can you tell us what we're looking at in this

6  photograph?

7  A.    Yes.  This is the vehicle flipped over into the ravine

8  or deep creek.  Fire department is on scene.  Looks like

9  they're putting out a fire.

10 Q.    Can we turn to United States Exhibit 204.

11       What are we looking at this in photograph?

12 A.    A different view of the same vehicle.  Fire department

13 on scene.

14 Q.    Do you know if the car was on fire or not?

15 A.    I believe so with the smoke and the fire department

16 being there.

17 Q.    Can we turn to United States Exhibit 203.

18       And tell us what we're looking at in that photograph.

19 A.    Again, it's another view of the vehicle with smoke

20 coming out.

21 Q.    And can we turn to United States Exhibit 202.

22       What are we looking at in this photograph?

23 A.    It's a picture of a vehicle again on its side in the

24 ravine.

25 Q.    And lastly, can we turn to United States Exhibit 200.

1    Can you tell us what we're looking at in this?

2  A.    Another picture, looks like the underside of the

3  vehicle in the ravine.

4  Q.    When you arrived at this location, did you see the

5  person or the driver in the car?

6  A.    No, there were no occupants in the vehicle.

7  Q.    Was the car drivable or was it not drivable?

8  A.    No, it was not drivable.

9  Q.    What would happen to that car if it was not drivable?

10 A.    It would be towed.

11 Q.    Do you know if the car was towed that day?

12 A.    It was.

13 Q.    What did you and the other officers do once you

14 realized that that car had to be towed?

15 A.    We conducted an inventory search of the vehicle before

16 it's towed.

17 Q.    Was anything significant found during that search?

18 A.    Yes.

19         MR. SAFEEULLAH:  Your Honor, may I approach?

20         THE COURT:  You may.

21 BY MR. SAFEEULLAH:

22 Q.    Can you look at United States Exhibits 10 and 11.

23 A.    Yes, sir.

24 Q.    Do you recognize those two exhibits?

25 A.    I do.

1  Q.   And what do you recognize them to be?

2  A.   11 is a sunglass case with -- or a glass case with

3  some eyeglasses, and 10 is cocaine packaged in individual

4  Baggies.

5  Q.   And were these the substances that were seized on the

6  day that you-all searched this car that turned over that we

7  just looked at?

8  A.   They were.

9       MR. SAFEEULLAH:  Your Honor, I move to admit

10  United States Exhibits 10 and 11 into evidence.

11       THE COURT:  Absent objection, Government

12  Exhibit 10 and 11 are admitted.

13       (Government Exhibits 10 and 11 were marked and

14  admitted into evidence.)

15  BY MR. SAFEEULLAH:

16  Q.   Were you the person that submitted these items into

17  evidence or the property room?

18  A.   Yes, sir.

19  Q.   Did you also request a laboratory test on the cocaine?

20  A.   Yes, sir.

21       MR. SAFEEULLAH:  Your Honor, at this point, the

22  United States would like to read a stipulation into the

23  record.

24       THE COURT:  All right.  You may proceed.

25       MR. SAFEEULLAH:  "It is hereby stipulated and

1    agreed among the parties that:

2            "On March 15th, 2016, Metro Nashville Police

3    Department officers lawfully seized the controlled

4    substances admitted as United States Exhibit 10.  A proper

5    chain of custody was maintained until the controlled

6    substances were submitted to the Metro Nashville Police

7    Department Crime Laboratory for analysis.

8            "The controlled substances admitted as

9    United States Exhibit 10 were tested by forensic chemist

10   Nicole Dowell of the Metro Nashville Police Department Crime

11   Laboratory using appropriate testing procedures.

12           "Ms. Dowell examined United States Exhibit 10 and

13   determined that the substance in this exhibit contained

14   cocaine, a Schedule II controlled substance, with a total

15   gross weight of approximately 49.92 grams.

16           "It is so stipulated."

17           And for the record, this is

18   United States Exhibit 1337, and we would ask that this

19   exhibit be admitted into evidence.

20           **THE COURT:**  All right.  Any objection to the

21   admission of 1337?

22           Seeing none, then 1337 will be admitted.

23           (Government Exhibit 1337 was marked and admitted

24   into evidence.)

25           **MR. SAFEEULLAH:**  Your Honor, I don't have any

```
 1   additional questions for this witness.
 2              THE COURT:  All right.  Mr. Ganguli?
 3              MR. GANGULI:  No questions, Your Honor.
 4              THE COURT:  Ms. Hood-Schneider?
 5              MS. HOOD-SCHNEIDER:  No questions.
 6              THE COURT:  And Mr. Bloom?
 7              MR. BLOOM:  No questions, Your Honor.
 8              THE COURT:  All right.  Then Agent Terry may step
 9   down.  Thank you.
10              THE WITNESS:  Thank you.
11              (The witness stepped down.)
12              MR. HOFF:  Your Honor, the United States next
13   calls Officer Autumn Manning.
14              THE COURT:  All right.  Officer Manning may come
15   forward.
16              (The witness was sworn.)
17                         *   *   *
18                     AUTUMN MANNING,
19   was called as a witness, and after having been first duly
20   sworn, testified as follows:
21                     DIRECT EXAMINATION
22   QUESTIONS BY MR. HOFF:
23   Q.   Good morning.  Can you please state and spell your
24   name for the record.
25   A.   Autumn Manning.  A-U-T-U-M-N, then M-A-N-N-I-N-G.
```

1  Q.    And, Officer, where are you currently employed?

2  A.    The Metro Nashville Police Department.

3  Q.    How long have you been with the Metro Nashville Police

4  Department?

5  A.    For nine years.

6  Q.    In 2017, what was your assignment?

7  A.    I worked patrol for South Precinct.

8  Q.    And what was your shift?

9  A.    The overnight shift.

10  Q.    What hours are the overnight shift?

11  A.    It included from, at that timeframe, 10:30 at night

12  until 7:00 in the morning.

13  Q.    And what area of Nashville does the South Precinct

14  patrol cover?

15  A.    Antioch.  Cane Ridge-Antioch area.

16  Q.    Were you working on February 18th of 2017?

17  A.    Yes.

18  Q.    At some point that night, were you called out to 1316

19  Antioch Pike?

20  A.    Yes.

21  Q.    About what time did you go out there?

22  A.    In the early hours of the morning around like -- I

23  believe around 2:00 in the morning.

24  Q.    And what is that -- in 2017, in February 2017, what

25  was that location?

1    A.    That is a nightclub called Island Vibes.

2    Q.    What were you called to that area for?

3    A.    For a shots fired at the location.

4    Q.    I want to show you United States Exhibit 395.  Do you

5    recognize this?

6    A.    Yes.

7    Q.    And what is that a photograph of?

8    A.    That is the photograph of Island Vibes, the nightclub.

9    Q.    And that's -- is that where you responded on February

10   the 18th of 2017?

11   A.    Yes.

12   Q.    Thank you.  When you first arrived, what did you see?

13   A.    Multiple people scrambling, running outside of the

14   building.

15   Q.    And when you say multiple people, how many people were

16   there approximately?

17   A.    Approximately, probably 30, 40 people.  It was a crowd

18   of people who were out for the night.

19   Q.    And was the scene hectic?

20   A.    It was at first, yes.

21   Q.    Okay.  When you say it was at first, what happened?

22   A.    There were several officers trying to get on scene as

23   well as several patrons from the location running, trying to

24   get to their cars to leave, and we were trying to contain

25   the scene.

```
 1   Q.    Were you and other officers finally able to contain
 2   the scene?
 3   A.    Yes.
 4   Q.    Did you notice anything about any of the cars parked
 5   at that location?
 6   A.    Yes.  There was a -- one of the sedans had several
 7   bullet holes.
 8   Q.    And were you directed towards anything by any
 9   employees of the club?
10   A.    Yes.  There were several cartridge casings that were
11   all around the ground.  The employees also instructed that
12   the building had multiple bullet holes in it as well and
13   some of their equipment was damaged, and then the car as
14   well.
15   Q.    And did you -- at some point, did you speak with any
16   of the occupants of the sedan?
17   A.    Yes.  I spoke to the driver of the sedan as well as
18   the passenger of the sedan.
19   Q.    Without telling me what they said, who were those
20   people?
21   A.    The passenger was a Mr. Hansy Sanchez, and the driver
22   was a Mr. Jorge Velasquez.  He was the owner of the vehicle.
23   Q.    I want to show you Government Exhibit 406.  Do you
24   recognize this?
25   A.    Yes.  That is the side view of the parking lot
```

1    entrance, the side of the building, the side of Island
2    Vibes.
3    Q.    And is this after the area was secured?
4    A.    Yes.
5    Q.    And there appears in that photo, there's some evidence
6    markers on the ground; is that right?
7    A.    Correct.
8    Q.    And were those there when you arrived?
9    A.    No.
10    Q.    Okay.  And next to those evidence markers, what are
11    those?
12    A.    Those are plastic cups from inside the Island Vibes
13    location that they use for drinks.  They had placed multiple
14    cups over the cartridge casings so people would not trample
15    over the evidence.
16    Q.    Were those there when you arrived?
17    A.    Yes.
18    Q.    Okay.  So after you arrived, did someone call the
19    crime scene unit for those evidence markers?
20    A.    Yes.
21    Q.    And collect the cartridge casings?
22    A.    Yes.
23    Q.    Did you walk throughout the Island Vibes nightclub?
24    A.    Yes.
25    Q.    What did you see when you walked throughout there?

1   A.    As far as inside the location or outside?

2   Q.    Yeah, I'm sorry.  Inside the location.

3   A.    Inside the location, we noticed that there were

4   several bullet holes that came through the location and

5   knocked -- had struck the speakers and other equipment and

6   walls of the location.

7   Q.    And that night, did you learn if anyone had been

8   injured?

9   A.    I believe Mr. Sanchez had a small cut on his hand.

10  Q.    Okay.  Had anyone been shot?

11  A.    No, nobody was shot.

12  Q.    Were you also working on February the 25th of 2017?

13  A.    Yes.

14  Q.    And that's -- so that was about a week later?

15  A.    Yes.

16  Q.    And you were working in the same area?

17  A.    Yes.

18  Q.    And on February 25th of 2017, did you -- were you

19  called to the area of Antioch Pike and Murfreesboro Road?

20  A.    I was, yes.

21  Q.    And why were you called there?

22  A.    I was working a vehicle accident crash scene.

23  Q.    So initially, you were out there for a crash?

24  A.    Yes.

25  Q.    And about what time was that?

1    A.    It was overnight.  It was early hours.  I believe
2    close around 5:00 a.m.
3    Q.    Was it still dark when you were investigating the
4    crash?
5    A.    It was still dark.
6    Q.    While you were out there investigating this crash, did
7    you hear anything?
8    A.    I heard multiple shots being fired coming from the
9    north of us on Murfreesboro Pike.
10   Q.    And --
11   A.    Near the Jack in the Box.
12   Q.    I'm sorry.  I didn't mean to interrupt you.
13   A.    No, that's okay.
14   Q.    How far away was the Jack in the Box from where you
15   were?
16   A.    Less than a quarter of a mile.
17   Q.    And approximately how many gunshots did you hear?
18   A.    About four or five.
19   Q.    After you heard those gunshots, what happened?
20   A.    There was a white sedan that was speeding towards us,
21   myself as well as a few other officers and detectives that
22   were on the crash scene with me on Una Antioch Pike.
23   Q.    Had you seen that car before?
24   A.    Yes.
25   Q.    Where?

1    A.    It was the same car that was involved in the shooting
2    incident on the week prior at Island Vibes.
3    Q.    And the car that you saw with bullet holes in it?
4    A.    Yes.  And it had new ones.
5    Q.    Was the car coming towards you?
6    A.    Yes.
7    Q.    Okay.  What happened as the car came towards you?
8    A.    It came towards us on Una Antioch Pike.  It stopped
9    right in front of us, and then it just stayed stalled there.
10   There was no movement inside the car.
11   Q.    I want to show you United States Exhibit 440.
12         Do you recognize this photograph?
13   A.    Yes.
14   Q.    And what is that a photograph of?
15   A.    That is a photograph of, to the left of it, the two
16   vehicles together is the crash scene I was originally
17   working.  The white Toyota -- I'm sorry -- the single
18   vehicle in the middle of the road is the vehicle that was
19   involved that drove towards us.
20   Q.    And is that the vehicle with the door, the driver's
21   side door open?
22   A.    Yes.
23   Q.    Okay.  Now you -- I want to also show you United
24   States Exhibit 441.  Do you recognize this?
25   A.    Yes.

1  Q.    Okay.  And what's that a photograph of?

2  A.    That is the white Toyota Scion.  It's the vehicle that

3  was involved in the prior shooting incident the week prior

4  at Island Vibes.  It was also the same car that Mr. Hansy

5  Sanchez was driving towards us after we heard the shots

6  fired coming from Murfreesboro Pike.

7  Q.    And is there something about the rear window in that

8  photograph that you can see?

9  A.    The back window was shattered.

10 Q.    Now, you mentioned that there was a Mr. Hansy Sanchez

11 in the vehicle.

12 A.    Yes.

13 Q.    Was that person driving?

14 A.    Yes.  He was in the driver's seat.  He was the only

15 occupant inside the vehicle.

16 Q.    And when you -- I believe you testified when the car

17 stopped, there was no movement?

18 A.    Correct.

19 Q.    And was the -- was Mr. Sanchez, the driver, was he

20 moving when the car stopped?

21 A.    No.

22 Q.    And what happened after the car stopped?

23 A.    Myself and the other officers that were with me gave

24 multiple commands for the driver to open up the door.  When

25 there was no movement, we approached the vehicle, opened it

1    up, Mr. Sanchez fell out of the vehicle.

2    Q.    And what you say "fell out," what do you mean?

3    A.    He slumped over and we helped him out.

4    Q.    I want to show you United States Exhibit 447.

5          And is that the -- is that a photograph of the

6    driver's side of that vehicle?

7    A.    Yes, with the door open.

8    Q.    Okay.  And when -- Mr. Sanchez, did he actually fall

9    out of the vehicle or did he slump over?

10   A.    He slumped over falling out of the vehicle.  He did

11   not walk out.

12   Q.    I want to also show you United States Exhibit 448.  Do

13   you recognize this photograph?

14   A.    Yes.  That is the picture of the driver's seat.  It

15   has blood stain all over the steering wheel.

16   Q.    And if you can, in that photograph, did you notice

17   anything about the front windshield?

18   A.    Yes.  It has bullet holes in it.

19   Q.    Now, after, was Mr. Sanchez responsive?

20   A.    Barely.

21   Q.    And what -- did you notice anything about him?

22   A.    He had been shot in the neck.

23   Q.    Was he bleeding?

24   A.    Yes.

25   Q.    And what, if anything, did you or the other officers

1  on the scene do?

2  A.    We provided him medical attention, called for an

3  ambulance to help try and keep him alive.

4  Q.    Where -- do you remember where on his neck Mr. Sanchez

5  was bleeding from?

6  A.    He was -- went through the back of his neck and it

7  came out the front.

8  Q.    And did -- how did you -- how did you render medical

9  treatment?

10  A.    The other officer on the scene had applied pressure to

11  his neck to keep from the -- to keep him from bleeding.

12  Q.    Did the ambulance arrive?

13  A.    Yes.

14  Q.    Approximately how long?  Do you remember?

15  A.    I don't remember on that.

16  Q.    When --

17  A.    It wasn't hours.  It was immediate.

18  Q.    When -- did Mr. Sanchez go in the ambulance and leave?

19  A.    Yes.  He was transported.

20  Q.    Was he alive when he left?

21  A.    Yes.

22  Q.    After the ambulance left, what did you and the other

23  officers do?

24  A.    We contained the scene, set up a perimeter around

25  where we were at and blocked off the roadway.

```
1    Q.    Did Crime Scene arrive?

2    A.    Crime Scene came out right around as daylight started

3    hitting or started coming.

4    Q.    And I think in those photographs, it appeared to be

5    bright outside; is that right?

6    A.    Yes.

7    Q.    So did the -- did it continue into the early morning

8    hours?

9    A.    It did.  It came in, we were going through a shift

10   change.

11             MR. HOFF:  I have no further questions, Your

12   Honor.

13             THE COURT:  All right.  Mr. Ganguli?

14             MR. GANGULI:  No questions, Your Honor.

15             THE COURT:  Thank you.  Ms. Hood-Schneider?

16             MS. HOOD-SCHNEIDER:  No questions.

17             THE COURT:  Thank you.  Mr. Bloom?

18             MR. BLOOM:  No questions, Your Honor.

19             THE COURT:  Thank you, Officer.  You may step

20   down.

21             THE WITNESS:  Thank you.

22             (The witness stepped down.)

23             THE COURT:  All right.

24             MR. SAFEEULLAH:  The United States calls Justin

25   McCormick.
```

```
 1              THE COURT:  All right.  Mr. McCormick may come
 2   forward.
 3              (The witness was sworn.)
 4                         *   *   *
 5                    JUSTIN McCORMICK,
 6   was called as a witness, and after having been first duly
 7   sworn, testified as follows:
 8                    DIRECT EXAMINATION
 9   QUESTIONS BY MR. SAFEEULLAH:
10   Q.    Good morning.
11   A.    Good morning.
12   Q.    Can you please state and spell your last name for the
13   record.
14   A.    My last name?
15   Q.    Can you please state your full name and spell your
16   last name for the record?
17   A.    Justin McCormick.  Last name is M-C-C-O-R-M-I-C-K.
18   Q.    Where are you presently employed?
19   A.    Nashville Police Department.
20   Q.    And what's your job title?
21   A.    I'm a field training officer.
22   Q.    How long have you been a police officer with Metro
23   Nashville Police department?
24   A.    Ten years.
25   Q.    And what side of town do you work on now?
```

1    A.    The West Precinct.

2    Q.    Where were you working before you worked with -- with

3    the West Precinct?

4    A.    South Precinct.

5    Q.    And approximately how long were you working in the

6    South Precinct?

7    A.    Approximately four to five years.

8    Q.    So on January the 18th, 2017, you would have been

9    working on the South Precinct?

10   A.    Yes, sir.

11   Q.    And you were working as a patrol officer?

12   A.    Yes, sir.

13   Q.    I want to draw your attention to a shooting incident

14   that occurred on January 18th, 2017.  Did you respond to an

15   incident that night?

16   A.    Yes, sir.

17   Q.    Do you know where you went to?

18   A.    Yes, sir.

19   Q.    Where did you go?

20   A.    It was off of Billingsgate Road.

21   Q.    Can we pull up United States Exhibit 382.

22         Can you tell us what we're looking at in this

23   photograph?

24   A.    That silver-ish SUV is a vehicle that was described in

25   the -- to be involved in the shooting.

1    Q.    And what was your primary role when you got to this

2    residence?

3    A.    I would have been to secure the scene.  I was the

4    officer responsible for that zone, so I would have also done

5    any medical attention if it needed to be required, if there

6    was a victim there.

7    Q.    And can we pull up United States Exhibit 385.

8          Can you tell us what we're looking at in this

9    photograph?

10   A.    It's the front of the vehicle that was -- has some

11   bullet holes in the hood and through the windshield of the

12   vehicle that was involved.

13   Q.    And do you know if the victim was injured in this?

14   A.    Yes.

15   Q.    What type of injuries did he sustain?

16   A.    It would have been gunshot wounds to the right -- I

17   believe it was the arm and a leg.  I might have to refresh

18   my memory with the report.

19   Q.    But you remember that this victim had gunshot wounds?

20   A.    Yes, sir.

21   Q.    Did you go to the hospital with him, or did you stay

22   at the scene?

23   A.    I stayed at the scene.

24   Q.    What did you do as you stayed at the scene?

25   A.    I secured the scene, waited for the ID unit to process

1  the scene.

2  Q.    Were you also working on February the 25th, 2017?

3  A.    Yes, sir.

4  Q.    And what side of town were you working on on that day?

5  A.    South Precinct.

6  Q.    What shift were you working?

7  A.    The midnight shift.

8  Q.    So you and Autumn Manning probably would have been

9  working around the same time?

10  A.    Yeah, we were on the same detail.  We worked together.

11  Q.    Same side of town, same shift?

12  A.    Yes.

13  Q.    Did you respond to an incident in the early morning

14  hours?

15  A.    Yes.

16  Q.    And what incident did you respond to?

17  A.    Originally, I was -- I had responded to an alarm call

18  on that day.

19  Q.    And where did you respond?  What location did you

20  respond to to that alarm call?

21  A.    It was -- I don't remember the location.  It was just

22  on Murfreesboro.  It would have been a commercial alarm.

23  Q.    And was Autumn Manning out there at the scene that

24  day?

25  A.    Not on that scene.  While I was on that scene, there

1    was -- I responded to some -- a shooting incident off of

2    Murfreesboro and Una Antioch, which is what we're talking

3    about.

4    Q.    And while you were at that scene, what happened?

5    A.    There was a victim that was inside the driver's side

6    of the vehicle.  We were assessing gunshot wounds,

7    particularly one to the neck which was significant enough to

8    call for an ambulance.

9    Q.    And what did you do to this victim that was shot

10   through the neck?

11   A.    We made sure to apply pressure and continue to give

12   medical attention until the medics got there.

13   Q.    Can we pull up United States Exhibit 440.

14         Is this the scene that you're -- just got finished

15   describing to us?

16   A.    Yes, sir.

17   Q.    And can we pull up United States Exhibit 448.

18         Is this also what the scene or the car looked like

19   while you were out there?

20   A.    Yes, sir.

21   Q.    And what's that on the steering wheel?

22   A.    That would be blood.

23   Q.    Can you see the headrest?  Is there something with the

24   headrest that we should know about?

25   A.    There's a bullet hole through the gun rest -- or, I

1    mean, through the headrest.

2    Q.    Were you there when the paramedics got there or the

3    ambulance?

4    A.    Yes, sir.

5    Q.    Did you leave this scene and go to the hospital, like

6    following the paramedics or after the paramedics?

7    A.    Yes.  I was responsible for following the ambulance to

8    the hospital to verify the significance of the injuries and

9    to get any further statements or evidence at the hospital.

10           MR. SAFEEULLAH:  Your Honor, may I approach this

11    witness?

12           THE COURT:  You may.

13    BY MR. SAFEEULLAH:

14    Q.    I'm passing up what's previously been marked as

15    United States Exhibit 30.  Can you look at that exhibit?

16    A.    Yes, sir.

17    Q.    Do you know what that is?

18    A.    That's a bullet that has been fired from a shell.

19    Q.    Did you recover that bullet from the hospital?

20    A.    I did.

21           MR. SAFEEULLAH:  Your Honor, I move to admit into

22    evidence United States Exhibit 30.

23           THE COURT:  Absent objection, Government

24    Exhibit 30 will be admitted.

25           (Government Exhibit 30 was marked and admitted

1    into evidence.)

2              **MR. SAFEEULLAH:**  Your Honor, I don't have any

3    additional questions for this witness.

4              **THE COURT:**  All right.

5              **MR. GANGULI:**  No questions, Your Honor.

6              **THE COURT:**  Thank you.

7              **MS. HOOD-SCHNEIDER:**  No questions.

8              **THE COURT:**  Thank you.

9              **MR. BLOOM:**  No questions, Your Honor.

10             **THE COURT:**  All right.  Thank you, officer.  You

11   may step down.

12             **THE WITNESS:**  Thank you, sir.

13             (The witness stepped down.)

14             **THE COURT:**  All right.  If the government wishes

15   to call its next witness.

16             **MS. FARZAD:**  Thank you, Your Honor.  The

17   government calls Hansy Sanchez to the stand.

18             **THE COURT:**  All right.  He may come forward.

19             (The witness was sworn.)

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

```
                              *    *    *

                         HANSY SANCHEZ,

was called as a witness, and after having been first duly

sworn, testified as follows:

                         DIRECT EXAMINATION

QUESTIONS BY MS. FARZAD:

Q.    Good morning, sir.

A.    Good morning.

Q.    Can you please state and spell your name for the

record?

A.    My name is Hansy Sanchez.  H-A-N-S-Y, S-A-N-C-H-E-Z.

Q.    Where were you born, Mr. Sanchez?

A.    Guatemala.

Q.    How old were you when you came to the United States?

A.    4 years old.

Q.    Why did you come to Nashville, Tennessee?

A.    To have a better future.

Q.    Did you go to high school here?

A.    Yes.

Q.    What grade did you graduate -- I'm sorry.  What grade

did you go to in high school?

A.    I went to eleventh grade.

Q.    Sir, have you used drugs in your life?

A.    Yes.

Q.    How old were you when you first started using drugs?
```

```
 1   A.     I was 12 years old.
 2   Q.     And what kind of drugs did you use at first?
 3   A.     Weed.
 4   Q.     At some point, did your drug use increase to other
 5   drugs?
 6   A.     Yes.
 7   Q.     Okay.  And what other drugs have you used?
 8   A.     Later on in my life, I used cocaine and, furthermore,
 9   I used methamphetamine.
10   Q.     Okay.  And how often would you use those drugs?
11   A.     Pretty often.
12   Q.     How long were you using these drugs?  From about what
13   age to what age?
14   A.     Probably I was 14 to the present day.
15   Q.     Okay.  When was the last time you used drugs?
16   A.     A couple of months ago.
17   Q.     Okay.  In addition to using drugs, have you also sold
18   drugs?
19   A.     Yes.
20   Q.     What kind of drugs have you sold?
21   A.     Cocaine.
22   Q.     Do you remember about how old you were when you
23   started selling cocaine?
24   A.     15, 16.
25   Q.     Okay.  And how long, about, did you sell cocaine for?
```

1  How many years?

2  A.    Probably four or five.

3  Q.    Okay.  Where did you sell cocaine?

4  A.    Here in Tennessee.

5  Q.    Did you sell it in any particular places?

6  A.    Bars.

7  Q.    Do you remember the names of any of those bars?

8  A.    Bola Ocho and La Mansion.

9  Q.    Okay.  What time period are we talking about when you

10 sold at Bola Ocho and La Mansion?  Are we talking like . . .

11 A.    2015, 2016.

12 Q.    Okay.  And who provided the cocaine that you sold?

13 A.    Luis.

14 Q.    Do you call him anything else?

15 A.    Lucito.

16 Q.    Does he go by any other names?

17        (Reporter clarification.)

18        **THE WITNESS:**  Lucito.

19 **BY MS. FARZAD:**

20 Q.    Thank you.  Does he go by any other names?

21 A.    Gordo.

22 Q.    I'd like to show Government Exhibit 1259, please.

23        Who is this, sir?

24 A.    Luis.

25 Q.    Okay.  And was he a friend of yours?

```
1   A.    Yes.

2   Q.    Did you live with him at some point?

3   A.    Yes.

4   Q.    So in early 2017, were you still selling cocaine in

5   Bola Ocho and La Mansion?

6   A.    Yes.

7   Q.    How would it work?  If somebody in one of those clubs

8   wanted to buy cocaine from you, how would they approach you

9   to purchase the cocaine?

10  A.    They just come to me or saying they wanted 20 or

11  something.

12  Q.    Okay.  And what would that mean, "I want 20"?

13  A.    Like .2 of cocaine.

14  Q.    Is 20 the quantity or the price?

15  A.    The price.

16  Q.    Okay.  And what size -- how much cocaine could you get

17  for $20?

18  A.    0.2 grams.

19  Q.    Okay.  Now, while you were selling cocaine in these

20  nightclubs in the bathrooms, did you see other people

21  selling cocaine in there also?

22  A.    Yes.

23  Q.    And did you know some of those people?

24  A.    Did I know them?  No.

25  Q.    Did you recognize them?  Did you see them over and
```

1  over?

2  A.    That I recall, no.  Because I would just go in there

3  and do my own thing.  I wouldn't pay attention to other

4  people.

5  Q.    Okay.  So you don't remember seeing the same faces in

6  the bathrooms selling the drugs?

7  A.    Over and over?  No.

8  Q.    Okay.  Do you know any of the people that you saw,

9  let's not say over and over, but sometimes in those

10  bathrooms?

11  A.    Probably.

12  Q.    Well, probably, or do you remember them?  Let me take

13  that back.  Strike that.

14        It's been a long time, has it not?

15  A.    Yes, ma'am.

16  Q.    Okay.  And is your memory clear, as clear today as it

17  was back in 2017?

18  A.    No.

19  Q.    Okay.  Do you -- back in 2017, did you know the names

20  of some of the people that you saw in the bathroom?

21  A.    Probably, yes.

22  Q.    Okay.  Do you recall -- have you met with the

23  government before today?  Have you met with the prosecutors

24  before today?

25  A.    Yes.

Q.    Okay.  And do you recall meeting with prosecutors back in 2018?

A.    No.

Q.    Do you recall meeting with prosecutors a few years ago?

A.    Yes.

Q.    Okay.  And did you have an occasion to come to the courthouse and testify in the Grand Jury?  Do you remember that?

A.    No.

Q.    Do you remember going into a room with other people and having a prosecutor ask you questions?

A.    Yes.

Q.    Okay.  And do you remember if there was a court reporter there, similar to the woman sitting right here in court?

A.    No, I don't think she was.  Well, not exactly her, but . . .

Q.    But a person like her?

A.    Yeah.

Q.    Recording the conversation?

A.    I mean, she wasn't in the room, but I guess somebody was recording the conversation.

Q.    Okay.  So what I'd like to do is, I'm going to hand you -- and I don't want you to look at it yet, but I want to

1  hand you a transcript from that proceeding.

2           **MR. LUCAS:**  Your Honor, may we approach?

3           **THE COURT:**  You may.

4           (WHEREUPON, a bench conference was had out of the

5  hearing of the jury, as follows:)

6           **MR. LUCAS:**  Understand where Ms. Riley's going,

7  but I'm not sure that we got there yet in terms of him not

8  remembering certain things.  I know he said previously that

9  he doesn't remember, and then she'll say something, and

10 he'll say, oh, yeah, I remember that.

11          My thing is, we haven't gotten to any questions

12 where he definitively says I don't remember or I don't -- so

13 if we're going to refresh his recollection at this point, I

14 don't know if that's -- it's the proper time to do it.

15          **THE COURT:**  All right.

16          **MS. FARZAD:**  May I be heard?

17          **THE COURT:**  Response?

18          **MS. FARZAD:**  He's right.  We're not quite there

19 yet.  All I'm doing is going to give this to the witness so

20 that when the time comes, he has it.  I do anticipate that

21 he -- his memory is challenged given his drug use and the

22 length of time that it's been.  And so --

23          **THE COURT:**  We'll be real quiet.

24          **MS. FARZAD:**  -- the length of time that it's been

25 and his drug use.  I do anticipate that he will likely need

1   to be refreshed, but that's why I said I'm going to hand it

2   to you and do not look at it.  And I'm going to ask the

3   question again, and if he does not remember the names of the

4   people that he saw selling drugs in the bathroom, I'm going

5   to ask to refresh his memory.

6           **THE COURT:**  Do we -- understanding that, I do

7   wonder, though, if we hand a document for purposes of

8   refreshment just in case, I think that's a little out of the

9   ordinary.  I wouldn't say it's wrong.  Is there a particular

10   reason you're kind of teeing it up like that rather than --

11           **MS. FARZAD:**  No.  It's just, unlike a police

12   officer who often has their reports with them, he's a lay

13   witness and didn't have a copy of his Grand Jury transcript,

14   so it was just --

15           **THE COURT:**  All right.  Well, why don't you -- I

16   think you've -- you know, I think you sort of described the

17   document that you may have in hand to refresh later if

18   needed.  I would say hold on to it until later, and at that

19   time, then you -- if and when necessary, you can tell him

20   what you're handing up.

21           **MS. FARZAD:**  Okay.

