```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF TENNESSEE
 2                        NASHVILLE DIVISION

 3
    UNITED STATES OF AMERICA          )
 4                                    )
                                      )
 5       v.                           ) 3:18-cr-00293
                                      ) JUDGE RICHARDSON
 6                                    )
    JORGE FLORES, ET AL.              )
 7                                    )
                                      )
 8    -----------------------------------------------------------

 9

10

11

12
        BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE
13

14
                       TRANSCRIPT OF PROCEEDINGS
15
                        TRIAL VOLUME 16 of 18
16

17
                           April 28, 2023
18

19

20

21

22    -----------------------------------------------------------

23    DEBORAH K. WATSON, RPR, CRR
      Official Court Reporter
24    713 Church Street, Suite 2300
      Nashville, TN 37203
25    debbie_watson@tnmd.uscourts.gov
```

```
 1   APPEARANCES:

 2

 3   For the Government:

 4              AHMED A. SAFEEULLAH
              BROOKE C. FARZAD
 5              U. S. Attorney's Office
              Middle District of Tennessee
 6              719 Church Street, Suite 3300
              Nashville, TN 37203
 7              (615) 736-5151
              Email: ahmed.safeeullah@usdoj.gov
 8              Email: brooke.farzad@usdoj.gov

 9              MATTHEW KEVIN HOFF
              Department of Justice
10              Organized Crime and Racketeering Sect
              1301 New York Avenue, 7th Floor
11              Washington, DC 20005
              (202) 598-8093
12              Email: matthew.hoff2@usdoj.gov

13

14   For the Defendant, Jorge Flores:

15              VAKESSHA HOOD-SCHNEIDER
              236 Public Square, Suite 103
16              Franklin, TN 37064
              (615) 791-1819
17              Email: vhslaw1@gmail.com

18              LEONARD E. LUCAS, III
              The Law Firm of Leonard Earl Lucas
19              315 Deaderick Street, Suite 1550
              Nashville, TN 37238
20              (301) 204-6498
              Email: leonard.lucas@lellawfirm.com

21

22

23

24

25
```

```
1    APPEARANCES   (Continued):

2


3    For the Defendant, Jose Pineda-Caceres:

4              THOMAS F. BLOOM
               911 Marengo Lane
5              Nashville, TN 37204
               (615) 260-5952
6              Email: tfbloom1@comcast.net

7              GEORGE TRAVIS HAWKINS
               Hawkins Law Firm, PLLC
8              735 Broad Street, Suite 305
               Chattanooga, TN 37402
9              (615) 599-1010
               Email: travis@travishawkins.com
10

11

     For the Defendant, Kevin Tidwell:
12
               JUNI S. GANGULI
13             Ganguli Law Firm
               202 Adams Avenue
14             Memphis, TN 38103
               (901) 544-9339
15             Email: j.ganguli@gmail.com

16             MATTHEW C. GULOTTA
               The Gulotta Firm, PLLC
17             202 Adams Avenue
               Memphis, TN 38103
18             (901) 213-6648
               Email: matt@gulottalaw.net
19

20

21

22

23

24

25
```

1                 **I N D E X**

2                                  **Page**

3

**JURY CHARGE CONFERENCE (Continued)**        **6**

4

5   **DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL**    **29**

6

   **CLOSING ARGUMENTS**

7

   **By Mr. Safeeullah**                    **38**

8

   **By Mr. Ganguli**                      **84**

9

   **By Ms. Hood-Schneider**           **96**

10

   **By Mr. Hawkins**                   **116**

11

   **By Mr. Hoff**                       **130**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        *   *   *

2              The above-styled cause came on to be heard at

3    8:39 a.m. on April 28, 2023, before the Honorable Eli J.

4    Richardson, District Judge, when the following proceedings

5    were had, to-wit:

6

7              THE COURT:  All right.  We're here for, I

8    believe, Day 16 in the trial of *United States v. Flores*.

9    We're going to start by talking about jury instructions, and

10   then we'll proceed to see where counsel might be on defense

11   case in chief.

12              Looks like all counsel are present.

13              I think I'm constrained to make an announcement

14   here.  The last case I tried in federal court, the judge

15   was -- felt compelled to note that a federal courtroom is

16   not a movie theater; therefore, we don't have things like

17   soft drinks and coffee and popcorn and all that.  We do do

18   water.  We do that because people need to speak, and water

19   helps in that regard, but we're not going to have -- run

20   this place like there's a concession stand outside, so

21   please keep that in mind.  That applies to me as well as

22   everyone else.

23              All right.  Any preliminary matters that might be

24   appropriate before talking about jury instructions?

25              MR. SAFEEULLAH:  Not from the United States.

1          THE COURT:  No?

2          Looks like nothing from the defendants.  Okay.

3     All right.

4          I'm going to ask this broadly first, starting

5     with the government.  Any major concerns with the draft that

6     the Court distributed for a proposal for discussion purposes

7     yesterday?

8          MR. HOFF:  No, Your Honor.  There are no major

9     issues.  There were two jury instructions.  Well, one,

10    Your Honor asked us to kind of -- it was the flight and

11    concealment.

12         THE COURT:  Yeah.

13         MR. HOFF:  And I did draft -- we did draft a

14    version, sent it to defense counsel.  I think, but I don't

15    want to speak for them, that there was sort of -- and I have

16    a typo in there.  But there was some agreement as to this

17    proposed language, and I can pass that up to the Court.

18         THE COURT:  Sure.

19         MR. HOFF:  And then the only other thing, Your

20    Honor, and we talked about this a little bit, but the

21    opinion and fact testimony, I think just reading the

22    commentary of that, of that particular jury instruction, I

23    think it makes sense to just -- to not, I guess, use the

24    term experts, but sort of -- I guess we kind of proposed

25    some language to generally say it and list the people that

1    were the opinion witnesses.  And I did propose that language

2    up there as well.

3          But other than that, the United States is fine

4    with the rest of the instructions.  And I believe, Your

5    Honor, if I'm correct, that the Court did keep in the

6    criminal liability under Tennessee law.

7          **THE COURT:**  Criminal responsibility?

8          **MR. HOFF:**  Criminal responsibility.

9          **THE COURT:**  Yeah, for the murder section.  Yeah.

10         **MR. HOFF:**  Thank you.

11         **THE COURT:**  Yeah, we did keep it in.  Took it out

12   the other places, but your comments the other day I think

13   were spot on as to its relevance on VICAR murder and VICAR

14   attempted murder.

15         You know, I think your -- regarding the thoughts

16   about the adding in the testimony -- adding in a reference

17   to the particular people who testified, I think that's -- I

18   think that is preferable, and I think it's, if anything,

19   fairer to the defendants than sort of the default to the

20   notion of expert.  Counsel probably picked up on that.

21         But what I did was combine it for very specific

22   reasons.  I mentioned yesterday that, right or wrong, I'm

23   very intentional about it.  And I thought when you stack

24   those two things on top of each other, it creates confusion.

25   In particular, my concern is that every witness that did

testify to an opinion, whether an expert opinion or a lay

opinion, did testify to some things we call facts.

And that includes, let's say, government

cooperator that might have said something that could be

considered a lay opinion.  It also applies to any expert

because experts, in addition to getting around to the

opinion that they're allowed to offer under Rule 702, they

talk about facts all the time.  Yeah, we received the body

at, you know, September 27th at 8:00 a.m., and that's a

fact.

So I thought the way of combining it the way I

did is probably more accurate, and it sounds like with the

changes suggested by the government, the government is fine

with that notion.

All right.  So I'm going to go defendant by

defendant on this as well, but I did want to note that

before we do that, let's touch on a few things.  I want to

talk about defense theory which for now is blank.

You know, to me -- and I don't think, unless we

missed it somehow, I've received defense theories.  To me,

I'm not sure that that's a great thing for a jury

instruction anyway, but it seems to be allowable and the

custom.  And the reason is, you know, the defense theory is

set forth in much more detail by defense counsel during

their closing arguments than anything the Court could

1   summarize in a jury instruction.  Therefore, I'm not sure

2   it's even a great idea to have something, but I'm happy to

3   consider anything.

4           The next thing I wanted to note is we will need

5   to talk separately about the verdict form, so we'll get to

6   that.

7           Next thing I wanted to ask:  Redacted version of

8   the indictment, where are the parties on that?  Mr. Hoff?

9           **MR. HOFF:**  We redacted a version yesterday, Your

10  Honor, and sent it to defense counsel yesterday afternoon

11  or, I guess, yesterday evening.  I don't -- we've heard back

12  from, I think, two out of three counsel.  And there were a

13  couple of additional redactions that we needed to make.

14  There were counts that were dismissed prior to trial that

15  needed to be redacted.

16          So that's, I think, where we're at.  I think

17  we're close.

18          **THE COURT:**  Okay.  My section about the

19  indictment, do counsel want me to just make a quick

20  reference to, you know, an edit there to saying, "You'll

21  notice that parts of the indictment that you'll receive are

22  redacted, don't give it any thought, the redacted material

23  is irrelevant, and you shouldn't even speculate as to what

24  it would say"?  I'm inclined to do that.

25          Does that make sense to you, Mr. Hoff?

1          **MR. HOFF:**  I think that makes sense, Your Honor.

2          **THE COURT:**  Okay.  All right.  When I turn to

3     defense counsel, if you disagree with that, let me know, and

4     we can talk about it.  I think that that's appropriate;

5     otherwise, they're going to wonder what's going on.  I'm

6     confident that, you know, we just tell them, well, what's

7     the deal with the redactions, that they will have no trouble

8     following that instruction not to speculate.

9          The next thing, of course, to note is, we will

10    make the choice as appropriate regarding the instruction for

11    defendant testifying, defendant not testifying, or both.

12    One or both of those will need to stay in there.  And we'll

13    make that decision, of course.

14         The next thing I wanted to ask was:  On summaries

15    not admitted into evidence, we right now have bracketed

16    language, and it's really, you just gotta kind of -- summary

17    is not admitted into evidence.  Let's see if I can direct

18    you to the right page.  It's going to be towards the end.

19    Page 138.

20         Here's the choice:  "During trial, you have seen

21    counsel use -- bracket -- summaries, charts, drawings,

22    calculations, or similar material which were offered to

23    assist in the presentation and understanding of the

24    evidence."

25         You know, I don't know -- have we had any of that

1    yet?  I suppose during the -- during, I mean, closings, I'm

2    assuming we'll have something like that.  Do we have

3    anything that qualifies for opening, from opening in that

4    regard?

5              **MR. HOFF:**  I don't think so.

6              **THE COURT:**  Yeah, I don't think so.  Okay.  So

7    considering, Mr. Hoff, your knowledge of what the

8    government's going to present at evidence, what do you think

9    the right word or words would be?

10             **MR. HOFF:**  Is that -- I mean, Your Honor, do you

11   think this refers to sort of like a PowerPoint that would be

12   used in closing?

13             **THE COURT:**  Yeah, like -- and I suppose one --

14   well, you ask a good question because one thing is, look,

15   since nothing like this was presented during the actual

16   presentation of evidence, maybe we can just strike it, you

17   know.  Otherwise, if we want to take this as applying to

18   closings, then if a PowerPoint is to be used, we could sort

19   of describe that.  But it may be best just to strike it

20   because the jurors are already going to be told that, hey,

21   listen, you know, closing arguments aren't itself evidence,

22   but I'm amenable either way.

23             What do you think, Mr. Hoff?  Would you strike

24   it?

25             **MR. HOFF:**  I think we strike it, Your Honor.

1          THE COURT:  Okay.  All right.  If counsel

2     disagree, please put that on your list to raise; otherwise,

3     I'm inclined to strike it.

4          MR. HAWKINS:  I don't disagree, Your Honor.  But

5     in my closing, I have a sort of a depiction of a hole, a

6     black hole from space.  And I just -- you know, I want to

7     let everybody know that up front, because I don't want --

8     it's -- obviously, it's a depiction.  And, you know, I don't

9     know if that's the kind of thing that this instruction would

10    address.

11         THE COURT:  It seems to me like with respect to a

12    demonstrative like that or, you know, a PowerPoint by the

13    government or defense counsel, I think it will be clear,

14    hey, these are just aids to help explain counsel's view of

15    something and is not evidence.  So appreciate the heads-up

16    about what that demonstrative would be.

17         And if other defense counsel are not opposed to

18    striking this, then I'm inclined to do that since there was

19    nothing like this that was presented during trial that could

20    be confused with -- you know, during trial presentation of

21    evidence that could be confused with evidence.

22         The next thing counsel will note is -- and

23    ordinarily, you don't necessarily see this included in

24    written instructions.  I've gotten to the point where -- and

25    this is the first time I've done it -- drafted sort of

standard language which is tweaked a little bit here for the specifics of the case about what we are doing with the evidence.  We're doing particular things with the evidence, we're -- and I set that forth in the instructions that I include at the very end of what I provided.

And it's become increasingly clear to me that, you know, the written instructions as well as sort of what's stated off the cuff orally about how to operate the machinery in the jury room are appropriate.

Because one thing that I will note -- and I can't speak to other judges' practices:  To me, like, having an IT person go in there in the middle of deliberations, you know, to show them?  No way.  And I'm not at all sure that that's the other judges' view.  There is no way any external person is going to go in the middle of a jury deliberation room as long as I'm the judge over the case.

So that's what that is about.  And I think that that will accomplish our objectives, to sort of let them know what to expect in terms of evidence.

And in terms of what needs to remain out on the front end, I'd welcome the -- you know, I'd welcome sort of any thoughts about that.  I do think maybe -- for example, sending back the firearms but not the ammunition.  I don't like to put those together.  Start out by sending back the firearms but not the ammunition.

1          Another thing is, if I understand correctly, for

2   example, the tattoo kit may have some needles that may or

3   may not be clean.  Maybe we don't send that back.

4          So I'm happy to have a discussion about that, but

5   I think the main point is, whether we send something back or

6   not, the instruction makes clear that the jurors can get it

7   if they just want to ask for it.

8          All right.  The exhibit list.  Let me ask you

9   this, Mr. Hoff.  It seems to me that in terms of, you know,

10  paper copies, all the binders are going to go back, and the

11  exhibit list is at the front page of the first binder?  The

12  exhibit list?  Okay.

13         So on the exhibit list, it sounds like

14  Ms. Jackson is talking about tweaking a little bit to

15  reflect, you know, the difference between what was on the

16  list on the front end and what went into evidence to the

17  extent there's daylight between the two of them.  I guess

18  the thing is just to -- you know, for Ms. Jackson to square

19  away with the attorneys the exhibit list and that it's

20  appropriate to go back.

21         Any concerns about that, let me know.

22         The final thing to note is that if we talk about,

23  you know, the list, I refer to the list of government

24  exhibits.  I don't say anything about a defense exhibit

25  list.  I'm not going to require one.  Right now, at least,

1 │ there are only two defense exhibits, and I think the jurors

2 │ would have seen that.  I think they realize that, you know,

3 │ we don't need a list for the defendants the way you do for

4 │ the government.

5 │          But if the defendants, based on what's happened

6 │ already or what happens in the future, you know, want their

7 │ own list to go back, let me know and we can accommodate

8 │ that.  But right now, there are only two defense exhibits,

9 │ so my initial thought is that that's not an issue.

10 │          All right.  So I'm going to start with

11 │ Mr. Ganguli.  Any thoughts about the proposed jury charge?

12 │          **MR. GANGULI:**  No, Your Honor.

13 │          **THE COURT:**  Thank you.  Ms. Hood-Schneider or

14 │ Mr. Lucas?

15 │          **MR. LUCAS:**  No, Your Honor.

16 │          **THE COURT:**  All right.  Thank you.  And Mr. Bloom

17 │ or Mr. Hawkins?

18 │          **MR. HAWKINS:**  Your Honor, on page 160, the

19 │ testimony -- I'm sorry.  Not that.

20 │          I'm sorry.  Page 159, testimony of a witness

21 │ under grant of immunity or reduced criminal liability.

22 │          **THE COURT:**  All right.  I think you may have old

23 │ pagination, but let me find --

24 │          **MR. HAWKINS:**  I'm sorry.

25 │          **THE COURT:**  No, that's all right.  Let me find it

1    here in the new -- I think the new page number is going to

2    be 130 in the redline version that I gave counsel.  Yes,

3    sir.

4              **MR. HAWKINS:**  Under that instruction, I feel like

5    the cooperators -- Mr. Baca, Mr. Hernandez, and the other

6    gentleman, Avila -- I'm wondering if they should be

7    mentioned in this.

8              **THE COURT:**  Well, my thought is that this is

9    specifically tailored to a non-prosecution agreement in

10   particular as opposed to other sort of forms of assistance

11   that may be provided or requested by the government.  And I

12   think there's another charge that's going to address that.

13             I will say that as that -- let me put it this

14   way:  As that particular instruction you're talking about is

15   written, it really is talking about a witness who has been

16   promised he will not be prosecuted for drug trafficking

17   offenses in exchange for his cooperation.  The way it's

18   written, it does apply only to the Hansy Sanchez.

19             Now, if you want -- if you don't think -- and

20   maybe you're right.  If you don't think that other

21   cooperators who have cooperating plea agreements are not

22   adequately covered by any of the instructions, I think it

23   would be appropriate to include something about that,

24   like -- along the lines that, you know, any witness who

25   testified for the government that has an agreement with the

1    government, you might want to look at that sort of testimony
2    with increased scrutiny.

3            So hold that thought for a moment.

4            Mr. Hoff, would you disagree that it might be
5    appropriate to have language that's specific -- not -- that
6    covers not just a non-prosecution agreement but, you know,
7    there are various ways to describe it, but cooperating plea
8    agreements?

9            **MR. HOFF:**  I think -- well, if you look at the
10   next page, Your Honor, it discusses testimony of an
11   accomplice.

12           **THE COURT:**  Yeah.  So that's probably what I had
13   in mind where I thought that it was the charge that I think
14   probably covers it.  But I suppose Mr. Hawkins's view was,
15   okay, but it doesn't refer to the fact that there is this
16   agreement with the government.  I think you probably here
17   had used the pattern instruction anyway; is that right?

18           **MR. HOFF:**  For the --

19           **THE COURT:**  For testimony of an accomplice?

20           **MR. HOFF:**  Yes, that's right.

21           **THE COURT:**  You know, if Mr. Hawkins was to draft
22   something today proposing tweaks to refer to the notion of
23   a -- you know, that, you know, some of these accomplices or
24   all of them may have agreements with the government, if that
25   notion gets in here, are you on principle setting aside the

1  specifics of this language, are you, on principle, opposed

2  to that?

3          **MR. HOFF:**  I'm not on principle opposed to it,

4  but obviously the language would be --

5          **THE COURT:**  You'd want to see what the language

6  says?

7          **MR. HOFF:**  Yes, we would want to see what the

8  language says before we put that in there.

9          **THE COURT:**  Why don't we do this, then,

10 Mr. Hawkins.  If you want to put pen to paper, you can just

11 scribble something together.  Don't need anything fancy in

12 terms of form for a proposal to tweak that charge that's at

13 page 131.  Let's see if we can't --

14         **MR. HAWKINS:**  Happy to.

15         **THE COURT:**  Yeah.  -- can't reach an agreement.

16 We can handle that later in the day, and I can turn that

17 around.

18         All right.  Anything else from Mr. Bloom, or

19 Mr. Hawkins?  No?

20         All right.  Mr. Hoff?

21         **MR. HOFF:**  Your Honor, the only other thing, and

22 I failed to raise this earlier, is page 36, the membership

23 in the conspiracies alleged, I believe this is the multiple

24 conspiracies instruction.

25         **THE COURT:**  Yeah.

1            **MR. HOFF:**  We had talked about this last -- or

2    whenever we last spoke about all this.  And we do mention

3    the RICO conspiracy and the drug conspiracy, but there are

4    the VICAR murder conspiracies that we don't mention in

5    there, so I'm not sure how --

6            **THE COURT:**  Yeah.  Yeah.

7            **MR. HOFF:**  I think we discussed potentially

8    saying --

9            **THE COURT:**  You're right.  I mean -- and I don't

10   mean to interrupt you.  Would it make sense to do what I've

11   done before, which is kind of repeat what I said about the

12   RICO conspiracy when I discussed the drug conspiracy?  I

13   could, you know, just spoon-feeding it to the jurors, repeat

14   the same thing and refer to the VICAR conspiracy.

15           **MR. HOFF:**  I think that makes sense, Your Honor.

16           **THE COURT:**  Okay.

17           **MR. HOFF:**  I think it makes sense to mention them

18   so that they're not like, well, what about these other

19   ones --

20           **THE COURT:**  Yeah, yeah.  And you did mention

21   that.  And ideally, I would have done that the first time to

22   add that language.

23           And, you know, and that's another reason why --

24   you know, that's a third kind of conspiracy where -- and I

25   think counsel don't appear to disagree.  It was important

1  not to sort of use the pattern instruction that talks about

2  the issue being whether there was more than one conspiracy

3  shown.  And I think that this is the way to describe the

4  applicable principle.

5          Gives the government -- you know, it's fair to

6  the government but gives defense counsel the ability to make

7  the argument they want, which is the government didn't prove

8  what they alleged as regards conspiracy.

9          All right.  So we'll make those changes.  You

10  know, my inclination and my hope is just to turn those

11  around over the noon hour.  You can get a revised draft to

12  counsel.

13          Now, the jurors -- in the meantime, we'll get a

14  check on the jurors.

15          You know, to me, the proposed verdict forms, we

16  had sort of some preliminary instructions.  Did anyone have

17  any revisions to that?  And I -- I'm going to have, just for

18  sure, some slight language tweaks, very slight, that are

19  just for the purpose of additional clarity to the jurors

20  that I'm confident will not be seen as any substantive

21  changes.  And we'll get that -- you know, we'll get a

22  revised version out.

23          I didn't tweak that, though, because I didn't --

24  I didn't tweak it yet and distribute it because I didn't

25  know if anyone else was going to propose any changes to that

| | |
|---|---|
| 1 | in light of really the only issues that I see are, you know, |
| 2 | everyone confident that this verdict form is consistent with |
| 3 | the requirements of unanimity. |
| 4 | Have any thoughts on that, Mr. Hoff? |
| 5 | **MR. HOFF:** Just what we had proposed before, Your |
| 6 | Honor -- but we haven't yet made those edits. We will |
| 7 | today -- but what we had discussed previously about the, I |
| 8 | think it's Count 15 and -- and the 924(c) that is attached |
| 9 | to that count. |
| 10 | **THE COURT:** Yeah. Count 16 where it's like there |
| 11 | should be an option of None -- I think that's something we |
| 12 | discussed -- if the government's view is that using and |
| 13 | carrying in connection with only one victim, attempted |
| 14 | murder victim, would suffice. |
| 15 | So, you know, that's something I'm confident |
| 16 | that, you know, we can turn this around Monday morning or |
| 17 | whatever, but I do think it would be helpful if you could |
| 18 | get us a proposal, and we'll turn it around as soon as we |
| 19 | can. |
| 20 | **MR. HOFF:** Hopefully do that today, Your Honor. |
| 21 | **THE COURT:** Yes, sir. All right. Thank you for |
| 22 | that. |
| 23 | The thing I wanted to mention like is -- the kind |
| 24 | of tweaks I'm talking about is to make it -- and our jurors |
| 25 | are -- I want to be very clear. I'm just using a term here. |

1   Our jurors, to say the least, are not idiots.  180 degrees

2   the contrary.  There are a couple of things that I'm going

3   to do to try and make the verdict form what is known as

4   idiot-proof.  And, for example, this is based on my

5   experience with verdict forms.