22           **MR. LUCAS:**  The only other question, the only

23   other point I wanted to make is, I know we're trying to

24   refresh his recollection.  I get it.  But the leading

25   questions, we've gotten into a little bit more leading than

1   probably what needs to take place on direct.

2          **THE COURT:**  All right.  So if, in the future, you

3   know, as leading questions are coming, if you want to object

4   to them, I'll certainly resolve the objection.  Sure.

5          **MR. LUCAS:**  Thank you.

6          **THE COURT:**  All right.  Thank you.

7          (WHEREUPON, the bench conference concluded, and

8   the following took place within the presence and hearing of

9   the jury:)

10  **BY MS. FARZAD:**

11  Q.    Okay, sir.  I believe I was asking you about some of

12  the people that you saw selling drugs in the nightclubs,

13  when you were in the bathroom selling those drugs.

14        Do you remember, sitting here today, the names of any

15  of those people?

16  A.    Huh-uh.

17  Q.    Okay.  Would it refresh your memory to review the

18  transcript of what you testified in the Grand Jury to see if

19  you can remember the names of some of those people?

20  A.    Yeah, that's fine.

21        **MS. FARZAD:**  Your Honor, may I approach the

22  witness and hand him the Grand Jury transcript?

23        **THE COURT:**  You may.

24        **MS. FARZAD:**  Thank you.  And with the Court's

25  indulgence, I'm going to direct him to a page in just one

1    moment.

2              THE COURT:  All right.

3    BY MS. FARZAD:

4    Q.    Sir, could you turn to page 11, please, and please

5    don't read this out loud, but if you could read page 11 to

6    yourself and look up when you're finished.

7    A.    (Witness complies.)

8    Q.    And sir, could you also please take a look at page

9    No. 14 and read that as well.

10   A.    (Witness complies.)

11   Q.    Has your memory been refreshed?

12   A.    Yes.

13   Q.    Okay.  What were some of the names of people that you

14   saw in the bathroom selling drugs?

15             THE COURT:  One moment.  If you could flip that

16   document over, and it's important that you kind of testify

17   from your refreshed memory rather than just read it off the

18   page.  Thank you.

19             THE WITNESS:  Some was Happy, Frijole.

20   BY MS. FARZAD:

21   Q.    Okay.  I'd like to show Government Exhibit 1268,

22   please.

23         Who is this?

24   A.    That's Happy.

25   Q.    Okay.  And he's one of the people you saw in the

1  bathrooms selling cocaine?

2  A.    (Nodding head affirmatively.)

3  Q.    Do you know if Happy is a member of any gang?

4  A.    I'm not -- I'm not sure.

5  Q.    How about Government Exhibit 1277, please.

6        And who is that?

7  A.    That's Frijole.

8  Q.    Okay.  And do you know, is he one of the people that

9  you saw selling in the bathrooms?

10 A.    Yes.

11 Q.    Okay.  And do you know if he's a member of any gang?

12 A.    Yes.

13 Q.    What gang is he a member of?

14 A.    MS-13.

15 Q.    Okay.  Do you know if Happy sold drugs for anybody?

16 A.    No.

17 Q.    Okay.  All right.  I'd like to -- how often were you

18 selling drugs in these nightclubs in that time period?  Was

19 it every weekend or . . .

20 A.    Almost every weekend.

21 Q.    Okay.  And at some point, do you know whether or not

22 Happy knew your friend Luis?

23 A.    No, I didn't.

24 Q.    Okay.  Was there ever a time when there was a

25 confrontation between you and any of the other people

1  selling drugs in the bathrooms?

2  A.    Yes.

3  Q.    Okay.  Can you tell the jury what happened with that?

4  A.    We were fighting over a sale of $50 worth of cocaine.

5  And I recall that the dude that was there didn't have change

6  for a 100-dollar bill.  So he went and got change, but

7  before he came back, I stole him, the sale, because I had

8  change.  And then he came back and he saw that I had taken

9  the customer.

10  Q.    Okay.  Do you remember who that person was that you

11  had this altercation with?

12  A.    No.

13  Q.    Do you remember if he was a part of a gang?

14  A.    Yes.

15  Q.    What gang was he a part of?

16  A.    MS-13.

17  Q.    Okay.  After that altercation, what, if anything, did

18  anyone from MS-13 say to you about selling drugs in the

19  bathrooms?

20  A.    That I had to stop.

21  Q.    Do you remember who that person was who told you you

22  had to stop?

23  A.    Happy.

24  Q.    Okay.  And what did he say to you, if you remember?

25  A.    That if I wanted to keep on selling, that I would have

1    to become a member of the MS.

2    Q.    And what if you didn't become a member of MS and you

3    kept on selling?

4    A.    They would probably try to kill us or shoot us.

5    Q.    What did you do after Happy told you that?

6    A.    I went and told the person who I sold for.

7    Q.    And who was that person?

8    A.    Luis.

9    Q.    Okay.  And what did -- did you and Luis stop selling

10   cocaine after this?

11   A.    No.

12   Q.    Okay.  You continued on?

13   A.    (Nodding head affirmatively.)

14   Q.    Okay.  Now, Mr. Sanchez, you've admitted to selling

15   drugs here in open court, but prior to testifying here

16   today, did you sign a nonprosecution agreement with the

17   government about where we would agree that we wouldn't

18   prosecute you for the criminal activity concerning the drug

19   distribution in and around 2014 to present day?

20   A.    I don't really remember that.

21   Q.    Do you remember entering into some type of an

22   agreement with the government?

23   A.    No.

24   Q.    Okay.  Let me --

25            MS. FARZAD:  Your Honor, if I may --

```
 1              THE COURT:  All right.
 2              MS. FARZAD:  -- hand the witness a copy of this
 3    agreement.
 4              THE COURT:  Okay.
 5    BY MS. FARZAD:
 6    Q.    Sir, can you just take your time and scan through that
 7    agreement and refresh yourself with the agreement.
 8    A.    (Witness complies.)
 9    Q.    Sir, did you see your signature on there?
10    A.    Yes.
11    Q.    Did reviewing that refresh your memory of the
12    agreement you had with the government?
13    A.    Yes.
14    Q.    Okay.  What's your understanding, under the agreement,
15    of what you have to do?
16    A.    I didn't get that.
17    Q.    Okay.  As part of your agreement with the government,
18    did the government agree not to prosecute you for the drug
19    distribution that you engaged in that you testified about
20    here in court?
21              MR. LUCAS:  Objection, Your Honor.  Leading.
22              THE COURT:  Response to that?
23              MS. FARZAD:  Your Honor, I'm just trying to
24    direct the witness through this document.
25              THE COURT:  All right.  If we could approach,
```

```
1   please.
2                (WHEREUPON, a bench conference was had out of the
3   hearing of the jury, as follows:)
4            THE COURT:  All right.  We're in this unfortunate
5   situation, perhaps -- I mean, I don't know.  I wasn't there.
6   But one suspects that we might be in this unfortunate
7   situation where there's no real dispute about what kind of
8   agreement he has, but he doesn't seem to recall anything.
9            Now --
10           MR. LUCAS:  And, Your Honor, the other issue
11  is -- and I've been here but the other issue is it sounds
12  like this is going to be the case with durn near everything
13  he testifies to.
14           MS. FARZAD:  That what?
15           MR. LUCAS:  It seems like this is going to be the
16  case with pretty much everything he testified to, and so
17  we're going to be --
18           MS. FARZAD:  It's a difficult witness, I mean,
19  yes.
20           MR. LUCAS:  But it's not difficult because he's
21  not -- he's not difficult because he's fighting against you,
22  he's difficult because he doesn't remember, which is an
23  issue.
24           THE COURT:  One thing to consider is this.  I'll
25  tell you what.  There's a lot going on here.  One thing is
```

this:  And I perceive there are multiple reasons why the
government's bringing this out, and I won't speak for the
government, but part of it is, part of the process of not
hiding the ball from the jury.  So the first thing to note
is the government's tried.  All right?  It's tried.  Here's
someone that doesn't remember anything about this agreement.
And so that's one thing, whether the government, in its
option, can walk away from this.

The other thing is, and it -- what's the second
reason -- I mean, if we look at it in more detail, what's
the government trying to do?  It's trying to elicit evidence
of his incentive to testify and his incentive to testify
truthfully versus falsely.

If the witness apparently has no idea right now
of those incentives one way or the other, is it proper to
suddenly remind him or just let his testimony proceed with
whatever evidence is in the record of what his motivations
are?  That is to say, on our current record, it sounds like
this guy doesn't remember this agreement; therefore, there's
nothing in his agreement that could motivate him.  I think
that's fair to say.

That's by way of saying -- all this is probably
of saying that I think we should proceed the following way:
You have probably a fair amount of additional stuff to get
into --

1          **MS. FARZAD:** Uh-huh, we do.

2          **THE COURT:** -- that you could proceed to before

3    you turn back to really what is generally Giglio

4    information, right, regarding his non-pros.

5          I suggest you proceed on that.  Then over the

6    break, think -- both sides think about what they want to do

7    about the fact that we have the government trying to

8    disclose to the jury this information that tends to help the

9    defendant but the witness can't help the government with it.

10   Think about whether the government wants to leave it alone

11   because it's tried and has therefore, I think, met its

12   obligations not to hide the ball from the jury, or if one

13   side or the other wants to try and get into it further with

14   this individual, how are we going to go about doing it?

15         I do think it is relevant that the current record

16   shows that this prosecution agreement is something he

17   doesn't know anything about and it is not motivating him one

18   way or the other.

19         So I think on the break, think about this.  We'll

20   take it up before the jury comes back in after break.

21         **MR. LUCAS:** I think the big question for me sort

22   of goes beyond the specific issue here.  I think we've gone

23   through at least three different times where he's -- and the

24   issue really is, can he remember anything?

25         **THE COURT:** Anything.  I think that's right.

```
1    That's another issue.  We'll go to about 10:30.  That's
2    another thing to consider over the break.  We'll see how we
3    go until then, because here's the thing.  The government is
4    allowed to try and elicit the testimony from the witness,
5    it's allowed to try to refresh the memory, but its
6    discussion about -- in addition to the non-pros agreement
7    issues, issues about the logistics of how we're going about
8    this and where we are when we reach the break is worth
9    discussing.
10            MR. LUCAS:  And one last thing I did want to
11   mention.  When he was refreshed, he was refreshed on page 11
12   and 14 specifically.  But he -- in his testimony before the
13   Grand Jury, he mentions several names, and the only names --
14   it's clear the only name that he said he remembered, only
15   two names he's actually mentioned were the two names that he
16   saw in the transcript even though there are more names that
17   he -- he just didn't look at those pages.
18            And so that's another thing that's concerning in
19   terms of whether he actually remembers at all, because the
20   only names he's mentioned are the ones that he saw in the
21   transcript.
22            THE COURT:  And we touched on this earlier.  My
23   view that sometimes this is the elephant in the room.  A
24   witness testifies in good faith that they're refreshed even
25   though -- and then they'll give the information that they
```

1    believe is accurate.  Were they actually refreshed or do

2    they just kind of think that they're supposed to say they're

3    refreshed and they think that probably reading it off the

4    page counts as refreshed?

5            And the question of whether their memory is

6    really refreshed is probably a fair question.  And if you're

7    skeptical, you're allowed to be, and that's fodder for cross

8    if you want to.

9            **MR. LUCAS:**  Yes, I understand.

10           **THE COURT:**  And I would say this.  I'm trying to

11   be a stickler about this issue that I think you have raised

12   which is, I certainly don't want people reading off the

13   document used to refresh them.  And obviously that's what

14   happened here.  So he wasn't able to read a bunch of names

15   off the page.  He was able to state two names that he said

16   he was refreshed as to.

17           I would say the final piece of this is that, you

18   know, it wouldn't shock me if he was actually refreshed as

19   to those two names but not others, but you're allowed to

20   cross about that.

21           And I think the government, if it wants to return

22   to the issue to see is your name -- is your memory refreshed

23   as any other names, it could do that, but we are going to --

24   particularly for a witness like this, but as with any

25   witness, we're going to be a stickler about the process for

1    refreshing and we're following that, working through it.

2           So let's go until 10:30, see where we are, and

3    talk about what we need to after the break.

4           All right.  Thank you.

5           (WHEREUPON, the bench conference concluded, and

6    the following took place within the presence and hearing of

7    the jury:)

8           **THE COURT:**  Thanks for your patients, folks.

9    **BY MS. FARZAD:**

10   Q.    Sir, after the incident where Happy asked you to stop

11   selling cocaine in the bathrooms, do you recall whether or

12   not there was a time where people shot at you?

13   A.    Yes.

14   Q.    Okay.  Did that happen on one or two different

15   occasions?

16   A.    Two.

17   Q.    Okay.  I'd like to talk about the first one.  Before

18   that shooting, do you recall where you were that night?

19   A.    Yes.

20   Q.    Where were you?

21   A.    The Bola Ocho.

22   Q.    Okay.  And what's the Bola Ocho?

23   A.    It's a bar.

24   Q.    All right.  What were you doing there that night?

25   A.    We -- I went to sell.

```
 1   Q.    To sell what?

 2   A.    Drugs.

 3   Q.    Okay.  Who was with you that night?

 4   A.    Luis.

 5   Q.    Is that Gordo, the person we just saw the photo of?

 6   A.    Yes.

 7   Q.    All right.  Were you with anybody else that night?

 8   A.    Chamaco.

 9   Q.    I'd like to show, please, Government Exhibit 1280.

10         Who is this, sir?

11   A.    That's Chamaco.

12   Q.    Okay.  And do you know if he's a member of any gang?

13   A.    Yes.

14   Q.    What gang is he a member of?

15   A.    MS-13.

16   Q.    And were you friends with Chamaco?

17   A.    No.

18   Q.    How did you know him?

19   A.    Because of Luis.

20   Q.    Was Luis friends with him?

21   A.    I could say yes.

22   Q.    Okay.  While you were in the club that night, did you

23   see any other members of MS-13 at Bola Ocho?

24   A.    One of them.

25   Q.    Who was that person?
```

1  A.    Happy.

2  Q.    How late did you stay?  Did you stay until the club

3  closed or did you leave before the club closed?

4  A.    We stayed until, like, the club closed.

5  Q.    All right.  Did -- who left with you?

6  A.    Me and Luis and Chamaco and another friend of ours.

7  His name is Tony.

8  Q.    Okay.  And who is Tony?  Is he in any kind of a gang?

9  A.    No.

10  Q.    Where were you-all headed when you left?

11  A.    La Mansion.

12  Q.    Who drove?

13  A.    Luis.

14  Q.    What kind of car was Luis driving?

15  A.    A Toyota Scion.

16  Q.    If we could take a look, please, at Government

17  Exhibit 435.

18        Do you recognize this?

19  A.    Yes.

20  Q.    What vehicle is this?

21  A.    The Toyota Scion.

22  Q.    That's the car that y'all drove in that night?

23  A.    Yes.

24  Q.    As you pulled out of the parking lot of Bola Ocho, did

25  anyone notice any vehicles following behind?

1    A.    When we barely got out at first, no.  But while we

2    were driving towards the after-hour club, Chamaco noticed

3    that there was a Honda following us.

4    Q.    Okay.  And do you happen to remember what the Honda

5    looked like, the color, anything about it?

6    A.    I think it was black or green.  And it was a manual

7    car, and it had tinted windows.

8    Q.    Okay.  Where were you sitting in the car?

9    A.    The back seat behind the passenger.

10   Q.    And who was in the front-passenger seat?

11   A.    Chamaco.

12   Q.    When the car caught up to you-all, were you able to

13   get a look at the car, the Honda?

14   A.    At the car physically, yes.

15   Q.    Okay.  Were you able to see inside of the Honda?

16   A.    No.

17   Q.    All right.  What happened once the vehicle, the Honda,

18   caught up with you-all?

19   A.    Well, we noticed that we were being followed.  Chamaco

20   took his hand out of the car, out of the window, and shot

21   back at the Honda.

22   Q.    Okay.  Do you know why he did that?

23   A.    No.

24   Q.    Did you see where the bullet went that Chamaco shot?

25   A.    No.

1    Q.    Okay.  At any point -- what happened next?

2    A.    So after that shot happened, the car pulled up and

3    lowered down the window a little bit and started shooting at

4    us with an Uzi.

5    Q.    When you say an Uzi, what does that mean?

6    A.    A fast gun.

7    Q.    A fast gun?  Okay.

8          Did you see the faces of the people who were shooting

9    at you?

10   A.    Not the faces, but some of them were wearing hats.

11   Q.    Do you remember anything about the hats?

12   A.    One of the hats was a -- a Nike, like a Yankees hat.

13   Q.    Okay.  And what were you-all doing while these guns,

14   this Uzi, was being shot at you-all?

15   A.    We were running away -- well, driving away.

16   Q.    Where were you headed?

17   A.    Towards La Mansion.

18   Q.    And how were you driving?  Were you driving in a

19   straight line?  What type of a road were you on?

20   A.    No, we got on the back streets.

21   Q.    The back streets?

22   A.    Yes.

23   Q.    Why was that?

24   A.    Because it would have been difficult, more difficult

25   for them to have shot at us than if we would have hopped on

1   the highway.  It would have been way easier for them to keep

2   shooting at us straight.

3   Q.    Okay.  And while you-all are driving through these

4   back streets, what's the green Honda doing?

5   A.    Following us and still shooting.

6   Q.    Where did you go next?

7   A.    We parked.  We got to La Mansion, and we parked behind

8   where it was at, and we jumped the fences.

9   Q.    Okay.  I'd like to take a look at Government

10  Exhibit 395.

11        Okay.  What is this?

12  A.    That's where La Mansion used to be.

13  Q.    Okay.  And if we could take a look at Government

14  Exhibit 416, please.

15        What's this?

16  A.    That's the entrance of La Mansion.

17  Q.    Okay.  Is this where you-all drove?

18  A.    We drove behind it.

19  Q.    Okay.  While they were shooting at you, was anybody in

20  your car struck by any of the bullets?

21  A.    No.

22  Q.    Do you remember whether the car itself was hit by any

23  of the bullets?

24  A.    Yes.

25  Q.    What happened to the car?

1    A.    The back window shattered.

2    Q.    Okay.  I'd like to show Government Exhibit 434,

3    please.

4          Okay.  What's this?

5    A.    That's the car, and that's the window that got

6    shattered.

7    Q.    Okay.  And if we could take a look at 436, please.

8          And what's this?

9    A.    That's the window.

10   Q.    Where were you sitting in the vehicle when this window

11   was shot?

12   A.    I was on the right side.

13   Q.    Were you in the front or the back?

14   A.    The back.

15   Q.    Do you remember hearing the glass shatter?

16   A.    No.

17   Q.    Do you remember the bullet hitting the window?

18   A.    No.

19   Q.    Okay.  And if we could take a look, please, at

20   Government Exhibit 433.

21         What's this here?

22   A.    That's a bullet shot.

23   Q.    All right.  So I think you testified that once you

24   arrived in the parking lot, you got out of the vehicle.  Who

25   was with you at that point?

1    A.    Gordo, Chamaco, me, and my other friend Tony.

2    Q.    And what did you-all do?

3    A.    We got out the car, and we jumped over the fence, and

4    we started running.

5    Q.    If we could take a look, please, at Government

6    Exhibit 1244.  And maybe if we could zoom in just right in

7    this area here.

8          Okay.  Sir, what's this a map of?

9    A.    The apartments where we had Toyota Scion parked.

10   Q.    Okay.  And is this the area where you jumped the

11   fence, or had you gotten to this point yet?

12   A.    No.  That's way ahead of that.

13   Q.    Okay.  If we could take that down just for a second

14   then, please.

15         So when you jumped the fence, what was happening with

16   the green Honda at that point?

17   A.    So when the green Honda noticed that we jumped the

18   fence, it just started to drove back in reverse.  And then

19   when I heard the -- well, we all heard the police sirens

20   coming, so Chamaco told us that he had dropped the gun

21   inside the car.  So then I came back -- I risked my life and

22   jumped the fence back and closed the car and locked it up

23   and parked it.  And while I was putting it in park, a white

24   SUV came in.

25   Q.    What happened when the white SUV came in?

```
1    A.    It started shooting at me.

2    Q.    Did you see any of the people shooting at you?

3    A.    No.

4    Q.    Do you know what kind of guns they were using?

5    A.    AKs.

6    Q.    How do you know that?

7    A.    Because of the sound the AK makes.

8    Q.    Okay.  And I should ask:  When this is going on when

9    you first got to the club, did you see, were there other

10   people inside the club, patrons?

11   A.    Yes.

12   Q.    So did you retrieve the gun from the vehicle that you

13   went back to get?

14   A.    No.  We left it inside the car.

15   Q.    Okay.  And what did you do after the white SUV started

16   shooting at you?

17   A.    I ran behind the dumpster, and then while it was still

18   shooting at me, I jumped the fence again and I ran

19   towards -- going towards Sam's Club.

20   Q.    Where did you go once you ran towards Sam's Club?

21   What happened next?

22   A.    We got back to the parking in front of the Island

23   Vibes because the SUV and the other car had left already,

24   and the police were already getting there.

25   Q.    Did you speak to the police that night?
```

1    A.    Yes.

2    Q.    Okay.  What did you do after you spoke to the police?

3    A.    We went and parked the car.

4    Q.    Where did you park the car?

5    A.    Behind the bar, behind Daniela's bar.

6    Q.    If we could now take a look at Government

7    Exhibit 1244.

8          All right.  What do we have here?  What's this a map

9    of?

10   A.    That's the Daniela's bar, and behind it is the

11   apartments where the car was parked.

12   Q.    Okay.  If we could zoom in just a little bit, please.

13   Thank you.

14         So if you can kind of describe for the jury where in

15   the apartment area did you park the vehicle?

16   A.    To be exact, right where that mark is.

17   Q.    Which mark?  What color is the mark?

18   A.    The top.

19   Q.    Is it like a grayish blue -- oh, this white --

20   A.    Yeah, right there.

21   Q.    Oh, okay.  Okay, great.  Thank you so much.

22         All right.  So once you parked the car there, what did

23   you-all do?

24   A.    We just left to Miami.

25   Q.    Okay.  Miami, the city of Miami in Florida?

```
1   A.    Yes.

2   Q.    What -- first of all, who went to Miami?

3   A.    Luis, me, and Arling.

4   Q.    Who is Arling?

5   A.    He was a friend of ours.

6   Q.    Okay.  And did you -- why did you guys go to Miami?

7   A.    Because we noted that it was too hot, that we were

8   trying to get -- they were trying to shoot at us.

9   Q.    How did you get to Miami?

10  A.    We took Arling's car.

11  Q.    Okay.  I'd like to show you -- actually, if you could,

12  there's a binder next to you, and it is going to -- if you

13  could turn to the binder -- it's going to be probably your

14  last binder -- it's marked 1127 to 1328, probably the

15  furthest one.  Do you see that?

16        Thank you.

17        Could you turn to the tab in there that is marked

18  1282?  Do you recognize that photograph?

19  A.    Yes.

20  Q.    And what's that a photograph of?

21  A.    Arling.

22  Q.    How do you know that's Arling?

23  A.    Because I used to be a friend of him.

24        MS. FARZAD:  Okay.  Your Honor, at this point,

25  the government would like to move into evidence Government
```

1    Exhibit 1282 with permission to publish to the jury.

2              **THE COURT:**  Absent objection, Government

3    Exhibit 1282 will be admitted and may be published.

4              (Government Exhibit 1282 was marked and admitted

5    into evidence.)

6    **BY MS. FARZAD:**

7    Q.    All right, sir.  Who is this person?

8    A.    That's Arling.

9    Q.    And do you know, was Arling a member of any gang?

10   A.    No.

11   Q.    Did he hang out with any gang members?

12   A.    Yes.

13   Q.    Who did he hang around?

14   A.    I know he hang out with Happy, Frijole, Peluche.

15   That's all I remember.

16   Q.    All right.  Who is -- well, what gang are those three

17   people a member of?

18   A.    MS-13.

19   Q.    Okay.  And you mentioned Peluche.  Do you know his

20   real name?

21   A.    Huh-uh.

22   Q.    Okay.  Do you recognize him?  If you were to see him

23   today, do you think you could recognize him?

24   A.    Yes.

25   Q.    Okay.  Do you recognize him anywhere in the courtroom?

```
 1   A.    Yes.
 2   Q.    Can you please point out -- or describe what he's
 3   wearing and where he's seated?
 4   A.    He's wearing a blue shirt.
 5   Q.    Okay.  And where is he seated in the room?
 6   A.    In the middle.
 7   Q.    Is he to my left?
 8   A.    Yes.
 9         MS. FARZAD:  Let the record reflect, Your Honor,
10   that the witness has identified Jorge Flores, the defendant.
11         THE COURT:  All right.  Absent objection, the
12   record will so reflect.
13         And at this time, we'll take our midmorning
14   break, take about 15 minutes or so, and recommence with the
15   examination and go from there.  The jurors may step down.
16   Thank you.
17         (WHEREUPON, the jury was excused from the
18   courtroom at 10:33 a.m., with matters being heard in open
19   court as follows:)
20         THE COURT:  All right, folks.  Anything we need
21   to talk about before break?
22         MR. SAFEEULLAH:  Not from the United States.
23         THE COURT:  All right.  Then we'll see where we
24   are on the issue we had at the bench conference when we
25   return in about 15 --
```

1    **MR. LUCAS:**  Your Honor, I had one question.  It
2    looked like, at that last question, that the witness was
3    looking down reading and then looked up.  And I'm wondering
4    if he was reading his Grand Jury transcript.
5    **THE WITNESS:**  No, I was remembering because I
6    have trouble remembering.
7    **MR. LUCAS:**  I do think we probably need to take
8    the transcript, though.
9    **THE WITNESS:**  The transcript has been right here
10   on top of the desk the whole time.  I haven't touched it.
11   **THE COURT:**  Had you looked at it after the time
12   period when the prosecutor asked you to look at it?
13   **THE WITNESS:**  No, sir.
14   **THE COURT:**  All right.  Thank you, sir.  But we
15   will -- we'll have Ms. Jackson grab that and return it to
16   the government.
17   All right, folks.  Thanks.  Everyone can be on
18   break for 15 minutes and we'll go from there.  Thank you.
19   (Recess (10:14 a.m. to 10:58 a.m.)
20   **THE COURT:**  All right.  Anything we need to take
21   up here regarding what we were discussing earlier?
22   **MS. FARZAD:**  Nothing from the United States, Your
23   Honor.
24   **THE COURT:**  Anything from the defendants at this
25   time?  No?  All right.  In that case, we can call in the

```
 1   jury.  Thank you.
 2             MS. FARZAD:  Your Honor, may I take the podium?
 3             THE COURT:  You may.  Thank you.
 4             MS. FARZAD:  Thank you.
 5             (WHEREUPON, the jury re-entered the courtroom at
 6   10:59 a.m., with matters being heard in open court as
 7   follows:)
 8             THE COURT:  All right.  Thanks folks.  Please be
 9   seated.
10             MS. FARZAD:  Thank you, Your Honor.  May I
11   resume?
12             THE COURT:  You may.
13             MS. FARZAD:  Thank you, Your Honor.
14   BY MS. FARZAD:
15   Q.    Sir, I believe when we left off, we were talking about
16   somebody named Arling.  When was the last time you spoke
17   with Arling?
18   A.    A long time ago.
19   Q.    Do you know where Arling is today?
20   A.    No.
21   Q.    Do you know what happened to him?
22   A.    The rumors were that he was killed.
23   Q.    Okay.  So going back to Miami, how long were you in
24   Miami?
25   A.    A week.
```

1   Q.    And why did you-all decide to come back from Miami?

2   A.    Because we needed more money.

3   Q.    So where did you go when you came back -- or when you

4   left Miami?

5   A.    We came back to Nashville.

6   Q.    What did you do the day you got back to Nashville?

7   A.    We went -- we changed clothes and we went to

8   la Bola Ocho.

9   Q.    Do you remember what day of the week that was?

10   A.    I think it was a Saturday.

11   Q.    And the shooting that we talked about just before the

12   break, how -- when did that occur in relation to when you

13   came back and you were at Bola Ocho?  Do you remember?

14   A.    One week ago.

15   Q.    So one week prior?

16   A.    (Nodding head affirmatively.)

17   Q.    Why did you go to Bola Ocho that night?

18   A.    Because that was my spot where I go and sell.

19   Q.    Sell what?

20   A.    Cocaine.

21   Q.    Who went with you that night to Bola Ocho?

22   A.    Chamaco and Luis and me.

23   Q.    Did you consume any drugs that night while you were at

24   Bola Ocho?

25   A.    Yes.

```
1   Q.    What did you consume?

2   A.    I consumed cocaine, Xanax, beer.

3   Q.    How long did you stay at the club?  Do you remember?

4   A.    The whole night.

5   Q.    Okay.  Did you stay until it closed?

6   A.    Yes.

7   Q.    When the club closed, where were you guys going?

8   A.    We were going to La Mansion.

9   Q.    Who was with you?

10  A.    Luis and Chamaco and me.

11  Q.    Did you make it to La Mansion that night?

12  A.    No.

13  Q.    What happened?

14  A.    We decided to go pick up the Scion.

15  Q.    Okay.  So the Scion, the white vehicle that we saw

16  that you had driven the week before; is that right?

17  A.    Yes.

18  Q.    Where was the Scion?

19  A.    It was parked behind the Daniela's bars.

20  Q.    Okay.  And if we could pull up that map again, please.

21  Government Exhibit -- I believe it's 1244.  Yes, please.

22  Government Exhibit 1244.  Could you zoom in just slightly in

23  this area here, please.  Great.  Thank you.

24        Okay.  So the vehicle, is it still parked in the same

25  area where you-all had left it the week before?
```

```
1    A.    Yes.

2    Q.    All right.  And whose car did you drive in to get back

3    to Daniela's or the apartment parking complex?

4    A.    Arling's car.

5    Q.    What happened -- what was the plan once you got back

6    to the parking lot?

7    A.    We were going to pick up the car and we were going to

8    go park it at a safe place because it was going to get

9    towed.

10   Q.    Okay.  So what happened when you got to the parking

11   lot apartment?

12   A.    When we got there, I noticed there was a car parked in

13   front of -- at a store that it was closed.  And it had the

14   car headlights on.  And I noticed that was weird because it

15   was at 4:00 in the morning and the store was closed.  So, I

16   mean, I wouldn't see why there would be a car there for any

17   reason parked, so I didn't put too much attention to it.

18         And we got inside the apartments, we went straight to

19   the car.  And in front of the car, there was another car

20   parked, and I saw the reflection of the phone.

21   Q.    What reflection of the phone did you see?

22   A.    When he turned on his screen.

23   Q.    Okay.  So let's talk about the car that was parked

24   near the Scion.  What kind of car was that?  Do you

25   remember?
```

1    A.    I think it was a Honda.

2    Q.    You testified that there was a phone.  Explain to the

3    jury what you mean by that.

4    A.    He was parked.  And probably, I guess, he was just

5    spying on the car.  And he noticed that I got down the car

6    and got inside the car.  I seen him turn on his phone, so

7    basically his lock screen.

8    Q.    So when you're talking about the person with the

9    phone, is that the person who's inside of that vehicle that

10   you saw?

11   A.    Yes.

12   Q.    Okay.  Were you able to see the person's face?

13   A.    No.

14   Q.    And the first vehicle that you mentioned that was

15   parked sort of when you came in, what kind of car was that?

16   Do you remember?

17   A.    No, I don't.

18   Q.    Okay.  So what happened once you and Luis and Chamaco

19   arrived and you see this car?  What happens next?

20   A.    So we started driving out, and we went towards the

21   train tracks, and I thank God that the train had just

22   finished passing when they crashed into me and started

23   shooting at me.