6           "If you find the defendant guilty of Count 1,

7   proceed to the questions below and answer all three."  I'm

8   going to add the language, "answer all three," little things

9   like that.  Otherwise, I don't have any changes that I'm

10  going to make pending a review of the proposal that the

11  government will send.  Hopefully, the government's proposal

12  will be an agreement with defense counsel, but if not,

13  we'll, you know, resolve any disputes.

14          All right.  I think the other thing is -- and I

15  think we talked about this where there are a couple of times

16  we saw the word "or."  Where do we come down on that?  Are

17  we keeping the word "or," in the government's view?

18          **MR. HOFF:**  Yes, Your Honor.

19          **THE COURT:**  Like page 1, "or," even though it's

20  charged as "and," --

21          **MR. HOFF:**  Yes.

22          **THE COURT:**  -- the jury could return a verdict

23  finding either/or.  And so you're saying we should leave the

24  word "or"?

25          **MR. HOFF:**  That's our belief, Your Honor.

|    |
|----|
| 1  |        **THE COURT:**  Yeah, okay.  All right.  So regarding |
| 2  | the verdict form, I'm going to ask defense counsel one by |
| 3  | one.  Any comments at this time?  Again, the time to make |
| 4  | any objections, you know, to preserve error is not here, but |
| 5  | any comments at this stage, Mr. Ganguli? |
| 6  |        **MR. GANGULI:**  No, Your Honor. |
| 7  |        **THE COURT:**  Thank you.  Ms. Hood-Schneider or |
| 8  | Mr. Lucas? |
| 9  |        **MR. LUCAS:**  No comments at this time. |
| 10 |        **THE COURT:**  All right.  Thank you.  And |
| 11 | Mr. Bloom, Mr. Hawkins? |
| 12 |        **MR. BLOOM:**  No, Your Honor. |
| 13 |        **THE COURT:**  All right.  Now, let's talk about, |
| 14 | first of all, closing arguments.  I want to call on the |
| 15 | right defense counsel.  Mr. Ganguli, will you be closing? |
| 16 |        **MR. GANGULI:**  Yes, sir. |
| 17 |        **THE COURT:**  Thank you.  Mr. Lucas or |
| 18 | Ms. Hood-Schneider, which of you will be closing? |
| 19 |        **MS. HOOD-SCHNEIDER:**  I will be closing. |
| 20 |        **THE COURT:**  All right.  Thank you.  And it will |
| 21 | be Mr. Hawkins? |
| 22 |        **MR. HAWKINS:**  Yes, sir. |
| 23 |        **THE COURT:**  All right.  Thank you for that. |
| 24 |        Regarding defense case in chief, where are we on |
| 25 | that?  Mr. Ganguli? |

1    **MR. GANGULI:**  Your Honor, we will rely on the
2  proof heretofore presented.

3         **THE COURT:**  And I remember you saying that the
4  other day, and it sounds like you're still there.  Thank
5  you.

6         All right.  Ms. Hood-Schneider?

7         **MS. HOOD-SCHNEIDER:**  We will not be presenting a
8  case in chief.

9         **THE COURT:**  All right.  And Mr. Bloom?

10         **MR. BLOOM:**  We will not be presenting anything.

11         **THE COURT:**  Mr. Bloom, I believe it was you that
12  presented the two defense evidence exhibits; is that right?
13  That was Mr. Flores?

14         **MR. BLOOM:**  Mr. Hawkins.

15         **THE COURT:**  Okay, yeah, your team.  But it was
16  Mr. Hawkins that used them on cross.  Yeah, I was pretty
17  confident it was on behalf of Mr. Pineda.

18         Do you want me to refer to the fact that you did
19  present these evidences as part of -- you know, to me that
20  counts as part of a case in chief, or I can just say
21  nothing.  Do you have a preference?  To the jury, I mean.

22         I'm inclined to say something like, "You saw two
23  defense exhibits being admitted, but otherwise, defendants
24  have, you know, have -- something like -- exercised their
25  right not to present any evidence and they have no burden to

1  do so."

2          MR. HAWKINS:  I think that's appropriate, Your

3  Honor.

4          THE COURT:  Does that work for you?

5          MR. HAWKINS:  Yes, sir.

6          THE COURT:  All right.  Okay.  So I'm going to do

7  that.  And I think technically, since we kind of, by mutual

8  agreement, went out of order with a couple of defense

9  exhibits going in, technically the government could have a

10  rebuttal case to those two exhibits within the scope of

11  those two exhibits.  My guess is that the government is not

12  going to do that.  Is that fair to say?

13          MR. HOFF:  That's fair to say, Your Honor.

14          THE COURT:  All right.  I figured.

15          So I'll tell them we're closing the evidence and

16  that we are going to proceed to closing arguments and that

17  Mr. Safeeullah will commence.  He gets to go last because

18  the government has the burden of proof.  Well, actually he

19  may not -- you're doing the opening closing, is that right,

20  Mr. Safeeullah?

21          MR. SAFEEULLAH:  I'm doing the initial closing,

22  and Mr. Hoff is doing the rebuttal.

23          THE COURT:  Okay.  Gotcha.  All right.  So

24  Mr. Safeeullah and then Mr. Hoff.  So I'll explain to them

25  that the government gets to go last because they have the

1  burden of proof.

2        And, Mr. Safeeullah, will you be prepared to

3  proceed after I make those introductory remarks to the

4  jurors?

5        **MR. SAFEEULLAH:**  Yes, Your Honor.  But we just

6  wanted to make sure that the defendants have been advised of

7  their rights to testify --

8        **THE COURT:**  Testify?  Yeah.

9        **MR. SAFEEULLAH:**  -- if they want to.  And I'm not

10  sure if any of the defense attorneys wanted to make a motion

11  under Rule 29.  But if they did not want to, we can have

12  them put that on the record as well.

13        **THE COURT:**  Yeah, yeah.  That's a good point.

14  Those are a couple of steps that are appropriate.

15        So the first thing, regarding the issue of

16  defendants not testifying, my -- I do think that I'm

17  inclined to conduct a colloquy first of defense counsel and

18  then with defendants, and then we'll talk about the motions

19  that Mr. Safeeullah referred to.

20        Mr. Ganguli, without getting into what you said

21  to your client, do you feel like you've adequately discussed

22  with Mr. Tidwell his right to testify or not testify?

23        **MR. GANGULI:**  I have, Your Honor.

24        **THE COURT:**  All right.  Thank you for that.

25        Ms. Hood-Schneider, same question?

1          **MS. HOOD-SCHNEIDER:**  I have, Your Honor.

2          **THE COURT:**  And Mr. Bloom?

3          **MR. BLOOM:**  Yes, we have, Your Honor.

4          **THE COURT:**  All right.  Thank you.  And, you

5    know, and based on counsel's representation, it's clear that

6    they have concluded that their client does not wish to

7    testify as is, of course, completely their right.

8          So I'm going to address these remarks to all

9    three defendants, and then we will just have a short Q&A

10   with each of them.

11         So Mr. Pineda, Mr. Flores, Mr. Tidwell, I suspect

12   that none of this is new to you.  You will have obviously

13   discussed this with your attorneys, but you do have the

14   right to testify or not testify, and this is your right and

15   it is your decision.

16         It's appropriate for you to make that decision

17   based on recommendations or advice of counsel, but you are

18   allowed to disagree with your counsel, and if they recommend

19   not testifying, you still could disagree and choose to

20   testify.  And by the same token, if you were advised to

21   testify, you would have the right not to testify and

22   disagree with your counsel.  So the decision is yours based

23   on a discussion with counsel.

24         If you do testify, of course, what you say may be

25   helpful to your defense, but it could be used against you as

```
1   evidence as well.  And I suspect you're very well-aware, of
2   course, that if you were to testify, the government would be
3   able to cross-examine you and you'd be subjected to
4   cross-examination.
5            So it is your right to testify or decline to
6   testify as you see fit.  So I will ask each of you, starting
7   with Mr. Pineda.
8            Mr. Pineda, have you been able to discuss to your
9   full satisfaction the decision whether to testify in your
10  defense?
11           MR. BLOOM:  Would you repeat the question, Your
12  Honor?
13           THE COURT:  The question being whether you have
14  been able to discuss with your attorneys, to your full
15  satisfaction, whether to testify in your defense?
16           DEFENDANT PINEDA-CACERES:  Yeah.
17           THE COURT:  Okay.  Have you been able to make a
18  decision whether to testify?
19           DEFENDANT PINEDA-CACERES:  Yeah.  I don't want to
20  testify.
21           THE COURT:  All right.  Any questions at all
22  about your rights to testify or not testify?
23           DEFENDANT PINEDA-CACERES:  (Shaking head
24  negatively.)
25           THE COURT:  All right.  Thank you.
```

1          Mr. Flores, I'll ask you the same questions.
2   Have you been able to discuss with Mr. Lucas and
3   Ms. Hood-Schneider to your full satisfaction the question of
4   whether to testify in your defense?
5          **DEFENDANT FLORES:**  Yes.
6          **THE COURT:**  Do you have any questions about your
7   rights to testify or not testify as you see fit?
8          **DEFENDANT FLORES:**  No.
9          **THE COURT:**  Okay.  Have you made a decision
10  whether to testify?
11         **DEFENDANT FLORES:**  I don't want to testify.
12         **THE COURT:**  All right.  Thank you.
13         All right.  Then Mr. Tidwell, have you been able
14  to discuss with Mr. Gulotta and Mr. Ganguli your rights to
15  testify or not testify?
16         **DEFENDANT TIDWELL:**  Yes.
17         **THE COURT:**  Any questions about your rights?
18         **DEFENDANT TIDWELL:**  No.
19         **THE COURT:**  Have you been able to make a decision
20  as to whether to testify?
21         **DEFENDANT TIDWELL:**  I don't want to testify.
22         **THE COURT:**  All right.  Thank you.
23         All right.  Let's talk about the next thing.  Do
24  we have a motion from any defendants at this time?
25         **MR. GANGULI:**  I do, Your Honor.  May I make an

1    oral motion for Judgment of Acquittal pursuant to Rule 29 of

2    the Federal Rules of Criminal Procedure.

3            Your Honor, pursuant to Rule 29 of the Federal

4    Rules of Criminal Procedure, we are respectfully asking for

5    a Judgment of Acquittal.  We believe that no rational trier

6    of fact could convict Mr. Tidwell of these offenses based on

7    the proof that the jury has seen.

8            I say that because the proof against Mr. Tidwell

9    is largely based on coconspirators who have made wildly

10   inconsistent statements who expect to receive benefits as a

11   result of their testimony.

12           Again, we believe that no rational trier of fact

13   could convict Mr. Tidwell based upon this proof, and we

14   respectfully ask the Court to grant our motion.

15           **THE COURT:**  All right.  Thank you, Mr. Ganguli.

16   Hold that thought.

17           Mr. Lucas or Ms. Hood-Schneider, do you have an

18   oral motion?

19           **MS. HOOD-SCHNEIDER:**  We do, Your Honor.

20           On behalf of Mr. Flores, we also make a motion

21   for a Judgment of Acquittal.  Our basis is that the evidence

22   in this case is insufficient to support a conviction on any

23   of these counts, particularly as it relates to the alleged

24   victim, Roberto Viera.  We've heard little evidence in

25   regards to the circumstances surrounding Mr. Viera's

1 shooting, so we respectfully ask the Court for a Judgment of

2 Acquittal.

3         **THE COURT:** All right. Thank you. And hold that

4 thought.

5         And Mr. Hawkins?

6         **MR. HAWKINS:** Your Honor, on behalf of

7 Mr. Pineda, we also move the Court, pursuant to Rule 29 of

8 the Federal Rules of Criminal Procedure, for a Judgment of

9 Acquittal based on an insufficiency of the evidence on all

10 counts.

11         **THE COURT:** All right.

12         **MR. HAWKINS:** Thank you.

13         **THE COURT:** Thank you, Mr. Hawkins.

14         First thing to note is that these motions were

15 oral only, and there's nothing wrong with that. They're

16 also very general, and there's nothing wrong with that

17 either. And, in fact, in certain circumstances, counsel is

18 wise to make a Rule 29 motion that is a general one so as

19 not to limit, potentially limit what they can argue later.

20         So each of these three oral motions is kind of

21 made on the same general basis about insufficiency of the

22 evidence.

23         Regarding that, the first thing to note is this:

24 If the Court was to conclude right now on any count, one or

25 more counts, that no rational trier of fact could find the

defendant guilty on one or more counts based on the law and
the evidence, the Court would not hesitate to take that
action.

The Court, though, at this time does not conclude
that that is an easy determination to make, such that it
should be made now.

The Court notes that the way Rule 29 works -- and
depending on the complexity of the case and the number of
counts and so forth, this may or may not be an appropriate
mechanism.  Here, the Court thinks it is an appropriate
mechanism.

Rule 29(b) entitled "Reserving Decision.  The
Court may reserve decision on the motion," -- that is, a
Rule 29 motion for Judgment of Acquittal" -- proceed with
the trial (where the motion is made before the close of all
the evidence)" -- and I think that what we have here is,
since the government has not rested in front of the jury,
that's exactly where we are, of course, a timely motion made
before the close of all the evidence by the defendants --
"submit the case to the jury, and decide the motion either
before the jury returns a verdict or after it returns a
verdict of guilty or is discharged without having returned a
verdict.  If the court reserves decision, it must decide the
motion on the basis of the evidence at the time the ruling
was reserved."

1      So the Court's going to do that.  And the way
2  this typically works is that the Court would invite the
3  Rule 29 movants; that is, each of the defendants, to submit
4  briefing on this.  And, you know, if there is a verdict of
5  guilty on one or more counts, we'll talk about the process
6  for that and how and when that will be done.
7      So the Court notes that the Rule 29 motion was
8  made timely and that the motion is preserved and will be
9  reserved as well.
10     All right.  So I think, Mr. Safeeullah, you
11  really had the right idea because I had it in my head we
12  would call them in, have a discussion, then maybe break
13  again.  But that really -- it really was not preferable.  So
14  we can just proceed sort of straight to closing if counsel
15  are ready for that.
16     Now, if they want to break now, we can do that
17  because we won't -- now we won't have to break again after
18  the jurors come back.
19     Do counsel want a short break before we call them
20  in?
21         **MR. SAFEEULLAH:**  Yes, Your Honor, so we can
22  probably use the bathroom and also set up our electronic
23  equipment.
24         **THE COURT:**  All right.  What about ten minutes?
25  Would that do the trick?

1     **MR. SAFEEULLAH:**  That works, Your Honor, for the

2  United States.

3          **THE COURT:**  All right.  We'll do it that way.

4          **MR. HOFF:**  And Your Honor, I just wanted to raise

5  one thing before we break, and I did speak with defense

6  counsel about this.  I just want to bring it up before we

7  forget.  But it is related to Juror No. 8, and I just wanted

8  to put that on the Court's radar so that we could discuss it

9  perhaps before they deliberate.

10         **THE COURT:**  So is there sort of continued issues

11 regarding sleepiness?

12         **MR. HOFF:**  Yes, Your Honor.  We've noticed that

13 throughout the entire trial.  And I've spoken with defense

14 counsel, and all defense counsel agrees, and I think the

15 parties would agree -- I don't want to speak for them.  But

16 perhaps when the alternates are excused, maybe Juror No. 8

17 is excused with the alternates, and I think it would be the

18 first alternate, if that's the Court's practice, come in.

19         **THE COURT:**  So here's -- let me put it this way.

20 It would be the -- numerically, we'd sub in the first

21 alternate.  That would leave us three other alternates.  The

22 Court's practice is to segregate the other alternates or at

23 least one of them in case we need it.

24         That would leave three alternates.  We can talk

25 about whether we retain all three of the other ones,

1  assuming we do dismiss Juror No. 8, or fewer than all three.

2  We can talk about that.

3      But are all counsel of the view that based on

4  challenges Juror No. 8 has faced with -- and, you know, to

5  her credit, some of these -- the possibility of this and the

6  issue was, I think, fairly raised by her.  But the

7  challenges that she appears to be facing, that excusal of

8  her would be appropriate?

9      **MS. HOOD-SCHNEIDER:**  Yes, Your Honor.  On behalf

10  of Mr. Flores, I concur with the government.  There have

11  been times where, I'm not going to say every day of trial

12  I've seen her nodding off, but it's been quite a few.  And

13  this has been since the Court's admonishment of her.

14      I do also notice it tends to be more frequent

15  during the mornings than the afternoons, but still,

16  obviously, we need jurors to be 100 percent focused the

17  entire day.

18      **THE COURT:**  Okay.  Thank you for that.

19      Other counsel in agreement?  If so, raise your

20  hand.  Looks like it.  All right.  We have agreement

21  throughout.

22      So here's my thought.  You know, I wouldn't say I

23  have 100 percent made that decision, but I definitely see

24  the merits in that.  And I do think it could be disruptive

25  if I was to dismiss her, you know, right now, and it would

1  be appropriate to bring her back Monday before the charge.

2          Now, if anyone disagrees and says, well, Judge,

3  you need to make a decision to save her, probably, you know,

4  one day of her life, I'm amenable to that.  But I think

5  procedurally it makes more sense to not sort of single her

6  out, and I think it's fairer to her in any event.

7          If you disagree with that, raise your hand.  All

8  right.  I don't see any disagreement.

9          All right.  Let's take about ten minutes, and

10 then we will commence with Mr. Safeeullah's opening part of

11 the closing for the government.

12          Thank you.  We stand in recess.

13          (Recess 9:26 a.m. to 9:46 a.m.)

14          **THE COURT:**  All right.  Anything of a preliminary

15 nature before we call in the jurors and proceed how we had

16 discussed?

17          **MR. SAFEEULLAH:**  Not from the United States.

18          **THE COURT:**  Thank you.  And it looks like nothing

19 from the defendants, so we may call in the jurors.  Thank

20 you.

21          (WHEREUPON, the jury re-entered the courtroom at

22 9:47 a.m., with matters being heard in open court as

23 follows:)

24          **THE COURT:**  All right.  Thanks, folks.  Now

25 everyone may be seated.  Thank you.

1          Thanks to our jurors for their continuing

2  attention and service, and wanted to assure you that your

3  time spent after arrival here this morning before coming

4  into the courtroom was not wasted.  Turned out to be time

5  well-spent as we do the things that judges and lawyers do in

6  the courtroom, and we appreciate your patience.

7          So as you'll recall, that when we broke last

8  week, the government had rested its case.  And the

9  defendants, as you'll recall, on cross-examination of

10  government witnesses, had introduced a total of two

11  exhibits.

12          Otherwise, the defendants have opted not to

13  present any evidence as, of course, is their right.

14  Defendants have no burden to present any evidence, no

15  obligation to do so.  The burden of proof has always been,

16  and remains, on the government to prove the defendants'

17  guilt beyond a reasonable doubt.

18          So what that means in terms of how we proceed

19  today, folks, is that we'll do closing arguments, and we

20  start with the government.  They go first and they also go

21  last, and that's because they have the burden of proof.

22          So the government goes, then the defendants are

23  able to make their closing remarks, and then the government

24  has one more opportunity to speak.  And after closings are

25  completed, we will do jury instructions, which seems

1  unlikely we'd get to before Monday.

2          So the thing to note about closing arguments is

3  that this is an opportunity for counsel to summarize for you

4  what they believe the evidence has shown, and they are

5  allowed to talk about the law during their closing

6  arguments.  They're allowed to talk about what law they

7  think will be instructed to you.  And that's appropriate.

8          But if it turns out that there is a difference

9  between what they say the law is and what I later tell you

10 the law is, you need to go with what I say the law is.

11         All right.  Mr. Safeeullah, are you prepared to

12 proceed?

13         **MR. SAFEEULLAH:**  Yes, Your Honor.

14         **THE COURT:**  All right.

15         **MR. SAFEEULLAH:**  May I proceed, Your Honor?

16         **THE COURT:**  You may.

17         **MR. SAFEEULLAH:**  Over the course of this trial,

18 it has become clear that these defendants, Jorge Flores,

19 Jose Pineda-Caceres, and Kevin Tidwell, engaged in

20 racketeering activities that furthered the MS-13 enterprise.

21 Time and time again, they came up with plans and agreed to

22 murder rivals.  Once they agreed, they either stalked or

23 lured their rivals and their victims to their deaths.  After

24 the murders, they tried to conceal or destroy evidence of

25 their guilt, all the while basking and celebrating in their

1    accomplishments.

2          While there are many lawful associations, the

3    defendants' associations with MS-13 was not lawful.  It was

4    based in murder, kidnapping, robbery, carjackings, and drug

5    dealings.  These three defendants conspired with each other

6    and with others to commit these crimes, and the United

7    States asks you to hold them accountable for their crimes by

8    finding them guilty on all counts.

9          The first count is RICO conspiracy.  In order for

10   you to find the defendants guilty of RICO conspiracy, each

11   of the following elements must be proven:

12         One:  That the charged enterprise, MS-13, was

13   either established or would be established, and it existed

14   or existed sometime in the future;

15         Two:  The enterprise was or would be engaged in

16   or affect interstate commerce;

17         Three:  That the defendants knowingly agreed that

18   a conspirator would be associated with the enterprise;

19         Four:  The defendant knowingly agreed that a

20   conspirator would conduct or participate, either directly or

21   indirectly, in the conduct of the enterprise's affairs

22   through a pattern of racketeering activity;

23         And lastly:  That the defendant knowingly agreed

24   that at least one member of the conspiracy would commit at

25   least two racketeering acts.

 1          Listen closely to what the Judge tells you is

 2     required under this law and what is not required.

 3          I expect the Judge is going to tell you that

 4     these five elements are required.  And the enterprise, it

 5     can be informal.  It can be an association in fact, a group,

 6     a club, a gang, whatever the label, people who are

 7     associated together for a common purpose or purposes.

 8          It can either be an enterprise where they work

 9     together or whether they envision one working together.  It

10     doesn't have to be part of a larger organization.  Any

11     defense attorney that stands in front of you and says it has

12     to be part of this larger organization is wrong.  It doesn't

13     have to be.  That's not required under the law.

14          When we started this trial on April the 6th, we

15     told you that it was seven years to the day in which Jorge

16     Alvarado was murdered by Pineda.  Seven years has passed,

17     but the evidence of Pineda's guilt still remains.  This

18     evidence establishes that he, along with Carlos Ochoa,

19     Hector Venturas, Jose Calderon, Francisco Avila, conspired

20     to murder Alvarado.

21          Now, when we take a bird's-eye view of the

22     evidence, we find Alvarado in a field by himself.  It may

23     seem that there are little to no clues as to who is

24     responsible for his murder.  But when we dive deeper into

25     the evidence and look at his body and all the other evidence

that was at the scene and the accounts of the people who were with him last, we uncover who murdered him.

The detectives initially found his body in this field, and that led to a blood trail. They followed that blood trail to shell casings, and these shell casings were .45 caliber shell casings. And while these shell casings, in and of themselves, don't establish who killed Alvarado, they're part of the story of how he died. And we know, we now know, how those shell casings got there.

Recall the testimony of Hector Venturas. He goes by several names. I'll call him Venturas. He said he gave Jose Calderon a .45 caliber handgun before Jose Calderon or JoJo left with the victim, Pineda, and Avila. That's how those shell casings got there.

He later said -- Venturas later said that he saw on the news that this murder happened by a lake. Well, the farmer came in here, Tim Brownlee, one of the first witnesses that we had in this trial, and he said on his property there is a lake, and he uses that lake to feed his cattle.