24   Q.    Okay.  If you could point out if it's visible on the

25   map:  What direction are you leaving?  Where are the train

1  tracks?

2  A.    The train tracks are right over here.

3  Q.    It's not showing up on the screen.  Can you describe

4  "to the left," "to the right" of where you were parked?  Can

5  you describe for us, please?

6  A.    To the right.

7  Q.    Okay.  So where is the exit?  Is it -- do you need us

8  to zoom out, or are you able to use the map that's on the

9  screen?

10  A.    You can zoom out a little bit.

11  Q.    Okay.  All right.  If you could describe where the

12  exit is that you were -- where you were leaving the parking

13  lot.

14  A.    So the exit is right here.  Where it says Glenrose

15  Avenue, those are the exit from the apartments.

16  Q.    So this is where you're driving out, right, at

17  Glenrose Avenue?

18  A.    Yes.

19  Q.    All right.  So when you're getting to Glenrose Avenue,

20  you testified that a car crashed into you?

21  A.    Yes, but it crashed where -- in front of

22  Daniela's Bar And Grill.

23  Q.    Okay.  As you're coming around the side of the parking

24  lot; is that right?

25  A.    Yes.

```
1   Q.    Do you remember what -- which car that was?

2   A.    It was a Jeep.  It was a white Jeep.

3   Q.    What happened when the car crashed into you?

4   A.    They popped my passenger front tire, and I got shot in

5   the neck.

6   Q.    Okay.  How do you know you got shot in the neck?

7   A.    Because that was the first bullet that I felt.

8   Q.    Describe for the jury what you mean by that.

9   A.    When they crashed into me, the first bullet came in my

10  throat, and I felt it because I touched it.

11  Q.    So you actually could feel the bullet coming out of

12  your neck?

13  A.    Yes.

14  Q.    What was happening to your neck at that point?

15  A.    I was pouring out blood.

16  Q.    And what did you think was going to happen to you?

17  A.    I thought I was going to die right there in that

18  moment.

19  Q.    So then what did you do?

20  A.    I catched myself and I drove off.

21  Q.    Where did you go?

22  A.    I was heading towards La Vergne.

23  Q.    Okay.  What was the white Jeep doing that had shot at

24  you?

25  A.    Well, there wasn't just one car.  There was several
```

1  cars following me from both sides and behind me, and they

2  were all shooting at me at the same time.

3  Q.    Okay.  Do you remember anything about the people who

4  were shooting at you?

5  A.    No.

6  Q.    Do you remember anything about the guns they were

7  using?

8  A.    Well, when I got to the hospital, they said one of my

9  shots that was here in the neck were a .45.

10  Q.    Okay.  So as you're driving and your neck is bleeding,

11  they continued to shoot at you, what happens next?

12  A.    I kept on going straight, going towards La Vergne.

13  And then I received two last bullets in my back, which, I

14  still have one and it's right beside my spine.

15        Well, I was still driving when I seen a car accident

16  up ahead where I was going towards, and I seen the blue

17  lights.  And then I just went right in the middle of the

18  accident.

19  Q.    Okay.  How many times in total were you shot?

20  A.    Nine.

21  Q.    Do you remember where?

22  A.    Two times in my arm, my neck, my back, my finger, my

23  leg, and right here too (indicating).

24  Q.    Okay.  Is that your chest area?

25  A.    Yes.  And right here close to my chin.

1  Q.    Okay.  Now, when you -- you were driving and you said

2  you saw blue lights ahead.  What condition were you in at

3  that point?

4  A.    I was already fading out.

5  Q.    What do you mean by fading out?

6  A.    I -- I could barely drive.

7  Q.    I'd like to show you Government Exhibit 440.  Do you

8  recognize this?

9  A.    Yes.

10 Q.    What do you see here?

11 A.    That was the car I was driving.

12 Q.    The one with the door open here, the white one?

13 A.    Yes.  The one to the right.

14 Q.    The blue lights, do you see them in the photograph?

15 A.    Yes.

16 Q.    What happened when you got to this point?  Was the

17 door like that -- was your door already open?  What happened

18 when you pulled up on the scene?

19 A.    When I pulled up, the cars that were following me

20 still made a couple of shots to the police officers that

21 were standing out there.  And they all got armed, and I

22 thought they were going to finish killing me.  But I opened

23 my door, and I just fell to the ground.

24 Q.    And do you remember anything after that?

25 A.    No.

1    Q.    I'd like to show you Government Exhibit 441.  And

2    what's this here?

3    A.    That was the car.

4    Q.    What is on the back of the trunk in the bumper area?

5    A.    Those are all bullet holes.

6    Q.    Okay.  Were they like that before you got in the car

7    to drive that night?

8    A.    No.

9    Q.    Okay.  Government Exhibit 443, please.

10          What's that?

11   A.    That's the car I was driving.

12   Q.    Okay.  And again, what's on the door panel there?

13   A.    Bullet holes.

14   Q.    Were they like that before you got in the car to drive

15   that night?

16   A.    No.

17   Q.    Can we take a look at Government Exhibit 448, please.

18          What's this?

19   A.    That was the car I was driving.

20   Q.    Were you sitting in that front passenger seat?

21   A.    Yes.

22   Q.    And what's on the steering wheel?

23   A.    My blood.

24   Q.    Government Exhibit 452, please.

25          Do you know what that is?

```
1    A.    That's the bullet that I have in my back, on my spine.

2    Q.    All right.  Do you remember waking up in the hospital?

3    A.    No.

4    Q.    Do you know how long you were in the hospital for?

5    A.    No.

6    Q.    Do you know the extent of your injuries?

7    A.    No.

8    Q.    Okay.  Have you had any lasting effects from the

9    shooting?

10   A.    Yes.  I do sometimes.

11   Q.    What are those?

12   A.    I wake up in the middle of the night, panic, or

13   sometimes I just have bad dreams that I go back, have

14   flashbacks.

15   Q.    Are you -- how do you feel being here today?

16   A.    A little bit, I'd say awkward, I guess we could say.

17   Q.    I'm sorry.  What did you say?

18   A.    Awkward.

19   Q.    Okay.  How come?

20   A.    This is my first time being this.

21   Q.    Okay.

22              MS. FARZAD:  One moment, Your Honor.

23              THE COURT:  All right.

24              (Respite.)

25              MS. FARZAD:  All right.  Your Honor, I have no
```

1    more questions for the witness at this time.

2              **THE COURT:**  All right.  Mr. Ganguli?

3              **MR. GANGULI:**  No questions, Your Honor.

4              **THE COURT:**  All right.  Thank you.

5    Ms. Hood-Schneider or Mr. Lucas?

6              **MR. LUCAS:**  No questions, Your Honor.

7              **THE COURT:**  Thank you.  Mr. Bloom?

8              **MR. BLOOM:**  No questions, Your Honor.

9              **THE COURT:**  All right.  Thank you, sir.  You may

10   step down.

11             (The witness stepped down.)

12             **THE COURT:**  Okay.  Mr. Safeeullah?

13             **MR. SAFEEULLAH:**  The United States calls Steven

14   Rowlett.

15             **THE COURT:**  All right.

16             (The witness was sworn.)

17                       *   *   *

18                  <u>**STEVEN ROWLETT,**</u>

19   **was called as a witness, and after having been first duly**

20   **sworn, testified as follows:**

21                  **DIRECT EXAMINATION**

22   **QUESTIONS BY MR. SAFEEULLAH:**

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    Could you please state your full name and spell your

```
 1    last name for the record.
 2    A.     It's Steven Rowlett, R-O-W-L-E-T-T.
 3    Q.     And where are you employed?
 4    A.     Metro Nashville Police Department.
 5    Q.     And how long have you worked for the Metro Nashville
 6    Police Department?
 7    A.     Just shy of 8 1/2 years.
 8    Q.     And what's your job title?
 9    A.     Currently I'm a detective.
10    Q.     How long have you been a detective?
11    A.     Since November of 2021.
12    Q.     And what role were you serving before you became a
13    detective?
14    A.     From summer of 2018 to November of 2021, I was a flex
15    officer.  Our unit was restructured in a community
16    engagement unit.
17    Q.     And prior to that, what did you do for the Metro
18    Nashville Police Department?
19    A.     I was a patrol officer.
20    Q.     And what side of town were you a patrol officer on?
21    A.     Hermitage.
22    Q.     So you would have been a patrol officer in Hermitage
23    in March of 2017?
24    A.     Yes, sir.
25    Q.     I would like to direct your attention to March 10th,
```

1  2017.  Did you respond to a call at 1020 Thompson Place in

2  Nashville, Tennessee?

3  A.    I did.

4  Q.    And why did you go to that location?

5  A.    I was dispatched there.

6  Q.    And did you write a report about what you did on that

7  date?

8  A.    I did.

9  Q.    And could you tell the jury why you were dispatched

10  there and what you did?

11  A.    I was dispatched there because Chapman's Wrecker

12  Service was supposed to be towing a vehicle from a private

13  lot.  Typically what the wrecker services will do is they'll

14  run the VIN numbers.  And it showed up in their systems as

15  it was stolen, so they contacted Metro Police dispatch, and

16  I responded.

17  Q.    And what type of car was this?

18  A.    It was a green Honda.

19  Q.    Do you know what year it was?

20  A.    Not off the top of my head.

21  Q.    Well, when you got there, did you look for a VIN

22  number?

23  A.    I did.

24  Q.    Did you find one?

25  A.    I did.

1  Q.    What did you do with that VIN number?

2  A.    I entered the VIN into our police database and ran it

3  through NCIC.  And when I entered that in through the query,

4  I got a return, and it was showing that the vehicle was

5  stolen.

6  Q.    So what did you do based on that response that you

7  got?

8  A.    I began doing a recovery of the vehicle.  It would

9  have included doing an incident report, an inventory search,

10  and then we would have -- if we had any evidence, we would

11  have turned it in.

12  Q.    And why would you do an inventory search?

13  A.    That's part of our policy.  If we are taking a vehicle

14  to the impound lot, we have to do an inventory search.

15  Q.    Did you conduct the inventory search of this green

16  Honda?

17  A.    I did.

18         MR. SAFEEULLAH:  Your Honor, may I have

19  permission to approach this witness?

20         THE COURT:  Yes, sir.

21  BY MR. SAFEEULLAH:

22  Q.    I've just passed up United States Exhibit 1332.  Could

23  you look at that exhibit, please.

24  A.    (Witness complies.)

25  Q.    Do you know what that exhibit is?

1    A.    It's an evidence bag that I turned in of shell

2    casings.

3    Q.    And how do you know that it's the shell casings that

4    you turned in?

5    A.    Because they were with the sealed evidence bag with

6    the complaint number and my name and signature on it.

7              MR. SAFEEULLAH:  Your Honor, at this time, I move

8    to admit into evidence United States Exhibit 1332.

9              THE COURT:  All right.  Absent objection,

10   Government Exhibit 1332 will be admitted.

11             (Government Exhibit 1332 was marked and admitted

12   into evidence.)

13   BY MR. SAFEEULLAH:

14   Q.    And where did you submit the shell casings, again?

15   A.    To the Metro Nashville Police property and evidence

16   section.

17             MR. SAFEEULLAH:  I don't have any additional

18   questions for this witness, Your Honor.

19             THE COURT:  All right.  Mr. Ganguli?

20             MR. GANGULI:  No questions, Your Honor.

21             THE COURT:  Ms. Hood-Schneider?

22             MS. HOOD-SCHNEIDER:  No questions.

23             THE COURT:  And Mr. Bloom?

24             MR. BLOOM:  No questions, Your Honor.

25             THE COURT:  All right.  Thank you, Detective

1    Rowlett.  You may step down.

2              THE WITNESS:  Thank you.

3              (The witness stepped down.)

4              MR. HOFF:  Your Honor, the United States calls

5    Jorge Luis Antunez Vasquez.

6              THE COURT:  All right.  He may come forward.

7              (The witness was sworn.)

8                        *   *   *

9              **JORGE LUIS ANTUNEZ VASQUEZ,**

10   **was called as a witness, and after having been first duly**

11   **sworn, testified through the interpreter as follows:**

12                   **DIRECT EXAMINATION**

13   **QUESTIONS BY MR. HOFF:**

14   Q.    Sir, can you please state and spell your name for the

15   record.

16   A.    Jorge Luis Antunez Vasquez.

17   Q.    Sir, do you speak English?

18   A.    No.

19   Q.    Do you have a nickname?

20   A.    El Gordo.

21   Q.    Where are you from?

22   A.    Honduras.

23   Q.    How long have you lived in the United States?

24   A.    13, 14 years.

25   Q.    And do you work?

```
1    A.    Yes.

2    Q.    What do you do for a living?

3    A.    I remodel homes.

4    Q.    In early 2017, did you sell drugs?

5    A.    Yes.

6    Q.    What kind of drugs?

7    A.    Cocaine.

8    Q.    And did you sell drugs with any of your friends?

9    A.    Yes.

10   Q.    Who is that?

11   A.    Hansy.

12   Q.    I want to show you United States Exhibit 1275.

13         Can you see that on your screen there?

14   A.    Yes.

15   Q.    Who is that?

16   A.    Hansy.

17   Q.    Did you also have a friend by the name of Chamaco?

18   A.    Yes.

19   Q.    Did you know Chamaco's real name?

20   A.    No.

21   Q.    I want to show you United States Exhibit 1280.

22         Do you recognize that person?

23   A.    Yes.

24   Q.    Who is that?

25   A.    Chamaco.
```

```
1    Q.    Did you call Chamaco by any other names?

2    A.    No, just that.

3    Q.    And was Chamaco a member of a gang?

4    A.    I don't know.  I think so.

5    Q.    Okay.  Why do you think that?

6    A.    Because he was always on the street.

7    Q.    Where -- in early 2017, where did you sell drugs?

8    A.    On the street, in the bars.

9    Q.    What bars?

10   A.    La Mansion.

11   Q.    Any other bars?

12   A.    Bola Ocho.

13   Q.    Around that time, did you provide -- were you

14   providing drugs to any members of MS-13?

15   A.    Like once, twice.

16   Q.    Did you know someone by the name of Scrappy?

17   A.    Yes.

18   Q.    Who was Scrappy?

19   A.    Someone who I met in the street to sell drugs.

20   Q.    And I want to show you United States Exhibit 1258.

21         Do you recognize that person?

22   A.    Yes.

23   Q.    Who is that?

24   A.    That's Scrappy.

25   Q.    Did you provide drugs to Scrappy?
```

```
 1   A.    Yes.

 2   Q.    Do you know about how many times?

 3   A.    Once or twice.

 4   Q.    And what did you provide to him?

 5   A.    Cocaine and marijuana.

 6   Q.    About how much?  Do you remember?

 7   A.    Like one or two ounces.

 8   Q.    Did there come a point when you learned that Scrappy

 9   had been arrested?

10   A.    Yes.

11   Q.    After Scrappy was arrested, did you provide drugs to

12   any other member of MS-13?

13   A.    Yes.

14   Q.    Who was that?

15   A.    Cabezon.

16   Q.    Okay.  Did you know Cabezon's real name?

17   A.    No.

18   Q.    Did you know if Cabezon was related to anyone?

19   A.    I don't know.  I never spoke to him that way.

20   Q.    I want to show you United States Exhibit 1271.

21         Do you recognize this person?

22   A.    Yes.

23   Q.    Who is that?

24   A.    Cabezon.

25   Q.    What kind of drugs did you provide to Cabezon?
```

1   A.    Cocaine.

2   Q.    And did you -- how did you give it to him?  Did he pay

3   you for it?

4   A.    No.

5   Q.    Did you front it to him?

6   A.    Yes.

7   Q.    And what exactly does that mean, to front it to him?

8   A.    I fronted it to him.

9   Q.    Okay.  So did you give it to him on credit?

10  A.    Yes.

11  Q.    And was he supposed to pay you back after he sold it?

12  A.    Yes.

13  Q.    How much did you provide to Cabezon?

14  A.    Two ounces.

15  Q.    Did Cabezon ever pay you back for that?

16  A.    No.

17  Q.    Did you ever ask him for the money, Cabezon?

18  A.    No.

19  Q.    Why not?

20  A.    I didn't want any problems.

21  Q.    And what do you mean by that?

22  A.    Why was I going to fight over $2,000?

23  Q.    Did there come a time when you were told to stop

24  selling drugs inside Bola Ocho?

25  A.    Yes.

```
1    Q.    Who told you that?

2    A.    Frank.

3    Q.    I want to show you United States Exhibit 1268.

4          Do you recognize that person?

5    A.    Yes.

6    Q.    Who is that?

7    A.    Frank.

8    Q.    I want to ask you about February of 2017.  Was there a

9    time that your car was shot at?

10   A.    Yes.

11   Q.    How many different days did that happen?

12   A.    I don't remember exactly how many days, but there were

13   several days.

14   Q.    Well, let's talk about the first time that that

15   happened.  Do you remember that?

16   A.    One or a couple of things, I do remember.

17   Q.    Where -- the first time your car was shot at, where

18   were you?

19   A.    At Bola Ocho.

20   Q.    Who were you with?

21   A.    With Hansy and Chamaco.

22   Q.    And did you leave Bola Ocho that night?

23   A.    Yes.

24   Q.    Whose car were you in?

25   A.    In a car I had.
```

1  Q.    What kind of car was it?

2  A.    A Toyota Scion.

3  Q.    Do you remember what color?

4  A.    Yes.

5  Q.    What color?

6  A.    Black with white.

7  Q.    After you left Bola Ocho, what happened?

8  A.    We left normal, and at a light in front of Kroger,

9  they stopped right next to us.

10 Q.    Who stopped right next to you?

11 A.    A car with two people.

12 Q.    Do you remember what kind of car it was?

13 A.    No, because it was at night.  I don't remember what

14 color it was.

15 Q.    After the car stopped next to you, what happened?

16 A.    One bent backwards, and they began to follow me and

17 shoot at me.

18 Q.    And is this the car that was next to you at the

19 stoplight?

20 A.    Yes.

21 Q.    Could you see anything that anyone in the car was

22 wearing?

23 A.    Yes.  Black clothes and a Yankees cap.

24 Q.    After the car started -- or the people in the car

25 started shooting at you, what did you do?

1  A.    Well, I tried to run and flee.

2  Q.    And was -- when you say run, were you driving?

3  A.    Yes.

4  Q.    How did you try and flee?

5  A.    Well, driving until losing them.

6  Q.    And did you take -- how did you try and lose them?

7  A.    Well, on the streets, taking streets that I knew.

8  Q.    Did you see any other cars following you other than

9  the initial car you saw?

10  A.    At that moment, I did not until I got to the place I

11  was getting to, and then another car showed up and they

12  began shooting.

13  Q.    So where were you -- the place you were going to,

14  where was that?

15  A.    La Mansion.

16  Q.    Did you make it to La Mansion?

17  A.    Yes, into the parking lot.

18  Q.    What happened when you got into the La Mansion parking

19  lot?

20  A.    I got out of the car, I began to run, and they started

21  shooting.

22  Q.    So there were more shots when you arrived at

23  La Mansion?

24  A.    Yes.

25  Q.    What about the other occupants of your car?  Where did

1   they go?

2   A.    They ran.

3   Q.    You mentioned that you saw another car once you got to

4   La Mansion.  Where did you see that car?

5   A.    I don't know.  I know the car just came in, and I

6   started to run.

7   Q.    Did you see if anyone shot at you from the other car?

8   A.    They were shooting, just like that.

9   Q.    And was -- I'm sorry.  Maybe I wasn't clear.  The

10  second car that you saw, was anyone shooting at you from

11  that car?

12  A.    No, because I left running, and the other car arrived

13  and he just began shooting.  And I didn't . . .

14  Q.    Where did you run?

15  A.    Like that, over there to a part in the back.

16  Q.    So a park in the back of where?  La Mansion?

17  A.    Yes.

18  Q.    How many gunshots did you hear?

19  A.    A bunch.

20  Q.    At some point, did the shooting stop?

21  A.    Yes.

22  Q.    And where -- did you go back to where your car was

23  parked after the shooting stopped?

24  A.    Yes.

25  Q.    Were the police there?

```
1    A.    Yes.

2    Q.    Did you speak with them?

3    A.    Yes, because they were asking me who was the owner of

4    the car.

5    Q.    Did -- what did you do with your car after that night?

6    A.    I went to park it at some apartments.

7    Q.    I want to show you United States Exhibit 409.

8          Do you recognize this, what's in this photograph?

9    A.    Yes.

10   Q.    What is that a photograph of?

11   A.    Of a parking lot.

12   Q.    Okay.  And did you -- was this the parking lot you

13   were in the night that your car was shot at?

14   A.    Yes.

15   Q.    And where did you run to?  Is it in this photograph?

16   A.    Like over to the back.

17   Q.    To the back of what's shown in this photograph?

18   A.    Yes.

19   Q.    I also want to show you United States Exhibit 434.

20         Do you recognize this?

21   A.    Yes.

22   Q.    What is that a photograph of?

23   A.    Of my car.

24   Q.    And I want to show you United States Exhibit -- I'm

25   sorry.
```

1    So is that the car you were driving that night?

2  A.    Yes.

3  Q.    Now, you said that you saw one of the occupants of the

4  car that stopped at you -- next to you at the stoplight

5  wearing a Yankees hat.  Was there someone that you knew that

6  wore a Yankees hat often?

7  A.    Yes.

8  Q.    Who is that?

9  A.    Peluche.

10 Q.    I want to show you United States Exhibit 1266.

11    Do you recognize that person?

12 A.    Yes.

13 Q.    Who is that?

14 A.    Peluche.

15 Q.    After this shooting, did you leave Tennessee?

16 A.    Yes.

17 Q.    Why?

18 A.    Because I didn't want any problems.

19 Q.    Were you scared?

20 A.    Yes.

21 Q.    Who did you go to Miami with?

22 A.    With Hansy.

23 Q.    And anyone else?

24 A.    No, just him.

25 Q.    How long did you stay in Miami?

```
 1   A.    Like a week or ten days.

 2   Q.    And did you come back to Tennessee after that week?

 3   A.    Yes.

 4   Q.    Why did you come back to Tennessee?

 5   A.    Because they told me I had to move the car where I had

 6   it parked.

 7   Q.    Was that in the apartment complex where you parked at?

 8   A.    Yes.

 9   Q.    So did you come back to move the car?

10   A.    Yes.

11   Q.    Who did you go with to move the car?

12   A.    With Hansy and Chamaco.

13   Q.    Whose car were you driving that day to go move your

14   Scion?

15   A.    With Hansy and Chamaco.

16   Q.    No, my question was who -- you were in a different car

17   than your Scion; is that right?

18   A.    Yes.

19   Q.    Do you remember whose car you were in?

20   A.    No, I don't remember.

21   Q.    So what happened when you went to move your car?

22   A.    Well, some cars were waiting for me there.

23   Q.    And who was supposed to drive your car away from the

24   apartment complex?

25   A.    Would you repeat again?
```

1    Q.    I'm sorry.  Yeah, let me rephrase.

2         Who was supposed to drive your Scion that was parked

3    at the apartment complex away from there?

4    A.    Well, any one of us three were going to take it:

5    myself, Hansy, or Chamaco.

6    Q.    Who decided to take it?

7    A.    Hansy.

8    Q.    So did you drop Hansy off at the Scion?

9    A.    Yes.

10   Q.    What happened then?

11   A.    Well, the lights of some cars were turned on, and they

12   started to yell.

13   Q.    And then what happened?

14   A.    They started to follow us to shoot at us.

15   Q.    Could you see any of those -- did you recognize any of

16   the people at those cars?

17   A.    Yes.

18   Q.    Who?

19   A.    La Cabeza.

20   Q.    And could you see the guns?

21   A.    Well, I just saw him that he was wearing a ski mask,

22   and a long gun.

23   Q.    And what did you do when you saw that?

24   A.    Well, I started to drive to get away from there, but

25   they started to follow us, shooting at us.

1  Q.    Could you see where Hansy was?

2  A.    He was also coming out as well.

3  Q.    Was he behind you or in front of you?

4  A.    We left at the same time.

5  Q.    And as you drove away, could you see what happened to

6  the car Hansy was in?

7  A.    Yes.  They were shooting, and it stopped for a moment.

8  Q.    And where did you go?

9  A.    To a McDonald's.

10  Q.    Did you -- are you and Hansy still friends?

11  A.    Yes.

12  Q.    Did you learn that Hansy had been shot?

13  A.    Yes.

14  Q.    Did you continue selling drugs after this?

15  A.    No.

16  Q.    Has this -- have these incidents impacted your life?

17  A.    Yes.

18  Q.    How so?

19  A.    What do you mean, how so?

20  Q.    How have things changed for you since this incident?

21  A.    I do not know how to explain it.

22  Q.    Okay.  When you say you don't know how to explain it,

23  what do you mean by that?  Can you try?

24  A.    Well, I don't know how to . . .

25        **MR. HOFF:**  I don't have any further questions,

1   Your Honor.

2           **THE COURT:** All right. Thank you.

3           **MR. GANGULI:** No questions, Your Honor.

4           **THE COURT:** Thank you, sir.

5           **MR. LUCAS:** No questions, Your Honor.

6           **THE COURT:** Thank you.

7           **MR. BLOOM:** No questions, Your Honor.

8           **THE COURT:** All right. Thank you.

9           Okay. You may step down, sir.

10           (The witness stepped down.)

11           **THE COURT:** All right. The government may call

12   its next witness.

13           **MR. SAFEEULLAH:** The United States calls James

14   King.

15           **THE COURT:** All right.

16           (The witness was sworn.)

17                     *   *   *

18                     <u>**JAMES KING,**</u>

19   **was called as a witness, and after having been first duly**

20   **sworn, testified as follows:**

21                  **DIRECT EXAMINATION**

22   **QUESTIONS BY MR. SAFEEULLAH:**

23   Q.   Good morning.

24   A.   Good morning.

25   Q.   Can you please state your name and spell your last

1    name for the record.

2    A.    Yeah.  James King.  Last name, K-I-N-G.

3    Q.    Where are you presently employed?

4    A.    Employed with the Metro Nashville Police Department on

5    the interdiction unit as an investigator.

6    Q.    And how long have you been employed by the Metro

7    Nashville Police Department?

8    A.    23 years.

9    Q.    What do you do as an investigator in the interdiction

10   unit?

11   A.    We investigate narcotics-related crimes, tips that

12   come in through Crime Stoppers.  We work with freight

13   companies such as UPS, FedEx, and the United States Postal

14   Service.  We also work in collaboration on cases with TBI

15   and DEA.  And we also work with the cooperation of citizen

16   informants or confidential informants.

17   Q.    Were you working in this role in 2018?

18   A.    In 2018, I was assigned to the Metro Police

19   Department's major case task force.

20   Q.    And what were you doing with that unit or division?

21   A.    It was very similar.  We were investigating

22   upper-level narcotics organizations within Davidson County,

23   Nashville-Davidson County, and in other jurisdictions with

24   the assistance of DEA and TBI.

25   Q.    In the summer of 2018, did you conduct several

1    controlled buys from Jason Sandoval?

2    A.    Yes, I did.  There was three buys that we conducted.

3    Q.    Can you explain to us what a controlled buy is?

4    A.    Yeah.  On this specific incident, a controlled buy is

5    where we would --

6    Q.    In general, and then we'll get more specific later.

7    A.    It's where we would use a -- what we call a

8    confidential informant, and that's someone that works not

9    for the police department, but signs up paperwork saying

10   that they are cooperating.  A lot of these work with us to

11   either assist with charges where they've been charged, or

12   some of them work with us for -- to get paid U.S. currency.

13   Q.    And how is the process?  How do you go about doing a

14   controlled buy or controlled purchase?

15   A.    So that individual would be under our direction; in

16   this instance, would be under my direction.  Information

17   would be given to me as to whom this person could maybe make

18   a purchase of drugs from, and we would meet up with this

19   individual at a secure predetermined location that would be

20   set by me.

21         And I would meet with other detectives on my unit.  We

22   would meet up with this person.  A search of this person

23   would be conducted, their person.  A thorough search of

24   their person and their vehicle would be conducted.  And then

25   we would set up what we call a controlled phone call, which,

1   this phone call would be monitored from an electronic

2   monitoring device that we have.  A phone call would be made

3   to the individual that they allege they could purchase

4   narcotics from.

5   Q.   And once you have that agreement that they can conduct

6   this transaction, what happens next?

7   A.   The informant would be equipped with previously

8   photocopied buy money.  That means it's regular U.S.

9   currency that's ran through a machine and the serial numbers

10  would be copied.

11       Once the informant is supplied with U.S. currency,

12  then a phone call would be made to set up this transaction.

13  We would find out how much money that the -- whatever we're

14  buying would cost, and then we would give the informant that

15  amount of money to purchase the drugs.

16  Q.   Do you also give the informant recording devices?

17  A.   There is a monitoring device that would be with the

18  informant at all times.  And that's for us to monitor

19  listening and for location purposes to know where they're at

20  at all times and for safety purposes.

21  Q.   So when the informant has the photocopied buy money

22  and the recording equipment, what's the next step?  The

23  transaction has already been scheduled.  What's the next

24  step?  What happens next?

25  A.   Once the location has been determined, then that

1  informant will be followed to the location where the deal

2  has been set.  And usually that's determined by the person

3  selling the drugs.  So once we get the location where the

4  informant is going to go to purchase the drugs, then we

5  would have other detectives in the area doing surveillance,

6  taking photos.

7  Q.    Do you-all watch the transaction and/or listen to the

8  transaction as it takes place?

9  A.    Yes, we do.

10  Q.    All right.  Now I want to talk about this case.  On

11  May 23rd, 2018, on June 1st, 2018, and June 19th, 2018, did

12  you and other officers conduct controlled purchases?

13  A.    Yes, we did.

14  Q.    Who were you buying drugs from?

15  A.    Jason Sandoval.

16  Q.    And what type of drugs were you-all buying?

17  A.    We were buying cocaine.

18  Q.    And did you watch or listen to the transactions on

19  these dates?

20  A.    Yes, sir.

21  Q.    And what did you see or hear?

22  A.    A narcotics transaction being conducted between the

23  confidential informant and Mr. Jason Sandoval.

24  Q.    And that was on three separate occasions?

25  A.    Yes, sir.

1  Q.    What happened after the informant bought the cocaine

2  from Mr. Sandoval on those three occasions?

3  A.    The informant was directed to meet at a predetermined

4  secure location.  Once the informant would pull up to the

5  location, there would be several detectives there.  That

6  informant would be searched again thoroughly, person and

7  vehicle, and the narcotics purchased would be recovered and

8  eventually turned in to the Metro Police Department's

9  property room.

10  Q.    Before you turn the cocaine in to the property room,

11  do you do anything with that cocaine?

12  A.    Yes, sir.  We are supplied with what's called a field

13  test.  And it's a plastic little container that you place a

14  small amount of the cocaine in.  And you pop a couple vials

15  inside, and you shake it up, agitate it.  And if it turns

16  blue, that is a positive test for the presence of cocaine.

17  Q.    Did you conduct a field test on the cocaine that was

18  purchased from Jason Sandoval on the three times that you

19  purchased or had the informant purchase cocaine from him?

20  A.    Yes, sir.  The substance was field-tested on all three

21  separate incidences, and it did field test positive for the

22  presence of cocaine.

23  Q.    And where did you say the cocaine went after it was

24  field-tested and it was determined the field test showed

25  positive for cocaine?

1  A.    Yes, sir.  That substance would be bagged up, placed

2  into evidence bags, and then turned in to the Metro property

3  lab.

4         **MR. SAFEEULLAH:**  Your Honor, may I approach this

5  witness?

6         **THE COURT:**  You may.