Venturas also said that two .38 caliber pistols were at the apartment complex that day. Hernandez testified and he confirmed this. In addition, Avila said he was shooting a .38 caliber handgun that Pineda gave him. And this gun wouldn't leave any shell casings.

1          When we look at the cooperators and what they

2     said and see if it's any other evidence to support their

3     testimony, they each testified that the victim was running

4     away.  Well, the photos from this crime scene and his

5     autopsy show bullet entries into the victim's back and into

6     the back of his arm as he's fleeing away.

7          They also said that after this murder, they went

8     to the house in West Nashville where Pineda ascended, where

9     he rose in the ranks of the gang.  Venturas and Hernandez

10    said the house was by a river.  When you see the evidence

11    that was seized from Flores's house 18 months later, it's

12    the same address, 560 Annex, which is right by that river.

13         And the river is significant.  It's significant

14    because Hernandez and Venturas each testified that the guns

15    that they had that were used in this murder were thrown in

16    that river.  That river is only blocks away from Ochoa's

17    house.

18         In essence, the cooperators' account of this

19    murder is the same.  Pineda came to the Rolling Hills

20    Apartment with the victim, he left with the victim, and he

21    bragged about killing him afterwards.  They each recall how

22    that victim begged for his life, saying he had a daughter.

23    But that didn't matter to Pineda.  He wanted his letters.

24    Even though the rule is you're only supposed to take two

25    people on a murder and you're supposed to burn the car after

1  you get done, Pineda was determined to commit this murder.

2  He was the main one seeking to murder Alvarado.

3  He drove Alvarado to the Rolling Hill Apartment complex.  He

4  told his coconspirators, Hernandez, Avila, Venturas, of the

5  plan to kill Alvarado.  He was seeking people to join him

6  and earn their letters.

7  Once he relayed this idea of seeking an agreement

8  and the parties reached an agreement, they've committed a

9  crime in the eyes of the law.  The conspiracy to murder

10  Alvarado, that's a crime.  Pineda did not need to actually

11  commit the murder or take another step to complete the

12  murder to be found guilt of conspiracy.  His agreement with

13  the coconspirators was enough.

14  However, it wasn't enough for him just to agree

15  to do it.  He had to actually do it, because murdering

16  rivals is how you move up in MS-13.

17  Witness after witness after witness after witness

18  has come before you and testified to that fact.  From the

19  MS-13 expert Detective Betts, to Avila, to Venturas, to

20  Hernandez, to Oscar Delgado, this is a rule in MS-13.  Kill

21  rivals.  You couldn't even become a full member of TPLS

22  unless you killed a rival.  And for his act of murder, he

23  was rewarded with being a full-fledged member.  He was

24  allowed to tattoo himself with the coveted MS-13 letters.

25  You don't need Hernandez, Venturas, or Avila to

tell you that Pineda has murdered to advance the MS-13
enterprise.  His MS-13 tattoo shows you what he's done.
Pineda murdered Alvarado.  He also aided and abetted his
murder by getting two additional shooters.  And by aiding
and abetting, the United States means the crime was
committed.  Pineda helped commit the crime or encouraged
someone else to commit the crime, and he intended to help
commit or encourage the crime.

         Pineda assisted others by driving them to the
secluded location.  He shot at Alvarado, and he was the
cause of Alvarado's death through the use of a firearm.  He
didn't have to land the fatal shot.  He was the one that
organized the execution squad.  And he's guilty of Counts 4
and 5.

         I presume the defendants may argue that this
murder didn't follow the rules that they were supposed to
adhere to.  The defense may argue, well, Ochoa was mad
afterwards because they broke the rules, they tried to call
him from out there, they didn't burn the car, and that this
murder maybe didn't further the enterprise.

         Well, that's not true.  First, Mr. Alvarado was
just another dead chavala to them.  Second, Jason Sandoval
agreed that Pineda, Avila, and JoJo could get their letters
for this murder.  Ochoa and Sandoval didn't say, "Wait a
minute now.  You guys are doing too much.  You're murdering

1   people; you guys have to get out of our gang." They didn't

2   say, "Hey, this is not what this organization is about.

3   We're about selling Girl Scout cookies, or we're about

4   motorcycles or vintage cars." That's not what they said.

5   That's not what happened. Pineda, Avila, and JoJo were

6   rewarded by the gang for their act of murder.

7          Hernandez, he said it was a celebration. They

8   weren't kicked out of the gang, they were jumped in the

9   gang. And because they were rewarded for this, Pineda

10  decided to murder again. This time, he murdered Liliana

11  Rodriguez a couple of months later.

12         Count 7, Counts 8, 9, and 10 charged him with

13  that murder and the conspiracy to murder Rodrigo Rodriguez

14  in aid of racketeering; murdering Liliana Rodriguez in aid

15  of racketeering; using, carrying, brandishing, or

16  discharging a firearm in relation to a crime of violence;

17  and causing Liliana's death through the use of a firearm.

18         Like the murder of Alvarado, the evidence has

19  shown that Pineda unlawfully killed Liliana. He acted

20  intentionally and premeditatedly -- and with premeditation.

21  At the time he committed this murder, MS-13 existed as an

22  enterprise. It was involved in acts of murder and drug

23  trafficking.

24         And Pineda, he had a position in the gang within

25  this enterprise. And the purpose for conspiring to murder

1  Rodrigo and his murder of Liliana was to increase his

2  position within the enterprise. And he did so by

3  discharging a .40 caliber Smith & Wesson at Liliana after he

4  and Smiley agreed to chase Rodrigo's car. Pineda's

5  discharge of that firearm caused Liliana's death. The facts

6  and the evidence establish his guilt of these offenses.

7         Pineda was at that club in the early morning

8  hours of July 31st, 2017 -- 2016. We know this because

9  Venturas, Avila, and Hernandez each testified that he was

10 there. And there was an altercation involving Pineda's

11 family.

12        Their testimony that he was there was also

13 corroborated by Ammerli Garcia-Munoz and Cindy Hernandez.

14 They also saw him there. But for the details of this

15 conspiracy, for the inner workings of this plan to murder

16 Rodrigo, we need to go inside of the gang and get the

17 details from Pineda's coconspirators, from his gang members.

18        According to Avila and Hernandez, when Rodrigo

19 was identified at the club, Pineda and Smiley developed a

20 plan to murder him. And the plan was simple: for Smiley to

21 drive while Pineda shot at Rodrigo's car. They followed him

22 on the highway, they caught up with him, Pineda lowered the

23 window, and he shot at them. And Liliana was struck by a

24 bullet.

25        Whether Pineda intended to kill Liliana is no

1  defense to the fact that he murdered her.  He acted

2  intentionally and with malice to bring about someone's

3  death.  He committed this act because he thought Rodrigo was

4  a rival gang member.  Rodrigo was an opportunity for

5  Mr. Pineda to gain respect, to move up in the ranks of

6  MS-13.

7           He didn't need permission from Ochoa, Sandoval,

8  or anyone else.  He and Smiley decided that they would cause

9  death by firing this gun from Smiley's car into Liliana's

10 car as they were driving away from the nightclub.  It was

11 his belief that he was acting on behalf of the gang, and he

12 bragged about it.  He was happy to have killed a chavala.

13          And he came back to the house, and he told

14 everybody what he did.  So while Liliana was on that highway

15 struggling for her life with a bullet that had passed

16 through her heart, Mr. Pineda is at his house celebrating,

17 having a party with his family and friends over this murder.

18          She didn't get to live a day over 18, while

19 Mr. Pineda got another chance.  His gang decided that they

20 would just ship him out of the country.

21          Now, this murder, it happened on the highway, and

22 officers didn't recover any shell casings like the ones they

23 found at the Alvarado murder.  And had Pineda not told

24 anyone, this murder would have been harder to solve.  But he

25 had to tell other people what he did.  He had to tell his

```
 1   fellow gang members because that's the way you increase your
 2   rank.
 3              By telling them to increase his rank, he created
 4   witnesses who later came into this court and testified about
 5   his murder.  As you consider their testimony, consider what
 6   other independent pieces of evidence corroborate their
 7   testimony.  Recall Avila's testimony that he gave Pineda the
 8   .40 caliber Smith & Wesson prior to Pineda arriving at the
 9   nightclub.
10              When that bullet was taken from Liliana's right
11   shoulder, it was examined by the Metro Nashville Police
12   Department Crime Laboratory and found to be a .40 caliber
13   bullet compatible with a Smith & Wesson.
14              Avila said after the murder, Pineda gave the gun
15   back to him and said it was hot, get rid of it.  Well,
16   ladies and gentlemen, that's obstruction of justice.  That's
17   a racketeering act.  You can't do that.  And that gun has
18   never been recovered.
19              Avila, Hernandez, Hector, all said Smiley was the
20   driver and Pineda was the shooter.
21              Now, the cooperators have varying degrees of what
22   type of car it was.  Venturas recalled it was black.  Avila
23   remembered it was an Infiniti.  Hernandez says it was a
24   G Series Infiniti with a light around the tag, and he wasn't
25   going anywhere in that car because it was too hot.
```

1          But consider the eyewitness testimony of the

2   person who was there.  And if you would, bear with me one

3   second.

4          (Playing audio.)

5          **MR. SAFEEULLAH:**  That was real time, folks.  That

6   was right after Liliana Rodriguez was shot right on the

7   highway.  That was Eduardo Nava calling, trying to get help

8   for her.  And he described that car to a T.  He said it was

9   a black G35 Infiniti with tinted windows.

10          And when you compare his testimony to the two

11   officers who testified about Smiley's car, it's clear what

12   car was used.  One officer recalled seeing that black

13   Infiniti with the illuminating tag driving away from the

14   scene of the murder around the time of the murder.  Another

15   officer stopped Smiley in that car six days after the

16   murder.  That car was registered to Smiley.

17          These officers' testimony corroborates the

18   testimony of Hernandez and Eduardo Nava that Smiley was

19   driving a black Infiniti and that Pineda was with him at the

20   time of Liliana's murder.

21          Also, think about what happened after the murder.

22   Once Pineda realized that Liliana was dead and not Rodrigo,

23   he was scared because he had broken a rule that he knew he

24   shouldn't have, and he had killed a female.

25          Remember Hernandez said he, Scrappy, and Carlos

went to Pineda's house to talk to him about the murder, and
Pineda's mom came out the house yelling, and then he came
out the house crying because he knew he had killed Liliana.
And what was the gang's solution?  Not to turn him over to
the police, but to sanction that murder by hiding him from
the police and getting him out of the country.  They gave
him a second chance, the second chance Liliana did not have.

On the other hand, while Mr. Pineda Caceres is
out of the country, he's communicating with Avila saying
people should be killed.  He's talking about distributing
drugs.  You-all saw that picture with his hand where he's
holding all of that marijuana, and you saw him stand up in
court last week and show you the same hand that he had that
marijuana in.

We heard the testimony of gang members and how
they stand up for each other.  And that's exactly what they
did for Mr. Pineda with Liliana.

But they also did it with Luis Lopez, a/k/a
Chino, when he was murdered.  They had to do something.
Carlos Ochoa had to do something; otherwise, the members of
the gang would think he was looking weak.  So as a result,
they agreed with each other, they conspired to seek revenge
for Luis's death.

You heard from two people who were there.  Two of
the other coconspirators are in court with us today.  By

1  agreeing to murder Roberto, both Flores and Tidwell agreed

2  to a racketeering act.  One of them shot and attempted to

3  murder Roberto.  We know this because members of the inner

4  circle were there.  Members of their gang were there.  A

5  party to the agreement testified in court.  Hector and Avila

6  both told you that they saw Roberto at Walmart.  And their

7  plan was to kill him.

8  This mission was so important that both Avila and

9  Flores left their girlfriends at Walmart.  They just left

10  them at Walmart, jumped in the car, and figured they were

11  going to murder Roberto.  And Roberto was in the car with

12  his kids and his wife.  But that didn't matter.

13  The video we watched corroborates what Avila

14  said.

15  (Playing video.)

16  **MR. SAFEEULLAH:**  He said they followed him to

17  this location.  They turned around.  Two firearms were used:

18  a .40 and a .45 caliber.  But they didn't kill Roberto.  He

19  fled away.  But they didn't stop.  That wasn't the end of

20  it.  They had orders to kill him, so they turned around and

21  chased after him.

22  And what do we see at the crime scene?  .45 and

23  .40 shell casings.  Officer McCormick testified that the

24  victim of this shooting suffered severe gunshot wounds and

25  had to be transported to the hospital.

1    Avila -- this is photos of inside of that car

2  where Roberto was shot.  Avila said that .40 caliber that he

3  used in this shooting of Roberto was also used in a

4  carjacking.  He said he gave it to two younger MS-13 members

5  or associates.  And he described this carjacking.

6    Consider Avila's details about this carjacking

7  and how they match with the testimony of what you heard from

8  Detective Fracker.  Detective Fracker said it was a gold

9  Honda that was stolen, but he couldn't stop the silver Ford

10  SUV because it made a U-turn and it left the scene.

11    Avila testified he was in that Ford SUV.  He

12  drove over the median and he left the scene.

13    Detective Fracker testified that he took a

14  .40 caliber Smith & Wesson out of that gold Honda.  Avila

15  said he used that .40 caliber Smith & Wesson with Flores to

16  shoot at Viera.

17    The lab determined that the firearm used in the

18  attempted murder of Viera was the same one that was taken

19  during that carjacking.

20    These aren't minor coincidences.  They

21  corroborate Avila's testimony that Flores attempted to

22  murder Roberto Viera to maintain or increase his position in

23  MS-13.  This incident happened on January 18th, 2017, and it

24  was reported back to Jason Sandoval in prison.

25    We know this because they had a jail call about

1    it.  On February 3rd, 2017, they're talking about shooting.

2    And what does Sandoval say?  This is Flores:  "I told you

3    that.  All that fuss.  The who?  The one you saw.  Oh, he

4    was the one that" -- and they're talking in code.  "Do you

5    understand?  The one behind everything, that dude."

6              They're talking about the reason that Luis Lopez

7    died.  This is what Happy told us.

8              And when you get down here at line 38:  "You

9    crossed paths with him.  The one you crossed paths with."

10   This is how Jorge Flores crossed paths with Roberto Viera.

11   He left him bloody in his car with his children there.

12             But that wasn't the end of the conversation.

13   What happens 15 days after this conversation?  They're doing

14   more crimes.  And when you read the rest of this

15   conversation, he's talking about Happy and dealing with that

16   issue.  "I hope that you take initiative.  You don't wait

17   until I tell you, until he tells you anything.  You know

18   what you have to do.  Do you understand?"

19             "I'm doing my thing."

20             This is what Flores responds.  "We're all grown,

21   and we know that you have to do what you have to do.

22   Humilde and Felix, they also know what's up.  Do you

23   understand?"

24             I mean, everybody should be looking to be on top

25   of that.  Everybody should be looking for something, for

1 | anything, any thread.  Any thread you can find from there,
2 | you get ahold of it, and then you keep pulling until you do
3 | the entire shirt.
4 | And then Sandoval asks him, "Do you understand?"
5 | Flores says, "Dog, we know who they are, man.
6 | The only issue is, is that we're looking for those dudes."
7 | And what does Sandoval tell him in response?
8 | "You gotta look a little bit harder.  You gotta look for the
9 | right people.  Do you understand?"
10 | And Flores says:  "I'm going to do what you told
11 | me.  How is that going to work?"
12 | And at the end, Sandoval says:  "The devil is the
13 | devil.  The devil will put it in front of you.  You will
14 | see."
15 | And then he repeats it again later.
16 | And lastly, at line 114, he says:  "Because the
17 | beast has to eat.  It's hungry."  He says:  "We'll talk
18 | another day.  I gotta go, fool."
19 | **THE COURT:**  Well, one moment, Mr. Safeeullah.  It
20 | sounds like we need to take a break.  Looks like this might
21 | be a good time before we move on to a discussion of this
22 | date.
23 | **MR. SAFEEULLAH:**  Okay.
24 | **THE COURT:**  So we'll take that break and try and
25 | be back as soon as the jurors are ready to take their seats

1    again.  The jurors may step down.

2            (WHEREUPON, the jury was excused from the

3    courtroom at 10:20 a.m., with matters being heard in open

4    court as follows:)

5            **THE COURT:**  All right.  Thanks, counsel.  Please

6    be seated.

7            Apologies for that.  It's just a situation where

8    a message was conveyed that a juror needed a rest break, so

9    I'm presuming this can be short.  We don't need this to turn

10   into one of these 25-minute things.  And, you know, counsel

11   can step out, but I'll be prepared to come back within just

12   a few minutes, and counsel should do likewise.  So you may

13   step out, take a short break, but let's not make it a long

14   one.  Thank you.

15           (Recess 10:21 a.m. to 10:34 a.m.)

16           **THE COURT:**  All right.  Mr. Safeeullah, you may

17   take the podium again.

18           **MR. SAFEEULLAH:**  Thank you, Your Honor.

19           **THE COURT:**  Yes, sir.

20           (WHEREUPON, the jury re-entered the courtroom at

21   10:34 a.m., with matters being heard in open court as

22   follows:)

23           **THE COURT:**  Thanks, folks.  Please be seated.

24           You may proceed, Mr. Safeeullah.

25           **MR. SAFEEULLAH:**  Thank you, Your Honor.

1    I think when we left off, we were talking about
2  the beast, the beast having to eat.  And when we talked to
3  Mr. Hernandez on the stand, he said the beast was the gang.
4  And in that conversation with Flores and Sandoval, they're
5  talking about the beast eating.  And that was early
6  February, February the 3rd, 2017.
7    It didn't even take a month for Mr. Flores to try
8  to carry out Sandoval's wishes.  On February the 18th, 2017,
9  they littered that parking lot with bullets from all
10  different types of weapons.
11    They shot up the front door, the deejay booth,
12  outside, inside the Scion that Hansy and Gordo were driving.
13  These coconspirators were determined to feed the beast, to
14  feed the gang.
15    And why?  Because they had a drug conspiracy
16  going on where they wanted to protect their drug territory.
17  And when you look at the communication between Pineda and
18  Avila, what did Pineda say?  Nobody can sell drugs in our
19  neighborhood.  And the south shits, they have a green light
20  on them.
21    That was on June 6th, 2016.  But that was their
22  attitude towards distributing drugs on that side of town.
23    And we know that they were distributing drugs
24  because on March 15th, 2016, Carlos Ochoa was arrested with
25  a substantial amount of drugs.  And when those drugs were

sent to the laboratory, they were determined to be
approximately 50 grams of cocaine. When Flores was arrested
on his house -- at his house on October the 4th, 2017, more
cocaine. 70 grams of cocaine.

In May and June of 2018, officers seized
approximately 240 grams of cocaine from Jason Sandoval.
That's approximately 360 grams on several occasions from
three individuals. And this group was selling drugs
repeatedly every weekend in the nightclub.

This enterprise was distributing well in excess
of 500 grams of cocaine. To establish the drug conspiracy
alleged, the United States must prove that two or more
persons conspired, or agreed to distribute, or possess with
intent to distribute, 500 grams or more of cocaine and a
mixture and substance containing a detectable amount of
marijuana.

Flores and Pineda, they knowingly and voluntarily
joined this conspiracy.

Well, the text messages from Flores's phone
established that he was selling drugs. "Come on now. It's
all on you to get soft."

And then we've got a price. 180.

"How much for an eight ball?"

"170."

"Can you do 160?"

1    Then when we look at Pineda's messages, while he
2 has all of that marijuana in front of him, what does he tell
3 Avila?  "Fool, we gotta work together when I get those
4 kilos."
5    And Avila responds, he agrees, "For sure."
6    Pineda says, "No fights between brothers or
7 arguments."
8    Avila further agrees, "Yep.  We're family, not
9 enemies."
10    This is June 2016.
11    But their competition was Hansy Sanchez and Luis
12 Antunez, and they couldn't deal with competition in the
13 nightclubs because it impacted their profits.  So what was
14 the solution that they came up with?  Hernandez threatened
15 Hansy.  He told him that either he would have to join MS-13
16 or stop selling in the nightclubs.
17    When Hansy and Gordo failed to heed that caution
18 and continued selling cocaine, on February 18th, 2017,
19 Hernandez, Gerson Serrano-Ramirez, Carlos Ochoa, Franklin
20 Hernandez, and Jorge Flores decided to murder Hansy Sanchez
21 and Gordo.  And we know this because Flores's fellow gang
22 members came into court and told us what they were trying to
23 do.
24    He told us the path that they took, where the
25 shooting started, where the shooting ended, who was shooting

which firearms.  And the objective of their agreement was to commit murder.

When we analyze the merit of the cooperators' testimony, evaluate how much of their testimony can be corroborated by other evidence.  Consider the victims' testimony.  Hector said that there was a green car, a green Honda that was involved in the shooting.  Hansy said a green car was involved as well.

Consider that testimony with the testimony of Officer Rowlett, where he said approximately three weeks after this shooting, he recovered a stolen green Honda.  And in that stolen green Honda, there were .45 shell casings.  And those .45 shell casings from that green Honda and the .45 shell casings from this shooting scene were determined to be fired from the same gun.

Remember when Hector and Ochoa said that they came up with this plan to kill Gordo as opposed to paying a drug debt?  Gordo also said that.  He said that Ochoa didn't want to pay him back that drug debt.  He said it was worth approximately like $2,000 worth of cocaine.

How scared do you have to be to not even ask for your money back for a drug debt that's owed to you?

And each one of you-all, you-all saw Gordo on that stand.  That man was scared.  He was scared then, and he's scared now.  He was trying to hide behind that screen

1  up there because he's still scared to this day.  He had his

2  head down the whole time because he's in fear of what they

3  did to him on this date and what they did to him on the

4  following weekend.

5          If that's not enough corroboration, remember

6  Hector said that somebody in that shooting had on a hat.

7  Gordo corroborated it and said it was a New York Yankees

8  hat.  If you want to gauge their level of truthfulness, look

9  at what Jorge had in his car with all those guns: a blue

10 New York Yankees hat.

11         Remember when Hansy said he heard the sound of an

12 AK-47?  Avila told us who was shooting that.  He said Ochoa

13 was the person shooting that AK-47.  You-all saw all those

14 shell casings from those AK-47s out on that scene.  The

15 crime scene was littered with bullet holes and shell

16 casings.  Bullets penetrated the club, the front door, the

17 bathroom, the deejay booth.  The way Jorge and his

18 associates fired their guns demonstrates their intent to

19 kill Gordo, Hector, and Venturas.  This was no accidental

20 discharge.  This was attempted murder.

21         Avila said there was a green light on them and

22 whoever was in the car with them.  And what further

23 illustrates the fact that they really wanted to murder

24 Hansy, to eliminate him as competition, think about what

25 they did to him the next weekend, February the 25th, when

1 they shot him up inside of that car and he had to go to the

2 hospital.  Hansy came in here and testified before you-all

3 that he's still got a bullet in his back to this day.

4    He was on that stand describing to you-all how it

5 felt to have that bullet come through his neck, and how all

6 he wanted to do was make it to the blue lights that were in

7 front of him.

8    Now, Jorge isn't charged with a shooting incident

9 on February 25th, 2017, where Hansy was shooting.  But the

10 shooting on that date is circumstantial evidence as to the

11 conspiracy to murder Hansy, Gordo, and Venturas on the

12 weekend that preceded that, February the 18th, 2017, when

13 Jorge was there and when he was shooting at them.  He didn't

14 have to be there on February the 25th because he had already

15 agreed that others would commit this murder.