7  **BY MR. SAFEEULLAH:**

8  Q.    Can you look at those three exhibits that's been

9  passed up to you?  I believe they're

10 United States Exhibit Nos. 150, 151, and 152.

11 A.    Yes, sir.  So 150 appears to be two ounces of cocaine

12 which would be consistent with our first purchase of

13 cocaine.

14 Q.    And what is 151?

15 A.    Looking at 151, appears to be a plastic bag containing

16 three separate ounces of cocaine which would be consistent

17 with our second purchase of cocaine.

18 Q.    And can you tell me what is in

19 United States Exhibit 152?

20 A.    Yes, sir.  Items in 152 appear to be consistent with

21 three separate bags of cocaine which is consistent to Buy

22 No. 3 which would be three ounces of cocaine.

23        **MR. SAFEEULLAH:**  Your Honor, at this point, I

24 move to admit into evidence United States Exhibits 150, 151,

25 152, and request permission to publish them to the jury.

1       THE COURT:  All right.  Absent objection,

2  Government Exhibits 150, 151, and 152 will be admitted, and

3  they may be published.

4              (Government Exhibits 150 through 152 were marked

5  and admitted into evidence.)

6       MR. SAFEEULLAH:  And, Your Honor, if the jury

7  could be passed those.  I'm going to read a stipulation

8  here, and as I set up, the jury can look at this.

9              THE COURT:  All right.  They may be passed.

10             (Respite.)

11      MR. SAFEEULLAH:  Your Honor, may I read the

12  parties' stipulation into the record?

13             THE COURT:  You may.

14             Tell you what.  If counsel want to approach real

15  quick.  I had one question.

16             (WHEREUPON, a bench conference was had out of the

17  hearing of the jury, as follows:)

18             THE COURT:  It occurs to me the stipulation

19  refers to gross weight.  Anyone want to explain to the

20  jurors what you mean by that?  In fact, I'm not even sure I

21  know what that means, gross versus net, in this context.

22  The gross weight, do you know what that means?

23      MR. SAFEEULLAH:  Gross is the total sum of the

24  packaging that the lab tech would have as opposed to the net

25  weight, so it's everything that she put in there together as

opposed to a smaller portion.  I believe it includes
everything.

          THE COURT:  But not the packaging, right?

          MR. SAFEEULLAH:  I would have to go back and look
at the --

          MR. LUCAS:  So the only question I have on that
is, I always thought net weight had to do with the actual
controlling substance within the drug, within whatever you
get, so the gross weight is everything, right, --

          MR. SAFEEULLAH:  Yeah.

          MR. LUCAS:  -- like you said?

          But then the net weight is what -- the actual
controlled substance because, you know, it has all kinds
of --

          THE COURT:  See, that's one possible
interpretation, but I'm not sure that's universal.  I'm not
sure if there's even a universal notion of gross weight.  So
I think everyone agreed to this, that's fine.  I'll just put
it out there.  If anyone -- I'm just always a little bit
apprehensive about throwing out terms to the jury that
doesn't -- you know, maybe we don't even know what they
mean.

          MR. LUCAS:  The big issue is that -- you know,
sort of following your line, I guess the big issue is
ultimately, that might become an issue as to whether or not

1    they understood what gross weight was versus net weight.

2            **THE COURT:**  Yeah, right.  So I think that's

3    right.  I mean, I understand that the thrust of this is

4    that, well, they're controlled purchases of cocaine.  I just

5    put that out there in case anyone wants to do anything to

6    firm up what that means.  I'm not going to require it.  The

7    government, you know, can put on the evidence it wants, the

8    parties can stipulate to what they want.

9            I just flag it as, you know, if I haven't made it

10   clear already, I like to spoon-feed concepts to the jury

11   just so they are as clear as possible.

12           So I'll leave that there, and if anyone wants to

13   follow up on that, they can.  But we'll leave it there, but

14   I think it's something worth just kind of keeping in mind.

15           All right.  Thank you.

16           **IN UNISON:**  Thank you.

17           (WHEREUPON, the bench conference concluded, and

18   the following took place within the presence and hearing of

19   the jury:)

20           **THE COURT:**  All right.  Mr. Safeeullah, you may

21   proceed.

22           **MR. SAFEEULLAH:**  "It is hereby stipulated and

23   agreed among the parties that:

24           "On May 23rd, 2018, Metro Nashville Police

25   Department, MNPD, officers lawfully seized the controlled

1   substances admitted as United States Exhibit 150.

2            "On June 1st, 2018, MNPD officers lawfully seized

3   the controlled substances admitted as United States

4   Exhibit 151.

5            "On June 19th, 2018, MNPD officers lawfully

6   seized the controlled substances admitted as United States

7   Exhibit 152.

8            "A proper chain of custody was maintained until

9   the controlled substances were submitted to the MNPD crime

10   laboratory for analysis.

11            "The controlled substances admitted as

12   United States Exhibit Nos. 150, 151, and 152, were tested by

13   forensic chemist Sharon Tilley of the Metro Nashville Police

14   Department Crime Laboratory using appropriate testing

15   procedures.

16            "Ms. Tilley examined United States Exhibit 150

17   and determined that the substance in this exhibit contained

18   cocaine, a Schedule II controlled substance with a total

19   gross weight of approximately 57.71 grams.

20            "Ms. Tilley examined United States Exhibit 151

21   and determined that the substance in this exhibit contained

22   cocaine, a Schedule II controlled substance, of a total

23   gross weight of approximately 84.69 grams.

24            "Ms. Tilley examined United States Exhibit 152

25   and determined that the substance in this Exhibit contained

```
1    cocaine, a Schedule II controlled substance, with a total
2    gross weight of approximately 86.78 grams.
3              "It is so stipulated."
4              And this is United States Exhibit 1338, and the
5    United States would move to admit this exhibit into
6    evidence.
7              THE COURT:  All right.  Absent objection,
8    Government Exhibit 1338 is admitted.
9              (Government Exhibit 1338 was marked and admitted
10   into evidence.)
11             THE COURT:  All right.  Mr. Safeeullah, you may
12   proceed.
13             MR. SAFEEULLAH:  I do not have any additional
14   questions for this witness.
15             THE COURT:  All right.  Thank you.
16             Mr. Ganguli?
17             MR. GANGULI:  Thank you, Your Honor.  Very
18   briefly.
19                         CROSS-EXAMINATION
20   QUESTIONS BY MR. GANGULI:
21   Q.    Is it Sergeant King?
22   A.    No, it's Detective King.
23   Q.    Detective King.  All right.  With respect to the
24   amounts that we discussed a few moments ago, are you
25   familiar with the term "gross weight"?
```

```
1    A.    Yes, sir.
2    Q.    Could you please tell us -- and, in fact, are you
3    familiar with the concept of "net weight"?
4    A.    Yes, sir.
5    Q.    Could you please tell us the difference between gross
6    weight versus net weight when a controlled substance is
7    weighed?
8    A.    I believe the terminology that you are referring to as
9    far as gross weight would be the narcotics within the
10   plastic bag.  And then the net weight would be the narcotics
11   if they were out of the bag on a scale.
12   Q.    Okay.
13   A.    I believe that's what you're referring to.
14   Q.    Yes, sir.
15         Do you personally weigh the narcotics, or is that
16   someone else who does that?
17   A.    Typically, if we weigh the narcotics, we would leave
18   the narcotics within the plastic bag just for safety
19   purposes.
20   Q.    Yes, sir.  Thank you.
21             MR. GANGULI:  No further questions, Your Honor.
22             THE COURT:  All right.  Thank you, Mr. Ganguli.
23             MR. LUCAS:  Your Honor, I just have one question.
24             THE COURT:  Yes, sir.
25   ///
```

1          CROSS-EXAMINATION

2   QUESTIONS BY MR. LUCAS:

3   Q.    Good afternoon, Detective King.

4         Just have one question for you in regards to

5   Mr. Sandoval.  Did you -- you didn't know what -- you don't

6   know what Mr. Sandoval did with the proceeds of that sale,

7   do you?

8   A.    No, sir.

9   Q.    And you don't know where Mr. Sandoval obtained the

10  drugs?

11  A.    No, sir.

12             MR. LUCAS:  That's all, Your Honor.

13             THE COURT:  Thank you.  Mr. Bloom?

14             MR. BLOOM:  No questions, Your Honor.

15             THE COURT:  All right.  Thank you.  Any redirect

16  examination?

17             MR. SAFEEULLAH:  No, Your Honor.

18             THE COURT:  All right.  Thank you, Detective

19  King.  You may step down.

20             (The witness stepped down.)

21             THE COURT:  All right.  Mr. Safeeullah, do you

22  anticipate the next witness being a brief one or perhaps a

23  little more extended?

24             MR. SAFEEULLAH:  He may be brief, Your Honor.

25  But I think we've got a video in there, and it calls for the

1    admission of a video that the jury would watch, so I was

2    going to ask Your Honor whether you thought this would be an

3    appropriate time to take a lunch break and then we just

4    start with him after the lunch break.

5              THE COURT:  All right.  Sounds like that would be

6    appropriate under the circumstances.  You can get prepared

7    for the next examination.

8              So, folks, we will take our break now, and if you

9    could be back by, we'll say, 1:05, we will pick up from

10   there.  The jurors may step down.  And please remember my

11   usual admonition: no talking about the case, researching, or

12   investigating.  Thank you.

13             (WHEREUPON, the jury was excused from the

14   courtroom at 12:08 p.m., with matters being heard in open

15   court as follows:)

16             THE COURT:  All right.  Anything to discuss

17   before we go on break?

18             MR. SAFEEULLAH:  Not from the United States.

19             THE COURT:  Thank you.  Defense counsel?

20             Not seeing anything, we'll reconvene at 1:05.

21   Thanks, folks.

22             (Lunch recess 12:09 p.m. to 1:14 p.m.)

23             THE COURT:  All right.  If we could call in our

24   jurors, please.

25             (WHEREUPON, the jury re-entered the courtroom at

1  1:14 p.m., with matters being heard in open court as

2  follows:)

3          **THE COURT:**  Thank you.  Please be seated.

4          All right.  The government, in a moment, will

5  call its next witness.  Thanks, folks, for continuing your

6  service and your attention.  And I anticipate we'll probably

7  go roughly close to 5:00 today, and then we'll pick back up

8  tomorrow at -- should be 9:00 a.m.

9          All right.  Mr. Safeeullah, if you wish to call

10  your next witness.

11          **MR. SAFEEULLAH:**  Yes, Your Honor.  The United

12  States calls Santos Del-Cid.

13          **THE COURT:**  All right.

14          (The witness was sworn.)

15          **MR. SAFEEULLAH:**  Your Honor, may I proceed?

16          **THE COURT:**  You may.

17                      *   *   *

18                  <u>**JOSE SANTOS DEL-CID,**</u>

19  **was called as a witness, and after having been first duly**

20  **sworn, testified through the interpreter as follows:**

21                  **DIRECT EXAMINATION**

22  **QUESTIONS BY MR. SAFEEULLAH:**

23  Q.    Good afternoon.

24  A.    Good afternoon.

25  Q.    Can you please state and spell your last name for the

1    record.

2    A.    Jose Santos Del-Cid.  It's J-O-S-O -- -E, sorry.  And

3    Santos, S-A-N-T-O-S, and Del-Cid, D-E-L-C-I-D.

4    Q.    Where are you originally from?

5    A.    From El Salvador.

6    Q.    In 2017, did you work at the Bola Ocho nightclub?

7    A.    Yes.

8    Q.    What was your role or position?

9    A.    That night, I was -- I'm the owner.  And that night, I

10   was somewhat putting on the music.

11   Q.    And where is Bola Ocho?

12   A.    At 1088 Murfreesboro Pike.

13   Q.    So what does the Bola Ocho stand for?

14   A.    It's like a billiards game.

15   Q.    Okay.  Is this a bar or a nightclub?

16   A.    It's like a club and a bar.  All three things are

17   somewhat combined.

18   Q.    And how long have you owned or operated this bar?

19   A.    I opened it starting in 2014.

20   Q.    Can you look at the last binder over there and turn to

21   United States Exhibit 1246.

22   A.    1246.

23   Q.    What is that picture looking at in that photograph?

24   A.    It is a map where there -- this is the shopping center

25   wherein is the bar.

1    **MR. SAFEEULLAH:**  Your Honor, I request permission

2  to admit into evidence United States Exhibit 1246 and

3  request permission to publish it to the jury.

4          **THE COURT:**  Absent objection, Government

5  Exhibit 1246 will be admitted and may be published.

6          (Government Exhibit 1246 was marked and admitted

7  into evidence.)

8          **THE WITNESS:**  Yes.

9  **BY MR. SAFEEULLAH:**

10 Q.    What is the street intersection that your bar rests

11 on?

12 A.    The main street is Murfreesboro.  And the shopping

13 center is -- well, it's towards the inside.  And the

14 building where the bar is at is the one that is closest to

15 the tall grass.

16          **MR. SAFEEULLAH:**  If we could zoom in to show the

17 building.

18 **BY MR. SAFEEULLAH:**

19 Q.    Can you explain to us where --

20 A.    This one?

21 Q.    -- the building is where your bar is located?

22 A.    Well, on the very corner is the restaurant, on the

23 very corner.  And the one next to it, it's the one over

24 here.

25 Q.    So on the corner, you're talking about to the top of

1    the building on the left-hand side where the orange dot is?

2    A.    Well, the restaurant is adjacent to the other building

3    over there, the one that has the black roof.  And then

4    there's a restaurant, and then the next one over is our

5    space.

6    Q.    So is it under the white roof or the black roof?

7    A.    White roof.

8    Q.    And on this map, it has "Delicias De El Salvador,

9    Family Friendly."  Is it below the words, "Family Friendly"?

10   A.    Yes.  There's Delicias De El Salvador over here, and

11   right next to it -- well, you've got Delicias De El Salvador

12   which is 1086, and mine is 1088.

13            MR. SAFEEULLAH:  Can we pull up

14   United States Exhibit 476, please.

15   BY MR. SAFEEULLAH:

16   Q.    What is this a picture of?

17   A.    That's the front of the bar.

18   Q.    And this is the bar that you owned and operated on

19   May 21st, 2017?

20   A.    Yes.

21   Q.    Does your bar have cameras?

22   A.    Yes.

23   Q.    Did the bar have cameras on May 21st, 2017?

24   A.    Yes.

25   Q.    Where do the recordings from the cameras, where are

1    they stored?

2    A.    The next day after the incident, I handed them over to

3    the detectives.

4    Q.    Yes.  My question is:  Where are the recordings stored

5    inside of your store before you handed them over?

6    A.    I did not have much knowledge as far as how to store

7    them because I don't understand much about technology.  What

8    I know is that the people that installed these told me that

9    every ten days, that which was being recorded would be

10   erased.

11   Q.    And are they stored on a modem?

12   A.    Yes.

13   Q.    And how many cameras did you have these people set up

14   at your store?

15   A.    Well, I don't remember well, if it was 8 or 12

16   cameras, but it was around 8 to 12 cameras.

17   Q.    Prior to today, have you had the opportunity to review

18   recordings from your store from May 21st 2017?

19   A.    Yes.

20           MR. SAFEEULLAH:  Your Honor, may I approach and

21   pass this witness United States Exhibit 461, 462, 463, 464,

22   465, 466, 467, 468, and 1336?

23           THE COURT:  All right.  You may do so.  You said

24   1366?

25           MR. SAFEEULLAH:  36.

```
 1              THE COURT:  1336.  Okay.  Thank you.
 2   BY MR. SAFEEULLAH:
 3   Q.    Can you look at those disks in front of you?
 4   A.    Yes.
 5   Q.    Have you previously looked at those disks?
 6   A.    Yes.
 7   Q.    What is on those disks?
 8   A.    It's all the videos that are inside the bar while
 9   others record on the outside.
10   Q.    And did you initial those disks to indicate that you
11   have watched those videos?
12   A.    Yes.
13   Q.    And you were present at the bar on May 21st, 2017?
14   A.    Yes.
15   Q.    Do you see yourself on any of those videos?
16   A.    Yes.
17              MR. SAFEEULLAH:  Your Honor, I move to admit into
18   evidence and request permission to publish
19   United States Exhibits 461, 462, 463, 464, 465, 466, 467,
20   468, and 1336.
21              THE COURT:  All right.  Absent objection, the
22   following will be admitted and may be published:  Government
23   Exhibits 461, 462, 463, 464, 465, 466, 467, 468, and 1336.
24              (Government Exhibits 461 through 468 and 1336
25   were marked and admitted into evidence.)
```

```
 1              MR. SAFEEULLAH:  Can we start with

 2   United States Exhibit 461, please.

 3              (Playing video.)

 4   BY MR. SAFEEULLAH:

 5   Q.    In looking at this video, where is the front of your

 6   bar?  Is it to the left or to the right?

 7   A.    To the left.

 8              MR. SAFEEULLAH:  Okay.  If we could press Play.

 9   I'm sorry.  I think it skipped.  Could you back it up a

10   little bit?

11              (Playing video.)

12              MR. SAFEEULLAH:  Thank you.  Can we take that

13   down and play United States Exhibit 463.

14              (Playing video.)

15              MR. SAFEEULLAH:  Can we pause this, please.

16   BY MR. SAFEEULLAH:

17   Q.    What are we looking at in this video?

18   A.    It's the inside part on the entrance.

19   Q.    So this is the inside of the club where people enter

20   and exit?

21   A.    Yes.

22              MR. SAFEEULLAH:  Can we press Play, please.

23              (Playing video.)

24              MR. SAFEEULLAH:  Thank you.  Can we play

25   United States Exhibit 465, please.
```

```
 1                    (Playing video.)

 2          MR. SAFEEULLAH:  Can you pause this.

 3   BY MR. SAFEEULLAH:

 4   Q.    What are we looking at in this video?

 5   A.    It's the inside where there's some pool tables and the

 6   other tables where the clientele sits at.

 7          MR. SAFEEULLAH:  Can you press Play, please.

 8                    (Playing video.)

 9          MR. SAFEEULLAH:  I'm sorry.  Can we start this

10   over again from the beginning.

11                    (Playing video.)

12          MR. SAFEEULLAH:  Can you pause it now.

13   BY MR. SAFEEULLAH:

14   Q.    In this video, do you see a male to the right-hand

15   side of the screen that has on white shoes?

16   A.    Yes.

17          MR. SAFEEULLAH:  Can we press Play.

18                    (Playing video.)

19   BY MR. SAFEEULLAH:

20   Q.    And you watch that male.

21   A.    Yes.

22          MR. SAFEEULLAH:  Can we play

23   United States Exhibit 464, please.

24                    (Playing video.)

25          MR. SAFEEULLAH:  Can you pause the video.
```

1    **BY MR. SAFEEULLAH:**

2    Q.    Is this -- what are we looking at in this video from

3    this camera view?

4    A.    Well, that's the camera scene that captures part of

5    the bar and also where the other pool tables are at.

6              **MR. SAFEEULLAH:**  Can we press Play and then pause

7    it.

8              (Playing video.)

9    **BY MR. SAFEEULLAH:**

10   Q.    Do you see the male to the right-hand side of the

11   screen with the white shoes on?  It looks like he's holding

12   a phone to his head.

13   A.    Yes.

14             **MR. SAFEEULLAH:**  Can we press Play and watch that

15   male.

16             (Playing video.)

17             **MR. SAFEEULLAH:**  Can we play

18   United States Exhibit 462, please.

19             (Playing video.)

20   **BY MR. SAFEEULLAH:**

21   Q.    Can you tell me what color shoes that male has on

22   that's walking?

23   A.    White.

24   Q.    There is a timestamp at the top of this video that

25   says May 21st, 2017, around 12:20.  Is that close in time to

```
 1    when this video was taken?

 2    A.    Yes.

 3                MR. SAFEEULLAH:  That video has stopped.

 4                Can we pull up United States Exhibit 466.

 5                And, Your Honor, just so you know, this is going

 6    to be a lengthy video, a longer video.

 7                THE COURT:  All right.  Thank you.

 8                (Playing video.)

 9    BY MR. SAFEEULLAH:

10    Q.    Is this still outside of your bar?

11    A.    Yes.

12                MR. SAFEEULLAH:  Can we pause the video right

13    now.

14    BY MR. SAFEEULLAH:

15    Q.    Moving from the left-hand side of the screen towards

16    the top of the screen, did you see a car back up?

17    A.    Yes.

18                MR. SAFEEULLAH:  Can we press Play and continue

19    to watch that car.

20                (Playing video.)

21                MR. SAFEEULLAH:  Can we pause it at this point.

22    BY MR. SAFEEULLAH:

23    Q.    Who is -- what is the individual that's closest to the

24    door entering your establishment wearing?

25    A.    It's a blue shirt, white shoes.  And his pants, I
```

```
 1   don't know if they're black-black.  And he's wearing a cap.
 2              MR. SAFEEULLAH:  Can we press Play.
 3              (Playing video.)
 4   BY MR. SAFEEULLAH:
 5   Q.    And you let me know if you can determine what color
 6   cap he has on.  If not, that's fine.
 7   A.     It's black.
 8   Q.    Does it appear that that hat has some type of emblems
 9   on it that may have been golden?
10   A.    Yes.  It's like white, the upper part.
11              MR. SAFEEULLAH:  Can you pause it at this point.
12   BY MR. SAFEEULLAH:
13   Q.    Do you still see that car that has the headlights
14   turned on?
15   A.    Yes.
16              MR. SAFEEULLAH:  Can you press play.
17              (Playing video.)
18   BY MR. SAFEEULLAH:
19   Q.    Do you see the male walking to your bar?
20   A.    Yes.
21   Q.    Do you know who that is?
22   A.    He always came to play pool with us.
23              MR. SAFEEULLAH:  Can you pause right now.
24   BY MR. SAFEEULLAH:
25   Q.    Do you know what he's pointing to?
```

```
 1    A.    Yes.  He told me that in that part over there, some
 2    shots could be heard.
 3    Q.    Is that you in the video right now?
 4    A.    Yes.
 5              MR. SAFEEULLAH:  Can we press Play, please.
 6              (Playing video.)
 7    BY MR. SAFEEULLAH:
 8    Q.    Did you walk over to the car?
 9    A.    Yes.
10    Q.    Did the police show up that day?
11    A.    Yes.
12              MR. SAFEEULLAH:  Can we pull up
13    United States Exhibit 1336, please.
14              (Playing video.)
15    BY MR. SAFEEULLAH:
16    Q.    Is this another view from outside of your bar?
17    A.    Yes.
18    Q.    On May 21st, 2017?
19    A.    Yes.
20    Q.    Do you see that blinking light towards the right-hand
21    side of the screen?
22    A.    Yes.
23              MR. SAFEEULLAH:  Can we pull up
24    United States Exhibit 468, please.
25              (Playing video.)
```

**BY MR. SAFEEULLAH:**

Q.    Is this another view of the parking lot on May 21st,

2017?

A.    Yes.

Q.    Is that car with the flashing lights moving?

A.    No.  The car is parked.

          **MR. SAFEEULLAH:**  Can we pull up

United States Exhibit 471, please.

**BY MR. SAFEEULLAH:**

Q.    What are we looking at in this photograph?

A.    That's the car that the victim was in.

Q.    What did you see inside of that car when you walked

over there?

A.    He was in the driver's seat and he was already

unconscious.

Q.    Was he bleeding?

A.    Yes.

          **MR. SAFEEULLAH:**  I don't have any additional

questions for this witness at this time.

          **THE COURT:**  All right.  Yes, sir.

          **MR. GANGULI:**  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

**QUESTIONS BY MR. GANGULI:**

Q.    Mr. Del-Cid, I'm going to ask you a few questions.  If

there's something that I ask you that I'm unclear about, if

1    you'll please tell me, I'll back up and I'll try to ask a

2    better question.

3        Mr. Del-Cid, did I understand you correctly that you

4    opened the Bola Ocho nightclub in 2014?

5    A.   I'm not very sure if it was in 2014 or at the end of

6    2013.

7    Q.   Yes, sir.  We noticed that there was a lot of

8    surveillance footage that we saw.  Did you install those

9    security cameras?

10   A.   The company that installed it for me, they put it

11   there.

12   Q.   Okay.  Do you remember what year that the cameras were

13   installed?

14   A.   I couldn't tell you an exact date because a long time

15   has passed, but it had been open for a couple of months when

16   I installed them.

17   Q.   Is there a reason that some of the footage was in

18   black and white and other footage was in color?

19   A.   I don't know.  Sometimes when it's dark, it looks like

20   it comes out in black and white.  But when there's light, it

21   comes out in color.

22   Q.   Okay.  So what you're telling us is that it's a -- the

23   cameras record in color?

24   A.   Well, since I installed them, I had never reviewed the

25   videos because there had never been any need to.

1   Q.    Interesting.  When you looked at the footage, were

2   there times that the footage is more clear than others?

3   A.    But the thing is that in some parts where the camera

4   is at, there's a lot of birds, and also some spider webs are

5   formed.

6   Q.    So what you're telling us is, just so I understand

7   correctly, when the footage is grainy, it's because there's

8   spider webs and birds?

9   A.    Well, when one can say it like so is that there are

10   cameras that have somewhat become detached, and when there's

11   wind, they move somewhat.

12   Q.    Okay.  When you've reviewed the security footage, was

13   there ever a time that there was sound on the footage?

14   A.    No, not that I can remember.  No.

15   Q.    Okay.  With respect to the security at the club, you

16   employed security guards obviously, right?

17   A.    Yes.

18   Q.    They would frisk people as patrons walked inside the

19   club?

20   A.    Yes.

21   Q.    Was that to prevent -- was that to prevent people from

22   bringing guns into the club?

23   A.    Yes.

24   Q.    Were there sometimes fights inside the club?

25   A.    Never like so.  Perhaps just arguments.

1    Q.    Okay.

2    A.    But nothing major.

3    Q.    Yes, sir.  And on May 21st, 2017, were there arguments

4    inside the club?

5    A.    Not that I can remember, no.

6    Q.    Okay.  Did you allow drug sales inside your club?

7    A.    No.

8    Q.    Were you aware the drug sales were happening inside

9    your club?

10   A.    Well, yes, there are many who do it.  I don't know how

11   but they always do it.

12   Q.    Okay.  As to the shooting itself, did you see it?

13   A.    No.

14   Q.    So is it fair to say that you don't know who shot

15   Ammerli Garcia-Munoz?

16          **THE INTERPRETER:**  I'm sorry.  The interpreter

17   requests repetition of the name.  Ammerli Garcia-Munoz?

18          **THE WITNESS:**  Not until now, that now I have seen

19   the video already.

20   **BY MR. GANGULI:**

21   Q.    Okay.  But the video itself doesn't show the shooting,

22   does it?

23   A.    But it was the only car that stopped in front of him,

24   and all of us went to see, and that had occurred.

25   Q.    So what you're saying is that you saw a person get

```
1   shot on the videos that we just saw?

2   A.    I have not said that.  What I said is that we went

3   over there seconds after it occurred, and it was the only

4   car that had been at the bar.

5   Q.    I understand.

6         Is there any more video footage that would show the

7   shooting?

8   A.    Not that I know of.

9   Q.    And you would know, right?

10  A.    How so?

11  Q.    I'll back up.  You were the owner of Bola Ocho, right?

12  A.    Yes.

13  Q.    It was your responsibility to have security and

14  surveillance footage from that club, right?

15  A.    Yes.

16  Q.    You provided what footage you had to the United

17  States, right?

18  A.    Yes.

19  Q.    You provided to them all the footage you had, right?

20  A.    Correct.

21  Q.    In all the footage that you provided to the United

22  States, that -- that does not show the shooting itself, does

23  it?

24  A.    It cannot be -- it cannot be seen clearly but . . .

25  Q.    Is there more footage?  It's a yes-or-no question.
```

```
1    A.    I don't know.  I turned it all in.

2    Q.    Thank you.

3               MR. GANGULI:  Your Honor, may I have a moment to

4    speak with Mr. Gulotta?

5               THE COURT:  You may.

6               (Respite.)

7               MR. GANGULI:  Your Honor, I'll pass the witness.

8               THE COURT:  All right.  Thank you, Mr. Ganguli.

9               Ms. Hood-Schneider?

10              MS. HOOD-SCHNEIDER:  No questions for this

11   witness.

12              THE COURT:  Thank you.

13              Mr. Bloom?

14              MR. BLOOM:  No questions, Your Honor.

15              THE COURT:  All right.  Mr. Del-Cid you may --

16   oh, any redirect?

17              MR. SAFEEULLAH:  Just very briefly.

18              THE COURT:  Okay.

19                        REDIRECT EXAMINATION

20   QUESTIONS BY MR. SAFEEULLAH:

21   Q.    The security that you hire, they search people before

22   they come into the nightclub or the establishment?

23   A.    Yes, but sometimes they do not do it.  I do not know

24   why.

25   Q.    And they're looking for firearms and weapons?
```

```
 1   A.    Firearms, blades, everything.

 2   Q.    Do they search cars in the parking lot?

 3   A.    No.

 4   Q.    So someone could keep a firearm in their car?

 5   A.    Yes.

 6         MR. SAFEEULLAH:  No further questions, Your

 7   Honor.

 8         THE COURT:  All right.  Mr. Del-Cid, you may step

 9   down at this time.  Thanks very much.

10         (The witness stepped down.)

11         THE WITNESS:  May I go or must I remain here?

12         THE COURT:  You are free to go.  Thank you.

13         MS. FARZAD:  Your Honor, at this time, the

14   government calls Cindy Hernandez to the stand.

15         THE COURT:  All right.  She may come forward.

16         (The witness was sworn.)

17                     *   *   *

18                 CINDY HERNANDEZ,

19   was called as a witness, and after having been first duly

20   sworn, testified as follows:

21                  DIRECT EXAMINATION

22   QUESTIONS BY MS. FARZAD:

23   Q.    Good afternoon.  Can you please state and spell your

24   name for the record.

25   A.    Cindy Hernandez.  C-I-N-D-Y, H-E-R-N-A-N-D-E-Z.
```

```
1    Q.    How old are you, Ms. Hernandez?
2    A.    31.
3    Q.    Where were you born?
4    A.    New Jersey.
5    Q.    And how far did you go in school?
6    A.    Eleventh grade.
7    Q.    Where did you go to high school?
8    A.    Antioch High.
9    Q.    And you can move the microphone closer to you if it's
10   easier.  Do you live here in Tennessee?
11   A.    Yes.
12   Q.    Okay.  I'd like to first start by asking you, do you
13   want to be here today?
14   A.    No.
15   Q.    Why not?
16   A.    Because I don't have nothing to do with this.
17   Q.    Okay.  And when the agent reached out to you to speak
18   with you to schedule you a time to come and prep for this
19   trial, what did you say to him?
20   A.    That why did I have to do that, that this has nothing
21   to do with me.  I've been running from this for almost seven
22   years.  I even ran from my probation because of that.
23   Q.    Why is that?
24   A.    Because I don't want nothing to do with this.
25   Q.    Okay.  I'd like to take you back to 2016, 2017.  Do
```

```
1   you remember in -- excuse me -- June 28th of 2017, did you

2   get arrested on that day?

3   A.    Yes.

4   Q.    And what were you arrested for?

5   A.    Violation probation.

6   Q.    Okay.  Do you recall speaking to law enforcement that

7   day?

8   A.    Yes.

9   Q.    Why did you speak to law enforcement that day?

10  A.    Because they been looking for me to question me about

11  what happened in Bola Ocho.

12  Q.    Okay.  And did they -- did they question you about

13  what happened in Bola Ocho?

14  A.    Yes.

15  Q.    All right.  Before we get into what they asked you

16  about and what happened at Bola Ocho, I'd like to show you

17  some photographs.

18           MS. FARZAD:  Can you pull up, please, Government

19  Exhibit 1266.

20  BY MS. FARZAD:

21  Q.    Do you recognize this individual?

22  A.    Yes.

23  Q.    Who is this?

24  A.    Jorge Flores.

25  Q.    How do you know him?
```

1    A.    I met him through a friend.

2    Q.    Okay.  Does he go by any nicknames?

3    A.    Yeah.

4    Q.    What nickname?

5    A.    Peluche.

6    Q.    How long have you known him?

7    A.    Not that long.  I met him 2016, 2017.

8    Q.    Okay.  Were you friendly with him?

9    A.    Yeah.  I mean, we talked.  I mean, I'm not going to

10   say he's my friend and I'm not his friend either, but we

11   know each other.