16    That's a racketeering act.  It's unlawful.

17 Because he agreed to this murder, agreed others would commit

18 this murder, and he participated in the attempted murder,

19 he's guilty.  He's guilty of Count 1, Count 14, Count 15,

20 Count 16.

21    Jorge Flores and Kevin Tidwell are also charged

22 with conspiring to murder Ammerli Garcia-Munoz; murdering

23 him, causing his death through the use of a firearm.  The

24 evidence presented at trial establishes that they are guilty

25 of all of these offenses as well as discharging or aiding

and abetting the discharge of a firearm in relation to a
crime of violence.

Before we get into the facts from the night of
that murder, let's take a step back. Let's consider the
background and the reason why. Ammerli Garcia-Munoz's
brother came in here and he testified. He said that he was
confronted by Pineda about being an 18th Street member.

Jose Pineda-Caceres almost made that man strip
down to show him whether he was an 18th Street member or
not, showing him his back, his chest, to see whether he had
this tattoo, all because he was from a place in Honduras
where there were a lot of 18th Street members; one could
presume, because he's from that area, he was in -- a member
of 18th Street.

Well, that was enough for Jorge Flores and Kevin
Tidwell, that he was suspected of being from an area where
there were a lot of 18th Street gang members. They didn't
need to seek permission to kill him. They saw him as an
opportunity to increase their stature in the gang, and they
seized it.

Both Avila and Hernandez said they drove to the
crime scene and they saw the victim in the car. They both
spoke with Flores and Tidwell about this murder and heard
them confess to the murder. Both Avila and Hernandez said
this murder was done because Ammerli Garcia-Munoz was

1    suspected to being a rival gang member.

2          Also consider the testimony of Cindy Hernandez,

3    that Kevin Tidwell said he wanted to kill one more person

4    than the person who had killed the most people so he could

5    be famous.

6          Well, on this day, he killed Ammerli

7    Garcia-Munoz.  We all saw the video of Tidwell in that

8    nightclub.  And I'm going to play it again right now.

9          (Playing video.)

10         **MR. SAFEEULLAH:**  And as this video came in at

11   trial through Santos Del-Cid, we were focused on this car

12   that just backed in with the lights on, because the lights

13   never go off.  They stay on.  They're in that parking lot

14   looking for something.  They're in that parking lot for a

15   reason.

16         And we see Kevin Tidwell approaching this club.

17   We all note he's got on white shoes, a blue hat with a gold

18   emblem.  And when Santos Del-Cid was on the stand, he said

19   he had security to prevent people from going into that

20   nightclub with guns.  And on redirect, I asked him, "Well,

21   do you have security to prevent people from having guns in

22   the parking lot?"

23         And he said, "No, I don't."

24         There were no guns that came inside of that club

25   that night.  They were in the car.  And we see Kevin Tidwell

1    entering this club.  And if anybody wants to see what

2    premeditation looks like, watch this video.

3              (Playing video.)

4         **MR. SAFEEULLAH:**  He's walking around this club

5    looking for somebody.  He's not looking for Cindy Hernandez.

6    He's looking for a chavala to kill.  Now, Cindy Hernandez

7    and Adriana Hall see him and they follow him.

8              And then we have that testimony of Cindy

9    Hernandez.  Everybody heard her testimony.  She didn't want

10   to be here.  She said she had been using drugs that day,

11   pills, marijuana, drinking beer.  She said she had been

12   drinking liquor, but she also said she was a functioning

13   addict.  Look at Cindy Hernandez in this video.  See if

14   she's falling down, if she looked like she doesn't know what

15   she's doing.

16             She said at this point in this video, she was

17   asking for a cigarette.  She knew exactly what she was

18   doing.  She knew who she was talking to:  Kevin Tidwell.

19   And she said, at this point, I'm walking back with Kevin

20   Tidwell to the car to get a cigarette.

21             And when she gets back to this car, she sees

22   Jorge Flores in the car.  She hears Kevin Tidwell tell the

23   person in the back seat to go and get the gun out of the

24   trunk because they're getting ready to murder Ammerli

25   Garcia-Munoz.  That was their plan.  That was their intent.

This was their opportunity to do it.

So while Cindy is here thinking about a cigarette that she's trying to get, they're thinking about murdering this man in this parking lot.

And when we showed this video to Cindy, she said she was coming back with a cigarette. She said she was smoking the cigarette at this point right now. She wasn't making this stuff up. She was watching it on the video and remembering what happened that day.

She says at this point, I've got the cigarette in my hand. As you can see, it's almost smoke coming up from her right there because she's smoking a cigarette. She doesn't need any help walking.

And there goes that car straight through the parking lot. They've identified their victim, and they're trying to seek that opportunity. And they pull forward, stop right in front of him, and they discharged their firearms into that car, killing him.

The shock of this incident stuck with Cindy Hernandez. She recalled coming outside, seeing the victim after he was shot, and she remembered the individuals who did it. And her testimony corroborates the testimony of Venturas, of Hernandez, of Avila, and it establishes Flores's and Tidwell's guilt.

When we look at the cell phone evidence,

1   Tidwell's phone is right up the street several blocks away
2   right after this murder happens.

3   In addition to Cindy and the cell phone evidence,
4   also consider the testimony of Kimberly Caceres who said
5   that Jorge wasn't with her that night; they had had an
6   argument.  And she called after that night, he made a
7   comment that that guy deserved it because he was an 18th.
8   Also remember that prior to that night, he didn't have an
9   MS-13 tattoo on his back.  But after that murder, he
10  received one.

11  He didn't confess to her that he committed this
12  murder.  His act of tattooing that MS-13 on his back after
13  the murder not only shows her, but it shows all of us, that
14  he's guilty of murder on behalf of MS-13.

15  Remember when Flores approached Hector Venturas
16  after the murder and showed him the murder weapons, one
17  being that AK-47?  And he made a reference that Hector
18  Venturas couldn't do the murder.

19  Well, there's ballistic evidence to prove that
20  the AK-47 was used in this crime.  The ballistics expert,
21  Don Carman, testified that based on his 30-plus years of
22  experience, this AK-47 left those shell casings at that
23  scene.  And Flores left this AK-47 in that white
24  Toyota Camry.

25  It was not enough for Flores and Tidwell to

1    murder Ammerli.  They had to do another murder, the murder

2    of Jesus Flores, that started with that disagreement at the

3    marketplace.  When we look at the evidence related to this

4    murder, it establishes their guilt again.

5         The video and still images from this murder

6    depict the moments before Jesus Flores was murdered.

7         And I'm going to play this video.

8         (Playing video.)

9         **MR. SAFEEULLAH:**  Give me two seconds.  Here we

10   go.  We see Tidwell entering the store, same shoes, same hat

11   that he had on six days earlier when he murdered Ammerli

12   outside of that nightclub.  And as he gets ready to leave

13   here, he bumps into his next victim, and they exchange

14   words.

15        What's happening now, ladies and gentlemen, is an

16   agreement.  They're agreeing to murder Jesus Flores.

17   They're planning it right now.  They're figuring out how

18   they can conceal themselves for a moment to spring back on

19   Jesus Flores and kill him.  And the reason they're doing

20   that, the reason Hernandez told us that they were doing

21   that, is because Flores, Jesus Flores, says he didn't care

22   about MS-13; that Tidwell told him, "Hey, I'm MS-13," and

23   Jesus said, "Well, I don't care about MS-13."

24        He's concerned.  He's coming out looking for him.

25   The old man in the store is concerned.  He's coming out

1    looking.  And all the while they're concerned, Jorge Flores
2    and Kevin Tidwell are behind this market with an AK-47 and a
3    Glock handgun waiting for their opportunity to kill them.

4            And you see their truck sitting back there, and
5    they spring into action.  They pull off chasing behind him.
6    The question was asked to Luis Roserio-Loyo whether he
7    turned to the right; he said he turned to the left.  And
8    here they go chasing after him until they finally catch up
9    with him on McCall Street.

10           And we see the fires -- shots, gunshots, coming
11   from this pickup truck.  It's not enough for them just to
12   shoot at him and leave; they've got to turn back around and
13   chase him down and shoot at him again.

14           But let's back up to the video of this store.
15   This is clear.  It's Kevin Tidwell.  Same hat, same shoes.
16   And when we closely look at the stills of him, we see the
17   same tattoos.  Those were the tattoos that were taken in
18   2023, and that's one taken in 2017 where he's purchasing
19   that item from that store owner.

20           We also know that Cindy Hernandez said that it
21   was Kevin Tidwell and Jorge Flores in this still photograph.
22   She wasn't the only one.  Kimberly Caceres also identified
23   him in the photograph.  Kimberly went further to say that
24   she was in this truck when they -- when Jorge arranged for
25   her to go see her sick child in the hospital in late May of

1    2017.

2            Cindy and Kimberly, they weren't the only ones.

3    Hernandez also identified them in this truck being at the

4    crime scene.  In addition, Venturas said he was out

5    committing crimes with Kevin Tidwell around this time.  He

6    said they were stealing something and they stole something

7    out of a yellow van, and he drove off in this truck while

8    Kevin Tidwell was in the yellow van.

9            There is no question that Jorge Flores and Kevin

10   Tidwell were in this truck.

11           On top of all the people that hung around with

12   them, think about Janet Salgado.  She said that Jorge Flores

13   was driving around in a silver truck around this time.  She

14   also gave us Kevin Tidwell's phone number.  She had been

15   communicating with him around this time.

16           And what did the cell site records show?  He's

17   right there at the time of the murder.  His phone places him

18   at the scene of the crime.

19           Now, if you're still on the fence and you still

20   need additional proof, well, let's consider the testimony of

21   Luis Roserio-Loyo.  He was there that night.  He saw Kevin

22   Tidwell.  Not only did he see him at the store, he saw him

23   hanging out the window when he was shooting at him and his

24   friend.  He identified Kevin Tidwell days after the murder,

25   and he's continuously said that Tidwell was the person that

1  shot at him.

2       He said there was no doubt in his mind it was

3  Kevin Tidwell.  There should be no doubt in any of you-all's

4  mind either.  But the United States isn't required to prove

5  offenses beyond all doubt.  It's a reasonable doubt.  And

6  the term "reasonable" has a meaning.  It's within reason.

7       But the witnesses' testimony, the videos, the

8  cell site records, it's overwhelming.  It establishes our

9  burden.  It also establishes that Jorge Flores, Kevin

10  Tidwell, they were in that car that night.

11      It establishes that they conspired with each

12  other, that they aided and abetted each other in the

13  attempted murder of Luis Roserio-Loyo and the victim's

14  murder.  Flores drove that truck while Tidwell fired an

15  AK-47.  The victim died from a gunshot wound.  It doesn't

16  matter whether the bullet that killed him was an AK-47 or a

17  .45 caliber.  What matters is that both Flores and Tidwell

18  conspired to murder their victims.  And Flores drove the

19  truck while Tidwell fired the firearm.

20      They didn't keep it a secret either.  They

21  reported back to their fellow gang members, so they could be

22  promoted in the gang and receive enhanced stature.

23      They also tried to destroy evidence by burning

24  that F-150 truck.  But they couldn't destroy everything, and

25  they left evidence behind.  Specifically, they left shell

1  casings that were the same type and caliber shell casings

2  that were left at the crime scene.

3          If Tidwell is in the front seat shooting that

4  AK-47, and Bomba is in the back seat shooting a .45 caliber

5  handgun, it makes sense why the .45 caliber shell casings

6  are in the bed of that truck.

7          Kevin Tidwell also left something else behind.

8  When we look at the photographs from May 27, we see it was

9  raining.  The ground was soaked.  So when Kevin Tidwell

10  tried to destroy evidence, he left a shoe imprint in that

11  mud, in that soft ground.  And when he's arrested on

12  June 1st, 2017, his shoes were all muddy.

13          Now, when you go back and you deliberate, take a

14  close look at that shoe impression in that mud.  Compare it

15  to the soles of Kevin Tidwell's shoes in this video.  And

16  that evidence adds to the proof and establishes that he's

17  guilty.  And Jorge Flores is guilty on Counts 24, 25, 26,

18  27, 28, and their continued efforts to destroy evidence.

19          The murders of Garcia-Munoz and Jesus Flores and

20  the destruction of evidence are also racketeering acts that

21  prove their guilt as to Count 1, the RICO conspiracy.  When

22  we look at when Kevin Tidwell was arrested on June 1st,

23  2017, he's arrested with a firearm.  And there are four

24  elements that the United States has to prove to convict him

25  of being a felon in possession of a firearm.

1    Has he been convicted of a crime punishable by

2    imprisonment for more than one year?  Following this

3    conviction, did he knowingly possess the firearm, that

4    revolver?  At the time of his possession of the revolver,

5    did he know that he had that prior conviction, and did the

6    revolver cross state lines?

7    Well, there are certain things that we agree

8    upon.  We agree that Kevin Tidwell has been convicted of a

9    crime.  We've stipulated to this.  He's agreed that he's

10   been convicted of a crime that's punishable by imprisonment

11   of more than one year.

12   And he agrees, we all agree, that at the time

13   that he possessed the revolver, he knew he had been

14   convicted of a crime punishable by imprisonment for more

15   than one year.  We also agree that that firearm, that

16   revolver, crossed state lines prior to his possession of it.

17   So what's in dispute?  Whether he knowingly

18   possessed this firearm.

19   If I could direct your attention back to the

20   testimony of SWAT Officer Tim Brewer, who was executing that

21   high-risk arrest warrant on Kevin Tidwell on that day.  He

22   testified that when Kevin Tidwell got out that car, he said,

23   "Hey, I got a gun on me in my pocket."  This gun, United

24   States Exhibit No. 73.  And he said he took that gun out of

25   Kevin Tidwell's pocket and he placed it on the seat of the

1    car.

2           But also consider what he was doing the night

3    before to determine whether he possessed this revolver.

4    Janet Salgado, she said that he brandished this gun at her.

5    He kidnapped her, and he told her not to call the police.

6    That's obstruction of justice, folks.  You can't do that.

7    That's a racketeering act.

8           We also saw his text messages, MS-13 TPLS until I

9    die.  Police are going to have to kill me.

10          Also consider his flight on that day, his

11   determination to get away from the officers.  Ramming into

12   cars, ramming into the guardrail.  And I'm going to play

13   this video.

14               (Playing video.)

15          **MR. SAFEEULLAH:**  It's evident what Kevin Tidwell

16   was trying to get away from.  It's clear why he was trying

17   to evade arrest.  He had just murdered Garcia-Munoz outside

18   of Bola Ocho, he murdered Jesus Flores on McCall Street, and

19   he was trying to avoid being arrested for these murders.

20   And I presume the Judge will tell you that you can consider

21   the fact that he was fleeing because he thought he was

22   guilty and he was trying to avoid punishment.

23          When you-all consider his guilt as to the

24   murders, consider the manner in which he fled and why

25   someone would want to get away from the police so

desperately.

But that instruction, it just doesn't apply to Kevin Tidwell.  It also applies to Jorge Flores.  He, too, took extreme measures to evade arrest on August the 4th, 2017.  He rammed the police car.  He jumped out, ran on foot.  Is this because he had body armor and guns in the car?  Exactly.  And those were the guns that he used in the murder.  But he's also fleeing because he's guilty of murdering two people.

And he doesn't want to be sitting in this courtroom today.  He doesn't want to be waiting on you-all to come back with your verdict.  That's why he took off running.  Use your good judgment and reasoning skills to determine whether he's guilty of being a felon in possession.

But again, there are things we agree upon.  We agree that he was convicted of a felony prior to August the 4th, 2017.  We agree that he knew that he was convicted of this felony, and we also agree that the firearms crossed state lines prior to his possession.

So what is in dispute?  It's whether he knowingly possessed those guns on that day.

Well, to evidence his possession of those firearms, let's back up a couple of weeks and see this video from July the 18th, 2017, where he's putting that long gun

1   into that white Toyota Camry.

2            (Playing video.)

3            **MR. SAFEEULLAH:**  Kimberly Caceres told us what

4   that was.  It's underneath the towel, but she said that's a

5   long gun.

6            And when we look at that white Toyota Camry, we

7   see that damage on that back bumper.  That's the same car

8   that he was arrested in.  And remember the testimony of

9   Shaun Hardin, that SWAT officer that tried to arrest Jorge

10  Flores in that white Toyota Camry on August the 4th, 2017?

11  He said he looked him right in the face when Jorge Flores

12  was striking his car trying to get away from there.  And

13  shortly thereafter, the AK-47 and the Glock .45 are found in

14  that white Toyota Camry.

15           Now, if you're still skeptical and you want to

16  hear it from Jorge Flores's own words, think back to the

17  conversation that he had with Carlos Ochoa where he says,

18  "Even me.  Don't you see that they came after me too?  Me

19  too there.  They took all my tools from the car.  Don't

20  play."

21           And then Ochoa asked him, "Which one, the white

22  one?"

23           "Yep, with all the tools.  They got me in the --

24  in the -- in the neighborhood.  They opened the car, bro,

25  and I had to leave it.  But they took all my tools."

1    Well, ladies and gentlemen, the tools that he's

2 talking about are these tools right here.  Detective Oakley

3 said this is what our military uses.  These are the tools of

4 war, the tools of war that Jorge Flores was using when he

5 was raging war against the chavalas on the streets of

6 Nashville.  He served as a judge and executioner of who

7 should live and who should die based on the rules of the

8 MS-13 enterprise.  And their goal was to advance the gang,

9 and to do so, they had to commit murder.

10    But those firearms weren't the only thing that

11 got out of his car.  He also possessed other evidence of his

12 crime, like that blue Yankees hat which Gordo said he was

13 wearing on February the 18th, 2017.  Remember when Hansy

14 said he was being shot at by somebody that had that blue

15 hat?  There's a blue hat.

16    I'm not saying there aren't other Yankees fans in

17 Nashville.  There may be other Yankees fans in Nashville,

18 but this is evidence that he was the one shooting at Hansy

19 Sanchez and Gordo on February the 18th, 2017.

20    But that's not the only evidence he left in the

21 car.  If you look to the far right, you also see a blue

22 bandanna, blue Converses.  Detective Betts told us what

23 that's about.  He said blue symbolizes the color of MS-13.

24    But there's more evidence in that car.  There's

25 digital scales for weighing drugs.  There's ammunition that

1  matches the ammunition that was recovered from the crime
2  scene.  It's the same type.
3          And we see these digital scales that are used in
4  the drug trade.  And his coconspirators, Hernandez, Hector,
5  Oscar, Avila, they all said that he was selling cocaine and
6  marijuana in the clubs.
7          The evidence also establishes that he murdered
8  Arling Laines as well.  Luis Colindres, Oscar Delgado,
9  Franklin Pineda also known as Bomba, they conspired to
10 murder a chavala while they were at Club Galaxy.
11         They followed that black Lincoln to the
12 Maple Crest Apartments before the Lincoln arrived.
13 Colindres and Bomba got out of that white Chevy Traverse
14 that Oscar Delgado was driving, and they killed the chavala
15 and the front-seat passenger.  They shot the first victim
16 because they believed he was an 18th Street member.  They
17 killed the other passenger so he wouldn't be a witness
18 against them.
19         And then they left the scene.  Colindres even
20 fired a round off in the air, a celebration as they drove
21 away from the scene.
22         Now, Colindres isn't on trial, but the fact that
23 he murdered those two individuals is still relevant.  It
24 plays into what Flores was thinking when he and Hernandez
25 decided that they were going to murder Arling Laines.  It

shows that they were some of the last few members on the street, and Colindres called them to get approval to do the double murder. Agents had been arresting these MS-13 members. They arrested Avila, they arrested Ochoa. So it wasn't that many people left out on the street. Hernandez, Flores. And Colindres was trying to become a full member, so he wanted to do the double murder.

And the testimony establishes that after that double murder, Flores needed to do something. He needed to do something to keep his stature in the gang. He couldn't be outshined, outdone by these young guys doing the double murder.

And Arling wasn't a chavala. But he was an opportunity again for Flores to maintain his rank in the gang, to maintain his leadership position. Colindres, Delgado, and Bomba, they had done a double murder. He had to do something.

Now, you heard the testimony of Franklin Hernandez, that he participated in this murder with Flores. Consider his testimony in light of all the other evidence that's coming in at this trial. Specifically, consider his testimony about where they shot Arling, the type of firearm he and Flores shot, where they took his body afterwards, the fact that Colindres got lost and parked at a Waffle House for some time. And then where they ended up burning the

1   body.

2           And when you analyze and weigh his testimony,

3   consider that there were .40 and .45 caliber casings

4   recovered from the scene of that murder.

5           There were .40 caliber casings recovered from the

6   trunk of Arling's body.  There were .45 caliber bullets

7   taken out of Arling's burnt corpse.  This is all consistent

8   with what Hernandez testified to.

9           Also think about Laura Hodge's testimony where

10  she said -- where she examined this car and said the bullet

11  entries into that car were consistent with either one of two

12  things: somebody moving and shooting or two different

13  shooters because the shots were coming from two different

14  places.

15          In addition, consider the video from Waffle House

16  where we see that gray Avenger pull into the parking lot.

17  And this is the Waffle House close to the Cheatham

18  County/Davidson County line close to where Arling's burned

19  remains were found.

20          But Hernandez, he wasn't the only cooperator to

21  tell us this.  Oscar Delgado also described how Arling got

22  to that scene.  He described the scene where they killed

23  Arling.  He described gunshots and going into that Waffle

24  House.  And from that camera of Waffle House, we see that

25  the Dodge Avenger pulls up there.  Consider Delgado's and

Hernandez's testimony in light of all the evidence.  Look
for any similarities in their testimony and the evidence
that was recovered.

Also think about the cell phone information, the
cell phone data.  This evidence corroborates what Delgado
and Hernandez both said about where they met Arling, about
where they shot him, and where they burned his body.  This
cell phone map traps their movements and places them where
Delgado and Hernandez said they were.

In addition, look to the physical evidence.  Now,
the plan for this group, these MS-13 murderers, was to burn
cars and destroy evidence.  And you can see from these cars,
they're burned down to the metal.  Any DNA, fingerprint
evidence, all that's gone.  It's burned.  It's all
destroyed.  And by burning these cars, they're obstructing
justice and the federal investigation that was going on at
that time.

But how does that saying go?  If you're playing
with fire, you're going to eventually get burned.  Well,
Jorge Flores, he wasn't playing with fire.  He was
intentionally setting fires.  Cary Webb said those fires
were incendiary.  A human started those fires.  And Jorge
Flores got burned.  He created the evidence, and
Detective Barr photographed the burns on his hand.

You heard the testimony from Kimberly Caceres.

1   She said around that time, she treated him for this burn.

2   She put mayonnaise on it.  Not only did he burn his hand, he

3   also left evidence at the crime scene.  He left a .45

4   magazine spring back plate, and Colindres has the other part

5   of that magazine when he's arrested in Kentucky.

6           This whole story, this whole version of events

7   fits back together because it's not rocket science.  It's

8   common sense.  It's the same common sense that you develop

9   as a child.  When you're trying to figure out whether

10  something circular goes into a triangle hole or whether it

11  goes into a square hole or whether it goes into a triangle

12  or whatever it goes into.  But it's the same common sense

13  because it's the truth.  All of these things are coming back

14  together because they're the truth.

15          Jorge Flores conspired to murder Arling Laines.

16  He murdered him for Franklin Hernandez, Oscar Delgado, Luis

17  Colindres, and Franklin Pineda-Caceres.  He discharged a

18  firearm into Arling causing his death, and he destroyed

19  evidence of his crime.

20          And because he did all of those things, he's

21  guilty.  You should find him guilty.  You should hold him

22  accountable for his crimes.