12   Q.    Okay.  Do you see that person, Peluche or Jorge

13   Flores, in the courtroom today?

14   A.    Yes.

15   Q.    Can you identify him by an item of clothing that he's

16   wearing?

17   A.    Baby blue shirt.

18   Q.    And is he located to the left of me?

19   A.    Yes.

20         **MS. FARZAD:**  Let the record reflect, Your Honor,

21   that the witness has identified Jorge Flores.

22         **THE COURT:**  All right.  The record will so

23   reflect.

24         **MS. FARZAD:**  If we can please take a look at

25   Government Exhibit 1278.

1    BY MS. FARZAD:

2    Q.    Who is this man?

3    A.    Kevin.

4    Q.    Do you know his last name?

5    A.    Tidwell.

6    Q.    And what nickname does he go by?

7    A.    Miklo.

8    Q.    How do you know Kevin Tidwell?

9    A.    I met him in the streets.

10   Q.    About how long ago did you meet Kevin Tidwell?

11   A.    A while ago.

12   Q.    Was it before you had met Jorge Flores?

13   A.    Yeah, way before then.

14   Q.    Okay.  And do you see him in the courtroom today?

15   A.    Yes.

16   Q.    Can you please describe him for the jury with an

17   article of clothing that he's wearing?

18   A.    Gray or tan shirt.

19   Q.    Okay.  Is he to the left of me?

20   A.    Yes.

21         MS. FARZAD:  Let the record reflect that the

22   witness has identified Kevin Tidwell.

23         THE COURT:  Absent objection, it will so reflect.

24         MS. FARZAD:  Could we please take a look at

25   Government Exhibit 1274.

BY MS. FARZAD:

Q.     Who is this?

A.     That's Demente.

Q.     Do you know Demente's legal name?

A.     I can't think about it right now.

Q.     Okay.  How do you know Demente?

A.     I met him in the streets too.

Q.     Okay.  And did you know him back in 2016?

A.     Yes.

Q.     Do you see Demente in the courtroom today?

A.     Yes.

Q.     Can you describe what he's wearing?

A.     White shirt.

Q.     Is he to the left of me?

A.     Yes.

          MS. FARZAD:  Let the record reflect that the witness has identified Jose Pineda or Demente.

          THE COURT:  All right.  Absent objection, it will so reflect.

BY MS. FARZAD:

Q.     Okay.  All three of these men, do you know if they were members of a gang?

A.     I mean, everybody knows that.

Q.     Okay.  Well, what gang did you know them to be members of?

```
1    A.    MS-13.

2              MS. FARZAD:   Okay.  I'd like to take a look at

3    Government Exhibit 1280.

4              (Discussion off the record.)

5    BY MS. FARZAD:

6    Q.    Okay.  Who is this man?

7    A.    It's Hector.

8    Q.    Okay.  And did he have a nickname?

9    A.    Chamaco.

10   Q.    How do you know Chamaco?

11   A.    I used to date him.

12   Q.    What time period did you date Chamaco?

13   A.    I don't remember.  It was around that time.

14   Q.    Okay.  And are you still in a relationship with him?

15   A.    No.

16   Q.    Okay.  All right.  I'd like to direct your attention

17   to May 21st, 2017.  Did you know someone who was murdered

18   that night?

19   A.    Yeah.  Flaco.

20   Q.    Okay.  Did you know anyone who was related to Flaco?

21   A.    His brother.

22   Q.    And what did you call his brother?

23   A.    Pelon.

24   Q.    If you could, there should be a binder over there, and

25   it should be marked Government Exhibits 1127 to 1328.  It's
```

1   probably the furthest one away from you.

2   A.    This one?  1127, 1328?

3   Q.    Yes.  Thank you so much.

4         Ms. Hernandez, could you turn, please, to Tab 1288.

5   A.    Yeah.

6   Q.    Do you recognize that?

7   A.    That's Flaco.

8   Q.    Is that a photograph of Flaco?

9   A.    Yeah.

10        **MS. FARZAD:**  Your Honor, at this time, the

11  government moves to admit into evidence Government

12  Exhibit 1288 with permission to publish to the jury.

13        **THE COURT:**  Absent objection, it will be

14  admitted, 1288, and may be published.

15        (Government Exhibit 1288 was marked and admitted

16  into evidence.)

17        **MS. FARZAD:**  If we could show 1288, please.

18        Seems like we're having technical difficulties.

19        You know what?  I think it's right here.  I can

20  put it up on the Elmo.  Just a moment.

21  **BY MS. FARZAD:**

22  Q.    All right.  All right.  Ms. Hernandez, who is in this

23  photograph?

24  A.    That's Flaco.

25  Q.    Okay.  And is that the person who was murdered at Bola

```
1    Ocho on May 21st?

2    A.    Yes.

3    Q.    You said "yes"?

4    A.    Yes.

5    Q.    Okay.  How did you know him?

6    A.    Through Pelon.

7    Q.    Okay.  What was he like?

8    A.    He was nice.  I mean, I didn't really "know him" know

9    him, but what I've seen, he was a nice person.

10   Q.    Do you know if he was a member of any gang?

11   A.    Not that I know of.  It's not my business either.  I

12   didn't care.

13   Q.    Okay.  All right.  So earlier in the evening before

14   the murder, I think you testified you were at Bola Ocho?

15   A.    (Nodding head affirmatively.)

16   Q.    Okay.  What were you doing there that night?

17   A.    Drinking, chilling.

18   Q.    Who were you there with?

19   A.    My friend.

20   Q.    What was her name?

21   A.    Adriana.

22   Q.    Were you using drugs that night?

23   A.    Yes.

24   Q.    Okay.  What kind of drugs were you using?

25   A.    Pills, coke, weed.
```

Q.    Were you high?

A.    Yes.

Q.    Even though you were high, do you remember the events that night?

A.    Yeah.  I mean, I'm a functioning addict.  I've always been an addict.

Q.    Are you still an addict?

A.    Not at this moment, no.  I've been clean 60 months.

Q.    That's great.

      So take me back to when you're standing in the Bola Ocho.  Do you recall at any point in time someone walking in who you knew?

A.    Yeah.

Q.    Who was that?

A.    Miklo, Kevin Tidwell.  He was there because he was going to sell me some Xanax bars.

Q.    I'm sorry.  What did you say?

A.    Xanax bars.

Q.    Okay.  All right.  And how did you know -- is there anything distinctive about Kevin Tidwell in his appearance that helps you know who he is?

A.    He was wearing all blue.

Q.    Okay.  But how are you able to recognize Kevin Tidwell?

A.    Because he's the only white boy in a Hispanic bar.

```
 1   What do you mean?
 2   Q.    That's fine.  I was -- you've answered my question.
 3         So once Kevin Tidwell came into the bar that night,
 4   what did he do?
 5   A.    He came up to me and my home girl.  He gave me a hug
 6   and a kiss.  That's it.
 7   Q.    And then what happened?
 8   A.    I got the bars from him.
 9   Q.    Okay.  Did you stay inside the bar --
10   A.    No, I asked --
11              (Reporter clarification.)
12              THE WITNESS:  Me and my home girl asked him for a
13   cigarette, and he said that he didn't have it on him, that
14   it was in the car.  So we walked to the car.
15   BY MS. FARZAD:
16   Q.    And where was his car parked?
17   A.    To the right.
18   Q.    Okay.  What kind of car was he driving?
19   A.    It was a Honda.
20   Q.    Okay.  And who was in the car?
21   A.    There was a little boy in the back.  I don't know --
22   he wasn't a little boy, but, you know.  And then Jorge was
23   in the passenger side.
24   Q.    And did you know who the person was in the back seat?
25   A.    No.
```

1  Q.    But you knew who Jorge Flores was; is that right?

2  A.    Yeah, I know him.

3  Q.    Did you speak to Jorge Flores that night?

4  A.    Yeah.  Just said what's up.

5  Q.    What was Jorge Flores doing when you walked out and he

6  was sitting in the car?

7  A.    Just sitting there quiet-looking.

8  Q.    Did -- what was -- was there anything different about

9  the way Jorge Flores was acting that night?

10  A.    I mean, he was just quiet.

11  Q.    Is he normally quiet when you see him?

12  A.    No, he would always speak to me.

13  Q.    But that night, he didn't say much?

14  A.    No.

15  Q.    The boy in the back, did he say anything at all?

16  A.    No, not to me.  I didn't know him.  I don't know him.

17  Q.    Do you remember Kevin Tidwell saying anything to the

18  boy in the back?

19  A.    Yeah.  He said something about a gun, but I thought he

20  was just playing.

21  Q.    Do you remember what he said about the gun?

22  A.    Something about get a gun, and -- but I never saw a

23  gun.

24  Q.    Okay.

25  A.    I never saw it.  I thought he was just talking shit.

1  Q.   After he said -- Kevin Tidwell said something about

2  get a gun, what did the boy in the back do?

3  A.   He got out the car and went to the back.  But I didn't

4  see a gun.  I didn't see it.

5  Q.   Were you able to see behind the car where the boy --

6  A.   No.  I didn't care either, so -- to be honest.  I

7  mean . . .

8  Q.   What did the boy do after he went to the back of the

9  car?

10  A.   Just went there, and then he got in the car again.

11  Q.   Okay.  And what happened at that point?

12  A.   I just went back inside.

13  Q.   Did you see Kevin Tidwell get back into the vehicle?

14  A.   No, I don't remember.  I think I was already by the

15  door.  I wasn't paying attention.

16  Q.   Okay.  All right.  Once you got back inside --

17       **MS. FARZAD:**  Well, I want to go ahead and if we

18  could pull up, please, Government Exhibit 462, please.

19       (Playing video.)

20  **BY MS. FARZAD:**

21  Q.   Do you recognize this scene here?

22  A.   Yeah.  That's in front of Bola Ocho.

23  Q.   Who do we see?

24       **MS. FARZAD:**  If you could pause just for one

25  second.

1  **BY MS. FARZAD:**

2  Q.    In the upper left-hand corner, who do we see here?

3  A.    That's Kevin, that's my friend, that's me.

4  Q.    Okay.  All right.  And what are you guys doing?  Why

5  did you go outside?

6  A.    Trying to get the cigarette.

7          **MS. FARZAD:**  Can we go ahead and play, please.

8          (Playing video.)

9  **BY MS. FARZAD:**

10  Q.    Where are you going here?

11  A.    To get the cigarette.

12  Q.    And which direction is this from Bola Ocho as you walk

13  out?  Is it to the left or to the right?

14  A.    To the right.

15  Q.    And what was over to the right?

16  A.    I don't remember what it was.  I think it was -- no,

17  the laundromat's more ahead.  I don't know what it was.

18          (Playing video.)

19  **BY MS. FARZAD:**

20  Q.    And while we're off -- you're off camera here, do you

21  know what -- where you are at this point, what you're doing?

22  A.    Yeah.  Getting the cigarette.

23  Q.    Are you by the car?

24  A.    Yeah.  Probably just talking shit.

25  Q.    Okay.  And what do we see here?

1    A.    Just coming back inside.

2    Q.    And you're still talking to them?

3    A.    Yeah.  Got the cigarette in my hand.

4    Q.    And where are you going here?

5    A.    Inside.

6    Q.    Thank you.

7          **MS. FARZAD:**  Now, if we could play Government

8    Exhibit 466.  If possible, if you could skip ahead to

9    3 minutes and 40 seconds.

10         (Playing video.)

11   **BY MS. FARZAD:**

12   Q.    Okay.  What do you see here?

13   A.    I was standing outside.

14   Q.    Okay.  Is that you -- is this a different angle of you

15   and your friend and Kevin Tidwell?

16   A.    (Nodding head affirmatively.)

17   Q.    And can you point out the vehicle that Jorge Flores

18   and Kevin Tidwell and the boy were in, in this scene here?

19   A.    The one that got the lights on.

20   Q.    Okay.  And what you just testified about the boy

21   getting out and going to the back of the car and Jorge

22   Flores sitting in the front seat, is this all happening in

23   this video here?  And I know we can't see what's happening

24   in the car, but this is the time that this occurred; is that

25   right?

1  A.    Well, yeah, that's the time that they were there, the

2  only time.

3  Q.    Okay.  And what are you doing here?

4  A.    Walking back inside.  Or -- yeah.

5  Q.    Are these doors in the club, are they dark?  Is it

6  easy for you to see through them?

7  A.    No, you can't see through them.

8  Q.    So once you're back inside the club, can you see

9  outside?

10  A.    No.

11        MS. FARZAD:  We can go ahead and stop it there,

12  please.  Thank you.

13  BY MS. FARZAD:

14  Q.    So once you go back inside the club, what happens

15  next?

16  A.    I was over by the deejay.  I was charging my phone.  I

17  was actually texting.  And then one of the security guards

18  said, "Your friends are crazy.  They just shot about nine

19  times out there," something like that, that's what he said.

20  Q.    What did you do after that?

21  A.    Nothing.  I just kept looking at my phone.

22  Q.    And then what happened?

23  A.    Then somebody else came in, said that they had killed

24  Flaco.

25  Q.    Okay.  What did you do at that point?

1    A.    I just stood there.  And then after a little bit, I

2    walked out.

3    Q.    And where did you go when you walked out?

4    A.    No, actually I went to get my friend, and I told her

5    about what happened to him.  And then we walked out.

6    Q.    Where did you go when you walked out?

7    A.    To see what was going on.  But I didn't get close.  I

8    just stayed away from where he was shot.

9    Q.    Did you see Flaco?

10   A.    Yeah.  He was in the car, shot.

11   Q.    Did you have any conversations with Flaco's brother,

12   Pelon, that night?

13   A.    Yeah.  He asked me if it was true that his brother was

14   dead.  I said yes.  And he said I'm going to --

15            MS. HOOD-SCHNEIDER:  I'm going to object to

16   hearsay.

17            THE COURT:  All right.  Response to that?

18            MS. FARZAD:  That's fine, Your Honor.  I can move

19   on.

20            THE COURT:  Okay.  All right.  Very well.

21   Sustain the objection.

22            Ms. Hernandez had started to say something, but

23   whatever she was starting to say, please disregard it.

24   BY MS. FARZAD:

25   Q.    Did you talk to the police that night?

1   A.    No.  I left.

2   Q.    How come?

3   A.    Because I didn't want nothing to do with that.  I

4   didn't have nothing to do with that, and I still don't want

5   nothing to do with that.  I'm not here because I want to be;

6   I'm here because you're making me be here.

7   Q.    I understand, ma'am.

8         After the murder of Pelon's brother, do you remember

9   speaking to Chamaco?

10  A.    Yeah.  He called me on the phone while he was locked

11  up.

12  Q.    And what did he say to you?

13  A.    That Jorge Flores had told him to tell me whatever I

14  saw, whatever I heard or whatever, not to say anything.  And

15  I was, like, what are you talking about?

16  Q.    Do you remember at any point talking to Kevin Tidwell

17  and what, if anything, he said about wanting to be famous?

18  A.    We were high.  I was smoking, and I just thought it

19  was stupid.  Something about some man had killed I don't

20  know how many people and he wanted to kill one more.  And

21  I'm, like, you're stupid as hell, what the fuck is wrong

22  with you?  I was laughing.  That was dumb.

23  Q.    I'd like to talk to you a little bit about the murder

24  of Liliana Rodriguez.

25  A.    I don't know nothing about that either.  I was there

1    at La Mansion, but I left.  I don't know nothing.  I just

2    saw it the next day.  I don't have nothing to say about

3    that.

4    Q.    When you were at La Mansion that night before she was

5    murdered, did you see any MS-13 members in the bar there?

6    A.    Yes, they've always been at the bars.  Always.  I've

7    always seen them.

8    Q.    Did you see any of the defendants who are in the

9    courtroom today at the bar that night?

10   A.    Yeah.  I saw Demente there.

11   Q.    Okay.  Do you -- after the murder of Pelón's brother,

12   do you remember another murder being reported on the news

13   about a week after?

14   A.    Yeah, I think so.

15   Q.    And did you see -- do you recall whether you saw any

16   photographs on the news?

17   A.    Yeah, the -- a truck.

18   Q.    Okay.  If I could have you take a look, please, at

19   Government Exhibit 573.  Now, that's going to be in the

20   binder that's marked 436 to 650.

21   A.    What do you want me to look at?

22   Q.    Government Exhibit 573.

23   A.    Yeah, that's the truck.

24   Q.    Okay.  Do you recognize that photograph?

25   A.    Yes.

1  Q.    Does that fairly and accurately depict the photograph

2  that you saw on the news?

3  A.    Yes.

4            MS. FARZAD:  Your Honor, at this point, the

5  government would like to move into evidence, with permission

6  to publish to the jury, Government Exhibit 573.

7            THE COURT:  Any objection?

8            MR. GANGULI:  No, Your Honor.

9            THE COURT:  All right.  Then without objection,

10  573 will be admitted and may be published.

11            (Government Exhibit 573 was marked and admitted

12  into evidence.)

13  BY MS. FARZAD:

14  Q.    Who do you see in this photograph, ma'am?

15  A.    Kevin.

16  Q.    Where do you see Kevin?

17  A.    By the door.

18  Q.    Okay.  What's he wearing?

19  A.    A white T-shirt and blue pants.

20  Q.    Okay.  And who do you see in the truck here?

21  A.    That's Jorge.

22  Q.    Where is Jorge sitting in the truck?

23  A.    In the driver's seat.

24  Q.    Now, when you saw Mr. Tidwell, Kevin Tidwell, in

25  the -- in Bola Ocho, do you remember what color hat he was

1    wearing that night?

2    A.    Blue hat.

3    Q.    Okay.  And when you saw Jorge Flores in the vehicle

4    that night, did you see whether or not he had a gun?

5    A.    No.  I never saw a gun.  I told you that.  I never saw

6    a gun.

7    Q.    Okay.

8            MS. FARZAD:  I have no further questions for this

9    witness, Your Honor.

10           THE COURT:  All right.  You may proceed.

11           MR. GANGULI:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   QUESTIONS BY MR. GANGULI:

14   Q.    Ms. Hernandez, I'm going to ask you some questions.

15   If there's something that I ask you that I'm unclear about,

16   if you'll let me know, I'll back up and I'll try to do

17   better.  Okay?

18   A.    Okay.

19   Q.    Ms. Hernandez, none of the questions that I ask you

20   are designed to embarrass you.  Okay?

21   A.    Uh-huh.

22   Q.    And with the Court's permission, I'm going to ask you

23   direct questions, so if you'll please answer me directly.

24   Okay?

25   A.    Okay.

```
 1   Q.    Ms. Hernandez, I want to invite your attention back to

 2   May of 2017.  And specifically, I'd like to talk to you

 3   about the Bola Ocho nightclub.  All right?

 4   A.    Uh-huh.

 5   Q.    On May 21st, 2017, you'd been drinking; is that right?

 6   A.    Yes.

 7   Q.    How long had you been drinking that day?

 8   A.    For a while.

 9   Q.    Okay.  What kind of stuff were you drinking?

10   A.    Beer, liquor.  And I was using drugs too.  I had been

11   using drugs all day.  That's not something I've hidden from

12   anybody.

13   Q.    Yes, ma'am.  And I'm not trying to embarrass you, and

14   we'll get to --

15   A.    I'm not embarrassed.

16   Q.    We'll get to that in just a second.

17         How much beer, how much liquor, how much alcohol had

18   you consumed?

19   A.    A lot.

20   Q.    Is it fair to say that you were drunk?

21   A.    No, I wasn't drunk, falling off my feet, no, I wasn't,

22   but I was drinking.

23   Q.    Okay.  Is it fair to say that you were tipsy?

24   A.    Yeah, you could say that.

25   Q.    All right.  In addition to beer, alcohol, and liquor,
```

1  you said you'd been taking some drugs?

2  A.    Yeah.

3  Q.    All right.  What kind of drugs had you been taking?

4  A.    Cocaine, smoking weed, pills.

5  Q.    Okay.  What kind of pills had you been taking?

6  A.    Xanax bars.

7  Q.    How many Xanax bars had you taken?

8  A.    I don't remember.

9  Q.    More than one?

10  A.    Yeah.

11  Q.    Okay.  More than two?

12  A.    Possibly, yeah.

13  Q.    When you take Xanax bars or, rather, when you took

14  Xanax bars back in 2017, how did they make you feel?

15  A.    Good.  I mean, that's why I took them.  That was the

16  whole point.

17  Q.    Okay.  By "good," can you tell us exactly?

18  A.    Relaxed.

19  Q.    Okay.  Other than relaxed, is there any other way it

20  made you feel?

21  A.    No.  Like, I mean, I get aggressive.

22  Q.    You would get aggressive?

23  A.    Yeah, but, I mean, that night I wasn't aggressive.

24  Q.    Okay.  So you'd been taking some Xanax bars, drinking

25  some alcohol.  You also used cocaine?

1  A.    Yes.

2  Q.    Okay.  Is that the cocaine that you snort or did you

3  smoke it?

4  A.    No, you snort -- I snort it.  I've never smoked it.

5  Q.    Okay.  How much cocaine had you snorted?

6  A.    I don't remember.

7  Q.    When you snort or used to snort cocaine, how did that

8  make you feel?

9  A.    Good.  I didn't get violent.  I would just be a

10 functional person.

11 Q.    Okay.  It would relax you as well?

12 A.    Uh-huh.

13 Q.    Okay.  Did I understand you that you also smoked

14 marijuana?

15 A.    Yes.

16 Q.    How much weed had you smoked?

17 A.    Probably like two or three blunts.

18 Q.    Okay.  Two or three blunts in how many hours?

19 A.    I don't remember.  It was a long time ago.

20 Q.    That's fine.  So just so I'm clear, you had taken at

21 least two Xanax bars?

22 A.    (Nodding head affirmatively.)

23 Q.    Is that a "yes"?

24 A.    Uh-huh, yes.

25 Q.    You had snorted some cocaine?

```
1   A.     Yes.

2   Q.     You'd smoked two or three blunts?

3   A.     Yes.

4   Q.     You'd drunk some alcohol?

5   A.     Yes.

6   Q.     You've met with the government many times; is that

7   right?

8   A.     When they've arrested me.  Not because I willingly

9   wanted to.

10  Q.     Yes, ma'am.  Absolutely.

11         You've met with them in May -- I'm sorry -- March of

12  2023, right?

13  A.     Yeah.

14  Q.     Okay.

15  A.     They made me come in, yeah.

16  Q.     Yes, ma'am.  And when they made you come in in March

17  of 2023, did you tell them that you were high on drugs that

18  night and your recollection of events that night is not the

19  best?

20  A.     Well, because they've been harassing me.  They've been

21  calling me, they've been showing up at my house, they've

22  been -- like, I was on the run for, like, since 2017 until I

23  got arrested in 2021 because of the same thing, that I

24  didn't want to have to do this, sit right here.  I told them

25  that since the beginning.
```

1    So whenever -- now that I've gotten myself

2   straightened out, I'm back on community corrections and

3   everything, I'm doing things right, I don't want to have a

4   warrant on my arrest again.  I don't want to have to do

5   that.  So I told them to leave me alone, that I didn't want

6   to be here, that I didn't want to testify.  So they told me

7   I was subpoenaed to be here.

8         THE COURT:  But the question, ma'am, was:  Did

9   you tell the government that you were high on drugs that

10  night?

11        THE WITNESS:  Yes, I did, and I'm not hiding

12  that.

13        THE COURT:  Okay.  All right.  That was the

14  question and needs to be answered.

15        You can ask another one.

16        MR. GANGULI:  Thank you, Your Honor.

17  BY MR. GANGULI:

18  Q.   With respect to your community corrections that you

19  discussed, can you please tell us what the phrase "community

20  corrections" means?

21  A.   I'm basically locked up but out.  But that's for a

22  whole different charge, nothing to do with any of this.

23  Q.   Yes, ma'am.  Have you been reconvicted of robbery in

24  Case No. 2016-C-1234?

25  A.   That's the charge that I'm on community corrections

1  for.

2  Q.    Yes, ma'am.

3        Going back to May of 2017, that night, how long had

4  you been at the Bola Ocho nightclub?

5  A.    Maybe an hour or two?  I don't know.

6  Q.    Okay.  With whom -- who did you come there with?

7  A.    With my friend, the one that you see me on the video

8  with.

9  Q.    What's her name?

10 A.    Adriana.

11 Q.    Does she have a last name?

12 A.    Hall.

13 Q.    H-A-L-L?  Okay.

14       You were friendly with Kevin Tidwell in 2017, right?

15 A.    Yeah.

16 Q.    Okay.  Because you guys used to get high together,

17 right?

18 A.    Yeah.  I didn't have a problem with him.

19 Q.    Okay.  And on that May night in 2017, did I understand

20 you correctly that Mr. Tidwell gave you a couple of bars?

21 A.    Yeah.

22 Q.    Okay.  Is that the two Xanax bars that you had taken?

23 A.    Yeah.

24 Q.    Okay.  When you talked to officers, did you tell them

25 that you were inside the nightclub when the shooting

1    happened?

2    A.    I was inside.

3    Q.    Okay.  If you can tell us:  How big is the Bola Ocho

4    nightclub?

5    A.    I don't know.

6    Q.    Is it bigger than the courtroom?

7    A.    About the same size, I think.

8    Q.    Okay.  If we can agree that there's an exit to the

9    Bola Ocho nightclub, and if we can agree that the doors to

10   the courtroom, the double doors, are the exit, where in the

11   nightclub were you when the shooting happened?

12   A.    Where the deejay sits, that's right by the door.  But

13   the music is all -- the speakers are there too.  You can --

14   all you hear is the music.

15   Q.    Okay.

16          MR. GANGULI:  Your Honor, may I have permission

17   to walk around the courtroom?

18          THE COURT:  Where do you intend to go?

19          MR. GANGULI:  Somewhere in the courtroom where

20   the witness would be standing when this shooting happened.

21          THE COURT:  Yeah.  Okay.  All right.  We'll see

22   where this goes, but you may proceed.

23          MR. GANGULI:  Thank you, Your Honor.

24   BY MR. GANGULI:

25   Q.    So again, Ms. Hernandez, let's pretend that the doors

```
1   of the courtroom are the doorways to the nightclub.  And if
2   you'll tell me, please, where exactly you were standing.
3   A.    On that side was where the deejay is.
4         MR. GANGULI:  With the Court's permission, I'm
5   going to go stand there.
6         THE COURT:  All right.
7   BY MR. GANGULI:
8   Q.    Am I in the correct place?
9   A.    A little bit further down, but yeah.  Yeah.
10  Q.    Over here?
11  A.    Uh-huh.
12  Q.    How many other people were between you and the exit?
13  A.    There was no other people between me and the exit.
14  The only one person that was there was behind the little
15  deejay booth, and it was the deejay.
16  Q.    Okay.  You talked about a deejay.  So there's a lot of
17  music blaring in the nightclub; is that right?
18  A.    It's right there, yeah.
19  Q.    So if you're inside the nightclub and there's music
20  blaring, is it fair to say that you didn't even hear the
21  shooting?
22  A.    I didn't.  I never said I did.
23  Q.    Thank you.
24        MR. GANGULI:  Your Honor, may I have a moment to
25  speak with Mr. Gulotta?
```

1    **THE COURT:**  You may.

2       (Respite.)

3    **MR. GANGULI:**  Your Honor, I'll pass the witness.

4    **THE COURT:**  All right.  Thank you.

5                **CROSS-EXAMINATION**

6    **QUESTIONS BY MS. HOOD-SCHNEIDER:**

7    Q.    Good afternoon, Ms. Hernandez.  My name is Vakessha

8    Hood-Schneider, and I represent Mr. Flores.  I just have a

9    few quick questions for you.

10       The night of May 21st, 2017, when you were at

11   Bola Ocho, you mentioned you saw Mr. Flores in a vehicle,

12   correct?

13   A.    Yes.

14   Q.    And you said he was in the front-passenger seat,

15   correct?

16   A.    Yes.

17   Q.    Okay.  And you also said when you returned into the

18   club, you didn't hear any gunshots, right?

19   A.    I didn't.

20   Q.    Didn't see anybody shoot?

21   A.    I didn't.

22   Q.    Didn't see a gun that night, right?

23   A.    I didn't.  That's what I've been saying the whole time

24   that they've been arresting me and asking me questions and

25   asking me to come in.

1          **MS. HOOD-SCHNEIDER:**  Those are my questions.

2          **THE COURT:**  All right.  Mr. Bloom?

3          **MR. BLOOM:**  No questions, Your Honor.

4          **THE COURT:**  All right.  Redirect examination?

5          **MS. FARZAD:**  Very briefly, Your Honor.

6          **THE COURT:**  All right.

7                         REDIRECT EXAMINATION

8   **QUESTIONS BY MS. FARZAD:**

9   Q.    Ms. Hernandez, you've testified multiple times that

10  you don't want to be here.

11  A.    I don't.

12  Q.    And that the government harassed you to come to court

13  today.

14  A.    Yes.

15  Q.    But you were there that night.

16  A.    Yes, I was.

17  Q.    And a person was murdered.

18  A.    Yes, it was, and I'm sorry for that.  I'm sorry that

19  that happened.  But at the end of the day, it doesn't have

20  anything to do with me.  I wasn't the one pulling no

21  triggers.  I didn't see who did it.  I don't -- what do I

22  have to do with it anyways?  There was a lot of other people

23  that was there.  I don't see any of them in here.

24  Q.    Would you agree with me that the police investigating

25  that crime, that's an important thing?

1          **MR. GANGULI:**  Objection, Your Honor, as to

2    leading.

3          **THE COURT:**  Actually, for reasons I'm happy to

4    explain later, that question is not leading, so I'm going to

5    overrule the objection.

6          Question being:  "Would you agree with me that

7    the police investigating that crime, that's an important

8    thing?"

9          **THE WITNESS:**  They should investigate all crimes.

10   That's what they're -- they're police -- to do, right?

11   **BY MS. FARZAD:**

12   Q.   That's correct.  Your -- that's correct.  Is it

13   important -- do you believe it's important for people to

14   come testify in court about what they've seen and what they

15   know?

16   A.   Not if they don't want to.  Because I'm here on

17   something that I didn't see actually physically happen.  I'm

18   just here because I was there.  I didn't have nothing to do

19   with it.  I don't want to be here.  And if it's okay, I just

20   want to go ahead and go and put this behind me.