23          Approximately 11 days after he murdered Arling,

24  officers arrested him.  He was living at the Priest Woods

25  residence with his girlfriend, Kimberly Caceres.  Both

Kimberly and Hernandez testified where in that house Jorge was living.  And you see above his bed, he's got that thing on the wall for his child that he just had.  There were baby items in that room, and there was also cocaine, a drum magazine, digital scales, a cell phone where he's been -- he's been working, but we're not talking about construction work or insurance sales.  He's in the business of drug trafficking to raise funds for the MS-13 enterprise.  And that's what we see in his text messages.

And he's charged with possessing with the intent to distribute cocaine in Count 53, with being a felon in possession of a firearm in Count 54, and possessing a firearm in furtherance of a drug trafficking crime in Count 55.

Now, when you consider his intent to distribute this cocaine, consider the circumstances that surround it.  Consider everything that's found in that room: the Baggies, the firearms, the messages on his phone.  He's guilty of these offenses.

He's also guilty of possessing a firearm after being convicted of a felony offense and possessing a firearm in furtherance of a drug trafficking crime.  And as we talked about earlier, these tools that he needed to murder chavalas, he also needed these tools to protect his drugs and drug proceeds.  That's why he's got these guns in the

house and all that ammunition, because if somebody wants to
break into his house, he can protect that stuff.

Now, as you consider the crime of possessing a
firearm in furtherance of a drug trafficking crime, there
are some things that you need to consider. Consider whether
the firearms were strategically located. And the Judge is
going to give you some instructions on this, and what the
Judge says about the law controls.

But consider whether these firearms were
strategically placed. And on the side of his bed, he's got
that drum magazine. On the other side, he's got that Glock
.45.

In the bathroom across the hall, he's got that
AR-15. Both of these firearms were loaded. And we know
that he couldn't lawfully possess these firearms. We look
at his text messages and see that he's involved in street
sales, bargaining with people on the prices of eight balls,
whether it's 180, 170, or 160.

And consider the circumstances in which they were
found. He's on the run for two murders.

Each of these defendants made the decision to
associate with and become members of MS-13. They did so
through murdering, agreeing to murder, attempting to murder,
robbery, robbing people, obstructing justice, destroying
evidence.

1          As they maintain this enterprise, they murder and

2     agree to murder Jorge Flores -- I mean Jesus Flores -- I'm

3     sorry -- Ammerli Garcia-Munoz, Liliana Rodriguez, Jorge

4     Alvarado, Arling Laines, those two young men that were at

5     the Maple Crest apartment that were all shot up.  And then

6     they tried to cover up their crimes.  But they failed

7     because the truth always comes out to light.

8          Justice is always served, and that's what's

9     required in this case: justice.  The evidence presented at

10     this trial establishes that these three defendants are

11     guilty on all counts.

12          What is required of you is just consider all of

13     the evidence.  Follow the Judge's instruction on the law.

14     And once you've done that, return a verdict of guilty on all

15     counts.

16          Thank you.

17          **THE COURT:**  All right.  Thank you,

18     Mr. Safeeullah.

19          Mr. Ganguli?

20          **MR. GANGULI:**  Thank you, Your Honor.

21          Good morning.  About 140 years ago, a man named

22     Carlo Collodi wrote a book.  The book was about a young boy

23     who was made of wood.  And when the child would lie, you

24     would see his nose would grow.  That story, of course, is

25     the tale of Pinocchio.

1          Your job as jurors is a lot more difficult

2     because when witnesses come into this courtroom and they

3     give their version of events, it's not easy to see or to

4     discern when they've lied.  And so unlike Pinocchio whose

5     nose would grow, your job is much more difficult when you

6     assess a witness's credibility.

7          When you go through this -- when you go through

8     the deliberations, I submit to you that there are at least

9     three general principles that you've got to consider.  And

10    I'd like to take just a couple of minutes to talk about each

11    of those principles.

12         First, of course, is the standard of proof.  And

13    as the Court's told you, it's beyond a reasonable doubt.

14         The next is that there's no prejudice or

15    sympathy, as you deliberate in this case.  The Court will

16    tell you that there is absolutely no place for sympathy for

17    either side in this courtroom.

18         And finally, you've got to decide whether

19    witnesses are credible.  In other words, do their stories

20    make sense?

21         Let's talk about each of these issues one by one.

22         With respect to standard of proof, it's beyond a

23    reasonable doubt.  And we've talked about that phrase many

24    times over the course of the last several weeks.  But what

25    does it mean?  Well, if you remember, during jury selection,

1   we talked about an accident that might have happened in

2   downtown Nashville.  And that accident involved two cars.

3   We talked about witnesses who were at each corner of the

4   intersection.

5         If you had been a juror in that car accident case

6   or any case in civil court where millions of dollars might

7   be at issue, the standard is preponderance of the evidence

8   if it's -- if the defendant is guilty of being at fault of

9   more than 50 percent.

10        If you were charged with neglecting your child,

11   and the Department of Children's Services stepped in and

12   filed a dependency and neglect petition against you, in

13   order to take your child away from you, DCS would have to

14   prove that you were a bad parent, so to speak, by a clear

15   and convincing standard.  So realizing we've talked about

16   beyond a reasonable doubt over and over again, but this

17   standard is much higher than preponderance of the evidence

18   as well as clear and convincing.

19        Again, there is no prejudice or sympathy for

20   either side during your deliberations.  The verdict has to

21   be based on proof, proof that's come in from the witness

22   stand, not from what lawyers say, because again, as the

23   Court's told you, lawyers' statements are not evidence.  But

24   the proof has to come from the witness stand.

25        And you also can't decide this case based on

1   sympathy for the defendants or fear.  And you don't have to

2   like Mr. Tidwell in order to return a just verdict, because

3   again -- and I realize I sound like a broken record at this

4   time -- there is no prejudice or sympathy during your

5   deliberations.

6          Credibility of witnesses.  Are the witnesses

7   believable?  Do their stories make sense when you compare it

8   to the rest of the evidence?  When you decide a witness's

9   credibility, I submit to you there at least a couple of

10  factors that you've got to consider.  The first is do they

11  have a bias against Mr. Tidwell?  Do they have an ax to

12  grind, so to speak?

13         Something else that's also important is whether

14  they'll gain anything from their testimony.  Because you

15  will find, again, common sense will show that a witness will

16  tailor their testimony if they have something to gain.  So

17  not only do you have to use your common sense when you

18  evaluate the credibility of witnesses, but again, you've got

19  to see whether it makes sense in the light -- in contrast to

20  the rest of the evidence.

21         I'm not going to go over the indictment page by

22  page, but I would like to highlight to you some relevant

23  parts of the case law.  If I misstate the case law, it is

24  completely unintentional, and you should always follow the

25  Court's mandates in terms of the law.

1           And in order to decide if there is a RICO

2  conspiracy, the first question that you've got to decide is

3  if there was an enterprise.  That is the first issue.  And

4  again, there are other -- there's at least four other issues

5  that affect interstate commerce.  Did Mr. Tidwell agree to

6  associate with the enterprise?  Did he agree that a

7  conspirator would participate in the affairs?  Did

8  Mr. Tidwell agree that somebody else would commit an offense

9  of racketeering?  But the first element is:  Was there an

10 enterprise?

11          So as the Court's told you, there are at least

12 three issues to an enterprise.  And it's longevity,

13 relationships with those associated with the enterprise, and

14 a purpose.

15          So was this an enterprise?  By its very

16 definition -- and again, you've got to use your common

17 sense -- an enterprise has rules, right?  Otherwise, there's

18 absolutely no organization.  People are doing whatever they

19 want to.

20          This was not an enterprise because it's a group

21 of friends who grew up together.  They hung out together,

22 and people routinely did whatever they wanted to do.  As the

23 proof will show -- and we'll highlight a couple of salient

24 examples -- many times, people did things completely on

25 their own in order to further their own interests or to

1  avenge their own slights.

2       For example, we've heard so much, we've seen so

3  many gruesome photographs about Arling Laines and his

4  murder.

5       But Luis Colindres and Franklin Hernandez

6  committed that murder over a $100 drug debt.  That was it.

7  Your recollection is much better than mine.  But if you

8  review your notes, and I know that you've listened to each

9  and every witness, you'll find that Mr. Colindres thought

10 that Arling Laines had held out on him for $100.  And

11 because Mr. Laines had held out for $100, Luis Colindres and

12 his associates, including Franklin Hernandez, decided to

13 kidnap and kill this man.

14      Again, this was not an enterprise.  We've heard a

15 lot about how Hansy Sanchez was shot at a couple of times.

16 The government's done an excellent job showing you each and

17 every photograph from those crime scenes.  But the fact of

18 the matter is that Hansy Sanchez stole a client.  That's why

19 they shot at him.

20      Remember, Hansy Sanchez would sell cocaine at one

21 of those seedy nightclubs -- I don't remember which one --

22 in the bathrooms.  And if you remember, it was early in the

23 night, and there was a customer who needed change for a $50

24 bag, rock, whatever it is, of cocaine.  And Mr. Sanchez who

25 was near one of the bathroom stalls or wherever he was in

the bathroom had change for that customer. The other
gentleman did not have change. The other gentleman, who
remains nameless, thought that Mr. Sanchez had stolen his
customer. That's why Hansy Sanchez was shot at: because he
stole a customer.

With respect to this not being an enterprise, if
rules in an enterprise are truly that important, remember
Hector Venturas. He told us that he had been greenlit since
2016, '17, or '18, whenever it was, but he's never been
killed. And I realize that he's been in prison. And I
realize that he may be in protective custody. But if you
truly believe the MS-13 is as fearsome as it is and these
guys were members of that enterprise, don't you think that
they would have been able to silence him? The fact that he
was greenlit and has been greenlit for year after year and
remains walking around, again, it's further proof that this
was not an enterprise. These people had zero capability.

This is not an enterprise because no one followed
the rules. So what kind of rules did people break? Well,
these are just two examples, and I know that you can think
of others if given the time.

Just consider Franklin Hernandez's testimony. He
told us that one of the tenets of the MS-13 is that you can
sell cocaine but you can't use it. What did Mr. Hernandez
tell us? He told us a lot of people were doing cocaine.

 1          Again, we know that you have to get permission to

 2    kill from the First Word or the Second Word in order to

 3    commit a murder.  But Mr. Hernandez himself killed an

 4    18th Street gang member without getting permission from

 5    anybody.

 6          Mr. Hernandez told us that this -- that these

 7    people belonged to a bogus clique.  Those were his words.

 8    That was his phrase.  No defense lawyer, no U.S. Attorney

 9    put those words in his mouth.  Mr. Hernandez told us that

10    this was a bogus clique.  These guys thought they were

11    something that they were not.

12          So the entire question is:  Did Mr. Tidwell

13    commit these murders?  Did he commit the kidnapping of Janet

14    Salgado?  If you truly believe that, your verdict should

15    reflect that.  However, if you returned that verdict, you

16    would be falling to fear and fantasy.  And here in the

17    Middle District in the City of Nashville, we have to deal

18    with reality.  And the reality is that Kevin Tidwell did not

19    kidnap Janet Salgado, he did not commit these murders.

20          With respect to the kidnapping, as it were, of

21    Janet Salgado, I'll submit to you, she has never told

22    anybody, before April of 2023, that Mr. Tidwell kidnapped

23    her on May 31st, 2017.

24          When you go back to your deliberations, you're

25    going to have the indictment with you, and I would defy

1    anybody to show me a count in that indictment where

2    Mr. Tidwell is charged with the kidnapping of Janet Salgado.

3    It's not in there because it didn't happen.

4            What else did she tell us?  She told us that he

5    brandished a weapon, told her to get into this car, but

6    somehow let her go back home on the morning of June 1st,

7    2017.  I submit to you that makes no sense whatsoever.

8            So let's talk about each of these homicides on

9    May 21st, 2017, and May 27th, 2017.

10           With respect to the Bola Ocho nightclub shooting,

11   there is absolutely no proof whatsoever that Mr. Tidwell

12   committed that murder.  None.  None.  There are no witnesses

13   who saw him shoot.  With respect to the video, of course he

14   was there.  That's never been in doubt.  But that video does

15   not show him shooting.

16           I would respectfully encourage you to look at the

17   video inside the Bola Ocho nightclub on May 21st, 2017.  And

18   I don't mean to be flippant, but if you look at that video,

19   you're going to see that Mr. Tidwell is quite possibly the

20   only white male inside that Latino nightclub.

21           It's like the children's game.  One of these

22   things doesn't look like the other.  But with that said,

23   that he sticks out like a sore thumb, no one saw him do

24   anything other than leave.  There's absolutely no proof that

25   he even had a gun that night.

The video shows him in the club, but of course it does. There's absolutely no dispute that he was there, but the videos show nothing else.

With respect to May 27th, 2017, Mr. Tidwell was at that Mercado. He did pass Jesus Flores. And again, Mr. Tidwell left. The only proof you have of Mr. Tidwell doing anything that night in terms of that homicide and that attempted murder of Luis Loyo, again, comes from Luis Loyo. And what do we know about him? We know that he was drinking and that he was using cocaine. On May 30th, 2017, he told officers that it was a male Hispanic that was shooting at him.

When you go back to your deliberations, look at his photo spread identification. Witnesses are allowed to write whatever they want to on their photo spread identification. And what did Mr. Loyo write on that identification? What he wrote, what he told officers on May 30th, 2017, was that this was the man I saw at that market. There is nothing on that identification that shows that Mr. Loyo identified Mr. Tidwell as the shooter. Nothing. If Mr. Tidwell truly had been the shooter, if Mr. Loyo thought that he was truly the shooter in May of 2017, he would have written that in his identification. That he didn't speaks volumes.

What else do we know? He told us that the

1  officers helped him with his identification.  Again, that's

2  not stuff that any defense lawyer put in his mouth.  That's

3  stuff that he volunteered.

4          So let's talk for a few minutes about credibility

5  of the witnesses.  And although we've heard from over 60,

6  maybe 70 witnesses over the course of the last three or four

7  weeks, I submit to you that there are roughly four witnesses

8  that you've got to focus on.  And those are Francisco Avila;

9  Janet Salgado; Hector Venturas or Hector Baca, whatever name

10 he's using; and Franklin Hernandez.

11         With respect to Francisco Avila, I'll submit to

12 you that he expects to receive a deal, a 5K1 motion from the

13 government in exchange for his testimony.

14         He's used the name Edwin Reyes over and over and

15 over.  That -- that statement that Edwin Reyes is merely my

16 Facebook name, that is a ruse.  How do we know this?  We

17 know this because one of the other witnesses said that Edwin

18 Reyes was involved in the murder.  We know that he has an

19 alias, we know that he lied to officers many times, even

20 something as basic as far as what his leadership position

21 was in the MS-13, and he lied about when he joined the

22 MS-13.

23         Strangely, Mr. Avila expects to receive an

24 immigration benefit.  He expects to remain in the United

25 States after he serves his sentence.  What does that tell

us?

Mr. Avila has pled guilty to at least two murders. Each of those murders, as you heard, carries with it a mandatory sentence of life imprisonment. Why would a man who expects to spend the rest of his life in jail care about immigration benefits?

He cares because he knows he's going to be released at some point. Mr. Avila, although he may not realize it, has already received additional benefits. What are those benefits? Well, remember, he's been convicted of robbery. He's been convicted of robbery in state court. He was indicted for two counts of aggravated robbery. Each of those counts carries 8 to 12 years at the Department of Corrections.

So what kind of sentence did Mr. Avila get for those two aggravated robberies? He got a sentence of four years of which he'll have to serve 30 percent for robbery.

Janet Salgado told us a tale about getting kidnapped, but she has never told anybody that tale, that version, that she was kidnapped on May 31st, 2017, before April of 2023. She is Mr. Tidwell's ex-girlfriend. Her kidnapping story absolutely does not add up.

So Hector Venturas. If we agree that a mass murderer is someone who has killed at least four people, Hector Venturas is a mass murderer. How do we know this?

He told us that he doesn't know how many people he's killed in Honduras. He's lost count.

It's unfathomable how a person can kill so much that you lose count of your bodies. It's insanity. He has gotten away with those murders and even mass murder. Hector Venturas expects to be released even though he's pled guilty to murders. And we know he expects to be released because the government has asked for immigration benefits for him.

So Franklin Hernandez. He, again, much like the others, says that he expects to receive a deal for his testimony. He's killed at least two people and pled guilty to three murders. He says that Mr. Tidwell confessed these murders to him, but also concedes he didn't know him like that.

In the absence of conclusive evidence, you cannot find, you cannot convict Mr. Tidwell of these offenses. You must do what truth dictates. You must do what justice demands. You must find Mr. Tidwell not guilty.

Thank you.

**THE COURT:** All right. Thank you, Mr. Ganguli.

All right. Ms. Hood-Schneider?

**MS. HOOD-SCHNEIDER:** Good morning.

Confusion, chaos, and calamity. The government has not met its burden of proof as it relates to Mr. Flores. Now, you've just been told about the beyond-a-

1    reasonable-doubt standard by Mr. Ganguli.  Reasonable doubt,

2    it's like having multiple cracks in your windshield, so many

3    cracks that you start to think this windshield is not going

4    to hold up much longer.

5          Well, there are a lot of cracks in the

6    government's case as it relates to Mr. Flores.

7          This all began with a group of childhood friends,

8    a group of young boys who knew each other around the

9    neighborhood, around the block, a group of boys who were

10   hanging with each other way before MS-13 TPLS, according to

11   Franklin Hernandez; a group of boys who were undisciplined,

12   maybe lacked a good role model, or maybe they lacked the

13   guidance that they needed to stay on the right path.  Who

14   knows?

15         But what is known is that this group of boys that

16   comprised MS-13 TPLS was not organized.  They lacked the

17   discipline, even according to the standards set by MS-13 in

18   general.  They failed to follow those rules, and everyone

19   was acting in their own personal interests.

20         What has been presented to you over the past few

21   weeks has been a conglomerate of confusion, chaos, and

22   calamity.  According to the government's proof, everyone

23   involved with MS-13 TPLS broke every single rule, according

24   to MS-13.

25         So what were the rules that were broken?  Well,

you're only supposed to sell drugs provided by the clique.
Well, you heard testimony that nobody was really following
that rule.  Sometimes they were getting drugs from MS-13,
sometimes it was from a different source.  They agreed to
share territory with rival members in some of these
nightclubs.  You heard testimony how they had an agreement
where it would be two people from MS-13 selling, and then
another two people from a different group or independent
also selling in the same place.

Nobody was following these rules.

Another rule:  No women at meetings.  Well, you
heard that a woman was at a meeting, and that was
Mr. Pineda-Caceres's mother.  Now, if it walks like a duck,
quacks like a duck, it's a duck.  They held a meeting in
that parking lot that night after Liliana was killed.  They
held a meeting to determine what to do.

Now, it might have been an impromptu meeting, but
it was a meeting nonetheless.  Things were discussed,
decisions were made, and Mr. Pineda-Caceres's mother had
input in that discussion and that decision.

That leads us to the next rule that was violated.
If a member kills a woman or child, they're to be greenlit
or killed.  But instead, according to the government's
proof, they hid the member they believed to be responsible
for Liliana's death.  And they hid this member from who?

Leadership, other MS-13 members.

So you're starting to see that we have this infighting that's going on within MS-13 TPLS.

But we've got more rules that have been broken. You've heard testimony that another rule is that you're only supposed to use two people involved in a hit. Yet according to the government's proof, three or more members of TPLS, including their alleged associates, were present during most of these homicides that were presented to you.

One of the few truths that Franklin Hernandez testified about was how unorganized MS-13 TPLS was. He testified how everybody was basically doing their own thing.

Mr. Avila, he even testified that Carlos Ochoa, the leader, got in trouble for tattooing letters on himself without permission. Now, who else did he tattoo letters on without permission? After all, the government claims that Mr. Ochoa had a tattoo gun and that he would tattoo other members.

Pure chaos. No one took the rules seriously. And if they don't care about the rules, how could they possibly act to enter, maintain, or increase their position within MS-13 TPLS?

The evidence that the government presented to you shows that, in fact, the opposite happened. You heard testimony on multiple occasions that so-called leadership

1    was not happy with TPLS.  And I say MS-13 TPLS because

2    that's the alleged enterprise here, not MS-13 as a whole,

3    but MS-13 TPLS.

4          The relationships between alleged members of

5    MS-13 TPLS was precarious at best.  Hector Venturas or

6    Hector Baca, he was hanging out with folks that the rest of

7    the group didn't like, that the rest of the group felt were

8    enemies.  And when he was confronted February of 2017, who

9    shot first?  Mr. Baca, shooting at his own members.

10   There were fights, there were fractions -- there

11   were fractures, and there were factions within the group.

12   There was no clear purpose.  There was no clear organization

13   within MS-13 TPLS.  This is a case again of chaos, broken

14   rules, and acts done for personal gain which unfortunately

15   produced horrible results.

16   Let's talk about some of the testimony in detail.

17   You may recall that we started off with Detective Ray Betts,

18   the so-called gang expert.  Ray Betts is not in the

19   Tennessee loop.  He has no ties to Tennessee, no experience

20   investigating or working in Tennessee.  He's not involved

21   with the investigation of this case.

22   He doesn't really know anything about MS-13 TPLS.

23   He doesn't know about their rules, if they really had any,

24   or whether or not those rules conformed with most other

25   MS-13 cliques.  He also didn't verify -- he did not verify

that to get your letters, you have to kill. Now, I recall
on his testimony that he said you had to complete a mission
in order to get your letters. So how much of an expert is
he?

I won't say much about the other law enforcement
officers because no one disagrees that the victims in this
case were all shot. That's pretty much clear from the
evidence. But who shot them and why were they shot, that's
the key issue here.

You know, it's funny how on direct examination, a
lot of these witnesses, their memories are just so clear,
but when being cross-examined and asked the tough questions,
all of a sudden, they can't remember anything. They can't
recall. They don't remember. They need the question
repeated. They start fumbling or stuttering in their
answers, or sometimes they can't even give a straight
answer. That is a telltale sign of a liar.

Now, they might not have lied about everything,
but they did lie about some material relevant facts. So
let's talk about the liars. Let's start with Mr. Avila. He
is not credible. He has lied about when he joined MS-13,
and he has lied about his status in MS-13.

When we talk about the Ammerli Garcia-Munoz
shooting, Mr. Avila did not see that shooting himself. He
was told about it allegedly by Bomba who said the chavala

```
 1    was shot while parking his car.  That's clearly not what the
 2    video depicts.
 3              However, I do believe him when he says that he's
 4    robbed someone and used the proceeds for himself because he
 5    was apparently punished for that.  Another rule broken in
 6    MS-13 TPLS.  That falls in line with everyone else who has
 7    talked about how unorganized this group was and how everyone
 8    was out for themselves.
 9              And why would Mr. Avila lie?  Because he had a
10    falling out with Mr. Flores.  He testified about that on the
11    stand.  Him and Mr. Flores didn't like each other.  Again,
12    more infighting within this clique.
13              So, of course, he's going to spin his testimony
14    to make it look -- to make Mr. Flores look worse than what
15    the situation really is.
16              It's also worth noting that Mr. Avila tells a
17    different account of how Mr. Laines was killed.  He says
18    that Mr. Hernandez, or Happy, told him that Mr. Laines was
19    picked up by Flores, placed in the back of the trunk, taken
20    to the outskirts of Nashville, and then when they opened the
21    trunk, Mr. Laines tried to run away.  That's not consistent
22    with what everyone else has said.
23              Also, keep in mind that he was housed with
24    Mr. Hernandez while they were incarcerated.  They didn't
25    talk about their testimony in this case?  I find that
```

extremely hard to believe, that you could be housed with someone that you both are cooperating, and you're not going to compare notes?  It doesn't make sense.