21         **THE COURT:**  Ma'am, ma'am, the attorneys are

22   allowed to ask questions, and we are -- I would venture to

23   say we're on the back part of this, and you will get out of

24   here quicker if you just answer the question if counsel --

25         **THE WITNESS:**  I just did.

```
 1              THE COURT:  -- if counsel has any more.
 2              MS. FARZAD:  Thank you, Your Honor.  I have no
 3    further questions.  Thank you.
 4              THE COURT:  All right.  You may step down.  Thank
 5    you.
 6              (The witness stepped down.)
 7              THE COURT:  All right.  One moment.
 8              (Respite.)
 9              THE COURT:  All right.  Thank you.  All right.
10    The government may call its next witness, please.
11              MR. SAFEEULLAH:  The United States calls Tim
12    Brewer.
13              THE COURT:  All right.
14              (The witness was sworn.)
15                        *   *   *
16                      TIMOTHY BREWER,
17    was called as a witness, and after having been first duly
18    sworn, testified as follows:
19                    DIRECT EXAMINATION
20    QUESTIONS BY MR. SAFEEULLAH:
21    Q.    Good afternoon.
22    A.    Good afternoon.
23    Q.    Can you please state and spell your last name for the
24    record.
25    A.    Timothy Brewer, B-R-E-W-E-R.
```

Q.    Where are you presently employed?

A.    Metro Nashville Police Department.

Q.    And what division do you work in?

A.    Currently in full-time SWAT or SRT.

Q.    And what does SRT stand for?

A.    Special response team.

Q.    And in -- well, when did you start working in that
unit?

A.    I believe it was 2013.

Q.    And what are some of the things that you-all do?

A.    It varies from day to day.  Part of our job would be
to seek the arrest of violent felony warrant individuals and
things like that, or respond to calls, special calls that --
requests from patrol or things like that.

Q.    Were you a member of this team on June 1st, 2017?

A.    Yes, sir.

Q.    Were you working on that day?

A.    Yes, sir.

Q.    And what were you doing?

A.    We were doing our day-to-day duties.  I think we were
out attempting to serve warrants on that day.

Q.    Were you trying to arrest Kevin Tidwell?

A.    Yes.

Q.    Did you actually participate in his arrest?

A.    Yes.

1  Q.    Do you remember what time of day it was when you

2  arrested him?

3  A.    I believe it was approximately 11:00 a.m.

4  Q.    And how did you become involved in that arrest?

5  A.    We received information that Brentwood police had

6  spotted him in a stolen vehicle.  We started moving that

7  direction.  During that time, things started to develop.  I

8  think they tried to get a traffic stop on him, and he

9  refused to stop.

10  Q.    And what did you do?

11  A.    We continued that way.  Prior to our arrival, he

12  wrecked on I-65 North in the Brentwood area, and we

13  responded to that scene where he crashed his vehicle.

14  Q.    And this was on I-65?

15  A.    Yes, sir.

16  Q.    And was he far in front of you when he crashed or were

17  you in pursuit behind other officers when he crashed?

18  A.    I was in pursuit behind.  It was -- I don't know the

19  exact distance, but just out of my view when he crashed, but

20  I shortly came up on the crash after it occurred.

21  Q.    Were you driving at a normal rate of speed or were you

22  driving above the speed limit?

23  A.    Probably a little above.

24  Q.    And this crash occurred on I-65?

25  A.    Yes, sir.

1   Q.   And was that northbound or southbound?

2   A.   It would be -- it was from Brentwood back towards

3   Nashville, so it would have been northbound.

4   Q.   And did you observe the scene as you arrived on it?

5   A.   Yes, sir.

6           MR. SAFEEULLAH:  Your Honor, may I approach this

7   witness?

8           THE COURT:  You may.

9   BY MR. SAFEEULLAH:

10   Q.   I'm passing up what's previously been marked as

11   United States Exhibit 744.  Can you tell me what's on that

12   disk?

13   A.   This was dash cam video, I believe, of a sheriff's

14   deputy in Williamson County.  It's a -- was a marked

15   sheriff's deputy's car, patrol car.

16   Q.   And was that video taken on June 1st, 2017?

17   A.   Yes, sir.

18   Q.   And have you watched the full video that depicts part

19   of that snippet that's on that disk?

20   A.   Yes, sir.

21   Q.   And do you see yourself in that full video?

22   A.   The full video, yes.  There's a snippet that I'm not

23   in, but the full video, yes, I'm in that.

24   Q.   And the video that you watched, does it accurately and

25   correctly depict the scene on that day?

1    A.    Yes, sir.

2              **MR. SAFEEULLAH:**  Your Honor, I move to admit into

3    evidence United States Exhibit 744, and I request permission

4    to publish it to the jury.

5              **THE COURT:**  All right.  Absent objection,

6    Government Exhibit 744 will be admitted and can be

7    published.

8              (Government Exhibit 744 was marked and admitted

9    into evidence.)

10             (Playing video.)

11   **BY MR. SAFEEULLAH:**

12   Q.    Now, the video has ended, but this is just a snippet

13   of a larger video?

14   A.    Yes, sir.

15   Q.    And if we continued to watch this video, would we see

16   you in the video?

17   A.    Yes, sir.

18   Q.    Were officers able to get Kevin Tidwell out of that

19   car?

20   A.    Yes, sir.  We eventually got him out the front

21   passenger side of the vehicle.

22   Q.    The front passenger side, not the front driver's side?

23   A.    Right.  Because it was up against the retaining wall

24   there, so we got him out through the passenger side of the

25   front, passenger side.

1    Q.    When he got out of the car, what did you do?

2    A.    I helped take him into custody.  Me and another

3    officer actually went hands on with him and placed him in

4    handcuffs.  During that time, he confessed to me that there

5    was a handgun in his pocket, and at that time after we got

6    him into custody, I took that out of his pocket and, I

7    believe, laid it back on the front seat, front passenger

8    seat of the vehicle.

9              **MR. SAFEEULLAH:**  Your Honor, may I approach

10   again?

11             **THE COURT:**  You may.

12   **BY MR. SAFEEULLAH:**

13   Q.    I'm passing up what's previously been marked as

14   United States Exhibit 73.  Can you tell me what this item

15   is?

16   A.    Yes, sir.  That is the handgun that I retrieved.  I

17   just want to confirm the serial number just to make sure.

18         Yes, sir.  That is the firearm that I recovered off of

19   Mr. Tidwell.

20   Q.    Now, I just saw you look at something.  What were you

21   looking at there to refresh your recollection?

22   A.    Just the incident report that was done the day of his

23   arrest.

24   Q.    And who wrote that incident report?

25   A.    Desmond Sumerel.

1  Q.    Okay.  Now, that firearm there that's in front of you,

2  does that look like the firearm that you took out of Kevin

3  Tidwell's pocket?

4  A.    Yes.

5  Q.    And which pocket did you take it out of?

6  A.    His front right pocket.

7  Q.    And where did you put that firearm when you took it

8  out of his pocket?

9  A.    On the front passenger seat of the vehicle that he was

10  driving.

11          MR. SAFEEULLAH:  Your Honor, I move to admit into

12  evidence United States Exhibit 73.

13          THE COURT:  Absent objection, it will be

14  admitted.

15          (Government Exhibit 73 was marked and admitted

16  into evidence.)

17          MR. SAFEEULLAH:  I'm not going to publish it to

18  the jury; however, Your Honor, I have two stipulations I

19  would like to read into the record at this point.

20          THE COURT:  All right.  You may proceed.

21          MR. SAFEEULLAH:  "It is hereby stipulated and

22  agreed among the parties that:

23          "Before June 1st, 2017, the defendant, Kevin

24  Tidwell, was a convicted -- was convicted of a crime

25  punishable by imprisonment for more than one year.

1          "Before June 1st, 2017, the defendant knew he had

2    been convicted of a crime punishable by imprisonment for

3    more than one year."

4          And this is United States Exhibit 1340, Your

5    Honor.  I move to admit United States Exhibit 1340 into

6    evidence.

7          **THE COURT:**  Absent objection, Government

8    Exhibit 1340 will be admitted.

9          (Government Exhibit 1340 was marked and admitted

10   into evidence.)

11         **MR. SAFEEULLAH:**  My next stipulation is United

12   States Exhibit 1339.

13         "It is hereby stipulated and agreed among the

14   parties that:

15         "The Ruger Model LCR Caliber .38 Special +P

16   revolver, with serial number: 540-41049, admitted as United

17   States Exhibit 73, is a firearm as defined under Title 18,

18   United States Code, Section 921(a)(3), in that it is a

19   weapon which will, or is designed to, or may readily be

20   converted to, expel a projectile by the action of an

21   explosive.

22         "The Ruger Model LCR Caliber .38 Special +P

23   revolver, with serial number 540-41049, admitted as United

24   States Exhibit No. 73, was manufactured outside of the State

25   of Tennessee, and was transported across state lines into

the State of Tennessee, thereby affecting interstate

commerce.

            "It is so stipulated."

            Your Honor, I move to admit into evidence

United States Exhibit 1339.

            **THE COURT:**  And 1339 is what you had just read,

no more, no less; is that right?

            **MR. SAFEEULLAH:**  Well, it has the title of the

case, the style of the case, and then the parties' signature

at the bottom.

            **THE COURT:**  Yeah, so it did have those pieces of

substance as reflected in Government Exhibit 1339, I take

it.

            **MR. SAFEEULLAH:**  That's correct.

            **THE COURT:**  All right.  Absent objection,

Government Exhibit 1339 will be admitted.

            (Government Exhibit 1339 was marked and admitted

into evidence.)

**BY MR. SAFEEULLAH:**

Q.    It appears that Mr. Tidwell was in a car accident.

Was that accurate?

A.    Yes, sir.

Q.    And was he injured in that accident?

A.    He was transported to Vanderbilt.  I don't remember

exactly what his injuries were, but he was there several --

1   like four hours and then he was released.  And I transported
2   him to booking.  But I don't remember the extent of his
3   injuries.  They were minor.
4   Q.    But was he treated on the scene?
5   A.    He was transported to Vanderbilt by an ambulance, and
6   I rode in the ambulance with him to Vanderbilt and stayed
7   with him the entire time of his stay, and then transported
8   him to booking after about four hours.
9   Q.    Can you look at United States Exhibit 745 in one of
10  those booklets.
11  A.    745, you said?
12  Q.    That's correct.
13  A.    Okay.
14  Q.    Do you recognize that photograph?
15  A.    Yes, sir.
16  Q.    What does that photograph depict?
17  A.    That is Mr. Tidwell on the stretcher inside the
18  ambulance that transported him to Vanderbilt.
19  Q.    And how do you know that?
20  A.    Because I was there and rode with him during that
21  trip.
22          MR. SAFEEULLAH:  Your Honor, I move to admit into
23  evidence United States Exhibit 745, and I request permission
24  to publish it to the jury.
25          THE COURT:  All right.  Absent objection,

```
1    Government Exhibit 745 is admitted and may be published.
2              (Government Exhibit 745 was marked and admitted
3    into evidence.)
4              MR. SAFEEULLAH:   Thank you for pulling that up
5    for us.
6              COURTROOM DEPUTY:   You're welcome.
7    BY MR. SAFEEULLAH:
8    Q.    Is this the photograph that you were just describing?
9    A.    Yes, sir.
10   Q.    And who is the person in the ambulance that we're
11   looking at?
12   A.    That's Mr. Tidwell that's seat-belted onto the
13   stretcher.
14             MR. SAFEEULLAH:   Can we zoom in on his shoes,
15   please.
16   BY MR. SAFEEULLAH:
17   Q.    What color were his shoes?
18   A.    White.
19   Q.    It appears to be something on those shoes.  Is that a
20   glare from the camera or was there something on his shoes
21   that day?
22   A.    I believe -- I'm not 100 percent sure.  It appeared
23   that it could possibly be blood.
24   Q.    But you're not completely sure?
25   A.    I'm not completely sure.
```

1    Q.    But there is some type of coloring on his shoe?

2    A.    Yes.

3    Q.    And what city was Mr. Tidwell in or what county when

4    he was arrested?

5    A.    That was right on the border of Davidson County and

6    Williamson County.  It was actually on the Williamson County

7    side though, but right on the border.

8              MR. SAFEEULLAH:  I don't have any additional

9    questions of this witness at this time, Your Honor.

10             THE COURT:  Okay.  Mr. Ganguli?

11             MR. GULOTTA:  No questions, Your Honor.

12             THE COURT:  All right.  Thank you, Mr. Gulotta.

13             Ms. Hood-Schneider?

14             MS. HOOD-SCHNEIDER:  No questions.

15             THE COURT:  And Mr. Bloom?

16             MR. BLOOM:  No questions, Your Honor.

17             THE COURT:  All right.  Thank you, sir.  You may

18   step down.

19             (The witness stepped down.)

20             THE COURT:  All right.  We will at this time take

21   our midafternoon break, and the jurors may step down for

22   roughly 15 minutes, and then we'll go on our last stretch

23   for the day.  Thank you.

24             (WHEREUPON, the jury was excused from the

25   courtroom at 3:05 p.m., with matters being heard in open

1    court as follows:)

2              THE COURT:  All right.  Thank you.  Please be

3    seated.  One thing I wanted to say, I think it was you,

4    Mr. Ganguli, that made the objection.  Just for future

5    reference and to explain my remark about the objection there

6    to leading:  The question was very similar to something

7    like, "Would you agree with me that the police investigating

8    that crime is an important thing?"  I do think in general

9    when a question is phrased as "would you agree with me," I

10   understand the argument as to what makes it leading, but to

11   me, by its very nature, it invites the witness to push back

12   very much on agreeing if they see fit to do so, offers them

13   a choice to an extent that most leading questions don't.

14             And that's why the -- I think on balance, that

15   sort of question, particularly when you're -- we're dealing

16   with a witness who is not inclined necessarily to agree with

17   the questioner about anything, I wouldn't call it leading.

18             So I did want to explain that.  Obviously, the

19   very particular way in which questions are formulated does

20   govern whether they are leading or not.

21             So just for the information for counsel as to how

22   I view that kind of thing.

23             Anything we need to discuss before we go to

24   break?

25             MR. SAFEEULLAH:  Not from the United States.

 1          **THE COURT:**  No?  Anything from counsel?  No?  All
 2  right.  We'll stand in recess.  Thank you.
 3          (Recess 3:07 p.m. to 3:34 p.m.)
 4          **THE COURT:**  All right.  Do we have any
 5  preliminary matters to discuss before we continue?
 6          **MR. SAFEEULLAH:**  Just very briefly, Your Honor.
 7  I think it was brought to the United States' attention that
 8  during portions of one of the last few witnesses that
 9  testified, someone was in the courtroom with their phone
10  out.  I'm not sure whether they were trying to record
11  testimony, take photographs, or whether they were taking a
12  selfie of themselves and their hair while they were in here.
13          I think the Marshals or the Court Security
14  removed them.  But that is something that we wanted to bring
15  to the Court's attention, that I think there was someone in
16  here trying to possibly record the testimony or witnesses on
17  the stand.
18          **THE COURT:**  All right.  Thank you for that,
19  Mr. Safeeullah.
20          Defendants have any comments about that?  Nope?
21  All right.
22          Yeah, the Court's obviously -- its expectation is
23  that things not be recorded.  We don't do that in these
24  courtrooms, have recordings of court testimony.  It's
25  against the rules.  People are allowed to observe, we

1  encourage that, but they can't sit here and record

2  testimony.  And individuals on their phone and CSOs and the

3  Marshals are certainly authorized to use their discretion to

4  deal with such situations.

5           All right.  Thank you.  If nothing further, we

6  can call in the jurors.  Thank you.

7           (WHEREUPON, the jury re-entered the courtroom at

8  3:35 p.m., with matters being heard in open court as

9  follows:)

10          **THE COURT:**  All right.  Thanks, folks.  Please be

11  seated.

12          Mr. Safeeullah, if the government wishes to call

13  its next witness.

14          **MR. SAFEEULLAH:**  Yes, the United States calls

15  Dr. Erin Carney.

16          **THE COURT:**  All right.  Dr. Carney may come

17  forward.

18          (The witness was sworn.)

19          **MR. SAFEEULLAH:**  May I proceed, Your Honor?

20          **THE COURT:**  Yes, sir.

21  ///

22  ///

23  ///

24  ///

25  ///

```
1                        *   *   *

2                    DR. ERIN CARNEY,

3   was called as a witness, and after having been first duly

4   sworn, testified as follows:

5                      DIRECT EXAMINATION

6   QUESTIONS BY MR. SAFEEULLAH:

7   Q.    Good afternoon, Dr. Carney.

8   A.    Good afternoon.

9   Q.    Can you please state and spell your last name for the

10  record.

11  A.    It's Dr. Erin Carney.  First name is E-R-I-N, last

12  name, C-A-R-N-E-Y.

13  Q.    And where are you presently employed?

14  A.    I'm employed at the center for forensic medicine.  We

15  serve as the Davidson County Medical Examiner's Office in

16  the regional forensic center for the Middle Tennessee area.

17  Q.    And what's your job title?

18  A.    I am the deputy chief medical examiner for Davidson

19  County.

20  Q.    And how long have you served in this role?

21  A.    I've been in that role since March of 2022.  And

22  before that, I was assistant medical examiner starting in

23  July of 2013.

24  Q.    What do you do as the chief -- the deputy chief

25  medical examiner?
```

1    A.    Well, I'm a forensic pathologist, so my job is to
2    perform external examinations and autopsies to determine
3    cause and manner of death in deaths that fall under medical
4    examiner jurisdiction.  So these are deaths that occur under
5    violent or suspicious circumstances or are sudden and
6    unexpected in someone with no medical history to explain why
7    they died.
8    Q.    Before you became the deputy chief, I think you
9    mentioned you were assistant medical examiner?
10    A.    Yes, sir.
11    Q.    And how long did you serve in that role?
12    A.    From July 2013 until March of 2022.
13    Q.    Could you please explain your educational background
14    that makes you qualified to be a medical examiner?
15    A.    Yes.  I earned my bachelor of science degree in
16    biology with a concentration in biochemistry and cellular
17    and molecular biology from the University of Tennessee
18    Knoxville.  I attended Vanderbilt University School of
19    Medicine where I earned my doctor of medicine degree.
20          I completed residency in anatomic and clinical
21    pathology at the Johns Hopkins Hospital in Baltimore, and a
22    forensic pathology fellowship at the State of Maryland
23    Office of the Chief Medical Examiner.
24    Q.    And how long was your residency?
25    A.    It was four years.

1  Q.    After you finished your residency, where did you work?

2  A.    So after my forensic pathology fellowship at the

3  office of the chief medical examiner in Baltimore, I then

4  moved to Nashville and began working here.

5  Q.    And were you performing autopsies in Baltimore?

6  A.    Yes.

7  Q.    And how long were you there?

8  A.    One year.

9  Q.    And over the course of your career, how many autopsies

10 have you performed?

11 A.    I've performed over 3,000 autopsies.

12 Q.    Have you taught any medical classes, courses, or

13 spoken at any lectures?

14 A.    I have taught medical students.  Did that during

15 residency.  I've also presented to residents and actually

16 helped teach residents in pathology from Vanderbilt.

17 Q.    Have you authored any publications?

18 A.    Yes.

19 Q.    What publications have you authored?

20 A.    I authored a publication on --

21 Q.    Well, are you referring to a document now?

22 A.    Yes.

23 Q.    Okay.  Do you need to remember what you made a

24 publication?  I think that's fine, but if so --

25 A.    Yes.  I was just looking at the title so I can give

1  you more detail about it.

2              THE COURT:  All right.  Let's do this.  If you

3  wouldn't mind just flipping that over.

4              THE WITNESS:  Sure.

5              THE COURT:  And you can have that available if

6  you need it to refresh your memory.

7              THE WITNESS:  Okay.

8              THE COURT:  Just let us know if you think that

9  that could refresh your memory if you can't remember

10  something.

11              THE WITNESS:  Okay.

12              THE COURT:  Otherwise, we'll just go with the

13  Q&A.

14              THE WITNESS:  Okay.

15  BY MR. SAFEEULLAH:

16  Q.    My question was, what publications have you authored?

17  A.    So I authored a publication on axillary lymph node

18  inclusions that appeared to be endosalpingiosis, and these

19  were in women who had --

20              (Reporter clarification.)

21              THE WITNESS:  So it was looking at inclusions in

22  axillary lymph nodes in women who had previously had breast

23  cancer, and we found that those inclusions were benign.

24              I also authored a publication on distinguishing

25  metastatic clear cell renal cell carcinoma from

1    hemangioblastoma in the central nervous system.

2    **BY MR. SAFEEULLAH:**

3    Q.    The second one that you just mentioned, could you give

4    us the 3000-foot view, the layman's version of what that

5    publication dealt with?

6    A.    So the publication was looking at a series of three

7    immunostains to distinguish what type of tumor was actually

8    in the brain and spinal cord.

9    Q.    Have you ever been called to testify in court before?

10   A.    Yes.

11   Q.    Have you ever been called to testify about autopsies

12   that you've performed?

13   A.    Yes.

14   Q.    How many times have you been called to court to

15   testify about autopsies that you've performed?

16   A.    I have been called to court 58 times.  Well, I've

17   testified 58 times.

18   Q.    Have you ever been qualified to give your opinion

19   about a person's cause of death?

20   A.    Yes.

21   Q.    How many times have you been qualified to give your

22   opinion about a person's cause of death?

23   A.    Pretty much most of those 58 times.

24   Q.    In what courts have you been qualified to give your

25   opinion on the cause of death?

```
1    A.    Do you mind if I refer to my list?
2              THE COURT:  If you can't recall, that is fine.
3    So --
4              THE WITNESS:  Well, do you want all the counties
5    or just the states?
6              THE COURT:  What -- let's do it this way.  Maybe
7    ask kind of as clear as you can what you're looking for, see
8    what you can recall, and if you can't recall the rest, then
9    you may refer to that.
10             THE WITNESS:  Okay.
11   BY MR. SAFEEULLAH:
12   Q.    In what states have you been qualified to give your
13   expert opinion on someone's cause of death?
14   A.    I've been qualified in the states of Maryland, Texas,
15   Kansas, Tennessee, and Kentucky.
16   Q.    Any other states?
17   A.    No.
18             MR. SAFEEULLAH:  Okay.  Your Honor, at this
19   point, I would move to have Dr. Carney qualified to give her
20   expert opinion on the causes of death under Rule 702.
21             THE COURT:  All right.  Any objection to
22   qualification under Rule 702 for Dr. Carney re manner of
23   cause of death?
24             All right.  Seeing no objection, Dr. Carney may
25   testify under Rule 702.
```

1    **BY MR. SAFEEULLAH:**

2    Q.    Before we get into what you did in relation to the

3    facts of this case, can you explain to us what doctors at

4    the Medical Examiner's Office do on a day-to-day basis?

5    A.    Yes.  So on the days that I am on autopsy, I will

6    perform external examinations and autopsies, like I

7    mentioned, to determine cause and manner of death.

8          Would you like me to explain the autopsy procedure?

9    Q.    Well, how long is your day?  Do you start at 8:30, do

10   you start at 10:00, do you work Monday through Friday, are

11   you on rotation?

12   A.    So I usually work Monday through Friday.  The office

13   is open from 8:00 to 4:30.  We do perform autopsies every

14   day of the year with the exception of Christmas, so I do

15   work some weekends, and we switch out on that.

16   Q.    When you report to the office first thing in the

17   morning, what's one of the first things you do?

18   A.    So the first thing we do at 8:00 is we have a meeting

19   and we go over the cases that are there for the day to

20   determine what -- you know, which ones need an autopsy,

21   which ones need an external examination, and then we divide

22   the work between the two doctors who are doing the autopsies

23   and external examinations that day.

24   Q.    And just generally speaking, after you -- a doctor at

25   the Medical Examiner's Office has done an autopsy, what

1   other procedures or things do they do?

2   A.    I will dictate that case so that my transcriptionist

3   can transcribe my autopsy report.  I'll follow up on

4   previous cases where I have the paperwork and I'm waiting on

5   toxicology results, so I'll check any toxicology results

6   that have come in, maybe review slides if I submitted any

7   tissue for slides on previous cases, and then I can complete

8   out those autopsy reports and death certificates.

9   Q.    Now, we've been using this term "autopsy."  Could you

10   explain what that means?

11   A.    Yes.  So an autopsy is an examination of the body.  It

12   typically consists of two parts.  There's an external

13   examination and an internal examination.

14        For the external examination of the body, I look at

15   the outside of the body, and I will record details about

16   that body: the length of the body on the table, the weight

17   of the body, the hair color, eye color.  I will look for

18   evidence of disease or injury on the outside of the body

19   that might help explain why the person died.

20        Following that, there's an internal examination.  We

21   perform a Y incision on the chest and abdomen and reflect

22   that skin and soft tissue so that I can see the ribs and the

23   sternum.  We'll cut through the ribs and take off the

24   front -- the sternum and ribs -- chest plate, if you will --

25   so that I can see the internal organs, look for any blood or

other fluids that are around the organs that shouldn't be there.

And then we'll remove those organs and look at them more carefully to look for evidence of disease or injury to explain why that person died. And then we'll also draw blood and other body fluids to send off for toxicology testing.

Q. Now, when you-all begin the autopsy at the Medical Examiner's Office, is that the first time that someone from your office may be involved in dealing with a body?

A. It depends if we've had a scene investigation by my office or not.

Q. And explain that, please.

A. So if someone is pronounced deceased at the scene and their body is not transported to the hospital for CPR, then the police will be called out to the scene. And if it's determined that that death falls under medical examiner jurisdiction, then an investigator from my office will go out to the scene, take pictures of the scene, take pictures of the body, examine the body, talk to the police, talk to any family that are there, and gather all that information and compile it into a report which I can review prior to beginning the autopsy.

If the body is transported to the hospital, then we don't have a scene to respond to, and so then the first time

1    that I see that body will be when they come to my office.

2    Q.    And why is it important for the investigator to get

3    information at the scene?

4    A.    It helps to see the surroundings.  If you have a case

5    where there's been some sort of violent activity, it helps

6    to see if there's a lot of blood on the ground around the

7    body.  It also helps to look around and see maybe if the

8    body is in an awkward position where they couldn't breathe,

9    if there are any drugs or drug paraphernalia on scene,

10   things like that that help understand how the person died.

11   Q.    In addition to taking the photographs at the scene, is

12   there anything else that the investigators do at the scene?

13   A.    Well, when they've completed their body examination

14   and they've talked to police and any family there, they will

15   actually -- the removal service will come and they will help

16   the investigator move the body into a bag.  That bag will

17   then be sealed up.  The name and the case number, medical

18   examiner case number, will be placed on the outside of the

19   bag.  And then they take -- there's two zippers on the bag,

20   and a seal goes through those two zippers, and it's

21   basically locked up and sealed up.

22         And my investigator will actually initial that seal,

23   and that seal is not broken until we bring the body out and

24   are ready to examine it at the Medical Examiner's Office.

25   Q.    Do they also do anything with the hands before they

1  zip the bag up?

2  A.    Sometimes they will put -- they will secure bags over

3  the hands, especially if we're trying to preserve any

4  evidence on the hands, if they want us to take nail

5  clippings or swabs or collect anything from the hands.

6  Q.    Do they do anything with the body as far as moving it

7  to observe how it is or what's going on with the body before

8  they put it in the bag?

9  A.    They will usually roll the body onto its side so they

10  can see the back of the body, maybe lift up the shirt if

11  they have a shirt on, to see if there's any injury that

12  might be covered up by the shirt.

13  Q.    Now, does the investigator also transport the body

14  from the scene to your office?

15  A.    No.  The investigator is usually in a company vehicle.

16  But a removal service that comes with a van and a gurney,

17  they will actually transport the body directly to the

18  office.

19  Q.    So when the body arrives at the scene -- I mean at

20  your office, what's one of the first things that happens in

21  processing when it arrives?

22  A.    So when the body first arrives, it is -- there's a

23  timestamp so we know what date and time the body arrived at

24  the office.  And then if it's not while we're doing

25  autopsies, like in the morning, then the body will be placed

1  in a cooler and kept cool until the following day when they

2  will be examined.

3  Q.    And how cool is this cooler?

4  A.    It's usually about 40 to 45 degrees.

5  Q.    And why is it that temperature?

6  A.    So if we keep them in that cooler environment, it will

7  slow the rate of decomposition and preserve the tissue for

8  the examination.

9  Q.    How soon after a body arrives at your office does it

10  get examined?

11  A.    It's usually within the next day or two.

12  Q.    So that cool temperature helps preserve it for that

13  next day or two before you-all can perform the autopsy?

14  A.    Yes, sir.

15  Q.    So when you get ready to begin an autopsy, can you

16  walk us through what you do?

17  A.    So like I mentioned, that seal is broken on the bag.

18  We'll take a picture of the body the way it appears when it

19  first comes in before we've moved it, collected any

20  evidence.  If any evidence needs to be collected, we'll do

21  that first: clip nails, pull hair, any evidence that needs

22  to be collected like that.

23        And then we will start to undress the body.  We'll

24  clean the body.  If they've been a victim of a stabbing or a

25  shooting, we will actually x-ray the body to look for any

1    projectiles or broken blades that might be in the body, and

2    then we will begin the autopsy like I mentioned.

3    Q.    How do you-all keep track of which individuals are

4    having autopsies performed on them?

5    A.    Well, we have a list each day.  And then each person

6    has their own specific medical examiner case number.  They

7    each get a tag placed around the right ankle that has the

8    medical examiner case number and their name so that we know

9    who they are.

10   Q.    And when you start the examination, you start the

11   external examination before the internal examination; is

12   that correct?

13   A.    Yes, sir.

14   Q.    When you're doing this external examination, what are

15   you looking for?

16   A.    So I'm usually looking for evidence of disease or

17   injury to help explain why the person died.  So if I find

18   any injuries, I will document where they are typically on a

19   body diagram.  If it's something like a gunshot wound, I'll

20   actually measure the size of the gunshot wound, where it's

21   located on the body.

22   Q.    Is there a person with you that's taking pictures as

23   you're doing the external examination of the body?

24   A.    Yes, sir.  We do have a photographer.

25   Q.    Is it -- what label?  What title does that person

1  have?

2  A.    Forensic photographer.  So they will take pictures of

3  all of those injuries and anything in addition that I would

4  like for them to document with photographs.

5  Q.    Do they try to get a complete 360 view of the body?

6  A.    Yes.

7  Q.    And why do they do that?

8  A.    Well, we want to have a photograph, like I mentioned,

9  of the body completely.  It's usually a series of three

10  photographs, working from head to toe, and then also of the

11  back, so that you see an overview of where those injuries

12  are located.  And then we'll take close-ups so you can get a

13  closer look at those injuries.

14  Q.    What would cause you to conduct an x-ray on someone

15  that's deceased?

16  A.    So we usually do an x-ray if they've got any sort of

17  gunshot wounds, stab wounds, or if they are unidentified and

18  the x-ray may help us identify who this person is by

19  comparing it to an antemortem or an x-ray performed while

20  they were still alive.

21  Q.    And what evidence or what guidance does this x-ray

22  give you?

23  A.    So when we do an x-ray, particularly on someone with

24  gunshot wounds, we can see if there are any projectiles in

25  the body, and that can help me determine, with my entrance

1    wounds and exit wounds, that I've accounted for all of the

2    gunshots and all of the bullets, in this particular case.

3    Q.    I want to turn your focus to the autopsies that you

4    performed in this case.

5    A.    Okay.

6    Q.    Did you perform autopsies on Liliana Rodriguez and

7    Ammerli Garcia-Munoz?

8    A.    Yes.

9    Q.    When did you perform these autopsies?

10   A.    All right.  The autopsy on Liliana Rodriguez was on

11   August 1st, 2016.

12   Q.    And when was the one on Ammerli Garcia-Munoz?

13   A.    That was on May 22nd, 2017.

14   Q.    Okay.  Let's start with Liliana Rodriguez.

15   A.    Okay.

16   Q.    Did a medical examiner go to the scene where she

17   passed away?

18   A.    No.  She was transported to the hospital, and so she

19   came to our office from the hospital.

20   Q.    And why was it that she would have been transported to

21   the hospital as opposed to coming straight from the scene?

22   A.    She either was transported by emergency medical

23   services or by the vehicle that she was already in when she

24   was shot.

25   Q.    Did an investigator from your office go to the scene?

1    A.    No.

2    Q.    Was she seen on the first day she arrived at your

3    office?