Let's move on to Hector Venturas.  What boggles my mind about him was the fact that he is an associate or claims to be an associate of MS-13 TPLS, but yet he's riding around with people he knows his clique doesn't like.  And again, he shot at them first.  He shot at his own clique members first.

Chaos and confusion.  Nobody took MS-13 TPLS seriously.  Not even its own members.

Mr. Venturas did not see the Roberto Viera shooting.  He did not see the Garcia-Munoz shooting.  And he even referred to Ammerli Garcia-Munoz as Pelon.  But we know that Pelon was not Mr. Garcia-Munoz's nickname, it was his brother's nickname.

He claimed that he was good friends with Arling Laines, but he didn't even know Mr. Laines's last name. Again, when we look back over their testimony, it's more of this he-said/he-said stuff.

Now let's move on to Oscar Delgado Flores.  His testimony was all over the place, playing games with the attorneys on cross-examination.  Said he was cooperating because a lot of innocent people had died, yet he unapologetically played a role in their deaths.  He stalked

Mr. Zuniga outside the Galaxy nightclub that night, calling
back and forth with Mr. Colindres, watching this 18th Street
member -- this alleged 18th Street member.

And he drove the alleged killers, Luis Colindres
and Bomba, he drove them to the victims and then drove them
away from the scene.  And his dear friend Arling did the
same thing.  He delivered Mr. Laines to Luis Colindres
knowing, knowing Mr. Laines was in danger.

And he didn't have to do those things.  He had
plenty of time to run.  He could have said, "Hey, dude,
let's hop in this car and get out of here."  But he didn't
do that.  So don't be fooled by Mr. Delgado's feigned
sincerity.  He is a killer himself, and he is here to get a
deal like everyone else.  They will all tell the government
whatever it wants to hear as long as it will get them out of
a life sentence.

Now let's move to the last cooperator.  That's
Franklin Hernandez.  He came in here with puppy-dog eyes.
That young man is not sincere either and again, in it to get
a deal for himself.  You heard how eager he was to commit
his first kill.  He was in one of the vehicles that chased
after Hansy Sanchez.

You also heard him talk about how he emptied his
clip into Arling Laines and then kicked Mr. Laines into the
trunk.  He also said that Mr. Flores threw a piece of shirt

1   in the car after dousing it with gasoline and then they lit

2   the car on fire. He doesn't say anything about putting a

3   piece of cloth within the gas tank, which you saw pictures

4   of.

5         First, he says Mr. Flores was the First Word, but

6   later he says Sandoval was still in control at that time.

7   Again, chaos and confusion.

8         Another thing that I thought was interesting was

9   that Mr. Hernandez testified that he -- he jumped Mr. Flores

10   into the gang. So that would imply that he was in MS-13

11   TPLS before Mr. Flores was. So why would he have to prove

12   anything to Mr. Flores? Why would he be afraid of

13   Mr. Flores? How are you afraid of somebody that you jumped

14   into the gang?

15         Again, chaos and confusion.

16         All of these individuals testified because they

17   are trying to get out of a life sentence. They will say

18   whatever they have to say to make the government happy

19   because they want the government to ask the Court to make an

20   exception for them. Not one of these guys have said they

21   don't care about getting their sentence reduced, that they

22   don't want to benefit from their testimony.

23         Also want to talk a little bit about the alleged

24   victims in this case as it relates to Mr. Flores.

25         Roberto Viera, now we have heard little evidence

about the circumstances surrounding Roberto Viera.  The
government has offered little evidence to show that Roberto
Viera was shot by Mr. Flores.  In fact, there's little
evidence that Mr. Viera was shot.  Did Mr. Viera see someone
shoot him?  We don't know.  Was Mr. Viera in fear of bodily
injury?  We don't know.

The government also pointed out that there was a
phone call between Mr. Flores and Mr. Ochoa that occurred
after the alleged shooting of Mr. Viera.  And I guess the
government was trying to say that Mr. Viera apparently was
involved with the death of an MS-13 member and his shooting
was revenge.  But this phone call that they're having, it
takes place after the alleged shooting of Mr. Viera.

So why would they still be looking for him if,
according to the government, they already found him?  And to
be truthful, we don't know what that phone conversation was.
What we do know is it's a lot of speculation from the
government about a phone call that we have no idea what the
context of it is.

Let's talk about Hansy Sanchez and Luis Antunez.
Mr. Antunez said he saw someone wearing a Yankees hat that
night that he was shot at.  He also said that Mr. Flores
wears a Yankee hat and, as the government alluded to, there
are thousands of blue Yankee hats that are out there.  And
blue, of course, is allegedly one of the colors of MS-13, so

anyone who was in the group could have been wearing that hat. Any other member could have had the New York Yankees hat.

And I would also posit to say that this shooting happened at night. Do we even know that the hat was blue? Because it looks like at night, a hat like that would appear black.

Mr. Sanchez, he testified that he didn't see specifically who was shooting at him.

Now I want to talk about Ammerli Garcia-Munoz. No one witnessed that shooting either. No one knows for sure why the shooting happened. Again, this is more speculation, more he-said/he-said. No one knows what transpired in that parking lot before the shooting. So what happened to Mr. Garcia-Munoz did not maintain or increase Mr. Flores's status in the group. As a matter of fact, he almost got in trouble for it, according to the testimony.

Mr. Hernandez testified that they were all wondering why was Mr. Garcia-Munoz shot in the first place? Again, more chaos and confusion.

And supporting this idea of this confusing testimony is that we heard from Mr. Garcia-Munoz's brother that he wasn't a member of 18th Street, and he proved to MS-13 TPLS that he was not a member of 18th Street, and he said things were good after that. He was cool with them

1   after that.

2           As far as Jesus Flores, again, no eyewitness to

3   that shooting.  No concrete proof as to why Mr. Flores was

4   shot.  Just more speculation, more he-said/he-said.  For all

5   we know, this could have been a personal issue between

6   Mr. Jesus Flores and Mr. Tidwell.  We don't know what that

7   conversation was about at the marketplace.  We don't know if

8   it related to MS-13.  There's definitely no proof that that

9   act was done to maintain or increase anybody's status in the

10  group.

11          And again, Hernandez doesn't know anything about

12  the shooting.  He can't tell you what's going on inside

13  Mr. Flores's mind.  He can't tell you what's going on in

14  Mr. Tidwell's mind.  He can't tell you what's going on in

15  Mr. Pineda's mind.  All he can tell you is what he's been

16  told, more he-said/he-said.

17          Lastly, I want to talk about Arling Laines.  He

18  was an associate of MS-13 TPLS.  And according to the

19  government's theory, Mr. Laines was killed because

20  Mr. Flores felt he had to one-up Mr. Colindres.  That

21  doesn't make sense.  Mr. Colindres was accused of committing

22  a double homicide, and one of the victims was supposedly

23  this 18th Street member.  And you're going to one-up that by

24  killing an associate?  Again, that doesn't make sense.  I

25  submit to you that that, too, had nothing to do with MS-13

1   TPLS.

2           So I want to make a few other quick points.  The

3   video of Mr. Flores that purportedly depicted him removing a

4   rifle from the trunk of the car, that was taken over a month

5   ago from the May 27th shooting.  Anything could have

6   happened with that rifle between May and July.  It's not

7   even known if necessarily that was the same rifle that was

8   used in any of those shootings.  If you recall from the

9   testimony, they traded guns with each other like baseball

10  cards.  Again, and they're supposed to destroy them.  Did

11  they do that?  No.  So now we have yet another rule that has

12  been broken.

13          There's also no evidence that Mr. Flores was

14  involved in selling drugs other than more he-said/he-said.

15  And I want you to pay close attention to the bait and

16  switch, the government's sleight of hand, so to speak.

17          Do you remember Agent Perez's testimony about the

18  cell phone that he found in the home where Mr. Flores was

19  arrested?  He only testified about one of them.  And he even

20  said he barely stepped into the house.  And the government

21  presented you with a series of text messages that were

22  pulled from that cell phone and had Agent Perez testify.

23  However, he never verified whose phone that was.  He just

24  stated that he saw a picture of Mr. Flores in that phone.

25          Well, that does not prove ownership of a phone.

1  That picture could have been sent to the phone by someone

2  who had the phone, or that picture could have been in there

3  because someone who had the phone took a picture of

4  Mr. Flores and his child.

5          So it's not known how that picture got into the

6  phone.  But did they ever say that that phone belonged to

7  Mr. Flores?  I don't think the government did.

8          And again, the government drew your attention to

9  a series of text messages in that phone that was purportedly

10 a conversation about selling drugs.  But there's no

11 testimony about who authored those texts.  There's no

12 testimony again about who owned that phone number or who was

13 associated with that phone.

14          Also, those that were selling drugs were clearly

15 selling drugs to support themselves.  Nobody had real jobs.

16 I believe you heard testimony about that.  Everybody was

17 selling drugs to support themselves.  We barely heard

18 evidence about where the proceeds from these drug sales, how

19 they went back, whether or not they went back to MS-13, how

20 did it go back to MS-13, what did they use it for.

21          The government shows you lots of photos of shell

22 casings.  It brought in the guns it believes are -- it's

23 connected to this case.  The firearm experts reportedly

24 matched the shell casings found to the guns that were

25 recovered.  But none of that tells you who fired the gun,

1  who was in possession of the gun at the time it was fired,

2  and when they got in possession of such guns.

3  The testimony again showed that these guys traded

4  their guns around. So don't let the voluminous pictures of

5  shell casings fool you. The government still has to show

6  you who shot whom and why. It has failed to do so. That's

7  an important element that you're going to have to consider

8  in order to find Mr. Flores guilty.

9  I just want to make mention about the

10  stipulations. Stipulations are not an admission of guilt.

11  Sometimes a defendant will stipulate to something because

12  it's an obvious fact. Mr. Flores agreed that the guns in

13  this case traveled across state lines at some point, you

14  know. That a gun is a gun, that's a fact, you know. That a

15  drug is a drug, that's a fact. And the reason why sometimes

16  we do these stipulations is that we help cut down on the

17  number of witnesses that are called to trial.

18  Stipulations don't tell you who pulled the

19  trigger on a firearm or why. Stipulations don't tell you

20  who was in possession of which drug or whether that amount

21  of drug was for personal use or for sale.

22  Jurors, the government has failed to prove beyond

23  a reasonable doubt its case against Mr. Flores. There are

24  multiple cracks in this windshield. Confusion, chaos, and

25  calamity. That's what's been presented to you.

1    The deaths that you have heard testimony about
2    during this trial are horrific. And it's natural to feel
3    compassion for the victims and their family. It's human to
4    feel compassion for these victims and their family. And
5    that's okay.
6    But what also makes us unique as human beings is
7    our ability to see past our emotion and our ability to make
8    decisions despite our emotion. It's our ability to use
9    logic when we're making choices. That is what you are
10   called upon to do today. That is why we spent the first
11   week of this trial selecting you as a juror, asking you
12   questions about your ability to be unbiased and your ability
13   to be fair, to be objective, when applying the law to the
14   facts of this case.
15   I won't talk about every instruction that you're
16   going to be given for your deliberation, but I would like to
17   point out a few. You will be instructed on the elements of
18   a RICO conspiracy. And one such element that I want you to
19   pay attention to is that there must have been an enterprise,
20   and in order for an enterprise to exist, there must be
21   longevity sufficient enough to permit the group to pursue
22   the enterprise purpose.
23   With all the broken rules mentioned, with
24   everybody out for their own benefit, there was no
25   organization in existence. In MS-13 TPLS, they failed to

1 function as a continuing unit.

2          You will also be instructed that in order to

3 convict on murder in aid of racketeering, the government

4 must prove that Mr. Flores was seeking position in this

5 so-called enterprise and that the purpose of the murder was

6 to gain entrance to, maintain, or increase his position.

7 Again, the government fails to meet his burden of proof on

8 this.

9          These past four weeks have been a long haul.

10 Please do not rush to a verdict for the sake of getting out

11 of here.  These three young men are depending on you to take

12 this case seriously and to thoroughly consider the evidence

13 and to be fair in your decision.  And once you have done

14 that, once you have fully evaluated the evidence and applied

15 it to the law in this case, Mr. Flores will ask that you

16 find him not guilty of these charges.

17          Thank you so much for your time.

18          **THE COURT:**  All right.  Thank you,

19 Ms. Hood-Schneider.  All right.

20          I think it's time that we take our lunch break,

21 and so when we return, it will be Mr. Hawkins who will have

22 an opportunity to address you.  And after that, the

23 government will have what we call its rebuttal closing.  And

24 until then, we will break for an hour.  Be back around 1:25.

25 The jurors may step down.  And please, as always, remember

1  my admonition.  It becomes as important as ever at this

2  point not to research or investigate the case or talk about

3  it until such time as the Court lets you go back into the

4  jury room to deliberate as a complete jury.

5  All right.  You may step down.  Thank you.

6  (WHEREUPON, the jury was excused from the

7  courtroom at 12:26 a.m., with matters being heard in open

8  court as follows:)

9  **THE COURT:**  All right.  Thank you.  Please be

10  seated.

11  Okay.  Just wondering, a ballpark range,

12  Mr. Hawkins, at this juncture, where are you on the length

13  of closing?

14  **MR. HAWKINS:**  45 minutes, Your Honor.

15  I have a quick question.  In my PowerPoint

16  presentation, I have some excerpts of the jury instructions.

17  I wanted to just give everyone a heads-up.  They are -- I

18  don't think there's anything controversial about these

19  particular instructions.  We've not even --

20  **THE COURT:**  Yeah, I think that -- you know,

21  here's the way I look at it.  You are allowed to tell the

22  jurors, including on a screen, what you think the charge

23  would be.  You're accountable for that if it's wrong, but I

24  think you can put it up on the screen.  And the government

25  did something similar with its, at least, paraphrasing of

1  some certain jury instructions it expects.

2           Yes, sir.  All right.  And, Mr. Hoff, for

3  rebuttal closing, do you have an estimated time?

4           **MR. HOFF:**  Well, depending on what Mr. Hawkins

5  says, I think I can -- 35 minutes, ballparking it.

6           **THE COURT:**  All right.  That's fine.  That's just

7  kind of helpful to know, because if someone was going to

8  say, well, I need three hours and I need four hours or

9  something, I'd probably need to know about it.  But what I

10  heard, that's fine.

11           **MR. HOFF:**  I wouldn't plan on talking more than

12  everyone else combined, so I think about 35 minutes.

13           **THE COURT:**  Okay.  All right.  That should be

14  fine.

15           All right.  Anything else to discuss?  If so,

16  raise your hand.

17           All right.  Seeing nothing, we will reconvene

18  about 1:25.  Thank you.

19           (Lunch recess 12:28 p.m. to 1:39 p.m.)

20           **THE COURT:**  All right.  We've been working on the

21  jury instructions and hope to have something to distribute

22  this evening to the parties that incorporates everything

23  we've talked about.

24           All right.  Mr. Hawkins, are you ready to go?

25           **MR. HAWKINS:**  Yes, sir.

```
 1              THE COURT:  All right.  We can call in the
 2   jurors, please.  Thank you.
 3              (WHEREUPON, the jury re-entered the courtroom at
 4   1:39 p.m., with matters being heard in open court as
 5   follows:)
 6              THE COURT:  All right.  Mr. Hawkins, you may
 7   proceed.
 8              MR. HAWKINS:  Thank you, Your Honor.
 9              If I may have my exhibits.
10              Good afternoon, everybody.  Thank you kindly for
11   your attention in what has, I'm sure, been a long month for
12   you.
13              It's difficult to depict the absence of
14   something, so I -- and I began this case talking to you
15   about the absence of proof that the government has against
16   my client, Jose Pineda.
17              I think my client, in particular in his case,
18   that there is an absence of proof and that there is a hole
19   in this case.  There's a question of a lack of evidence in
20   this case.  There are no -- you've not seen ballistic
21   evidence linking my client to the two murders that he's
22   accused of.  You have not seen DNA evidence linking my
23   client to the murders he's accused of; you've not seen blood
24   evidence linking my client to these two awful murders he's
25   accused of; and you've not seen a gun linking my client to
```

1  either of these murders.  There's a hole in that proof.

2         What you have seen in this case are some very,

3  very troubling and very awful murders, and you're probably

4  very angry about those murders, and rightly so.  There's

5  nothing about them that's not horrific.  But what I'm going

6  to ask you to do today and what the Judge is going to

7  instruct you to do today is to do your best to put aside

8  bias, prejudice, and sympathy, and not to let those things

9  influence your decision in any way.

10        And that's hard to do.  That's a hard ask of each

11 one of you: to look at these facts as they relate to my

12 client, Mr. Pineda, and to put aside the emotional responses

13 that you undoubtedly had to these horrific photographs, the

14 autopsy photos, of these young people who were killed.

15        What we're asking you to do is to sort of be like

16 Spock from Star Trek: to be logical, to think logically

17 about what you've seen in the proof, and not to let your

18 decision be guided by bias or prejudice or sympathy.  Let

19 your decision be guided by logic.

20        I'm going to quickly talk about the burdens of

21 proof.  Reasonable suspicion is the kind of suspicion that

22 an officer needs to stop you on the road to do an

23 investigative traffic stop.  He thinks something is wrong.

24        Probable cause is the kind of proof required to

25 send the case to criminal court, a finding that a crime was

1   committed and that this person probably or may have

2   committed it, probably committed it.

3            Preponderance of the evidence is a civil burden

4   that you see in civil cases, car wreck cases, injury cases

5   more probably than not, just 51 percent.

6            Clear and convincing is a higher standard of

7   proof.  I believe one of the other lawyers talked about if

8   somebody is having their parental rights terminated, clear

9   and convincing is the proof that the state must -- the

10  burden the state must meet in order to take someone's child

11  away from them.  So that's a much higher burden of proof.

12           And then finally at the top of the pyramid is

13  beyond a reasonable doubt.  And as I've mentioned to you,

14  beyond a reasonable doubt is the kind of certainty that you

15  would need in order to make the most important decisions of

16  your life.  And that's the kind of certainty, that's the

17  kind of weight that you need to bring to this decision today

18  to render a verdict.

19           I believe the Judge is going to read the jury

20  instructions to you, and I presume that this will be one of

21  those instructions.  To the extent I'm wrong, I'm sorry, and

22  the Judge will correct you, but I do believe this is what

23  will be in those instructions:

24           "A reasonable doubt is a doubt based on reason

25  and common sense.  It may arise from the evidence, the lack

1    of evidence, or the nature of the evidence.

2              "Proof beyond a reasonable doubt means proof

3    which is so convincing you would not hesitate to rely and

4    act on it, making the most important decisions in your

5    life."

6              Now, the government has brought a conspiracy, a

7    RICO charge in this case.  And you've heard from the other

8    attorneys, and I'll pose to you the same question:  Is it

9    really a RICO conspiracy?

10             The TPLS was an unorganized, ragtag bunch of

11   teenagers who sold drugs not only to -- between one another,

12   but to other people.  They got drugs from other people.

13   They broke just about every rule the gang had.  And there's

14   very, very little proof that any of these people followed

15   the rules of MS-13 at large, the international organization

16   that you -- we may know as MS-13 and the one that was

17   described by the expert that the government brought in here

18   to tell you about.

19             Rules are broken constantly.  Members break rules

20   but don't die.  This is not a serious group.

21             What is the physical and forensic evidence that

22   links Jose Pineda, my client, to either one of the murders

23   that he's been charged with: the April 6th, 2016, killing of

24   Jorge Potter Alvarado or the July 31st, 2016, killing of

25   Liliana Rodriguez?

1          Is there DNA evidence in this case?  No.

2          Did you see ballistic evidence linking Jose
3    Pineda to either one of those murders?  No.

4          Did you see video footage anywhere from
5    La Mansion or anywhere else linking Mr. Pineda to these
6    murders?  No.

7          Did you see a gun that Mr. Pineda used in either
8    one of these murders?  No.

9          Were there fingerprints?  No.

10          Was there cell phone mapping that allowed you to
11    see that he was in the places where the government has
12    alleged he was at the time?  Once again, no.

13          Without this physical or forensic evidence that
14    you might expect in a case like this, what does the
15    government have?  They've got the testimony of three
16    motivated self-confessed murderers.  And on that alone, they
17    expect you to find guilt beyond a reasonable doubt against
18    Mr. Pineda.

19          Another one of the jury instructions that I think
20    you're going to be given in this case is going to say:  Ask
21    yourself whether the witness had any relationship to the
22    government or the defendants, or anything to gain or lose
23    from the case that might influence the witness's testimony.
24    Ask yourself whether the witness had any bias or prejudice
25    or reason for testifying that might cause the witness to lie

or to slant the testimony in favor of one side or the other.

Let's take them one at a time.  There's Hector Venturas also known as Hector Baca, also known as Tito Montana, also known as Hector Perdomo.

He got on the stand and lied about murders in front of you.  He initially denied having been involved in additional murders in Honduras.  And on cross-examination, he got up and admitted to doing more murders than the government even knew about.  That's the first time the government learned about those additional murders.

He's a snitch of convenience.  He reached out to a Davidson County detective when he was first arrested on a state charge and told him that he had something he wanted to tell him about.  He spilled with that detective, and the minute that he got out of jail, he ghosted the detective. That's the kind of reliable witness the government would have you relying on in this case to find my client guilty of these murders.

He said something that I think is very curious with respect to the Potter murder, which was that the guns were covered with blood.  You heard from the medical examiner that there was nothing on the body of Mr. Potter that would indicate that this was a close range -- that he was shot at close range.  In fact, he was shot in the back.

You gotta ask yourself how could Mr. Venturas --

where did Mr. Venturas get this story about blood on the
guns and how could there be blood on the guns?  The other
person that said he was there and present for the killings
said they didn't even go over to this man's body.

          And, of course, Mr. Baca testified that whilst --
shortly after Detective Sumerel got him out of jail, he went
out -- he promptly went out and started selling guns on
Facebook.  And, of course, he had a charge of evidence
tampering dismissed right before he was released.  Evidence
tampering.

          Let's talk about Francisco Javier Avila.  Can you
believe him?  He lied in the first interviews when he sat
down with police and told them nothing about any knowledge
about the deaths of Jorge Potter Alvarado or Liliana
Rodriguez.  He waited months to say something about it.  And
he had plenty of time to watch the news and to learn.  He
told you, out of his own mouth, that he would not believe a
stranger with his own criminal record.

          His mother and sister have moved to the U.S.
because of his testimony.  And his memory improves over
time.  He stated things -- he gave specific testimony about
things he did not remember earlier.  How does that happen?

          And he murdered -- I want to correct learned
defense counsel.  He murdered actually not two people but
three.  He murdered Juan Rodriguez and Javier -- he murdered

two individuals, a Juan Rodriguez and a Javier, whose last
name escapes me. He also participated in the murder of
Jorge Potter Alvarado. So by my count now, it's three
bodies on Mr. Avila. And I suspect there's more.

Franklin Hernandez, can you believe him? He got
up here and told you guys that he had chosen to sit down
with the government. And that was on direct. When I got up
here and talked to him, he admitted that, number one, he was
still in custody; and, number two, the moment that he chose
to meet with these people was when they were waiting out in
the hall to talk to him.

Did he choose? Did he really choose to speak
with these detectives?

Now, when I questioned Mr. Hernandez, he also
gave a description or talked about a prior description of
Mr. Potter. And in that description, he described a man
that -- and I'll show you in a minute the photograph that he
described. He essentially gave to police the same
description of a photograph that the police had shown him.
And this was a picture of Mr. Potter while he was still
alive.