4    A.    Well, she came in on, I believe it was, July 31st.

5    Q.    Do you know or do you not know, because if you don't

6    know --

7    A.    I do have it.  She came in on July 31st, and then I

8    examined her on August 1st.

9    Q.    When you examined her externally, did you know or

10   notice any distinguishing injuries?

11   A.    Yes.  She had a gunshot wound, entrance wound on her

12   left arm.  She had an abrasion or scrape and a contusion or

13   an ecchymosis, a bruise, on her right arm.  And then she

14   also had some faint brown bruises on her thighs and an

15   abrasion or scrape on the left side of her torso.

16             THE COURT:  All right.  One moment, Doctor.  If

17   counsel could approach briefly.

18             (WHEREUPON, a bench conference was had out of the

19   hearing of the jury, as follows:)

20             THE COURT:  It is possible that the doctor may

21   just be reading.  That doesn't bother me if it doesn't

22   bother y'all.  Anyone have any thoughts about that?

23             MR. HAWKINS:  Just reading from --

24             THE COURT:  She might just be -- you know, which

25   I understand, but I don't know that that's what we do in

1    this situation.  So no one objected, so, you know, I'm okay

2    with it if no one objects, but I wanted to put it out there.

3         **MR. SAFEEULLAH:**  My next question is going to be

4    to admit the report into the record so it's publishable and

5    she can read from it.  I mean, I tried to tell her that

6    reading from the records was not something we could do, but

7    my next question is to have it admitted into evidence.

8         **THE COURT:**  Yeah, and so if we do it that way

9    where things come into evidence, then it's fair game and she

10   can read from it, right?  So we'll do it that way.

11        All right.  Thank you.

12        (WHEREUPON, the bench conference concluded, and

13   the following took place within the presence and hearing of

14   the jury:)

15   **BY MR. SAFEEULLAH:**

16   Q.    Dr. Carney, did you create and author an autopsy

17   report for the autopsy that you did on Liliana Rodriguez?

18   A.    I did.

19   Q.    Can you turn to the first binder in front of you and

20   find United States Exhibit 350.  And those other documents

21   that are on the table, you can push those aside.  I think

22   you'll only need United States Exhibit 350.

23   A.    Okay.  Okay.  All right.

24   Q.    And before you begin looking at 350, the other

25   documents that are on the table there, can you just remove

1    them or turn them over?

2    A.    Sure, I can do that.

3    Q.    And can you look at United States Exhibit 350, please.

4    A.    Yes, sir.  All right.

5    Q.    What is United States Exhibit 350?

6    A.    This is the autopsy report that I completed on Liliana

7    Rodriguez.

8    Q.    And how do you know that?

9    A.    I recognize this document.

10            MR. SAFEEULLAH:  Your Honor, I move to admit into

11   evidence United States Exhibit 350.

12            THE COURT:  All right.  Absent objection,

13   Government Exhibit 350 will be admitted and it may be

14   published.

15            (Government Exhibit 350 was marked and admitted

16   into evidence.)

17   BY MR. SAFEEULLAH:

18   Q.    Can you also look at United States Exhibits 351, 353,

19   355, and 358.

20   A.    Yes.

21   Q.    What are those exhibits?

22   A.    These are photographs that were taken at my office of

23   Ms. Rodriguez's entrance wound, the bruise and the scrape on

24   her shoulder, and pictures of the outside of the bag in

25   which her body was transported.

1  Q.    And how do you know that?

2  A.    It has her name and our specific case number.

3         MR. SAFEEULLAH:  Your Honor, at this time, I'd

4  move to admit into evidence United States Exhibit 351, 353,

5  355, and 358, and I request permission to publish them to

6  the jury.

7         THE COURT:  All right.  Absent objection, the

8  following exhibits will be admitted:  Government

9  Exhibits 351, 353, 355, and 358.  They may be published.

10         (Government Exhibits 351, 353, 355, and 358 were

11  marked and admitted into evidence.)

12  BY MR. SAFEEULLAH:

13  Q.    Dr. Carney, we're not going to go through all of the

14  photographs that were taken during this autopsy, but we're

15  going to go through a few of them.

16  A.    Okay.

17         MR. SAFEEULLAH:  If we could pull up

18  United States Exhibit 351.

19  BY MR. SAFEEULLAH:

20  Q.    Can you tell us what we're looking at in this

21  photograph?

22  A.    So this a photograph of the outside of the bag that

23  her body was placed in to transport to our office, and

24  you'll see it has her last name and our unique medical

25  examiner case number for her, as well as this yellow tag

1  which, once the bag is opened, will be placed around her
2  right ankle.
3          **MR. SAFEEULLAH:**  Can we publish
4  United States Exhibit 353, please.
5  **BY MR. SAFEEULLAH:**
6  Q.    And can you tell us what we're looking at in this
7  photograph?
8  A.    So this is her right ankle with that same yellow tag
9  as well as a bar-coded tag that has her name and her unique
10  case number on it.
11  Q.    Now, you've previously testified that there was an
12  entry wound on her left shoulder.  How are you able to
13  determine what an entry wound or an exit wound is?
14  A.    So an entrance wound typically is round to ovoid, kind
15  of a punched-out wound where the bullet has entered the skin
16  and literally pushed the skin and soft tissue in and out of
17  the way.  There's usually an abrasion or a scrape around it.
18          So if you think about when you push on your skin, how
19  the edges kind of bend around where you're pushing, so it
20  usually has that abrasion ring; whereas an exit wound is
21  literally where the skin usually just splits open enough for
22  the bullet to get out, unless the skin is up against
23  something, then it might be a little more open.
24          But typically, it's just like a little tear in the
25  skin.

1    Q.    And why is it important, in your line of work, to know

2    the difference between an entry wound and an exit wound?

3    A.    Well, it's important because we need to determine how

4    many times the person's been shot and also to understand

5    what direction the bullet is traveling. So if you know what

6    the entrance and the exit is, you could tell which side of

7    the body it entered on.

8         Obviously, we'll document what was injured in the

9    process and then where the bullet ended up.

10    Q.    Have there been times when you have not been able to

11    determine what an entrance or exit wound is?

12    A.    Yes. So when someone is shot through something, like

13    a car door or a window or a wall, it tends to deform the

14    bullet and the bullet will start to tumble so that when it

15    enters the body, it's at a different angle, and the entrance

16    wound can appear rather abnormal.

17         **MR. SAFEEULLAH:** And before I publish this next

18    exhibit, I just want to let the Court and the jury know that

19    it's graphic. But the United States would like to publish

20    United States Exhibit 358.

21    **BY MR. SAFEEULLAH:**

22    Q.    Can you tell us what we're looking at in this

23    photograph.

24    A.    So you can see kind of her dark hair off to the right

25    of the photo. This is her left shoulder, and that is the

1  entrance wound where the bullet entered her body.

2  Q.    And if you could explain to us kind of what this

3  photograph in front of us, how we can tell this is an

4  entrance wound as opposed to an exit wound.

5  A.    Well, like I mentioned before, it has kind of that

6  ovoid punched-out look.  And along the top of it, you can

7  see where there's an edge where the top layer of skin's been

8  scraped off, and that's where the bullet kind of scraped the

9  skin as it entered.

10  Q.    Based on that photograph and what you saw, were you

11  able to determine how far the shooter was away from Liliana

12  Rodriguez?

13  A.    Well, in this case, this would be a distant or

14  indeterminate range wound.

15        When we look at gunshot wounds, we're looking for the

16  things that come out of the end of the gun in addition to

17  the bullet.  So soot and partially burned or unburned

18  particles of gunpowder that could strike the skin and cause

19  little pinpoint abrasions around the skin, usually you see

20  those at a much closer distance.

21        So soot, you'll see from a few inches up to about a

22  foot.  From a few inches out to about 2 to 3 feet, you might

23  see those little pinpoint abrasions where the gunpowder has

24  struck the skin.  But beyond about 3 feet or so, depending

25  on the firearm, to whatever distance, it all kind of looks

1    the same.  There's no soot or gunpowder stippling around it.

2         So this entrance wound would be greater than 3 feet

3    but I'm not really sure how far away.

4    Q.    What's the term you-all use for when it's close and

5    you see the soot on the person or on the body?

6    A.    Well, if the gun is right up on the skin, I'll call it

7    a contact wound.  If it's close to where soot is on the

8    skin, I'll usually call it close range.  If it's soot and

9    gunpowder stippling or just gunpowder stippling, I'll

10   usually calling it intermediate range.

11   Q.    And what do you call it if you're not able to

12   determine how close the shooter was?

13   A.    Then I will call it distant or indeterminate.

14   Indeterminate because there could be something -- it could

15   have been fairly close but there was something in between

16   the skin and the gun when it was fired, like a pillow or

17   glass or something that caused that to not transfer to the

18   skin.

19   Q.    And what was your determination with Ms. Liliana

20   Rodriguez, again?

21   A.    I would determine hers to be distant or indeterminate

22   range.

23   Q.    And why did you make that determination?

24   A.    There's no soot or gunpowder stippling around her

25   entrance wound.

1  Q.    When you conducted the internal examination, were you

2  able to tell the path of the bullet?

3  A.    Yes.

4  Q.    And how were you able to do that?

5  A.    So when we opened up her body, you could see the hole

6  where it came through on the left side and entered her chest

7  cavity, and then the injury to the organs that it went

8  through, and as well as a hole on the right side of the

9  chest cavity where it exited her chest, and then the bullet

10  ended up in her right arm.

11  Q.    Were you able to recover the bullet?

12  A.    Yes.

13         **MR. SAFEEULLAH:**  Your Honor, may I approach this

14  witness?

15         **THE COURT:**  You may.

16  **BY MR. SAFEEULLAH:**

17  Q.    I'm passing up what's previously been marked as

18  United States Exhibit 21.  Can you look at this exhibit?

19  A.    Yes.

20  Q.    What is that exhibit in front of you?

21  A.    So this envelope right here was the envelope that I

22  put the bullet from her right arm in, and it was sealed with

23  evidence tape, and I signed it.

24         **MR. SAFEEULLAH:**  Your Honor, at this point, I'd

25  move to admit into evidence United States Exhibit 21 and

1  request permission to publish it to the jury.

2        **THE COURT:**  All right.  Absent objection,

3  Government Exhibit 21 will be admitted and it may be

4  published.

5        (Government Exhibit 21 was marked and admitted

6  into evidence.)

7        **MR. SAFEEULLAH:**  Can we also pull up

8  United States Exhibit 355.

9  **BY MR. SAFEEULLAH:**

10  Q.    Can you tell us what we're looking at in this

11  photograph?

12  A.    So that dark, kind of linear area, that's a scrape, an

13  abrasion that's dried and dark now.  And that red and blue

14  area around it is a bruise.  And underneath that bruise was

15  where the bullet was located in her right arm.

16  Q.    Now, you mentioned that this bullet passed through her

17  body and ended up in this shoulder.  Can you tell us the

18  effect of the bullet passing through her body, how that

19  would have affected her?

20  A.    Well, it went through her left rib 5 on the side when

21  it entered the chest.  It injured both the lower and upper

22  lobes of the left lung.  It went through the pericardium,

23  which is the fibrous sac that surrounds the heart.  It went

24  through the left atrium of the heart which is the top

25  chamber on the left side of the heart.  It went through the

1    upper lobe of the right lung, so the top of the right lung,

2    and then went through -- out of the chest between the third

3    and fourth ribs and broke the third rib on the right before

4    it stopped in the arm.

5         She bled significantly from her lungs and her heart

6    being entered.  She had 1,180 milliliters of blood in the

7    right side of her chest, so over a liter of blood that

8    surrounded her heart, made it hard for her lungs to expand

9    with all that fluid there.

10        She had 500 milliliters, so half a liter of blood,

11   around her left lung on the left side of her chest; and then

12   she had a little bit of blood, 45 milliliters, in the

13   pericardial sac around the heart.

14        She also was breathing after she was shot because she

15   has blood in her lungs, like in her airways, where she has

16   aspirated that blood, breathing after she was shot.

17   Q.   How were you able to determine how much blood was in

18   these different organs of her body?

19   A.   So when we open up the ribs on the front, we will

20   actually scoop out the blood and measure it in a container

21   to see how much blood is there.  And this is a significant

22   amount of blood, probably about a third of her blood volume

23   that's no longer in her arteries and veins.  It's kind of in

24   her chest cavity.

25   Q.   Did the bullet take a horizontal path from one arm

1  across her body to the other arm?

2  A.    It did go left to right and a little bit upward.

3  Q.    So by "going upward," it took a -- I guess an upward

4  trajectory from one arm to the other shoulder?

5  A.    Yes.

6  Q.    And does that give you any indication of how the

7  shooter was shooting at her?

8  A.    No.  Because there are a lot of possibilities

9  depending on the positioning of her body and where the

10  shooter is.  But we do know that the bullet entered on the

11  left and ended up on the right, but I can't say anything

12  about where the shooter is.

13  Q.    The bullet that you collected from her shoulder, what

14  happened to that bullet when you finished examining Liliana

15  Rodriguez?

16  A.    So we clean it off.  We take a picture of it.  And

17  then I seal it in an envelope with a label that has her name

18  and her specific case number on it, and then I will actually

19  initial and date the evidence seal.  And then it can be

20  transferred to law enforcement, and they can take it to a

21  crime lab to be further analyzed.

22  Q.    Dr. Carney, in your expert opinion, what was Liliana

23  Rodriguez's cause of death?

24  A.    Her cause of death is gunshot wound of the left arm.

25  Q.    And of the left arm is where it penetrated her body?

1    A.    Yes, continuing into the chest.

2    Q.    I want to change focus now to another autopsy that you

3    performed and another autopsy report that you wrote.

4          Can you look at United States Exhibit 554?

5    A.    Okay.

6    Q.    Have you reviewed that report?

7    A.    Yes.

8    Q.    What is that report?

9    A.    This is my autopsy report on Mr. Ammerli Garcia-Munoz.

10   Q.    How do you know that?

11   A.    I recognize this document.

12          **MR. SAFEEULLAH:**  Your Honor, I'd move to admit

13   into evidence United States Exhibit 554, and I request

14   permission to publish it to the jury.

15          **THE COURT:**  All right.  Absent objection, 554

16   will be admitted and may be published.

17          (Government Exhibit 554 was marked and admitted

18   into evidence.)

19   **BY MR. SAFEEULLAH:**

20   Q.    Dr. Carney, you previously testified about how bodies

21   arrive at your office.  Did Mr. Garcia-Munoz come from the

22   scene or did he come from the hospital?

23   A.    He came from the hospital.

24   Q.    And based on your experience, what does this mean,

25   again?

1    A.    Usually, it's when lifesaving measures have been

2    initiated.  And in this case, there were some that were

3    initiated.  And then he was transported, I believe for

4    safety reasons in this case, for the emergency medical

5    services personnel.

6    Q.    Otherwise they would have examined him where he was

7    first encountered?

8    A.    Yes.

9    Q.    And do you know where that was?

10   A.    I don't see that listed right here.  I do -- it did

11   say that he was in a parking lot in a vehicle.

12   Q.    And for safety reasons, they had to move him out of

13   the parking lot to the hospital?

14   A.    The scene itself became unsafe, according to what we

15   were told.

16   Q.    When did his body arrive at your facility?

17   A.    His body arrived at our facility, I believe it was, on

18   the 20th -- oh, no -- 21st of May.

19   Q.    And was he stored in the same fashion that you told us

20   about earlier today?

21   A.    Yes.

22   Q.    And that would have been in a cooler that's

23   approximately 40 degrees?

24   A.    Yes.

25   Q.    And when did you perform your examination of him?

1    A.    I performed my examination of him on May 22nd.

2    Q.    Can you look at United States Exhibit 555.

3    A.    Yes.

4    Q.    What is that exhibit?

5    A.    This is the photograph of the outside of the bag in

6    which he was transported.  It has his name and his unique

7    case number.

8    Q.    And how do you know that?

9    A.    This is one that I recognize from my photos.

10            MR. SAFEEULLAH:  Your Honor, at this point I move

11   to admit into evidence United States Exhibit 555 and request

12   permission to publish it to the jury.

13            THE COURT:  All right.  Absent objection,

14   Government Exhibit 555 will be admitted and may be

15   published.

16            (Government Exhibit 555 was marked and admitted

17   into evidence.)

18   BY MR. SAFEEULLAH:

19   Q.    Is this the photograph that you were just talking to

20   us about?

21   A.    Yes.

22   Q.    And what is distinctive about this photograph in

23   relation to Mr. Ammerli Garcia-Munoz?

24   A.    So this, like I said, has his name and his unique

25   medical examiner case number specific for him.

1    Q.    Did you begin this autopsy the way that you told us

2    that you normally do autopsies where you examine the

3    external portion of the body?

4    A.    Yes.

5    Q.    And what did you observe when you examined the

6    external body of Mr. Garcia-Munoz?

7    A.    Mr. Garcia-Munoz had multiple gunshot wounds of his

8    body.

9    Q.    And where were the gunshot wounds centralized to?

10   A.    There were quite a number on his torso.

11   Q.    Were these entrance wounds or exit wounds?

12   A.    A little bit of both.  More entrance than exit.

13   Q.    Based on the numerous wounds that you saw, did you

14   find it prudent to conduct an x-ray?

15   A.    Yes.

16   Q.    And why did you do that, again?

17   A.    With numerous entrance wounds that did not have

18   corresponding number of exit wounds, I expected there were

19   projectiles still in his body.

20   Q.    Can you look at United States Exhibit 566.

21   A.    Yes.

22   Q.    What are you looking at in that photograph?

23   A.    I'm looking at the full body x-ray of

24   Mr. Garcia-Munoz.

25   Q.    How do you know it's the full body x-ray of

1   Mr. Garcia-Munoz?

2   A.      This is one that I recognize from my office.

3           **MR. SAFEEULLAH:**  Your Honor, I move to admit into

4   evidence United States Exhibit 566, and I request permission

5   to publish it to the jury.

6           **THE COURT:**  All right.  Absent objection,

7   Government Exhibit 566 will be admitted and may be

8   published.

9           (Government Exhibit 566 was marked and admitted

10  into evidence.)

11          **MR. SAFEEULLAH:**  If we could pull up

12  United States Exhibit 566.

13  **BY MR. SAFEEULLAH:**

14  Q.      Is this the x-ray that you were just talking to us

15  about?

16  A.      Yes, sir.

17  Q.      And if we zoom in on the head and upper torso, can you

18  explain to us what we're looking at?

19  A.      Yes.  So you can see his bones, his skeletal elements

20  there.  All of those bright white areas, those are bullets

21  or jacket or bullet and jacket fragments.

22  Q.      And where do you see the bright white objects that are

23  bullet or jacket fragments in this photograph?

24  A.      He has one with some fragments in his head.  He has

25  one in his right shoulder.  He has -- it's actually a jacket

1  fragment up there in the kind of the top of his chest.

2  There's a bullet that's actually in his spine down below

3  that.  There's bullet and jacket pieces along the left side

4  of his torso, both higher up where you can tell the soft

5  tissue is a little disrupted, and then also down lower.

6       And there's two that are on the right side of his

7  abdomen in this photograph, and then there's also some

8  bullet fragments that are down a little closer, like in his

9  pelvis.

10  Q.    When we look at the head, am I correct, I believe that

11  you said there was only one bullet in the head?

12  A.    Yes.  So it's a bullet, and then all the little pieces

13  are just little fragments that have broken off.

14  Q.    Can you tell from this x-ray whether the bullet is in

15  the brain or whether it's in the skull?

16  A.    No.

17  Q.    So what was your next step, if you can't tell from

18  this x-ray exactly where the bullet is?

19  A.    It looks like it's just under the skull, but the best

20  way to -- really to know for certain and also to be able to

21  recover it is to perform an autopsy, because we do actually

22  incise the scalp and reflect it and then cut into the skull

23  and remove that so that we can look at the brain and look

24  for bleeding and for bullets.

25  Q.    Now, you mentioned that there were multiple entrance

1  and exit wounds to Mr. Garcia-Munoz.  How many entrance

2  wounds did you find?

3  A.    I believe there were 11.

4  Q.    How many exit wounds did you find?

5  A.    I think I only had four that were exits.

6  Q.    Okay.  So if there are 11 entrance and 4 exit wounds,

7  then that means there are 7 projectiles or fragments that

8  may have been left inside of Mr. Garcia-Munoz?

9  A.    Yes.

10          MR. SAFEEULLAH:  Can we turn to the diagram that

11  is in United States Exhibit 554.  And if you could -- we can

12  blow this up.

13  **BY MR. SAFEEULLAH:**

14  Q.    Can you tell us what we're looking at in this

15  photograph?

16  A.    So this is my documentation of where his entrance and

17  exit wounds are located.  And I tried to approximate the

18  shape and size of those.

19  Q.    And what was the first gunshot wound that you noted in

20  your report?

21  A.    So I don't know in which order these gunshots actually

22  occurred, but the way I organized my report is I start at

23  the head and work my way down towards the feet.  So the

24  first one that I list in my report is actually the one to

25  the back of his head, on the left side of the head.

1  Q.    And were you able to determine whether the one to the
2  back of the head was an entrance wound or an exit wound?
3  A.    Yes.  It was an entrance wound.
4  Q.    And how were you able to determine that it was an
5  entrance wound?
6  A.    So the way the bullet -- this actually broke through
7  the skull, and the skull has a very characteristic
8  appearance when it's an entrance versus an exit wound.  So
9  when I examined the skull, I could tell that that was an
10 entrance wound.  And there's actually still a bullet
11 retained in his head as a result of this entrance wound.
12 Q.    When the bullet traveled through the back of his
13 skull, what did it impact in his head?
14 A.    So it fractured through the occipital bone at the back
15 of the skull.  It went through the back of the brain, both
16 the left and right side, so the left and right occipital
17 lobes; that's what we call that part of the brain at the
18 book.  And then it also went through the right parietal lobe
19 which is just in front of the back of the brain.  And then
20 it broke through that fibrous covering that stuck to the
21 skull; it's called the dura mater.  But then the bullet
22 stopped, and that's where I found it.
23 Q.    Where are the occipital lobes?  Am I saying that
24 right?
25 A.    Occipital lobes, yes.

1    Q.     What are they?

2    A.     So that's where you process what your eyes see, so

3    that's very important for your vision.

4    Q.     And what effect would a bullet damage to the occipital

5    lobe have on a person?

6    A.     Well, it's going to disrupt his vision.  The problem

7    is, when a bullet enters the body, it tends to carry a lot

8    of energy with it.  And that path, even though there's a

9    straight path from the bullet, it tends to expand and then

10   contract.  So when that happens, it can cause some issue

11   with consciousness.  You know, he might have lost

12   consciousness as a result of this bullet to the head.

13        He also had bleeding on his brain.  It's listed in my

14   report as subarachnoid hemorrhage, so it's bleeding

15   underneath that clear covering of the brain where he was

16   shot.  And it fractured his skull, of course, where the

17   bullet entered.

18   Q.     Would this gunshot have been fatal?

19   A.     Yes.

20   Q.     And why is that?

21   A.     Well, like I mentioned, because of the kind of the

22   ballistic trauma where it expands and then contracts, it can

23   cause additional trauma to the brain, so not just to your

24   vision, but also may cause you to lose consciousness.

25        And if he lived long enough, the brain responds to

1    injury by bleeding and swelling.  And unfortunately, within

2    the fixed nature of the skull, there's really nowhere for

3    the brain to go when it swells or for that blood to push on

4    except to push down and out through the top of the skull

5    down to the spinal cord.  And the base of the brain where

6    you really control your heartbeat and your breathing, once

7    that gets pressed on, over time, it causes death.

8              **MR. SAFEEULLAH:**  Your Honor, may I approach this

9    witness?

10             **THE COURT:**  You may.

11   **BY MR. SAFEEULLAH:**

12   Q.    Dr. Carney, did you recover the bullet from

13   Mr. Garcia-Munoz's head?

14   A.    I did.

15   Q.    Can you look at United States Exhibit 53?

16   A.    Yes.

17   Q.    What is that exhibit?

18   A.    So this is the bullet that I recovered from his head,

19   and here's the packaging from where it came from my office.

20             **MR. SAFEEULLAH:**  Your Honor, I move to admit into

21   evidence United States Exhibit 53, and I request permission

22   to publish it to the jury.

23             **THE COURT:**  Absent objection, Government

24   Exhibit 53 will be admitted and may be published.

25             (Government Exhibit 53 was marked and admitted

1  into evidence.)

2  BY MR. SAFEEULLAH:

3  Q.    In addition to this injury to his head, did you

4  observe any other significant injuries to Mr. Garcia-Munoz?

5  A.    Yes.  There were a number of other gunshot wounds.

6  Q.    And were these entrance and exit wounds?

7  A.    Yes.

8        MR. SAFEEULLAH:  If we could pull up Dr. Carney's

9  report, go to page 2 and paragraph 1C.

10 BY MR. SAFEEULLAH:

11 Q.    With one of the gunshot wounds -- I think you had

12 documented it as 1C -- what did that bullet or bullet

13 fragment impact?

14 A.    So that bullet entered the axilla, which is a medical

15 term for the armpit, and went into the chest again.  It hit

16 left rib 4.  It hit the left lung as well as the primary

17 airway that comes into the left lungs of the left bronchus,

18 and the left pulmonary artery which is the primary artery

19 that supplies blood to the left lung.

20        It also injured the aorta, which is the largest artery

21 in the body that comes out of the heart to supply oxygenated

22 blood to the rest of the body, and it injured the left side

23 of the spine.  So I mentioned here the -- I think that

24 the -- yeah, the spine, so the thoracic spine.

25        And in this case, I did recover a bullet from the

1    spine, and there was 520 milliliters of blood in the left

2    chest cavity, so a little over half a liter of blood around

3    his lung.

4         He also had bleeding and bruising of his spinal cord

5    where the bullet impacted the spine.  And like in

6    Ms. Rodriguez's case, there is, again, aspiration of blood

7    from where the lung has been injured and he's breathing

8    blood into his lung as he survives for at least some short

9    period of time after being shot.

10   Q.   Can we look at 1D and you explain to us what you

11   observed when you examined this gunshot wound.

12   A.   All right.  In D, we are looking at a gunshot wound on

13   the left side of the torso.  So that's just kind of a

14   general term for the chest and abdomen.  This one enters

15   through the left ribs 4 and 5.  It went through the

16   pericardium, again, that fibrous sac surrounding the heart;

17   injured the heart and, again, the aorta, so the heart itself

18   which is pumping blood to the body and aorta, that large

19   artery.

20        And in this case, there's, again, the bleeding into

21   the left chest cavity that we've talked about, a little over

22   half a liter.  And then there's coagulated blood in that

23   pericardial sac around the heart.

24   Q.   Would the hemorrhaging or the loss of blood associated

25   with this gunshot wound have been fatal?

1   A.   This isn't a large amount of blood given the estimated

2   blood volume for an adult male.   But we've also already

3   talked about the injury to his head which may have caused

4   him to die before he could bleed much more into his chest.

5   Q.   So the gunshot wound to the head basically stopped him

6   from breathing in more blood from these other gunshot

7   wounds?

8   A.   Yes.

9   Q.   Were you able to collect any foreign objects from his

10  body?

11  A.   Yes.

12  Q.   I'm passing up what's previously been marked as

13  United States Exhibits 42 through 52.   Can you look at these

14  exhibits?

15  A.   Yes.   (Witness complies.)

16  Q.   Have you looked at those exhibits?

17  A.   Yes.

18  Q.   What are they?

19  A.   Most of these are bullets, bullet and jacket fragments

20  from his body, and there's one metal fragment that was

21  recovered from the side of his body.   It's not clear to me

22  if that's truly a bullet fragment or if it's a fragment of

23  metal that was forced into his skin as a result of being

24  shot through something.

25  Q.   And how do you know these exhibits are bullet

```
 1    fragments and also that piece of metal that you just

 2    described?

 3    A.    They all show the labels from my office with his name,

 4    his unique case number, and then the description that I gave

 5    it before it left my office.

 6              MR. SAFEEULLAH:  Your Honor, I move to admit into

 7    evidence United States Exhibits 42 through 52 and request

 8    permission to publish them to the jury.

 9              THE COURT:  All right.  Absent objection,

10    Government Exhibits 42 through 52 will be admitted and may

11    be published.

12              (Government Exhibits 42 through 52 were marked

13    and admitted into evidence.)

14    BY MR. SAFEEULLAH:

15    Q.    If we could go back to your report and look at what

16    you labeled 1E, can you explain to us what we are -- or what

17    you found when you examined that gunshot wound?

18    A.    All right.  So this is a gunshot wound.  It's also on

19    the left side of the torso.  This one, it's an entrance

20    wound, and it had a number of abrasions or scrapes as well

21    as ecchymosis, or bruises, and puncture wounds around it

22    along with some metal fragments that were lodged in his

23    skin, which is where one of those pieces of evidence came

24    from.

25              The bullet entered through the left side of the torso
```

1  through just that skin and soft tissue and went through to

2  the back, but it did not enter the chest or abdominal

3  cavity.  So there's an exit wound on the back, but there

4  were also bullet and jacket fragments along the wound path

5  that I recovered.

6  Q.    What would an injury like this have on someone?

7  A.    This is going to bleed, it's going to hurt.  But it

8  didn't injure any vital organs.

9  Q.    Can we look at what you've marked as 1F in your

10  report.

11  A.    Yes.

12  Q.    Can you tell us what this gunshot wound injured in

13  Mr. Garcia-Munoz?

14  A.    All right.  So this one is on the left side of the

15  chest right here.  So this one entered his skin and soft

16  tissue, and it stops at his sternum, so it really doesn't go

17  very far.  The wound itself was only about an inch and a

18  quarter inch from the midline, and it stopped there at the

19  sternum.

20  Q.    Were you able to collect a bullet fragment or bullet

21  from this injury?

22  A.    There were no bullet or jacket fragments along this

23  very short wound path, so it's possible that may have fallen

24  out in the process of moving for CPR, because they're

25  pressing on the chest trying to potentially save him there.

1    Q.    Can we look at what you've marked in your exhibit as

2    1G.

3    A.    Yes.

4    Q.    Can you tell us what injuries are associated with this

5    gunshot wound?

6    A.    So 1G is on the left side of the chest.  It's a little

7    lower down than the one we just talked about.  This one

8    enters and damages the stomach or injures the stomach, the

9    pancreas, the right adrenal gland, the right side of the

10   diaphragm, and the bullet ends up in the right side of his

11   back.

12          So as a result of this one, the stomach contents are

13   spilling into the abdominal cavity.  There's a little bit of

14   bleeding in the abdominal cavity, and there's also bleeding

15   in the -- kind of along his back where the kidneys and the

16   adrenal glands sit, and the pancreas.  And it fractured a

17   rib on the right side, right rib 11.

18   Q.    Did you determine whether there was an exit wound

19   associated with this projectile that caused this wound?

20   A.    There was not an exit wound because the bullet was

21   still in his body.

22   Q.    And did you collect that fragment or bullet?

23   A.    Yes, sir.

24   Q.    And was that one of the exhibits that you previously

25   looked at on the stand today?

1  A.    Yes.

2  Q.    What effect would this gunshot have had on someone?

3  A.    Well, this is going to cause bleeding, like I said,

4  into his abdomen and along his back.  And his stomach

5  contents are spilling out into his abdominal cavity, so had

6  he survived, that would have put him at risk for an

7  infection.

8  Q.    Can we look at what you've marked as 1H in your

9  report.