He minimized his actual role in the death of
Potter in front of you. He told you that he never got a
phone call from Calderon about Mr. Potter.

Well, we know -- if we're to believe

1  Mr. Venturas, we know that he did get a phone call because

2  they were trying to decide whether or not they could kill

3  this young man; and Mr. Hernandez, according to

4  Mr. Venturas, said, "Fuck him."

5          He also gave a -- in that first interview when

6  these two agents came in on him and he chose to talk to

7  them, he also lied to them.  In a tearful confession, he

8  lied to them about the planning of the death of Arling

9  Laines, the young man who was put in the trunk of the car

10  and shot.  He told those detectives that he didn't know that

11  that was going to happen, and he gave them a very tearful,

12  sorrowful confession about all that.

13          Well, the truth of it is and the truth that came

14  out here was, he planned the death of -- he -- they selected

15  Mr. Laines as someone to kill, and he was part of that

16  selection process.  He premeditated the murder of

17  Mr. Laines.

18          This is the picture of Mr. Alvarado, the victim,

19  of that April 6th, 2016 murder.  This is the picture -- this

20  is the person that Mr. Hernandez described when he talked to

21  police about the killing.  He said he had short hair and he

22  had a shirt with marijuana prints on it.

23          That is not the young man that they found in the

24  field.  That's not the man that the coroner described to you

25  as having shoulder-length hair and a black shirt with

designs on it.  He gave them an inaccurate description of
the victim based on what he saw in their file.

Now, let's talk a little bit about how these
three kind of mesh together.

On the night of Liliana Potter's murder -- I'm
sorry -- Liliana Rodriguez's murder, on July 31st, 2016,
Mr. Venturas says that Smiley and my client left the scene
in a black Impala.  Mr. Avila says they left in a white
Infiniti, and Mr. Hernandez says they left in a black
Infiniti.

I've already talked about this.  Mr. Hernandez
lied about getting permission to kill Mr. Potter.

This brings -- brings up a second question I'd
ask is:  If Mr. Ochoa had already green-lit this young man
that they murdered, why were they asking permission to
murder him?  Why were they calling in, asking permission?
That doesn't make sense.

On the day of Mr. Potter's murder, we have three
different descriptions of the vehicle that Mr. Pineda was
driving: green Honda, a two-tone Accord, or a truck.  The
medical examiner says Mr. Potter had long hair.
Mr. Hernandez says short hair.

I've already talked about Mr. Potter's clothes.

The other thing you heard was that -- from
Mr. Venturas was that Mr. Calderon was shot -- I mean, I'm

1  sorry -- that Mr. Potter was shot in the face by Calderon

2  and there was blood all over the guns.  Neither of these

3  things are true.

4          As I said, Mr. Potter was running away apparently

5  when he was shot.  And according to Mr. Avila, they never

6  went near him with those guns.

7          Lastly, you've heard conflicting testimony about

8  why and how Mr. Potter was lured away to this remote site

9  where he was killed.  One of these witnesses says it was to

10  smoke marijuana; the other said they were going to do a

11  robbery.

12          I'd like to talk a little bit about the death of

13  Liliana Rodriguez.  Where is the individual that was driving

14  that car that night?  Where is Smiley?  Where is the

15  individual identified by Mr. Hernandez seven years after the

16  murder who's alleged to be in that car with them?  Where is

17  Tony?

18          Who saw Jose Pineda shoot Liliana Rodriguez?  No

19  one.  None of the people in Ms. Rodriguez's car saw it, nor

20  did any of the cooperators that you heard from, nor did any

21  of them see it.  There are no eyewitnesses.  Three

22  cooperators each identify a different vehicle as being

23  involved.

24          And lastly, Francisco Avila, Humilde, told you

25  that he lost the gun that was used in that murder after a

hurricane.  We heard proof that Mr. Pineda left for
Honduras, but that was several months after this killing.
He didn't just leave town.  And the proof has shown that he
returned.

I want to talk a little bit about the tattoos.
As I understand the government's argument in this, it's that
tattoos equal murder.  And I don't think this slide could be
any more simple:  Tattoos do not equal murder.  We heard
proof that two of the leaders of this gang had MS-13
tattoos, but Mr. Avila did not know if they had killed
anyone.  And these are people that are actually in the
hierarchy.  These are sort of supposed to be the bosses of
the gang.  They've got the tattoos, and this witness is
telling you he doesn't know if they've killed anyone.

I think from that alone, you can conclude that
just because my client has an MS-13 tattoo does not equal
murder.

Lastly, are you going to base one of the most
important decisions of your life or would you base one of
the most important decisions of your life on these guys?
Can you trust them?

This is another one of the jury instructions that
the Judge is going to talk to you about, and I believe that
he's going to read this instruction to you, and I believe
this is an accurate depiction of that instruction.

"You've heard the testimony of several witnesses who are involved in some of the same crimes that some of the defendants are charged with committing. You should consider the witnesses' testimony with more caution than the testimony of other witnesses."

That means you need to weigh these guys much more carefully. You need to weigh whether you can trust them more carefully.

"Do not convict the defendant based on the unsupported testimony of such a witness standing alone unless you believe his testimony beyond a reasonable doubt."

"The fact that these witnesses pled guilty to a crime is not evidence that the defendant is guilty, and you cannot consider this against the defendant in any way."

You're going to get back there and you're going to go deliberate, and you're going to talk to each other, and I hope that you will respect one another's opinions and talk about the proof.

I personally want to thank you for your attention in this case. I feel like everyone has been very attentive, and that is greatly appreciated, I know, by the Court and by the parties. We're at that place in the trial where though you've been sitting there silently or taking notes, it's now your time to act and to think and to talk amongst yourselves about the case. And I urge you to be respectful of one

another, and to be logical, and try to put aside your anger and your emotions about these deaths, and to talk about this case in a logical way.

There's another instruction in here that the Judge is, I think, going to give you that says: "Do not ever change your mind just because the jurors, other jurors, see things differently or just get -- just to get the case over with. In the end, your vote must be exactly that: your own vote.

"It's important for you to reach a unanimous verdict, but only if you can do so honestly and in good conscience."

So if you get into that room back there, and you feel that the government has not met its burden of proof with respect to my client, Jose Pineda, it's your duty -- it's your duty not to simply go along with what everybody else thinks. If you find yourself alone in that position, it's your duty to my client to hold your ground.

I think when you consider the lack of evidence in this case, the lack of forensic evidence, physical evidence linking my client to the case, linking my client to these murders, when you consider what the government has offered, the testimony of these very problematic, very motivated witnesses who have lied again and again, I think you will have no -- you'll see no other way but to find my client not

1    guilty.

2            And I want you to go back there, and I want you

3    to check that box.

4            I thank you for your attention.

5            **THE COURT:**  All right.  Thank you, Mr. Hawkins.

6            All right.  And lastly folks, we will hear from

7    Mr. Hoff on behalf of the government.

8            **MR. HOFF:**  Thank you, Your Honor.

9            May I proceed, Your Honor?

10           **THE COURT:**  You may.

11           **MR. HOFF:**  Ladies and gentlemen, over these last

12   few hours, you've listened to the arguments of these defense

13   attorneys.  After hearing all of that, you would think that

14   these were just coincidences, that somehow these three men

15   are the unluckiest men in Nashville, that coincidence after

16   coincidence after coincidence somehow make them look guilty.

17           But after hearing those arguments, I'm wondering

18   if we all sat through the same trial, because you would

19   think that Defendant Tidwell being at the scene of two

20   murders on video just before they happened days apart,

21   that's a coincidence; that those murder weapons from both of

22   those murders being found in Defendant Flores's car, also

23   was coincidence; that the bullet found in Liliana

24   Rodriguez's arm was the same caliber and consistent with the

25   make that he used to commit that murder, also a coincidence;

1    that the MS-13 tattoos that are on these defendants' bodies,

2    that, too, is a coincidence.

3            But the testimony and the exhibits that you've

4    heard over these four weeks, those are not coincidences.

5    Those are facts, evidence and facts that prove when you look

6    at it all collectively, the guilt of each of these

7    defendants beyond a reasonable doubt.

8            Now, I want to address some of the defense

9    lawyers' arguments and look at the lack of common sense and

10   logic of those arguments.  Judge Richardson's going to tell

11   you the instructions you must follow to render a verdict in

12   this case, but I'm confident that one thing the Judge will

13   not tell you is to abandon your common sense and don't use

14   your logic, because by using your common sense, all of the

15   evidence in this case, when you look at it as a whole, shows

16   the guilt of these defendants.

17           And the defense can try and point you away from

18   that evidence, point you away from the proof, but I want to

19   keep -- I want you to keep in mind two things:  These

20   speculative theories that the defense just proposed, that's

21   not evidence.  What they cannot avoid is the overwhelming

22   evidence in this case, and none of that is a surprise.  The

23   goal is to focus your attention from the collective

24   evidence, focus on just a couple of things, small things.

25           And I'm not going to rehash or summarize all of

1    that evidence for you.  That's already been done.  And

2    truly, we thank you for your patience over these last four

3    weeks.  But I do need to address some of these arguments.

4            First, you've heard a lot about proof beyond a

5    reasonable doubt.  But proof beyond a reasonable doubt does

6    not mean proof beyond all doubt.  It does not mean proof

7    beyond a shadow of a doubt.  First, proof beyond a shadow of

8    a doubt, that's something that exists in movies and TV.

9    It's make believe and doesn't exist in the real legal world.

10           Second, possible doubts or doubts based purely on

11   speculation, that's not reasonable.  That's what the defense

12   is asking you to do.  Proof beyond a reasonable doubt, yes,

13   that's a high standard, a standard we embrace, that we will

14   meet.  It's applied every day in courtrooms across the

15   country.  Every criminal defendant who has been convicted at

16   trial has been convicted under this burden of proof.  It

17   does not require a leap of faith.

18           Second, use your reason, logic, and your good

19   judgment.  Use your common sense.  Each of these defense

20   lawyers tried to explain away certain facts by looking at

21   them one by one, one at a time in isolation, while blatantly

22   ignoring all of the other evidence.  You don't have that

23   luxury.  You don't have the luxury of willful blindness, the

24   ability to ignore that proof that you've heard over these

25   four weeks.  You have to look at it all at once.

1    Now, I want to start with the argument that MS-13

2  is not an enterprise.  First off, I want to address one

3  point:  The charged enterprise is MS-13.  It is not a clique

4  of MS-13.  It's MS-13 as a whole.  But the defense wants you

5  to think this is just a group of friends who hung out.  The

6  argument that MS-13 is not an enterprise, that doesn't make

7  sense.  Use your common sense.

8    And Mr. Ganguli told you this is a group with

9  zero capability.  Well, first off, I'll say this.  I think

10  Jorge Alvarado, Liliana Rodriguez, Ammerli Garcia, Jesus

11  Flores, Arling Laines, and their families, I think they

12  would certainly disagree that this is a group with zero

13  capability, that this was just a group of friends who hung

14  out.

15    They also told you no one took this seriously.

16  Well, you heard a lot of witnesses.  There were almost 70

17  witnesses.  We can tell you that law enforcement took them

18  seriously, because over the course of a period of time, they

19  were committing murders, shootings, robberies, drug

20  trafficking.  And let's be clear.  One of the things we do

21  have to prove is that MS-13 was or would be an enterprise.

22  They're associated for a common purpose.

23    You will also hear and you will hear from the

24  Judge what we have to prove, but you will also hear what we

25  don't have to prove to show that MS-13 is an enterprise.  We

1    don't need to prove a formal structure, a hierarchy, a chain

2    of command, fixed roles, regular meetings, dues, established

3    rules and regulations, disciplinary procedures, or

4    initiation ceremonies.  We don't have to prove any of those

5    things to show you that an enterprise exists.  But we did.

6    You heard testimony over the course of this trial of all of

7    those things.

8            When you hear the Judge's instructions, focus on

9    that because you'll hear, and there will be a list, and

10   every one of those things, you can check off: dues, chain of

11   command, fixed roles, regular meetings.  They had Sunday

12   mass where they would get together and talk about crimes:

13   who needed to be greenlit, who needed to be killed.  "Hey,

14   tell us, who did you kill?"  That's what was going on.

15           There's also testimony -- you also heard

16   testimony about the dues, and there was an argument, "We

17   don't know what these were used for."  That's not true.  You

18   heard what these dues were used for: buy guns, buy more

19   drugs, and give money to the MS-13 at large.

20           Those are things -- drug trafficking, sending

21   money to gang members in El Salvador, that's interstate

22   commerce.  This is a group that did that.

23           You also heard here's no longevity.

24           Ladies and gentlemen, you heard about a period of

25   time where they were selling drugs, then murders, then more

1    shootings, then more murders.  That's longevity.  It doesn't

2    need to be 25 years.  This is a period of time where this

3    group got together and committed those crimes enough to

4    prove that this is an enterprise.

5         There was also talk about a bogus clique, that

6    this was a bogus clique, but that's not what the testimony

7    was.  In fact, the testimony was that these defendants used

8    to be a part of a bogus clique.  But they had to be subsumed

9    by an actual MS-13 clique, TPLS.  That shows you an

10    enterprise.  The fact that you can't just run around saying

11    you're MS-13, you gotta to be legit, that's what happened.

12         The defense attorneys would have you think that

13    this was just some sorority or fraternity or guys getting

14    together to hang out.  But what sorority or fraternity do

15    you know that requires you to commit a murder to get a large

16    tattoo as your commitment to that organization?  Those

17    tattoos and what you need to earn them, that's a big

18    commitment to a group of friends.

19         And while you may have something to say to

20    someone who wears a shirt from your sorority or fraternity

21    and they're not involved, in MS-13, someone who insults the

22    gang, they get murdered, like Jesus Flores.  That's what

23    happens.

24         And it's clear from the testimony that, yes,

25    these defendants with their coconspirators, they were

friends.  We're not denying that.  Francisco Avila told you
that he and Defendant Pineda were close.  He helped his
friend, his homeboy, as he put it, dispose of the gun that
the defendant used to kill Liliana Rodriguez.

          He and Franklin Hernandez helped him by driving
him to Texas so that he could flee the country to avoid the
police.  Franklin Hernandez told you that he drove
Defendant Flores around after he was hot because he
committed two murders, that he helped him hide.  Yeah, maybe
they're good friends, but that also makes them
coconspirators.  They're coconspirators in this crime.

          And what else did they do?  They killed together,
they robbed together, they sold drugs together.

          Now, Detective Betts told you that MS-13 has been
around since the '80s.  It's a highly structured criminal
organization.  And what he told you about MS-13, all of that
is consistent with the TPLS clique.  They sent money to
El Salvador.  They belonged to an MS-13 program.  They sent
money not only to support their own clique members here, but
to support MS-13 members at large in El Salvador.

          They had the same rules, they held Sunday
meetings, they paid dues, all of that.  That's not
dysfunction, that is not disorganization; that is a highly
structured criminal enterprise.

          And over and over again, you heard they didn't

follow rules. Shocking, shocking that violent gang members
didn't follow the rules. And yes, these rules were broken.
And think about that. When someone breaks the rule of your
organization or an organization or a job, maybe that person
gets reprimanded, maybe they get fired. But in MS-13,
getting fired or getting reprimanded, that would be a gift
because when you break the rules in MS-13, you get beaten or
potentially worse. You get greenlit.

But breaking rules, the defense would have you
believe that's evidence that this was not an enterprise.
Exactly the opposite. To have rules, you need to have
structure. That is evidence of an enterprise. And when you
break the rules, you get beaten.

Francisco Avila told you over and over again, "I
got beaten for losing bullets. I bought drugs not from
Cabezon one time. I got beaten for that."

That is organization. That is structure.

And what was the one important rule that we know
they followed? You must kill chavalas. When you see them,
you do that.

It was celebrated. And why? Because it earned
you rank, you gained status, you gained respect. These
defendants, all three of them, hunted rivals to earn that
status, the letters and the respect of their fellow gang
members. And that didn't take much. You just needed to be

1    labeled a rival and that was enough.

2         A simple insult to MS-13 at Antioch Market was

3    enough to get gunned down while you're leaving the market.

4    And when the gang, these -- when the gang suspected Arling

5    Laines of having one foot in the gang and one foot with

6    rival drug dealers, he had to go.  So we know that was a

7    rule that they certainly followed.

8         Except in one case.  And there's a point made

9    about this.  That when Jose Pineda-Caceres killed Liliana

10   Rodriguez, he was following the rule.  He was hunting

11   chavalas.  That was his goal.  But he broke the rule with

12   his results.  And because his desire to kill a chavala to

13   gain his fellow clique members' respect, he shot the wrong

14   person.  This transgression, that's the only time that you

15   heard anyone cared about who got shot during the war against

16   the chavalas.  But they were not worried for Liliana or

17   Liliana's a family.  No.  They only cared about who they

18   killed when it affected the gang, when it affected

19   Defendant Pineda.

20        Because when he did that, he cried.  His mother

21   wailed.  You heard about that.  And it was also -- think

22   about this:  If someone else killed Liliana Rodriguez, you

23   didn't hear about anyone else crying.  It's because this

24   defendant did it.  He was upset because he thought they were

25   going to kill him.  He feared for his life, but not the

lives of anyone else. The gang was concerned, but they weren't sad for anyone but the gang.

A transgression, this one would normally require death. And Franklin Hernandez told you, "I thought we were going to kill him until the decision was made that for that mistake, let's hide him. Let's get him out of here. You gotta go cool down. Go to Honduras."

And you heard that Pineda told the gang, "I did this for the gang, and you guys now want to kill me?"

No, he was too valuable. He had already proved his worth. At that point, he had already earned his letters. So they said, all right, we'll take a different approach.

You also heard over and over again the defense attorneys attacking the cooperating witnesses. Now, that's not a surprise at all because the testimony of these witnesses, it's devastating.

Now, think about where these witnesses came from. Do you think that the government just chose to call violent gang members to the stand because they would make such great witnesses? Doesn't common sense tell you that we would have rather called a model citizen to the stand to tell you about these things? We would rather call -- but you can't. We can't do that. Obviously, a model citizen can't tell you what happens inside a transnational criminal street gang.

1    Compare the testimony of a model citizen like Tim

2 Brownlee.  He picks up the phone and calls the police when

3 he finds Jorge Alvarado lying dead in a field with gunshot

4 wounds.  Compare that with a witness like Oscar Delgado, who

5 picks up the phone to call his fellow gang members when he

6 sees chavalas that need to be killed.

7    No.  The defendants, they're the ones who chose

8 these witnesses because they trusted them.  They committed

9 crimes with them, crimes that furthered the gang.  These

10 defendants told these witnesses about these crimes because

11 it gained them the status they were seeking.  That's why

12 they told them: because that was what they needed to do,

13 kill chavalas.  They were celebrated for these things.  You

14 heard testimony about that over and over again.

15    They earned their letters together.  They were

16 jumped in together.

17    There was also a point made about Franklin

18 Hernandez earning his letters, killing someone.  But

19 Ms. Hood-Schneider glossed over the part that

20 Defendant Flores was with him when that happened.  He drove

21 him to commit that murder.  And he drove him there, and when

22 they got there, he said, "I'll do it."  But Hernandez wanted

23 his letters.  That's aiding and abetting.  That's a

24 racketeering act.  And he helped Franklin Hernandez earn his

25 letters in this gang.

1    You also heard that Defendant Tidwell trusted

2  Hernandez enough to tell him about the murders.  He told him

3  about these murders after he did them, after he helped kill

4  Ammerli Garcia-Munoz, after he killed Jesus Flores.

5    So while, yes, the government called these

6  witnesses, the defendants were the ones who made them

7  witnesses in the first place.  Your average person can't

8  just drop in and check in on misa.  Not going to happen.

9    Avila told you that oftentimes, even chequeos

10 couldn't do that, lower-ranking members.  You have to be a

11 member of MS-13 to know what's going on inside the

12 organization.  And yes, these gang members are -- they've

13 committed crimes.  You heard all about that.  But does that

14 make them inherently not believable?  Just the opposite,

15 because you know that's how they were privy to these crimes,

16 because they had inside information because they committed

17 these crimes with the defendants.  They sat through those

18 meetings.

19    So why spend so much time attacking them?  Let's

20 look at the arguments and the evidence in this case.  We

21 told you right up front at the beginning of trial:  You do

22 not have to like these witnesses.  They've done horrible

23 things.  They told you all about that.

24    But the reality is, as I said, you can't find a

25 comprehensive witness to these inner workings without

1    someone who did these things.

2           Do they have deals with the government?  Sure.
3    We didn't hide that.  Are they absolutely trying to spend
4    less time in prison and stay in the United States?  They
5    told you that's their hope, if they can.  But they told you
6    their cooperation agreements require them to do one thing,
7    each of them, and that's to tell the truth.  So let's
8    consider what's at stake for them.

9           They testified, they're facing their entire lives
10   in prison.  Francisco Avila told you, "I'm facing four life
11   sentences."  And defense counsel made much of this,
12   repeatedly asking them over and over again, "You hope to do
13   less time, you hope to get this?"

14          "Yeah, I hope to, but I don't know that I am."

15          But what they told you, again, to get those
16   breaks in those sentences, they have to do one thing,
17   according to their cooperation agreements.  But from the
18   attacks on these witnesses alone, you should be skeptical,
19   because you heard defense counsel stand up here and tell
20   you, "On one hand, you should believe them when they tell
21   you about all of the crimes they committed, that they were
22   truthful when they told you, 'I killed Jorge Alvarado,'
23   that, 'I killed Arling Laines.'"

24          They want you to believe that.  But on the other
25   hand, they also want you to believe that they were

untruthful when they tell you about the defendants'
involvement in these crimes.

They want you to believe that Francisco Avila
murdered Mr. Alvarado, that Hector Venturas provided the gun
for that murder.  They just didn't do it with Defendant
Pineda.

They want you to believe that Franklin Hernandez
murdered Arling Laines, shot him, put him in the trunk, and
poured gasoline on him; that Oscar Delgado set up his
friend, drove him to get murdered.  They just didn't do it
with Jorge Flores.

The defense wants you to believe these witnesses
when it comes to the crime these witnesses committed, just
don't believe them when they tell you about all of the
crimes my client committed.

Again, your job is not to abandon your good
judgment but to instead use your common sense.  And when you
do, that argument is illogical.

You also heard that Franklin Hernandez, he lied
to the police.  He told you that.  I think I lost track
of -- I lost count of how many times:  "Like I said, I was
not truthful in the first interview."

And they stand up here and say he lied on his
first interview.  He told you that.  He said that outright.
Many of them told you that.  "Yeah, I was not truthful when

1    I first spoke to the police."

2              Oscar Delgado said, "Well, I was scared of going

3    to jail and also the gang."  That's understandable now,

4    knowing what we've heard.

5              The other thing defense counsel wants you to do

6    is focus on insignificant details.  Because if you focus on

7    insignificant details in a vacuum, it focuses your attention

8    away from all of the proof.  Was Jorge Alvarado wearing a

9    white shirt or a black shirt?  Was his hair long or was it

10   short?  The intent is to focus you away from the devastating

11   details of what actually happened.

12             You know one thing that was consistent?  That

13   Defendant Pineda was the one who lured the victim to his

14   death.  Now, there's -- was it a robbery?  Was he smoking

15   marijuana?  Maybe he told them both, but you didn't hear

16   that anyone else drove him to that scene.  It was --

17   Defendant Pineda was the one who picked up Mr. Alvarado and

18   picked up all of his other gang members so they could earn

19   their letters.