10  A.    Yes.

11  Q.    And you tell us what injury this would have caused to

12  Mr. Garcia-Munoz.

13  A.    So this is an entrance wound on the right side of the

14  chest.  This one enters through right ribs 5 and 6, so

15  fractures both of those.  Injures his right lung, his

16  diaphragm, his liver, ribs 6 and 7 along the side, and then

17  it exits through the right side of the back.

18  Q.    And were you able to collect the projectile from this

19  gunshot wound?

20  A.    No.  There was no projectile with this one because it

21  exited the body.

22  Q.    And how much blood did he lose based on this injury?

23  A.    Well, this one, there was only 380 milliliters of

24  blood in the right chest cavity, so less than half a liter.

25  There were numerous lacerations of the liver and also of the

```
1    diaphragm, so the liver was coming up into the right side of
2    the chest.  There was a little bit of bleeding in the
3    abdomen.
4         And with the exit wound, it is possible that there was
5    additional bleeding at the scene, but there's not -- it
6    wasn't retained in his body.
7    Q.   Would this have been a fatal wound or fatal gunshot?
8    A.   Yes, this could be fatal.
9    Q.   Can we look at what you've marked in your report as
10   1I.
11   A.   Yes.
12   Q.   Can you explain this to us?
13   A.   So this one is on the left side of the abdomen or
14   belly.  This one, the bullet entered, and it injured the
15   omentum which is that fatty soft tissue that covers and
16   protects your intestines.  It actually basically grazed the
17   large intestine.  It didn't puncture through it so that
18   stool came out, but it just kind of grazed the intestine.
19   And then it went out the right side of the torso.  Or
20   actually -- I'm sorry -- it went through the soft tissue but
21   it stopped there, so I actually found a bullet in the right
22   side of the torso.
23   Q.   And was that one of the exhibits that you looked at
24   here in court today?
25   A.   Yes.
```

1  Q.    And what effect would this have had on someone?

2  A.    This could cause bleeding, and it would be painful.

3  Q.    Can we look at what you've marked in your report as

4  1J.

5  A.    Yes.

6  Q.    Can you explain to us what happened with this gunshot

7  wound.

8  A.    So J is, again, on the right side of the abdomen.

9  It's down a little lower.  This is one that we kind of

10  mentioned earlier where there are scrapes or abrasions

11  around it as well as puncture wounds, and likely due to the

12  fact that this bullet traveled through something before it

13  hit him because the two wounds connect, but I can't tell

14  which one is the entrance and which one is the exit.

15  There's two wounds, and they just go through the skin and

16  soft tissue.  They don't enter the abdominal cavity.

17  Q.    And you were not able to recover any bullet fragments

18  from this gunshot wound?

19  A.    No, I was not.

20  Q.    Can we go back to Diagram 1 in your report.

21        MR. SAFEEULLAH:  And if we could blow that up.

22  BY MR. SAFEEULLAH:

23  Q.    Where are the majority of the injuries on

24  Mr. Garcia-Munoz?

25  A.    So most of the entrances are along the left side of

```
 1   his torso along the front.  He does have the one to the back
 2   of the head, one to the back of the neck, and the right arm.
 3   But most of the rest of them are on the left side of his
 4   torso.
 5   Q.    And based on the path of these wounds, were you able
 6   to tell like which direction the person firing the firearm
 7   was or which path the bullet took?
 8   A.    The -- most of the bullets go left to right.
 9   Q.    And they go from the front to the back of his body?
10   A.    Yes.  With the exception of the one to the back of the
11   head and the back of the neck, everything goes front to
12   back.
13   Q.    So there are really only two entrance wounds on the
14   back, and that's the one to the back of the head and to the
15   back of the neck?
16   A.    Yes.
17   Q.    In addition to the wounds that you observed on Liliana
18   Rodriguez and also on Mr. Garcia-Munoz, did you also examine
19   their other vital organs to determine their cause of death?
20   A.    Yes.
21   Q.    And based on your examinations of both of them, what
22   was your conclusion as to their manner of death?
23   A.    So their manner of death is homicide.
24   Q.    And homicide by what?
25   A.    So homicide is a classification of death.  On a
```

1  Tennessee Death Certificate, there are six possibilities.

2  There's homicide, suicide, accident, natural, could not be

3  determined, and pending investigation.  But the pending

4  investigation is really just until you have more information

5  or toxicology results, whatever we're waiting on to get it

6  into one of those top five manners.

7       Homicide means that the person died at the hands of

8  someone else, so someone else fired the gun that caused

9  their deaths, not themselves.

10       **MR. SAFEEULLAH:**  If you could give me one moment,

11 Your Honor.

12       **THE COURT:**  Yes, sir.

13       (Respite.)

14 **BY MR. SAFEEULLAH:**

15 Q.   And what was the cause of death for Mr. Garcia-Munoz?

16 A.    Mr. Garcia-Munoz's cause of death is multiple gunshot

17 wounds.

18       **MR. SAFEEULLAH:**  I don't have any additional

19 questions at this time, Your Honor.

20       **THE COURT:**  All right.  Thank you,

21 Mr. Safeeullah.

22       Mr. Ganguli?

23       **MR. GANGULI:**  No questions, Your Honor.

24       **THE COURT:**  Thank you.  Ms. Hood-Schneider,

25 Mr. Lucas?

          MR. LUCAS:  No questions, Your Honor.

          THE COURT:  All right.  Thank you.  And
Mr. Bloom?

          MR. BLOOM:  No questions, Your Honor.

          THE COURT:  All right.  Dr. Carney, thank you.
You may step down.

          (The witness stepped down.)

          THE COURT:  All right.  Mr. Safeeullah?

          MR. SAFEEULLAH:  The United States calls Khalid
Mozeb.

          And I'm cognizant of the time, Your Honor.

          THE COURT:  Yes, sir.  We'll get a start, we'll
go 15 minutes-ish, something like that.  Maybe 20, max.

          MR. SAFEEULLAH:  Thank you.

          (The witness was sworn.)

                         *    *    *

                      <u>KHALID MOZEB</u>,

**was called as a witness, and after having been first duly**

**sworn, testified as follows:**

                      **DIRECT EXAMINATION**

**QUESTIONS BY MR. SAFEEULLAH:**

Q.    Good afternoon.  Can you please state and spell your
last name for the record.

A.    Khalid Mozeb.

Q.    And if you could, pull that microphone a little bit

1    closer to you.

2    A.    Khalid Mozeb.

3    Q.    Thank you.  Where do you work?

4    A.    Antioch Market.

5    Q.    And where is that located?

6    A.    929 Richard Road, Antioch.

7    Q.    And what is your role at that market?

8    A.    Owner.

9    Q.    And what types of goods do you sell at that market?

10   A.    Fruit, vegetables.

11   Q.    How long have you owned or operated that market?

12   A.    I think since 2012 maybe.

13   Q.    Would you have owned and operated that market on

14   May 27th, 2017?

15   A.    Yes.

16   Q.    In one of the binders in front of you, there are some

17   exhibits.  Can you look for the one that has 1239 in it.

18             THE COURT:  If you want to pick that one up,

19   carry it over, and find 1239.  It's kind of heavy.  Thank

20   you.

21             THE WITNESS:  You're welcome.

22   BY MR. SAFEEULLAH:

23   Q.    Are you able to see 1239?

24   A.    1239, I see.

25   Q.    What is that photograph?

```
1   A.    That is -- there is a red sign here next to our store.

2   Q.    Your market is in that photograph?

3   A.    Yes.

4             MR. SAFEEULLAH:  Your Honor, I move to admit

5   United States Exhibit 1239 into evidence and request

6   permission to publish it to the jury.

7             THE COURT:  One question.  Would you describe

8   that as a -- is it a map basically?  Is that what that is?

9             THE WITNESS:  This is a map, yes.

10            THE COURT:  Overhead map?  Kind of overhead view?

11            THE WITNESS:  Yes.  That's for the area, yeah.

12            THE COURT:  Yeah.  Okay.

13            All right.  Any objection?  All right.  Without

14  objection, Government Exhibit 1239 is admitted and may be

15  published.

16            (Government Exhibit 1239 was marked and admitted

17  into evidence.)

18  BY MR. SAFEEULLAH:

19  Q.    Can you show us where your store is on this map?

20  A.    What am I doing, now?

21  Q.    Can you tell us where your store is on that map, tell

22  us orally?  Without pointing, just tell us so we can see on

23  the map.

24  A.    Oh, 929 Richard Road right on the corner here.

25  Richard Road and Cummings Park Drive right on the corner.
```

```
1    Q.     Would it be where that blue circle is that has the --

2    A.     Where the cart, shopping cart.

3    Q.     Can you look in that booklet at United States

4    Exhibit 1243.  So I think if you flipped it . . .

5    A.     Flip?

6    Q.     Yeah.

7    A.     1243.

8    Q.     What is that a photograph of?

9    A.     That's the store, my store.

10   Q.     How do you know that that's your store?

11   A.     It's clear it is my store.

12          MR. SAFEEULLAH:  Your Honor, I move to admit into

13   evidence United States Exhibit 1243.

14          THE COURT:  Without objection, Government

15   Exhibit 1243 will be admitted.

16          (Government Exhibit 1243 was marked and admitted

17   into evidence.)

18   BY MR. SAFEEULLAH:

19   Q.     This is your store?  Is this your store that's on the

20   screen now?

21   A.     Yes, sir.

22   Q.     And does your store have an alarm or cameras?

23   A.     Yes.

24   Q.     Did it have cameras on May 27th, 2017?

25   A.     Yes.
```

```
1    Q.    How were the cameras recording?  What was it stored
2    to?
3    A.    It's recording outside/inside 24/7.
4    Q.    And how was it stored?
5    A.    What do you mean?
6    Q.    Like, once it captures on the camera, where does it go
7    back and store that information if you wanted to look at it
8    at a later date?
9    A.    That stay in there for around 30 days.
10   Q.    Okay.
11   A.    And it delete automatic.
12   Q.    And on May 27th, 2017, did your store have cameras
13   that were recording?
14   A.    Yes.
15   Q.    Have you looked at recordings from your store on that
16   date?
17   A.    No.
18   Q.    Before you came in here to court, did you look at
19   videos that had recordings from your store?
20   A.    Videos for other things, yes.  Sometimes I do if
21   something happen around.
22          MR. SAFEEULLAH:  May I approach this witness and
23   pass?
24          THE COURT:  You may.
25   ///
```

1    **BY MR. SAFEEULLAH:**

2    Q.    Prior to coming into court today, did you look at

3    those disks?

4    A.    Uh-huh.

5    Q.    Is that a "yes"?

6    A.    One, two, three, four, yeah.

7              **THE COURT:**  What have you shown him?

8              **MR. SAFEEULLAH:**  United States Exhibit 568, 569,

9    570, and 571.

10             **THE COURT:**  Okay.

11             **THE WITNESS:**  I saw this today, but I don't look

12   in the store what happened over there.  I don't -- the

13   camera is over there.  I see everything in here when I come

14   in here.

15   **BY MR. SAFEEULLAH:**

16   Q.    And when you looked at the disks when you came here,

17   what's on those disks?

18   A.    The pictures inside and outside the store.

19   Q.    Are they pictures or are they videos?

20   A.    It was videos, yeah.  I'm sorry.

21   Q.    And how do you know those are videos from your store?

22   A.    It's clear.  I been watching them three times here.

23   I've been here three times watching those videos.

24             **MR. SAFEEULLAH:**  Your Honor, I move to admit into

25   evidence United States Exhibit 568, 569, 570, 571, and

1    request permission to publish them to the jury.

2              **THE COURT:** Were these recordings that you saw on

3    these disks, to your understanding, were these from the date

4    that Mr. Safeeullah has been talking to you about?

5              **THE WITNESS:** The date?

6              **THE COURT:** Yeah. Are they from a particular

7    date? Do you know?

8              **THE WITNESS:** I saw the date on the videos, but

9    I'm not sure. I mean, if that -- for that date, for the

10   dates before, I don't know.

11             **THE COURT:** Okay.

12             **THE WITNESS:** But it's shown on the videos.

13             **THE COURT:** All right. Yeah, you don't happen to

14   know the date, but these are from your store at some point?

15             **THE WITNESS:** It is from my store. Sure about

16   this.

17             **THE COURT:** Okay. All right. Any objection to

18   the admission of 568, 569, 570 and 571?

19             **MR. LUCAS:** Your Honor, can we approach?

20             **THE COURT:** You may. Thank you.

21             (WHEREUPON, a bench conference was had out of the

22   hearing of the jury, as follows:)

23             **MR. LUCAS:** We just want to make sure we object

24   to the fact that he can't remember the date. He doesn't

25   know when those videos were taken.

1          THE COURT:  You know, and I asked him about that.

2    I wanted to clarify for the record what it was just to, you

3    know, if nothing else, to satisfy myself that they're of

4    something relevant.  And I think they've been authenticated

5    by him as what they purport to be, video footage.  The only

6    issue was, to me, I was just trying to get the relevance of

7    them before going willy-nilly to admit them.

8          Have you seen -- Mr. Lucas, have you seen the

9    videos?

10          MR. LUCAS:  I have seen the videos, but what I

11   will tell you is, is that to his point, the date -- the

12   dates are on there, they're date-stamped, but my thing is is

13   that he can't tell you, he just -- he can't tell you if

14   that's from the day that the incident -- he can't tell you

15   that that date stamp is correct.  He's saying that he

16   doesn't know.

17          And all I'm saying is that we want to make sure

18   we put on -- you know, have on the record that we object

19   since he can't -- to your point, he can't really -- the

20   relevance of it is in doubt if he can't really say when it

21   occurred or when that taped.

22          THE COURT:  If one was to look, Mr. Safeeullah,

23   at what's on the videos, would it reflect events that could

24   easily be shown to be relevant?

25          MR. SAFEEULLAH:  Yes.

1          THE COURT:  You know what I mean?

2          MR. SAFEEULLAH:  Yes.

3          THE COURT:  Uh-huh.  Well, what was your thought?

4    Were you going to play them?  Were you just going to have

5    him authenticate these --

6          MR. SAFEEULLAH:  Yes.

7          THE COURT:  -- and then allow him to leave for

8    the day?  You could play them at any time if he was to

9    authenticate them.

10          Is there any additional information you think you

11   could provide that could help you show the relevance of

12   these?

13          MR. SAFEEULLAH:  Well, he said that they were

14   from his store, and I think there is something else I could

15   ask him to show the relevance of --

16          (Reporter clarification.)

17          MR. SAFEEULLAH:  -- the relevance of why they're

18   important in this case.  But I think he authenticated them

19   by saying that they were from his store, he watched the

20   video, and he knows that they were from his score.

21          THE COURT:  From his store.  Do they have a date

22   stamp on them?

23          MR. SAFEEULLAH:  I believe they do.

24          THE COURT:  Okay.  Do you think they have a date

25   stamp on there?

```
1          MR. LUCAS:  I think so, Your Honor.  I can't
2     remember; it's been a minute.  But I think they do.
3          THE COURT:  Here's what I think.  Particularly if
4     they have a date stamp, then they probably -- if it shows
5     May 27th and their events on there, if there's not a dispute
6     about that, then it probably meets the standard of
7     admissibility.  I just didn't want to be too casual about
8     it.
9          Now, of course, I'm relying on the representation
10    that there are events that would be, you know --
11         MR. SAFEEULLAH:  Relevance.
12         THE COURT:  -- of significance.  There's a date
13    stamp.  If there is sort of an issue otherwise about
14    authenticity, then we probably give anyone a few minutes
15    here before he leaves.  And we can play it tomorrow, right?
16    There's no reason --
17         MR. SAFEEULLAH:  That he has to be here?  That's
18    correct.
19         THE COURT:  Yeah.  Okay.
20         MR. SAFEEULLAH:  Once you get it in --
21         THE COURT:  Yeah, if there's anything else you
22    want to ask about that.  Okay.  Thank you.
23         (WHEREUPON, the bench conference concluded, and
24    the following took place within the presence and hearing of
25    the jury:)
```

1    BY MR. SAFEEULLAH:

2    Q.    The disks contain videos; is that correct?  The disks

3    that are in front of you, do they contain videos?

4    A.    The videos, yes.

5    Q.    And are those videos from things inside of your store?

6    A.    (Nodding head affirmatively.)

7    Q.    Is that a "yes"?

8    A.    Yes.

9    Q.    And do they depict an altercation inside of your

10   store?

11   A.    A what, again?

12   Q.    An altercation from inside of your store?

13   A.    Like . . .

14   Q.    Like a verbal altercation inside of your store?  An

15   argument inside of your store?

16   A.    In the disks?

17   Q.    Yes.

18   A.    No, I don't see that.

19   Q.    Were you present there that day when these videos were

20   taken?

21   A.    I don't remember what happened.

22   Q.    Were you --

23   A.    I was there, yes.

24   Q.    So my question was were you there.

25   A.    I was there, yes.

```
1    Q.    And you see yourself in those videos, correct?
2    A.    Yes.
3    Q.    And based on what happened while you were there, did a
4    man that was working or standing there walk outside of that
5    store?
6    A.    Repeat that.
7    Q.    Based on what happened inside of your store, did
8    somebody who was inside of your store, an older gentleman,
9    walk outside of the store?
10   A.    Okay.  Yes.
11   Q.    And was there some kind of altercation or conversation
12   between two gentlemen that caused an older man to walk
13   outside?
14   A.    They told me that, but I don't hear that myself.
15            MR. GANGULI:  Objection, Your Honor, as to
16   hearsay.
17            THE COURT:  I don't know that there was asked for
18   or elicited an out-of-court statement offered for the truth
19   of the matter asserted, so I'll overrule the objection.
20            Let me ask you -- I'm going to jump in for a
21   second and ask this, Mr. Mozeb.  Do you know whether there
22   are date stamps on these videos?
23            THE WITNESS:  Hmm?
24            THE COURT:  Are there date stamps on these
25   videos?
```

```
 1              THE WITNESS:  Again?
 2              THE COURT:  Date stamps.  You see a date on the
 3    videos?
 4              THE WITNESS:  Yeah.  There was in the video.
 5              THE COURT:  Okay.  All right.
 6              You may continue, Mr. Safeeullah.
 7          MR. SAFEEULLAH:  Your Honor, I'd ask that these
 8    videos be admitted and -- as United States Exhibit 568, 569,
 9    570, and 571.
10              THE COURT:  All right.  Any objection?
11          MR. LUCAS:  Your Honor, we'll make the same
12    objection as before.
13              THE COURT:  All right.  Let me do this.  I'm
14    going to admit the videos as meeting the base-level standard
15    for authenticity, but when Mr. Safeeullah is done here, if
16    you want to take a couple of minutes, you can certainly
17    cross about that, Mr. Lucas.
18              (Government Exhibits 568 through 571 were marked
19    and admitted into evidence.)
20              THE COURT:  Anything further from you,
21    Mr. Safeeullah?
22          MR. SAFEEULLAH:  No, Your Honor.
23              THE COURT:  All right.
24              Mr. Lucas, you may proceed.
25          MR. SAFEEULLAH:  Well, no, I thought you meant on
```

1    that issue.  I do have something else, yes.

2              THE COURT:  Oh, on that issue.  Yeah, something

3    else you need to ask?  Yes.

4              MR. SAFEEULLAH:  Can we pull up

5    United States Exhibit 570.

6              (Playing video.)

7    BY MR. SAFEEULLAH:

8    Q.    Who is the person in this video?

9    A.    That's me.

10   Q.    The person that just walked wearing a white T-shirt,

11   what color shoes does he have on?

12   A.    What color -- white shirt.

13   Q.    What color shoes does he have on?

14   A.    Shoes?  Oh, they're black.

15   Q.    What color hat does he have on?

16   A.    Blue.

17   Q.    Is there a yellow emblem on that hat?

18   A.    Yellow, yes.

19   Q.    Does that male who you're giving that item have

20   tattoos on his right arm?

21   A.    Had shoes -- hand?

22   Q.    Does he have tattoos on his right arm?

23   A.    Yes.

24   Q.    Do you remember what the man in front of you is

25   talking about now?

```
 1    A.    No.
 2                  MR. SAFEEULLAH:  Can we pull up
 3    United States Exhibit 568.
 4                  (Playing video.)
 5    BY MR. SAFEEULLAH:
 6    Q.    Is this a recording from your store?
 7    A.    Yes.
 8                  MR. SAFEEULLAH:  Can we pause the video.
 9    BY MR. SAFEEULLAH:
10    Q.    Mr. Mozeb, do you try to keep the date and timestamps
11    on videos accurate or inaccurate in your recordings?
12    A.    Like . . .
13    Q.    The date and time that is on this recording, when you
14    records things at your business, do you try to keep them
15    accurate or inaccurate?
16    A.    I don't get the question clear.
17    Q.    Okay.  I'll withdraw the question.
18                  MR. SAFEEULLAH:  Can we press Play, please.
19                  (Playing video.)
20                  THE WITNESS:  It is the right time.
21    BY MR. SAFEEULLAH:
22    Q.    It is the right time?
23    A.    Yeah.
24    Q.    Did you just see that altercation or confrontation
25    that just happened in your store?
```

```
1    A.    No.   That old man tell me something, you know, like --
2    Q.    Don't tell us what the old man told you.
3              MR. SAFEEULLAH:   Can we stop this video and pull
4    up United States Exhibit 571.
5              (Playing video.)
6    BY MR. SAFEEULLAH:
7    Q.    Is this another video from your store?
8    A.    Yes.
9    Q.    Can you see that pickup truck in this video?
10   A.    Yes.
11   Q.    Can you see the driver in the pickup truck?
12   A.    Yes.
13   Q.    Can you see the driver of the passenger -- of the
14   other car there?
15   A.    Yeah, the driver.
16   Q.    Do you see a four-door pickup truck in the camera now?
17   A.    Yes.
18             MR. SAFEEULLAH:   Your Honor, I have one last
19   video.   I'll try to be under 2 minutes.
20             THE COURT:   All right.   Thank you.
21             MR. SAFEEULLAH:   Can we pull up
22   United States Exhibit 569.
23             (Playing video.)
24   BY MR. SAFEEULLAH:
25   Q.    Where is this a camera from your store?
```

```
1    A.    Outside the store.

2    Q.    Is this the back of the store?

3    A.    Not the back, side to the store.

4    Q.    Is this the direction that that Ford pickup truck

5    would have driven in in the previous video that we just

6    walked?

7    A.    It looked like.  It's not colored in there.  But yes,

8    almost is it.  I'm not sure.

9    Q.    And what's the date stamp on this video?

10   A.    The date?

11   Q.    That's on this video.

12   A.    05/27/17.

13             MR. SAFEEULLAH:  I don't have any additional

14   questions for this witness at this time, Your Honor.

15             THE COURT:  All right.  Mr. Lucas, do you have

16   anything?

17             MR. LUCAS:  I don't have anything, Your Honor.

18             THE COURT:  All right.  Thank you.  Mr. Ganguli?

19             MR. GANGULI:  No questions, Your Honor.

20             THE COURT:  Mr. Bloom?

21             MR. BLOOM:  No, Your Honor.

22             THE COURT:  All right.  Thank you, counsel.

23             Mr. Mozeb, you may step down.  Thank you.

24             THE WITNESS:  You're welcome.

25             THE COURT:  And you are free to leave.  Thank you
```

1    for coming.

2                    **THE WITNESS:**  You're welcome.

3                    (The witness stepped down.)

4           **MR. SAFEEULLAH:**  Your Honor, there was one last

5    thing I think that Mr. Mozeb, I think in my haste, I failed

6    to ask him about and get exhibits in, and I'm not sure

7    whether I would be allowed to at this point.

8                    **THE COURT:**  Do you have something else to ask him

9    about?

10          **MR. SAFEEULLAH:**  Yeah.  I mean, they're just

11   screenshots from the recording that we just watched.

12   They're in the booklet in front of him, that was in front of

13   him up on the stand, if he could look through those.

14   They're Exhibits 570 through 595.

15                   **THE COURT:**  570 is one of the videos, right?

16                   **MR. SAFEEULLAH:**  Yes.  572 through 595.

17                   **THE COURT:**  All right.  Any objection to

18   re-calling Mr. Mozeb briefly for this purpose?

19                   **MR. SAFEEULLAH:**  Or stipulate to their admission.

20                   **THE COURT:**  Will counsel stipulate to the

21   admission of the screenshots?

22                   **MR. GANGULI:**  No objections to him being

23   re-called to the witness stand, Your Honor.

24                   **THE COURT:**  Okay.  All right.

25                   **MR. BLOOM:**  No objection, Your Honor.

```
 1              MR. LUCAS:  Your Honor, we don't have any

 2    objection to him being called as a witness back to the stand

 3    as long as we can have some cross if necessary.

 4              THE COURT:  Okay.  All right.  Let's try and do

 5    this briefly.  And obviously the Court would like the jurors

 6    to go home but doesn't want Mr. Mozeb to have to come back

 7    unnecessarily, so we'll try and do this promptly.

 8              THE WITNESS:  No problem.

 9              (Mr. Mozeb returned to the witness stand.)

10    BY MR. SAFEEULLAH:

11    Q.    Mr. Mozeb, can you look at the booklet if front of you

12    that has 570 in it -- I mean that has 572, 573, 574?  Can

13    you start with 572 and flip through 593?

14    A.    Okay.  (Witness complies.)

15    Q.    Have you looked through 572 all the way to 593?

16    A.    Okay.  This is 72 through 93.

17    Q.    Have you looked from starting at 572 all the way, all

18    the ones up to 593?

19    A.    All these?  You mean that had I watched the videos?

20    Q.    No.  I'm asking you can you look at those photographs

21    in the booklet in front of you.  I'm not asking you to --

22    A.    I think --

23    Q.    Mr. Mozeb --

24    A.    I look at them now.  (Witness complies.)

25    Q.    Have you looked through those photographs?
```

```
1    A.    Yes.

2    Q.    What are depicted in those photographs?

3    A.    Same thing what I see before.

4    Q.    And what is that?

5    A.    Pictures around the store inside and outside.

6    Q.    And did those pictures come from the surveillance

7    system inside of your store and outside of your store?

8    A.    Yes.

9              MR. SAFEEULLAH:  Your Honor, the United States

10   moves to admit into evidence 572 through 593.  I think 573

11   has already been admitted into evidence with Cindy

12   Hernandez.

13             THE COURT:  All right.  Any objection?

14             MR. GANGULI:  No, Your Honor.

15             MR. LUCAS:  No, Your Honor.

16             THE COURT:  And Mr. Bloom?  No?  Okay.

17             Absent objection, 572 through 593 will be

18   admitted.

19             (Government Exhibits 572, 574 through 593 were

20   marked and admitted into evidence.)

21             THE COURT:  All right.  Anything further,

22   Mr. Safeeullah?

23             MR. SAFEEULLAH:  No, Your Honor.

24             THE COURT:  All right.  Any cross-examination?

25             MR. GANGULI:  No, Your Honor.
```

```
 1              MR. LUCAS:  Your Honor, I just have a quick
 2   question.
 3              THE COURT:  Okay.
 4                       CROSS-EXAMINATION
 5   QUESTIONS BY MR. LUCAS:
 6   Q.    Good afternoon.  I'll try to keep this really quick.
 7         You've watched the video, you've looked at these
 8   stills.  When -- when the individual who left the store last
 9   leaves and you see him get into the car as a passenger, do
10   you recall that when that car leaves your parking lot, it
11   turns to the left?  Is that correct?
12   A.    What I see in the video now, I'm not sure if it's the
13   same car or different car, the one go to the left.  But that
14   car, I don't know if it go right or left, the first one, the
15   small car.
16   Q.    The small car.
17         The actual truck actually turns and goes to the right,
18   though -- comes from the right, correct?
19   A.    It come -- I don't know where it come from, but it go
20   to the right when they finish.
21   Q.    All right.  Thank you.
22   A.    You're welcome.
23              THE COURT:  All right.  Thank you.  You may step
24   down, sir, and you're free to leave.
25              (The witness stepped down.)
```

1          **THE COURT:**  All right, folks.  We certainly have

2    kept you longer than anticipated.  Appreciate your continued

3    attention and service.  I think we ended up imposing on your

4    schedule a bit, although with the best of intentions to get

5    our small business owner back to his store in the morning

6    rather than bringing him back downtown.  So we appreciate

7    your continued patience to make that happen.

8          We will recommence 9:00 a.m. tomorrow.  Thanks

9    again, and please, as always, no discussing the case, no

10   researching or investigating the case.  Thanks very much.

11         (WHEREUPON, the jury was excused from the

12   courtroom at 5:16 p.m., with matters being heard in open

13   court as follows:)

14         **THE COURT:**  All right.  Thanks.  Please be

15   seated.  I did want to make some remarks about that sort of

16   admissibility issue of the recordings.  You know, there are

17   a couple of things there.  There was authentication as to

18   date, and I was satisfied, based on the government's sort of

19   representation which was not in dispute that the cameras

20   were from -- videos were from May 27th.  And the witness

21   subsequently confirmed that he said it was the right time.

22         But I did raise the issue because prior to their

23   offering, I had no idea kind of at all what was on there,

24   what it might show, and so I raised the issue.

25         I do think that, you know, if someone in

1  retrospect wants to claim there is an issue of relevance,
2  I'm happy to consider a motion to strike on that basis, so I
3  want to be clear.

4          But I wanted to just kind of raise the issue of
5  relevance on the front end because this was an unusual
6  situation where the discussion with the witness didn't kind
7  of give any indication of sort of what might be reflected on
8  the recording.

9          And I think under different circumstances, had
10 there been an issue in response to what was at the bench
11 conference, you know, be no problem with the Court just
12 taking a couple of minutes itself to review what was on
13 there.  But the timing wasn't good for doing that, and I
14 thought we had the -- thought we had what we needed to make
15 the admission based on relevance.

16         But if someone wants to raise the issue of
17 relevance later, if they, for some reason, think this isn't
18 connected to anything relevant, they're free to raise that
19 issue.  And if this is not relevant, then -- you know, then
20 it's going to be no issue for the jury to disregard it
21 anyway because there's nothing relevant that they would have
22 taken it for in any event, and disregarding the evidence
23 would be easy anyway.

24         So I just sort of point that out.  And the
25 main -- the main point there is, you know, it's helpful to

1  get a sense for what might be reflected on camera in

2  advance.

3          And I do realize that in this particular issue,

4  that Mr. Mozeb appears, you know, a successful businessman,

5  appeared to be a very -- you know, perfectly very much

6  with-it individual.  There appeared to be perhaps some

7  communication issues that I think maybe hindered the

8  identification of what was going on, on the tapes.  So the

9  long and the short of it, if someone wants to raise an issue

10 of relevance at some point, they are free to do so.

11         All right.  Anything else we need to take up

12 before we break for the evening and then reconvene for jury

13 instructions discussion at 8:30?  Mr. Safeeullah?

14         **MR. SAFEEULLAH:**  No, Your Honor.

15         **THE COURT:**  Thank you.  Counsel for defendant,

16 anything?  No?  Doesn't look like it.

17         All right.  We'll see counsel at 8:30.  Thank

18 you.

19         (WHEREUPON, the foregoing proceedings were

20 adjourned for the day at 5:20 p.m., to be resumed April 19,

21 2023, at 8:30 a.m.)

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3          I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6          That I reported on the Stenograph machine the

7    proceedings held in open court on April 18, 2023, in the

8    matter of *UNITED STATES OF AMERICA vs. JORGE FLORES, ET AL.*,

9    Case No. 3:18-cr-00293; that said proceedings in connection

10   with the hearing were reduced to typewritten form by me; and

11   that the foregoing transcript (Trial Volume 9 of 18, pages 1

12   through 284) is a true and accurate record of said

13   proceedings.

14          This the <u>24th</u> day of <u>July</u>, 2023.

15

16                              /s/ Deborah K. Watson
                                _____
                                DEBORAH K. WATSON, RPR, CRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25