20             Was the car an Impala, was it an Infiniti?  Well,

21   that's insignificant.  Did anyone come in here -- did you

22   hear any of the witnesses tell you that anyone other than

23   Defendant Pineda shot Liliana Rodriguez?  No, because that

24   was consistent throughout.  That detail is not

25   insignificant.

Was the truck white, was it silver?  That's an insignificant detail as well.  Also, you've seen the video of the truck.  There's no question, and plenty of people told you about that.  Focus on the significant details, that each witness who testified about that murder, about Ammerli Garcia-Munoz's murder, told you the same thing: that Defendant Flores and Defendant Tidwell shot him, and that afterwards, they got their letters.

Did anyone tell you that other than a simple exchange, what should have been a simple exchange at the Antioch Market, that should have been insignificant but it wasn't.  It turned into a very significant incident.

And the truth of that was significant because each witness that told you about that who had knowledge of that told you the same thing, that when Kevin Tidwell felt insulted, when his gang was insulted, they gunned them down.  They gunned down Jesus Flores.  They tried to gun down his friend who saw the defendant, Tidwell, shooting at him.

And again, every person who told you what happened to Arling Laines told you the same significant details.  They drove him out to Harrold and Radford Drive, shot him in the trunk, and lit the car with his body on fire.  Those are significant.

Don't focus on small little details in a vacuum.  You have to look at all of it.  It's also not weird that

certain insignificant details differ.  Use your common sense.  Wouldn't it be more concerning if every one of these witnesses got up here and told you the exact same story word for word?  That would be noteworthy.  That would be suspicious.

Also, if this was some coordinated lying contest, wouldn't it have been much better if this was tell the government everything the government wants to hear, why didn't each one of these witnesses get up there and check off every element of every crime that the Judge is going to instruct you on?

If they were so motivated to lie, why not just say, "He confessed to me," or "I was driving alongside Jose Pineda when he shot Liliana Rodriguez," that they saw the defendants pull the trigger in each murder.  Because they can't tell you that because they told you what they heard, what they knew, and what they saw.  If they were going to lie, common sense tells you they would lie better.

If they were so eager to please the government, why not just say -- why not Franklin Hernandez and Francisco Avila say, "Yeah, when we pulled up in the parking lot of Bola Ocho" -- because they were there that night; they told you that -- "we saw them gunning him down."

Because that's not what they saw.  But you don't have to just listen to them.  They gave you different

1  experiences but they all shared the same core details.

2       And here's the point:  If the witnesses wanted to

3  lie to friend the defendants, they could have said anything

4  they wanted under the sun.  Instead, were these defendants

5  more involved in crimes?  They told you that.  When a

6  defendant wasn't involved, they said that too.  They

7  testified about crimes they committed that the defendants

8  weren't involved in.

9       And what about their testimony about themselves?

10  Did they try to make themselves look better than they really

11  are?  I mean, you heard the testimony.  I don't think that

12  was the case, not at all.

13       But look, the defense attorneys want to focus on

14  four witnesses, four witnesses in this case.  There were

15  almost 70 witnesses that testified before you.  Don't just

16  focus on those four witnesses.  And yes, Mr. Hawkins is

17  right:  You should look at those witnesses with great care.

18  Look at what they said.  Compare it with the other evidence

19  in this case.  You should cross-check them.

20       The Judge will tell you that you should look at

21  their testimony with more caution.  And this is our burden,

22  a burden we embrace, so we are asking you to do that.

23       But again, it's just not these witnesses.  There

24  is overwhelming other evidence that corroborates all of

25  this.

1    And the defense lawyers can stand up here and

2  spend hours on calling these witnesses liars, but they truly

3  cannot explain all of the consistencies and all of the other

4  evidence that lines up in this case.  They just can't do it,

5  because it's not coincidences, they're facts.

6    Let's look at the testimony of Cindy Hernandez

7  who, again, certainly didn't want to be here.  I think she

8  made that clear.  But she saw Defendants Flores and Tidwell

9  just outside of Bola Ocho just before he was murdered,

10  minutes before he was murdered.  She saw the photo of them

11  outside the Antioch Market just before Jesus Flores was

12  killed.

13    How about Janet Salgado?  She told you what she

14  saw, that Defendant Flores was driving a gray F-150 around

15  the time of the murder of Jesus.  Her former boyfriend told

16  her that he shot Flores and that the gun would never be

17  found.  That's what she said.

18    Well, we know one thing.  That gun was found, and

19  it was found in Defendant Flores's car.  So he was wrong

20  about one thing.

21    And again, we know we've looked at the ballistics

22  evidence as well.  The cartridge casings from those murders

23  match -- were compared with the cartridge casings from both

24  murders and the guns in his car, and a firearms examiner

25  told you that they were fired from the same firearm.

            What about the testimony that Smiley drove?
Smiley drove for Liliana's murder.  Well, who was pulled
over in a black Infiniti that Eduardo Nava described during
a 911 call?  Smiley.  You can't ignore that.  Now, defense
counsel says was it white, was it black?  But you can't
ignore the fact that Smiley, the driver, everyone who told
you was the driver, was pulled over in that car.  The
corroboration is everywhere.

            There's also been -- Mr. Hawkins puts up a
picture of a black hole and says there's a lack of forensic
evidence, there's a lack of physical evidence.

            That's just not the case.  It's not a black hole.
The only hole in this case, the holes that you've heard
about, are bullet holes in victims, cars, nightclubs.

            There's not a lack of physical evidence.  There's
not a lack of forensic evidence.  And if there is a lack of
forensic evidence, think about why that is.  Because these
defendants tried to get rid of it.  They buried guns, they
threw guns in rivers, they dismantled guns, they burned
cars, they burned trucks, they burned Arling Laines.

            That's -- when there's a lack of physical
evidence, it's because these defendants obstructed justice
to get rid of that evidence.  That was their goal, avoid
getting caught.  But let's talk about what the physical and
forensic evidence that counsel says doesn't exist.

 1          Franklin Hernandez and Hector Venturas told you

 2     that JoJo used a .45 to commit the murder of Jorge Alvarado.

 3     Franklin Hernandez told you, "I got rid of the guns.  I

 4     threw them in the river."  He knew that.

 5          Only .45 caliber casings are recovered from that

 6     scene.  That's consistent with the evidence.  There's only

 7     casings from one gun because the other two are revolvers,

 8     and we know that they don't leave casings.  That's physical

 9     evidence.  So when they stand up here and tell you there's

10     no physical evidence, that's physical evidence.  It's

11     independent evidence of the witnesses.

12          Also, shots to the victim's back.  That is

13     physical evidence.  He's running away in a dark field.

14     Francisco Avila said they were shooting at him, heard him

15     yell, and then they left.  That's physical evidence that

16     corroborates what these witnesses told you.

17          There's also a blood trail that is consistent

18     with that.  Francisco Avila also told you that he lent his

19     Smith & Wesson .40 caliber gun to Defendant Pineda because

20     he needed a gun.  Didn't have a gun.  Avila had two.  Sure,

21     he was looking out for his coconspirator, his fellow gang

22     member.

23          But they say there's no ballistic evidence in

24     this case, so you should find my client not guilty because

25     of that.

 1          But that's just not true.

 2          Mr. Hawkins would have you believe that, well,

 3     there's no DNA or fingerprint evidence in this case.  It's a

 4     drive-by shooting.  What kind of DNA, fingerprint evidence

 5     is left on the victim's car in a drive-by shooting?

 6          But again, let's look at the forensic evidence.

 7     What was found in Liliana Rodriguez's body?  A .40 caliber

 8     bullet consistent with the gun that you heard he used in

 9     this murder.  That's physical and forensic evidence.  So --

10     and it just so happens that it's consistent with a

11     Smith & Wesson.  That's some pretty good guesswork by

12     Francisco Avila.  Those are facts.  Don't be distracted from

13     those.

14          You also have to look at the testimony regarding

15     the murders of Ammerli Garcia-Munoz and Jesus Flores.  What

16     about the forensic evidence that supports that?  You heard

17     the testimony of Kimberly Caceres, right?  I'm not going to

18     go through it all again, but Defendant Flores got his MS-13

19     tattoo after this.

20          So when Mr. Hawkins tells you tattoos don't equal

21     murder, no one said that.  Every witness who stood up there

22     from MS-13 told you -- what do you do to get your letters?

23     To quote Franklin Avila:  "To earn your letters, you must

24     kill."  And Avila said, "I don't know if Ochoa and Sandoval

25     killed.  I don't know.  They had their letters."

1    But that's not -- that's not what happened.
2    That's not -- what they're telling you, that that doesn't
3    equal murder, no one told you that.  Every single member who
4    stood up there told you that's what you have to do.
5    You just -- the defense just simply cannot
6    explain away all of the consistent physical, other witness
7    testimony and the physical evidence with the consistencies
8    of the cooperating witnesses.
9    And again, you heard testimony from several
10   firearms examiners and, trust us, we know there were many.
11   I'm sure you're tired of hearing about class and individual
12   characteristics.  We recognize that.  But when you commit so
13   many shootings and you commit so many homicides with
14   firearms, you tend to leave a lot of ballistics evidence.
15   I'm not going to go and rehash all of that, but
16   what you heard about this, this ballistics evidence, what
17   does that tell you?  This independent evidence is consistent
18   with the witnesses.  So the reality is, the lawyers simply
19   cannot explain how each witness supposedly lied to you but
20   did it consistently, consistent with all of the other
21   evidence in this case.
22   When you evaluate the evidence and the testimony
23   of all of the witnesses in this case, all of them and look
24   at it as a whole, think:  Are these important or unimportant
25   details?  Are these coincidences?  And when you look at it,

1    you'll be convinced beyond a reasonable doubt that these are

2    not coincidences.  These defendants are not just unlucky

3    men.  They're guilty beyond a reasonable doubt.

4            You also heard over and over again that these

5    crimes were committed for personal gain.  They're not part

6    of MS-13.  Well, that's one point I agree with

7    Ms. Hood-Schneider on.  There was some personal gain to

8    these.  That's for sure.  The personal gain was to earn your

9    respect and to earn your letters.  That's it.

10            But the fact that it wasn't related in any way to

11   MS-13, again, use your common sense.  That's illogical.  If

12   it's not related to MS-13, why would you get an MS-13 tattoo

13   for it?  If it's not related to MS-13, why would an insult

14   to the gang cause you to murder someone?  If it's not

15   significant to MS-13, then why do you care if Arling Laines

16   is associated with rival gang members?  If it's not

17   associated with MS-13, why do you need to kill rival drug

18   dealers in the bar?  Because it impacted their drug trade.

19   Those are all related to MS-13, and anyone that tells you

20   otherwise wasn't listening to the testimony, because each

21   and every one of these was related.

22            The defense just wants you to believe these are

23   just run-of-the-mill murders, totally unrelated to MS-13.

24   Well, one thing we don't have to prove is that MS-13

25   sanctioned these murders.  And that -- you heard a lot of

1    questions about that, defense counsel made that argument,

2    that they just didn't get approval.  Well, let's look at

3    what you heard over the course of this trial.

4            One thing that the government has to prove is

5    that the purpose of these murders for VICAR murder is that

6    the defendant did them to gain entrance to, or to maintain

7    or increase their position in the enterprise.  And you heard

8    arguments about that.

9            One of the things you're also going to hear is

10   that this can be shown if a defendant committed that crime

11   because he knew it was expected of him by reason of his

12   membership in the enterprise, or if he committed that crime,

13   because he thought it would enhance his position or prestige

14   within the enterprise, because it was expected of him.

15           Every person in this conspiracy knew what the

16   purpose was, what the goal was: kill chavalas.  Francisco

17   Avila told you, what's the purpose?  To wipe out the

18   chavalas.  You learn that when you join this gang.

19           And each one of these defendants took steps to

20   win that war.  That's what the purpose were -- of each of

21   these were.  They don't need to be sanctioned.  That is not

22   a requirement.

23           And you heard a motive for every single one of

24   these, and every single one required a motive.  It was to

25   earn letters, the ultimate status symbol, to further the

purpose, kill chavalas.  Each time this murder was done, it
was reported back to leadership so that they could be --
they could get credit for it.  They were committed to uphold
the reputation of the gang and to take out those who failed
to show commitment.

And in the end, when Jorge Flores couldn't be
outdone by a double murder committed by his fellow gang
members, he and Franklin Hernandez basically played eeny,
meeny, miny, moe to figure out who the next victim was.
They went through a list of them all because Defendant
Flores needed more status.  He could not be outdone.

Also what else did you hear?  There's an open
green light on chavalas.  Yeah, try and get permission, but
if you have the chance, you go for it.  You don't pass up
that chance.  Franklin Hernandez told you it's always a go
if it's a rival.

So when you hear these assertions that there was
no authorization to kill chavalas, that's expected of you in
MS-13.  Detectives Betts told you the same thing.

I also want to address some of these other
points.  Mr. Ganguli said many things, they did on their
own.  Yeah, we just talked about that, that Arling Laines
was killed over a $100 drug debt.  That's not what the
testimony was.  He was lured over a $100 drug debt.  He was
lured to his death.  But that's not why he was killed.  In

fact, I think the argument was, Hansy Sanchez, he was shot because he stole a client. That just goes to exactly what we told you. If you stole a client, that threatened the gang's drug trade.

That's not what the testimony was, but even if that were to be true, even if you believe that, it still is MS-13-related.

When you look at who heard what and from who, remember that. Remember that people heard things from different people, and that's why the stories are the way they are. But you compare that with all of the other evidence.

You also heard there's little evidence that Roberto Viera was even shot. Well, did you look at the pictures from the car? There's blood all over the seat. They said, well, that doesn't make any sense. They weren't trying to do anything to him. And they didn't say why on the jail call would they be looking for him? Well, because they didn't achieve the goal. They didn't kill him. They only shot him.

We don't have to speculate what happened. You heard what happened.

You also heard, as far as Arling Laines, that this is what happens when you don't heed orders. That's what Luis Colindres told Oscar Delgado as they drove away

1    from the shooting.  That is an MS-13-related murder.

2        Each one of these crimes committed by the

3    defendants in this case were related to MS-13 and the RICO

4    conspiracy.  Each one of these murders is a racketeering

5    act.  Each one of these attempted murders is a racketeering

6    act.  Each time they burn a car, dispose of evidence, that

7    is a racketeering act.  The robberies they committed, those

8    are racketeering acts.  They're all related.

9        So when you look at all of the evidence in this

10   case, did the cooperators just get lucky with all of the

11   other witnesses?  Does that make sense?  Does it just so

12   happen that all of the evidence in this case is consistent,

13   that the guns testified were used in these crimes just

14   happened to be consistent with the ballistics evidence; that

15   the witness testimony was consistent with each other:  Cindy

16   Hernandez, Janet Salgado, Luis Rosario.  The other victims

17   in this case:  Hansy Sanchez, Luis Antunez Vasquez.

18       It just so happens to be consistent with the cell

19   site records; the jail calls; the crime scene evidence; the

20   car dealer records, they were Luis Colindres's car; the

21   Facebook records; that Jose Pineda was out of the country;

22   the videos from Bola Ocho; the videos from the supermarket

23   and the Waffle House; the law enforcement witnesses; the

24   injuries to Defendant Flores's hands; the burned cars.

25   Because that is some amazing guesswork by everyone involved.

1          Ladies and gentlemen, I want to leave you with

2    one final point.  The defense lawyers would have you believe

3    that their clients weren't members of MS-13, but we know

4    that's not true.  You've seen the evidence.  And they

5    weren't members of a violent international street gang, but

6    even if they were, they somehow lacked the motivation and

7    the involvement in their clique's greatest successes.  The

8    killing of these victims, that they were just a group of

9    friends in the wrong place at the wrong time who just -- old

10   neighborhood friends, the three unluckiest men in Nashville.

11         But that is not what the evidence shows in this

12   case.  The evidence shows that these defendants participated

13   in a coordinated sophisticated conspiracy to wage war on

14   those who stood in the way of the gang, to wage war on their

15   rivals, to kill those victims who for no other reason would

16   gain them status in the gang.  That was the reason.

17         And that is enough for you to find them guilty

18   beyond a reasonable doubt because of that purpose.  That is

19   what they do.

20         It matters what they did over the course of this

21   conspiracy.  They killed because they wanted to be

22   respected, because they wanted to be recognized as members

23   of this enterprise, of this violent gang.  And in their

24   gang, these three defendants, each one of them were

25   celebrated for these murders.  They achieved their goal.

1          And now you've seen the testimony and you've

2    heard the evidence over these last few weeks, and based on

3    that evidence and having been here the entire time, you can

4    leave here confident and comforted in a verdict that finds

5    these defendants guilty of every count in the indictment.

6          Based on the evidence, you can leave here

7    confident and comfortable that you gave justice to Jorge

8    Alvarado, Liliana Rodriguez, Ammerli Garcia-Munoz, Jesus

9    Flores, Arling Laines, and their families.

10          Ladies and gentlemen, it is your duty to return

11   the only verdict that is consistent with the evidence in

12   this case.  And that verdict is guilty on each and every

13   count.

14          **THE COURT:**  All right.  Thank you, Mr. Hoff.

15          Okay.  So, folks, obviously, you've done

16   important work today so far listening to the comments of

17   counsel.  And as we're towards the end of the week, we will

18   start again anew Monday morning rather than proceeding to

19   jury instructions this afternoon.

20          So here's how we're going to proceed.  We'll

21   dismiss you in a moment.  And as I've said so many times, it

22   is important, and remains especially important now over the

23   weekend break with the trial being concluded but for

24   instructions and deliberations, for you to again not speak

25   about this case and not research or investigate it in any

1    way.

2              Come back Monday, 9:00 a.m.  We will give the

3    instructions, and then we will dismiss you to deliberate in

4    the jury deliberation room.  There is important work for you

5    to do still, of course, but the Court is appreciative of

6    your efforts so far throughout this trial.

7              All right.  With that, if you would please feel

8    free to step down at this time, and we will see you Monday.

9    Report no later than 9:00 a.m., please.

10             (WHEREUPON, the jury was excused from the

11   courtroom at 2:56 p.m., with matters being heard in open

12   court as follows:)

13             **THE COURT:**  All right.  Thank you, folks.  Please

14   be seated.

15             All right.  A couple of things.  We plan to

16   e-mail you in a bit here.  We're really done with a revised

17   version of a proposed charge except for fixing the Table of

18   Contents, in terms of the page numbers, especially.

19             One thing, it seems to me that maybe we just

20   delete the page regarding defense theory.  I haven't seen

21   any language.  I think, from the closing arguments, that

22   jurors know the defense theory because counsel was able to

23   lay it out.

24             Anyone want to propose language for a defense

25   theory?

         All right.  Don't see any hands.  And here's
another reminder about the verdict form.  We'll look at it
over the weekend, and we'll be prepared to have the proposed
verdict form if we come back, I'm thinking, 8:30 Monday
morning.

         One final point.  I had put down an order about
how we would handle objections to coconspirator statements
when any that were objected to were admitted subject to a
later finding that the requirements for admission of
coconspirator statements were satisfied.  What I would like
counsel to do, consistent with what I had laid out, is
review their notes on this.  And happy to talk at 8:30 if
anyone wants to reraise one of those objections and assert
that the jury should be instructed to disregard a particular
answer, in which case I can do that as part of my
instructions.

         I think we only had a couple or three objections
during trial.  Counsel is free to reraise those or abandon
those objections as they see fit.  But under our
methodology, counsel are still able to do that and it's not
too late to instruct the jury together with the other
instructions about disregarding any testimony.

         Of course, on this side of the testimony, all of
the government's evidence is in and, you know, the Court is
dealing only with the standard that the elements of the

1  coconspirator exception be satisfied by showing sufficient

2  to support those elements.

3         So Monday morning at 8:30.  If counsel want to

4  reraise that, we'll talk about it and the Court will make a

5  decision.  And counsel, of course, can also, you know, let

6  those objections go if they wish to do so.

7         All right.  From the perspective of the

8  government, anything that we need to talk about pending sort

9  of each side doing a little work this weekend on those

10  things that remain, which really is the verdict form and

11  taking a look at the Court's proposed charge?

12         Anything, Mr. Safeeullah?

13         **MR. SAFEEULLAH:**  No, Your Honor.

14         **THE COURT:**  Thank you.  Anything from any

15  defendants?

16         **MR. GANGULI:**  Your Honor, would you please tell

17  the jury that Mr. Gulotta will be here during deliberations,

18  only?

19         **THE COURT:**  Yeah, I will definitely put that on

20  the list to advise them when they come in.  So when they

21  come in, I'll say you might note that if counsel is absent,

22  there's a good reason and that it's not at all reflective of

23  anything, certainly not reflective that counsel does not

24  continue to represent and stand behind the client.

25         Yes, Mr. Lucas?

1     **MR. LUCAS:**  Same thing, Your Honor.

2          **THE COURT:**  Yes, sir.  We'll make sure that that

3     gets done when they come in on Monday morning.

4          You know, we'll talk about it now.  This isn't

5     going to come as a surprise to counsel but what we'll do is

6     the following:  Obviously we need to respond to notes, and I

7     do have one note that we had mentioned earlier:  "Was the

8     testimonies this witness gave to the Courts written by him

9     or translated to paper for him?"  And this was a note signed

10    by a juror by the number.  We shared that with counsel.

11         Since it was a juror note, I'll treat it like it

12    came from the foreperson unless anyone objects.  And I don't

13    think it will come as a surprise to counsel that the Court's

14    response would be something along the lines of, hey, the

15    Court needs -- the jury needs to evaluate the testimony

16    based on what it saw and heard in court.  Just leave it at

17    that.

18         If we have additional notes, I'd only require one

19    counsel to be here to discuss it.  If we get juror notes, be

20    it regarding a verdict or a question, you know, I'm sure

21    you'll make sure that Ms. Jackson has the best contact

22    information.  If you're within 15 minutes, that should be

23    fine.  Only one counsel per defendant is required, although

24    both, of course, are welcome.

25         And while you're getting over here, the Court

```
 1   will work on its proposed response, and we'll prepare a
 2   proposed response to review with counsel.
 3           Again, I think if you're within 15 minutes, that
 4   should be fine.  I know that's kind of easier for the
 5   government to meet.  And if defense counsel was, you know,
 6   sort of located as close as the government, I might put a
 7   tighter time frame on that, but typically I'll give about
 8   15 minutes as an expectation.
 9           Okay.  If nothing further then, the to-do list is
10   to keep an eye out for the Court's proposed charge.  We'll
11   send it redlined against the most recent version you've seen
12   for your convenience.  We will look for a proposed revised
13   verdict form from counsel.  It may come from the government,
14   I suppose, with defense counsel copied, but one way or the
15   other, proposed revisions from counsel would be helpful.
16           All right.  If nothing further, thank you to
17   everyone for their efforts during this trial.
18           And we will stand in recess.  Have a good
19   weekend.
20           (WHEREUPON, the foregoing proceedings were
21   adjourned for the day at 3:04 p.m., to be resumed
22   May 1, 2023, at 8:30 a.m.)
23
24
25
```

REPORTER'S CERTIFICATE

          I, Deborah K. Watson, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

          That I reported on the Stenograph machine the proceedings held in open court on April 28, 2023, in the matter of *UNITED STATES OF AMERICA vs. JORGE FLORES, ET AL.*, Case No. 3:18-cr-00293; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Trial Volume 16 of 18, pages 1 through 164) is a true and accurate record of said proceedings.

          This the <u>24th</u> day of <u>July</u>, 2023.


                              /s/ Deborah K. Watson
                              DEBORAH K. WATSON, RPR, CRR
                              Official Court Reporter